```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                         WACO DIVISION

3    TEXTRON INNOVATIONS INC.*
                            *      April 18, 2023
4    VS.                    *
                            * CIVIL ACTION NO. 6:21-CV-740
5    SZ DJI TECHNOLOGY CO., *
       LTD. ET AL           *
6
            BEFORE THE HONORABLE ALAN D ALBRIGHT
7                  JURY TRIAL PROCEEDINGS
                      Volume 2 of 5
8
     APPEARANCES:
9
     For the Plaintiff:  Kurt Pankratz, Esq.
10                        Morgan G. Mayne, Esq.
                          Harrison Rich, Esq.
11                        Emily M. Deer, Esq.
                          Baker Botts
12                        2001 Ross Ave., Suite 900
                          Dallas, TX 75206
13
                          Kevin J. Meek, Esq.
14                        Mark A. Speegle, Esq.
                          Lance Joseph Goodman, Esq.
15                        Boyang Zhang, Esq.
                          Baker Botts, LLP
16                        98 San Jacinto Blvd., Suite 1500
                          Austin, TX 78701
17
                          Mark Siegmund, Esq.
18                        Cherry Johnson Siegmund James, PLLC
                          The Roosevelt Tower
19                        400 Austin Avenue, 9th Floor
                          Waco, Texas 76701
20
     For the Defendant:  J. Michael Jakes, Esq.
21                        Qingyu Yin, Esq.
                          Sydney Kestle, Esq.
22                        Finnegan Henderson Farabow Garrett
                            & Dunner LLP
23                        901 New York Ave. Nw
                          Washington, DC 20001
24

25
```

```
 1                          Benjamin R. Schlesinger, Esq.
                            Robert High, Esq.
 2                          Finnegan Henderson Farabow Garrett
                              & Dunner LLP
 3                          271 17th St Nw, Suite 1400
                            Atlanta, GA 30363
 4
                            Jacob Schroeder, Esq.
 5                          Finnegan Henderson Farabow Garrett
                              & Dunner LLP
 6                          Stanford Research Park
                            3300 Hillview Avenue, 2nd Floor
 7                          Palo Alto, CA 94304

 8                          John P. Palmer, Esq.
                            Jacqueline Altman, Esq.
 9                          Naman Howell Smith & Lee
                            P.O. Box 1470
10                          Waco, TX 76703-1470

11   Court Reporter:        Kristie M. Davis, CRR, RMR
                            PO Box 20994
12                          Waco, Texas 76702-0994
                            (254) 340-6114
13

14      Proceedings recorded by mechanical stenography,

15   transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

01:29  15

01:29  16

| | | |
|---|---|---|
| 07:52 | 1 | (Hearing begins.) |
| 08:37 | 2 | THE BAILIFF:  All rise. |
| 08:37 | 3 | THE COURT:  Thank you.  You may be |
| 08:37 | 4 | seated. |
| 08:37 | 5 | I'm happy to take up whatever y'all have. |
| 08:37 | 6 | Yes, sir. |
| 08:37 | 7 | MR. SIEGMUND:  Good morning, Your Honor. |
| 08:37 | 8 | Mark Siegmund on behalf of the plaintiff. |
| 08:37 | 9 | First, some good news:  We did just |
| 08:37 | 10 | resolve one of the disputes. |
| 08:37 | 11 | THE COURT:  I can't believe you wore a |
| 08:37 | 12 | yellow tie. |
| 08:37 | 13 | MR. SIEGMUND:  I know.  Even with all |
| 08:37 | 14 | your comments on it, I know. |
| 08:37 | 15 | So we did resolve the disputes to DTX-84 |
| 08:37 | 16 | through 91.  So that's now resolved. |
| 08:37 | 17 | So I think I only have one dispute to |
| 08:37 | 18 | take up.  And if I could approach real quick, I'll just |
| 08:37 | 19 | show you the slide. |
| 08:37 | 20 | THE COURT:  Sure. |
| | 21 | MR. SIEGMUND:  Okay. |
| 08:38 | 22 | THE COURT:  This is DDX-2-76, and I think |
| 08:38 | 23 | I've seen this before or something like it. |
| 08:38 | 24 | MR. SIEGMUND:  Something pretty similar, |
| 08:38 | 25 | Your Honor, that's correct.  So this -- we believe that |

08:38  1    this is improper.  You don't compare figures, and

08:38  2    that's not how you do a prior art analysis.

08:38  3              More importantly, in his expert report he

08:38  4    does not do that.  So it's not in his expert report

08:38  5    comparing the two figures together.  We think it's

08:38  6    improper anyways.

08:38  7              THE COURT:  Okay.  Well, why don't you

08:38  8    tell me where in the report he has this?

08:38  9              MR. HIGH:  Thank you, Your Honor.

08:38  10             He -- this slide isn't being used to

08:38  11   compare the figures; it's just being used to set the

08:38  12   level overview.

08:38  13             THE COURT:  I just need to know where he

08:38  14   says something in his report that compares Figure 4 to

08:38  15   the patent -- '909 patent, Figure 1.

08:39  16             MR. HIGH:  I don't think that exact

08:39  17   comparison happens in his report, Your Honor.

08:39  18             THE COURT:  Okay.  And what is it that he

08:39  19   would say about it?

08:39  20             MR. HIGH:  He's just using this slide to

08:39  21   discuss at a high level what the patent and the prior

08:39  22   art are about, and his limitation-by-limitation

08:39  23   analysis comes later.

08:39  24             THE COURT:  Yeah.  My problem is, again,

08:39  25   that if it's not in his report -- I'm going to exclude

08:39  1    it if it's not in his report.

08:39  2              It seems to me -- and, you know, the

08:39  3    problem is if there's nothing -- if there's nothing

08:39  4    where -- I see reports as being notice, and if this --

08:39  5    if they haven't had an opportunity to ask him in

08:39  6    advance of trial to explain this at a deposition, you

08:39  7    know, if there's something in the report that put them

08:39  8    on notice of this, I'm happy to hear it.

08:39  9              MR. HIGH:  So he does have a section with

08:39 10    a summary of the patent and with a summary of the prior

08:40 11    art reference that's referenced in this slide.

08:40 12              THE COURT:  And tell me anywhere where

08:40 13    you think in here it gave them notice of -- that you

08:40 14    would make this comparison in a way that would prepare

08:40 15    them to handle this on cross and to have something in

08:40 16    their expert's report about it.

08:40 17              MR. HIGH:  Sure.  So --

08:40 18              THE COURT:  If there's something in there

08:40 19    that puts them on notice, that's what I'm seeking.

08:40 20              MR. HIGH:  So Paragraph 56 does include

08:40 21    Figure 4 as a summary of Frink, and he discusses

08:40 22    Figure 1 of the patent in different sections, and then

08:40 23    goes into his invalidity analysis as to why he believes

08:40 24    that Frink invalidates the claims of the '909 patent.

08:40 25              So you don't see the two figures side by

331

08:40  1    side, but he discusses Frink using Figure 4, and he

08:40  2    discusses the summary of the '909 patent as well

08:41  3    mentioning this portion.

08:41  4                    THE COURT:  Okay.  And then let me hear

08:41  5    from counsel for plaintiff.

08:41  6                    Are you going to object to any comparison

08:41  7    that they make between Figure 1 in the '909 patent and

08:41  8    Figure 4 in Frink?

08:41  9                    MR. SIEGMUND:  If they're doing it like

08:41  10   that, Your Honor, yes.  If they're going to do it where

08:41  11   he's talking about, hey, here's Figure 1 of the '909

08:41  12   patent, here's Figure 4 of the Frink patent later on

08:41  13   and he's not just basically sticking the two on top of

08:41  14   each other, no, I don't think that would be improper.

08:41  15                    But that slide in their suggestion, the

08:41  16   way they're doing, it is improper.  And he does not do

08:41  17   that in his expert report, as you just heard.  That's

08:41  18   our problem with it.

08:41  19                    THE COURT:  I'm going to -- let me make

08:41  20   clear.  I'm going to try and make it as clear as I can.

08:41  21   I'm going to exclude this slide.  I'm not excluding --

08:41  22   I'm not prohibiting the defendant from using Figure 1

08:41  23   in the '909 patent or the figures in Frink during

08:42  24   his -- during your expert's direct.

08:42  25                    I just -- I am not going to allow you to

332

08:42  1    do it in a manner that compares it as directly as this

08:42  2    in the manner that it does.  Is that clear?

08:42  3                   MR. SCHROEDER:  Your Honor, just one

08:42  4    quick question so that I'm clear on that.  Is it that

08:42  5    they just can't be on the same slide?

08:42  6                   THE COURT:  Yes.

08:42  7                   MR. SCHROEDER:  Okay.

08:42  8                   THE COURT:  Right.  Okay.

08:42  9                   MR. SPEEGLE:  Your Honor, Mark Speegle

08:42  10   for the plaintiff.  We have one more objection to an

08:42  11   exhibit of Mr. Oushana.  May I bring it up?

08:42  12                   THE COURT:  Sure.  And this is also their

08:42  13   validity expert?

08:42  14                   MR. SPEEGLE:  No.  This is a fact witness

08:42  15   for DJI.

08:42  16                   THE COURT:  Oh, okay.

08:42  17                   MR. SPEEGLE:  And we don't have a problem

08:42  18   with the document there as a demonstrative, but we

08:42  19   don't think -- we think there's a hearsay problem with

08:42  20   putting DJI's own press release up and DJI saying that

08:43  21   its press release is true and accurate.  That seems

08:43  22   like a hearsay use of it, and we're not sure how

08:43  23   they're going to get over cross authenticity or any of

08:43  24   the other issues with using this.

08:43  25                   THE COURT:  Is there a reason you want

08:43    1    this in evidence?

08:43    2                    MR. HIGH:  Your Honor, we're not planning

08:43    3    to introduce this for the truth of the matter asserted.

08:43    4    It's being used for a non-hearsay purpose, just as a

08:43    5    statement of DJI's policy and --

08:43    6                    THE COURT:  Yes.  I'll allow you to use

08:43    7    it as a demonstrative.

         8                    MR. HIGH:  Thank you, Your Honor.

08:43    9                    THE COURT:  Which means only that the

08:43    10   jury won't have it when they go back.

08:43    11                   MR. HIGH:  Thank you.

08:43    12                   THE COURT:  You bet.

08:43    13                   Anything else?

08:43    14                   MR. SIEGMUND:  That's it, Your Honor.

08:43    15                   THE COURT:  Okey dokey.

08:43    16                   Then here's what we'll do:  If you all

08:43    17   will sort of stay in place when all the jury's here,

08:43    18   we'll get started just as soon as the jury's all here,

08:43    19   which may not be until 9:00, but Waco juries tend to

08:43    20   get here early and so -- which is a good thing.

08:43    21                   So as soon as they're here, I'll have

08:43    22   Becca give you a heads-up, and we'll get started.

08:44    23                   And we're having the expert back on the

08:44    24   witness stand, if he's -- I see him.  There he is.

08:44    25   Ready to go.

334

08:44  1                    THE BAILIFF:  All rise.

08:44  2                    (Recess taken.)

08:51  3                    THE BAILIFF:  All rise.

08:51  4                    THE COURT:  Please remain standing for

08:51  5   the jury.

08:51  6                    (Jury entered the courtroom.)

08:51  7                    THE COURT:  Thank you.  You may be

       8   seated.

08:51  9                    Counsel, if you would -- oh, there you

08:51 10   are.  Doctor, if you'd take the stand, please.

08:51 11                    DIRECT EXAMINATION CONTINUED

08:51 12   BY MR. RICH:

08:52 13       Q.   Good morning, Dr. Michalson.

08:52 14       A.   Good morning.

08:52 15       Q.   Are you ready to continue?

08:52 16       A.   Sure.

08:52 17                    MR. RICH:  Your Honor, may I approach the

08:52 18   witness with binders?

08:52 19                    THE COURT:  Sure.

08:52 20   BY MR. RICH:

08:52 21       Q.   All right.  Dr. Michalson, can you please give

08:52 22   the jury a roadmap for your testimony today?

08:52 23       A.   Sure.  My plan is to talk about the process

08:52 24   that I used for determining infringement of the

08:52 25   patents-in-suit.  To give you a little bit of

08:53  1    background on technology, some of these things get

08:53  2    pretty complicated so I'll discuss a little bit of

08:53  3    background.  I'll talk specifically about my

08:53  4    infringement positions and, you know, how the opinions

08:53  5    I have about infringement are found in the accused

08:53  6    products, and also I'll talk a little bit about the

08:53  7    technical value of the inventions.

08:53  8        Q.   What part of the patent did you focus your

08:53  9    infringement analysis on?

08:53  10       A.   I focused on the claims.  The claims are the

08:53  11   inventions of the patent.  And when reading through the

08:53  12   claims, it's kind of analogous to a recipe where you

08:53  13   have to have certain things in the accused product for

08:53  14   it to be able to infringe a patent.  So you're

08:53  15   comparing the product to the patent.

08:53  16           In this case, I have a simple example of a

08:53  17   cake, and the cake is defined as including:  Flour,

08:54  18   sugar, eggs, butter and vanilla icing.  If it's missing

08:54  19   any one of those things, it might be a cake, but it's

08:54  20   not going to be that cake.

08:54  21       Q.   Now, if all the elements or ingredients of the

08:54  22   cake are present, what does that tell you about it?

08:54  23       A.   If all of those ingredients are present, then

08:54  24   it tells me that that cake infringes that patent on

08:54  25   cakes.

08:54  1      Q.    Now, what are the checkboxes on your recipe

08:54  2   suggesting?

08:54  3      A.    I'll be using that as a notation as I go

08:54  4   through the claim elements to validate whether or not

08:54  5   that feature is actually in the accused products.

08:54  6      Q.    What are the two main types of infringement

08:54  7   that you considered in this case?

08:54  8      A.    Two main types; there's direct infringement

08:54  9   and there's indirect infringement.

08:54  10     Q.    Tell the jury what direct infringement is.

08:54  11     A.    Direct infringement is when somebody actually

08:55  12  does everything that's in the patent.  So if a user

08:55  13  flies the drone and the drone meets all the elements of

08:55  14  a particular claim, that would be direct infringement.

08:55  15     Q.    If a company sells or offers to sell the thing

08:55  16  that falls within the scope of the claim, is that a

08:55  17  direct infringement?

08:55  18     A.    Just the offer to sell is not, but you have

08:55  19  to -- that can be part of an indirect infringement.

08:55  20  But offering to sell, you still have to show that

08:55  21  somebody actually used it and used the device.

08:55  22     Q.    And for direct infringement of the company,

08:55  23  though, if the company is the one selling or offering

08:55  24  to sell, that's a direct infringement, correct?

08:55  25     A.    Yes.  That is.  Yes.

337

08:55  1        Q.    Indirect infringement, can you tell the jury

08:55  2   what indirect infringement is?

08:55  3        A.    Sure.  Indirect is basically when somebody has

08:55  4   a product, maybe they don't use it in a way that

08:56  5   infringes it -- a patent, but they teach somebody how

08:56  6   to use it so that it infringes.  They would still be

08:56  7   liable for infringement.

08:56  8        Q.    That would be like a company instructing users

08:56  9   how to use the claim?

08:56  10       A.    Correct.  Yes.

08:56  11       Q.    Are there different types of direct

08:56  12  infringement that you considered in this case?

08:56  13       A.    There are.  There's what we call literal

08:56  14  infringement, and then there can be infringement under

08:56  15  a theory called the doctrine of equivalents.

08:56  16       Q.    Can you explain literal infringement?

08:56  17       A.    Yes.  Literal infringement is kind of like it

08:56  18  sounds.  It's every element of the claim is literally

08:56  19  present in the accused product.

08:56  20       Q.    Now, tell the jury what the doctrine of

08:56  21  equivalents is.

08:56  22       A.    The doctrine of equivalents gives you a --

08:56  23  gives the patent owner a little bit of wiggle room

08:56  24  where, you know, maybe you don't do something exactly

08:57  25  the way it's specified in the patent, but that you're

338

08:57  1    doing it in a way that is equivalent to what's

08:57  2    described in the patent.

08:57  3        Q.   What tests did you use or consider for the

08:57  4    doctrine of equivalents?

08:57  5        A.   There are two different tests that can be

08:57  6    used.  One is that the two ideas can be what they call

08:57  7    "insubstantially different."

08:57  8             So if I think -- if I'm trying to build

08:57  9    something and I need to nail two boards together in a

08:57  10   certain orientation, maybe the patent says nail these

08:57  11   two boards together at right angles or something, and

08:57  12   maybe the product that is being accused, instead of

08:57  13   nails, maybe they use screws, and they use screws to

08:57  14   hold it at that 90-degree angle.

08:58  15            You know, in that case, I may be able to argue

08:58  16   that, well, there's an insubstantial difference between

08:58  17   those two things.

08:58  18       Q.   What materials did you consider in arriving at

08:58  19   your infringement opinions in this case?

08:58  20       A.   There were a lot.  There were the drones

08:58  21   themselves.  I did do some testing on some of the DJI

08:58  22   drones.  I, of course, reviewed the patents, the patent

08:58  23   claims, the file history, which is a record of what

08:58  24   went on between the person seeking the patent and the

08:58  25   Patent Office.

339

| | | |
|---|---|---|
| 08:58 | 1 | I looked at the DJI source code that I had |
| 08:58 | 2 | available. I looked at a number of documents that were |
| 08:58 | 3 | produced by DJI. I looked at witness depositions. I |
| 08:58 | 4 | looked at various documents that are exchanged between |
| 08:58 | 5 | the attorneys and available from the Court. |
| 08:59 | 6 | Q. How did you get access to DJI's secret |
| 08:59 | 7 | technical documents? |
| 08:59 | 8 | A. When I first started getting involved with |
| 08:59 | 9 | this case, I had to sign what they call a "protective |
| 08:59 | 10 | order," which is kind of a nondisclosure. It's me |
| 08:59 | 11 | promising that, outside of these proceedings, I won't |
| 08:59 | 12 | tell anybody what I saw in those documents. |
| 08:59 | 13 | MR. RICH: Your Honor, may I approach the |
| 08:59 | 14 | demonstrative and -- |
| 08:59 | 15 | THE COURT: Sure. |
| 08:59 | 16 | MR. RICH: -- set it up? |
| 08:59 | 17 | Thank you. |
| 08:59 | 18 | Your Honor, may the witness approach the |
| 08:59 | 19 | demonstrative and walk the jury through the |
| 08:59 | 20 | demonstrative? |
| 08:59 | 21 | THE COURT: Sure. |
| 08:59 | 22 | MR. RICH: Just out of courtesy, we're |
| 08:59 | 23 | displaying the demonstrative on the screen so counsel |
| 08:59 | 24 | can also see it. |
| 09:00 | 25 | BY MR. RICH: |

340

| | |
|---|---|
| 09:00 | 1 |

Q.    All right.  Dr. Michalson, I'd like you to
walk through the various components of the drone shown
on this slide.

A.    Sure.  Some of the -- some of the main
components here, we can see this gray shell that's on
top.  That's actually covering a lot of the electronics
that are inside the drone.  There are processors here.
There are navigation sensors here, GPS receivers and
things like that.  There's also a radio receiver inside
the drone.

We can see these -- these little black things
under here.  In this example are the motors that
actually drive the propellers.  The propellers are
connected to the motors.  We can see that it has a
camera here, and we can also see the controller -- this
is an example of a controller for an Inspire drone.
That's one of the brands or one of the models of a DJI
drone, and we can see that it has two joysticks.  These
can move front and back or side to side to control the
various ways a drone can fly.

We can see that it has a couple of antennas
here.  Those are used for the radio communications
between the controller and the drone as well as the
drone can send information back to the controller.

And this little pad here is made to be able to

341

09:01  1    hold a cell phone, either an Android™ phone or an Apple

09:01  2    iPhone, because that can provide a display for what's

09:01  3    going on that the -- with the drone.

09:01  4        Q.    All right.  Thank you, Dr. Michalson.

09:01  5              All right.  Let's turn to your infringement

09:01  6    opinions, okay?

09:01  7        A.    Sure.

09:02  8        Q.    How many of Textron Innovations' patents are

09:02  9    you providing infringement opinions on today?

09:02  10       A.    I'll be talking about two patents today.  One

09:02  11   of them is a U.S. 8,014,909.  I'll call that the '909

09:02  12   patent for short.  The other one is U.S. Patent

09:02  13   9,162,752, and I'll be referring to that as the '752

09:02  14   patent.

09:02  15       Q.    We'll get into the details of all of your

09:02  16   opinions, but can you please summarize your

09:02  17   conclusions?

09:02  18       A.    Yeah.  In conclusion, I think that all of the

09:02  19   elements of the asserted claims of these two patents

09:02  20   are infringed by the DJI drones.

09:02  21       Q.    What patent are you going to start with, sir?

09:02  22       A.    I'm going to start with the '752 patent.

09:02  23             MR. RICH:  Your Honor, may I approach the

09:02  24   witness with another demonstrative?

09:03  25       A.    Thank you.

342

| | | |
|---|---|---|
| 09:03 | 1 | BY MR. RICH: |
| 09:03 | 2 | Q. What are you holding there, Dr. Michalson? |
| 09:03 | 3 | A. This is an example of a DJI Phantom 4 Pro |
| 09:03 | 4 | drone. This is one of the many drones that DJI sells, |
| 09:03 | 5 | and this is the controller for that drone. Similar to |
| 09:03 | 6 | the picture, we see the antennas, the joysticks. This |
| 09:03 | 7 | one happens to have a built-in display. |
| 09:03 | 8 | Q. Now, on the slide that's shown right now is |
| 09:03 | 9 | the '752 patent, the patent -- Mr. Christensen's patent |
| 09:03 | 10 | that he testified about yesterday? |
| 09:03 | 11 | A. Yes. It is. |
| 09:03 | 12 | Q. Can you remind the jury at a general level |
| 09:03 | 13 | what the '752 patent is about? |
| 09:03 | 14 | A. Yeah. In general, it's really about |
| 09:04 | 15 | controlling the movement of the drone in any direction, |
| 09:04 | 16 | any of the four basic directions. |
| 09:04 | 17 | It's about this automatic hover so that when |
| 09:04 | 18 | the joystick is returned to the detent position or the |
| 09:04 | 19 | center position that the control systems inside the |
| 09:04 | 20 | drone take over the flight of the drone, and they do |
| 09:04 | 21 | that automatically. When you just release the stick, |
| 09:04 | 22 | they take over automatically. I don't have to push any |
| 09:04 | 23 | other buttons or tap anything on the display or do |
| 09:04 | 24 | anything other than release the stick. |
| 09:04 | 25 | Q. When was the '752 patent filed? |

09:04  1      A.      It was filed in July of 2011.

09:04  2      Q.      When did the Patent Office award

09:04  3  Mr. Christensen his patent?

09:04  4      A.      That'd be in October of 2015.

09:04  5      Q.      How long was the patent application for the

09:05  6  '752 patent at the Patent Office before they allowed

09:05  7  it?

09:05  8      A.      That would be about four-and-a-half years.

09:05  9      Q.      What DJI feature are you going to focus your

09:05  10  infringement analysis on for the '752 patent?

09:05  11     A.      The automatic hovering, the ability of these

09:05  12  drones to automatically hover.

09:05  13     Q.      And what claim of the '752 patent are you

09:05  14  going to focus on?

09:05  15     A.      I'm going to focus on Claim 13.

09:05  16     Q.      Dr. Michalson, can you please walk the jury

09:05  17  through what they're going to see on this slide?

09:05  18     A.      Yes.  This is a short video I had made that

09:05  19  really shows the action.  This is a Mini 2 Pro drone

09:05  20  and another variant of a DJI drone.

09:05  21             And when the stick gets pushed forward, you're

09:05  22  going to see the drone move forward, which will be

09:05  23  moving from right to left across this screen.

09:05  24             When you let go of the stick, you'll see it

09:05  25  slow down and come to a stop and hover, and then we'll

| | | |
|---|---|---|
| 09:06 | 1 | move it backwards.  You'll see it travel back to where |
| 09:06 | 2 | it -- pretty much where it started, just release the |
| 09:06 | 3 | stick and see it come to a stop.  And it does that a |
| 09:06 | 4 | couple of times. |
| 09:06 | 5 | (Video played.) |
| 09:06 | 6 | A.    Yeah.  This is where the stick is held |
| 09:06 | 7 | forward.  You release the stick, the drone stops and |
| 09:06 | 8 | hovers; pull the stick back, the drone moves backwards. |
| 09:06 | 9 | Release the stick, the drone stops and hovers. |
| 09:06 | 10 | BY MR. RICH: |
| 09:06 | 11 | Q.    All right.  Dr. Michalson, what DJI drones |
| 09:06 | 12 | have hovering technology? |
| 09:06 | 13 | A.    Based on the information DJI provided in their |
| 09:06 | 14 | supplemental response to Interrogatory 1, they said |
| 09:06 | 15 | that all of the drones that they have sold in the |
| 09:07 | 16 | United States have this hover functionality. |
| 09:07 | 17 | Q.    Can you identify the exhibit number for DJI's |
| 09:07 | 18 | response that you're showing here on the screen? |
| 09:07 | 19 | A.    I can't because it's hidden by the annotations |
| 09:07 | 20 | that are at the bottom on my screen here. |
| 09:07 | 21 | Q.    All right.  It's Plaintiff's Exhibit 135. |
| 09:07 | 22 | Is this a DJI document, Dr. Michalson? |
| 09:07 | 23 | A.    It is a DJI document. |
| 09:07 | 24 | MR. RICH:  We move to admit Plaintiff's |
| 09:07 | 25 | Exhibit 135 into evidence. |

09:07  1          MR. YIN:  No objection.

09:07  2          THE COURT:  It'll be admitted.

09:07  3   BY MR. RICH:

09:07  4      Q.   Now, does the analysis that you're about to

09:07  5   give to the jury apply the same across all of the

09:07  6   accused drones?

09:07  7      A.   Yes.  It does.

09:07  8      Q.   Can you generally describe the directions in

09:07  9   which DJI drones control automatic hovering?

09:08  10     A.   Yes.  There are four basic directions.  The

09:08  11  language in the patent is kind of -- a little bit

09:08  12  different than everyday language, but they have this --

09:08  13  what the patent calls the longitudinal direction which

09:08  14  is the front-and-back movement of the drone.

09:08  15          So, you know, the camera points towards the

09:08  16  front of the drone the way DJI has defined it.  So when

09:08  17  they say longitudinal, they mean driving forward or

09:08  18  driving backwards.

09:08  19          Another one that they talk about is lateral,

09:08  20  and that's moving to the left or the right.  That's

09:08  21  kind of moving the drone sideways relative to its

09:08  22  forward direction.

09:08  23          There's also directional or heading, and

09:08  24  that's really what direction is the drone headed,

09:08  25  right?  It can rotate in space to the right or to the

09:08  1   left without moving laterally or longitudinally or

09:09  2   vertically.

09:09  3           And then the last dimension is vertical where

09:09  4   it just can go up or down.  It can increase its

09:09  5   altitude or decrease its altitude.

09:09  6       Q.    Do the drones control that movement through

09:09  7   something called a control loop?

09:09  8       A.    They do.  There are control loops that control

09:09  9   all of those movements.

09:09  10      Q.    Now, looking at Claim 13 on this slide, how

09:09  11  many loop designs are there in Claim 13?

09:09  12      A.    There are four basic loop designs.  One is for

09:09  13  the longitudinal control.  That's the front-and-back

09:09  14  control.

09:09  15          One is lateral loop, the lateral loop which is

09:09  16  the side-to-side control.

09:09  17          The directional loop which is the rotational

09:09  18  control.  Is it rotating right or is it rotating left?

09:09  19  You know, counterclockwise or clockwise is probably

09:09  20  even a better way to think about it.

09:09  21          And a vertical control loop that moves -- that

09:10  22  controls the up-and-down motion of the drone.

09:10  23      Q.    So four basic directions, right?

09:10  24      A.    Yes.

09:10  25      Q.    Will the jury see color coding for those four

347

| | | |
|---|---|---|
| 09:10 | 1 | basic directions reflected throughout your slides? |
| 09:10 | 2 | A.   Yeah.   To try to simplify things and keep |
| 09:10 | 3 | people on track, I've kind of color-coded everything so |
| 09:10 | 4 | that they have the same colors. |
| 09:10 | 5 | Q.   When we go through the infringement analysis, |
| 09:10 | 6 | how will you indicate that the elements of Claim 13 are |
| 09:10 | 7 | met? |
| 09:10 | 8 | A.   What I'm going to do is I'll put checkmarks in |
| 09:10 | 9 | the side when I find an element, you know, kind of |
| 09:10 | 10 | check it off and say, yep, this is here, this is here, |
| 09:10 | 11 | this is here. |
| 09:10 | 12 | Q.   What is your conclusion on whether DJI |
| 09:10 | 13 | infringes Claim 13? |
| 09:10 | 14 | A.   I believe that DJI -- all the accused DJI |
| 09:10 | 15 | drones do infringe Claim 13. |
| 09:10 | 16 | Q.   With respect to source code for the '752 |
| 09:10 | 17 | patent, did DJI produce all the relevant source code so |
| 09:10 | 18 | that you could do your infringement analysis? |
| 09:10 | 19 | A.   They didn't.   There were a number of source |
| 09:11 | 20 | code elements that I had asked for when I was doing my |
| 09:11 | 21 | review of their code, but we never -- I never received |
| 09:11 | 22 | them. |
| 09:11 | 23 | Q.   What are we seeing on this slide, |
| 09:11 | 24 | Dr. Michalson? |
| 09:11 | 25 | MR. YIN:  I'm sorry. |

348

09:11  1                    Please, Your Honor, I think counsel is

09:11  2  going to get into DJI confidential information.  If we

09:11  3  could seal the court?

09:11  4                    THE COURT:  Okay.  We'll seal it.

09:11  5                    Anyone who is not under the protective

09:11  6  order who is in the courtroom needs to excuse

09:11  7  themselves until we are done with this portion of the

09:11  8  testimony.

09:11  9                    MR. SCHROEDER:  And, Your Honor, for the

09:11  10  record, can we make clear that DJI representatives can

09:11  11  stay in the courtroom --

09:11  12                    THE COURT:  Of course.

09:11  13                    MR. SCHROEDER:  -- if they're -- okay.

09:11  14                    And, Your Honor, one other final point.

09:12  15  What about plaintiff's corporate representative?

09:12  16                    THE COURT:  He gets to stay.

09:12  17                    MR. SCHROEDER:  Okay.  Thank you.

09:12  18                    (Sealed proceedings.)

09:12  19  BY MR. RICH:

09:12  20     Q.   Dr. Michalson, what are we seeing on this

09:12  21  slide?

09:12  22     A.   What this is, is this is an application that

09:12  23  DJI made fairly late in the process to ask for

09:12  24  permission to release certain source code modules, and

09:12  25  the source code modules they listed, there were --

```
09:12   1   there were eight modules that were listed in that
09:12   2   application that related to things that I'd asked for
09:12   3   about the '752, and all of those modules were never
09:12   4   delivered to me.  They were all denied export
09:12   5   permission.
09:12   6        Q.    Who did DJI submit this application to?
09:12   7        A.    The Chinese government, as I understand it.
09:12   8        Q.    And this is a DJI document, correct?
09:12   9        A.    Yes.  It is.
09:12  10              MR. RICH:  We move to admit Plaintiff's
09:13  11   Exhibit 106 into the record.
09:13  12              MR. YIN:  No objection.
09:13  13              THE COURT:  Admitted.
09:13  14   BY MR. RICH:
09:13  15        Q.    When DJI sent that application to the Chinese
09:13  16   government, did it identify the source code modules
09:13  17   that it was not producing in this case?
09:13  18        A.    Yes.  It did.
09:13  19        Q.    And are those source code modules listed on
09:13  20   this slide?
09:13  21        A.    Yes.  These are the general headings that
09:13  22   they -- that they had for those -- those various
09:13  23   modules, and then they had some detailed descriptions
09:13  24   of what those modules did.
09:13  25        Q.    And was it eight modules total?
```

350

```
09:13   1        A.    Yes.  There were.

09:13   2        Q.    And how many did you find related to the '752

09:13   3   patent?

09:13   4        A.    Seven of them.

09:13   5        Q.    Now, because DJI didn't produce all of its

09:13   6   relevant source code, are you aware of any special

09:13   7   instructions related to the DJI source code evidence in

09:13   8   this case?

09:13   9        A.    Yes.  It's my understanding that the Court had

09:13   10  ordered that I can presume that those -- what was in

09:13   11  those missing modules would be favorable to Textron and

09:14   12  favorable to a finding of infringement.

09:14   13       Q.    Does the Court's instruction of you, this

09:14   14  failure to produce all of the relevant source code as

09:14   15  favorable to the infringement case, apply to all of the

09:14   16  limitations of Claim 13?

09:14   17       A.    Yes.  It does.

09:14   18       Q.    All right.  Let's start marching through the

09:14   19  claim elements.  What is the first element of Claim 13

09:14   20  that you'll address?

09:14   21       A.    The first element will be the first part of

09:14   22  the preamble which is:  A flight control system for a

09:14   23  rotary aircraft...

09:14   24       Q.    Can you explain your opinion on whether DJI's

09:14   25  drones have a flight control system for a rotary
```

09:14  1    aircraft?

09:14  2        A.    Yes.   They certainly do.   As we see in the

09:14  3    picture, there is a controller.   The controller has

09:14  4    joysticks that the pilot uses to be able to control the

09:14  5    direction of the aircraft.   It's in radio communication

09:14  6    with the actual drone.   The drone's in radio connection

09:15  7    with the controller.

09:15  8            So these two things operate as a complete

09:15  9    system for this -- this -- this rotorcraft -- we call

09:15  10   it a multi-rotor aircraft -- and allows it to -- allows

09:15  11   the user to control the flight of that aircraft.

09:15  12       Q.    Now, where's the information shown on this

09:15  13   slide from?

09:15  14       A.    This is out of the -- DJI's Mavic 2 Pro user

09:15  15   manual.

09:15  16       Q.    And is this from Plaintiff's Exhibit 24?

09:15  17       A.    I believe so, yes.

09:15  18       Q.    Okay.

09:15  19            MR. RICH:   We move to admit Plaintiff's

09:15  20   Exhibit 24 into the record.

09:15  21            MR. YIN:   No objection.

09:15  22            THE COURT:   Admitted.

09:15  23   BY MR. RICH:

09:15  24       Q.    The next part of Claim 13 recites the rotary

09:15  25   aircraft having a longitudinal controller, a lateral

09:16  1   controller, a directional controller and a vertical

09:16  2   controller, correct?

09:16  3       A.    Yes.

09:16  4       Q.    Do DJI's products meet that element?

09:16  5       A.    Yes.  They do.

09:16  6       Q.    Can you explain why DJI's drones have a

09:16  7   longitudinal controller, a lateral controller, a

09:16  8   directional controller and a vertical controller?

09:16  9       A.    Sure.  There are a couple of ways that you can

09:16  10  configure a DJI controller, but out of the box when you

09:16  11  buy it and it comes with the drone, it's in what they

09:16  12  call Mode 2.

09:16  13       And what that means is that the right stick is

09:16  14  used to control longitudinal movement.  If I push it

09:16  15  forward, the drone drives forward.  If I pull it back,

09:16  16  the drone drives backwards.  If I push it to the left,

09:16  17  the drone moves to the left.  If I push it to the

09:16  18  right, the drone moves to the right.  So that's the

09:17  19  lateral controller.  So this controls longitudinal

09:17  20  movement and lateral movement.

09:17  21       Similarly the left joystick, if I push it

09:17  22  forward, the drone rises vertically.  If I pull it

09:17  23  back, the drone starts to descend.  So this one

09:17  24  controls my vertical movement and, again, I can move it

09:17  25  side to side.  If I move it all the way to the left,

09:17  1    the drone starts rotating kind of counterclockwise.  If

09:17  2    I hold it over to the right, then it starts moving

09:17  3    clockwise.

09:17  4        Q.    And does that stick that moves left and right

09:17  5    to twist the drone, is that the directional controller?

09:17  6        A.    That would be the directional controller, yes.

09:17  7        Q.    And the stick that moves the drone up and down

09:17  8    when you press it up and down, that's the vertical

09:17  9    controller?

09:17  10       A.    That's the vertical controller, yes.

09:17  11       Q.    And is the stick that moves the right control

09:17  12   stick that moves the drone forward and backward, is

09:17  13   that the longitudinal controller?

09:17  14       A.    That would be the longitudinal controller.

09:18  15       Q.    And the right stick that you can move left and

09:18  16   right to move the drone left and right, is that the

09:18  17   lateral controller?

09:18  18       A.    Yes.  That's the lateral controller.

09:18  19       Q.    Why do DJI drones have these controllers when

09:18  20   they're offered for sale and sold in the United States?

09:18  21       A.    Could you repeat that, please?

09:18  22       Q.    Yes.  Why do DJI drones have these controllers

09:18  23   when they're offered for sale or sold in the United

09:18  24   States?

09:18  25       A.    They have these controllers because that's

354

09:18  1   what you need to have to be able to fly the aircraft.

09:18  2   You can't fly the aircraft without the controller.

09:18  3        Q.    Is this the box that drone came in?

09:18  4        A.    Yes.  It is.

09:18  5        Q.    And within this box would the drone have the

09:18  6   remote controller with it?

09:18  7        A.    Yeah.  If you were to open that box up, you'd

09:18  8   see little slots and spaces and cutout in the packing

09:18  9   that the controller slides in, the drone slides in.

09:19  10  And when you buy one of these, it's shipped with the

09:19  11  controller.  You open the box and everything's --

09:19  12  everything's in its little slot.

09:19  13       Q.    So the drones have the controller in the box

09:19  14  when they're offered for sale?

09:19  15       A.    Yeah.  It's -- I mean, it's just like buying a

09:19  16  TV set, right?  You buy the TV set, you open the box,

09:19  17  there's the TV in there, there's the controller in

09:19  18  there.

09:19  19       Q.    Dr. Michalson, did this evidence come from

09:19  20  Plaintiff's Exhibit 113, Phantom 4 Pro user manual?

09:19  21       A.    Yes.

09:19  22            MR. RICH:  Plaintiffs move to admit

09:19  23  Plaintiff's Exhibit 113 into evidence.

09:19  24            MR. YIN:  No objection.

09:19  25            THE COURT:  It'll be admitted.

355

09:19 1    BY MR. RICH:

09:19 2        Q.    Did you see anything from plaintiff's -- or

09:19 3    defendants' exhibit, Dr. Nourbakhsh, that disputed that

09:19 4    this element is met?

09:19 5        A.    Yes.  I did.

09:19 6        Q.    And why does Dr. Nourbakhsh dispute that

09:19 7    Claim 13 is met -- not met?

09:19 8        A.    Well, Dr. Nourbakhsh is essentially adding a

09:20 9    few words to the claim.  He seems to be adding the fact

09:20 10   that, you know, he wants this to only apply to manned

09:20 11   aircraft and is saying that these controllers have to

09:20 12   be on board the aircraft.  They can't be -- it can't be

09:20 13   fly-by-wire.  They have to be on board the aircraft.

09:20 14       Q.    What is your response to Dr. Nourbakhsh adding

09:20 15   those requirements into the claim?

09:20 16       A.    Well, I think it's improper.  The claim says

09:20 17   what the claim says.  The claim -- the original claim

09:20 18   doesn't have those words in it.  So it's improper to

09:20 19   try to add that as a requirement to the claim.

09:20 20       Q.    Do you have a doctrine of equivalents opinion

09:20 21   on this element too?

09:20 22       A.    I do.  You know, to the extent that the jury

09:20 23   believes that it's okay to add those words to the

09:20 24   claim, then I would say really having it separate is

09:21 25   equivalent.

356

09:21  1          If I have the radio link that's connecting the

09:21  2   control surfaces of the aircraft to the remote

09:21  3   controller, it really doesn't matter if this

09:21  4   controller -- if I'm sitting -- if I'm sitting in the

09:21  5   aircraft or if I'm outside the aircraft, I can still do

09:21  6   the same kinds of controls whether I'm in the aircraft

09:21  7   or outside the aircraft.  Although, I don't think I'd

09:21  8   fit inside this aircraft.

09:21  9      Q.   Can we check the box for this limitation as

09:21  10  met under both literal infringement and equivalent

09:21  11  infringement?

09:21  12     A.   Yes.  We can.

09:21  13     Q.   What is the next claim element in Claim 13 of

09:21  14  the '752 patent?

09:21  15     A.   The next element is really referring to this

09:21  16  longitudinal control loop.

09:21  17     Q.   Okay.  Do DJI's drones meet these elements?

09:21  18     A.   They do.  Yes.

09:22  19     Q.   Before we talk about the evidence that we're

09:22  20  about to look at, who's the guy on the left of this

09:22  21  slide?

09:22  22     A.   That's Mr. Shang who we heard some deposition

09:22  23  testimony from -- played yesterday.

09:22  24     Q.   Is he DJI's flight control engineer?

09:22  25     A.   Yes.  He is.

357

09:22  1      Q.     Have you reviewed his deposition testimony?

09:22  2      A.     I have.  Yes.

09:22  3      Q.     And did you see that he leads a team that is

09:22  4   in charge of DJI's flight control technology?

09:22  5      A.     That's my recollection.  Yes.

09:22  6      Q.     And did you see that he's the only guy in this

09:22  7   case that was allowed full access to the code?

09:22  8      A.     As far as I'm aware.  I know he said he had

09:22  9   full access to the code.  I don't know if there's

09:22  10  others at DJI that do, but I know he said he did have

09:22  11  it.

09:22  12     Q.     Please explain to the jury why DJI's drones

09:22  13  have a longitudinal loop design.

09:22  14     A.     Well, basically Mr. Shang admitted that they

09:22  15  did.  You know, he was asked if there's a control loop

09:23  16  that controls the forwards and backwards position.

09:23  17  That would be the longitudinal control.  And he said,

09:23  18  yes.  It did.

09:23  19     Q.     And is that in the trial transcript at

09:23  20  Page 297, Lines 13 through 16?

09:23  21     A.     Yes.

09:23  22     Q.     Now, moving on to the forward speed hold loop

09:23  23  element, are there any control loops in DJI's code that

09:23  24  controls forward speed?

09:23  25     A.     There are.  Again, Mr. Shang admits that --

09:23  1    you know, when he's asked about forward and backwards

09:23  2    speed, you know, he says yes.  They refer to it as

09:23  3    horizontal velocity.

09:23  4            In their code, they kind of have -- the same

09:23  5    kinds of loops deal with both the longitudinal, the

09:23  6    forward/backward and the lateral velocity.

09:23  7    Q.    Now, how is that a loop that holds forward

09:23  8    speed?

09:23  9    A.    Well, again, as we kind of saw in the video,

09:24  10   you know, if I push the stick forward, the drone flies

09:24  11   forward; if I pull the stick back, the drone flies

09:24  12   backwards.  If I drop the controller and release the

09:24  13   stick, it just automatically will stop.  So it'll hold

09:24  14   a speed of zero.

09:24  15   Q.    Now, what did Mr. Shang say about holding

09:24  16   speed at zero?

09:24  17   A.    He said that, yes.  He was asked a question if

09:24  18   the stick is centered, you know, if it's in the middle

09:24  19   position or I let go of it because it's spring-loaded,

09:24  20   that the speed will be held at zero, and he admits

09:24  21   that, yes.  It'll be held at zero.

09:24  22   Q.    Is there any other evidence that confirmed to

09:24  23   you that DJI's drones hold forward speed at zero?

09:24  24   A.    Yes.  ██████████████████████████████████

09:24  25   ████████████████████████████████████████████



09:25  13    Q.    And this evidence is from Plaintiff's

09:25  14  Exhibit 127, correct?

09:25  15    A.    Yes.

09:25  16          MR. RICH:  We move to admit Plaintiff's

09:25  17  Exhibit 127.

09:25  18          MR. YIN:  No objection.

09:26  19          THE COURT:  It'll be admitted.

09:26  20  BY MR. RICH:

09:26  21    Q.    And for the record, Dr. Michalson, this

09:26  22  evidence is from pages -- source code Pages 74 and 75,

09:26  23  correct?

09:26  24    A.    I believe so.

09:26  25    Q.    Are there any of the missing source code

360

| 09:26 | 1 | modules that you view as relevant to the forward speed |
| 09:26 | 2 | hold loop? |
| 09:26 | 3 | A.   Yes.  I think that there's a number of |
| 09:26 | 4 | modules, in particular, you know, the actuator device |
| 09:26 | 5 | management. ███████████████████████████████████████ |
| 09:26 | 6 | ██████████████████████  That's important to being able |
| 09:26 | 7 | to maintain speed. |
| 09:26 | 8 | The flight law control module.  You know, |
| 09:26 | 9 | that -- that is what's actually implementing the |
| 09:26 | 10 | control laws so when the code I did have can send the |
| 09:26 | 11 | command to the -- to the drone, it's those lower level |
| 09:27 | 12 | control law algorithms that would be executing that I |
| 09:27 | 13 | did not have the code for. |
| 09:27 | 14 | And also ████████████████████████ |
| 09:27 | 15 | ████████████████████████████████  is you got to |
| 09:27 | 16 | take inputs that tell you what the drone is actually |
| 09:27 | 17 | doing so that you can put in the corrections that you |
| 09:27 | 18 | need to make it do the right thing, and I would expect |
| 09:27 | 19 | to see some relevant code in that section as well. |
| 09:27 | 20 | Q.   So let me get this straight.  One of the |
| 09:27 | 21 | modules in DJI's source code that they didn't give you |
| 09:27 | 22 | is called the "flight control law module"? |
| 09:27 | 23 | A.   That's correct.  Yes. |
| 09:27 | 24 | Q.   And Claim 13 is about flight control laws? |
| 09:27 | 25 | A.   Yes. |

361

09:27  1    Q.    How does the lack of having access to the

09:27  2  missing code modules impact your analysis for this

09:27  3  element?

09:27  4    A.    Well, it means for some of these elements to

09:27  5  actually, you know, prove it and do all my homework, I

09:27  6  have to rely -- I just have to rely on Mr. Shang's

09:27  7  testimony.  I can't -- I can't dig in and find the --

09:28  8  you know, the actual spot where the command gets

09:28  9  implemented.  So I have to rely on Mr. Shang's

09:28  10  testimony to demonstrate that the element exists there.

09:28  11    Q.    And you're talking about Mr. Shang's testimony

09:28  12  where he said they hold forward speed at zero?

09:28  13    A.    Yes.  Yes.

09:28  14    Q.    Now, does DJI dispute that the forward speed

09:28  15  hold loop is present?

09:28  16    A.    They do.

09:28  17    Q.    Can you tell us why?

09:28  18    A.    Yes.  Again, DJI's expert, Dr. Nourbakhsh,

09:28  19  wants to add some language to the claim that basically

09:28  20  says:  Wherein the forward speed hold loop maintains

09:28  21  current non-zero forward speed.

09:28  22        So, you know, the fact that it maintains zero

09:28  23  speed is not enough for Dr. Nourbakhsh.  He wants it to

09:29  24  maintain some non-zero speed, but that's not what the

09:29  25  claim says.

362

09:29    1        Q.    Does the claim say anything about maintaining
09:29    2   current non-zero speed?
09:29    3        A.    No.  It doesn't.
09:29    4        Q.    Are there any other reasons that support you
09:29    5   disagreeing with DJI adding those words to the claim?
09:29    6        A.    Yes.  During the litigation, there's this
09:29    7   process called claim construction, and during that
09:29    8   process DJI proposed that the claim -- that the -- that
09:29    9   when determining the meaning of the claim, that you had
09:29   10   to be able to maintain this current forward speed, and
09:29   11   the Court rejected that argument and said, no.  It's
09:29   12   just plain and ordinary meaning.
09:29   13        Q.    Before we move on to the pitch attitude loop
09:30   14   element in Claim 13, can you please explain a drone's
09:30   15   pitch movements to the jury?
09:30   16        A.    Certainly.  What pitch is, is -- you know, you
09:30   17   think about if you've taken off in an airplane.  When
09:30   18   you take off on the runway, all of a sudden the
09:30   19   airplane starts tilting up.  When you're coming in for
09:30   20   a landing, the plane kind of tilts down.  That would be
09:30   21   referred to as pitch.
09:30   22             And in the drone that would be, you know, if
09:30   23   it wants to move forward, it will tilt forward, and we
09:30   24   kind of saw that in the video, and then it was able to
09:30   25   drive forward.  So we call that pitch.

09:30  1          And what that is is actually rotation along

09:30  2   the lateral axis or the side axis of the drone.  And

09:30  3   DJI calls that lateral axis the pitch axis because

09:31  4   that's what's -- you know, the direction that the drone

09:31  5   is rotating around.

09:31  6      Q.    Now, did you pull this information from

09:31  7   Plaintiff's Exhibit 156, which is a DJI website?

09:31  8      A.    Yes.  The picture in the top center is

09:31  9   basically DJI's picture.  I color-coded the axes to be

09:31 10   consistent with what we've been talking about.  The

09:31 11   animations are things that I had created.

09:31 12          MR. RICH:  Your Honor, we move to admit

09:31 13   Plaintiff's Exhibit 156 into evidence.

09:31 14          MR. YIN:  No objection.

09:31 15          THE COURT:  Admitted.

09:31 16   BY MR. RICH:

09:31 17      Q.    Dr. Michalson, can you explain whether DJI

09:31 18   drones have a pitch attitude loop as recited in

09:31 19   Claim 13?

09:31 20      A.    Yes.  Again, Mr. Shang admits that there is a

09:31 21   loop for commanding attitude, and, you know, he further

09:32 22   admits that they control that attitude in the X, Y and

09:32 23   Z axis.  So that would include the pitch movement, the

09:32 24   roll movement and the yaw movement, which would be

09:32 25   rotating around the vertical axis.

09:32  1     Q.   Now, is this testimony from yesterday's

09:32  2   transcript at Page 296, Lines 2 through 4, and

09:32  3   Page 303, Lines 17 through 23?

09:32  4     A.   Yes.  Yes.  We saw -- and we saw that

09:32  5   yesterday.

09:32  6     Q.   Moving on to the pitch rate loop in Claim 13.

09:32  7          Can you please explain why DJI drones have a

09:32  8   pitch rate loop?

09:32  9     A.   Well, again, Mr. Shang admits that they do.

09:32  10   He's asked if there's a control loop commanding angular

09:32  11   velocity, and he agrees that there is, as well as

09:32  12   agreeing that that angular velocity, one of the

09:33  13   elements of that, is the pitch rate.

09:33  14          And what the pitch rate would be is, really,

09:33  15   how fast am I moving.  You know, if I'm moving -- if

09:33  16   I'm pitching at a very slow rate or if I'm pitching

09:33  17   very quickly, those affect the -- what we'd call the

09:33  18   dynamics of the aircraft.

09:33  19          And the control system has to operate within

09:33  20   the capabilities of the aircraft.  So you have to be

09:33  21   able to control those aspects of the aircraft.

09:33  22     Q.   Are Mr. Shang's admissions on the pitch rate

09:33  23   loop in yesterday's trial transcript at Page 296,

09:33  24   Lines 5 through 7, and Page 285, Lines 18 through 20?

09:33  25     A.   Yes.  They are.

09:33  1      Q.    Can we now check the box on all of the

09:33  2  longitudinal loop design elements in Claim 13?

09:33  3      A.    Yes.  We can.

09:33  4      Q.    All right.  The next element is a bit lengthy.

09:34  5  I'll refer to it as the "automatic engagement of the

09:34  6  forward speed hold loop element," okay?

09:34  7      A.    Okay.

09:34  8      Q.    Now, let's break this element into two parts

09:34  9  and address the first part, okay?

09:34  10     A.    Okay.

09:34  11     Q.    Now, the first part of this element recites

09:34  12  something called detent position.

09:34  13     A.    Yes.

09:34  14     Q.    Can you tell the jury what a detent position

09:34  15  means?

09:34  16     A.    Yeah.  The detent position, again, is just --

09:34  17  I mean, it's -- the sticks are both in detent now,

09:34  18  right?  Nobody's pushing them.  If you push the stick,

09:34  19  it will naturally return to its -- it has a little

09:34  20  spring in there that'll naturally return to the center.

09:34  21          And if you were actually able to play with

09:34  22  this a little bit, you'd feel that it kind of stops in

09:34  23  the middle.  There's a very obvious spot where it takes

09:34  24  some resistance to move it out to the right, left, up

09:35  25  or down, and that would be the detent position when

366

| | |
|---|---|
| 09:35 | 1 |

it's in that centered position.

    Q.   Can you explain why DJI drones have a forward speed hold loop that automatically engages when the longitudinal controller is returned to a detent position?

    A.   Yes.  Again, that's an admission by Mr. Shang. And as we saw in the video, when I pull this stick back, it moves backwards.  When I release the stick, it automatically engages, the drone stops.  So there's no more forward movement, and I didn't have to push any buttons or anything to do it.  I just had to return the stick to detent.

    Q.   Is Mr. Shang's admission listed in yesterday's trial transcript at Page 288, Lines 21 through 25?

    A.   Yes.

    Q.   Now, why is -- why is this an automatic engagement?

    A.   Well, because all I have to do is release the stick.  I don't have to push anything on the display. I don't have to push any switches or buttons on the controller.  It's just the act of releasing the stick that causes it to automatically go into that zero-speed hold mode.

    Q.   Can you explain how this looks in practice using this video, Dr. Michalson?

367

09:36  1      A.    Yeah.   This is the video we saw earlier.   We

09:36  2  see we're moving forward.   We release the stick.   It

09:36  3  goes into the hold.   Move backwards, again, this is the

09:36  4  longitudinal movement.   Release the stick and it holds

09:36  5  that position at zero velocity.

09:36  6      Q.    Now, the next part of this element says that

09:36  7  the loop is engaged when outside a first groundspeed

09:36  8  threshold.

09:36  9          Did you find evidence of a groundspeed

09:36 10  threshold in the code that you did have?

09:36 11      A.    I did.  ████████████████████████████████

09:37 12  ███████████████████████████████████████████

09:37 13  ████████████████████████████████████████████

09:37 14  ██████████████████████████████

09:37 15  ██      ████████████████████████████████████

09:37 16  ██████████

09:37 17  ██      ████████████████

09:37 18  ██      █████████████████████████████

09:37 19  ██      ████

09:37 20  ██      ███████████████████████████████████

09:37 21  █████████████████████████████████

09:37 22  ██      ████████

09:37 23      Q.    Now, do all of DJI drones have a groundspeed

09:37 24  threshold?

09:37 25      A.    Again, Mr. Shang admitted that they do, and my

368

09:37    1    experience is every DJI drone that I've flown does.

09:37    2        Q.    What is the speed of DJI's groundspeed

09:37    3    threshold?

09:37    4        A.    The threshold is set -- according to

09:38    5    Mr. Shang, it's set at .1 meters per second.  If you

09:38    6    don't think metric, that's a little less than a quarter

09:38    7    of a mile an hour.  So it's pretty slow.

09:38    8        Q.    How do DJI drones automatically engage their

09:38    9    forward speed hold loop when they're outside that

09:38   10    threshold?

09:38   11        A.    When they're outside the thresholds, they

09:38   12    don't do the speed hold.  It's once they get to the

09:38   13    threshold, then it goes -- and if the stick is

09:38   14    centered, then it will go to zero speed.

09:38   15        Q.    And so you're flying above the threshold,

09:38   16    release the stick, and then it will decelerate to

09:38   17    hover, right?

09:38   18        A.    Right.  You have to release the stick.  That's

09:38   19    the key to triggering the hold loop.

09:38   20        Q.    Can we check the box on this element?

09:38   21        A.    Yes.

09:38   22        Q.    All right.  Moving on to the next element.

09:39   23    Can you explain what's going on in this set of

09:39   24    elements?

09:39   25        A.    Yeah.  This is referring to the longitudinal

```
09:39   1    maneuverability.  That's basically how fast or slow you
09:39   2    can move forwards or backwards.
09:39   3            They're saying that has to be controlled by
09:39   4    either the pitch attitude loop or the pitch rate loop
09:39   5    when the controller is out of detent.  So that's
09:39   6    talking about the behavior of, you know, how -- the
09:39   7    control loop has to be operational.  When I push the
09:39   8    stick out of detent, I got to be doing -- it has to be
09:39   9    controlling the forward speed of the drone.  When it
09:39  10    returns to detent, that's when it will engage the hold
09:39  11    loop.
09:39  12        Q.    Now, in this claim element do you only need
09:39  13    control by one or the other of the pitch attitude loop
09:39  14    or the pitch rate loop?
09:39  15        A.    Yes.
09:39  16        Q.    Do you have to prove control by both?
09:39  17        A.    No.  No.  It's -- it's an "or."  So it could
09:40  18    be one or the other or both.
09:40  19        Q.    Do DJI drones meet this element?
09:40  20        A.    They do.
09:40  21        Q.    Can you please tell the jury why longitudinal
09:40  22    maneuverability of the drones is controlled by the
09:40  23    pitch attitude loop when the longitudinal controller is
09:40  24    out of detent?
09:40  25        A.    Yeah.  Again, we have admissions by Mr. Shang.
```

09:40    1    He's asked if there is a loop for controlling the

09:40    2    attitude, and the attitude is really -- it's a fancy

09:40    3    word for how is the drone oriented in space.

09:40    4            You know, this would be level.  Maybe it's

09:40    5    oriented this way.  Maybe it's attitude just like this.

09:40    6    There's a variety of different angles that the drone

09:40    7    can exist in.  We generally call that the attitude of

09:40    8    the aircraft.

09:40    9            And then he's asked what stick movement

09:40    10   relates to pitch?  And he says it's the longitudinal

09:41    11   controller.  When you push it forward, the drone will

09:41    12   tilt forward, drive forward.  You pull it back, the

09:41    13   attitude will go backwards -- well, go in the opposite

09:41    14   direction and the drone will fly backwards.

09:41    15   Q.    So the drones have a control loop for

09:41    16   controlling attitude?

09:41    17   A.    Yes.

09:41    18   Q.    And is pitch one part of attitude?

09:41    19   A.    Pitch is.  That's one part of the attitude.

09:41    20   Q.    And the claim element is controlled by the

09:41    21   pitch attitude?

09:41    22   A.    That's correct, yes.

09:41    23   Q.    And that element's met?

09:41    24   A.    Yes.

09:41    25   Q.    Are any of DJI's missing code modules relevant

09:41  1    to your analysis of this element that we're talking

09:41  2    about?

09:41  3        A.    Yes.    They are.    Certainly all the same ones

09:41  4    we talked before.    Some of the others may actually play

09:41  5    a part here.    The state estimation module, ████████

09:41  6    ████████████████████████████████████████████

09:41  7    ████████████████████████████████████████████

09:42  8    ████████    You know, is it oriented like this right now?

09:42  9    Is it oriented like that right now?

09:42  10            Those loops may have to know information about

09:42  11    that.    You know, ████████████████████████████████

09:42  12    So it -- probably more than just the three I've

09:42  13    highlighted but at least the three I've highlighted.

09:42  14        Q.    Now, is No. 6 that you've highlighted, that's

09:42  15    the attitude-sensing and determination module?

09:42  16        A.    It is.    Yes.

09:42  17        Q.    And that was one of the ones that DJI didn't

09:42  18    make available?

09:42  19        A.    That's correct.

09:42  20        Q.    And the claim element we just talked about is

09:42  21    the pitch attitude loop?

09:42  22        A.    Yes.

09:42  23        Q.    How did DJI's missing code impact your

09:42  24    analysis of the control by the pitch attitude loop

09:42  25    element?

09:42  1      A.    Well, it forced me to rely on Mr. Shang's

09:42  2  testimony.  I couldn't -- I couldn't look at the code

09:42  3  to confirm that testimony.  If I had the code, I

09:42  4  certainly would have looked at that stuff.

09:42  5      Q.    Can we check the box on this element?

09:43  6      A.    Yes.

09:43  7      Q.    And is that all of the elements for the entire

09:43  8  longitudinal loop design now?

09:43  9      A.    It is, yes.

09:43  10      Q.    All right.  And now are we going to move on to

09:43  11  the lateral loop elements?

09:43  12      A.    Yes.

09:43  13      Q.    And is this next set of elements similar to

09:43  14  the analysis that we just stepped through?

09:43  15      A.    Yeah.  It's very similar.  ███████████████

09:43  16  ████████████████████████████████████████████████████

09:43  17  ████████████████   ███████████████████   ████████████

09:43  18  ████████████████

09:43  19      Q.    Now, do DJI's drones meet this group of

09:43  20  elements?

09:43  21      A.    They do.

09:43  22      Q.    Can you explain why DJI drones meet the

09:43  23  lateral loop design element?

09:43  24      A.    Yes.  Again, it's an admission by Mr. Shang.

09:43  25  He is asked if there's a loop that controls left and

09:43   1   right movement or lateral movement, and his answer --

09:44   2   they just said, yes.  It's the same as forward-backward

09:44   3   movement.  It's the same basic loops that they use.

09:44   4       Q.    Is Mr. Shang's admission in the trial

09:44   5   transcript from yesterday at Page 298, Lines 19 through

09:44   6   23?

09:44   7       A.    Yes.

09:44   8       Q.    Before we move on to the roll rate -- well,

09:44   9   let me step back.

09:44  10            Why is that lateral speed loop a lateral speed

09:44  11   hold loop?

09:44  12       A.    Because, again, if the stick is in the detent

09:44  13   position, it holds the lateral speed at zero.

09:44  14       Q.    And what evidence did you see that that

09:44  15   happens?

09:44  16       A.    Well, certainly I've operated the drones and

09:44  17   that's exactly what happens, but there's also an

09:44  18   admission by Mr. Shang that, in fact, that's what

09:44  19   happens.

09:44  20       Q.    Is Mr. Shang's admission that the drones will

09:44  21   hold left and right speed at zero in the trial

09:44  22   transcript from yesterday at 288, Lines 21 through 25?

09:45  23       A.    Yes.

09:45  24       Q.    Now, moving on to the roll rate loop element.

09:45  25   Can you explain the concept of aircraft roll?

374

09:45  1    A.   Sure.  You know, that's kind of when you're in

09:45  2  that airplane and you make a bank turn and the aircraft

09:45  3  kind of turns to the left or the right; that's the

09:45  4  roll.  That's rotating around the longitudinal axis of

09:45  5  the drone.

09:45  6         So when we're referring to roll and roll rate,

09:45  7  roll is a movement around that longitudinal axis.  Roll

09:45  8  rate would be how fast is it rolling.  Is it rolling

09:45  9  very slowly or is it rolling very quickly.

09:45  10   Q.   And is this information, again, from

09:45  11  Plaintiff's Exhibit 156?

09:45  12   A.   Yes.  The top part -- like the previous

09:45  13  demonstrative that I had, the top part is out of DJI's

09:46  14  manuals.  I've color-coded that figure from them, and

09:46  15  the animations are things I had created.

09:46  16   Q.   Now, on the rate loop element in Claim 13, can

09:46  17  you explain why DJI drones have that loop?

09:46  18   A.   Yes.  Roll rate would be -- if I think about

09:46  19  rolling here, I'm rolling through some angle, and it's,

09:46  20  like, now I'm maybe at zero degrees, maybe 90 degrees,

09:46  21  180 degrees.  So the roll rate would be how fast am I

09:46  22  rotating through some angle.

09:46  23         Engineers will call that an angular velocity.

09:46  24  How fast am I -- how fast am I going through a

09:46  25  rotation.  And he's asked if there is a control loop

09:47  1   that's controlling that angular velocity, and Mr. Shang

09:47  2   says yes.  And when asked if it's -- if that also

09:47  3   applies to the roll, he admits that, yes.  It does.

09:47  4        Q.   So Mr. Shang admits that there's a loop for

09:47  5   controlling angular velocity, right?

09:47  6        A.   Yes.

09:47  7        Q.   And then he also admits that one part of

09:47  8   angular velocity is roll rate?

09:47  9        A.   Yes.

09:47  10       Q.   Okay.  And that admission is from the trial

09:47  11  transcript yesterday at Page 296, Lines 5 through 7 and

09:47  12  285, Lines 18 through 20, correct?

09:47  13       A.   Yes.

09:47  14       Q.   Okay.  Can we check the box on this element of

09:47  15  lateral loop design?

09:47  16       A.   We can.

09:47  17       Q.   Moving on to the next group of elements.

09:47  18            Can you explain what those elements are?

09:47  19       A.   Yes.  This element is talking about when the

09:47  20  lateral -- that the lateral speed hold loop

09:48  21  automatically engages when the lateral controller is

09:48  22  returned to a detent position and the aircraft is

09:48  23  outside of first groundspeed threshold.

09:48  24       Q.   Do DJI drones meet this element?

09:48  25       A.   They do, very similarly to the longitudinal

| | | |
|---|---|---|
| 09:48 | 1 | motion.  I don't have a video where we're rolling the |
| 09:48 | 2 | aircraft, but it behaves the same way on -- in lateral. |
| 09:48 | 3 | And Mr. Shang admits that that's the case.  If |
| 09:48 | 4 | the right stick goes back to center, then the drone |
| 09:48 | 5 | will hold its lateral speed as well as its longitudinal |
| 09:48 | 6 | speed at zero. |
| 09:48 | 7 | Q.   Now, can you explain why that is automatically |
| 09:48 | 8 | engaging when the longitudinal controller is returned |
| 09:48 | 9 | to detent? |
| 09:48 | 10 | A.   Yeah.  Because the pilot has to do nothing |
| 09:48 | 11 | other than center the stick.  There's no buttons that |
| 09:49 | 12 | you need to push.  No -- nothing on the display that |
| 09:49 | 13 | you need to select.  It just automatically does it. |
| 09:49 | 14 | Q.   And so as soon as you center the -- if you |
| 09:49 | 15 | center the right stick, the lateral speed hold loop |
| 09:49 | 16 | will be automatically engaged? |
| 09:49 | 17 | A.   That's correct. |
| 09:49 | 18 | Q.   Can you explain why the lateral speed hold |
| 09:49 | 19 | loop is automatically engaged when the drone is outside |
| 09:49 | 20 | the first groundspeed threshold? |
| 09:49 | 21 | A.   ██████████████████████████████████████ |
| 09:49 | 22 | ██████████████████████████████████████████ |
| 09:49 | 23 | ██████████████████████████████████████ |
| 09:49 | 24 | ████████████████████████████████ |
| 09:49 | 25 | █████████████████████████████████ |

377

09:49   1   ██████████████████████████████████████

09:49   2   ████████████████████████████████████████████

09:50   3   █████████████████████████████████

09:50   4       Q.    Now, is the groundspeed threshold for this

09:50   5   loop the same as the groundspeed threshold we looked at

09:50   6   earlier?

09:50   7       A.    Yes.  It's that same .1 meters per second or a

09:50   8   little less than a quarter-mile an hour.

09:50   9       Q.    Can we check the box on this group of

09:50   10  elements?

09:50   11      A.    Yes.

09:50   12      Q.    Now, moving on to the next element.

09:50   13            Is this one similar to one you addressed for

09:50   14  longitudinal movement?

09:50   15      A.    It is.

09:50   16      Q.    Do DJI drones meet this element?

09:50   17      A.    They do.  Yes.

09:50   18      Q.    Can you please tell the jury why longitudinal

09:50   19  maneuverability is controlled by the roll rate loop

09:50   20  when the lateral controller is out of detent?

09:50   21      A.    Yes.  The -- Mr. Shang certainly admits that

09:50   22  there is a control loop for controlling that angular

09:50   23  velocity, and he admits that the operation of the loop

09:51   24  is the same as for the pitch movement.

09:51   25            You'll recall the pitch movement was rotating

09:51  1    around the lateral axis; roll is just rotating around

09:51  2    the longitudinal axis or the forward/backward axis.

09:51  3            And that happens when -- when I move the stick

09:51  4    out of detent, for example, that means I want the drone

09:51  5    to be traveling laterally just like longitudinal.  To

09:51  6    move laterally, the drone tilts and then it can fly

09:51  7    laterally or it tilts the other direction, it can fly

09:51  8    laterally the other direction.

09:51  9    Q.    Are Mr. Shang's admissions on this point at

09:51  10   the trial transcript from yesterday at Page 296,

09:51  11   Lines 5 through 7?

09:51  12   A.    Yes.

09:51  13   Q.    And Page 287, Lines 6 through 9?

09:51  14   A.    Yes.

09:51  15   Q.    And so how far you move the lateral stick left

09:52  16   or right will control roll rate?

09:52  17   A.    Yes.  It will.  If I just move it a little bit

09:52  18   to the right, then it just tilts a little bit to the

09:52  19   right and moves slowly to the right.

09:52  20           If I hammer the control all the way over to

09:52  21   the right, then you'll see it tilt much more

09:52  22   dramatically to the right, and it'll go faster to the

09:52  23   right.

09:52  24   Q.    All right.  Can we check the box on this

09:52  25   element?

09:52    1          A.    Yes.

09:52    2          Q.    All right.  Moving on to the directional loop

09:52    3    group of elements.

09:52    4          Do DJI drones include this directional loop

09:52    5    design set of elements?

09:52    6          A.    They do.

09:52    7          Q.    Can you please tell the jury why DJI drones

09:52    8    have a directional loop design as in Claim 13?

09:52    9          A.    Again, it's another admission by Mr. Shang.

09:52    10   They -- he's asked if there are control loops for

09:52    11   directional movement around the yaw axis.

09:52    12         Remember, that's the rotation.  You know, the

09:53    13   drone is level.  It's not moving horizontally or

09:53    14   laterally, at least in one state, and it's just

09:53    15   rotating around.

09:53    16         And he admits that, in fact, there is that

09:53    17   control loop.

09:53    18         Q.    Is Mr. Shang's admission in the trial

09:53    19   transcript from yesterday at Page 299 --

09:53    20         A.    Yes.

09:53    21         Q.    -- Lines 22 through 25?

09:53    22         A.    Yes.

09:53    23         Q.    Now, before we address the yaw rate command

09:53    24   loop in Claim 13, can you explain what a yaw movement

09:53    25   is?

09:53    1    A.    Yeah.    That's that -- you know, if you take

09:53    2    the topdown view, that's where it's rotating.    It's

09:53    3    just rotating on its axis.    In reality, it would be

09:53    4    typically rotating around.

09:53    5        If I'm hovering, it'll just rotate around its

09:53    6    center.    If I'm -- if I've got the other sticks rotated

09:53    7    in some other way, it'll rotate in some other different

09:53    8    pattern depending on what the pilot wants it to do.

09:54    9    Q.    Now, can you tell the jury why DJI drones have

09:54    10   a yaw rate command loop as in Claim 13?

09:54    11   A.    Yes.    Again, it's an admission by Mr. Shang.

09:54    12   He's asked if it includes a control loop for

09:54    13   controlling yaw, and he agrees that, yes.    It does.

09:54    14       And in terms of the rate, you know, again,

09:54    15   like all these other controllers, you know, if I push

09:54    16   it a little bit to the -- to the left, it'll rotate

09:54    17   slowly counterclockwise.    If I push it all the way to

09:54    18   the left, it'll rotate much faster counterclockwise.

09:54    19   Q.    Is Mr. Shang's admission listed in the trial

09:54    20   transcript from yesterday at Page 300, Lines 1 through

09:54    21   3 and Page 286, Lines 7 through 4?

09:54    22   A.    Yes.

09:54    23   Q.    Now, moving on to the heading hold loop.

09:54    24       Can you explain why DJI drones meet that

09:55    25   element in Claim 13?

381

09:55    1      A.    Yes.  Again, I've certainly observed that

09:55    2   behavior in the drones, but we also have an admission

09:55    3   by Mr. Shang yesterday.  He's asked if there's -- if

09:55    4   the control loop for controlling yaw will cause the

09:55    5   drone to hold its current heading.

09:55    6          And indeed, if I -- if I get it positioned the

09:55    7   way I want it and then I leave that stick -- that left

09:55    8   stick in the center, it'll keep that heading.  So I

09:55    9   can -- I can fly any direction I want.  It'll still be

09:55   10   pointed in that heading.

09:55   11      Q.    Is Mr. Shang's admission from yesterday at

09:55   12   Page 300, Lines 8 through 12?

09:55   13      A.    Yes.

09:55   14      Q.    Can we check the box on the directional loop

09:55   15   design elements?

09:55   16      A.    Yes.  We can.

09:55   17      Q.    Now, moving on to the next element in

09:56   18   Claim 13, can you tell the jury what that is?

09:56   19      A.    Yes.  This is saying, you know:  Wherein the

09:56   20   heading hold loop will be re-engaged automatically

09:56   21   during flight in the first groundspeed threshold when

09:56   22   the directional controller is in detent.

09:56   23          And all that's saying is that, you know, if I

09:56   24   move out of detent, that hold loop will not be engaged.

09:56   25   When I move back to detent, it'll re-engage.

382

09:56  1          And it does -- it -- every time it goes back

09:56  2  to detent, in the software they send a command to zero

09:56  3  that rate and then it holds that -- that direction.

09:56  4      Q.    Do DJI drones meet that element?

09:56  5      A.    They do.

09:56  6      Q.    All right.  What evidence did you see that the

09:56  7  heading hold loop is automatically re-engaged during

09:56  8  flight in the first groundspeed threshold when the

09:56  9  directional controller's in detent?

09:57  10     A.    Again, that's an admission by Mr. Shang.  He's

09:57  11 asked if it will hold its current heading when the --

09:57  12 when the stick is centered, and he agrees that it is.

09:57  13     Q.    And is Mr. Shang's admission again in

09:57  14 yesterday's transcript at Page 300, Lines 8 through 12?

09:57  15     A.    Yes.

09:57  16     Q.    Why is that automatic?

09:57  17     A.    Because you don't have to do anything other

09:57  18 than release the stick.  You center the stick, and you

09:57  19 don't have to push any buttons.  You don't have to

09:57  20 select anything on the screen.  It just does it

09:57  21 completely automatically.

09:57  22     Q.    Now, is the groundspeed threshold here the

09:57  23 same threshold we talked about earlier, .1?

09:57  24     A.    That would be the same threshold.  Yes.

09:57  25     Q.    And how does this heading hold happen during

09:57    1    flight inside that .1 threshold?

09:57    2        A.    Well, any time the stick is centered, it will

09:57    3    go into a heading hold.

09:58    4        Q.    Including when you're flying below the

09:58    5    .1 meters per second threshold?

09:58    6        A.    Yes.  Yes.  Yeah.  It doesn't matter.

09:58    7        Q.    Moving on to the next group of elements.

09:58    8              This is the vertical control design?

09:58    9        A.    Yes.

09:58   10        Q.    Does DJI drones meet this element?

09:58   11        A.    They do.

09:58   12        Q.    Why do DJI drones have a vertical control loop

09:58   13    design?

09:58   14        A.    Again, Mr. Shang admits that they do have

09:58   15    control loops for controlling vertical flight.

09:58   16        Q.    Is Mr. Shang's admission listed in yesterday's

09:58   17    trial transcript at Page 297, Lines 1 through 5?

09:58   18        A.    Yes.

09:58   19        Q.    Now, why is that a vertical speed hold loop?

09:58   20        A.    Well, again, very similarly to all of the

09:58   21    other loops that we've been talking about.  When I --

09:59   22    when I go to detent -- you know, if I'm moving down or

09:59   23    if I'm moving up, when I go to detent, the drone will

09:59   24    slow down vertically and stop.

09:59   25              And Mr. Shang admits that -- that, you know,

384

09:59  1   when you have the left control stick centered that

09:59  2   you'll have zero.  It'll go to zero vertical speed.

09:59  3        Q.   Is Mr. Shang's admission on that holding zero

09:59  4   vertical speed listed at yesterday's transcript at

09:59  5   Page 302, Lines 9 through 15?

09:59  6        A.   Yes.

09:59  7        Q.   And stepping back one slide.

09:59  8             Did Mr. Shang also admit that they have a loop

09:59  9   for controlling vertical velocity?

09:59 10        A.   Yes.  He did.  Yes.

09:59 11        Q.   Is that at yesterday's transcript Page 297,

09:59 12   Lines 10 through 12?

09:59 13        A.   Yes.

09:59 14        Q.   Now, moving on to the altitude hold loop in

10:00 15   Claim 13.

10:00 16             Does DJI have a loop for controlling altitude?

10:00 17        A.   They do.  You can set the altitude -- you

10:00 18   know, using the left stick, you can set the altitude

10:00 19   where you want it to be.  If you release the stick, it

10:00 20   stays right there.

10:00 21             And Mr. Shang admits that there is a control

10:00 22   loop that controls that altitude up and down.

10:00 23        Q.   And is Mr. Shang's admission in yesterday's

10:00 24   trial transcript at Page 301, Lines 5 through 7?

10:00 25        A.   Yes.

385

10:00  1      Q.    Now, can you explain why that altitude loop is

10:00  2  an altitude hold loop?

10:00  3      A.    Because it will hold that altitude.  It will

10:00  4  not -- it will not be moving.  It will not have any

10:00  5  vertical velocity.  It'll just be holding that vertical

10:00  6  position at zero vertical velocity.

10:00  7      Q.    And what evidence did you see that it will

10:01  8  hold its altitude?

10:01  9      A.    Again, it's an admission by Mr. Shang.  And he

10:01 10  relates it and he says it's just like the horizontal

10:01 11  movement.  There's a braking action.  If I'm moving

10:01 12  vertically at high speed and I let go, it'll go into a

10:01 13  braking mode.  It'll slow down, and then it'll hold

10:01 14  that position.

10:01 15      Q.    And is Mr. Shang's admission in the transcript

10:01 16  from yesterday at Page 301, Lines 12 through 19?

10:01 17      A.    Yes.

10:01 18      Q.    Can we check the box on the vertical control

10:01 19  loop design elements now?

10:01 20      A.    We can.

10:01 21      Q.    Now, moving on to the next element.  Can you

10:01 22  tell the jury what this element is about?

10:01 23      A.    Yes.  This is very similar to an element we

10:01 24  saw earlier.  This is when -- this is related to the

10:01 25  vertical controller.

10:01  1          And it's saying:  Wherein the altitude hold

10:01  2    loop automatically engages when the vertical controller

10:02  3    is returned to a detent position and the aircraft

10:02  4    groundspeed is inside the first groundspeed threshold.

10:02  5          So that's -- again, that's this action that if

10:02  6    the stick gets returned to detent, it will stop its

10:02  7    vertical -- any vertical motion.

10:02  8    Q.    Do DJI drones meet this automatic engagement

10:02  9    element?

10:02  10   A.    They do.

10:02  11   Q.    Can you tell the jury why DJI drones' altitude

10:02  12   hold loop is automatically engaged when the vertical

10:02  13   controller is returned to detent and the aircraft is

10:02  14   inside the groundspeed threshold?

10:02  15   A.    Yes.  Again, we have an admission from

10:02  16   Mr. Shang that he's saying that it's just like the

10:02  17   horizontal movement in the vertical dimension.  There

10:02  18   would be a braking action when the speed falls below

10:03  19   threshold, and then it does a position hold, and it

10:03  20   does that without having to push any buttons or select

10:03  21   anything on the controller.

10:03  22   Q.    Now, if you're flying inside the .1-meter

10:03  23   threshold in DJI's code and you return the vertical

10:03  24   controller to a detent, will it hold altitude?

10:03  25   A.    It will.

387

10:03  1      Q.    And Mr. Shang's admission is in the trial

10:03  2  transcript at 301, Lines 12 through 19, correct?

10:03  3      A.    Yes.

10:03  4      Q.    And why is that engagement automatic?

10:03  5      A.    Because I don't have to do anything special.

10:03  6  I just return the stick to detent, and the drone takes

10:03  7  care of the rest for me.

10:03  8      Q.    Can we check the box on this set of elements?

10:03  9      A.    Yes.

10:03 10      Q.    All right.  Moving on to the last element of

10:03 11  Claim 13.  Can you tell the jury what this element

10:03 12  says?

10:03 13      A.    Yes.  This is referring to the vertical

10:04 14  maneuverability and how the vertical maneuverability is

10:04 15  controlled by the vertical speed hold loop.

10:04 16      Q.    Do DJI's drones meet this element?

10:04 17      A.    They do.

10:04 18      Q.    Why is vertical movement controlled by the

10:04 19  vertical speed hold loop when the stick is out of

10:04 20  detent?

10:04 21      A.    Well, again, when I'm out of -- when I'm out

10:04 22  of detent position, that's when the hold loop will

10:04 23  control the vertical speed, you know, how fast I climb,

10:04 24  how fast I descend.  And that control loop will be

10:04 25  getting commands from the -- from the controller that

388

10:04  1    tell it how fast you want it to move.  And the vertical

10:04  2    control loop will govern how it moves in that case.

10:04  3        Q.    Now, what evidence did you see that this

10:04  4    happens in DJI's products?

10:04  5        A.    That's an admission by Mr. Shang as well as my

10:05  6    observations during tests.

10:05  7        Q.    And is Mr. Shang's admission in yesterday's

10:05  8    trial transcript at Page 302, Lines 24 through 303,

10:05  9    Line 7?

10:05  10       A.    Yes.

10:05  11       Q.    Can we check this element off now?

10:05  12       A.    Yes.

10:05  13       Q.    And have we checked all of the elements in

10:05  14   Claim 13 off?

10:05  15       A.    Yes.

10:05  16       Q.    What is your conclusion as to infringement of

10:05  17   Claim 13 of the '752 patent?

10:05  18       A.    I believe Claim 13 is infringed.

10:05  19       Q.    How does the Court's instruction to presume

10:05  20   that DJI's failure to produce relevant code would be

10:05  21   viewed -- should be viewed as favorable to the

10:05  22   infringement case impact your conclusion?

10:05  23       A.    Well, my understanding is that the lack of

10:05  24   that source code should be, you know, viewed favorably

10:05  25   towards Textron and my opinions of infringement.

```
10:05   1       Q.    All right.  So that was direct infringement.
10:06   2             Let's move on to indirect infringement of the
10:06   3    '752 patent.
10:06   4             MR. YIN:  Excuse me.  Please, Judge,
10:06   5    based on what I see coming up, we can probably unseal
10:06   6    the Court now.
10:06   7             MR. RICH:  No objection.
09:42   8             (Sealed proceedings end.)
10:06   9             THE COURT:  Sounds good.
10:06   10   BY MR. RICH:
10:06   11      Q.    Now, Dr. Michalson, can you please explain
10:06   12   what the test for indirect infringement is?
10:06   13      A.    Yes.  There are four elements for the indirect
10:06   14   infringement.  One is that there has to be direct
10:06   15   infringement, at least by DJI's customers.
10:06   16             Another is that you have to be able to show
10:06   17   that DJI actively encouraged other people to infringe
10:06   18   the '752 patent.  You have to demonstrate that DJI knew
10:07   19   about the '752 patent and that they knew its actions
10:07   20   amounted to infringement.
10:07   21      Q.    Now, to be clear, is it your opinion that DJI
10:07   22   directly infringes the '752 patent?
10:07   23      A.    Yes.
10:07   24      Q.    And that's the analysis we just did?
10:07   25      A.    Yes.
```

390

| | | |
|---|---|---|
| 10:07 | 1 | Q.    And that can happen whenever you make, use, |
| 10:07 | 2 | sell or offer for sale the drones in the U.S.? |
| 10:07 | 3 | A.    Correct. |
| 10:07 | 4 | Q.    And can a company both directly and indirectly |
| 10:07 | 5 | infringe a patent? |
| 10:07 | 6 | A.    Yes. |
| 10:07 | 7 | Q.    Well, your opinion is DJI does both, right? |
| 10:07 | 8 | A.    Yes. |
| 10:07 | 9 | Q.    Can you please tell the jury what your |
| 10:07 | 10 | conclusion is on whether DJI indirectly infringes? |
| 10:07 | 11 | A.    I believe they do indirectly infringe as well |
| 10:07 | 12 | as directly infringe. |
| 10:07 | 13 | Q.    Now, starting with the element of underlying |
| 10:07 | 14 | direct infringement, for your indirect infringement |
| 10:07 | 15 | theory, who are the underlying direct infringers? |
| 10:07 | 16 | A.    That would be the people that are using the |
| 10:08 | 17 | automatic hover capability of the drone. |
| 10:08 | 18 | Q.    Have you seen any evidence of users using that |
| 10:08 | 19 | technology in the U.S.? |
| 10:08 | 20 | A.    Yes.  I mean, I've used it myself.  But also |
| 10:08 | 21 | Mr. Ai admits that he's aware of users in the United |
| 10:08 | 22 | States that have used DJI's hovering technology. |
| 10:08 | 23 | Q.    And Mr. Ai's admission is in the transcript |
| 10:08 | 24 | from yesterday at Page 282, Lines 12 through 14, |
| 10:08 | 25 | correct? |

10:08  1      A.    Yes.

10:08  2      Q.    Now, moving on to the active encouragement

10:08  3  element of indirect infringement.  Can you please

10:08  4  explain why DJI actively encourages users to infringe?

10:08  5      A.    Sure.  If you look at the user manuals that

10:08  6  they have, in this case this is DJI's Phantom 4 Pro

10:09  7  user manual, you'll find the specific instructions that

10:09  8  are necessary to use the technology.  In this case, the

10:09  9  first thing when they're talking about the remote

10:09 10  controller, it says when both sticks are centered, the

10:09 11  Phantom 4 Pro and Pro+ will hover in place.

10:09 12          You know, it says if you release the

10:09 13  directional controller, the Phantom 4 will maintain its

10:09 14  orientation.  So the user manual tells you explicitly

10:09 15  that all these things will happen.

10:09 16      Q.    And is this user manual Plaintiff's

10:09 17  Exhibit 113 at Page 39?

10:09 18      A.    Yes.

10:09 19      Q.    Moving on to knowledge of the patent.

10:09 20          When did DJI first learn of the '752 patent?

10:09 21      A.    Based on the responses DJI gave in their

10:09 22  response to interrogatories, it seems as if they knew

10:10 23  about the patent at least by August 16 of 2021.

10:10 24      Q.    And is this from DJI's response to an

10:10 25  interrogatory at Plaintiff's Exhibit 138 at Page 3?

392

10:10  1      A.    Yes.

10:10  2                 MR. RICH:  We move to admit Plaintiff's

10:10  3  Exhibit 138 into the record.

10:10  4                 MR. YIN:  No objection.

10:10  5                 THE COURT:  Admitted.

10:10  6  BY MR. RICH:

10:10  7      Q.    Now, when did DJI first learn of its

10:10  8  infringement of the '752 patent?

10:10  9      A.    My understanding that relative to the '752

10:10  10 patent, that would also be the August 16, 2021 date.

10:10  11     Q.    And where did you get this information from?

10:10  12     A.    That's from DJI's response to interrogatories.

10:10  13     Q.    Plaintiff's Exhibit 138 at Page 3, correct?

10:10  14     A.    Yes.

10:10  15     Q.    Can you please just summarize for the jury

10:10  16 your overall conclusions for the '752 patent?

10:10  17     A.    Yes.  As an overall conclusion, I believe that

10:11  18 all of the elements of Claim 13 of the '752 have been

10:11  19 satisfied in all of the accused products.  And that

10:11  20 would be direct infringement of Claim 13 as well as

10:11  21 indirect infringement of Claim 13.

10:11  22     Q.    All right.  Moving on to the second patent,

10:11  23 the '909 patent, okay?

10:11  24     A.    Okay.

10:11  25     Q.    Now, is the '909 patent the patent inventor

10:11  1  James Harris testified about yesterday?

10:11  2      A.    It is.  Yes.  Yes.

10:11  3      Q.    At a high level, can you remind the jury what

10:11  4  the '909 patent is about?

10:11  5      A.    Yes.  This is, you know, about listening to

10:11  6  the target to get some information from the target that

10:11  7  would convey movement and position.  It's about

10:11  8  calculating how fast you need to drive the drone in

10:11  9  order to be able to keep up and follow that target and

10:12  10  following that target.

10:12  11      Q.    What features are accused of infringing the

10:12  12  '909 patent?

10:12  13      A.    There are two of what DJI calls Intelligent

10:12  14  Flight Modes.  One of them is called Follow Me.  The

10:12  15  other one is called ActiveTrack.

10:12  16      Q.    Can you please explain to the jury at a high

10:12  17  level what Follow Me mode is?

10:12  18      A.    Yeah.  I have a little animation here.  What

10:12  19  Follow Me is, is if I have this control box and I set

10:12  20  this drone into a Follow Me mode, it will do exactly

10:12  21  that.  It'll follow me.  I'll enable the mode and then

10:12  22  I can walk around, and anywhere this controller is,

10:12  23  that drone will follow it.

10:12  24      Q.    Did you personally test DJI's Follow Me mode?

10:12  25      A.    I did.  You can get a good view of New England

| | | |
|---|---|---|
| 10:13 | 1 | in the winter here.  But here I'm testing a Mavic 2 |
| 10:13 | 2 | drone, and I'm testing the Follow Me functionality of |
| 10:13 | 3 | that drone. |
| 10:13 | 4 | Q.    And is this from Plaintiff's Exhibit 458? |
| 10:13 | 5 | A.    Yes. |
| 10:13 | 6 | MR. RICH:  We move to admit Plaintiff's |
| 10:13 | 7 | Exhibit 458 into the record. |
| 10:13 | 8 | MR. YIN:  No objection. |
| 10:13 | 9 | THE COURT:  Admitted. |
| 10:13 | 10 | BY MR. RICH: |
| 10:13 | 11 | Q.    What DJI drones have Follow Me mode? |
| 10:13 | 12 | A.    There are a number of them.  DJI provided |
| 10:13 | 13 | their seventh supplemental response to Interrogatory 1 |
| 10:13 | 14 | and identified a number of those drones that had the |
| 10:13 | 15 | Follow Me functionality. |
| 10:13 | 16 | Q.    Is this from Plaintiff's Exhibit 135 at |
| 10:13 | 17 | Pages 13 through 15? |
| 10:13 | 18 | A.    Yes. |
| 10:13 | 19 | Q.    Does your infringement analysis of Follow Me |
| 10:14 | 20 | mode apply the same across all of these drones? |
| 10:14 | 21 | A.    They do.  Yes.  It does. |
| 10:14 | 22 | Q.    Can you please explain to the jury what |
| 10:14 | 23 | ActiveTrack mode is at a high level? |
| 10:14 | 24 | A.    Yeah.  ActiveTrack is similar in function to |
| 10:14 | 25 | Follow Me, but instead of following the control box, |

```
10:14   1    what I do with the control box is I select what I want
10:14   2    the drone to follow.
10:14   3              So, you know, if I want it to follow my cocker
10:14   4    spaniel around in the front yard, I could literally
10:14   5    select the cocker spaniel in the image that it gets
10:14   6    from the camera, and it'll follow the dog around, at
10:14   7    least until the dog runs in the woods and the drone
10:14   8    can't follow it anymore.
10:14   9        Q.    What DJI models have ActiveTrack mode on it?
10:14   10       A.    Again, there was a response by DJI to
10:15   11   Textron's fifth set of interrogatories, and DJI
10:15   12   identified all of the drones that have this ActiveTrack
10:15   13   functionality.
10:15   14       Q.    This information is from Plaintiff's
10:15   15   Exhibit 141 at Pages 4 through 7, correct?
10:15   16       A.    Yes.
10:15   17              MR. RICH:  Your Honor, we move to admit
10:15   18   Plaintiff's Exhibit 141 into evidence.
10:15   19              MR. YIN:  No objection.
10:15   20              THE COURT:  It'll be admitted.
10:15   21   BY MR. RICH:
10:15   22       Q.    Now, does your infringement analysis for
10:15   23   ActiveTrack apply the same across all these models?
10:15   24       A.    Yes.  It does.
10:15   25              MR. RICH:  Your Honor, we're about to
```

10:15   1    start marching through the elements of the claim.

10:15   2                   Would Your Honor like to take a morning

10:15   3    recess?

10:15   4                   THE COURT:  I think that sounds great.

10:15   5    Let's see if the jury wants to take a recess.

10:15   6                   (Laughter.)

10:15   7                   THE COURT:  You should always be the

10:15   8    lawyer who gets to suggest the recess.  So well played.

10:15   9                   MR. RICH:  Thank you.

10:15  10                   THE COURT:  Ladies and gentlemen, if you

10:15  11    will remember my instructions.  We'll take about ten

10:16  12    minutes and then we'll come back, and we'll -- I think

10:16  13    he was -- we're not going to march through them.  We're

10:16  14    going to go through the very interesting points.

10:16  15                   MR. RICH:  We'll do our best.

10:16  16                   THE COURT:  We'll do our best.

10:16  17                   So we will be in recess.

10:16  18                   THE BAILIFF:  All rise.

10:16  19                   (Jury exited the courtroom.)

10:16  20                   THE COURT:  You may be seated.

10:16  21                   Is there anything we need to take up?

10:16  22                   MR. RICH:  Your Honor, we do have one

10:16  23    issue.

10:16  24                   THE COURT:  Sure.

10:16  25                   MR. SPEEGLE:  Your Honor, it was brought

10:16  1    to our attention that some of the deposition video

10:16  2    clips that played yesterday didn't have clear audio on

10:16  3    some of the statements so there were some missing gaps

10:16  4    in the transcript.

10:16  5              We've conferred with the other side, and

10:16  6    we have a short clip of less than -- I think it's

10:17  7    about -- less than five minutes of deposition testimony

10:17  8    to play to fill those gaps.

10:17  9              THE COURT:  We'll do that whenever y'all

10:17  10   want.

10:17  11             MR. SPEEGLE:  Okay.  Thank you.

10:17  12             THE COURT:  Anything else?

10:17  13             MR. YIN:  Nothing from us.

10:17  14             THE COURT:  Okay.  We'll be back in about

10:17  15   ten minutes.

10:17  16             THE BAILIFF:  All rise.

10:17  17             (Recess taken.)

10:33  18             THE BAILIFF:  All rise.

10:33  19             THE COURT:  Please remain standing for

10:33  20   the jury.

10:33  21             (Jury entered the courtroom.)

10:33  22             THE COURT:  Thank you.  You may be

10:33  23   seated.

10:33  24             Counsel, you may proceed.

10:33  25             MR. RICH:  Thank you, Your Honor.

```
10:33    1   BY MR. RICH:
10:34    2        Q.    Before we step through the elements of
10:34    3   Claim 1, we talked some about the models of DJI's
10:34    4   drones that have Follow Me and ActiveTrack.
10:34    5        Do you remember that?
10:34    6        A.    Yes.
10:34    7        Q.    Did you see additional evidence of models that
10:34    8   have ActiveTrack and Follow Me?
10:34    9        A.    I did.  There's a DJI developer website where
10:34   10   they seem to identify more models than DJI identified
10:34   11   in those rog responses.
10:34   12        Q.    Now, turning back to your claim analysis, are
10:34   13   you going to address Claims 1, 7, 10 and 11 from the
10:34   14   '909 patent?
10:34   15        A.    Yes.
10:34   16        Q.    And just to alleviate the jurors' concerns
10:34   17   about that, are these claims as long as the one we just
10:34   18   looked at?
10:34   19        A.    They're not as long, and two of them have a
10:34   20   lot of redundancy between them.  So the first one,
10:34   21   yeah.  We'll have to slog through, but the others will
10:34   22   go quicker.
10:34   23        Q.    All right.  Let's start with Claim 1.
10:34   24        Are we going to break this claim down
10:35   25   element-by-element like we did for Claim 13?
```

399

10:35  1    A.    We are.  Yes.

10:35  2    Q.    The first part of Claim 1 says:  A system for

10:35  3    controlling flight of an aircraft.

10:35  4          Do DJI drones with both Follow Me and

10:35  5    ActiveTrack meet that element?

10:35  6    A.    They do.  Yes.

10:35  7    Q.    Can you explain why DJI drones include a

10:35  8    system for controlling flight of an aircraft?

10:35  9    A.    Yes.  This is, again, out of the DJI Phantom 4

10:35  10   Pro user manual.  And as I was talking about before,

10:35  11   the drone plus controller certainly is a system, but

10:35  12   inside the drone itself, there's actually a computer

10:35  13   that they call the flight control computer or flight

10:35  14   controller, and that is what they're referring to here

10:35  15   in the manual.

10:36  16         The flight controller controls the motors.

10:36  17   The motors control the propellers.  The propellers

10:36  18   control the -- how the drone flies in space.

10:36  19   Q.    Is this from Plaintiff's Exhibit 113 at

10:36  20   Pages 6 and 8?

10:36  21   A.    Yes.

10:36  22   Q.    Now, does DJI dispute that this element is met

10:36  23   with respect to either Follow Me or ActiveTrack?

10:36  24   A.    They do not.

10:36  25   Q.    Can we check the box on this element as met

10:36  1    for both Follow Me and ActiveTrack?

10:36  2        A.    Yes.

10:36  3        Q.    What's the next element you'll address?

10:36  4        A.    That's referring to a sensor system disposed

10:36  5    on the aircraft for sensing a position of the aircraft

10:36  6    and movement of the aircraft.

10:36  7              So that's the sensors on the aircraft that

10:36  8    figure out how it's moving, where it's moving.

10:36  9        Q.    Do DJI drones meet this element?

10:36  10       A.    They do.

10:36  11       Q.    Can you explain why DJI drones with Follow Me

10:37  12   and ActiveTrack include a sensor system for sensing a

10:37  13   position of the aircraft and inertial movement of the

10:37  14   aircraft?

10:37  15       A.    Yeah.  Mr. Zhang does indicate, you know, he

10:37  16   is asked if they have sensors that measure position and

10:37  17   speed, and he says he believes they do.

10:37  18       Q.    Is this admission from Mr. Zhang at

10:37  19   yesterday's trial transcript Page 278, Lines 7 through

10:37  20   10?

10:37  21       A.    Yes.

10:37  22       Q.    All right.  What's the next part of this

10:37  23   element that you'll address?

10:37  24       A.    The second half of that element is:  The

10:37  25   sensor system has to be adapted to communicate sensed

401

10:37  1    data representing the position and inertial movement of

10:37  2    the aircraft.

10:37  3           So that would be the communications between

10:37  4    the sensors that are sensing the movement and position

10:38  5    of the drone and that flight control processor that's

10:38  6    inside the drone.

10:38  7    Q.    So we're talking about the GPS sensor within a

10:38  8    drone just passing the information to the processor in

10:38  9    the drone?

10:38  10   A.    Yes.

10:38  11   Q.    Can you explain why DJI drones include a

10:38  12   sensor system that communicates sense data representing

10:38  13   the position and movement of the aircraft?

10:38  14   A.    Sure.  You know, in my process, I reviewed a

10:38  15   lot of the electrical schematics and other information

10:38  16   that DJI provided for me.  And everything that I saw

10:38  17   showed a GPS receiver, an inertial measurement unit and

10:38  18   other sensors that were communicating to the processor.

10:38  19          And this is an excerpt of a web page on DJI's

10:38  20   website, their developer's site, that's talking about

10:39  21   flight controller, and they say:  It's an onboard

10:39  22   computer that combines control information from a pilot

10:39  23   with sensor information to adjust the thrust at each

10:39  24   propeller.

10:39  25          So that's taking that sensor information that

—402—

10:39  1    tells the computer what the drone is doing and makes

10:39  2    the drone do what the pilot wants it to do.

10:39  3        Q.    And you found this evidence at Plaintiff's

10:39  4    Exhibit 155, which is a DJI website, correct?

10:39  5        A.    That's correct.

10:39  6                MR. RICH:  We move to admit Plaintiff's

10:39  7    Exhibit 155 into evidence.

10:39  8                MR. YIN:  No objection.

10:39  9                THE COURT:  It'll be admitted.

10:39  10   BY MR. RICH:

10:39  11       Q.    Now, does DJI even dispute that this element

10:39  12   is met?

10:39  13       A.    I don't believe so.

10:39  14       Q.    Can we check the box on this entire element

10:39  15   for both Follow Me and ActiveTrack?

10:39  16       A.    Yes.

10:39  17       Q.    Now, what's the next element in Claim 1 that

10:39  18   you'll address?

10:40  19       A.    That's a receiver on the aircraft adapted to

10:40  20   receive transmitted reference data communicating a

10:40  21   position and movement of a reference vehicle.

10:40  22            So that's the receiver that's on board the

10:40  23   aircraft that's getting information from the

10:40  24   controller.

10:40  25       Q.    Do DJI's drones meet this element both

—403—

10:40  1    literally and under the doctrine of equivalents?

10:40  2        A.    They do.

10:40  3        Q.    All right.  Let's address the first part of

10:40  4    that, "a receiver disposed on the aircraft."

10:40  5            Can you explain why DJI drones include that

10:40  6    receiver?

10:40  7        A.    Well, again, Mr. Zhang admits that, you know,

10:40  8    indeed, we have a hardware component to receive the

10:40  9    data sent from the app.

10:40  10           There, he's referring to the radio receiver

10:40  11   that would be on board the aircraft and that's

10:40  12   receiving signals from the application that's running

10:41  13   on the controller.

10:41  14       Q.    Moving on to the next part of the claim

10:41  15   element.

10:41  16           Can you explain why DJI drones with Follow Me

10:41  17   receive reference data communicating a position and

10:41  18   movement of a reference vehicle?

10:41  19       A.    Sure.  In the case of Follow Me, this

10:41  20   controller has a GPS receiver -- or a receiver that can

10:41  21   receive GPS signals and determine its position so the

10:41  22   controller knows where the controller is, and it can

10:41  23   send that information to the drone on the radio link

10:41  24   between the drone and the controller.

10:41  25       Q.    Now, why is that data received at the drone

10:41  1    reference data that communicates position and movement?

10:42  2        A.   Well, similarly to what Mr. Harris described

10:42  3    yesterday, if I have two position fixes and I know how

10:42  4    much time has passed between those two position fixes,

10:42  5    having just those position fixes gives me not only the

10:42  6    position of the reference vehicle but also the speed of

10:42  7    the reference vehicle.  So it gives me position and

10:42  8    speed.

10:42  9        Speed is just change in position divided by

10:42  10   time, you know, miles per hour, something like that.

10:42  11       Q.   Did you see any DJI engineer testimony that

10:42  12   confirmed that DJI receives reference data

10:42  13   communicating a position and movement?

10:42  14       A.   Yes.  In fact, Mr. Zhang admits that on the --

10:42  15   on the drone they can estimate the speed using that

10:43  16   position information because they know -- they know how

10:43  17   often they're getting their position updated so they

10:43  18   can calculate speed.

10:43  19       And he then admits that using the position --

10:43  20   the differences in position from the target that, yes,

10:43  21   the software that runs on the drone can do that, can

10:43  22   estimate that speed.

10:43  23       Q.   Is this admission in the trial transcript from

10:43  24   yesterday at Page 274, Line 18 through Page 275,

10:43  25   Line 5?

10:43  1      A.    Yes.  That's correct.

10:43  2      Q.    Do you have a doctrine of equivalents opinion

10:43  3  that Follow Me -- that the Follow Me mode for the

10:43  4  element reference data communicating position and

10:43  5  movement of the reference vehicle?

10:43  6      A.    Yes.  The claim says you have to communicate

10:43  7  position and reference data.  It doesn't specify

10:44  8  specifically what pieces of data you need to

10:44  9  communicate that.  And as long as you're communicating

10:44  10  enough information to be able to determine the position

10:44  11  and movement of the data, it works.

10:44  12          So I could certainly -- at this box, I could

10:44  13  calculate -- you know, it could calculate the movement,

10:44  14  you know, the different GPS positions and the time, and

10:44  15  it could send the latitude and longitude of the box as

10:44  16  well as how fast the box moved and the direction the

10:44  17  box moved.

10:44  18          But the drone can calculate that, right, just

10:44  19  from the position.  So where I actually do the

10:44  20  calculation doesn't matter.  I'll get the same answer.

10:44  21  So I consider that an insubstantial difference.

10:44  22      Q.    Can the jury find infringement under both

10:45  23  literal infringement and equivalent infringement for

10:45  24  this element?  For Follow Me?

10:45  25      A.    Yes.

| | | |
|---|---|---|
| 10:45 | 1 | Q.    Can we check the box for Follow Me? |
| 10:45 | 2 | A.    Yes. |
| 10:45 | 3 | Q.    All right.  Moving on to ActiveTrack. |
| 10:45 | 4 | Can you explain why DJI drones with |
| 10:45 | 5 | ActiveTrack literally receive transmitted reference |
| 10:45 | 6 | data communicating a position in movement of a |
| 10:45 | 7 | reference vehicle? |
| 10:45 | 8 | A.    Yes.  ActiveTrack works a little bit |
| 10:45 | 9 | differently than the -- than the Follow Me in that for |
| 10:45 | 10 | ActiveTrack, on this display, I'll see a picture of |
| 10:45 | 11 | what the drone sees.  So I'll move the drone in an |
| 10:45 | 12 | orientation that has what I want in the picture. |
| 10:45 | 13 | And then what I do is I'd literally take my |
| 10:45 | 14 | finger and I'd select what it is.  I either draw a box |
| 10:45 | 15 | around it or I touch it and select it.  Depending on |
| 10:45 | 16 | the version of the software that's running, it can |
| 10:45 | 17 | recognize different things:  Cars, boats, animals, |
| 10:46 | 18 | things like that. |
| 10:46 | 19 | But generally I can always draw a box around |
| 10:46 | 20 | it.  And when I draw that box around it, what this box |
| 10:46 | 21 | does is it sends where in the image that object is |
| 10:46 | 22 | located.  Once the drone knows where that object is |
| 10:46 | 23 | located that I want it to follow, then it can estimate |
| 10:46 | 24 | from that image where that drone is. |
| 10:46 | 25 | Because it can estimate what the distance is |

—407—

10:46  1    and it knows which way the camera's pointed.  So it can

10:46  2    figure out exactly where that object is.  And once it

10:46  3    knows what object I want, if that object moves, it

10:46  4    knows that that object moves and can follow that

10:46  5    object.

10:46  6         Q.    So the drone will receive data that allows it

10:46  7    to determine the position and movement of the reference

10:46  8    vehicle?

10:46  9         A.    That's correct.

10:46 10         Q.    And what is this slide showing, Dr. Michalson?

10:47 11         A.    This is an animation of that process I just

10:47 12    described where, you know, I select the image on the --

10:47 13    on the screen.  That gets transmitted to the drone, and

10:47 14    then the drone will lock onto that image that I've

10:47 15    selected and will follow that image.

10:47 16              MR. RICH:  I believe we have source code

10:47 17    on the next slide.  Would you like to seal?

10:47 18              MR. YIN:  Certainly.

10:47 19              Your Honor, counsel is going to discuss

10:47 20    DJI source code.  So we request to seal the courtroom.

10:47 21              THE COURT:  That's fine.  Anyone who's

10:47 22    not under the protective order needs to step out.

10:47 23              (Sealed proceedings.)

10:48 24              MR. RICH:  Mr. Patterson, clicking over

10:48 25    to the next slide, please.  Thank you.

408

| | | |
|---|---|---|
| 10:48 | 1 | BY MR. RICH: |
| 10:48 | 2 | Q.    Now, the claim talks about following a |
| 10:48 | 3 | reference vehicle.  Do you remember that element, a |
| 10:48 | 4 | reference vehicle? |
| 10:48 | 5 | A.    Yes. |
| 10:48 | 6 | Q.    Can the target in ActiveTrack be a reference |
| 10:48 | 7 | vehicle? |
| 10:48 | 8 | A.    It can.  It can be a variety of different |
| 10:48 | 9 | vehicles, in fact, a large number of different things. |
| 10:48 | 10 | I've got a couple of pictures that are pulled |
| 10:48 | 11 | from DJI's -- one of DJI's websites that shows the |
| 10:48 | 12 | drone following a vehicle. |
| 10:48 | 13 | |
| 10:49 | 14 | |
| 10:49 | 15 | |
| 10:49 | 16 | |
| 10:49 | 17 | |
| 10:49 | 18 | |
| 10:49 | 19 | |
| 10:49 | 20 | |
| 10:49 | 21 | |
| 10:49 | 22 | |
| 10:49 | 23 | So it can track a lot of things, including |
| 10:49 | 24 | cars and vans and boats, all of which would be |
| 10:49 | 25 | vehicles. |

| | | |
|---|---|---|
| 10:49 | 1 | Q.   Now, on the left side of the slide -- I know |
| 10:49 | 2 | the text is pretty small. |
| 10:49 | 3 | Are you able to read the text? |
| 10:49 | 4 | A.   Yes. |
| 10:49 | 5 | Q.   And the top left-hand portion, can you read |
| 10:49 | 6 | the highlighted text? |
| 10:49 | 7 | A.   Yeah.  I mean, the website says, in fact, get |
| 10:50 | 8 | in a car and let your drone follow your car.  So I can |
| 10:50 | 9 | follow you while you're driving. |
| 10:50 | 10 | Q.   And in the bottom left-hand corner of the |
| 10:50 | 11 | slide, can you read the highlighted text from DJI's |
| 10:50 | 12 | website? |
| 10:50 | 13 | A.   Yes.  That's another part of the website where |
| 10:50 | 14 | they say, you know, better yet you get out in the open |
| 10:50 | 15 | water, just like road vehicles, a drone can follow and |
| 10:50 | 16 | fly around boats, yachts and other types of watercraft. |
| 10:50 | 17 | Q.   And is the information on the left side of the |
| 10:50 | 18 | slide from Plaintiff's Exhibit 173? |
| 10:50 | 19 | A.   Yes. |
| 10:50 | 20 | MR. RICH:  We move to admit Plaintiff's |
| 10:50 | 21 | Exhibit 173 into evidence. |
| 10:50 | 22 | MR. YIN:  No objection. |
| 10:50 | 23 | THE COURT:  Admitted. |
| 10:50 | 24 | BY MR. RICH: |
| 10:50 | 25 | Q.   And is the information on the right from |

| | | |
|---|---|---|
| 10:50 | 1 | Plaintiff's Exhibit 127 at Page 968, Lines 1159 through |
| 10:50 | 2 | 1173? |
| 10:50 | 3 | A.    Yes. |
| 10:50 | 4 | Q.    Now, do you also have an equivalents opinion |
| 10:50 | 5 | for ActiveTrack on this reference data element? |
| 10:50 | 6 | A.    Yes.  Again, all the controller has to do is |
| 10:51 | 7 | communicate enough information that will allow the |
| 10:51 | 8 | drone to track the position and movement of the |
| 10:51 | 9 | reference vehicle.  And when that -- when that image is |
| 10:51 | 10 | selected on the -- on the display, that's what gives |
| 10:51 | 11 | the drone all the information it needs to be able to |
| 10:51 | 12 | follow that object. |
| 10:51 | 13 | Q.    And why does that meet the doctrine of |
| 10:51 | 14 | equivalents? |
| 10:51 | 15 | A.    Because it's insubstantially different. |
| 10:51 | 16 | Q.    Can we check the box on this element as met |
| 10:51 | 17 | under both literal infringement and doctrine of |
| 10:51 | 18 | equivalents? |
| 10:51 | 19 | A.    Yes. |
| 10:51 | 20 | Q.    What is the next element you'll address? |
| 10:51 | 21 | A.    The next element is -- reads:  Commanded data |
| 10:51 | 22 | representing a selected velocity of the aircraft |
| 10:51 | 23 | relative to the reference vehicle. |
| 10:51 | 24 | Q.    Do DJI drones with Follow Me meet this |
| 10:52 | 25 | element? |

411

10:52  1        A.    They do.

10:52  2        Q.    Please explain to the jury why DJI's Follow Me

10:52  3   mode meets this element.

10:52  4        A.    Well, if you're going to follow an object, you

10:52  5   have to be able to track not only the position of that

10:52  6   object, where it's moving, so you have to move at the

10:52  7   same -- at the same speed in a selected relative

10:52  8   position.

10:52  9   ████████████████████████████████████████████████

10:52  10  ████████████████████████████████████████████████

10:52  11  ████████████████████████████████████████████████

10:52  12  ████████████████████████████    if we're in the Follow

10:52  13  Me mode, then we do some calculations to calculate the

10:52  14  speed of the target relative to what the current

10:52  15  velocity command is in the drone.  And then we add --

10:53  16  we go through and add those parameters together, the

10:53  17  commanded velocity and the target velocity, to come up

10:53  18  with a number that'll represent -- that will be

10:53  19  ultimately sent to the motor controllers to set the

10:53  20  speed.

10:53  21  █  ████████████████████████████████████████████

10:53  22  ████████████████████████████████████████████████

10:53  23  █  ██  ███████████████████████████████████████████

10:53  24  ████████████████████████████████████████████████

10:53  25  ██████████████████████    The code is already on

412

10:53    1    there.   It's preprogrammed.

10:53    2    ████ ███████████████████████

10:53    3    ████ ████

10:53    4    ████ ████████████████████████████████████████

10:53    5    ████████████████████████████████████████

10:53    6    █████████

10:53    7    ████ ███████ █████████████████████████████

10:53    8    ████████████████████████████████████████

10:53    9    █████████

10:53    10    Q.    All right.   Does DJI dispute that this element

10:54    11    is met?

10:54    12    A.    They do.   Dr. Nourbakhsh, DJI's technical

10:54    13    expert, wants to add into the claim language that

10:54    14    that's -- that speed has to be chosen by the operator,

10:54    15    and that's not in the claim.

10:54    16    Q.    And is it proper to add it into the claim?

10:54    17    A.    It's not only not proper to add it into the

10:54    18    claim, but unless the operator knows exactly what the

10:54    19    speed of the vehicle is, it wouldn't make sense.   If

10:54    20    you change the speed of the vehicle a little bit, the

10:54    21    drone's going to lose synchronization with the vehicle.

10:54    22    The drone has to be able to do those calculations.

10:54    23    Q.    Can we check the box on the commanded data set

10:54    24    of elements for Follow Me?

10:54    25    A.    We can.

| | | |
|---|---|---|
| 10:54 | 1 | Q.    And does ActiveTrack meet the commanded data |
| 10:54 | 2 | element? |
| 10:54 | 3 | A.    Well, right now, Follow Me -- we've just |
| 10:55 | 4 | discussed Follow Me but, yes, ActiveTrack also does. |
| 10:55 | 5 | Q.    Can you please explain why ActiveTrack meets |
| 10:55 | 6 | the commanded data element? |
| 10:55 | 7 | A.    It does.  There are a number of places that |
| 10:55 | 8 | the code is a bit more complicated because it involves |
| 10:55 | 9 | the image processing and the orientation of the camera |
| 10:55 | 10 | and the orientation of the vehicle.  But there are a |
| 10:55 | 11 | number of places where these calculations where the |
| 10:55 | 12 | drone is estimating its position, is estimating camera |
| 10:55 | 13 | position, is estimating vehicle position based on that |
| 10:55 | 14 | information.  And this is one of the portions of the |
| 10:55 | 15 | code in which those calculations are being done. |
| 10:55 | 16 | █  ███████████████████████████ |
| 10:55 | 17 | ████████████████████████████████ |
| 10:55 | 18 | █  ████  █████████████████████ |
| 10:55 | 19 | █████████████████ |
| 10:55 | 20 | Q.    And is this in Plaintiff's Exhibit 127 at |
| 10:56 | 21 | Page 953, Lines 5529 through 5543? |
| 10:56 | 22 | A.    Yes. |
| 10:56 | 23 | Q.    Okay.  Can we check the box on the commanded |
| 10:56 | 24 | data limitation for ActiveTrack? |
| 10:56 | 25 | A.    We can. |

414

10:56  1    Q.    All right.  What's the next set of elements

10:56  2    that you'll address?

10:56  3    A.    This is a long one.  But this is related to

10:56  4    the control system that's on the aircraft and, you

10:56  5    know, the calculations that that control system has to

10:56  6    do.

10:56  7    Q.    Okay.  Can we break this element into pieces

10:56  8    and address the control system disposed on the aircraft

10:56  9    first?

10:56  10   A.    Yes.

10:56  11   Q.    Okay.  Can you please explain why DJI drones

10:56  12   include a control system disposed on the aircraft?

10:56  13   A.    Yes.  I mean, that's the code that's provided

10:57  14   by DJI.  ███████████████████████████████████████

10:57  15   ████████████████████████    And this excerpt is, again,

10:57  16   from the DJI developer website where they're talking

10:57  17   about that flight controller as an onboard computer

10:57  18   that's combining information from the pilot and the

10:57  19   sensor to adjust the thrust at the propellers which is

10:57  20   what changes the flight path of the drone.

10:57  21         And in this case, the pilot is giving it the

10:57  22   information that it needs to determine where the target

10:57  23   is, and then the drone is calculating how to control

10:57  24   those thrusts based on what it sees.

10:57  25   Q.    Now, is that computer on all the drones that

10:57  1    are at issue for Follow Me and ActiveTrack?

10:57  2        A.    Every drone has a flight control computer,

10:57  3    yes.

10:57  4        Q.    Now, let's move on to the calculating -- a

10:57  5    calculated velocity element.

10:57  6              Do you have a literal and doctrine of

10:58  7    equivalents opinion for these elements?

10:58  8        A.    I do.

10:58  9        Q.    Let's start with the literal infringement

10:58  10   opinion.

10:58  11             Can you please explain to the jury why DJI

10:58  12   drones in Follow Me mode calculate a calculated

10:58  13   velocity of the aircraft relative to the reference

10:58  14   vehicle using the sense data and the reference data?

10:58  15       A.    Yes.  Really, it's a multipart algorithm.  The

10:58  16   first thing that has to happen is the drone estimates

10:58  17   the target velocity based on the information it got

10:58  18   from the drone.  It then calculates the distance

10:58  19   between the drone and the target object.

10:58  20             After it does that, it's going to calculate an

10:58  21   initial velocity of the drone that it needs to speed up

10:58  22   to.  Because usually when you start this, the drone is

10:58  23   in its automatic hover and you're selecting, you know,

10:59  24   how far away you want it to be, what altitude you want

10:59  25   it to be, how you want the camera positioned.

416

10:59  1        And then once it starts, it picks up that
10:59  2   velocity.  Once it gets in lock with the drone, then
10:59  3   it's going to keep adjusting that velocity.  As the
10:59  4   vehicle speeds up and slows down, the drone is going to
10:59  5   be getting -- in the case of Follow Me, is going to be
10:59  6   getting different amounts of distance it travels at,
10:59  7   you know, over different points in time.  And it's
10:59  8   going to keep adjusting the velocity.
10:59  9        So, you know, if the car or the boat speeds up
10:59  10  a little or slows down a little, the drone will speed
10:59  11  up a little or slow down a little to match the speed of
10:59  12  the vehicle.
10:59  13  Q.   When DJI's calculating the drone's velocity in
10:59  14  a way that tries to match the target's velocity, what
10:59  15  data is DJI using in that calculation?
11:00  16  A.   They're using the successive positions that
11:00  17  are being reported from the drone in the Follow Me --
11:00  18  or from the controller in the Follow Me mode.
11:00  19  Q.   And that's the sense data and the reference
11:00  20  data we talked about earlier?
11:00  21  A.   Yes.  That's correct.
11:00  22  Q.   Why is the calculation of velocity that DJI is
11:00  23  doing a calculation of a calculated velocity relative
11:00  24  to the reference vehicle?
11:00  25  A.   Well, because when it's -- when it's doing its

11:00  1  velocity update, the drone has to calculate its

11:00  2  position; the reference vehicle calculates its position

11:00  3  in the GPS receiver in the -- in the controller.

11:00  4        The information from the controller is sent to

11:00  5  the drone, and it's going to be calculating based on

11:01  6  its -- the information it's been getting, what the

11:01  7  current velocity is.  So it's going to calculate the

11:01  8  corrections that it needs to do.

11:01  9        And then it's going to take that calculation

11:01  10 of a new velocity and send that to the motors to -- so

11:01  11 that the drone can keep up with the vehicle.

11:01  12     Q.    How does DJI characterize this ability to

11:01  13 follow with the velocity that is relative to the

11:01  14 target?

11:01  15     A.    You can consider it -- or at least they

11:01  16 describe it in their Phantom 4 user manual as a virtual

11:01  17 tether.  So you could kind of almost think about it as

11:01  18 a leash on the -- between the drone and the controller,

11:01  19 but instead of a physical leash, it's the radio link.

11:01  20 It's a virtual leash.

11:02  21     Q.    How would you characterize the importance for

11:02  22 DJI's drones to calculate their velocity so that it's

11:02  23 relative to the reference vehicle?

11:02  24     A.    It's critical.  Because if you want to follow

11:02  25 something that may be changing in speed, you have to be

418

| | | |
|---|---|---|
| 11:02 | 1 | able to keep up with those changes.  You have to be |
| 11:02 | 2 | able to keep calculating those velocity updates. |
| 11:02 | 3 | Without that, you know, the vehicle would |
| 11:02 | 4 | either speed away and the drone would be left behind or |
| 11:02 | 5 | the drone would speed away and the vehicle would be |
| 11:02 | 6 | left behind.  It has to match those speeds. |
| 11:02 | 7 | Q.    Now, earlier we looked at the flowchart you |
| 11:02 | 8 | created. |
| 11:02 | 9 | Is that derived from the DJI source code for |
| 11:02 | 10 | Follow Me that you looked at? |
| 11:02 | 11 | A.    Yes. |
| 11:02 | 12 | Q.    And is that source code shown on this slide? |
| 11:02 | 13 | A.    Yes.  That's part of the source code where |
| 11:02 | 14 | these calculations are being done. |
| 11:02 | 15 | Q.    And is that source code in Plaintiff's |
| 11:02 | 16 | Exhibit 127 at Page 295, Lines 930 through 950? |
| 11:03 | 17 | A.    Yes. |
| 11:03 | 18 | Q.    Now, does DJI agree that they meet this |
| 11:03 | 19 | element? |
| 11:03 | 20 | A.    DJI does not agree that this element is met. |
| 11:03 | 21 | Q.    Why is that? |
| 11:03 | 22 | A.    Well, my understanding of DJI's position is |
| 11:03 | 23 | that ███████████████████████████████████████ |
| 11:03 | 24 | ███████████████████████████████████████████ |
| 11:03 | 25 | ███████████████████████████████ |

11:03    1          They kind of -- and here, I've blacked out on

11:03    2    the slide Steps 3 and 4, where they're getting the

11:03    3    position updates, calculating the velocity and using

11:03    4    that to keep up with the drone, DJI appears to be

11:03    5    ignoring.

11:03    6    Q.    You mentioned you also have an infringement

11:04    7    opinion under the doctrine of equivalents for the

11:04    8    calculating a calculated velocity element.

11:04    9          Can you explain that opinion to the jury?

11:04   10    A.    Yes.  The drone -- well, what's happening in

11:04   11    the process that I'm describing, getting those position

11:04   12    updates over time, is performing the -- substantially

11:04   13    the same function as if I'd actually sent velocity to

11:04   14    the drone.  And that function is it's setting the

11:04   15    drone's velocity to equal that of the object.

11:04   16          It's doing it in substantially the same way.

11:04   17    It's calculating the velocity using data from the drone

11:04   18    and data about the tech-tracked object.

11:04   19          And we're getting substantially the same

11:04   20    result.  The drone is obtaining and maintaining a

11:04   21    constant velocity relative to the target so that the

11:05   22    drone can keep up with the target and maintain its

11:05   23    position relative to the target.

11:05   24    Q.    Now, switching to ActiveTrack, can you please

11:05   25    explain to the jury why ActiveTrack mode literally

11:05    1    calculates a calculated velocity of the aircraft

11:05    2    relative to the reference vehicle?

11:05    3       A.    Sure.  In the case of ActiveTrack, I'm

11:05    4    selecting the object and going through a very similar

11:05    5    process, except instead of getting GPS data, I'm now

11:05    6    using image data.  But I use that received data to

11:05    7    figure out what image I'm trying to track.

11:05    8       I -- then as the object moves in that image,

11:05    9    I'm going to be calculating a velocity based on that

11:05   10    initial data I provided, because it's going to change

11:05   11    its shape or its size in the image.  The drone's going

11:06   12    to know that and going to continue to calculate that

11:06   13    position and velocity.

11:06   14       It's going to calculate the velocity that it

11:06   15    needs to match how the drone is moving in the image,

11:06   16    and then it's going to use that to send the necessary

11:06   17    velocity commands to the motors of the drones so that

11:06   18    it can keep up with the object.

11:06   19       Q.    When the drone calculates a velocity of the

11:06   20    drone relative to the reference vehicle, what data is

11:06   21    the drone using to make that calculation?

11:06   22       A.    Well, it's using -- certainly, it's starting

11:06   23    with the initial position of the object that the drone

11:06   24    has received.  And from that point forward, it's

11:06   25    tracking that object, and it's watching how that object

421

11:06   1    moves and it's estimating the speed.

11:06   2           It continues to estimate the speed and the

11:07   3    velocity, the motion, of that object based on that

11:07   4    initial data.

11:08   22      Q.    And is this at Plaintiff's Exhibit 127,

11:08   23    Page 953 at Lines 5529 through 5543?

11:08   24      A.    Yes.

11:08   25      Q.    Do you have a doctrine of equivalents theory

11:08  1    for ActiveTrack for the calculating elements?

11:08  2        A.    I do. ███████████████████████████

11:08  3    ████████████████████████████████████████

11:08  4    ████████████████████████████████████

11:08  5    ████████████████████████████████████

11:08  6    ██████████████████████████████████████████

11:08  7    ████████

11:09  8            ████████████████████████████████████

11:09  9    ████████████████████████████████████████

11:09  10   █████████████████████████████

11:09  11           It does it in the same way.  The math is

11:09  12   different, but the way it does it is by ███████████

11:09  13   ██████████████████████████████████████

11:09  14   ██████████████████████████████████████████

11:09  15   ████████  ██████████████████████████████

11:09  16   ████████████████████

11:09  17       Q.    Now, moving on to the very last part of this

11:09  18   element, the controlling flight-control devices aspect

11:09  19   of the claim.

11:09  20       A.    Yeah.  Actually relative to the tracked object

11:09  21   and the drone.

11:09  22       Q.    Correct.

11:09  23       A.    Yeah.

11:09  24       Q.    Can you please explain why DJI drones meet

11:09  25   this element with Follow Me and ActiveTrack?

423

11:10  1    A.    Sure.

11:10  2          Again, the brains of the drone are the

11:10  3    processor, or processors on some drones, inside the

11:10  4    drone.  And as we've seen before, that's the device

11:10  5    that's doing all these calculations.  It's taking

11:10  6    control information from the controllers.  It's taking

11:10  7    sensed information from the camera and other sensors

11:10  8    for the GPS, and it's combining those to create this

11:10  9    Intelligent Flight Mode or these Intelligent Flight

11:10 10    Modes.

11:10 11    Q.    I see the element flight-control device is in

11:10 12    the claim.

11:10 13          What are the flight-control devices on the

11:10 14    drone?

11:10 15    A.    The flight-control devices fundamentally are

11:10 16    the propellers.  And that flight-control unit sends the

11:10 17    commands to the electronic speed controllers that

11:11 18    determine how fast each propeller has to spin in order

11:11 19    to get the right kind of thrust to keep the drone in

11:11 20    the desired position.

11:11 21    Q.    Now, the last part of that element says:  To

11:11 22    attain and maintain a selected velocity relative to the

11:11 23    reference vehicle corresponding to the commanded data.

11:11 24          Can you explain why that's met?

11:11 25    A.    Yes.  There is an admission by Mr. Zhang, and

11:11  1    he's asked if the purpose of the velocity command sent

11:11  2    to the flight controller is to cause the flight module

11:11  3    to control the drone to fly according to that command.

11:11  4    And of course, he agrees.

11:11  5          You know, it's the processor that calculates

11:11  6    the necessary velocity commands to enable the

11:11  7    Intelligent Flight Modes of the drone.

11:11  8    Q.    So is Mr. Zhang saying that you calculate a

11:12  9    velocity and then just send it out to the motors so

11:12  10   it'll achieve the velocity they need?

11:12  11   A.    Correct.

11:12  12   Q.    Now, can you show the jury why DJI's drones

11:12  13   have to attain and maintain the velocity relative to

11:12  14   the vehicle?

11:12  15   A.    Yeah.  I've got this animation again.  You

11:12  16   know, the vehicles you're following are not going to be

11:12  17   traveling necessarily in a -- at a consistent speed and

11:12  18   a consistent direction.

11:12  19         So to be able to keep up with the reference

11:12  20   vehicle and to maintain this, you know, what they

11:12  21   previously called a virtual tether, you have to be able

11:12  22   to maintain the -- a velocity that's selected by the

11:12  23   software in the -- in the drone to be able to keep

11:12  24   constantly matching the speed of the object being

11:12  25   tracked and the speed of the drone.

11:13  1       Q.   All right.  Can we now check the box for both

11:13  2   Follow Me and ActiveTrack for this whole group of

11:13  3   elements as met both literally and equivalently?

11:13  4       A.   Yes.  We can.

11:13  5       Q.   All right.  Moving on to the very last

11:13  6   limitation of Claim 1.  It references commanded data.

11:13  7            Is that the same commanded data we talked

11:13  8   about earlier?

11:13  9       A.   That commanded data is the -- I mean, that's

11:13  10  the data that is being used -- that's being calculated

11:13  11  and used to drive the motor controllers.

11:13  12      Q.   And is that the algorithm that's pre-coded

11:13  13  into DJI's code?

11:13  14      A.   Yeah.  All those calculations are done in the

11:13  15  code that DJI has in the drone.  That's in the drone

11:13  16  when you take it out of the box.

11:13  17      Q.   And so the claim says that the commanded data

11:13  18  that's preprogrammed into the system is an algorithm

11:13  19  like we're seeing here on the code?

11:14  20      A.   Yes.

11:14  21      Q.   Is that preprogrammed?

11:14  22      A.   All these algorithms are preprogrammed.

11:14  23  Obviously, you know, nobody, including the driver of

11:14  24  the vehicle, can know what speed they're going to be

11:14  25  driving at what time, right?  If the -- that dog runs

—426—

| | | |
|---|---|---|
| 11:14 | 1 | in front of the car, you're going to slow down.  The |
| 11:14 | 2 | drone has to be able to keep up with it.  So the |
| 11:14 | 3 | preprogramming is associated with the code that's |
| 11:14 | 4 | actually in here and the algorithms that are in the |
| 11:14 | 5 | drone. |
| 11:14 | 6 | Q.    Now, who preprogrammed that into the drone? |
| 11:14 | 7 | A.    That's DJI. |
| 11:14 | 8 | Q.    And is this at Plaintiff's Exhibit 127 at |
| 11:14 | 9 | Page 295, Lines 930 through 950? |
| 11:14 | 10 | A.    Yes. |
| 11:14 | 11 | Q.    Now, for ActiveTrack, is there also an |
| 11:14 | 12 | algorithm in the code that's preprogrammed into the |
| 11:14 | 13 | system? |
| 11:14 | 14 | A.    Yeah.  For all of these modes, these |
| 11:14 | 15 | algorithms are all preprogrammed into the system, yes. |
| 11:14 | 16 | Q.    And so is that at Plaintiff's Exhibit 127, |
| 11:15 | 17 | Page 953, Lines 5529 through 5543? |
| 11:15 | 18 | A.    Yes. |
| 11:15 | 19 | Q.    Can we now check the box on the commanded data |
| 11:15 | 20 | being preprogrammed into the control system before |
| 11:15 | 21 | flight? |
| 11:15 | 22 | A.    Yes.  We can. |
| 11:15 | 23 | Q.    And that's for both Follow Me and ActiveTrack? |
| 11:15 | 24 | A.    Yes. |
| 11:15 | 25 | Q.    What do all these checkboxes mean now? |

427

11:15  1      A.   Well, that means that I've shown that all of

11:15  2   these elements are satisfied for both -- all the

11:15  3   elements of Claim 1 of the '909 patent are satisfied

11:15  4   for both Follow Me and ActiveTrack.

11:15  5      Q.   All right.  Moving on to Claim 7.

11:15  6           Does Claim 7 share a lot of similarities with

11:15  7   Claim 1?

11:15  8      A.   Happily there are a lot of similarities

11:15  9   between Claim 7 and Claim 1.  So what I'll do is I'll

11:15 10   highlight the similarities and the differences so we

11:16 11   don't have to talk about the same things we've already

11:16 12   talked about.

11:16 13      Q.   That's probably good news for most folks.

11:16 14      A.   It is.

11:16 15      Q.   All right.  Starting with the first element, a

11:16 16   system for controlling flight, is that element met in

11:16 17   both Follow Me and ActiveTrack?

11:16 18      A.   It is.  Yes.  It's the same -- it's exactly

11:16 19   the same wording.

11:16 20      Q.   Now, moving on to the next element, the

11:16 21   sensors carried on the aircraft, are there any

11:16 22   differences between Claim 7 and Claim 1?

11:16 23      A.   Yeah.  The difference in Claim 7 is that

11:16 24   Claim 7 is specific to doing these calculations

11:16 25   relative to the earth.  And in Claim 1, they could be

428

11:16  1    relative to the earth but they don't have to be.

11:16  2              So, you know, the fact that it's relative to

11:16  3    the earth in Claim 7, everything we've been talking

11:16  4    about is relative to the earth.  So for the same

11:16  5    reasons, this element of Claim 1 is satisfied by

11:17  6    Follow Me and ActiveTrack.  This element of Claim 7 is

11:17  7    also satisfied.

11:17  8        Q.    And are there multiple sensors carried on the

11:17  9    aircraft?

11:17  10       A.    There are.

11:17  11       Q.    All right.  Moving on to the control system

11:17  12   set of elements, are there any differences from Claim 7

11:17  13   to Claim 1 that you need to address for Claim 7?

11:17  14       A.    Did we talk about the receiver carry?

11:17  15       Q.    Thank you for reminding me about that one.

11:17  16             Stepping back to the receiver set of elements,

11:17  17   can you explain about -- your opinion on whether

11:17  18   Claim 7 is met for both Follow Me and ActiveTrack?

11:17  19       A.    Yes.  This is -- again, it's very similar to

11:17  20   the previous element.  The difference between Claim 7

11:17  21   and Claim 1 is that Claim 7 is specific to being

11:17  22   relative to the earth.  So the element would be met for

11:18  23   the same reasons I described for Claim 1 and both

11:18  24   ActiveTrack and Follow Me would satisfy it.

11:18  25       Q.    Now moving on to the control system elements.

429

11:18  1          Are there differences from Claim 7 to Claim 1

11:18  2    that you need to address here?

11:18  3          A.    Yeah.   There are basically two differences.

11:18  4    One is calculating the position of the aircraft

11:18  5    relative to the reference vehicle, and the other is

11:18  6    this language that says, in Claim 7, that attains and

11:18  7    maintains a selected position relative to the reference

11:18  8    vehicle.   Everything else is the same as Claim 1.

11:18  9          Q.    So are the elements that are not highlighted

11:18  10   in Claim 7 the exact same as in Claim 1?

11:18  11         A.    Yes.

11:18  12         Q.    And your opinions there are the same that you

11:18  13   already gave?

11:18  14         A.    Yes.   That's correct.

11:18  15         Q.    Does DJI dispute that it calculates position

11:18  16   relative to the reference vehicle?

11:19  17         A.    I believe they do.

11:19  18         Q.    Okay.   Can you explain why DJI drones with

11:19  19   Follow Me calculate the position of the aircraft

11:19  20   relative to the reference vehicle?

11:19  21         A.    They -- the drones with Follow Me and with

11:19  22   ActiveTrack -- in this case we're talking about

11:19  23   Follow Me -- are constantly estimating the position of

11:19  24   both the drone and the position of the reference

11:19  25   vehicle.   So in order to try to maintain that relative

430

| | | |
|--|--|--|
| 11:19 | 1 | position, they have to constantly be calculating those |
| 11:19 | 2 | updates. |
| 11:19 | 3 | Q.   And so the flowchart that you showed earlier, |
| 11:19 | 4 | the first two steps, that was calculating the position |
| 11:19 | 5 | of the aircraft relative to the reference vehicle; is |
| 11:19 | 6 | that right? |
| 11:19 | 7 | A.   Yes. |
| 11:19 | 8 | Q.   And is the code evidence that you're showing |
| 11:19 | 9 | here on Plaintiff's Exhibit 127 at Page 294, Lines 901 |
| 11:20 | 10 | through 927? |
| 11:20 | 11 | A.   Yeah. ███████████████████ |
| 11:20 | 12 | ████████████████████████████████ |
| 11:20 | 13 | ██████████████████████████████ |
| 11:20 | 14 | ██████████ |
| 11:20 | 15 | Q.   Do you have the same evidence for ActiveTrack? |
| 11:20 | 16 | A.   Well, it's different code, but it's doing |
| 11:20 | 17 | similar calculations based on the sensors that are used |
| 11:20 | 18 | in ActiveTrack. |
| 11:20 | 19 | Q.   And is it your opinion that after reviewing |
| 11:20 | 20 | all this code, that ActiveTrack calculates the position |
| 11:20 | 21 | of the aircraft relative to the reference vehicle? |
| 11:20 | 22 | A.   Yes.  It certainly does. |
| 11:20 | 23 | Q.   And have you identified the code evidence for |
| 11:20 | 24 | ActiveTrack at Plaintiff's Exhibit 127, Page 968, |
| 11:20 | 25 | Lines 1136 through 1157? |

431

11:20  1      A.    Yes.

11:21  2                  MR. RICH:  Your Honor, I believe we can

11:21  3      unseal the courtroom at this time.

11:21  4                  THE COURT:  Great.

09:42  5                  (Sealed proceedings end.)

11:21  6      BY MR. RICH:

11:21  7      Q.    Now, for both Follow Me and ActiveTrack, are

11:21  8      they both programmed so that they attain and maintain

11:21  9      the selected position relative to the reference

11:21  10     vehicle?

11:21  11     A.    Yes.

11:21  12     Q.    And that goes back to your explanation from

11:21  13     earlier of how they're able to maintain the same

11:21  14     distance and velocity?

11:21  15     A.    Yes.  Absolutely.

11:21  16     Q.    Can we now check the box for both Follow Me

11:21  17     and ActiveTrack on this element?

11:21  18     A.    Yes.

11:21  19     Q.    Now, moving on to the very last element of

11:21  20     Claim 7.

11:21  21           Is this similar to one that you've already

11:21  22     addressed for Claim 1?

11:21  23     A.    It is.  It's very similar to the last element

11:21  24     of Claim 1.  They just add the -- they have the

11:21  25     addition of the selected position and velocity in

432

11:22   1   the -- and where the reference -- where the -- the

11:22   2   relative to the reference vehicle is selected and input

11:22   3   into the control system.

11:22   4       Q.    So we have Claim 1 that is about the velocity,

11:22   5   and Claim 7 adds the concept of position?

11:22   6       A.    Yes.

11:22   7       Q.    And is -- I see you have "selected an input"

11:22   8   highlighted here.  Is that another way for saying

11:22   9   preprogrammed?

11:22  10       A.    Yes.

11:22  11       Q.    And so is that difference impacting your

11:22  12   opinion at all?

11:22  13       A.    No.  All of this is handled by the source code

11:22  14   on the drone.

11:22  15       Q.    And for the selected position highlighted

11:22  16   element, is that the algorithm that you just showed a

11:22  17   minute ago?

11:22  18       A.    Yes.

11:22  19       Q.    For both Follow Me and ActiveTrack?

11:22  20       A.    Yes.

11:22  21       Q.    All right.  Can we now check the box on all

11:22  22   elements of Claim 7 for Follow Me and ActiveTrack?

11:22  23       A.    We can, yes.

11:22  24       Q.    Turning to Claim 7 (sic).  Can you tell me

11:23  25   what -- let me step back.

433

11:23  1          Can you tell me what Claim 10 is?

11:23  2      A.    Yes.  Claim 10 is what is called a dependent

11:23  3   claim, which means as it says, you know, the system

11:23  4   according to Claim 7.  So for a dependent claim,

11:23  5   everything in Claim 7 has to be satisfied, and then you

11:23  6   have to satisfy whatever's added by Claim 10 in order

11:23  7   to infringe this claim.

11:23  8          Now, I've already demonstrated that everything

11:23  9   in Claim 7 is there.  So now we just have to see

11:23  10  that -- you know, where the data communicating the

11:23  11  position and movement of the reference vehicle is

11:23  12  transmitted from the reference vehicle.  That's what

11:23  13  it's adding in Claim 10.

11:23  14     Q.    Now, we already talked about how DJI's drones

11:24  15  communicate data with the position -- or communicate

11:24  16  the position and movement of the reference vehicle,

11:24  17  right?

11:24  18     A.    Correct, yes.

11:24  19     Q.    Now, this just is adding the concept that that

11:24  20  is transmitted from the reference vehicle?

11:24  21     A.    That's correct.

11:24  22     Q.    Can you explain why the position and movement

11:24  23  data that you talked about earlier, why that data is

11:24  24  transmitted from the reference vehicle?

11:24  25     A.    Yes.  I mean, in the case of Follow Me, it's

—434—

11:24   1   following the controller, and the data is constantly

11:24   2   being transmitted from the controller.  So if I want to

11:24   3   follow a car that I'm in, I just bring the controller

11:24   4   into the car and it'll follow the car.

11:24   5            For ActiveTrack, I can also bring the

11:24   6   controller in the car, and I could select the image

11:24   7   that I wanted it to track and I'll -- from inside the

11:24   8   car, and I can -- you know, there's no reason I can't

11:25   9   keep the controller in the car.

11:25   10       Q.    Now, the image on the left is illustrating

11:25   11   Follow Me, right?

11:25   12       A.    Yes.

11:25   13       Q.    Now, that's not an illustration you created,

11:25   14   is it?

11:25   15       A.    No.  That's from DJI's websites.

11:25   16       Q.    And the little red blinking thing, that's the

11:25   17   transmitter inside the reference vehicle?

11:25   18       A.    Correct.

11:25   19       Q.    And it's sending data up to the drone?

11:25   20       A.    Yes.

11:25   21       Q.    Is that from Plaintiff's Exhibit 323?

11:25   22       A.    Yes.  It is.

11:25   23            MR. RICH:  Your Honor, we move to admit

11:25   24   Plaintiff's Exhibit 323.

11:25   25            MR. YIN:  No objection.

435

11:25  1              THE COURT:  Admitted.

11:25  2   BY MR. RICH:

11:25  3       Q.    Can we check the box on Claim 10 for Follow Me

11:25  4   and ActiveTrack?

11:25  5       A.    Yes.  We can.

11:25  6       Q.    Now, what is the last claim of the day?

11:25  7       A.    The last claim of the day is Claim 11.

11:25  8       Q.    All right.  Tell us what Claim 11 is doing.

11:25  9       A.    Claim 11 is -- again, it's a dependent claim.

11:25 10   It depends on 7.  We've already identified all the

11:25 11   elements in 7.  So the addition is that the position of

11:26 12   the aircraft is determined using a global positioning

11:26 13   system receiver module.

11:26 14       Q.    So all this is adding is a GPS module?

11:26 15       A.    Correct.

11:26 16       Q.    What is your opinion on whether DJI drones

11:26 17   meet Claim 11?

11:26 18       A.    They do.  Again, Mr. Shang was asked if GPS is

11:26 19   a sensor GPS -- or DJI uses to assess position, and he

11:26 20   agrees that, yes.  It is.

11:26 21       Q.    Is Mr. Shang's admission on GPS use at

11:26 22   Page 305, Lines 18 through 20, of the trial transcript

11:26 23   from yesterday?

11:26 24       A.    Yes.  It is.

11:26 25       Q.    All right.  Can we check the box on Claim 11?

436

| | | |
|---|---|---|
| 11:26 | 1 | A.    We can. |
| 11:26 | 2 | Q.    All right.  That was direct infringement. |
| 11:26 | 3 | Let's move on to indirect infringement. |
| 11:26 | 4 | This is the same test you applied earlier, |
| 11:26 | 5 | correct? |
| 11:26 | 6 | A.    Yes. |
| 11:26 | 7 | Q.    Okay.  For underlying direct infringement, can |
| 11:27 | 8 | you explain what evidence of underlying direct |
| 11:27 | 9 | infringement you found? |
| 11:27 | 10 | A.    Yes.  Again, the testimony of Mr. Ai.  He |
| 11:27 | 11 | admits that users of DJI drones have used DJI's |
| 11:27 | 12 | ActiveTrack feature.  And he admits that users of DJI |
| 11:27 | 13 | drones have used DJI's Follow Me feature. |
| 11:27 | 14 | Q.    And this is from yesterday's trial transcript |
| 11:27 | 15 | at Page 282, Lines 6 through 11, correct? |
| 11:27 | 16 | A.    Yes. |
| 11:27 | 17 | Q.    And that's the first element of the indirect |
| 11:27 | 18 | infringement test? |
| 11:27 | 19 | A.    Yes. |
| 11:27 | 20 | Q.    Now, moving on to the second element, active |
| 11:27 | 21 | encouragement, how does DJI actively encourage users to |
| 11:27 | 22 | indirectly infringe ActiveTrack? |
| 11:27 | 23 | A.    Well, with ActiveTrack, one way is they put |
| 11:27 | 24 | the instructions in the user manual.  So if you just |
| 11:27 | 25 | read the instructions in the user manual, it shows you |

—437—

11:28    1    exactly how to use the ActiveTrack feature.

11:28    2        Q.    So on this slide, it tells you how to go

11:28    3    about -- the steps of going about using ActiveTrack?

11:28    4        A.    Yes.

11:28    5        Q.    And is this from Plaintiff's Exhibit 24 at

11:28    6    Page 27?

11:28    7        A.    Yes.

11:28    8        Q.    All right.  Let's turn to Follow Me.

11:28    9             What are we seeing here on this slide,

11:28    10    Dr. Michalson?

11:28    11        A.    Well, this is another way that DJI teaches

11:28    12    people how to use the various modes of their drones.

11:28    13    This is a screenshot of portions of their YouTube

11:28    14    channel that highlights, you know, how many

11:28    15    subscribers, in this case one-and-a-half million

11:28    16    subscribers, to the YouTube channel.

11:28    17        Q.    So they're teaching 1.5 million people how to

11:29    18    use their drones?

11:29    19        A.    Yeah.  They're making the information

11:29    20    accessible to all those people and encouraging them to

11:29    21    use that website to learn how to use features of the

11:29    22    drone.

11:29    23        Q.    Is this from Plaintiff's Exhibit 179?

11:29    24        A.    Yes.

11:29    25             MR. RICH:  We move to admit Plaintiff's

438

| | | |
|---|---|---|
| 11:29 | 1 | Exhibit 179 into evidence. |
| 11:29 | 2 | MR. YIN:  No objection. |
| 11:29 | 3 | THE COURT:  Admitted. |
| 11:29 | 4 | BY MR. RICH: |
| 11:29 | 5 | Q.    Now, Dr. Michalson, what are we seeing on this |
| 11:29 | 6 | slide? |
| 11:29 | 7 | A.    This is just kind of focusing in on some of |
| 11:29 | 8 | the things that are on the YouTube channel.  I mean, |
| 11:29 | 9 | they say immediately, we're here to help.  You know, |
| 11:29 | 10 | whether you're a beginner or an expert, they've got |
| 11:29 | 11 | information there that might help you learn how to use |
| 11:29 | 12 | the features of the drone. |
| 11:29 | 13 | Q.    Did you see any evidence specific to telling |
| 11:29 | 14 | users how to use the Follow Me mode on the YouTube |
| 11:29 | 15 | channel? |
| 11:29 | 16 | A.    Yes.  This is a video clip on their YouTube |
| 11:29 | 17 | channel that explains, you know, literally how you turn |
| 11:30 | 18 | on, how you use Follow Me mode. |
| 11:30 | 19 | Q.    And is this from Plaintiff's Exhibit 183? |
| 11:30 | 20 | A.    Yes. |
| 11:30 | 21 | MR. RICH:  We move to admit Plaintiff's |
| 11:30 | 22 | Exhibit 183 into evidence. |
| 11:30 | 23 | MR. YIN:  No objection. |
| 11:30 | 24 | THE COURT:  Admitted. |
| 11:30 | 25 | BY MR. RICH: |

439

| 11:30 | 1 | Q. Now, that was the second element of indirect |
| 11:30 | 2 | infringement, right, the encouragement element? |
| 11:30 | 3 | A. Yes. |
| 11:30 | 4 | Q. Let's move to the knowledge element. |
| 11:30 | 5 | When did DJI first learn of the '909 patent? |
| 11:30 | 6 | A. Well, from my reading of DJI's third |
| 11:30 | 7 | supplemental responses to interrogatories, it appears |
| 11:30 | 8 | that they learned that in September of 2019. |
| 11:30 | 9 | Q. When did DJI first learn of its infringement |
| 11:30 | 10 | of the '909 patent? |
| 11:30 | 11 | A. Again, from the -- from the interrogatory |
| 11:30 | 12 | responses that they made, it looks like that was |
| 11:30 | 13 | August 16 of 2021. |
| 11:31 | 14 | Q. And these responses that you've referred to on |
| 11:31 | 15 | the last two answers, that's from Plaintiff's |
| 11:31 | 16 | Exhibit 138 at Page 3? |
| 11:31 | 17 | A. That's correct. Yes. |
| 11:31 | 18 | Q. Is it your opinion that all four elements of |
| 11:31 | 19 | the indirect infringement test are met for the '909 |
| 11:31 | 20 | patent? |
| 11:31 | 21 | A. Yes. |
| 11:31 | 22 | Q. Okay. Can you please summarize your overall |
| 11:31 | 23 | conclusions on the '909 patent? |
| 11:31 | 24 | A. My overall conclusion is that Claims 1, 7, 10 |
| 11:31 | 25 | and 11 of the '909 patent are all infringed, both |

11:31  1    directly and indirectly, by DJI.

11:31  2        Q.    Okay.  Were you asked to render some opinions

11:31  3    on the technical value of the inventions?

11:31  4        A.    I was.

11:31  5        Q.    Okay.  Do you have some -- are you familiar

11:31  6    with the concept of an acceptable noninfringing

11:31  7    alternative?

11:31  8        A.    I am.  Yes.

11:31  9        Q.    Can you please explain at a general level what

11:32  10   that means?

11:32  11       A.    Yeah.  An acceptable alternative would be, you

11:32  12   know, maybe there's a way I can do something that looks

11:32  13   similar to what -- what the patent is describing, but I

11:32  14   do it in such a way that I don't meet all the claim

11:32  15   elements.  That something's missing.

11:32  16            And if I can do that and if the result of that

11:32  17   is still something my customers want, then maybe that's

11:32  18   a noninfringing alternative.  Maybe that's a way to get

11:32  19   around the patent.

11:32  20       Q.    Is DJI claiming to have some noninfringing

11:32  21   alternatives in this case?

11:32  22       A.    They do.  I saw a number -- I'll say dozens --

11:32  23   of potential noninfringing alternatives that I

11:32  24   reviewed.

11:32  25       Q.    And so they came up with these hypothetical --

441

| 11:32 | 1 | dozens of hypothetical alternatives in your view? |
| 11:33 | 2 | A.    Yeah.  They came up with a lot of stuff that, |
| 11:33 | 3 | frankly, looked like they were throwing spaghetti at |
| 11:33 | 4 | the wall. |
| 11:33 | 5 | Q.    And did DJI actually implement any of those |
| 11:33 | 6 | alternatives? |
| 11:33 | 7 | A.    Not to my knowledge. |
| 11:33 | 8 | Q.    Now, can you tell us some other high-level |
| 11:33 | 9 | reasons why these hypothetical alternatives from DJI |
| 11:33 | 10 | are flawed? |
| 11:33 | 11 | A.    Well, some of the ones that I looked at were |
| 11:33 | 12 | flawed because they would have failed the |
| 11:33 | 13 | function-way-result test.  It looked like what they |
| 11:33 | 14 | were proposing was just an alternate -- a different way |
| 11:33 | 15 | to satisfy all the same claims.  So it wasn't clear how |
| 11:33 | 16 | those would avoid infringement. |
| 11:33 | 17 | Some of them were things that I don't believe |
| 11:33 | 18 | the customers would have accepted.  You know, there |
| 11:33 | 19 | were some alternatives that would have made it actually |
| 11:34 | 20 | more cumbersome for the user to fly the drone, and I |
| 11:34 | 21 | don't think a drone -- or I don't think a drone user |
| 11:34 | 22 | would appreciate that. |
| 11:34 | 23 | Some of them, they just did not provide enough |
| 11:34 | 24 | detail on how they might implement it.  So I couldn't |
| 11:34 | 25 | really determine if they were even plausible |

442

11:34    1    alternatives.

11:34    2             And, you know, I don't believe any of them

11:34    3    suggested when those alternatives would have been

11:34    4    available to be able to avoid infringement.

11:34    5    Q.    Did DJI just come up with these hypotheticals

11:34    6    for this litigation?

11:34    7    A.    I can't know that, but that's kind of what it

11:34    8    looked like to me.

11:34    9    Q.    Now, were you asked to estimate the cost to

11:34    10   DJI to implement the '909 patent and '752 patents?

11:34    11   A.    Yeah.  Once the -- you know, once they

11:34    12   basically had the air frame, the technology in the '909

11:35    13   and the '752 are both just adding software to something

11:35    14   that already exists.

11:35    15            So I would think that the software associated

11:35    16   with the '909 would probably represent a couple hundred

11:35    17   hours, about 200 hours, of engineering time, and then

11:35    18   probably some, you know, technician time and quality

11:35    19   assurance time.  So about 250 hours total.

11:35    20            And the same for the '752, about 200

11:35    21   engineering hours, probably about 50 or so hours for

11:35    22   testing and Q/A.

11:35    23   Q.    And did you do that estimate for the 2014 to

11:35    24   2015 time period?

11:35    25   A.    Yes.

443

11:35  1      Q.   And where in DJI's drones is the '909 patent

11:35  2  patented technology implemented?

11:35  3      A.   It's all in software.  It's all the software

11:35  4  of the drone.

11:36  5      Q.   Are there any discrete parts of DJI's drones

11:36  6  that are not necessary for implementing the '909

11:36  7  patent?

11:36  8      A.   For -- well, certainly for Follow Me, you

11:36  9  don't need the camera.  So, you know, in some cases,

11:36  10  there are things that the drone can do that are not

11:36  11  related to the patent.

11:36  12      Q.   And are there any discrete parts of DJI's

11:36  13  drones that are not necessary for implementing the '752

11:36  14  patent?

11:36  15      A.   Again, the camera.  You don't need the camera

11:36  16  for implementing the '752.

11:36  17      Q.   How would you characterize the importance of

11:36  18  the '909 patent to DJI's Follow Me and ActiveTrack

11:36  19  features?

11:36  20      A.   Oh, I think they're at the core of DJI's

11:36  21  Follow Me features.

11:36  22      Q.   How would you characterize the technical

11:36  23  benefits of the '909 patent from the user's

11:36  24  perspective?

11:36  25      A.   Of which patent?

—444—

11:37  1      Q.    '909.

11:37  2      A.    '909.   That one's almost comical.   You know,

11:37  3  if I'm -- let's say I'm driving a car and I want the

11:37  4  drone to follow me in the car.   If I didn't have the

11:37  5  '909 patent, I'd have to have two hands on the joystick

11:37  6  and two hands on the steering wheel, and two eyes on

11:37  7  the drone and two eyes on the road.   I couldn't do it.

11:37  8          You know, if I was -- if I was, you know, out

11:37  9  there surfing or something and I wanted it to follow

11:37  10  me, I'd have to control the surfboard while I'm

11:37  11  controlling the drone.   It would be extremely

11:37  12  cumbersome to be able to do those kinds of things.

11:37  13      Q.    Don't have enough eyes to do all that, do you?

11:37  14      A.    I don't have enough eyes and arms and enough

11:37  15  talent to be able to try to pull that gig off.

11:37  16      Q.    Can you describe the same -- let me ask a

11:38  17  different question.

11:38  18          How would you characterize the technical

11:38  19  benefits of the '909 patent for ActiveTrack?

11:38  20      A.    For ActiveTrack, it would be -- it would be

11:38  21  the same idea.   You know, ActiveTrack, again, if I

11:38  22  have -- if I have to fly the drone manually, it would

11:38  23  be very, very difficult to, you know, follow my dog

11:38  24  running around the front yard by flying the drone and

11:38  25  trying to keep everything consistent or, you know, if

445

11:38  1    I'm trying to follow a mountain bike or something, it

11:38  2    would be nearly impossible to do that manually.  And

11:38  3    the '909 facilitates that kind of thing.

11:38  4        Q.    Does DJI have any implementations of Follow Me

11:38  5    or ActiveTrack that don't use the '909 patent?

11:38  6        A.    Not that I'm aware of.

11:38  7        Q.    And they haven't changed their design at all

11:38  8    to avoid the patent, have they?

11:38  9        A.    Based on the testimony yesterday, no.

11:38  10       Q.    How would you characterize the technical

11:39  11   importance of the '752 patent to DJI's drones?

11:39  12       A.    Oh, that's critical to pretty much everything

11:39  13   that you do for all of these other flight modes.  It's

11:39  14   really one of the things that makes these drones

11:39  15   valuable to a beginner drone pilot.

11:39  16            You know, I've flown a number of drones that

11:39  17   don't have that technology, and you spend a lot of your

11:39  18   time and attention watching the drone and moving the

11:39  19   control sticks because you're constantly, constantly,

11:39  20   constantly moving those sticks around.

11:39  21            With the hover hold technology, you can pretty

11:39  22   much set the drone in a position that you want, then

11:39  23   you can start tweaking the position to, you know, if

11:39  24   you want to inspect the roof or something like that,

11:39  25   you can fly it up into a position, adjust the camera,

446

| | | |
|---|---|---|
| 11:39 | 1 | not have to worry about the drone bouncing around. |
| 11:39 | 2 | Then you can move it in a pattern the way you want to |
| 11:40 | 3 | without having to deal with changing wind currents and |
| 11:40 | 4 | things like that. |
| 11:40 | 5 | Q.    Would the drone just fly off if you didn't |
| 11:40 | 6 | have the '752 patent's automatic hover? |
| 11:40 | 7 | A.    It could fly off.  It could even more likely |
| 11:40 | 8 | crash. |
| 11:40 | 9 | Q.    What is the -- what types of drones does the |
| 11:40 | 10 | '752 patent provide value to? |
| 11:40 | 11 | A.    Can you say that again? |
| 11:40 | 12 | Q.    Yes.  What types of drones in terms of |
| 11:40 | 13 | consumer enterprise, what types of drones does the '752 |
| 11:40 | 14 | patent provide value to? |
| 11:40 | 15 | A.    Any drone that implements the hover hold |
| 11:40 | 16 | technology.  I would say all drones that are going to |
| 11:40 | 17 | be used by perhaps other than sport for racing fliers |
| 11:40 | 18 | or something, highly experienced people.  So pretty |
| 11:40 | 19 | much all drones. |
| 11:40 | 20 | Q.    Is it important regardless of price point, |
| 11:40 | 21 | size or application? |
| 11:41 | 22 | A.    It is.  It is. |
| 11:41 | 23 | Q.    Are you aware of DJI's surveys produced in |
| 11:41 | 24 | this case?  Consumer surveys? |
| 11:41 | 25 | A.    I am. |

11:41  1      Q.    Okay.  Do you have any opinions about whether

11:41  2  there are features listed in those surveys that relate

11:41  3  to the '752 patent?

11:41  4      A.    There are.  There are a few categories that

11:41  5  certainly relate to the '752.

11:41  6      Q.    How does the '752 patent relate to the three

11:41  7  categories of maneuverability, ease of control and ease

11:41  8  of use?

11:41  9      A.    Well, certainly ease of control and use, you

11:41  10  take it out of the box, in five minutes you'll have the

11:41  11  drone off the ground hovering in place, even if you're,

11:41  12  you know, have never -- have never flown a drone before

11:41  13  in your life.  So that's huge.

11:41  14          That technology also makes it very easy to

11:42  15  control because it gives you an opportunity to -- you

11:42  16  know, you can literally get the drone up in the air and

11:42  17  you can say, well, I don't like where the camera's

11:42  18  pointed.  I can point the camera up, down.  I can

11:42  19  rotate the drone around and get the picture I'm looking

11:42  20  for before I do anything else.  So those ease of use

11:42  21  and control features are huge.

11:42  22          Maneuverability, same thing.  If I want to

11:42  23  zero in on, you know, doing a chimney inspection or

11:42  24  what have you, you know, I can get the drone in the

11:42  25  position that I want.  I can adjust everything.  I can

| | | |
|---|---|---|
| 11:42 | 1 | spend my concentration on getting what I want out of |
| 11:42 | 2 | the camera, and I don't have to worry about all the |
| 11:42 | 3 | idiosyncrasies of flying the rotorcraft. |
| 11:42 | 4 | Q.    In view of all that, what percentage of |
| 11:42 | 5 | maneuverability, ease of control and ease of use would |
| 11:42 | 6 | you attribute to the '752 patent itself? |
| 11:43 | 7 | A.    Well, I would say, you know, ultra |
| 11:43 | 8 | conservatively, at least 50 percent. |
| 11:43 | 9 | Q.    Have you seen any documents from DJI that |
| 11:43 | 10 | support your conclusions about the technical value of |
| 11:43 | 11 | the '752 patent? |
| 11:43 | 12 | A.    I have.  And I received -- this is that export |
| 11:43 | 13 | control application.  And in that application they |
| 11:43 | 14 | identify eight different modules, at least seven of |
| 11:43 | 15 | which are directly focused on things related to the |
| 11:43 | 16 | '752.  And they explicitly talk about how these -- |
| 11:43 | 17 | these things are critical to the performance of the |
| 11:43 | 18 | drone. |
| 11:43 | 19 | Q.    Based on DJI's descriptions of these modules |
| 11:43 | 20 | in this application, did you find that seven of eight |
| 11:43 | 21 | modules relate to the '752 patent? |
| 11:43 | 22 | A.    I did, yes. |
| 11:44 | 23 | Q.    And to be clear, are these seven modules the |
| 11:44 | 24 | ones that DJI did not make available to you in this |
| 11:44 | 25 | case? |

449

11:44  1    A.    That's correct.  I never got the source code

11:44  2    related to those modules.

11:44  3    Q.    How did DJI's export control application

11:44  4    impact your conclusions about the value of the '752

11:44  5    patent?

11:44  6    A.    Well, in that document they talk about how it

11:44  7    enables precise operation and stable hovering.  They

11:44  8    talk about how the stuff that they didn't give me would

11:44  9    be controlling the speed of the motors.  They literally

11:44  10   say it's a core unit and the brain of a multi-rotor

11:44  11   drone and directly determines the drone's flight

11:44  12   performance.

11:44  13        That's why I really wanted to look at that

11:44  14   code so that we could, you know, dot all the I's and

11:44  15   cross all the T's on how these were done.

11:44  16   Q.    From your technical standpoint, do you think

11:45  17   DJI's statement about this technology directly

11:45  18   determining flight performance is reasonable?

11:45  19   A.    Yeah.  I think it's very reasonable.

11:45  20   Q.    And do all of the things we've been talking

11:45  21   about, the technical value of the '752 patent, apply to

11:45  22   Claim 13?

11:45  23   A.    Yes.

11:45  24   Q.    Okay.

11:45  25        MR. RICH:  We pass the witness,

450

11:45  1    Your Honor.

11:45  2                    THE COURT:  Why don't we -- it's up -- if

11:45  3    you'd like to get started now, you're welcome to.

11:45  4                    MR. YIN:  I defer to the Court, of

11:45  5    course.

11:45  6                    THE COURT:  No.  If you'd like -- if

11:45  7    you'd like to get started and go to noon -- I'm going

11:45  8    to change my mind.

11:45  9                    What would the judges like to do?  Would

11:45  10   y'all like to continue for a little bit or would you

11:45  11   like to go take a little bit earlier break for lunch

11:45  12   and we'll just come back and get started?

11:45  13                    I'll let you all decide.

11:45  14                    MR. YIN:  Looks like the jurors want to

11:45  15   go out.

11:45  16                    (Laughter.)

11:46  17                    THE COURT:  What do you want to do?  Keep

11:46  18   going?

11:46  19                    JUROR:  No.  Go.

11:46  20                    (Laughter.)

11:46  21                    THE COURT:  Then that's what we shall do.

11:46  22   Understand.

11:46  23                    Ladies and gentlemen, if you'll remember

11:46  24   my instructions.  If you all will be back by 1 o'clock,

11:46  25   we will try and get started by 1:15.

451

| 11:46 | 1 | THE BAILIFF:  All rise. |

11:46    1        THE BAILIFF:  All rise.

11:46    2            (Jury exited the courtroom.)

11:46    3        THE COURT:  You may be seated.  Is there

11:46    4  anything that we need to take up before we resume with

11:46    5  the doctor?

11:46    6        MR. SCHROEDER:  Your Honor, the only

11:46    7  thing is we ask for clarification as to the rule.

11:46    8  Dr. Michalson is now -- since he's been passed, he's

11:46    9  not to speak to counsel?

11:46   10        THE COURT:  No.  He can speak to counsel.

11:46   11        MR. SCHROEDER:  Okay.

11:46   12        THE COURT:  Yeah.  Until y'all start

11:46   13  asking him questions, he can speak.

11:46   14        MR. SCHROEDER:  Understood.  Thank you,

11:46   15  Your Honor.

11:46   16        THE COURT:  And that'll work for you guys

11:47   17  as well.  I just -- and so I don't think -- there's

11:47   18  no -- been no metaphysical change in --

11:47   19        MR. SCHROEDER:  We agree, Your Honor.

11:47   20  Just make sure we don't --

11:47   21        THE COURT:  And I doubt that there's

11:47   22  anything they can say to him now that will make a

11:47   23  difference.

11:47   24        MR. SCHROEDER:  Understood, Your Honor.

11:47   25  I just wanted to make sure that that was clear so we

452

```
 1   both know where the guidelines are.
 2               And the second issue is there was no
 3   videos.  Did we agree -- do we want to play those
 4   now -- or not now, but perhaps after Dr. -- after cross
 5   maybe or once you guys --
 6               THE COURT:  Okay.  Let's stop.  You're
 7   driving Kristie crazy.
 8               Let me just say, here's what we'll do.
 9   If Mr. Palmer or Mr. Siegmund will remind me when we
10   finish with this gentleman, back and forth when that's
11   done, if one of you will remind me, we'll play the
12   little bit of the deposition that needs to be played,
13   okay?
14               MR. PALMER:  Will do, Your Honor.
15               THE COURT:  Anything else?
16               MR. SIEGMUND:  Nothing from plaintiff,
17   Your Honor.
18               THE COURT:  Okay.
19               (Recess taken.)
20               THE BAILIFF:  All rise.
21               THE COURT:  Please remain standing for
22   the jury.
23               (Jury entered the courtroom.)
24               THE COURT:  Thank you.  You may be
25   seated.
```

453

01:04    1              Counsel?
01:04    2                    CROSS-EXAMINATION
01:04    3    BY MR. YIN:
01:04    4        Q.    Dr. Michalson, good to see you again.
01:04    5        A.    My pleasure.
01:04    6        Q.    Let's see if we can agree on a few things.  I
01:04    7    think you mentioned hover means you maintain a zero
01:04    8    velocity, right?
01:04    9        A.    Well, you're maintaining your zero velocity
01:04   10    and your position over ground, yes.
01:04   11        Q.    Are you saying hover means maintaining zero
01:04   12    velocity and maintaining position?
01:04   13        A.    Well, you're maintaining zero velocity when
01:05   14    you're hovering.
01:05   15        Q.    Okay.  It's different from maintaining
01:05   16    position, right?
01:05   17        A.    It can be.
01:05   18        Q.    All right.  Let's talk about '909 patent
01:05   19    first.  You were here when the inventor, Mr. Harris,
01:05   20    was testifying yesterday, right?
01:05   21        A.    Yes.
01:05   22        Q.    Did you hear that he explained the idea that
01:05   23    led to the invention was that they had to figure out a
01:05   24    way to fly an aircraft to a moving ship -- relative to
01:05   25    a moving ship and possibly landing on the moving ship?

454

01:05   1           Did you hear that?

01:05   2       A.   I did.

01:05   3       Q.   All right.  Have you ever tested DJI drones?

01:05   4       A.   Yes.

01:05   5       Q.   Have you ever tried to land a DJI drone on a

01:05   6   moving ship or a boat?

01:05   7       A.   Yes.

01:05   8       Q.   You have?  How did it work?

01:05   9       A.   Pretty well.

01:05   10      Q.   Okay.  You identified two modes in the DJI

01:06   11  drones as, in your opinion, infringing the '909 patent

01:06   12  claims, right?

01:06   13      A.   Yes.

01:06   14      Q.   ActiveTrack and Follow Me?

01:06   15      A.   Yes.

01:06   16      Q.   In Follow Me, I believe you said that -- let

01:06   17  me think.  The drone would receive GPS signals, right?

01:06   18           Is that right?  From, I guess, remote

01:06   19  controller?

01:06   20      A.   Yes.

01:06   21      Q.   It does not receive the velocity or speed or

01:06   22  anything about -- or let's just say velocity or speed

01:06   23  of the remote controller.

01:06   24      A.   That's not correct.  It receives successive

01:06   25  positions that communicate speed.

455

01:06  1      Q.    So it receives successive GPS signals?

01:06  2      A.    Yes.

01:06  3      Q.    Okay.  And ActiveTrack -- in ActiveTrack mode

01:07  4  the drone does not receive GPS signal or velocity of

01:07  5  the remote controller or -- I'm sorry -- of the object

01:07  6  the drone is going to track?

01:07  7      A.    It receives the coordinates that allow the

01:07  8  drone to determine the position and velocity of the

01:07  9  target that's being tracked.

01:07  10     Q.    The coordinates are coordinates of the object

01:07  11 on the screen that you see, right?

01:07  12     A.    They're coordinates on the screen that are

01:07  13 translated into 3D coordinates on the drone.

01:07  14     Q.    The drone will translate the coordinates on

01:07  15 the screen into coordinates or a position on, say, on

01:07  16 earth, right?

01:07  17     A.    Yes.

01:07  18     Q.    So drone is receiving coordinates of the

01:07  19 object on the -- on the image on the video feed, right?

01:07  20     A.    The drone is receiving the coordinates, and

01:08  21 that passes all the information it needs to be able to

01:08  22 calculate --

01:08  23     Q.    I'm just trying to --

01:08  24     A.    -- the position and velocity.  Yes.

01:08  25     Q.    Sorry.  I'm just trying to figure out the

456

01:08    1    exact information that the drone is receiving about the

01:08    2    object it's tracking.

01:08    3            It's just the -- just the coordinates of that

01:08    4    object, say a dog, on the video feed, right?

01:08    5    A.    You are pass -- as I've told the jury, you're

01:08    6    selecting the image, and that's passing the coordinates

01:08    7    of that image to the drone.  Yes.

01:08    8    Q.    And the drone can figure out the positioning

01:08    9    and everything?

01:08   10    A.    Yes.

01:08   11    Q.    Okay.

01:08   12            MR. YIN:  So, Brian, can we put up

01:08   13    Claim 1?

01:08   14    BY MR. YIN:

01:09   15    Q.    Line 42:  A receiver disposed on the aircraft

01:09   16    and adapted to receive transmitted reference data

01:09   17    communicating a position and movement of a reference

01:09   18    vehicle.

01:09   19            Do you see that?

01:09   20    A.    Yes.

01:09   21    Q.    So in Follow Me, the drone is receiving, in

01:09   22    your words, successive GPS signals.

01:09   23            That's position, right?

01:09   24    A.    Yes.

01:09   25    Q.    And you believe that meets this limitation

01:09  1    that says the drone has to receive reference data

01:09  2    communicating a position and movement of a reference

01:09  3    vehicle?

01:09  4        A.    Yes.  It's my opinion that that communicates

01:09  5    the position and movement.  Yes.

01:09  6        Q.    And for ActiveTrack, the drone is receiving

01:09  7    the coordinates on the video feed, and the drone itself

01:09  8    is responsible for figuring out the positioning and

01:09  9    everything about the object to track, right?

01:09  10       A.    Based on the information that's been

01:10  11   communicated from the controller.  Yes.

01:10  12       Q.    And your opinion is that also meets this

01:10  13   limitation that the aircraft has to receive reference

01:10  14   data communicating a position and movement of the

01:10  15   reference vehicle?

01:10  16       A.    Yes.  That's correct.

01:10  17       Q.    Okay.  I assume you understand that every word

01:10  18   in the claim matters?

01:10  19       A.    Yes.

01:10  20              MR. YIN:  Can we put up Plaintiff's

01:10  21   Demonstrative Slide No. 93?

01:10  22   BY MR. YIN:

01:10  23       Q.    You recognize this?

01:10  24       A.    I do.

01:10  25       Q.    It's one of your slides.

458

01:10   1          I believe you were trying to demonstrate

01:10   2   Follow Me mode with the DJI drone, right?

01:10   3       A.    Yes.

01:10   4       Q.    Was it Phantom?  Did you use Phantom or

01:10   5   something else?

01:10   6       A.    This, I believe, was the Mavic 2.

01:10   7       Q.    Okay.  So Follow Me, the claim requires the

01:11   8   aircraft to be, I guess, flying relative to the

01:11   9   reference vehicle, right?

01:11   10      A.    That's one -- the claim says reference

01:11   11  vehicle.  Yes.

01:11   12      Q.    And in this situation where you tested it, I

01:11   13  guess you, yourself, are the reference vehicle?

01:11   14      A.    Yes.  I was carrying the controller.  That's

01:11   15  correct.  I didn't get in my truck and drive with the

01:11   16  drone out the window.

01:11   17              MR. YIN:  Now, let's take this down.

01:11   18  BY MR. YIN:

01:11   19      Q.    The Follow Me mode, once the drone receives

01:11   20  the successive GPS signals, in the DJI drones, it

01:11   21  tracks the relative position between the drone and, I

01:11   22  guess, the remote controller, right?

01:11   23      A.    It's receiving position information, but it's

01:12   24  also tracking the velocity and the position of both the

01:12   25  target and the drone.

01:12  1        Q.    It's trying to maintain the relative position

01:12  2   between the remote controller and the drone, right?

01:12  3        A.    Well, position and velocity.  Yes.

01:12  4        Q.    But you have reviewed the source code for DJI

01:12  5   drones, haven't you?

01:12  6        A.    I have.

01:12  7        Q.    And in the source code, it's actually

01:12  8   calculating the relative position between the remote

01:12  9   controller and the drone, right?

01:12  10       A.    It's calculating delta position with respect

01:12  11  to time.

01:12  12       Q.    So its position?  It's calculating position?

01:12  13       A.    Well, position over time is velocity.

01:12  14       Q.    It's trying to maintain that same position,

01:12  15  right?  Same relative position between the two?

01:12  16       A.    It is trying to maintain the same relative

01:12  17  position.  Yes.

01:12  18       Q.    And in your opinion --

01:12  19              MR. YIN:  Can we put Claim 1 back up?

01:13  20  BY MR. YIN:

01:13  21       Q.    In your opinion, calculating GPS --

01:13  22  calculating -- I'm sorry -- trying to maintain a

01:13  23  relative position between two vehicles -- or I'm

01:13  24  sorry -- between the drone and the remote controller is

01:13  25  enough to satisfy the claim limitation of calculating a

01:13    1    relative velocity.

01:13    2                    MR. YIN:  Let's highlight 47 to -- yeah.

01:13    3    That's good.

01:13    4    BY MR. YIN:

01:13    5    Q.    So even though, in DJI drones, the drone is

01:13    6    calculating and maintaining -- trying to maintain the

01:13    7    relative position between itself and the remote

01:13    8    controller, you are saying that's enough to satisfy the

01:13    9    claim limitation that you have to have a calculated

01:13   10    velocity relative between the two?

01:13   11    A.    Well, the drone maintains that relative

01:14   12    position by adjusting its velocity.  So it has to

01:14   13    calculate the velocity.

01:14   14            If the reference vehicle is stationary, then

01:14   15    that velocity won't be moving around a lot and neither

01:14   16    will the position, but if the vehicle starts to move,

01:14   17    then the drone has to recalculate the velocity so that

01:14   18    it can maintain that relative position and follow the

01:14   19    drone.

01:14   20    Q.    It's trying to maintain the relative position,

01:14   21    right?

01:14   22    A.    It's doing that -- it's maintaining the

01:14   23    relative position by adjusting the velocity of the

01:14   24    drone.

01:14   25                    THE COURT:  Doctor, let me explain how it

461

01:14  1    works here.  When your lawyer is asking you questions,

01:14  2    you get to explain and be a professor or whatever.

01:14  3                    THE WITNESS:  Okay.

01:14  4                    THE COURT:  When the lawyer has you on

01:14  5    cross and he asks you a question that would rightfully

01:14  6    be answered affirmatively or negatively or whatever, if

01:14  7    you would answer him.

01:14  8                    If your lawyer feels like you need to

01:14  9    have another chance to explain, he gets to do that on

01:15  10   redirect.  But right now you need to answer this

01:15  11   gentleman's questions directly, okay?

01:15  12                    THE WITNESS:  Yes, sir.

01:15  13                    MR. YIN:  Thank you, Your Honor.

01:15  14   BY MR. YIN:

01:15  15       Q.    So let me try to ask that question again.

01:15  16             In the DJI products you're accusing of

01:15  17   infringement, the drone is maintaining the relative

01:15  18   position, and you believe that's enough to satisfy the

01:15  19   claim limitation that you have to have a calculated

01:15  20   velocity relative between the two?

01:15  21       A.    Yes.

01:15  22       Q.    Okay.

01:15  23                    MR. YIN:  Can we have Plaintiff's

01:15  24   Demonstrative Slide 120?

01:15  25   BY MR. YIN:

462

01:15   1        Q.    I believe with this demonstrative you were

01:15   2   saying that DJI and DJI's expert, Dr. Nourbakhsh, was

01:16   3   interpreting this limitation selected velocity of the

01:16   4   aircraft has to be selected by the operator.

01:16   5             You disagree with that construction, right?

01:16   6        A.    Not sure how to answer that.  I disagree -- I

01:16   7   mean, I'm not -- the way you worded the question, I'm

01:16   8   not sure.

01:16   9        Q.    I apologize.  Let me rephrase.

01:16   10            So you understand that -- or your earlier

01:16   11  testimony with respect to this slide was that

01:16   12  Dr. Nourbakhsh and DJI was interpreting this claim

01:16   13  limitation on the slide as selected velocity of the

01:16   14  aircraft has to be a selected velocity of the aircraft

01:16   15  chosen by the operator, right?

01:16   16       A.    Yes.  I believe so.

01:16   17       Q.    And you disagree with Dr. Nourbakhsh?

01:16   18       A.    I do.

01:16   19       Q.    You don't have any infringement opinion

01:16   20  assuming Dr. Nourbakhsh's interpretation?

01:16   21       A.    That's correct.

01:17   22       Q.    Yeah.

01:17   23            MR. YIN:  Can we have Slide 34?

01:17   24  BY MR. YIN:

01:17   25       Q.    Let's switch to '752 patent.

463

| | | |
|---|---|---|
| 01:17 | 1 | A.    Okay. |
| 01:17 | 2 | Q.    I think you called it "automatic hover |
| 01:17 | 3 | patent," right? |
| 01:17 | 4 | A.    Yes. |
| 01:17 | 5 | Q.    So here, I believe you were explaining that |
| 01:17 | 6 | there was a claim construction proceeding earlier on in |
| 01:17 | 7 | this case and the parties proposed some construction -- |
| 01:17 | 8 | some interpretation of this term listed in the left |
| 01:17 | 9 | column under "claim term." |
| 01:17 | 10 | And were you -- you were saying the Court's |
| 01:17 | 11 | final construction, plain and ordinary meaning, was |
| 01:18 | 12 | basically a rejection of defendants' proposed |
| 01:18 | 13 | construction, right? |
| 01:18 | 14 | A.    Yes. |
| 01:18 | 15 | Q.    So two questions here. |
| 01:18 | 16 | One is:  Defendants' proposed construction, if |
| 01:18 | 17 | you assume that construction -- I'm sorry. |
| 01:18 | 18 | You don't have any infringement opinion |
| 01:18 | 19 | assuming that construction proposed by defendant, |
| 01:18 | 20 | right? |
| 01:18 | 21 | THE COURT:  Could I have y'all up here |
| 01:18 | 22 | for a second? |
| 01:18 | 23 | (Bench conference.) |
| 01:18 | 24 | THE COURT:  Why are you asking him about |
| 01:18 | 25 | those constructions?  It's not the Court's |

―464―

01:18   1    constructions.

01:18   2                    MR. YIN:  I was -- I was just trying to

01:18   3    get -- the plain and ordinary meaning still has to be

01:18   4    in the context of the patents.

        5                    THE COURT:  You're --

        6                    (Simultaneous conversation.)

01:18   7                    MR. YIN:  I'll take it down.  I'll take

01:18   8    it down.  Thank you.

01:18   9                    (Bench conference concludes.)

01:19  10                    MR. YIN:  Can I have '752 patent,

01:19  11    Figure 1?

01:19  12    BY MR. YIN:

01:19  13        Q.    Dr. Michalson, you were here when

01:19  14    Mr. Christensen was testifying yesterday, right?

01:19  15        A.    Yes.

01:19  16        Q.    He's the inventor for '752 patent, and he and

01:19  17    I discussed this figure.  We spent quite some time

01:19  18    yesterday.

01:19  19              You were here, right?

01:19  20        A.    Yes.

01:19  21        Q.    Let me think.  This figure shows the different

01:19  22    behaviors of the helicopter in different speed zones,

01:19  23    right?

01:19  24        A.    This is one of the embodiments he talked

01:20  25    about.  Yes.

01:20    1        Q.    Okay.  So we'll talk about this figure for

01:20    2    now.

01:20    3              The big circle, I believe this is roughly 10

01:20    4    knots in every direction?

01:20    5        A.    In this example.  Yes.

01:20    6        Q.    Right.  So if the -- if the helicopter is

01:20    7    flying below 10 knots -- you see the automatic hover

01:20    8    hold there?

01:20    9              Do you see that?

01:20   10        A.    Yes.

01:20   11        Q.    If the helicopter is flying below 10 knots and

01:20   12    the pilot releases the control stick, the helicopter

01:20   13    would get into hover, basically slow down, right?

01:20   14        A.    In this embodiment.  Yes.

01:20   15        Q.    And if the helicopter is flying at the faster

01:20   16    speed, say, 12 knots -- that's outside the big

01:20   17    circle -- and the pilot releases the stick, the

01:20   18    helicopter is going to maintain that 12 knots, right?

01:20   19        A.    In this example.  Yes.

01:21   20        Q.    Okay.  So I know you were calling the '752

01:21   21    patent hover patent; that's right?

01:21   22        A.    I believe that's in the title.  Yes.

01:21   23        Q.    Okay.

01:21   24              MR. YIN:  Can we have -- let's keep this

01:21   25    figure here.  Can we have this side by side with the

—466—

01:21  1  claim?  Let's do Claim 1 first.

01:21  2  BY MR. YIN:

01:21  3      Q.    Even though Claim 1 is not asserted in this

01:21  4  case, I assume you have read it before?

01:21  5      A.    It's been a while, but I have read it.

01:21  6      Q.    Okay.  The preamble, the first sentence says:

01:21  7  A method to control hovering flight of a rotary

01:22  8  aircraft.

01:22  9          Do you see that?

01:22  10      A.    Yes.

01:22  11      Q.    Starting from Line 33 it says:  Engaging an

01:22  12  automatic hover hold, that's AHH, when the aircraft

01:22  13  enters the first flight envelope.

01:22  14          But that's the big circle, right?

01:22  15      A.    That's not what that claim element says.

01:22  16      Q.    I'm sorry.  The first flight envelope is

01:22  17  defined a few lines above.  The first element inside

01:22  18  the claims that says:  Defining a first flight envelope

01:22  19  having a first groundspeed threshold.

01:22  20      A.    Yes.

01:22  21      Q.    Okay.  So this claim basically says the

01:22  22  aircraft would hover when the aircraft enters -- well,

01:22  23  flies in that -- within a certain speed threshold, say,

01:23  24  at 10 knots.

01:23  25      A.    I'm not sure there's a question there.

467

01:23  1        Q.    Never mind.  I should have raised my voice at

01:23  2   the end to indicate it's a question.

01:23  3                MR. YIN:  But that's okay.  Let me have

01:23  4   Claim 13 now.  Just the first part.  I don't need the

01:23  5   whole claim.  That's good.  That's good.

01:23  6   BY MR. YIN:

01:23  7        Q.    Claim 13 preamble says:  A flight control

01:23  8   system for a rotary aircraft.

01:23  9                It does not say "hover."

01:23 10        A.    That's correct.

01:23 11        Q.    And there's the first wherein clause, Line 36,

01:24 12   that says:  Forward speed hold loop will automatically

01:24 13   engage when the longitudinal controller -- that's the

01:24 14   stick -- is released into detent position and the

01:24 15   aircraft, at that time, if it's flying at the fast

01:24 16   speed above the first groundspeed threshold.

01:24 17                Do you see that?

01:24 18        A.    You're paraphrasing the claim but, yes, I see

01:24 19   that.

01:24 20        Q.    I want to talk about the preamble of this

01:24 21   claim just briefly.  Claim 13 is about a flight control

01:24 22   system, right?

01:24 23        A.    Yes.

01:24 24        Q.    It's a flight control system designed for a

01:24 25   particular rotary aircraft, right?

468

01:25   1        A.    No.

01:25   2        Q.    I'm sorry.  It's a control system designed for

01:25   3   a rotary aircraft that's -- that has a longitudinal

01:25   4   controller, a lateral controller, a directional

01:25   5   controller and a vertical controller.

01:25   6             Do you see the language there?

01:25   7        A.    Yes.  That's correct.

01:25   8        Q.    You have the DJI drone there.  If you can hold

01:25   9   it and raise it?

01:25   10       A.    Sure.

01:25   11       Q.    So everybody can see it.

01:25   12             That's the aircraft.  Do you agree?

01:25   13       A.    Yes.

01:25   14       Q.    And you're accusing that aircraft of

01:25   15   infringing this claim?

01:25   16       A.    Yes.

01:25   17       Q.    And that aircraft does not have the

01:25   18   longitudinal controller or lateral controller,

01:25   19   directional controller or vertical controller?

01:25   20       A.    That's where -- this is -- this controller is

01:25   21   part of the system so it does have those elements.

01:25   22       Q.    So the forward speed hold loop, you opined

01:26   23   that DJI drones have that forward speed hold loop and

01:26   24   meets the limitation in the wherein clause?

01:26   25             MR. YIN:  Can we highlight 36 to 39?

469

BY MR. YIN:

Q.   So your opinion is that DJI drones' accused products infringe or meet this limitation that's highlighted on the screen because when you're flying the DJI drone, you release the control stick -- I believe it's the right stick -- the drone would slow down and then hover, right?

A.   Yes.

Q.   Okay.  Remember you were talking about the source code that was subject to export control that you did not see?

A.   Yes.

Q.   Let me ask you, for you to determine if the accused product has a longitudinal controller, lateral controller, directional controller or vertical controller, do you need to see any source code?

A.   To determine if it has the controllers, no.

Q.   All right.  So for you to observe the behavior, you're alleging as meeting the wherein clause -- so let me just complete my question here.

    That behavior, according to you, is when you -- when you're flying the drone, you release the stick, the drone would slow down and stop, basically hover.

    For you to observe that behavior, do you need

470

01:27  1    to see the source code?

01:27  2        A.    To observe the behavior, no.

01:28  3        Q.    And you have -- I assume you have tested the

01:28  4    DJI drones to observe that?

01:28  5        A.    I have.

01:28  6        Q.    Okay.  I think that's all I have for now.

01:28  7    Thank you very much.

01:28  8                        REDIRECT EXAMINATION

01:28  9    BY MR. RICH:

01:28  10       Q.    All right.  Dr. Michalson, you were asked some

01:28  11   questions about the '909 patent, right?

01:28  12       A.    Yes.

01:28  13       Q.    You were asked some questions about data

01:28  14   communicating position and movement, right?

01:28  15       A.    Yes.

01:28  16       Q.    Can movement be communicated through position

01:28  17   information?

01:28  18       A.    Yes.  Of course.

01:28  19       Q.    Is there an example that would help the jury

01:29  20   understand this concept?

01:29  21       A.    Yeah.  I think that Mr. Harris used an example

01:29  22   of, if I'm in Dallas and I go to Waco and I tell you I

01:29  23   did it in an hour, it communicates position and

01:29  24   movement.  And I think he said the fact that he was

01:29  25   exceeding the speed limit.

471

01:29  1        Q.    Were you in the courtroom -- well, let me ask

01:29  2   a different question.

01:29  3             Did you hear him say that the simplest way of

01:29  4   communicating position and movement is to send position

01:29  5   periodically to the aircraft and then the aircraft

01:29  6   figures out what the movement is?

01:29  7        A.    Yes.

01:29  8        Q.    Does that sound like what DJI's doing in

01:29  9   Follow Me and ActiveTrack?

01:29  10       A.    Yes.

01:29  11       Q.    When in ActiveTrack a drone receives the

01:29  12  position coordinates, that's communicating position and

01:29  13  movement, right?

01:29  14       A.    Yes.

01:29  15       Q.    You were asked some questions about

01:29  16  calculating velocity and position, weren't you?

01:29  17       A.    Yes.

01:29  18       Q.    Now, is trying to maintain relative position

01:30  19  one of the two things the drone is maintaining?

01:30  20       A.    Yes.

01:30  21       Q.    Is the drone also maintaining its relative

01:30  22  velocity?

01:30  23       A.    Yes.  It has to, otherwise they get out of

01:30  24  synchrony.

01:30  25       Q.    Right.  The features just wouldn't work,

01:30  1    right?

       2        A.    Correct.

01:30  3        Q.    May I have -- actually, you were asked some

01:30  4    questions about the commanded data limitation in

01:30  5    Claim 1.

01:30  6              Do you remember that in the '909 patent?

01:30  7        A.    Yes.

01:30  8        Q.    And they put up the slide of Dr. Nourbakhsh?

01:30  9        A.    Yes.

01:30  10       Q.    Do you remember that?

01:30  11             Did Mr. Harris -- did you hear Mr. Harris

01:30  12   testify about that element yesterday?

01:30  13       A.    I did.

01:30  14       Q.    And did you hear when he said that commanded

01:30  15   data representing a selected velocity, that could just

01:30  16   be an algorithm in the code itself?

01:30  17       A.    Yes.

01:30  18       Q.    And is that like the algorithms that you're

01:30  19   pointing to in DJI's source code?

01:30  20       A.    Very much, yes.

01:31  21             MR. RICH:   May I have Slide 120 of

01:31  22   plaintiff's slides, please?

01:31  23   BY MR. RICH:

01:31  24       Q.    Now, you were asked if you had an infringement

01:31  25   opinion.  Assuming you add in those new words "chosen

01:31  1    by the operator" that Dr. Nourbakhsh is adding in,

01:31  2    right?

01:31  3       A.    Yes.

01:31  4       Q.    Now, it's not proper to add new words into the

01:31  5    claim, right?

01:31  6       A.    That's correct.

01:31  7       Q.    We have to take the claim as we see it,

01:31  8    correct?

01:31  9       A.    That's correct.

01:31  10      Q.    We have to look at what the Patent Office

01:31  11   examined for seven years on this patent and decide if

01:31  12   the product meets those limitations as they are

01:31  13   written?

01:31  14      A.    Yes.

01:31  15      Q.    Now, even if we took Dr. Nourbakhsh's words,

01:31  16   did DJI choose the algorithm that you're pointing to

01:31  17   for this element?

01:31  18      A.    They did.

01:31  19      Q.    Now, switching to the '752 patent.  The first

01:32  20   thing Mr. Yin took you to was Figure 1 of that patent,

01:32  21   right?

01:32  22      A.    Yes.

01:32  23      Q.    Now, did you hear Mr. Christensen, the

01:32  24   inventor of the '752 patent, testify yesterday that

01:32  25   that's just an example?

474

01:32  1      A.    Yes.  That's correct.

01:32  2      Q.    Are you supposed to compare the product to the

01:32  3  figures in the patent?

01:32  4      A.    No.  You have to compare the product to the

01:32  5  claims.

01:32  6      Q.    Now, the second thing Mr. Yin took you to was

01:32  7  Claim 1 of the '752 patent, right?

01:32  8      A.    Yes.

01:32  9      Q.    And did you hear him say that that claim's not

01:32  10 asserted in this case?

01:32  11     A.    Yes.

01:32  12     Q.    So is that the right claim to even look at to

01:32  13 determine infringement in this case?

01:32  14     A.    No.

01:32  15     Q.    Claim 13 is the right claim to look at, right?

01:32  16     A.    That's correct.

01:32  17     Q.    Now, Mr. Yin asked you, well, does Claim 13

01:32  18 cover -- name the specific word "hover"?

01:32  19           Did you hear that?

01:33  20     A.    I did.

01:33  21     Q.    Is a company like Bell able to claim the

01:33  22 boundaries of a feature without actually naming the

01:33  23 specific name of the feature?

01:33  24     A.    Of course, yes.

01:33  25     Q.    For example, if a company had a claim on

475

01:33    1    Apple's FaceTime feature but the claim didn't say the

01:33    2    words "FaceTime," could FaceTime still infringe if it

01:33    3    just meets all the elements of the claim?

01:33    4        A.    Oh, yes.  Of course.

01:33    5        Q.    Is Claim 13 the claim that claimed all the

01:33    6    nitty-gritty details on how the loops in the claim make

01:33    7    hovering work?

01:33    8        A.    It does, yes.

01:33    9        Q.    Is it possible to infringe more than one claim

01:33   10    of a patent?

01:33   11        A.    Of course, yes.

01:33   12        Q.    Now, you were asked about holding position.

01:33   13              Do you remember that?

01:33   14        A.    Yes.

01:33   15        Q.    When you're holding position, are you holding

01:33   16    speed?

01:33   17        A.    You have to, yes.

01:33   18              MR. RICH:  May I have Slide 29, please?

01:34   19              Thank you.

01:34   20    BY MR. RICH:

01:34   21        Q.    Now, we looked at this slide earlier today,

01:34   22    right?

01:34   23        A.    Yes.  We did.

01:34   24        Q.    We were talking about the forward speed hold

01:34   25    loop in Claim 13?

476

01:34  1        A.    Yes.

01:34  2        Q.    Did Mr. Shang admit that DJI has a control

01:34  3   loop that controls forward speed?

01:34  4        A.    He did.  Yes.

01:34  5             MR. RICH:  And may I have the next slide,

01:34  6   please?

01:34  7   BY MR. RICH:

01:34  8        Q.    And did Mr. Shang also admit that that loop

01:35  9   holds speed at zero?

01:35  10       A.    He did.  Yes.

01:35  11       Q.    Now, you were asked about the source code

01:35  12  again.

01:35  13             Did you hear that?

01:35  14       A.    Yes.

01:35  15       Q.    Claim 13 recites a bunch of different control

01:35  16  loops, right?

01:35  17       A.    It does.  Yes.

01:35  18       Q.    That's not something that you can just see by

01:35  19  looking at the product, right?

01:35  20       A.    Correct.

01:35  21       Q.    You need to see the secret sauce to make that

01:35  22  determination, right?

01:35  23       A.    Yeah.  You can't -- I mean, there may be a lot

01:35  24  of ways to get an observed behavior, but the important

01:35  25  thing is:  Do the DJI drones do it the way the patent

477

01:35   1   says you have to do it?

01:35   2          And you can't -- you can't tell that just by

01:35   3   looking at the way the drone flies.

01:35   4   Q.    Were you in the courtroom -- you were in the

01:35   5   courtroom when Mr. Christensen testified yesterday,

01:35   6   right?

01:35   7   A.    Yes.

01:35   8   Q.    And did you hear him say that the forward

01:35   9   speed hold loop allows for some variations in the

01:35   10  speed?

01:36   11  A.    Yes.

01:36   12  Q.    And you were asked about the first few

01:36   13  limitations in Claim 13.

01:36   14         You remember that, the rotary aircraft having

01:36   15  the controllers?

01:36   16  A.    Yes.

01:36   17  Q.    Is a drone a type of rotary aircraft?

01:36   18  A.    Yes.

01:36   19  Q.    Now, if a drone is a type of rotary aircraft,

01:36   20  are the controllers remote from the aircraft?

01:36   21  A.    Yes.  That's the case in the DJI drones.

01:36   22  Q.    Anything in Claim 13 that says that the rotary

01:36   23  aircraft has to be a manned rotary aircraft?

01:36   24  A.    No.  There's not.

01:36   25  Q.    Did you hear yesterday when Mr. Christensen

—478—

01:36  1    said that he thought his invention was applicable and

01:36  2    useful for drones?

01:36  3         A.    Yes.

01:36  4         Q.    Does Claim 13 of the '752 patent, as the

01:36  5    Patent Office examiners approved it, say that the

01:36  6    controllers have to be on board?

01:36  7         A.    No.

01:37  8         Q.    Is DJI just adding in more elements to the

01:37  9    claim that are just not there?

01:37  10        A.    That's what it appears to be.

01:37  11        Q.    But we have to take the claim as it comes,

01:37  12   right?

01:37  13        A.    Yes.

01:37  14        Q.    You just can't add in things, right?

01:37  15        A.    Correct.

01:37  16        Q.    Just like we can't change the boundaries on

01:37  17   the deeds of our own properties, right?

01:37  18        A.    That's correct.

01:37  19                    MR. RICH:  Nothing further.

      20                    MR. YIN:  May I ask one --

      21                    THE COURT:  As many as you want.

      22                    MR. YIN:  Or maybe two.

01:37  23                    THE COURT:  Never believe them when they

01:37  24   say, I just have one question.

01:37  25                    (Laughter.)

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 01:37 | 1  | RECROSS-EXAMINATION                                           |
| 01:37 | 2  | BY MR. YIN:                                                   |
| 01:37 | 3  | Q.   The '752 patent inventors tried to solve the            |
| 01:37 | 4  | problems of helicopters' risks in brownout situations,       |
| 01:37 | 5  | right?                                                        |
| 01:37 | 6  | A.   That's one of the applications they mentioned.          |
| 01:37 | 7  | Yes.                                                         |
| 01:37 | 8  | Q.   That's it.  Just one question.  Thank you very          |
| 01:37 | 9  | much.                                                        |
| 01:37 | 10 | THE COURT:  Very good.                                        |
| 01:38 | 11 | MR. RICH:  May I have one more question?                      |
| 01:38 | 12 | THE COURT:  Yes.                                              |
| 01:38 | 13 | FURTHER REDIRECT EXAMINATION                                  |
| 01:38 | 14 | BY MR. RICH:                                                  |
| 01:38 | 15 | Q.   Can drones fly in degraded visual                       |
| 01:38 | 16 | environments?                                                |
| 01:38 | 17 | A.   Yes.                                                    |
| 01:38 | 18 | Q.   Thank you.                                               |
| 01:38 | 19 | THE COURT:  One more?                                         |
| 01:38 | 20 | (Laughter.)                                                  |
| 01:38 | 21 | MR. YIN:  No.  Nothing.                                       |
| 01:38 | 22 | THE COURT:  May he be excused?                                |
| 01:38 | 23 | MR. YIN:  I believe so.  Oh, he's coming                      |
| 01:38 | 24 | back.                                                        |
| 01:38 | 25 | MR. RICH:  He's coming back.                                  |

480

| | | |
|---|---|---|
| 01:38 | 1 | THE COURT:  He's coming back.  I know.  I |
| 01:38 | 2 | just mean, may he step down? |
| 01:38 | 3 | MR. RICH:  He may step down. |
| 01:38 | 4 | THE COURT:  And your next witness? |
| 01:38 | 5 | MR. PALMER:  Your Honor, I think that you |
| 01:38 | 6 | wanted us to put on the video. |
| 01:38 | 7 | THE COURT:  Oh, yes.  Thank you very |
| | 8 | much. |
| 01:38 | 9 | Ladies and gentlemen of the jury, |
| 01:38 | 10 | yesterday it turns out that about five minutes of one |
| 01:38 | 11 | of the depositions that you all listened to was |
| 01:38 | 12 | inaudible.  So we're going to play that portion of it |
| 01:38 | 13 | for you, and then we'll hear from the next witness. |
| 01:38 | 14 | MS. MAYNE:  Your Honor, plaintiff calls |
| 01:38 | 15 | by deposition Chuyue Ai. |
| 01:38 | 16 | (Video deposition of Chuyue Ai played as follows.) |
| 01:38 | 17 | Q.    Which part? |
| 01:38 | 18 | A.    The mobile (inaudible).  For example, software |
| 01:39 | 19 | run on the cell phone or on the remote control. |
| 01:39 | 20 | (Video ends.) |
| 01:39 | 21 | MS. MAYNE:  Next call by deposition |
| 01:39 | 22 | Gavin Chen. |
| 01:39 | 23 | (Video deposition of Gavin Chen played as follows.) |
| 01:39 | 24 | Q.    After this deposition, are you going to go |
| 01:39 | 25 | read Textron's patents? |

481

01:39  1        A.    I will not.

01:39  2                   (Video ends.)

01:39  3                   MS. MAYNE:  We next call by deposition

01:39  4    Litian Zhang.

01:39  5     (Video deposition of Litian Zhang played as follows.)

01:39  6        Q.    Those sensors provide the position and speed

01:39  7    data of the drone?

01:39  8        A.    Some sensors can provide data for the position

01:40  9    or displacement; some can provide velocity data.

01:40  10                  What velocity are you referring to?  Are you

01:40  11   referring to the velocity of the drone in the world

01:40  12   coordinate system?

01:40  13       Q.    Yes.

01:40  14       A.    Generally speaking, we calculate a command by

01:41  15   using a controller that is similar to the PID

01:41  16   controller to calculate the velocity command.

01:41  17       Q.    Does the controller also use the estimated

01:41  18   velocity of the target to calculate the velocity

01:41  19   command?

01:41  20       A.    When you refer to the "estimated velocity,"

01:42  21   are you talking about the estimated velocity obtained

01:42  22   by the drone with position differentiation?

01:42  23                  (Video ends.)

01:42  24                  MS. MAYNE:  Plaintiff next introduces by

01:42  25   deposition Zhimeng Shang.

482

01:42    1    (Video deposition of Zhimeng Shang played as follows.)

01:42    2        Q.    What control stick movement controls the

01:42    3    drone's pitch?

01:42    4        A.    The forward/backward of the right stick --

01:42    5    right control stick.

01:42    6        Q.    And the drone will also hold its forward speed

01:42    7    at zero, correct?

01:42    8        A.    Yes.

01:42    9        Q.    So let's say that the drone is moving in

01:42    10   forward flight and the user then releases the stick to

01:42    11   the center position.

01:42    12        Can you tell me what happens within the

01:43    13   control loops from that point?

01:43    14        A.    When the forward velocity is less than the

01:43    15   threshold, it enters hover, locking its position.

01:43    16        Q.    And if the data indicates a centered right

01:43    17   control stick, the control loop will cause the drone to

01:43    18   decelerate and hold a zero forward speed, correct?

01:43    19        A.    It decelerates.  And when the velocity is low,

01:43    20   it holds the position.  It does not hold the velocity

01:44    21   at zero.

01:44    22        Q.    If the data indicates the left control stick

01:44    23   is centered, the control loop for controlling the yaw

01:44    24   will cause the drone to hold its current heading,

01:44    25   correct?

```
01:44   1        A.    Yes.

01:44   2                     (Video ends.)

01:44   3                     MR. SPEEGLE:  Your Honor, we next call

01:44   4   Jeff Andrien, the damages expert.

01:45   5                     (The witness was sworn.)

01:45   6                     DIRECT EXAMINATION

01:45   7   BY MR. SPEEGLE:

01:45   8        Q.    Good afternoon.

01:45   9        Would you please introduce yourself to the

01:45  10   jury?

01:45  11        A.    Good afternoon.  Good afternoon, ladies and

01:45  12   gentlemen.  My name is Jeffrey Scott Andrien.

01:45  13        Q.    And, Mr. Andrien, could you tell the jury a

01:45  14   little bit about yourself?

01:45  15        A.    Sure.  I'm from Austin, Texas.  I am the

01:45  16   father of three beautiful daughters ranging from 21 to

01:45  17   12.

01:45  18        I work as a senior managing director at an

01:46  19   economic consulting firm called Coherent Economics.  In

01:46  20   addition to that, I also teach at the University of

01:46  21   Texas at Austin in their business school.

01:46  22        Q.    And, Mr. Andrien, what is your role in this

01:46  23   case?

01:46  24        A.    I've been asked to quantify patent damages in

01:46  25   this case.
```

484

01:46   1       Q.    Do you have experience with patent damages?

01:46   2       A.    I do.  I've worked on patent damages-related

01:46   3   matters throughout my consulting career, which has been

01:46   4   about 25 years now.

01:46   5       Q.    At a high level, can you explain to the jury

01:46   6   what patent damages are?

01:46   7       A.    Sure.  If someone or a company is infringing

01:46   8   upon the technology of patents of another company, that

01:46   9   means they're not paying for the use of that

01:46   10  technology.  And patent damages are what you, the jury,

01:46   11  decide that they should rightfully pay for that use.

01:46   12      Q.    And how are damages typically measured in a

01:47   13  patent case?

01:47   14      A.    Well, there's different ways that one might

01:47   15  measure damages in a patent case.  But the courts have

01:47   16  determined that, at a minimum, the patentholders are

01:47   17  entitled to what's called a reasonable royalty.

01:47   18      Q.    Can you explain what that word means to the

01:47   19  jury, "royalty"?

01:47   20      A.    Sure.  As I think the example you heard the

01:47   21  other day is, it's kind of the fee associated with

01:47   22  using someone else's technology.  So you can kind of

01:47   23  consider it the rent for living in someone's bedroom.

01:47   24      Q.    And, Mr. Andrien, do you have any slides

01:47   25  prepared today to help explain your testimony?

485

01:47  1      A.    I do.  Yes.

01:47  2      Q.    Mr. Andrien, can you please share some of your

01:47  3  educational background with the jury?

01:47  4      A.    Yes.  I have two degrees, both of which are

01:47  5  from the University of Texas at Austin.  I have an

01:48  6  undergraduate degree in economics, and I have a

01:48  7  master's degree in business administration, or an MBA,

01:48  8  which I concentrated my studies in finance.

01:48  9      Q.    Can you also share some of your professional

01:48  10  background?

01:48  11     A.    Yes.  So as I mentioned, for about the last

01:48  12  25 years I've been working in this economic consulting

01:48  13  field and doing these types of analyses, both in

01:48  14  litigation cases and for just general business

01:48  15  consulting purposes.

01:48  16           Before that, I was a part owner of a small

01:48  17  business, and I also worked in the investment industry.

01:48  18     Q.    And do you have any teaching experience?

01:48  19     A.    I do.  I've been teaching finance, economics

01:48  20  and -- for about the last 15 years.  And currently I'm

01:48  21  on the faculty of the finance department at the McCombs

01:48  22  School of Business at UT.  And I teach a graduate-level

01:49  23  valuation corporate finance class to MBA students

01:49  24  there, and I also teach a similar class to other

01:49  25  master's degree-seeking students.

01:49  1    Q.    Have you testified about patent damages in the

01:49  2    past?

01:49  3    A.    I have.  I've testified on issues related to

01:49  4    patent damages and other types of damages in courts

01:49  5    throughout the country.

01:49  6    Q.    And, Mr. Andrien, would you describe yourself

01:49  7    as an expert in patent damages?

01:49  8    A.    I would.  I've been -- as I said, testified as

01:49  9    an expert in other courts.  So, yes, I would.

01:49  10         MR. SPEEGLE:  Your Honor, we offer

01:49  11   Mr. Jeff Andrien as an expert in patent damages.

01:49  12         MR. SCHROEDER:  No objection.

01:49  13         THE COURT:  He'll be admitted as such.

01:49  14   BY MR. SPEEGLE:

01:49  15   Q.    So, Mr. Andrien, can you tell the jury what

01:49  16   your assignment was in this case?

01:49  17   A.    Yes.  Specifically counsel for Bell Textron

01:49  18   asked me to determine what the reasonable royalty

01:49  19   should be that DJI should pay Bell Textron for use of

01:50  20   the two patents at issue in this case.

01:50  21   Q.    And did you reach any conclusions on that

01:50  22   topic?

01:50  23   A.    I did, yes.

01:50  24   Q.    What were your original conclusions?

01:50  25   A.    So I filed my first report in December of

—487—

01:50 1    2022, a few months ago, in this case.  And related to

01:50 2    that report I determined that the reasonable royalty

01:50 3    rate that DJI should pay Bell Textron for use of the

01:50 4    '909 patent would be a little over 2 percent of the

01:50 5    sale of a drone.

01:50 6            And in terms of damages, that equates to just

01:50 7    under $41 million of damage.

01:50 8    Q.    And what were the conclusions that you reached

01:50 9    in December 2022 related to the '752 patent?

01:50 10   A.    So the '752 patent and its ability to

01:50 11   automatically hover is an important component of a

01:50 12   drone's ease of use and maneuverability.  So that ease

01:51 13   of use and maneuverability feature of a drone, the '752

01:51 14   patent related to that, should have a reasonable

01:51 15   royalty rate of a little under 4.3 percent, or

01:51 16   4.29 percent, of the sale of a drone.

01:51 17           And that equates to roughly a little over

01:51 18   $104 million in damages.

01:51 19   Q.    And so in December of 2022, what did you

01:51 20   conclude would be the total amount of damages due for

01:51 21   the Follow Me and ActiveTrack patent?

01:51 22   A.    So --

01:51 23   Q.    Follow Me, ActiveTrack and maneuverability and

01:51 24   ease of use?

01:51 25   A.    Sure.  So these are important features to the

—488—

01:51  1    drone that's driven by these technologies.  And the sum

01:51  2    of those totals that I mentioned earlier's a little

01:51  3    over $145 million.

01:51  4        Q.    Now, did you reach any further conclusions in

01:51  5    this case?

01:51  6        A.    Yes.  Excuse me.  Yes, I did.

01:51  7        Q.    What additional conclusions did you reach in

01:51  8    this case?

01:51  9        A.    So after I filed my initial report, I received

01:52  10   some additional data that said the '752 patent is also

01:52  11   instrumental in the drone's flight performance.  And so

01:52  12   I had to add the value that that '752 patent drives to

01:52  13   this flight performance feature.

01:52  14        And based on my conversations with

01:52  15   Dr. Michalson, I determined -- and my calculations --

01:52  16   determined that that would drive an additional --

01:52  17   little over 9 percent -- up to at least an additional

01:52  18   9 percent of a royalty rate.  And that would equate to

01:52  19   damages -- additional damages up to $222 million.

01:52  20        Q.    And so when you included flight performance in

01:52  21   your calculation in January of 2023, what was the total

01:52  22   amount of damages that you concluded about at that

01:52  23   time?

01:52  24        A.    At that time damages could be up to

01:52  25   $367 million.

01:52  1       Q.    And what time period were you looking at for

01:53  2  these totals?

01:53  3       A.    In general I was looking between mid 2015

01:53  4  through June of 2022.

01:53  5       Q.    And why did your analysis end in June 2022?

01:53  6       A.    Because that's when I no longer had any sales

01:53  7  data from DJI.  So I need that sales data to do my

01:53  8  analysis.  And while during the last ten months I'm

01:53  9  sure they've continued to sell drones, I don't have

01:53  10  that sales data.  So I can't calculate damages for that

01:53  11  last ten-month period.

01:53  12       Q.    Now, are you here opining about whether, in

01:53  13  fact, DJI is infringing the asserted patents in this

01:53  14  case?

01:53  15       A.    I am not.  As a damages expert, I assume that

01:53  16  the patents are found valid and infringed.  That's how

01:53  17  we get to damages.

01:53  18       Q.    Even though you're not opining about

01:54  19  infringement, are you aware of any of the parties'

01:54  20  disagreements about infringement?

01:54  21       A.    Yes.  I am.

01:54  22       Q.    And did you calculate any alternative damages

01:54  23  figures based on any of those disagreements?

01:54  24       A.    Yes.  So I understand that there's a dispute

01:54  25  in this case about whether or not certain DJI entities

490

01:54  1    either directly infringe these patents or indirectly

01:54  2    infringe the patents.  And I have calculated -- the

01:54  3    numbers I just presented to you assume that all the

01:54  4    entities directly infringe.

01:54  5          Now, if it's found that some of the entities

01:54  6    only indirectly infringe, I have made an assumption and

01:54  7    redone my calculations assuming that only DJI Europe

01:54  8    directly infringes and the other entities indirectly

01:54  9    infringe.  And what that does under that assumption is

01:54  10   it shrinks the sales base, the number of drones that I

01:54  11   include in my calculation.

01:54  12     Q.    And approximately how much would it reduce

01:55  13   damages to for the '909 patent if you assume that only

01:55  14   DJI Europe directly infringes?

01:55  15     A.    It would reduce it from a little under

01:55  16   $41 million to a little over $19 million.

01:55  17     Q.    And what would be the damages that you

01:55  18   calculated for the '752 patent if you assume that only

01:55  19   DJI Europe directly infringes?

01:55  20     A.    Well, related to the ease of use and

01:55  21   maneuverability feature of a drone, those damages would

01:55  22   go down to about $50 million.  And related to the

01:55  23   flight performance, they could go down to roughly about

01:55  24   $106 million, I think.

01:55  25     Q.    And would the running royalty rates that you

01:55  1   calculated in this case change based on that

01:55  2   assumption?

01:55  3       A.    No.   The royalty rates wouldn't change.   It

01:55  4   would just be shrinking the base to which I apply those

01:55  5   rates, the number of drones that were sold and the

01:55  6   amount of sales.   It would just shrink the -- that

01:56  7   total, not the rates that are applied.

01:56  8       Q.    Thank you.

01:56  9            And, Mr. Andrien, can you summarize for the

01:56  10  jury what work you did to reach these conclusions?

01:56  11      A.    Yeah.   I can.   I had -- we did a lot of work

01:56  12  on this case.   I had a team of about six people that

01:56  13  worked under my direction in this case.   And we worked

01:56  14  on this case for months, looking at thousands of

01:56  15  produced documents.

01:56  16            We did our own independent research where we

01:56  17  looked at websites and magazines and trade press.   I

01:56  18  looked at financial data, read deposition testimony.

01:56  19  We interviewed Bell Textron personnel.   And I also went

01:56  20  to Bell Textron and visited -- did a site visit there,

01:56  21  and took all this information, and based on that,

01:56  22  performed our analyses.   And then memorialized our work

01:56  23  in two expert reports, the one in December of 2022 and

01:56  24  the one in January.

01:57  25      Q.    And about how many hours did you and your team

492

01:57　1　work on this matter?

01:57　2　　　A.　You know, I haven't added that up

01:57　3　specifically.  But in terms of man-hours, I would

01:57　4　estimate it's well over a couple thousand man-hours

01:57　5　that we put on this case.

01:57　6　　　Q.　Thanks.

01:57　7　　　　　Now, to orient everyone, could you give us an

01:57　8　outline of the steps you took in this matter?

01:57　9　　　A.　Sure.  At a high level, the first thing I

01:57　10　wanted to do was set the parameters for something

01:57　11　called the hypothetical negotiation.  After that I had

01:57　12　to value the technology at issue in the hands of DJI

01:57　13　and how they were using it and then determine how that

01:57　14　value would be split between the two parties at the

01:57　15　hypothetical negotiation.

01:57　16　　　Q.　Can you explain more what the hypothetical

01:57　17　negotiation -- what that phrase refers to?

01:57　18　　　A.　Yeah.  So what that means is just imagining

01:57　19　that the two parties, Bell Textron and DJI, sat down at

01:58　20　a negotiation table at the time DJI first started to

01:58　21　infringe.  So back in 2015.

01:58　22　　　　　If we assume that they sat down at a

01:58　23　negotiating table to negotiate a license instead of

01:58　24　infringing, what would that negotiation look like?

01:58　25　That's the hypothetical negotiation.

493

01:58  1    Q.    And where does the idea of a hypothetical

01:58  2    negotiation come from?

01:58  3    A.    So that comes out of U.S. case law.  There was

01:58  4    a case involving a company called Georgia-Pacific, and

01:58  5    in that case the Court listed 15 factors that an

01:58  6    economic damages practitioner should consider when

01:58  7    quantifying reasonable royalty damages.

01:58  8         And these are financial and economic factors.

01:58  9    And the 15th factor is the hypothetical negotiation

01:58 10    itself.  And so that's something the Court has asked us

01:59 11    to analyze, what would happen if they actually sat

01:59 12    down.

01:59 13    Q.    And did you consider the 15 Georgia-Pacific

01:59 14    factors in this case?

01:59 15    A.    I did, yes.  I applied those factors to my

01:59 16    analysis, and they were instrumental in reaching my

01:59 17    conclusions.

01:59 18    Q.    Now, are there any assumptions that we need to

01:59 19    understand for the hypothetical negotiation?

01:59 20    A.    There are.  The Court has asked us to make a

01:59 21    number of assumptions at the hypothetical negotiation.

01:59 22    So the first one that comes to mind is that the patents

01:59 23    at issue are both valid and infringed.  As I mentioned

01:59 24    earlier, damages experts have to assume that.

01:59 25         The next thing that they ask us to assume is

494

01:59  1    that both the parties at the hypothetical negotiation,

01:59  2    in this case Bell Textron and DJI, would both be

01:59  3    willing license -- you'd have -- they'd both be willing

01:59  4    to participate in that negotiation in trying to reach a

02:00  5    reasonable agreement.  And so you would have a lone

02:00  6    licensor, which would be Bell Textron, and you'd have a

02:00  7    lone licensee, which would be DJI.

02:00  8           And then the third thing they ask us to

02:00  9    consider and assume is that both parties would have

02:00  10   knowledge of all the relevant facts that would

02:00  11   influence that negotiation.

02:00  12        Q.    Thank you.

02:00  13           And, Mr. Andrien, what are the basic

02:00  14   parameters for a hypothetical negotiation?

02:00  15        A.    So you want to know who's going to be at the

02:00  16   hypothetical negotiation, what parties, when it's going

02:00  17   to occur and what they're going to be negotiating over.

02:00  18        Q.    And who would the parties be to the

02:00  19   hypothetical negotiation in this case?

02:00  20        A.    In this case, it would be Textron Innovations,

02:00  21   which is that patent-holding company for Textron

02:00  22   representing Bell, Textron, all the Textron entities.

02:00  23   So on that side it'd be Textron Innovations.

02:01  24        Q.    And who would be on the other side of this

02:01  25   negotiation table?

495

02:01  1      A.    On the DJI side, it'd be all the defendants in

02:01  2  this case, including DJI's parent company.  And they

02:01  3  would be representing the overall DJI conglomerate, the

02:01  4  entire corporation.

02:01  5      Q.    And is iFlight the parent corporation for DJI?

02:01  6      A.    It is, yes.

02:01  7      Q.    Now, when would the hypothetical negotiation

02:01  8  occur in this case?

02:01  9      A.    So in this case -- in general, the

02:01  10  hypothetical negotiation is supposed to occur at the

02:01  11  time when DJI would first start infringing the patents.

02:01  12  And because we have two different patents in this case,

02:01  13  there's two different hypothetical negotiation dates.

02:01  14          The first one for the '909 patent would be

02:01  15  April 8, 2015.  And that's the date when DJI first

02:01  16  introduced the infringing features onto their drones.

02:01  17          And then the second for the '752 patent would

02:02  18  be a few months later on October 20, 2015.

02:02  19      Q.    Is the date of the hypothetical negotiation

02:02  20  important for your analysis?

02:02  21      A.    Well, sure.  It identifies -- it helps

02:02  22  identify who is going to be at the negotiation because

02:02  23  you want to identify who is the patentholder at that

02:02  24  time.

02:02  25          And it also helps identify what the company's

*KRISTIE M. DAVIS, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (WACO)*

02:02  1    relative bargaining positions would be at that time.

02:02  2    And so when we figure out how to split the benefit

02:02  3    that's going to be created from the negotiation, we

02:02  4    have to use their bargaining positions to determine how

02:02  5    that money's going to be split, and so it helps us to

02:02  6    analyze those issues.

02:02  7        Q.    Does this mean that you are limited to

02:02  8    considering facts that the parties actually knew in

02:02  9    2015?

02:02  10       A.    It doesn't.  The courts have, in their wisdom,

02:02  11   determined that damages experts can consider

02:03  12   information that became available after the

02:03  13   hypothetical negotiation and assume that that

02:03  14   information would have been known at the hypothetical

02:03  15   negotiation.

02:03  16            And so we can determine how that information

02:03  17   would impact the actual license negotiation.

02:03  18       Q.    And is that referred to as the Book of Wisdom?

02:03  19       A.    Yes.  In legal jargon, that's known as the

02:03  20   Book of Wisdom.

02:03  21       Q.    And when is it appropriate to use new

02:03  22   information from the Book of Wisdom?

02:03  23       A.    Well, I understand, as a practitioner, it's

02:03  24   appropriate to use this new information that comes

02:03  25   available after the hypothetical negotiation date when

497

02:03  1    it's reasonably foreseeable.

02:03  2        Q.    Does it matter if the parties actually foresaw

02:03  3    these events in 2015?

02:03  4        A.    No.    It doesn't have to be foreseen.    It has

02:03  5    to be reasonably foreseeable.

02:03  6        Q.    Now, what would the parties be negotiating in

02:04  7    our hypothetical negotiation?

02:04  8        A.    Well, in the first negotiation, they would be

02:04  9    negotiating a license to the '909 patent, and that

02:04  10   would be a nonexclusive license.

02:04  11            And what that means is that while DJI would be

02:04  12   licensing the right to use that technology, Bell would

02:04  13   still have the right to either use it itself and/or

02:04  14   license it to others.    So it would be nonexclusive

02:04  15   right.

02:04  16            And the same would be for the '752 patent.    It

02:04  17   would be for nonexclusive rights to that patent.

02:04  18       Q.    Now, does the negotiation of the license for

02:04  19   the '909 patent depend on the other patent in the

02:04  20   hypothetical negotiation a few months later?

02:04  21       A.    It does not.    These are independent

02:04  22   negotiations.

02:04  23       Q.    Did you also consider how the parties would

02:04  24   structure a payment in the hypothetical negotiation?

02:04  25       A.    I did.    Yes.

498

02:04    1         Q.    What did you consider in that regard?

02:04    2         A.    So in general, there's a couple different

02:05    3    means by which they could agree to royalties.

02:05    4               One would be that the royalties are tied to

02:05    5    the number of sales that DJI makes.  So for every drone

02:05    6    they sell, they would pay a portion of those proceeds

02:05    7    to Bell Textron.  That is called a running royalty, and

02:05    8    so that would be tied to the number of sales that they

02:05    9    made.

02:05   10               The other is what we refer to as a lump-sum

02:05   11    royalty, and that would be paying -- DJI paying Bell

02:05   12    Textron a lump-sum amount of money up front and then

02:05   13    they could use the technology as much or as little as

02:05   14    they wanted to.  It wouldn't be tied to the number of

02:05   15    sales.

02:05   16         Q.    And which form did you decide was appropriate

02:05   17    in this case?

02:05   18         A.    Based on analyzing a variety of different

02:05   19    factors, it was clear to me that these parties would be

02:05   20    negotiating for a running royalty, not a lump-sum

02:06   21    royalty.

02:06   22         Q.    What led you to that conclusion?

02:06   23         A.    Well, I analyzed a lot of different

02:06   24    information, including the market and how that market

02:06   25    was growing.  I analyzed financial positions of the

499

02:06  1    companies.  I analyzed their historical licenses --

02:06  2    license agreements.  I looked at their preferences.  A

02:06  3    variety of different information.

02:06  4        Q.    Does that include all the factors we need to

02:06  5    consider for the hypothetical negotiation at this

02:06  6    stage?

02:06  7        A.    It does.  That kind of sets the parameters for

02:06  8    this hypothetical negotiation.

02:06  9        Q.    So what did you do next in your analysis?

02:06  10       A.    So next I had to determine what is the value

02:06  11   of this technology to DJI?

02:06  12             If they employ -- or utilize this technology

02:06  13   and put it onto their drones, how much extra money are

02:06  14   they going to make from doing that?

02:06  15             And that's that kind of pot of money that's

02:06  16   created from a license agreement.  So they agreed to a

02:07  17   license.  How much extra money would DJI make because

02:07  18   of it?

02:07  19             And then I had to figure out how that money

02:07  20   would be split between the two parties.

02:07  21       Q.    So can you explain different possible ways to

02:07  22   value Bell Textron's patents?

02:07  23       A.    Sure.  Valuation, whenever we're valuing an

02:07  24   asset, whether it be a physical asset or a patent or an

02:07  25   intangible asset like a patent, there's three main

500

02:07  1    approaches that practitioners use.  There's the income

02:07  2    approach, there's the cost approach, and there's the

02:07  3    market approach.  And these are what we teach in

02:07  4    business school when we teach valuation, these

02:07  5    different approaches.

02:07  6        Q.    And do these different approaches line up with

02:07  7    the 15 Georgia-Pacific factors that you mentioned

02:07  8    before?

02:07  9        A.    They do.  There are a number of factors that

02:07  10   relate specifically to the income approach, others that

02:07  11   relate specifically to the market approach, and there's

02:08  12   at least one that relates specifically to the cost

02:08  13   approach.  So yes, these are consistent with the

02:08  14   Georgia-Pacific factors.

02:08  15       Q.    So can you explain what the objective would be

02:08  16   for an income-approach analysis?

02:08  17       A.    Yes.  This is kind of what I just mentioned.

02:08  18   We're trying to figure out in an income approach how

02:08  19   much additional income DJI will make by putting this --

02:08  20   these technologies onto their drones.

02:08  21            So they can have a drone without the

02:08  22   technologies, go sell those, but if they put this

02:08  23   additional technology on, how much more money will they

02:08  24   make by doing that?

02:08  25            And so we have to know how much more revenue

501

02:08  1    they'll make and what are the costs associated with

02:08  2    putting this technology onto the drone, and so we do

02:08  3    that, we can get to a profit amount that they make, an

02:08  4    additional profit amount.

02:08  5          And then that kind of pool of money, that

02:09  6    extra profit they make, that needs to be split by the

02:09  7    two parties.

02:09  8    Q.    Thank you.

02:09  9          And did you have information available in this

02:09  10   case to perform the income approach?

02:09  11   A.    I did.  Yes.

02:09  12   Q.    What kind of information did you use in your

02:09  13   income-approach analysis?

02:09  14   A.    Well, I use a variety of different

02:09  15   information.  I used information about the sales of

02:09  16   infringing drones, how many drones they sold that

02:09  17   infringed, what the revenues associated with those

02:09  18   drones were.

02:09  19          I actually used -- they had survey data in

02:09  20   this case, where DJI had surveyed its customers, and I

02:09  21   used that information to determine what portion of

02:09  22   those overall sales were driven just by the infringing

02:09  23   technologies.

02:09  24          So I'm trying to isolate how much of that

02:09  25   money they're making is driven just by the infringing

502

02:09   1    technologies, and I was able to use that survey data to

02:09   2    do that.

02:09   3         And then I had data that allowed me to analyze

02:10   4    and assess the two parties' relative bargaining

02:10   5    positions, if one of them had a stronger bargaining

02:10   6    position than the other, as they sat down to the

02:10   7    negotiation table.

02:10   8         Q.    Great.

02:10   9         And did you also consider using a cost

02:10   10   approach in this case?

02:10   11        A.    I did.  Yes.

02:10   12        Q.    And what kind of information would you need to

02:10   13   perform a cost-approach analysis?

02:10   14        A.    So as I think -- that's been talked about in

02:10   15   this case.  A cost approach in patent damages is really

02:10   16   related to this concept of whether there's any

02:10   17   acceptable noninfringing alternatives.

02:10   18        And what that means, is there a way that DJI

02:10   19   could kind of get to a place where they would have the

02:10   20   same exact drone but technically not infringe the

02:10   21   patents?

02:10   22        So would it have the same kind of usability?

02:10   23   Would the interface with the user be the same?  That

02:11   24   type of stuff.  Can you get to the same place without

02:11   25   infringing the patents and, if so, what would be the

503

02:11    1    cost of implementing all that kind of design-around

02:11    2    work?  What would the cost be?

02:11    3         So that would be the cost approach.

02:11    4         Q.    Did you consider the availability of

02:11    5    noninfringing alternatives in this case?

02:11    6         A.    I did consider that.  Yes.

02:11    7         Q.    And what did you determine?

02:11    8         A.    Based on my conversations with the technical

02:11    9    expert for Bell Textron, Dr. Michalson, determined that

02:11    10   there are no acceptable noninfringing alternatives to

02:11    11   this technology -- these technologies.

02:11    12        Q.    Now, if you assume that there were

02:11    13   noninfringing alternatives available, would you still

02:11    14   need additional information to perform a cost-approach

02:11    15   analysis?

02:11    16        A.    You would.  If you're going to perform a cost

02:11    17   approach, you have to be able to identify all the costs

02:11    18   associated with designing around the patents.

02:11    19        So if you have a drone that's not exactly the

02:12    20   same, it might impact how consumers perceive it and,

02:12    21   therefore, the demand might be less for those drones so

02:12    22   they might sell less.  Their price might change.  And

02:12    23   so you'd have to have the information to be able to

02:12    24   analyze those factors, and those -- those data points,

02:12    25   that information, has not been available in this case.

504

02:12  1    Q.    So what did you decide about using the cost

02:12  2   approach in this case?

02:12  3    A.    Well, I can't use it.  A, there are no

02:12  4   acceptable noninfringing alternatives; and, B, even if

02:12  5   there were, there's not the right information to fully

02:12  6   calculate and reasonably, accurately calculate the

02:12  7   costs associated with implementing that alternative

02:12  8   technology.

02:12  9    Q.    Can you explain a bit what the market approach

02:12  10   requires?

02:12  11    A.    Yeah.  The market approach is really trying to

02:12  12   value the patents at issue by looking at other

02:12  13   historical market transactions.

02:12  14          So if those patents had been licensed before,

02:13  15   for example, that might give us some information about

02:13  16   how valuable they are and how we should value them in

02:13  17   this case.

02:13  18          If there's comparable technologies that are

02:13  19   similar and really close to the patented technologies

02:13  20   that were licensed before, maybe we could look at those

02:13  21   as benchmarks and get an indication of value of the

02:13  22   technology.  So that would be the market approach.

02:13  23    Q.    Thank you, Mr. Andrien.

02:13  24          And did you decide whether the information you

02:13  25   needed was available for the market approach in this

505

02:13    1    case?

02:13    2        A.    Well, there was no information that was --

02:13    3    would enable me to use the market approach.    The

02:13    4    patents at issue, the '909 and the '752 patents, have

02:13    5    not been licensed before by Bell Textron.    So there's

02:13    6    no previous market transactions related to the patents

02:13    7    themselves.

02:13    8              And when I went and looked to see if there's

02:13    9    any comparable transactions that I could use as

02:14    10   benchmarks, there was no comparable transactions

02:14    11   either.

02:14    12             So you can't employ the market approach if you

02:14    13   don't have either comparables or actual transactions

02:14    14   related to the technology at issue.

02:14    15       Q.    And so what approach did you decide was

02:14    16   appropriate in this case?

02:14    17       A.    Well, the only feasible approach that was left

02:14    18   was the income approach.

02:14    19       Q.    And do you feel confident that the income

02:14    20   approach is a good measure for this case?

02:14    21       A.    I do feel confident.    I have the data to

02:14    22   utilize that approach and come to a reliable

02:14    23   conclusion.

02:14    24       Q.    Is the income approach something you teach in

02:14    25   your classes?

506

02:14  1        A.    It is.  It is kind of the bellwether valuation

02:14  2   approach that we teach in valuations.  We teach all

02:14  3   three, but the income approach is a very important kind

02:14  4   of primary approach.

02:14  5        Q.    How many steps were there in the income

02:14  6   approach you used in this case?

02:14  7        A.    Roughly four main primary steps.

02:15  8        Q.    Could you walk us through an example of how

02:15  9   you performed the income approach in this case?

02:15 10        A.    I can.  So I think we'll use the example of

02:15 11   the '752 patent as it influences this ease of use and

02:15 12   maneuverability feature.  And so the first thing I have

02:15 13   to do -- and that's related because the '752 patent

02:15 14   enables this automatic hover hold.

02:15 15             And so the first thing I had to do was

02:15 16   identify the infringing drone sales during the relevant

02:15 17   time period I discussed earlier.  So I had to identify

02:15 18   all the drones that had automatic hover hold, and then

02:15 19   I had to look at how much DJI sold of those drones

02:15 20   during the damages period, from mid 2015 through

02:15 21   June 2022.

02:15 22        Q.    And how many infringing sales of drones with

02:16 23   automatic hover hold did you identify?

02:16 24        A.    I don't remember the exact unit number, but

02:16 25   the dollar amount was a little over $3 billion worth of

02:16  1    sales.  So I think it was close to $3.1 billion in

02:16  2    sales.

02:16  3        Q.    After you identified the original sales base,

02:16  4    what was the next step in your income-approach

02:16  5    analysis?

02:16  6        A.    So the next step is to actually look at a

02:16  7    drone and see are there any portions of this drone that

02:16  8    I can remove that don't practice the patented features?

02:16  9    If I can remove the value associated with those

02:16  10   components, then I wanted to do that and shrink the

02:16  11   base.

02:16  12        And so based on my conversation with

02:16  13   Dr. Michalson, who you just heard, he informed me that

02:16  14   both of these patents can be infringed without

02:16  15   utilizing the camera and the gimbal, which is that

02:17  16   component that attaches the camera to the drone and

02:17  17   enables the camera to spin around and move around.

02:17  18        So he informed me that they could -- both of

02:17  19   these patents could infringe without the camera and the

02:17  20   gimbal.  So I wanted to remove the value associated

02:17  21   with all those drone sales that's related to the camera

02:17  22   and the gimbal.  And so I wanted to shrink the sales

02:17  23   base by that amount.

02:17  24             MR. SCHROEDER:  Your Honor, I think we're

02:17  25   getting to the point where we likely need to seal the

| | | |
|---|---|---|
| 02:17 | 1 | courtroom. |
| 02:17 | 2 | THE COURT:  Okay.  Do you agree? |
| 02:17 | 3 | MR. SPEEGLE:  No objection. |
| 02:17 | 4 | THE COURT:  Anyone who's not under the |
| 02:17 | 5 | protective order should step out. |
| 02:17 | 6 | (Sealed proceedings.) |
| 02:18 | 7 | MR. SCHROEDER:  Thank you, Your Honor. |
| 02:18 | 8 | BY MR. SPEEGLE: |
| 02:18 | 9 | Q.   So, Mr. Andrien, did you say how much you |
| 02:18 | 10 | reduced the sales base by in view of the camera and the |
| 02:18 | 11 | gimbal? |
| 02:18 | 12 | A.   I haven't said that yet.  So in this example |
| 02:18 | 13 | that I'm giving, I calculated about ███████ of all |
| 02:18 | 14 | that sales amount, that ████████████ was |
| 02:18 | 15 | related to the camera and the gimbal. |
| 02:18 | 16 | And so I removed that ████████ out and |
| 02:18 | 17 | that shrunk the sales base from a little over |
| 02:18 | 18 | ████████ down to about ████████ |
| 02:18 | 19 | Q.   Now, after removing the value of the camera |
| 02:18 | 20 | and the gimbal, what was the next step in your |
| 02:18 | 21 | income-approach analysis? |
| 02:18 | 22 | A.   So I had to isolate the feature that was |
| 02:18 | 23 | practicing the patented technology.  So in this case, |
| 02:18 | 24 | the feature that I was concerned about was the drone's |
| 02:18 | 25 | ease of use and maneuverability.  And so I wanted to -- |

509

02:18  1    of that ████████████ remaining base, I wanted to remove

02:19  2    the value associated with the other features and

02:19  3    isolate the value associated with just that one

02:19  4    feature.

02:19  5         And so I had survey data that enabled me to do

02:19  6    this.  And based on analyzing those data, I was able to

02:19  7    determine that the ease of use and maneuverability of a

02:19  8    drone drove about ██████████ of that ████████████

02:19  9    Q.    And what did you do after you identified the

02:19  10   ████████████ attributable to the maneuverability and

02:19  11   ease of use?

02:19  12   A.    Then I had to determine, well, how important

02:19  13   was the '752 to that feature?  And so based on my

02:19  14   conversation with Dr. Michalson, who informed me that

02:19  15   it would be conservatively at least 50 percent, I

02:19  16   determined that, well, then I'll take 50 percent of

02:19  17   that value and attribute it to just the '752 patent.

02:19  18        So now what I've done is I've looked at all

02:19  19   the revenue associated with this feature and determined

02:20  20   how much of it is driven just by the '752 patent.

02:20  21   Q.    And after this analysis, how much revenue did

02:20  22   you conclude should be attributed to the '752 patent

02:20  23   and how it contributes to the maneuverability and ease

02:20  24   of use of DJI's drones?

02:20  25   A.    It was about ██████████ of that base, that

510

02:20  1    reduced base.  And I think it came to about

02:20  2    ████████████    of revenue that's solely attributable to

02:20  3    the '752 patent related to this feature.

02:20  4         Q.    Now, did you perform this analysis for any

02:20  5    other features?

02:20  6         A.    I did.  I did these for the other four --

02:20  7    three features, same exact analysis for the other three

02:20  8    features at issue in this case.

02:20  9              So I know that the '752 feature influences the

02:20  10   flight performance of a drone, and so that's another

02:20  11   feature, and that's a really important feature, it

02:20  12   turns out.  And so the amount of -- the amount of

02:21  13   revenue that was driven by the '752 patent related to

02:21  14   flight performance would be as much as ████████████

02:21  15             And I did the same thing for the two features

02:21  16   related to the '909 patent, the Follow Me and the

02:21  17   ActiveTrack.  And the ActiveTrack generated about

02:21  18   ████████████    in extra revenue, and the Follow Me

02:21  19   generated about ████████████    in extra revenue.

02:21  20             And so now I was able to determine all the

02:21  21   extra revenue that DJI made by employing these two

02:21  22   patented features.

02:21  23        Q.    After you identified the extra revenue, what

02:21  24   was the next step in your income-approach analysis?

02:21  25        A.    The next step was to determine, well, okay, so

511

02:21  1   if this is how much money they make by employing these

02:22  2   onto drones, how much does it cost to put this

02:22  3   technology onto a drone?  And so I had to determine

02:22  4   that cost.

02:22  5          Because what I wanted to do is subtract their

02:22  6   revenue that they make from putting it onto the drone,

02:22  7   subtract out the cost it cost them to put the

02:22  8   technology onto the drone so I got to profit.

02:22  9   Q.   And did you use the cost for the entire

02:22  10  accused drone when you did that subtraction?

02:22  11  A.   No.  Absolutely not.  That wouldn't be

02:22  12  appropriate.  So the calculation I'm doing is saying

02:22  13  DJI could make a drone.  They could sell that drone

02:22  14  without the technology and make a certain amount of

02:22  15  money.

02:22  16         But if they added the technology to that drone

02:22  17  that already exists, how much extra money do they make?

02:22  18  And so the cost that I need to be concerned with is,

02:22  19  well, how much does it cost to put that technology onto

02:22  20  the drone, not how much it costs to make a drone.

02:22  21  Q.   And how did you determine the incremental cost

02:22  22  from adding these features to DJI's drones?

02:22  23  A.   Well, I talked to Dr. Michalson again.  And as

02:23  24  you heard him testify, he thought that putting these

02:23  25  technologies onto a drone is really just software and

512

02:23　1    there would be some coding that would have to be done.

02:23　2    　　　So you have to remember that the technology

02:23　3    was already created by Bell Textron.  All that research

02:23　4    and development and the months and years it took to

02:23　5    develop the technology was already done by Bell

02:23　6    Textron.

02:23　7    　　　So now we're talking about taking that

02:23　8    technology and putting it into a drone, and that's

02:23　9    software.  That's writing code.  And Dr. Michalson told

02:23　10   me it'd be about 200 hours per patent of coding -- of

02:23　11   engineering time to write that code, and about 50 hours

02:23　12   for each one related to testing and making sure it all

02:23　13   worked right afterwards.

02:23　14   　　　And so what I did is I kind of decided, well,

02:23　15   to be conservative, I'm going to bump it to 500 hours

02:23　16   for each of these technologies.  And then I looked to

02:23　17   see what the annual cost of an engineer is and

02:23　18   determined how much of their time 500 hours would be

02:24　19   worth and figured out how much the cost would be.

02:24　20   　　Q.   So how much did you determine the extra costs

02:24　21   would be to add these patented features to DJI's

02:24　22   drones?

02:24　23   　　A.   So it'd be about $45,000 per patent, the extra

02:24　24   cost.  So $90,000 total.

02:24　25   　　Q.   Let's talk more about how you identified the

| | | |
|---|---|---|
| 02:24 | 1 | infringing units. Can you explain that step of your |
| 02:24 | 2 | analysis a little more? |
| 02:24 | 3 | A. Yeah. Sure. |
| 02:24 | 4 | So to do that, I looked at DJI documents. |
| 02:24 | 5 | DJI, in particular, answered a question in this |
| 02:24 | 6 | litigation: Which drones practice which features? |
| 02:24 | 7 | And I think you saw an example before where |
| 02:24 | 8 | they had kind of, like, a spreadsheet or a matrix where |
| 02:24 | 9 | they had the list of the drones down one column and the |
| 02:24 | 10 | features across the top. And they put a little |
| 02:24 | 11 | checkmark into each box for the drones that had which |
| 02:24 | 12 | features. |
| 02:25 | 13 | Q. And did you use any sources besides DJI's |
| 02:25 | 14 | responses that you mentioned? |
| 02:25 | 15 | A. I did. So in addition to -- this is just kind |
| 02:25 | 16 | of a subset of that larger document. |
| 02:25 | 17 | But in addition to this, I also looked at some |
| 02:25 | 18 | online information. DJI has an online developer |
| 02:25 | 19 | website that it has where they have kind of the same |
| 02:25 | 20 | type of spreadsheet or matrix where they do exactly the |
| 02:25 | 21 | same thing. It lists their drones down and check -- |
| 02:25 | 22 | put a checkmark on all the features that those drones |
| 02:25 | 23 | have. |
| 02:25 | 24 | Q. Mr. Andrien, can you turn in your binder to |
| 02:25 | 25 | PTX-154? |

02:25   1         A.      Yes.

02:25   2         Q.      And what is PTX-154?

02:25   3         A.      This looks like a printout of the developer

02:25   4    web page I was talking about.

02:25   5         Q.      That's a DJI website -- web page?

02:26   6         A.      Yes -- excuse me.  Yes, it is.

02:26   7                 MR. SPEEGLE:  Your Honor, we move to

02:26   8    admit PTX-154.

02:26   9                 MR. SCHROEDER:  No objection.

02:26   10                THE COURT:  Admitted.

02:26   11   BY MR. SPEEGLE:

02:26   12        Q.      And, Mr. Andrien, is this on the screen an

02:26   13   example of the online website you were referring to?

02:26   14        A.      Yeah.  This is a portion of that.  And as you

02:26   15   can see, again, on the left, that first column, you'll

02:26   16   see a list of different drones.  And on the top, you'll

02:26   17   see the row at the top will have different features.

02:26   18   And then for each drone, they put a yes in the box if

02:26   19   that drone has that feature.

02:26   20        Q.      And did you see any discrepancies when you

02:26   21   looked at DJI's online information compared to what was

02:26   22   on their discovery responses?

02:26   23        A.      There were a few, not too, too many, but a

02:26   24   few.  If you look at the discovery response for the

02:26   25   Matrice 100 drone and you look at the Follow Me

515

02:27  1    feature, it -- it would indicate that the Matrice 100

02:27  2    does not have the Follow Me feature.

02:27  3         But if you look at the website at the Matrice

02:27  4    100 and if you look at the Follow Me feature, it

02:27  5    indicates that that drone does have the Follow Me

02:27  6    feature.

02:27  7         And so whenever I saw "yes" on either one of

02:27  8    these documents, I included that model drone in my

02:27  9    analysis.

02:27  10    Q.    And after you had a list of the models with

02:27  11    the accused features, what else did you use to identify

02:27  12    the infringing sales base in this case?

02:27  13    A.    Well, then I wanted to go -- there's a sales

02:27  14    database that DJI produced in this case.  So I was able

02:27  15    to determine, okay.  Now that I know the drones that

02:27  16    I'm concerned about, let's go look at the sales

02:27  17    database and see how many of these drones and how

02:27  18    much -- how much of these drones, in terms of revenue,

02:27  19    were sold during the -- during the damages period,

02:28  20    between kind of mid-2015 and mid-2022.

02:28  21    Q.    And do you know if the -- is the sales

02:28  22    database you're referring to, is that Plaintiff's

02:28  23    Exhibit 74?

02:28  24    A.    Let me take a look.  This appears to be one of

02:28  25    them.  This looks like the sales database for DJI

516

02:28   1    Europe.

02:28   2                    MR. SPEEGLE:  Your Honor, we move to

02:28   3    admit PTX-74.

02:28   4                    MR. SCHROEDER:  No objection.

02:28   5                    THE COURT:  Admitted.

02:28   6    BY MR. SPEEGLE:

02:28   7        Q.    And if you turn to PTX-77.

02:28   8        A.    Okay.

02:28   9        Q.    Can you tell me what PTX-77 is?

02:28   10       A.    This seems to be the English translation of

02:28   11   that sales database for the entire organization, all

02:28   12   the DJI entities.

02:28   13                   MR. SPEEGLE:  Your Honor, we move to

02:28   14   admit PTX-77.

02:29   15                   MR. SCHROEDER:  No objection, Your Honor.

02:29   16                   THE COURT:  Admitted.

02:29   17   BY MR. SPEEGLE:

02:29   18       Q.    Now, do either of these -- well, let's back

02:29   19   up.

02:29   20             What time period were you interested in when

02:29   21   you looked at DJI's sales database?

02:29   22       A.    So for the '909 patent, although the date that

02:29   23   these features were first introduced was April 8th,

02:29   24   2015 because of when Bell Textron filed this case,

02:29   25   damages started at July 2015.

—517—

02:29   1           So I looked from July 2015 through the period

02:29   2   where I had data, which was June -- the end of

02:29   3   June 2022.  So that's the time period for the '909

02:29   4   patent.

02:29   5       Q.   And what time period did you look at for the

02:29   6   '752 patent?

02:29   7       A.   It was from October of 2015 through June 2022.

02:29   8       Q.   Now, did the sales data that we had -- that

02:29   9   you looked at from DJI, did that split out sales

02:30  10   specific to DJI's website?

02:30  11       A.   It did not.  No.

02:30  12       Q.   And do you -- let me go back.

02:30  13           Do you recall mentioning that you removed the

02:30  14   camera and gimbal from the sales base in this case?

02:30  15       A.   I do.  Yes.

02:30  16       Q.   Can you explain more what your analysis was

02:30  17   for the camera and gimbal?

02:30  18       A.   Yes.

02:30  19           So as part of this case, I had information

02:30  20   regarding the retail price of every one of these

02:30  21   drones, and so I knew the retail price of these drones.

02:30  22   And for about 80 percent of the sales base that I was

02:30  23   concerned about, I had price related to their

02:30  24   replacement costs of a camera and gimbal.

02:30  25           And so I was able to determine, well, how much

518

| | | |
|---|---|---|
| 02:30 | 1 | of the overall retail price of the drone is comprised |
| 02:30 | 2 | of that replacement cost of the camera and gimbal? |
| 02:30 | 3 | In some cases, it was as high as almost |
| 02:30 | 4 | ███████ of the value; other cases there was drones |
| 02:30 | 5 | that you could buy without a camera and gimbal. |
| 02:31 | 6 | So -- so I didn't have to remove it from those |
| 02:31 | 7 | drones. So there's a wide range. |
| 02:31 | 8 | Q. And what did you do for the drones -- you said |
| 02:31 | 9 | there was about 20 percent where you did not have the |
| 02:31 | 10 | retail price for the camera available? |
| 02:31 | 11 | A. For those 20 percent, I just took the highest |
| 02:31 | 12 | ratio I had. So out of all of the calculations I did, |
| 02:31 | 13 | that ███████ was the highest ratio from the camera |
| 02:31 | 14 | and gimbal price of the overall retail value of the |
| 02:31 | 15 | drone. |
| 02:31 | 16 | So for those 20 percent where I didn't have |
| 02:31 | 17 | data, I just used that highest percent, which I think |
| 02:31 | 18 | is a really conservative approach. Kind of over -- I |
| 02:31 | 19 | took out more value most likely using that approach. |
| 02:31 | 20 | Q. And can you remind us, approximately how much |
| 02:31 | 21 | of the sales base did you determine should be removed |
| 02:31 | 22 | for the camera and the gimbal? |
| 02:31 | 23 | A. They were slightly different per patent but |
| 02:32 | 24 | roughly around ███████. Roughly around ███████ |
| 02:32 | 25 | of the overall sales base was shrunk by removing the |

02:32  1    value of the camera and the gimbal.

02:32  2        Q.    And are you confident in your estimates

02:32  3    related to the value of the camera and the gimbal?

02:32  4        A.    I am confident.  I'm confident for two

02:32  5    reasons.

02:32  6            The first is that I used replacement costs.

02:32  7    Replacement costs are typically higher than the cost

02:32  8    would be as part of a new drone.  So I felt confident

02:32  9    using replacement costs.

02:32  10            And secondly, I did my analysis where I

02:32  11    separated out the camera and the gimbal and the

02:32  12    features of those surveys that related to the camera

02:32  13    and gimbal.  I did that analysis.  And then I did it

02:32  14    with the camera and gimbal and with those surveyed

02:32  15    features and compared the two.

02:32  16            And I got a lower damages number by taking out

02:32  17    the camera and the gimbal, and so that made me feel

02:32  18    comfortable that I was doing the right thing in pulling

02:33  19    out the appropriate amount related to those features.

02:33  20        Q.    I think you've mentioned a couple times

02:33  21    surveys that you used.

02:33  22            Can you provide some more context about the

02:33  23    surveys you considered in your analysis?

02:33  24        A.    Again, so there was a number of surveys that

02:33  25    were provided in this case.  And these are surveys that

520

02:33   1   DJI gave to their customers, the people who are buying

02:33   2   their drones.  They surveyed them in the normal course

02:33   3   of business.  So it wasn't for this litigation.  It was

02:33   4   to make business decisions about their drones.

02:33   5           And some of these surveys had questions on

02:33   6   them that asked the users or the purchasers of drones:

02:33   7   Why did you purchase our drones?  What features drove

02:33   8   your purchase decision?

02:33   9           And that's exactly what I'm trying to find out

02:33   10  is, how important are certain features versus other

02:33   11  features?

02:33   12          And so this survey data allowed me to analyze

02:34   13  that information and come to a conclusion about the

02:34   14  relative value of these features.

02:34   15      Q.    Mr. Andrien, can you turn in your binder to

02:34   16  Exhibit PTX-61?

02:34   17      A.    Yes.

02:34   18      Q.    And is PTX-61 one of the surveys you used in

02:34   19  this case?

02:34   20      A.    Yes.  This is the survey for the Inspire 1 and

02:34   21  Inspire 2 drones.

02:34   22      Q.    And is that a survey that DJI made in its

02:34   23  ordinary business and produced in litigation?

02:34   24      A.    Yes.  It is.

02:34   25                  MR. SPEEGLE:  Your Honor, we move to

02:34    1    admit PTX-61.

02:34    2              MR. SCHROEDER:  No objection, Your Honor.

02:34    3              THE COURT:  Admitted.

02:34    4    BY MR. SPEEGLE:

02:34    5        Q.    Mr. Andrien, can you turn to PTX-62?

02:34    6        A.    Yes.

02:34    7        Q.    And is PTX-62 a survey that you used in your

02:34    8    analysis?

02:34    9        A.    It is.  Yes.

02:34   10        Q.    And was it a survey created by DJI in its

02:34   11    ordinary business and produced in this litigation?

02:34   12        A.    It is.  Yes.

02:34   13              MR. SPEEGLE:  Your Honor, we move to

02:35   14    admit PTX-62.

02:35   15              MR. SCHROEDER:  No objection, Your Honor.

02:35   16              THE COURT:  Admitted.

02:35   17    BY MR. SPEEGLE:

02:35   18        Q.    And turn to PTX-59.

02:35   19        A.    Okay.

02:35   20        Q.    And same questions, this is a survey that DJI

02:35   21    created and you used in your analysis in this case?

02:35   22        A.    It is.  This is a survey related to the Spark

02:35   23    drones.

02:35   24              MR. SPEEGLE:  So, Your Honor, we'll move

02:35   25    to admit PTX-59.

—522—

| | | |
|---|---|---|
| 02:35 | 1 | MR. SCHROEDER:  No objection, Your Honor. |
| 02:35 | 2 | THE COURT:  Admitted. |
| 02:35 | 3 | BY MR. SPEEGLE: |
| 02:35 | 4 | Q.    And turn when you can to PTX-63. |
| 02:35 | 5 | A.    Here it is.  Sorry.  Okay. |
| 02:35 | 6 | Q.    And is PTX-63 a survey that you used in your |
| 02:35 | 7 | analysis? |
| 02:35 | 8 | A.    Yes.  This is the Phantom user drone. |
| 02:35 | 9 | Q.    And it was a survey created -- |
| | 10 | A.    Survey. |
| 02:35 | 11 | Q.    -- by DJI and produced in this litigation? |
| 02:36 | 12 | A.    Yes. |
| 02:36 | 13 | MR. SPEEGLE:  Your Honor, we move to |
| 02:36 | 14 | admit PTX-63. |
| 02:36 | 15 | MR. SCHROEDER:  No objection, Your Honor. |
| 02:36 | 16 | THE COURT:  Admitted. |
| 02:36 | 17 | BY MR. SPEEGLE: |
| 02:36 | 18 | Q.    Mr. Andrien, can you turn to PTX-58? |
| 02:36 | 19 | A.    Yes. |
| 02:36 | 20 | Q.    And is this a survey that you used in your |
| 02:36 | 21 | analysis that was created by DJI and produced in the |
| 02:36 | 22 | litigation? |
| 02:36 | 23 | A.    It is.  This is the survey related to the |
| 02:36 | 24 | Mavic Air drone. |
| 02:36 | 25 | MR. SPEEGLE:  And we move to admit |

523

| | | |
|---|---|---|
| 02:36 | 1 | PTX-58. |
| 02:36 | 2 | MR. SCHROEDER:  No objection, Your Honor. |
| 02:36 | 3 | THE COURT:  Admitted. |
| 02:36 | 4 | BY MR. SPEEGLE: |
| 02:36 | 5 | Q.    Last one.  Can you turn to PTX-60? |
| 02:36 | 6 | A.    Yes. |
| 02:36 | 7 | Q.    And is PTX-60 a survey created by DJI, |
| 02:36 | 8 | produced in this litigation and that you relied on in |
| 02:36 | 9 | your analysis? |
| 02:36 | 10 | A.    Yes.  This is a survey related to the DJI GO 4 |
| 02:36 | 11 | app.  So it's not related to a drone itself, but it was |
| 02:36 | 12 | given to app users. |
| 02:36 | 13 | MR. SPEEGLE:  Your Honor, we move to |
| 02:36 | 14 | admit PTX-60. |
| 02:36 | 15 | MR. SCHROEDER:  And no objection, |
| 02:36 | 16 | Your Honor. |
| 02:36 | 17 | THE COURT:  Admitted. |
| 02:37 | 18 | BY MR. SPEEGLE: |
| 02:37 | 19 | Q.    And, Mr. Andrien, do we have examples of the |
| 02:37 | 20 | information in these surveys that's appearing on the |
| 02:37 | 21 | screen? |
| 02:37 | 22 | A.    Yes.  You do. |
| 02:37 | 23 | Q.    And did you use -- well, let me back up. |
| 02:37 | 24 | Can you give us a little more context about |
| 02:37 | 25 | the different specific drones that were surveyed by |

524

02:37　1    DJI?

02:37　2        A.    Yes.  As I said, there were -- for the

02:37　3    Inspire 1 and 2 drones, the Phantom drone, the Mavic

02:37　4    Pro, the Mavic Air, the Spark drone and their app.

02:37　5        And so the drones that were surveyed were

02:37　6    really kind of their upper-end drones.  They sell

02:37　7    drones from, I think, around $100 up to $12,000.  And

02:37　8    all these surveys related to drones that were $500 and

02:37　9    above.

02:37　10       Q.    And what was the most expensive drone

02:37　11   surveyed?

02:37　12       A.    The Inspire 2, I believe, sells for over

02:37　13   12,000 -- or it can sell for over $12,000.

02:37　14       Q.    Now, in your analysis, did you use all of

02:37　15   these surveys in the same way?

02:38　16       A.    No.  I used -- there was five surveys that

02:38　17   specifically asked users:  What features drove your

02:38　18   purchase decision?  And so I used those drones to

02:38　19   determine the relative importance of different

02:38　20   features.

02:38　21       And one of the features that was surveyed was

02:38　22   this feature called Intelligent Flight Mode, and

02:38　23   Intelligent Flight Mode has sub-features, and Follow Me

02:38　24   and ActiveTrack are sub-features of Intelligent Flight

02:38　25   Mode.

525

02:38    1          So there's a bunch of different Intelligent

02:38    2     Flight Modes, and I needed to find out, well, of that

02:38    3     feature that was surveyed by the first five surveys,

02:38    4     how can I figure out how much of Intelligent Flight

02:38    5     Mode is related to ActiveTrack and Follow Me?

02:38    6          And I used the other two surveys to do that

02:38    7     work.  So I used them differently.

02:39    8     Q.    And were the two surveys that you used to

02:39    9     break down Intelligent Flight Modes, was that Mavic Air

02:39   10     and DJI GO 4?

02:39   11     A.    Yes.

02:39   12     Q.    Mr. Andrien, you mentioned at the beginning

02:39   13     that you prepared two separate reports with slightly

02:39   14     different numbers; is that right?

02:39   15     A.    Yes.  An initial report, and then I had new

02:39   16     information, and so I added to my initial report in my

02:39   17     second report.

02:39   18     Q.    And can you explain the new information that

02:39   19     caused you to prepare the second report?

02:39   20     A.    Yes.  It's this document that's already been

02:39   21     discussed today.  It was this export control document.

02:39   22     This is the application that DJI made to the Chinese

02:39   23     government to export its source code related to the

02:39   24     technologies at issue here.  Export that source code

02:39   25     for this litigation.  And so this is the application

02:40  1    document.

02:40  2        Q.    And do you think this is a reliable document

02:40  3    for you to use in your analysis?

02:40  4        A.    I do.  At the very end of the document, DJI

02:40  5    warranted that the information in that document was

02:40  6    true, and so they warranted that to the Chinese

02:40  7    government.  I take them at their word.

02:40  8        Q.    And were there any statements in this document

02:40  9    that you found relevant to your analysis of the '752

02:40  10   patent?

02:40  11       A.    Yes.  There is.

02:40  12       Q.    What did this document say that you found

02:40  13   relevant?

02:40  14       A.    It said:  The flight control system enables

02:40  15   precise operation and stable hovering of a drone by

02:40  16   controlling the rotational speed of various motors.  It

02:40  17   is a core unit and the brain of a multi-rotor drone and

02:40  18   directly determines the drone's flight performance.

02:40  19            And flight performance was one of the features

02:40  20   surveyed in these surveys.

02:41  21            MR. SCHROEDER:  Objection, Your Honor.  I

02:41  22   don't believe this exhibit has been admitted yet, and I

02:41  23   just want the record to be clear.

02:41  24            MR. SPEEGLE:  I believe PTX-106 has been

02:41  25   admitted, Your Honor.

527

02:41  1              MR. SCHROEDER:  Has it?  All right.

02:41  2    Sorry.

02:41  3    BY MR. SPEEGLE:

02:41  4         Q.    Now, Mr. Andrien, were you able to determine

02:41  5    from DJI's surveys how important flight performance is?

02:41  6         A.    I was.  This was one of the most important

02:41  7    features according to their consumers who engaged in

02:41  8    the surveys.

02:41  9         Q.    And how are you able to determine whether the

02:41  10   flight control system that enables precise operation

02:41  11   and stable hovering, as mentioned in PTX-106, was

02:41  12   related to the '752 patent?

02:41  13        A.    Well, again, this is based on my conversations

02:41  14   with Dr. Michalson.  And I asked Dr. Michalson, and he

02:41  15   said seven out of the eight modules that are at issue

02:41  16   here, that are being requested, relate directly to

02:42  17   Claim 13 of the '752 patent.

02:42  18              And so I now knew that flight performance was

02:42  19   influenced by the '752 patent, and I had to quantify

02:42  20   damages associated with that.

02:42  21        Q.    And how closely did DJI's document that was

02:42  22   submitted to the Chinese government tie the source code

02:42  23   accused of infringing the '752 patent -- how closely

02:42  24   was it tied to flight performance?

02:42  25        A.    It said it was directly determinant of a

528

02:42  1   drone's flight performance.  So it's directly

02:42  2   determinant of it.  That's very closely tied in my

02:42  3   mind.

02:42  4       Q.   And do you have an understanding of what

02:42  5   flight performance refers to in DJI's surveys?

02:42  6       A.   I do.  When they surveyed flight performance,

02:42  7   they said that it was related to a drone's speed, a

02:42  8   drone's distance and a drone's altitude, and then said

02:42  9   et cetera.  So things of that nature:  Speed, distance,

02:42 10   altitude.

02:42 11       Q.   And with this information, how much demand did

02:43 12   you determine should be attributed to the '752 patent's

02:43 13   contribution to flight performance?

02:43 14       A.   So the code was never produced.  So when I

02:43 15   talked to Dr. Michalson, he said, I'd really like to

02:43 16   have that code so I can determine exactly, but I know

02:43 17   seven-eighths of it relates to the '752.

02:43 18            And so if I assume that seven-eighths of the

02:43 19   flight performance is driven by the '752 patent, then I

02:43 20   get to that damages number I presented to you earlier.

02:43 21   And so that's the best information I have to make a

02:43 22   calculation.

02:43 23       Q.   And did each of the surveys that you used in

02:43 24   this calculation literally refer to flight performance?

02:43 25       A.   No.  There's three of them that literally

529

02:43  1   refer to flight performance.  Another one referred

02:43  2   to -- I think it was distance which is an element of

02:43  3   flight performance.  So...

02:43  4       Q.   Now, Mr. Andrien, to clarify, we talked about

02:44  5   the demand percentages here, I think, that you have on

02:44  6   the screen.  Is that the same as the running royalties

02:44  7   you presented at the beginning of your analysis?

02:44  8       A.   No.  These are just trying to determine what

02:44  9   percent of that sales base, that ██████████ sales

02:44  10  base, is driven by these features.  And so that's very

02:44  11  different than how much of a drone sale should DJI pay

02:44  12  Bell Textron when they make a sale of a drone.  Very

02:44  13  different calculation.

02:44  14      Q.   Mr. Andrien, can you summarize your conclusion

02:44  15  about the value of Bell Textron's technology to DJI's

02:44  16  infringing drones?

02:44  17      A.   I can.  So it was -- these are very valuable

02:44  18  technologies that consumers really want.  They're

02:44  19  driving demand for these drones, and they're driving

02:44  20  them to ███████ of additional profit, really, to

02:44  21  DJI.

02:45  22               MR. SPEEGLE:  Are we still on the sealed

02:45  23  record?

02:45  24               MR. SCHROEDER:  Yeah.  I was thinking

02:45  25  with the next slide, I think, we can probably go off.

530

02:45  1    After this, after 33, if that's fine.

02:45  2                    MR. SPEEGLE:  Okay.

02:45  3    BY MR. SPEEGLE:

02:45  4        Q.    Mr. Andrien, after determining the value of

02:45  5    the patents, what was the next step in your analysis?

02:45  6        A.    So now we've determined kind of this pot of

02:45  7    money, this extra money that DJI would make as a result

02:45  8    of licensing this technology.  And so now I had to

02:45  9    determine if they -- if the two parties had actually

02:45  10   sat down to a negotiating table way back in 2015, how

02:45  11   much -- how would they split this money?  Who would get

02:45  12   what?

02:45  13                And that's going to be based on their

02:45  14   bargaining positions relative to one another.  So if

02:45  15   they had an equal bargaining position, you would

02:45  16   imagine that they would split this equally.  But if one

02:45  17   of them had a stronger bargaining position, then they

02:45  18   would get a larger share of that money.  And so now I

02:46  19   had to analyze their bargaining positions.

02:46  20       Q.    I think you mentioned earlier that there were

02:46  21   two separate hypothetical negotiations in this case,

02:46  22   right?

02:46  23       A.    I did, yes.

02:46  24       Q.    And would the bargaining positions or the

02:46  25   split of the pot of money be different in those two

531

02:46  1    negotiations?

02:46  2        A.    No.    They wouldn't be.    Those are both done in

02:46  3    2015, just a couple months apart.    And I don't believe

02:46  4    that their negotiating positions would have altered

02:46  5    from one negotiation to the next.    They would have been

02:46  6    the same.    And so the split -- how they split the money

02:46  7    would be the same split, I mean, on both of those

02:46  8    negotiations.

02:46  9        Q.    And does the amount -- the balance of the

02:46  10   split depend on how much money is in the pot?

02:46  11       A.    No.    Whatever the money is in the pot, the

02:46  12   negotiation -- the bargaining positions determine how

02:46  13   much of whatever's in the pot each party gets.    And so

02:46  14   that's the split, the percentage split.    And that

02:47  15   doesn't change if the size of the pot changed.    You

02:47  16   would just get a larger or smaller portion depending on

02:47  17   how that pot size varies.

02:47  18       Q.    What factors did you consider when deciding

02:47  19   how to balance the parties' positions in the

02:47  20   hypothetical negotiation?

02:47  21       A.    Again, there's a lot of factors to consider.

02:47  22   There's -- and, again, the -- these Georgia-Pacific

02:47  23   factors relate to this issue, some of them.

02:47  24            And so I considered market factors, economic

02:47  25   and financial factors.    I considered strategic factors,

532

02:47  1    relationship factors, those types of things.

02:47  2        Q.    Can you walk us through the most important

02:47  3    factors in your analysis?

02:47  4        A.    I can.  There's a few that really stuck out as

02:47  5    being very important.  So, for example, the competitive

02:47  6    relationship between the parties was an important

02:47  7    factor.  And so based on my analysis, I understood that

02:48  8    these -- the Bell's helicopter market is actually

02:48  9    converging with the drone market; in other words,

02:48  10   things that Bell sells helicopters for or has been

02:48  11   selling helicopters for are starting to be done by

02:48  12   drones.

02:48  13        So if there's technology given to the drone

02:48  14   market that enables it to do more of this stuff, that's

02:48  15   going to mean Bell sells less helicopters.  So in that

02:48  16   way, there's competition even though Bell doesn't

02:48  17   directly sell drones right now.

02:48  18        But I think it's also clear, based on the

02:48  19   drone development work that Bell's done, it's very

02:48  20   possible they will enter the drone market at some

02:48  21   point, the commercial drone market, and, therefore,

02:48  22   they're certainly potential competitors.

02:48  23        So based on these two factors, if Bell is

02:48  24   going to license a competitor or potential competitor,

02:48  25   they would want to be compensated for the harm that

533

02:48    1    might do to their business, and so they would want a

02:49    2    larger share of that pot.  That's going to be a very

02:49    3    influential factor.

02:49    4        Q.    And would DJI's designation as a potential

02:49    5    Chinese military company impact the parties'

02:49    6    hypothetical negotiation bargaining posture?

02:49    7        A.    I believe that's another very important

02:49    8    factor.  We have to consider if there's any harm to

02:49    9    either party by doing business with the other one.

02:49    10            And now that -- knowing that -- that Bell

02:49    11    Textron's largest customer is the U.S. government and

02:49    12    they have contracts for billions of dollars and engage

02:49    13    in these contract discussions with the U.S. government,

02:49    14    they don't want to do anything to risk them.  And now

02:49    15    they would know that their largest customer thinks

02:49    16    DJI's a Chinese military company and wouldn't be

02:49    17    interested in having their -- might not be interested

02:49    18    in having Bell Textron do business with them.

02:49    19            And so this would put a lot of Bell Textron's

02:50    20    business at risk if they were going to negotiate an

02:50    21    agreement.  That's something you heard Mr. Runstadler

02:50    22    speak about and something they would have to think very

02:50    23    carefully about.  And that would also cause a large

02:50    24    imbalance in favor of Bell in that negotiation.

02:50    25        Q.    And do you recall what year the Department of

| | | |
|---|---|---|
| 02:50 | 1 | Defense designated DJI as a Chinese military company? |
| 02:50 | 2 | A.    I believe that was in 2022. |
| 02:50 | 3 | Q.    And do you think those statements in 2022 |
| 02:50 | 4 | would impact a hypothetical negotiation in 2015? |
| 02:50 | 5 | A.    I do.  This is that Book of Wisdom we talked |
| 02:50 | 6 | about before.  We're allowed to consider information |
| 02:50 | 7 | that's reasonably foreseeable, as if it was known at |
| 02:50 | 8 | the date of the hypothetical negotiation.  And so I |
| 02:50 | 9 | think there's evidence that that's reasonably |
| 02:50 | 10 | foreseeable and, therefore, I think it's appropriate to |
| 02:50 | 11 | include at the hypothetical negotiation. |
| 02:51 | 12 | Q.    And did you also consider noninfringing |
| 02:51 | 13 | alternatives to be an important factor in your analysis |
| 02:51 | 14 | of the hypothetical negotiation? |
| 02:51 | 15 | A.    I did.  This is in conjunction with kind of |
| 02:51 | 16 | the value of the technology.  The technology's driving |
| 02:51 | 17 | a lot of value to these drones, and they're making a |
| 02:51 | 18 | lot of money because of having this technology. |
| 02:51 | 19 |        There's no way they can design around and get |
| 02:51 | 20 | to that money.  Then this puts a lot of the negotiating |
| 02:51 | 21 | leverage on Bell's side of the table.  So the fact that |
| 02:51 | 22 | there were no noninfringing alternatives and the fact |
| 02:51 | 23 | that these drones -- these technologies are driving a |
| 02:51 | 24 | lot of value, that really raises the -- Bell Textron's |
| 02:51 | 25 | bargaining position relative to DJI's. |

535

02:51  1      Q.    Now, were there any factors that you found

02:51  2  important to consider on the DJI side of the table?

02:51  3      A.    There are.  So DJI makes the drones, right?

02:52  4  And so they're the ones putting the features on and

02:52  5  selling them.  And so they're tying up some of their

02:52  6  capital, some of their money, in the process of putting

02:52  7  these drones on and -- putting these technology on the

02:52  8  drones, selling it and then getting paid for it.

02:52  9  There's some capital tied up, and they would want a

02:52  10  return on that capital.  And so that's something that

02:52  11  would raise the negotiating position of DJI.

02:52  12          And also I know what DJI's profit margin is.

02:52  13  When they invest in their drone business, they make

02:52  14  roughly about ███████████ profit.  And so that was an

02:52  15  important fact to understand and know as I analyzed

02:52  16  this -- what would happen at a hypothetical

02:52  17  negotiation.

02:52  18      Q.    And so how did you decide that the parties'

02:52  19  bargaining position would tip in the hypothetical

02:52  20  negotiation?

02:52  21      A.    So I analyzed these factors, and I determined

02:53  22  that there's imbalances between their position, and the

02:53  23  imbalances are heavily weighted towards Bell Textron.

02:53  24  In fact, I think their imbalances are so large that

02:53  25  Bell would have a rightful claim on -- Bell Textron

—536—

02:53    1    would have a rightful claim on the entire pot because

02:53    2    there's a lot at risk for Bell here.  And I think they

02:53    3    would rightfully have claim on the entire pot.

02:53    4            However, I don't think that would get a deal

02:53    5    done between the parties.  If Bell took all the money

02:53    6    and then there's nothing in it for DJI, they'd probably

02:53    7    walk away from the table.

02:53    8            So -- but I do believe, if Bell is willing to

02:53    9    give DJI at least its profit margin, the percentage

02:53    10    profit margin it makes, that ███████████ , then I think

02:53    11    DJI would do a deal because that's what they make as a

02:53    12    return whenever they invest a dollar in this business.

02:53    13            So when they're analyzing a new portion of

02:53    14    their business that they would make a ███████████

02:53    15    return, I think they'd be happy with that.

02:53    16            And so that's how I determined the split and

02:54    17    how the parties would split.

02:54    18            And so based on that, DJI would get

02:54    19    75.9 percent of the pot of money, and then -- excuse

02:54    20    me -- Bell Textron would get ███████████  of the money,

02:54    21    and DJI would get their profit margin at ███████████ .

02:54    22    Q.    And so looking at the situation with

02:54    23    $484 million in incremental profit from DJI's use of

02:54    24    the patented technology, what did you conclude would be

02:54    25    the share that goes to Bell Textron?

—537—

02:54  1      A.    That would be ███████████ or $367 million,

02:54  2  which would mean about ███████████ goes to DJI.

02:54  3      Q.    And, Mr. Andrien, does this conclude your

02:54  4  analysis?

02:54  5      A.    It does.  Yes.

02:54  6      Q.    And so just to wrap up, can you summarize each

02:54  7  of your opinions in this case for the jury?

02:54  8      A.    I can.  So the '909 patent related to

02:55  9  Follow Me and ActiveTrack, I think that the reasonable

02:55 10  royalty rate would be just slightly above ██████████ of

02:55 11  the sale of a drone, and that would equate to damages a

02:55 12  little under ██████████, ██████████████ to be exact.

02:55 13      The '752 patent, as it influences

02:55 14  maneuverability and ease of use of a drone, would be --

02:55 15  would command a royalty rate of just under ██████████

02:55 16  of the sale of a drone, and that would equate to

02:55 17  damages of just a little over ██████████.

02:55 18      And then the flight performance, how '752

02:55 19  influences the flight performance, that could be as

02:55 20  much as ██████████████████████████████████████████

02:55 21  ████████████████████████████████████████████

02:55 22  ████████  and that would equate to up to $222 million

02:56 23  additional damages.

02:56 24      Q.    And so, Mr. Andrien, if the jury here finds

02:56 25  infringement and validity for the '752 patent and the

02:56  1    '909 patent, what is your opinion about the total

02:56  2    amount of damages that should be awarded to Bell

02:56  3    Textron for infringement through June 2022?

02:56  4        A.    Could be up to $367 million.

02:56  5        Q.    Thank you.

02:56  6                    MR. SPEEGLE:  Pass the witness.

02:56  7                    MR. SCHROEDER:  Your Honor, when would

02:56  8    you like to take the afternoon break?

02:56  9                    THE COURT:  Whenever works.  If you'd

02:56  10    like to take it now, that'd be fine.

02:56  11                    MR. SCHROEDER:  Now seems like a natural

02:56  12    breaking point, if everyone could use a stretch.

02:56  13    Otherwise, I'm happy to --

02:56  14                    THE COURT:  No.  No.  I'm happy to let

02:56  15    you all figure it out.  I'm just sitting here.

02:56  16                    So, ladies and gentlemen, let's take our

02:56  17    afternoon recess.  Please remember my instructions, and

02:56  18    we'll see you back in about ten minutes.

02:56  19                    THE BAILIFF:  All rise.

02:56  20                    (Jury exited the courtroom.)

09:42  21                    (Sealed proceedings end.)

02:57  22                    THE COURT:  Thank you.  You may be

02:57  23    seated.

02:57  24                    I thought it was a good breaking place

02:57  25    too, but I didn't know if you wanted to keep -- start

```
02:57   1   going.  I didn't want to interfere with that either.

02:57   2                   So you can step down, sir.

02:57   3                   Is there anything we need to take up?

02:57   4                   MR. SCHROEDER:  Nothing from us,

02:57   5   Your Honor.

02:57   6                   THE COURT:  Okay.  So we'll finish with

02:57   7   this gentleman whenever, and then we'll have your

02:57   8   corporate representative.  And then who -- will he take

02:57   9   more than an hour?

02:57  10                   MR. SCHROEDER:  Shouldn't for us.

02:57  11                   THE COURT:  So do you have someone after

02:57  12   him here?

02:57  13                   MR. SCHROEDER:  Yes.  And we also have

02:57  14   deposition videos.

02:57  15                   THE COURT:  That's all I need to know.

02:57  16   You guys -- we'll stand in recess.

03:10  17                   THE BAILIFF:  All rise.

02:57  18                   (Recess taken.)

03:10  19                   THE BAILIFF:  All rise.

03:10  20                   THE COURT:  Please remain standing for

03:10  21   the jury.

03:10  22                   (Jury entered the courtroom.)

03:10  23                   THE COURT:  Thank you.  You may be

      24   seated.

03:11  25                       CROSS-EXAMINATION
```

03:11  1   BY MR. SCHROEDER:

03:11  2       Q.    Good afternoon, Mr. Andrien.

03:11  3       A.    Good afternoon.

03:11  4       Q.    You agree that DJI has been a willing licensee

03:11  5   in the past; isn't that correct?

03:11  6       A.    Yes.  They've entered license agreements in

03:11  7   the past as I understand it.

03:11  8       Q.    As part of your work in this case, you

03:11  9   reviewed prior agreements where DJI obtained a license

03:11  10  to a patent by paying a lump-sum royalty; isn't that

03:11  11  correct?

03:11  12      A.    It is, but I wouldn't say those were willing.

03:11  13  Those were litigation settlements.

03:11  14      Q.    As part of your work in this case, you

03:11  15  reviewed prior agreements where DJI obtained a license

03:11  16  to a patent by paying a lump-sum royalty; isn't that

03:11  17  correct?

03:11  18      A.    That's correct.

03:11  19      Q.    And DJI has paid to obtain a patent -- a

03:11  20  license to patents in the past for technology patents

03:11  21  that were owned by other companies as well; that's

03:11  22  correct?

03:11  23      A.    I'm sorry.  Would you repeat that question?

03:11  24  There's some --

03:11  25      Q.    Sure.

541

03:11  1           DJI has paid to obtain a license to technology

03:12  2   patents owned by other companies in the past; isn't

03:12  3   that correct?

03:12  4      A.    Yes.  That's correct.

03:12  5      Q.    And you're not a technical expert in this

03:12  6   case; isn't that fair?

03:12  7      A.    That's fair.

03:12  8      Q.    You've never taken any engineering courses?

03:12  9      A.    That's correct.

03:12  10     Q.    Never taken any courses in robotics?

03:12  11     A.    I have not.

03:12  12     Q.    And you're not a lawyer either; isn't that

03:12  13  correct?

03:12  14     A.    That is correct.  I'm not a lawyer.

03:12  15     Q.    And the Judge will decide whether your

03:12  16  analysis -- strike that.

03:12  17           Let me start over.

03:12  18           Is there anything you cannot consider under

03:12  19  the Book of Wisdom?

03:12  20     A.    I gave my understanding of what I'm allowed to

03:12  21  consider and what I'm not is things that are reasonably

03:12  22  foreseeable.

03:12  23     Q.    But it's a legal question for the Judge to

03:12  24  tell what is appropriate or not to consider under the

03:13  25  Book of Wisdom; isn't that correct?

542

03:13  1      A.    That's my understanding.  Yes.

03:13  2      Q.    What was -- I thought I heard you say on

03:13  3  direct that the cost for DJI to develop these features,

03:13  4  you testified it was $95,000; is that correct?

03:13  5      A.    No.

03:13  6      Q.    What was the number?

03:13  7      A.    The number for implementing the technology

03:13  8  onto a drone was $45,000 per patent or $90,000.

03:13  9      Q.    Oh, sorry.  $90,000.

03:13  10          And that was the only cost you subtracted when

03:13  11  you performed your analysis as to the features that are

03:13  12  accused in this case; is that fair?

03:13  13      A.    That is.  That's the only relevant one.

03:13  14      Q.    Okay.  And how many hours did you testify it

03:13  15  took DJI to implement those features?

03:13  16      A.    Dr. Michalson testified that he thought it'd

03:14  17  be 200 hours of engineering time, 50 hours of testing

03:14  18  time for each one of the patents.

03:14  19          And I -- my calculation did 500 hours of

03:14  20  engineering time and 50 hours of testing time.  So I

03:14  21  did 550 hours total for each one of the patents.

03:14  22      Q.    So that's less than half of the time your team

03:14  23  spent preparing its analysis in your report; isn't that

03:14  24  correct?

03:14  25      A.    Yes.  That's correct.

543

03:14    1        Q.    And your hourly rate is what, Mr. Andrien?

03:14    2        A.    It is -- $695 is what my company bills me out

03:14    3   at.

03:14    4        Q.    So you would agree with me that it's cheaper

03:14    5   for DJI to implement its world-class hovering and

03:14    6   following features than it was for your team to prepare

03:14    7   the analysis you presented today?

03:14    8        A.    Absolutely.

03:14    9        Q.    And how many years has Bell been trying to

03:14   10   develop and sell a drone?

03:14   11        A.    You'd have to talk to Bell about that.  I know

03:14   12   they've been working on drone technology for a long

03:15   13   time.

03:15   14        Q.    Mr. Andrien, you do not own any DJI drones; is

03:15   15   that correct?

03:15   16        A.    That is correct.

03:15   17        Q.    And nor have you flown any DJI drones?

03:15   18        A.    That is -- I've flown a drone.  I don't know

03:15   19   if it was a DJI.  It was many, many years ago, but I

03:15   20   have flown a drone.  I just don't know whether it was a

03:15   21   DJI drone or not.

03:15   22        Q.    And this is the first case where you've served

03:15   23   as an expert of any sort involving drone technology?

03:15   24        A.    It is.  Yes.

03:15   25        Q.    And you've already talked about the reports

544

| | | |
|---|---|---|
| 03:16 | 1 | you prepared in this case, and you prepared two of |
| 03:16 | 2 | them; that's correct? |
| 03:16 | 3 | A.   Yes. |
| 03:16 | 4 | Q.   And the first one you prepared in December |
| 03:16 | 5 | 2022? |
| 03:16 | 6 | A.   Yes. |
| 03:16 | 7 | Q.   And if I refer to this today as your initial |
| 03:16 | 8 | report, you'll know what I mean? |
| 03:16 | 9 | A.   Yes. |
| 03:16 | 10 | Q.   Okay.  And you prepared an additional report |
| 03:16 | 11 | on January 19th, this year, 2023, after you received |
| 03:16 | 12 | two additional documents; is that correct? |
| 03:16 | 13 | A.   I think that's the date.  To the best of my |
| 03:16 | 14 | recollection, that's the date.  Yes. |
| 03:16 | 15 | Q.   And that was after you received those two |
| 03:16 | 16 | additional documents, correct? |
| 03:16 | 17 | A.   Yes. |
| 03:16 | 18 | Q.   And if I call that your supplemental report in |
| 03:16 | 19 | the next series of questions, you'll understand what I |
| 03:16 | 20 | mean, right? |
| 03:16 | 21 | A.   I will. |
| 03:16 | 22 | Q.   Okay.  Thanks. |
| 03:16 | 23 | And you spent a lot of time preparing those |
| 03:16 | 24 | reports as we've already discussed, correct? |
| 03:16 | 25 | A.   Yes. |

545

03:16  1        Q.    And you reviewed a lot of documents to prepare

03:16  2   those two?

03:16  3        A.    I did.

03:16  4        Q.    And you're proud of your analysis in those

03:16  5   reports?

03:16  6        A.    Yes.

03:17  7        Q.    You stated earlier that you did not have DJI's

03:17  8   sales data after June 2022, correct?

03:17  9        A.    That's correct.

03:17  10       Q.    Okay.  And that was -- but DJI produced all of

03:17  11  its other sales data prior to that; isn't that fair?

03:17  12       A.    I assume so.  They produced the information on

03:17  13  their sales during the relevant time period.

03:17  14       Q.    And you don't know whether or not Textron

03:17  15  asked DJI to produce or to supplement its sales data

03:17  16  after June 2022; is that correct?

03:17  17       A.    That's correct.  I don't know.

03:17  18       Q.    So you're not suggesting that DJI refused to

03:17  19  produce its sales data after June 2022?

03:17  20       A.    Not at all.

03:17  21       Q.    Okay.  You discussed a lot of surveys in your

03:17  22  reports, and I'd like to run through some of them with

03:17  23  you here.

03:17  24              MR. SCHROEDER:  So let's put up

03:18  25  Plaintiff's Exhibit 58 which was already admitted.

546

BY MR. SCHROEDER:

03:18   Q.    What is this exhibit, Mr. Andrien?

03:18   A.    This is the Mavic Air survey, user profile

03:18 survey.

03:18   Q.    I'd like to direct your attention to Slide 21,

03:18 and specifically the portion at the top.

03:18       Do you see underneath "Importance of Product

03:18 Features" where it says:  Globally, portability is

03:18 undoubtedly the most important product feature in

03:18 driving the purchase decision, followed by the 3-axis

03:18 gimbal and the 4K camera.

03:18       Do you see that?

03:18   A.    Yes.

03:18   Q.    And you can see it lists these features and

03:18 how important they were to users along the bottom.

03:18       Do you see that?

03:18   A.    I'm sorry.  What did you say?

03:18   Q.    What is this depicting?  What is the bar

03:18 charts depicting, Mr. Andrien?

03:18   A.    The bar chart is depicting the number of

03:19 people who said any one of these features is very

03:19 important as well as the number who picked it as most

03:19 important.

03:19   Q.    How many people picked ActiveTrack as the most

03:19 important feature driving their purchase decision?

547

03:19  1      A.    Two, it says most important.  58 said very

03:19  2   important.

03:19  3      Q.    How many said it was most important,

03:19  4   Mr. Andrien?

03:19  5      A.    Two.

03:19  6      Q.    Thank you.

03:19  7            Now I'd like you to turn to Plaintiff's

03:19  8   Exhibit 59, and specifically to Slide 17.

03:19  9            Actually, before we turn to Slide 17, what is

03:19  10  Plaintiff's Exhibit 59?

03:19  11     A.    This is the Spark user profile survey.

03:19  12     Q.    Okay.  And what is this -- okay.  So now I'll

03:20  13  have you turn to Slide 17, please, underneath

03:20  14  "Importance of Product Features."

03:20  15           Do you see that?

03:20  16     A.    I do.

03:20  17     Q.    Okay.  And there it says:  Portability, image

03:20  18  quality are the two most important aspects when

03:20  19  customers were considering to purchase.

03:20  20           Do you see that?

03:20  21     A.    I do.

03:20  22     Q.    And in that, what is this bar chart at the

03:20  23  bottom showing?

03:20  24     A.    This shows the people -- this shows different

03:20  25  features and how people rank those different

548

03:20   1   features -- how many people selected them as important

03:20   2   features.

03:20   3       Q.    And you see portability is listed first; isn't

03:20   4   that correct?

03:20   5       A.    Yes.

03:20   6       Q.    And image quality and stabilized video is

03:20   7   second?

03:20   8       A.    Yes.

03:20   9       Q.    Product design and craftsmanship is third?

03:20   10      A.    That's correct.

03:20   11      Q.    And obstacle sensing is No. 4?

03:20   12      A.    Yes.

03:20   13      Q.    And price is listed as the next.

03:21   14            Do you see that?

03:21   15      A.    I do.

03:21   16      Q.    Okay.

03:21   17            Next, I'll have you refer to Plaintiff's

03:21   18   Exhibit 61.

03:21   19            What is Plaintiff's Exhibit 61, Mr. Andrien?

03:21   20      A.    It is the survey for the Inspire 1 and

03:21   21   Inspire 2 drones.

03:21   22      Q.    Okay.

03:21   23            On this one I'll have you turn to

03:21   24   Slide No. 19.

03:21   25            Under the top, under key findings, do you see

549

03:21  1    that?  It says:  The proportion of

03:21  2    maneuverability/control of the aircraft for In 2 -- do

03:21  3    you understand that to be Inspire 2?

03:21  4        A.   Yes.

03:21  5        Q.   Is low, although an important upgrade of the

03:22  6    Inspire.  The probable reason is that most Inspire 2

03:22  7    users bought through online channels.  So they haven't

03:22  8    tried it in person before they bought it.

03:22  9             Do you see that?

03:22  10       A.   Yes.

03:22  11       Q.   And then on the left side of this survey, what

03:22  12   do you see there underneath Inspire 2 users?

03:22  13            What is that depicting?

03:22  14       A.   It is depicting different answer options and

03:22  15   their percent response -- the response percent and the

03:22  16   response count.

03:22  17       Q.   What is the Zenmuse X5S?

03:22  18       A.   That's a camera, I believe.

03:22  19       Q.   Okay.  And it appears that for 55 percent --

03:22  20   55.9 percent of the users, that alone was the feature

03:22  21   that attracted them to make a purchase decision.

03:22  22            Would you agree with that?

03:22  23       A.   No.

03:22  24       Q.   Okay.  Why not?

03:22  25       A.   Because you said "alone."

550

03:22  1        Q.    Okay.  So that -- so it's the camera, though,

03:22  2   was important to 55.9 percent of the users who

03:22  3   purchased a drone; isn't that correct?

03:22  4        A.    That's correct.

03:23  5        Q.    Okay.  Next is the dual battery design at

03:23  6   41.2 percent.

03:23  7        A.    Yes.

03:23  8        Q.    I'll have you now go to Slide 21 on

03:23  9   Plaintiff's Exhibit 60.

03:23  10        Under here, under "Key Findings," do you see

03:23  11   the second point there where it says:  Besides price,

03:23  12   compatibility with thermal imaging/zoom cameras is the

03:23  13   most important reason that users buy Inspire 1 instead

03:23  14   of Inspire 2.

03:23  15        Do you see that?

03:23  16        A.    Yes.

03:23  17        Q.    Now, I'll refer you to Plaintiff's Exhibit 62.

03:23  18        What is Plaintiff's Exhibit 62?

03:24  19        A.    This is the Mavic Pro user survey.

03:24  20        Q.    And I'll refer you to the fifth page or

03:24  21   slide of this exhibit which is Plaintiff's 62.

03:24  22        Isn't it correct that on the left side, it is

03:24  23   showing for global users of DJI's product which of the

03:24  24   following factors they considered when they were buying

03:24  25   a Mavic Pro?

551

03:24  1      A.    Yes.

03:24  2      Q.    Okay.  The first factor listed is portability.

03:24  3  It's the most popular factor considered.

03:24  4            Do you see that?

03:24  5      A.    I do.

03:24  6      Q.    And you see 65.5 percent considered it to be

03:24  7  the most important factor; is that correct?

03:24  8      A.    Yes.

03:24  9      Q.    So orders of magnitude larger than any other

03:24  10  factor that motivated them to consider buying the

03:24  11  Mavic Pro?

03:24  12      A.    In the most important factor, yes.  I wouldn't

03:24  13  say that for factors considered.

03:24  14      Q.    But it is the most important factor; is it

03:24  15  not?

03:24  16      A.    For people who ranked which factor was most

03:25  17  important, the majority of them picked portability.

03:25  18      Q.    Thank you.

03:25  19            Shooting performance was the second one.

03:25  20  People rate it as the most important factor, and it's 8

03:25  21  percent.

03:25  22            Do you see that?

03:25  23      A.    I do, yes.

03:25  24      Q.    On the next slide, Slide No. 6, in this one

03:25  25  users were asked:  Which of the following scenarios

552

03:25  1    influenced you most when purchasing your Mavic Pro?

03:25  2            Do you see that?

03:25  3        A.    Yes.

03:25  4        Q.    And the top answer choice is DJI's a

03:25  5    world-class brand with unmatched quality; isn't that

03:25  6    correct?

03:25  7        A.    That is the top answer choice, correct.

03:25  8        Q.    Yes.  The second answer choice given, most

03:25  9    popular response was:  The experience of flying is both

03:25  10   challenging and exciting.

03:25  11       A.    Yes.

03:25  12       Q.    Okay.  And you can see the third is:  Using

03:26  13   the best technology helps to distinguish my work.

03:26  14   40.6 percent of respondents selected that response;

03:26  15   isn't that correct?

03:26  16       A.    Yes.

03:26  17       Q.    And if you look at the answer for China users,

03:26  18   look at the most popular response there:  Flying drones

03:26  19   relieves stress and gives me enormous pleasure.

03:26  20            Do you see that?

03:26  21       A.    I do, yes.

03:26  22       Q.    Let's turn to Page 8, please.

03:26  23            And so this survey response deals with the

03:26  24   professional usage, and you can see that the top

03:26  25   choices for global usage are used -- are using the

553

03:26  1    Mavic Pro for movies or short film shooting at

03:26  2    53.9 percent.  Sports and outdoor adventure filmmaking

03:26  3    for 39.9 percent and real estate for 34.9 percent.

03:26  4              Do you see that?

03:26  5        A.    I do, yes.

03:26  6        Q.    And I'll have you turn to the next page which

03:27  7    lists people's personal usage.  You can see the top two

03:27  8    answer choices given for global users are travel

03:27  9    photography and video.  Almost 80 percent of the users

03:27  10   use it for that.

03:27  11             Do you see that?

03:27  12       A.    Yes.

03:27  13       Q.    You need to have a camera in order to do

03:27  14   travel photography and video, wouldn't you agree?

03:27  15       A.    I would agree.

03:27  16       Q.    Enjoying the fun of flying is rated at

03:27  17   75 percent.

03:27  18             Do you see that?

03:27  19       A.    Yes.

03:27  20             MR. SCHROEDER:  We'll switch exhibits

03:27  21   now.  Let's go to Exhibit -- Plaintiff's Exhibit 63,

03:27  22   please.

       23   BY MR. SCHROEDER:

03:27  24       Q.    And, Mr. Andrien, what is Plaintiff's

03:27  25   Exhibit 63?

03:27   1        A.    It is the Phantom drone user survey.

03:27   2        Q.    Okay.  And I'll direct you -- and this is the

03:28   3    one you relied on in your report and you discussed

03:28   4    earlier today; isn't that correct?

03:28   5        A.    This is one of the ones I've used and relied

03:28   6    upon, yes.

03:28   7        Q.    This is the one you had referenced and

03:28   8    authenticated earlier this afternoon; isn't that

03:28   9    correct?

03:28   10       A.    I don't understand your question.  Are you

03:28   11   asking when Mr. Speegle asked me, if this is the one I

03:28   12   used?

03:28   13       Q.    Yes.  It'll be in your binder.  I'm not trying

03:28   14   to be tricky here.  I was just confirming that this is

03:28   15   one of them that you used.

03:28   16       A.    Do you know which exhibit it was in my binder

03:28   17   and I can --

03:28   18       Q.    63.

03:28   19       A.    63.

03:28   20       Q.    It should be the same.  I'm not --

03:28   21       A.    Then I will -- if you want to stipulate it's

03:28   22   the same, I'll agree.

03:28   23       Q.    What is on the screen is exactly what's in

03:28   24   your binder.

03:28   25       A.    Okay.  That's fine.

555

03:28  1      Q.    I'll have you turn to Page 4.

03:28  2            And you can see here on the left side, global

03:29  3      users:  Which of the following factors did you consider

03:29  4      when deciding to buy a drone?  You can see the camera

03:29  5      specs and performance are listed as 81.6 percent of the

03:29  6      response.

03:29  7            Do you see that?

03:29  8      A.    I do, yes.

03:29  9      Q.    All right.

03:29  10           MR. SCHROEDER:  We can take this exhibit

03:29  11     down.

03:29  12     BY MR. SCHROEDER:

03:29  13     Q.    You did not perform or conduct any surveys on

03:29  14     your own; isn't that fair?

03:29  15     A.    That's fair.

03:29  16     Q.    And you did not rely on any surveys conducted

03:29  17     by Textron Innovations, correct?

03:29  18     A.    That's correct, yes.

03:29  19     Q.    And you did not rely on surveys conducted by

03:29  20     Bell Textron either?

03:29  21     A.    That's correct, yes.

03:29  22     Q.    And you said you didn't think -- strike that.

03:29  23           You said you didn't think it was necessary for

03:29  24     you to perform your own surveys; isn't that fair?

03:29  25     A.    That is fair.  I had DJI's surveys that were

556

| | | |
|---|---|---|
| 03:29 | 1 | done in the normal course of business.  I thought those |
| 03:30 | 2 | were quite reliable. |
| 03:30 | 3 | Q.   So you relied on DJI's surveys; is that |
| 03:30 | 4 | correct? |
| 03:30 | 5 | A.   Yes. |
| 03:30 | 6 | Q.   So your analysis assumed a hypothetical |
| 03:30 | 7 | negotiation in 2015? |
| 03:30 | 8 | A.   They both occurred in 2015.  Yes. |
| 03:30 | 9 | Q.   And this would have been a negotiation between |
| 03:30 | 10 | DJI on one hand and Textron Innovations on the other? |
| 03:30 | 11 | A.   Yes.  The -- all the defendants on one hand |
| 03:30 | 12 | represented the DJI entity, and then Textron |
| 03:30 | 13 | Innovations on the other representing the Bell |
| 03:30 | 14 | Textron -- the Textron entity and all the Textron |
| 03:30 | 15 | operating companies. |
| 03:30 | 16 | Q.   This would have been a negotiation between DJI |
| 03:30 | 17 | and Textron Innovations? |
| 03:30 | 18 | A.   Yes. |
| 03:30 | 19 | Q.   And that would have been before DJI was added |
| 03:30 | 20 | to a blacklist of any sort? |
| 03:30 | 21 | A.   The negotiation would have been 2015, before |
| 03:30 | 22 | they were added to that blacklist. |
| 03:31 | 23 | Q.   Seven years before; isn't that correct? |
| 03:31 | 24 | A.   Yes. |
| 03:31 | 25 | Q.   And just to be clear, Mr. Runstadler from |

557

03:31  1    Textron would have been at the negotiation table for

03:31  2    Textron Innovations?

03:31  3        A.    That's my understanding.  Yes.

03:31  4        Q.    You agree that if acceptable noninfringing

03:31  5    alternatives to the patented invention are available,

03:31  6    that these alternatives serve as a limiting factor on

03:31  7    the amount of royalties that a licensee would pay?

03:31  8        A.    They may.  I'd have to know more information

03:31  9    about them to make that determination, but they might.

03:31  10       Q.    You don't make that statement in your report?

03:31  11       A.    I think I said they might be a limiting

03:31  12    factor.

03:31  13       Q.    I'm going to hand up your report and see if

03:31  14    that refreshes your memory.

03:31  15             My question is, did you make that statement in

03:31  16    your report?

03:31  17       A.    I don't have it memorized, that report, so I'd

03:31  18    have to see it.

03:31  19       Q.    Do you agree with that statement, while I try

03:32  20    to locate the cite, if acceptable noninfringing

03:32  21    alternatives to the patented invention are available,

03:32  22    these alternatives serve as a limiting factor on the

03:32  23    amount of royalties that a licensee would pay?

03:32  24       A.    They may serve as a limiting factor.

03:33  25       Q.    They may serve or they do serve?

558

| | | |
|---|---|---|
| 03:33 | 1 | A.    Well, they may.  It depends on the |
| 03:33 | 2 | circumstances.  I mean, if it's going to cost a lot |
| 03:33 | 3 | more to implement than we would determine the |
| 03:33 | 4 | technology's worth, then it doesn't really serve as a |
| 03:33 | 5 | limiting factor. |
| 03:33 | 6 | Q.    Okay.  And the hypothetical negotiation is |
| 03:33 | 7 | supposed to occur at the moment prior to any |
| 03:33 | 8 | infringement; isn't that fair? |
| 03:33 | 9 | A.    Right.  That's fair. |
| 03:33 | 10 | Q.    Okay.  And at that point in time, you must |
| 03:33 | 11 | assume that DJI is not yet practicing the patent, but |
| 03:33 | 12 | it wants to take a license? |
| 03:33 | 13 | A.    Yes.  We assume that it's right at the point |
| 03:33 | 14 | of first infringement.  When they first start |
| 03:33 | 15 | infringing, we assume at that point they have a |
| 03:33 | 16 | hypothetical negotiation and they would be negotiating |
| 03:33 | 17 | for a license instead of infringing. |
| 03:33 | 18 | Q.    Mr. Andrien, you must assume that DJI is not |
| 03:33 | 19 | yet practicing the patent but wants to license it; is |
| 03:33 | 20 | that correct? |
| 03:33 | 21 | A.    Yes.  I believe that's what I just said. |
| 03:34 | 22 | Q.    And you offered two negotiation dates.  Your |
| 03:34 | 23 | opinion is that there would be two different |
| 03:34 | 24 | negotiation dates here? |
| 03:34 | 25 | A.    That's correct. |

559

03:34    1    Q.    And that's because the '752 patent issued

03:34    2    later than the '909 patent; isn't that correct?

03:34    3    A.    The date of first infringement happened later

03:34    4    on the '909 patent -- excuse me -- on the '752 patent

03:34    5    than it did on the '909 patent.

03:34    6    Q.    Mr. Andrien, my question was:  That's because

03:34    7    the '752 patent issued later than the '909 patent;

03:34    8    isn't that correct?

03:34    9    A.    Well, that influences the day -- I can't

03:34    10    answer that question the way it's asked.  That

03:34    11    influenced the date of first infringement.

03:34    12            The hypothetical negotiation is because of the

03:34    13    date of first infringement.  Whether one was issued

03:34    14    before the other isn't -- isn't determinant of when the

03:34    15    first infringement happens.

03:34    16    Q.    What date do you use for the hypothetical

03:34    17    negotiation of the '752 patent?

03:35    18    A.    It was the date it was issued because that's

03:35    19    when the first infringement started.

03:35    20    Q.    So the reason that the negotiation date for

03:35    21    the '752 patent is October 20th, 2015 and not the same

03:35    22    date that you used for the '909 patent is because the

03:35    23    '752 patent issued later than the '909 patent; isn't

03:35    24    that correct?

03:35    25    A.    Well, it did issue later.  It is correct.  The

03:35  1   reason that the hypothetical negotiation was later

03:35  2   because the date of first infringement started later,

03:35  3   and so it happens to coincide with when that patent was

03:35  4   first issued.

03:35  5        Q.   Why is the hypothetical negotiation for the

03:35  6   '909 patent the date that it is?

03:35  7        A.   Because that's when the DJI entities first

03:35  8   started employing the infringing features.

03:35  9        Q.   Is it also six years before the filing date of

03:35  10  Textron's complaint in this case?

03:35  11       A.   The date of the hypothetical negotiation?

03:36  12       Q.   That's what I'm asking you.

03:36  13       A.   I think it's earlier than six years before the

03:36  14  filing date.

03:36  15       Q.   And so my question is:  The reason the '752

03:36  16  patent has a separate negotiation than the '909 patent

03:36  17  is because the '752 patent issued later than the '909

03:36  18  patent; isn't that correct?

03:36  19       A.   I don't know how to answer your question any

03:36  20  different than I've already answered it.  It is because

03:36  21  the dates of first infringement are different between

03:36  22  the two patents.

03:36  23       Q.   And the '752 patent issued on October 20th,

03:36  24  2015, correct?

03:36  25       A.   Yes.

561

03:36    1        Q.    Now, when the '752 patent issued on

03:36    2    October 20th, 2015, DJI was already selling the

03:36    3    products that are accused of infringing in this case,

03:36    4    correct?

03:36    5        A.    Yes.  That's why the date of first

03:36    6    infringement happens when the patent issued in that

03:36    7    case.

03:36    8        Q.    You agree with me that Textron cannot recover

03:37    9    any damages for the '752 patent for products DJI was

03:37   10    selling a day prior, on October 19th, 2015, correct?

03:37   11        A.    It should be the date of first infringement.

03:37   12    That's correct.

03:37   13        Q.    Which was the day later, which is the day the

03:37   14    '752 patent issued, correct?

03:37   15        A.    Correct.

03:37   16        Q.    And that's because DJI was selling those

03:37   17    products before Textron's patent issued, correct?

03:37   18        A.    Yes.

03:37   19        Q.    And to be clear, it's your opinion that there

03:37   20    would, in fact, be two negotiations between DJI and

03:37   21    Textron?

03:37   22        A.    Yes.

03:37   23        Q.    The first one would have been April 8th, 2015

03:37   24    regarding the '909 patent?

03:37   25        A.    That's correct.

562

03:37  1       Q.    And you opine that DJI would have agreed to

03:37  2   pay $40.9 million at that negotiation, correct?

03:37  3       A.    They would have agreed to pay $40.9 million.

03:37  4   Yes.

03:37  5       Q.    And then in your analysis, DJI would come back

03:38  6   to Textron a few months later and agree to pay

03:38  7   $326 million more just so it could continue to sell

03:38  8   drones that it was selling the day before and, in fact,

03:38  9   on the day of the first hypothetical?

03:38 10       A.    Up to that amount.  Yes.

03:38 11       Q.    And you agree that the earliest drone model

03:38 12   that incorporated the hover-hold feature was the

03:38 13   Phantom 1 released on December 1st, 2012?

03:38 14       A.    I'd have to have my memory refreshed.  I don't

03:38 15   recall specifically which one was first.

03:38 16                 MR. SCHROEDER:  Your Honor, may I

03:38 17   approach?

03:38 18                 THE COURT:  Of course.

03:38 19                 MR. SCHROEDER:  Thank you.

03:38 20   BY MR. SCHROEDER:

03:38 21       Q.    Mr. Andrien, I've handed you a copy of your

03:38 22   initial report in this case, and I'll direct your

03:39 23   attention to Paragraph 44.

03:39 24                 Does that refresh your recollection?

03:39 25       A.    Yes.  It does.

563

03:39  1        Q.    So again, my question:  The earliest drone

03:39  2   model that incorporated the hover-hold feature was

03:39  3   DJI's Phantom 1, which was released on December 1,

03:39  4   2012; isn't that correct?

03:39  5        A.    That is correct.

03:39  6        Q.    And the Phantom 1 was DJI's first commercial

03:39  7   product; isn't that correct?

03:39  8        A.    Again, I don't recall that as I sit here.  I'd

03:39  9   have to see that information again.

03:39  10        Q.    And you're not seeking damages for sales of

03:39  11   DJI's Phantom 1 that were sold prior to the '752

03:39  12   patent's issue date, correct?

03:39  13        A.    No.  The patent has to be issued for there to

03:39  14   be infringement, not just filed.

03:39  15             So I believe the patent was filed in --

03:39  16   sometime in 2011, and it didn't issue until 2015.  So

03:39  17   it's when it issues that the infringement starts.

03:39  18        Q.    And you agree that Textron has not performed a

03:40  19   formal valuation of the specific patents at issue in

03:40  20   this case; isn't that correct?

03:40  21        A.    Yes.  That's my understanding.

03:40  22        Q.    Since you have a copy of your report, I'll

03:40  23   direct you to Paragraph 86 as well to refresh your

03:40  24   memory, specifically the last sentence.

03:40  25             Let me know when you get there.

564

| 03:40 | 1 | A.    Paragraph 86? |

03:40    1    A.    Paragraph 86?

03:40    2    Q.    Yes.  The final sentence of that paragraph.

03:40    3    A.    Yes.  Got it.

03:40    4    Q.    You agree that if acceptable noninfringing

03:40    5    alternatives to the patented invention are available,

03:40    6    these alternatives serve as a limiting factor on the

03:40    7    amount of royalties that a licensee would pay?

03:40    8    A.    That's what it says.  Yes.

03:40    9    Q.    Thank you.

03:40    10    Back to the hypothetical.

03:41    11    In this case, you've assumed that DJI is a

03:41    12    willing licensee; that's correct?

03:41    13    A.    I have.  Yes.

03:41    14    Q.    And you have to assume that your opinion

03:41    15    reflects a royalty amount that DJI would actually agree

03:41    16    to?

03:41    17    A.    Yes.  I do.

03:41    18    Q.    Did you review any license where DJI has

03:41    19    agreed to license a patent on a running royalty basis?

03:41    20    A.    I didn't review any, but I know that they have

03:41    21    done running royalties.

03:41    22    Q.    My question is:  Did you review any,

03:41    23    Mr. Andrien?

03:41    24    A.    No.  They weren't produced.

03:41    25    Q.    Mr. Andrien, did you review any?

565

03:41 | 1      A.    I said:  No.  They weren't produced.

03:41 | 2      Q.    Yet it's your opinion that in 2015, DJI would

03:41 | 3  have agreed to a running royalty that would total over

03:41 | 4  $300 million over a period spanning seven years?

03:41 | 5      A.    That's correct.  Yes.

03:41 | 6      Q.    Did you review any DJI license where DJI

03:41 | 7  agreed to pay over $100 million for a license to a

03:42 | 8  patent?

03:42 | 9      A.    No.  I have not reviewed one.

03:42 | 10      Q.    Has Textron licensed a single patent for that

03:42 | 11  rate?

03:42 | 12      A.    Not that I have seen -- for the rate or for

03:42 | 13  the amount?

03:42 | 14           I have never added up how much they've

03:42 | 15  received related to individual patents that they've

03:42 | 16  licensed.  So I don't know the answer to that question.

03:42 | 17      Q.    Textron sells products to the United States

03:42 | 18  military.  You agree with that?

03:42 | 19      A.    I do, yes.

03:42 | 20      Q.    In fact, they sell products to militaries in

03:42 | 21  different parts of the world outside the U.S. as well?

03:42 | 22      A.    They do.

03:42 | 23      Q.    Your report hasn't identified a single sale

03:42 | 24  from DJI to any military; is that correct?

03:42 | 25      A.    That is correct.

566

03:42  1    Q.    Don't you think DJI would be reluctant to
03:42  2  license technology from a military company to use in
03:42  3  its drones?
03:42  4    A.    Would you repeat the question?
03:42  5    Q.    Don't you think that DJI -- strike that.
03:42  6          Don't you think that DJI would be reluctant to
03:43  7  license technology from a military company to use in
03:43  8  its drones?
03:43  9    A.    No.  I don't think they'd be reluctant to
03:43  10  license technology from Bell Textron.  Aeronautical
03:43  11  leader.
03:43  12    Q.    It's your opinion that at the date of the
03:43  13  hypothetical negotiation in 2015, Textron would view
03:43  14  DJI as a potential competitor?
03:43  15    A.    Yes.
03:43  16    Q.    So is it your opinion that DJI and DJI -- is
03:43  17  it your opinion that Textron and DJI have been
03:43  18  potential competitors since 2015?
03:43  19    A.    To the extent that the drone market started
03:43  20  converging on the helicopter market, they're absolutely
03:43  21  competitors in that sense.  And to the extent that
03:44  22  DJI -- I mean, Bell Textron was making drones and had
03:44  23  the capability to utilize that technology in the
03:44  24  commercial sector, yes.  They're potential competitors.
03:44  25    Q.    So they've been potential competitors for

03:44  1    eight years?

03:44  2        A.    Since DJI -- they're potential competitors and

03:44  3    actual competitors in that sense.

03:44  4        Q.    But DJI and Textron are not direct

03:44  5    competitors, right?

03:44  6        A.    I wouldn't say they're direct competitors,

03:44  7    because that would mean that Bell Textron is selling

03:44  8    commercial drones, and they're not.  But they are

03:44  9    selling helicopters that perform the same functions as

03:44  10   commercial drones do and, therefore, their helicopter

03:44  11   market share is being eroded because of drones.

03:44  12       Q.    Mr. Andrien, are they direct competitors

03:44  13   today?

03:44  14       A.    I wouldn't call them direct competitors, but

03:44  15   they are definitely competitors in that their markets

03:44  16   are converging.

03:44  17       Q.    The average purchaser of an unmanned aerial

03:44  18   vehicle or a drone is not the average purchaser of a

03:45  19   manned helicopter?

03:45  20       A.    Not the average.  But there's certainly some

03:45  21   helicopter purchasers that are buying drones instead

03:45  22   now.

03:45  23       Q.    Mr. Andrien, that wasn't my question.

03:45  24             My question is, is the average purchaser of an

03:45  25   unmanned aerial vehicle or drone, is that the same

568

| | | |
|---|---|---|
| 03:45 | 1 | average purchaser of a manned helicopter? |
| 03:45 | 2 | A.    Definitely not. |
| 03:45 | 3 | Q.    And you were in the courtroom yesterday, |
| 03:45 | 4 | right? |
| 03:45 | 5 | A.    I was, yes. |
| 03:45 | 6 | Q.    And Bell Textron has never sold any drones, |
| 03:45 | 7 | correct? |
| 03:45 | 8 | A.    That's my understanding, yes. |
| 03:45 | 9 | Q.    Textron's not selling any drones right now? |
| 03:45 | 10 | A.    That's my understanding. |
| 03:45 | 11 | Q.    Nowhere in your report, either one of them, |
| 03:45 | 12 | your initial report or your supplemental report, do you |
| 03:45 | 13 | offer the opinion that Textron has been unable to sell |
| 03:45 | 14 | drones because of DJI; isn't that correct? |
| 03:45 | 15 | A.    That's correct.  I do not offer that opinion. |
| 03:45 | 16 | That's not part of my analysis. |
| 03:45 | 17 | Q.    And nowhere in your report do you opine that |
| 03:46 | 18 | Textron has lost the sale of even one helicopter |
| 03:46 | 19 | because of DJI; isn't that correct? |
| 03:46 | 20 | A.    Yes.  That's correct.  I've not quantified |
| 03:46 | 21 | lost profits. |
| 03:46 | 22 | Q.    That's for both your opening and your -- or |
| 03:46 | 23 | your initial and supplemental reports, correct? |
| 03:46 | 24 | A.    That's correct.  Yes. |
| 03:46 | 25 | Q.    And DJI does not make manned aerial vehicles, |

569

03:46   1   correct?

03:46   2       A.    That's my understanding, yes.

03:46   3       Q.    Let's turn back to that export control

03:46   4   application you reviewed and discussed.  It's

03:46   5   Plaintiff's Exhibit 106.

03:46   6             You may not recall it by the number, but you

03:46   7   probably recall I thought it had not yet been admitted.

03:46   8       A.    Yeah.  I know what you're talking about, but

03:46   9   I'm wondering if -- oh.  You're going to pull it up.

03:46  10   Okay.  There.

03:46  11       Q.    Yep.

03:46  12             You considered this document in forming the

03:46  13   opinions in your supplemental report; isn't that

03:46  14   correct?

03:46  15       A.    I did, yes.

03:46  16       Q.    And between your initial report and your

03:46  17   supplemental report, you received only two new

03:47  18   documents.  This was one of them?

03:47  19       A.    That is one of them, that's correct.

03:47  20       Q.    Okay.  And after you reviewed those two new

03:47  21   documents, you prepared your supplemental report,

03:47  22   correct?

03:47  23       A.    Yes.

03:47  24       Q.    And you read this whole document that's up on

03:47  25   the screen now, correct?

570

03:47  1          A.    I believe so.  It was a while ago, though.

03:47  2          Q.    And you relied on it in your supplemental

03:47  3    report, correct?

03:47  4          A.    I did, yes.

03:47  5          Q.    Okay.  And you testified earlier today that

03:47  6    you assumed everything in this document was correct;

03:47  7    isn't that right?

03:47  8          A.    That DJI thought it was correct, yes.

03:47  9          Q.    That wasn't your testimony.  You testified

03:47  10   that you treated everything in here as correct.

03:47  11         A.    You'd have to read it back to me, my

03:47  12   testimony.  But I know that DJI swore and warranted

03:47  13   that they believed the information was correct.

03:47  14         Q.    Okay.  So in this document, DJI asked the

03:47  15   Chinese government if it can export its source code for

03:48  16   use in this case; isn't that correct?

03:48  17         A.    That's my understanding.

03:48  18         Q.    And now I'll turn to Page 11 of this exhibit,

03:48  19   which I think is where you're referring to underneath

03:48  20   "warranty."  And that's where it says:  This entity --

03:48  21   and that's -- you can see the signature below.  This is

03:48  22   the translated version so we don't have the stamps

03:48  23   here, but it says:  This entity, referring to SZ DJI

03:48  24   Technology Company, warrants that the information

03:48  25   provided above is true.

571

| 03:48 | 1 | Do you see that? |

03:48    1          Do you see that?

03:48    2     A.    I do, yes.

03:48    3     Q.    So that's what you're referring to when you

03:48    4  said you treated this information in here as true,

03:48    5  correct?

03:48    6     A.    Yes.  According to DJI, yes.

03:48    7     Q.    Fair enough.  Do you know the penalty for

03:48    8  lying to the Chinese government on an official

03:48    9  submission to the Chinese government?

03:48   10     A.    I do not.

03:48   11     Q.    And if you continue on this warranty here it

03:49   12  says:  DJI also -- DJI also warrants.  If you continue

03:49   13  reading that sentence, this one we are talking about

03:49   14  here, that quote, the technology -- let me find it.

03:49   15     A.    Yes.

03:49   16     Q.    Yeah.  The technology in the export

03:49   17  application complies with the laws of the People's

03:49   18  Republic of China and does not infringe intellectual

03:49   19  property rights of other parties.

03:49   20          Do you see that?

03:49   21     A.    I do.

03:49   22     Q.    And it continues:  And that the to-be exported

03:49   23  technology will not harm national security and

03:49   24  interests of the People's Republic of China.

03:49   25          Do you see that?

572

03:49  1      A.    I do.

03:49  2      Q.    Okay.  And this is the information at the end

03:49  3  of the document underneath the warranty where there

03:49  4  would be the stamps if you had the original Chinese

03:49  5  version; isn't that correct?

03:49  6      A.    I don't know.

03:49  7      Q.    You didn't -- okay.

03:49  8            We can just turn to the -- it probably won't

03:50  9  be useful.

03:50  10           But you see here where it says "5" before

03:50  11  "Warranty," and it's got the signature block below it?

03:50  12     A.    Yes.

03:50  13     Q.    I'll have you turn to Page 24 of this exhibit.

03:50  14 And that's the actual --

03:50  15     A.    What exhibit number is it?

03:50  16     Q.    Same exhibit, Mr. Andrien.

03:50  17     A.    I just don't know the --

03:50  18     Q.    Yeah.  106.

03:50  19     A.    106.  Thank you.

03:50  20     Q.    I've got it on the screen.  It might be easier

03:50  21 to read, but I --

03:50  22     A.    Oh, all right.

03:50  23           MR. SCHROEDER:  And if we could blow up

03:50  24 what's next to "5."  Yes.  There we go.

      25 BY MR. SCHROEDER:

573

03:50  1        Q.    Now, I know you probably can't read Chinese,

03:50  2    can you?

03:50  3        A.    I cannot.

03:50  4        Q.    All right.  You can at least read that it's

03:50  5    No. 5 and there appears to be two stamps by what

03:50  6    appears to be two signature lines.

03:50  7              Do you see that?

03:50  8        A.    I do, yes.

03:50  9        Q.    Now, let's go back to Page 9 in this exhibit

03:50  10   which will be translated -- the certified translated

03:50  11   version of this document.

03:50  12             And I'm going to focus your attention to

03:50  13   underneath Question No. 3.  And Question No. 3 asks in

03:51  14   the application for DJI to identify the method and main

03:51  15   process for research and development of the technology.

03:51  16             Do you see that?

03:51  17       A.    Yes.

03:51  18       Q.    And it goes on and it says:  If another

03:51  19   party's intellectual property has been used in the

03:51  20   research and development process, note its source, as

03:51  21   well as its role and impact on the research and

03:51  22   development of the technology.

03:51  23             Do you see that?

03:51  24       A.    Yes.

03:51  25       Q.    All right.  And then DJI's answer is right

574

03:51  1    below it.  And it says -- I'll focus on this -- the

03:51  2    sentence that starts "the technology was researched."

03:51  3            Do you see that?

03:51  4            It's on that first line there.

03:51  5    A.    Yes.

03:51  6    Q.    DJI's answer:  The technology was researched

03:51  7    and developed by the exporter entirely on its own using

03:51  8    methods such as testing, reasoning and simulation, in

03:51  9    conjunction with a large amount of flight scenario data

03:51  10   and continuous updating and iteration on its own of the

03:51  11   to-be exported flight control system technology.

03:52  12           Do you see that?

03:52  13   A.    I do, yes.

03:52  14   Q.    Okay.  And then underneath "process for

03:52  15   research and development of the technology" it

03:52  16   continues:  The exporter has focused on flight control

03:52  17   technology since its founding in 2006.  Through more

03:52  18   than ten years of product iteration and batch

03:52  19   production reasoning, the company's flight control

03:52  20   system technology has been iterated and developed at a

03:52  21   very fast pace.

03:52  22           Do you see that?

03:52  23           And it continues:  The company started with

03:52  24   independent flight control technology initially and has

03:52  25   set its goal for hovering control technology.

575

03:52  1              Do you see that, Mr. Andrien?

03:52  2       A.    I do see that.

03:52  3       Q.    I'll have you turn to the next page, which I

03:52  4  believe is Page 5.  I'll have you turn to Page 5.  It

03:52  5  is not the next page in sequence, but we'll turn to

03:52  6  Page 5.

03:52  7              And actually let's go back to Page 4 real

03:53  8  quick.  I want to establish who the entity is here.

03:53  9              You can see the entity name is listed as

03:53  10  Shenzhen DJ-Innovations Technology Company, Limited.

03:53  11              Do you see that?

03:53  12       A.    I do.

03:53  13       Q.    Do you understand that's SZ DJI?

03:53  14       A.    I do.

03:53  15       Q.    And you can list -- right beneath there it

03:53  16  lists the nature of the entity under "basic

03:53  17  information."

03:53  18              Do you see that?

03:53  19       A.    Yes.

03:53  20       Q.    And the one that's checked is No. 14, wholly

03:53  21  foreign-owned enterprise.

03:53  22              Do you see that?

03:53  23       A.    Yes.

03:53  24       Q.    State-owned enterprise is not checked, is it?

03:53  25       A.    It is not.

576

03:53  1      Q.    Okay.  Do you know why wholly foreign-owned

03:53  2  enterprise is checked?

03:53  3      A.    That was their answer to that question.

03:53  4      Q.    Is SZ DJI a Chinese-owned enterprise?

03:53  5      A.    I don't know.

03:53  6      Q.    It's not.  That's why -- so you don't know

03:53  7  that SZ DJI is not a Chinese-owned enterprise?

03:53  8      A.    I know the -- how they answered this question.

03:54  9  I don't know whether or not it is owned by Chinese

03:54  10  entities or not.

03:54  11      Q.    Well, they warrant to the Chinese government

03:54  12  that they're not state-owned nor are they controlled by

03:54  13  the Chinese party.

03:54  14          You see that's right above?

03:54  15      A.    Yes.

03:54  16      Q.    Now, I'll have you turn to Page 5 on this.

03:54  17          You can see there's a question that was asked:

03:54  18  Is it a national secret technology or not?

03:54  19          Do you see that?

03:54  20      A.    Where are you?

03:54  21      Q.    That's right about the middle of this page.

03:54  22      A.    Okay.  There it is.  Yes.  I do see it.

03:54  23      Q.    Just above this callout here.  There we go.

03:54  24          Do you see that question:  Is it a national

03:54  25  secret technology or not?

577

| | | |
|---|---|---|
| 03:54 | 1 | A.    I do see that. |
| 03:54 | 2 | Q.    And DJI selected "no." |
| 03:54 | 3 | Do you see that? |
| 03:54 | 4 | A.    They did. |
| 03:54 | 5 | Q.    And do you see below where the Chinese |
| 03:54 | 6 | government asks DJI:  Is this for military use? |
| 03:54 | 7 | Do you see that? |
| 03:55 | 8 | A.    I do. |
| 03:55 | 9 | Q.    And they checked "no." |
| 03:55 | 10 | A.    They do. |
| 03:55 | 11 | Q.    And if we go to Page 7 of this document, |
| 03:55 | 12 | there's a question asking for the purpose of the |
| 03:55 | 13 | export. |
| 03:55 | 14 | And you see that DJI was trying to provide |
| 03:55 | 15 | relevant source code because they were ordered to |
| 03:55 | 16 | produce this source code? |
| 03:55 | 17 | A.    It says:  Discovery obligations. |
| 03:55 | 18 | Q.    Fair enough.  You're not a lawyer, right? |
| 03:55 | 19 | A.    I'm not a lawyer.  I just know the words on |
| 03:55 | 20 | the page. |
| 03:55 | 21 | Q.    All right.  Understood. |
| 03:55 | 22 | MR. SCHROEDER:  So let's go to Page 10 of |
| 03:55 | 23 | this document and underneath Question 4. |
| | 24 | BY MR. SCHROEDER: |
| 03:55 | 25 | Q.    I want to focus you to the answer DJI gave |

03:55  1    here underneath this answer, and it's the sentence --

03:55  2    second sentence in their answer which starts:  The

03:56  3    to-be exported flight control technology has a

03:56  4    tremendous competitive edge in the industry and is

03:56  5    fully carried on various models of DJI drones

03:56  6    manufactured by the exporter.  It is researched and

03:56  7    developed by the exporter on its own and is highly

03:56  8    confidential.  With the flight control technology, the

03:56  9    exporter started the civil drone industry in 2012,

03:56  10   offering an era-defining drone system and reshaping

03:56  11   people's work and lifestyles.

03:56  12        Do you see that?

03:56  13   A.    I do.  Yes.

03:56  14   Q.    And I mentioned that you reviewed two new

03:56  15   documents between your initial report and your

03:56  16   supplemental report; isn't that correct?

03:56  17   A.    Yes.

03:56  18   Q.    And that second document was the decision of

03:57  19   the Chinese government telling DJI they could not

03:57  20   export their source code; isn't that correct?

03:57  21   A.    Yes.  They disagreed with DJI and said it was

03:57  22   a national security interest not to -- not to produce

03:57  23   that, I believe.

03:57  24   Q.    So you understood DJI was not allowed to

03:57  25   export its code by order of the Chinese government?

03:57    1          A.    That's my understanding.

03:57    2          Q.    Okay.  And after those two documents were

03:57    3    given to you, Textron's counsel told you to prepare a

03:57    4    supplemental report; isn't that correct?

03:57    5          A.    They asked me if I wanted to prepare a

03:57    6    supplemental report and I did.

03:57    7          Q.    Didn't they alert you to the possibility that

03:57    8    you'd be providing a supplemental report?

03:57    9          A.    They gave me these documents and said, we

03:57   10    think this might be basis for a supplemental report.  I

03:57   11    reviewed the documents and determined on my own that it

03:57   12    was a basis for a supplemental report.

03:58   13          Q.    And after reviewing these two documents, isn't

03:58   14    it correct that you changed your opinion as to the

03:58   15    value of the '752 patent?

03:58   16          A.    Yes.  Because now, according to this document,

03:58   17    the '752 patent was directly responsible for flight

03:58   18    performance of a drone, which was one of the features

03:58   19    that was surveyed, which I did not include value for in

03:58   20    my initial report.

03:58   21          Q.    Mr. Andrien, yes or no, after you received

03:58   22    these two documents, isn't it correct that you changed

03:58   23    your opinion as to the value of the '752 patent?

03:58   24          A.    Yes.

03:58   25          Q.    And isn't it true, yes or no, that after

| | | |
|---|---|---|
| 03:58 | 1 | reviewing these two documents, you decided to triple |
| 03:58 | 2 | the amount of damages you said Textron was entitled to |
| 03:58 | 3 | for the '752 patent? |
| 03:58 | 4 | A.    I haven't done the math of whether it's |
| 03:58 | 5 | tripled or not.  I don't think it's quite tripled, if |
| 03:58 | 6 | that's what you're getting at. |
| 03:58 | 7 | Q.    Mr. Andrien, I saw your pedigree and I know |
| 03:59 | 8 | you've taken more math classes than I have.  I'm just |
| 03:59 | 9 | an attorney.  I was a computer engineer in a former |
| 03:59 | 10 | life. |
| 03:59 | 11 | But isn't it true that 326.7 million is more |
| 03:59 | 12 | than three times bigger than $104.2 million? |
| 03:59 | 13 | A.    Oh, you're talking about just that.  I'm |
| 03:59 | 14 | sorry.  I thought you were talking about the damages |
| 03:59 | 15 | number in total, the 145 versus the 367.  I |
| 03:59 | 16 | misunderstood your question.  I apologize. |
| 03:59 | 17 | Q.    My question is concerning the patent we're |
| 03:59 | 18 | talking about, which is the '752 patent. |
| 03:59 | 19 | A.    Would you repeat the question, please? |
| 03:59 | 20 | Q.    Isn't 326.7 million more than three times |
| 03:59 | 21 | bigger than 104.2 million? |
| 03:59 | 22 | A.    It is.  Yes. |
| 03:59 | 23 | Q.    Okay.  So you would agree that, yes, after |
| 03:59 | 24 | reviewing these two documents, your opinion as to the |
| 03:59 | 25 | value of the '752 patent tripled? |

03:59  1      A.    Based on the information available to me, yes.

03:59  2      Q.    So simply because DJI was prevented from

04:00  3  exporting the entirety of its source code from China,

04:00  4  you conclude that DJI should pay three times more for

04:00  5  the '752 patent, yes or no?

04:00  6      A.    No.  That's not right.

04:00  7      Q.    You're not an expert on who does business with

04:00  8  the Chinese military, correct?

04:00  9      A.    That is correct.

04:00  10     Q.    Does DJI market any of its products for

04:00  11 military use?

04:00  12     A.    Not that I'm aware of.

04:00  13     Q.    How many sales has DJI made to the Chinese

04:00  14 military?

04:00  15     A.    I'm not aware one way or the other.

04:00  16     Q.    Textron has a business presence in China,

04:00  17 doesn't it?

04:00  18     A.    It does.  Yes.

04:00  19     Q.    It runs companies in China?

04:00  20     A.    Yes.

04:00  21     Q.    Textron sells products itself to the Chinese

04:00  22 government, doesn't it?

04:00  23     A.    Yes.  It does.

04:00  24     Q.    Does Textron comply with the Chinese export

04:00  25 control law?

582

04:00  1        A.    You're asking a legal question.  I don't know

04:01  2    how to answer that question.

04:01  3        Q.    In 2015 -- actually, strike that.

04:01  4              In 2015, Textron derived a significant portion

04:01  5    of its revenue from the U.S. government.

04:01  6              Do you agree?

04:01  7        A.    I do agree with that.

04:01  8        Q.    I think you said it was billions, correct?

04:01  9        A.    I believe so.

04:01  10       Q.    And that's been pretty much the case every

04:01  11   year since 2015?

04:01  12       A.    Yes.

04:01  13       Q.    And so that's why you offered in your opinion

04:01  14   that that's a key risk for Textron in 2015, would be

04:01  15   losing that business from the U.S. government?

04:01  16       A.    Yes.  In the hypothetical negotiation, that

04:01  17   would be a key risk that they would have to consider

04:01  18   and be compensated for.

04:01  19       Q.    And it's your opinion that it would have been

04:01  20   foreseeable in 2015 that DJI would be added to a

04:01  21   Department of Defense blacklist in 2022?

04:01  22       A.    I think the information that the Chinese

04:02  23   government would -- I mean, excuse me -- the

04:02  24   U.S. government would be not really that happy with

04:02  25   Bell Textron doing business with DJI would have been

04:02  1    reasonably foreseeable in 2015.  Yes.

04:02  2        Q.    Mr. Andrien, nowhere in your report do you say

04:02  3    when the blacklist was created, correct?

04:02  4        A.    I'd have to go back and read my report.  I

04:02  5    don't recall saying it, one way or another, when it was

04:02  6    created.

04:02  7        Q.    You don't even know when the blacklist was

04:02  8    created, correct?

04:02  9        A.    As a -- I don't know when the U.S. government

04:02  10   started creating a blacklist.

04:02  11       Q.    Thank you.

04:02  12             You don't know when the first entity was added

04:02  13   to it either; is that correct?

04:02  14       A.    That's correct.

04:02  15       Q.    But it's your opinion that it would have been

04:02  16   foreseeable in 2015 that this would have happened?

04:02  17       A.    I think that mischaracterizes my testimony.  I

04:02  18   said that it would have been foreseeable that the

04:03  19   U.S. government would not be happy with Bell Textron

04:03  20   doing business with DJI in 2015.

04:03  21       Q.    But yet, Textron offered to sell DJI the '909

04:03  22   patent in 2019.

04:03  23             You agree with that, don't you?

04:03  24       A.    Yes.  They sent a letter at that point.  And

04:03  25   that's before -- as we heard, before all the due

584

04:03  1    diligence was done.

04:03  2        Q.    Even as of the date Textron filed the

04:03  3    complaint in this case, DJI had never been labeled as a

04:03  4    Chinese military company by the Department of Defense;

04:03  5    isn't that correct?

04:03  6        A.    I don't recall the date of when this case was

04:03  7    filed.  But if you're telling me it's before 2022, then

04:03  8    yes.  I would agree.

04:03  9        Q.    And now that that has happened, in your report

04:03  10   you wrote:  Because DJI is a Chinese military company

04:04  11   and has recently been blacklisted by the

04:04  12   U.S. government, Texas Innovations (sic) would have

04:04  13   risked its and Textron's relationship with the United

04:04  14   States government, as well as billions of dollars in

04:04  15   revenues and associated profits by entering into patent

04:04  16   licenses with DJI?

04:04  17       A.    That's correct.  And I believe that's true.

04:04  18       Q.    And you also continued and you opined that DJI

04:04  19   being on this blacklist "creates a massive imbalance

04:04  20   that requires assigning at least the remainder of DJI's

04:04  21   profits to Textron"; isn't that right?

04:04  22       A.    You'd have to show me the page.  I don't

04:04  23   remember the report exactly, and I want to make sure

04:04  24   you're --

04:04  25       Q.    Fair enough.

585

04:04   1      A.    -- saying my statement exactly right.

04:04   2           What page are you on?

04:04   3      Q.    Mr. Andrien, wasn't that your testimony just

04:04   4   about a half-hour ago?

04:04   5      A.    No.  I don't think that's exactly what --

04:04   6   that's not exactly what I testified to a half an hour

04:04   7   ago.  I testified the fact that they were a Chinese

04:04   8   military company would create -- and then their largest

04:04   9   competitor -- excuse me -- that Bell Textron's largest

04:05   10  customer was the U.S. military, and the fact that their

04:05   11  largest customer determined that DJI was a Chinese

04:05   12  military company and didn't want U.S. companies doing

04:05   13  business with them, that would be reasonably

04:05   14  foreseeable and that creates a huge imbalance, is what

04:05   15  I testified to.

04:05   16     Q.    Mr. Andrien, that was not my question.

04:05   17     A.    Well, you asked what I testified to, I

04:05   18  thought.

04:05   19     Q.    No.  I said:  Was that your testimony earlier?

04:05   20           That's yes or no.

04:05   21     A.    Well, I don't think it was the way you phrased

04:05   22  it.

04:05   23     Q.    I'll have you turn to Paragraph 157 of your

04:05   24  report.

04:05   25     A.    Okay.

586

04:05  1          Q.    You can reread it and let me know when you're

04:05  2     ready.

04:05  3          A.    Yes.  I'm ready.

04:06  4          Q.    Do you agree that you offered the opinion that

04:06  5     DJI being on a blacklist "creates a massive imbalance"

04:06  6     at the hypothetical negotiation?

04:06  7          A.    I think that's not exactly accurate.

04:06  8          Q.    It doesn't say that DJI being on a blacklist

04:06  9     creates a massive imbalance?

04:06  10         A.    No.  It says because DJI's a Chinese military

04:06  11    company and has recently been blacklisted by the

04:06  12    U.S. government --

04:06  13         Q.    Okay.

04:06  14         A.    -- it would have been known or reasonably

04:06  15    foreseeable by T -- Textron Innovations at the

04:06  16    hypothetical negotiation.  Textron Innovations would

04:06  17    have risked its and Textron's relationship with the

04:06  18    U.S. government as well as billions of dollars in

04:06  19    revenues and associated profits by entering into a

04:06  20    patent license with DJI.  This creates a massive

04:06  21    imbalance.

04:06  22              So that "this" refers to because it's a

04:06  23    Chinese military company, not just the blacklist.  The

04:06  24    blacklist is something that identifies it as a Chinese

04:07  25    military company, but the fact that the U.S. government

587

04:07  1    considers them one is what I was pointing out.

04:07  2        Q.    Thank you.

04:07  3              Mr. Andrien, you agree that the United States

04:07  4    government is an important customer to Textron, right?

04:07  5        A.    Yes.  Absolutely.

04:07  6        Q.    And, in fact, you sat in this courtroom when

04:07  7    the president of Textron Innovations, Mr. Runstadler,

04:07  8    testified yesterday, correct?

04:07  9        A.    I did, yes.

04:07  10       Q.    And you heard him testify that the United

04:07  11   States government is their biggest customer in the

04:07  12   aerospace sector?

04:07  13       A.    I did.

04:07  14       Q.    Okay.  And you heard him testify that the

04:07  15   U.S. government makes up most of Bell's revenue; isn't

04:07  16   that correct?

04:07  17       A.    I did, yes.

04:07  18       Q.    So the U.S. government is a really valuable

04:07  19   customer to Textron, right?

04:07  20       A.    It is.

04:07  21       Q.    And the U.S. government is so important to

04:07  22   Textron that Textron should consider how they feel

04:07  23   about DJI before they enter into a patent license.

04:07  24              Is that your opinion?

04:07  25       A.    It's my opinion that if the U.S. government is

04:07  1    labeling DJI as a Chinese military company, that this

04:07  2    would give Bell Textron pause and have to reconsider

04:08  3    doing business with DJI and how it might impact its

04:08  4    relationship with its largest customer.  I think

04:08  5    there're very competitive bids, as you heard yesterday,

04:08  6    for that work with the U.S. government, and anything

04:08  7    that might risk -- increase the risk of the

04:08  8    U.S. government choosing a different supplier versus

04:08  9    Bell Textron is a very important risk to consider.  And

04:08  10   I think it's consistent with Mr. Runstadler's testimony

04:08  11   yesterday, my conclusion.

04:08  12       Q.   But they're willing to forego those billions

04:08  13   in revenues for a few hundred million dollars, correct?

04:08  14       A.   No.  I don't think that's a correct

04:08  15   determine -- that's not what I'm getting at, at all.

04:08  16   It's an increased risk and have to be compensated for

04:08  17   taking that risk.

04:08  18       Q.   And they'd risk that for $367 million; that's

04:08  19   your opinion?

04:08  20       A.   I think that's -- they would -- they would

04:08  21   command a lot more of that pot, and that's why I said I

04:08  22   think it's even the whole pot to get it done.

04:09  23       Q.   So that's the price?

04:09  24       A.   I think they would -- they would reach a

04:09  25   negotiation at that point, yes.  I believe they would

589

04:09  1   negotiate, and as Mr. Runstadler testified to

04:09  2   yesterday, communicate with the U.S. government and let

04:09  3   them know what's happening.

04:09  4       Q.   Mr. Andrien, when you did your analysis, did

04:09  5   you consider that if a company is put on the United

04:09  6   States government blacklist, that that could have a

04:09  7   negative impact on their revenues?

04:09  8       A.   Did I consider that?

04:09  9       Q.   Yes.

04:09  10      A.   I considered their sales so I know what their

04:09  11  sales are.  So in that sense, it's considered.

04:09  12      Q.   But at the hypothetical negotiation there

04:09  13  would have been no sales; isn't that correct?

04:09  14      A.   No.  But we were allowed to determine using

04:09  15  the Book of Wisdom what those sales are -- actually

04:09  16  are.  So I used the actual sales to determine the value

04:09  17  as I sit at the hypothetical negotiation.

04:09  18      Q.   So let's explore that a little bit.  So it's

04:09  19  your opinion that at the hypothetical negotiation in

04:09  20  2015, DJI and Textron would have agreed, one, that DJI

04:10  21  is a Chinese military company or will be labeled as

04:10  22  such by the Department of Defense seven years in the

04:10  23  future, correct?

04:10  24      A.   Yeah.  I think that's reasonably foreseeable

04:10  25  that they either are determined or would --

590

04:10  1        Q.    Mr. Andrien, my question was, is that correct?

04:10  2        Yes or no?

04:10  3        A.    Yes.  I believe that's correct.

04:10  4        Q.    And, two, DJI would have agreed to pay even

04:10  5   more money for the next seven years because of that

04:10  6   simple fact?

04:10  7        A.    Yes.  Well, they would have had to, to do a

04:10  8   deal.

04:10  9        Q.    Do you have any idea whether the United States

04:10  10  government actively uses DJI's drones today like state

04:10  11  and local governments across America do?

04:10  12       A.    I think we heard testimony yesterday that one

04:10  13  of the reasons the U.S. government engaged -- engaged

04:10  14  Bell Textron to create those mini-drones is because

04:10  15  they didn't want their GIs using DJI drones anymore for

04:11  16  that purpose.

04:11  17             So they were certainly using DJI drones at one

04:11  18  point, and I think the U.S. military wants them to stop

04:11  19  doing that.

04:11  20       Q.    But it wouldn't change your opinion either

04:11  21  way, whether the U.S. government has continued to

04:11  22  purchase DJI's drones, correct?

04:11  23       A.    It wouldn't change my opinion, no.

04:11  24       Q.    And when you formed your -- when you formed

04:11  25  the opinions that are memorialized in your two reports,

591

04:11  1    you didn't have information one way or another whether

04:11  2    the Department of Defense purchases drones from DJI;

04:11  3    isn't that correct?

04:11  4        A.    I think that's correct, yes.

04:11  5        Q.    And when you formed the opinions that are

04:11  6    memorialized in your two reports, you also didn't have

04:11  7    information one way or the other whether the government

04:12  8    continued to purchase DJI's drones after DJI had been

04:12  9    added to that blacklist; isn't that correct?

04:12  10       A.    That's correct, yes.

04:12  11       Q.    In your two reports you never considered DJI's

04:12  12   patents at all; isn't that correct?

04:12  13       A.    No.  That's not correct.

04:12  14       Q.    You don't cite a single DJI patent in your

04:12  15   report, correct?

04:12  16       A.    I don't cite one in my report, no.

04:12  17       Q.    You don't talk about the value provided to

04:12  18   DJI's drones by its patents, do you?

04:12  19       A.    No.  My job was to value the value of the Bell

04:12  20   Textron patents.  I mean, that's what I focused on.

04:12  21       Q.    So nowhere in your report did you evaluate the

04:12  22   value provided to the end product from DJI's own

04:12  23   innovations, correct?

04:12  24       A.    I don't think that's quite correct, because I

04:12  25   did value different features.  Well, I valued certain

592

04:13  1    features, and I know that there's other features.

04:13  2            So to the extent that DJI has patents that are

04:13  3    including other features, I understand they might be

04:13  4    associated with those other features.

04:13  5        Q.   Mr. Andrien, you never attributed any value to

04:13  6    any of DJI's specific patent; isn't that correct?

04:13  7        A.   Yeah.  That's correct.  That's not the job I

04:13  8    was hired to do.  I was hired to value the two patents

04:13  9    at issue.

04:13  10       Q.   Mr. Andrien, I didn't ask if that was the job

04:13  11   you were hired to do.  I asked if anywhere in your

04:13  12   report if you attributed any value to the inventions

04:13  13   and contributions of DJI's own patents to its

04:13  14   technology?

04:13  15       A.   No.  I did not.

04:13  16       Q.   Mr. Andrien, you may recall when I started off

04:14  17   this afternoon, I went through some surveys with you.

04:14  18            Do you recall that?

04:14  19       A.   Yes.

04:14  20       Q.   And it seems that, at least for several of

04:14  21   them, I hope you would agree that the camera and the

04:14  22   gimbal were identified as important features to DJI's

04:14  23   customers?

04:14  24       A.   I would agree with that.

04:14  25       Q.   And yet on your slide where you subtracted the

593

04:14  1    cost of the -- or the contribution of the camera and

04:14  2    the gimbal, how much did you subtract for those

04:14  3    features?  What was the number?

04:14  4        A.    Right around, on average, 20 percent of the

04:14  5    overall drone.

04:14  6        Q.    And that's because the camera and the gimbal

04:14  7    have nothing to do with Textron's patents in this case;

04:15  8    is that correct?

04:15  9        A.    No.  It's because the patents can be infringed

04:15  10   without utilizing the camera and the gimbal.

04:15  11       Q.    So they're not necessary to Textron's

04:15  12   inventions; isn't that correct?

04:15  13       A.    They're not necessary to infringe the patents.

04:15  14       Q.    Mr. Andrien, you presented two sets of numbers

04:15  15   during your -- during your initial presentation.

04:15  16             Do you recall that?

04:15  17             The numbers from your December report, your

04:15  18   initial report which I've labeled it, and the numbers

04:15  19   from your supplemental report.

04:15  20             Do you recall that?

04:15  21       A.    I do, yes.

04:15  22       Q.    Do you still stand by the number in your

04:15  23   initial report?

04:15  24       A.    Yes.

04:15  25       Q.    So that was the number before you tripled the

594

04:15  1   value of the '752 patent, right?

04:15  2       A.    Before I added the value of flight

04:15  3   performance.

04:15  4       Q.    Would you agree that Textron is seeking to

04:16  5   profit not only off of DJI's success in the marketplace

04:16  6   but also the fact that DJI was labeled a Chinese

04:16  7   military company after Textron filed this case?

04:16  8       A.    No.  I would not agree with that.

04:16  9       Q.    I have no further questions for you at the

04:16  10  moment, Mr. Andrien.  Thank you.

04:16  11      A.    Thank you.

04:16  12                  REDIRECT EXAMINATION

04:16  13  BY MR. SPEEGLE:

04:16  14      Q.    Good afternoon.

04:16  15      A.    Good afternoon.

04:16  16      Q.    So, Mr. Andrien, you were asked some questions

04:16  17  about DJI's source code application to the Chinese

04:16  18  government.

04:16  19            Do you remember that?

04:16  20      A.    I do, yes.

04:16  21      Q.    And I think there was some specific questions

04:16  22  about --

04:16  23                  MR. SPEEGLE:  And can we pull up

04:16  24  Plaintiff's Exhibit 106, and the paragraph that has a

04:16  25  "5" for warranty?

595

04:16  1    BY MR. SPEEGLE:

04:17  2        Q.    Do you remember being asked about this

04:17  3    paragraph that says "warranty"?

04:17  4        A.    I do, yes.

04:17  5        Q.    And in this statement there's a -- there's --

04:17  6    there were questions about whether DJI thought its

04:17  7    technology was important to national security

04:17  8    interests.

04:17  9             Do you remember that?

04:17  10       A.    Yes.

04:17  11       Q.    Did the Chinese government agree with DJI's

04:17  12   statements in this paragraph?

04:17  13       A.    They did not.  They determined that this

04:17  14   technology was vital to national -- Chinese national

04:17  15   security.

04:17  16       Q.    And so at least the Chinese government

04:17  17   disagreed with one of DJI's statements in this

04:17  18   paragraph, right?

04:17  19       A.    Yes.

04:17  20       Q.    And you were also asked some questions about

04:17  21   the designation of DJI as a Chinese military company.

04:18  22             Do you remember that?

04:18  23       A.    I do.  Yes.

04:18  24       Q.    And there was a suggestion that there was a

04:18  25   certain price at which Bell Helicopter would be willing

596

04:18    1    to do a deal with a Chinese military company.

04:18    2            Do you remember that question?

04:18    3    A.    Yes.

04:18    4    Q.    At the hypothetical negotiation, are you

04:18    5    supposed to assume anything about how willing Bell

04:18    6    Textron is to do a deal?

04:18    7    A.    Yes.  I'm supposed to assume you have a

04:18    8    willing licensor and a willing licensee.

04:18    9    Q.    So in the hypothetical negotiation construct,

04:18   10    would Bell Textron have the option of walking away from

04:18   11    the table?

04:18   12    A.    No.  The idea is to -- what -- at what price

04:18   13    would a deal get done?  And so that's what I have to

04:18   14    calculate.

04:18   15    Q.    You were also asked some questions about the

04:18   16    date of the hypothetical negotiation and first

04:18   17    infringement for the '752 patent.

04:18   18            Do you remember that?

04:18   19    A.    I do.  Yes.

04:19   20            MR. SPEEGLE:  Your Honor, may I approach?

04:19   21            THE COURT:  Sure.

04:19   22    BY MR. SPEEGLE:

04:19   23    Q.    I'm handing you what's been previously marked

04:19   24    as Joint Exhibit 8.

04:19   25            Do you see that?

597

04:19   1          A.     I do.  Yes.

04:19   2          Q.     And what is Joint Exhibit 8?

04:19   3          A.     It looks like it is a certified copy of the

04:19   4    '752 patent.

04:19   5          Q.     And I think counsel was asking you whether

04:19   6    DJI's Phantom product was released before the '752

04:19   7    patent was issued.

04:19   8                 Do you remember that?

04:19   9          A.     He did.  Yes.

04:19   10         Q.     And do you remember when your report states

04:19   11   that the Phantom product was released in the United

04:19   12   States?

04:19   13         A.     I don't remember the exact date, it was in

04:19   14   2012.  I don't remember the month.

04:19   15         Q.     So can you tell me when Joint Exhibit 8, and

04:19   16   that's the '752 patent, was actually filed?

04:19   17         A.     Yes.  It was filed on July 15th, 2011.

04:19   18         Q.     So you're not saying just because DJI had

04:20   19   products that were on sale before the hypothetical

04:20   20   negotiation in 2015, that doesn't mean DJI came up with

04:20   21   the idea first, does it?

04:20   22         A.     It does not.

04:20   23         Q.     Now, you were also asked some questions about

04:20   24   DJI's surveys and survey answers that relate to

04:20   25   cameras.

04:20  1              Do you remember that?

04:20  2         A.    Yes.  I do.

04:20  3         Q.    Do you remember counsel pointed you to some

04:20  4    specific survey answers that had high answer rates for

04:20  5    camera-related features?

04:20  6         A.    I do.  Yes.

04:20  7         Q.    Do you feel like your report accurately and

04:20  8    your analysis accurately dealt with the amount of

04:20  9    demand DJI's camera-related features drove?

04:20  10        A.    I do.  As I talked about, I removed the value

04:20  11   of the camera and the gimbal in assessing the sales

04:20  12   base, and I compared that -- I did it once without and

04:20  13   once with.  I got a lower number when I removed it.

04:20  14             And so I'm confident and comfortable that I

04:21  15   considered the value of the camera and how customers

04:21  16   valued it in my analysis.

04:21  17        Q.    So just to be clear, you did the math with all

04:21  18   of the high numbers related to camera features.  And

04:21  19   that math with the higher numbers for camera features

04:21  20   in the surveys, would that have been higher or lower on

04:21  21   the final result than what you did taking the camera

04:21  22   and gimbal out on the front end?

04:21  23        A.    That would have given a higher damages number,

04:21  24   not a lower damages number, had I done that.  I did do

04:21  25   the math.  It gives a higher damages number if I

04:21  1    include the camera and everything.

04:21  2        Q.    So are you saying what you did to subtract

04:21  3    21 percent -- or 20 percent on the front end, that was

04:21  4    a bigger reduction than any amount of math you could

04:21  5    have done to hide camera-demand features in the

04:21  6    surveys?

04:21  7        A.    Yeah.  The number with -- removing it was more

04:21  8    conservative.  Yes.

04:21  9        Q.    And I think counsel also asked you about

04:21  10   surveys that referred to the most important feature

04:22  11   instead of just an important feature.

04:22  12            Do you remember that?

04:22  13       A.    Yes.  I do.

04:22  14       Q.    And do you think it would be appropriate in

04:22  15   your analysis to rely on surveys about the most

04:22  16   important feature?

04:22  17       A.    I do not.  That's not appropriate.

04:22  18       Q.    Can you explain why?

04:22  19       A.    Sure.  Because when someone says something is

04:22  20   the most important, I don't have any relative basis to

04:22  21   know what that means versus other technology.  I know

04:22  22   it's most important, but how much more important is it

04:22  23   than other features?  And that doesn't give me any

04:22  24   information regarding that.

04:22  25            And so my job, I needed to determine how much

04:22    1    more important is one feature versus another.  And so I

04:22    2    used the -- the way they ranked them when they picked

04:22    3    which purchases were driving demand decisions, if they

04:22    4    had voted for one, then I tabulated those votes.

04:22    5         So that enabled me to compare one feature

04:22    6    versus another.  Whether something's most important

04:22    7    doesn't give me that relative basis for comparison.  So

04:23    8    it's not appropriate.  I can't use it.

04:23    9              MR. SPEEGLE:  I'd like to go back to

04:23    10   Plaintiff's Exhibit 106, if I could, and this time the

04:23    11   paragraph that starts with the 4.

         12   BY MR. SPEEGLE:

04:23    13   Q.   And that paragraph that starts with the flight

04:23    14   control system, Mr. Andrien.

04:23    15        Do you see that?

04:23    16   A.   Yes.

04:23    17   Q.   And do you recall counsel asking you about the

04:23    18   sentence that starts the "to-be exported flight control

04:23    19   technology"?

04:23    20   A.   Yes.

04:23    21   Q.   And he highlighted how this is DJI's words,

04:23    22   right?

04:23    23   A.   He did.

04:23    24   Q.   And DJI called this technology something that

04:23    25   provided a tremendous competitive advantage or

| | | |
|---|---|---|
| 04:23 | 1 | competitive edge, right? |
| 04:23 | 2 | A.    Yes.  That's what it says. |
| 04:23 | 3 | Q.    And do you have an understanding about whether |
| 04:23 | 4 | the technology being described in this document relates |
| 04:23 | 5 | to the asserted '752 patent that belongs to Bell |
| 04:23 | 6 | Textron? |
| 04:23 | 7 | A.    It's my understanding that it does relate to |
| 04:24 | 8 | it.  Yes. |
| 04:24 | 9 | Q.    So it is technology related to the |
| 04:24 | 10 | infringement of the '752 patent that DJI says "provides |
| 04:24 | 11 | a tremendous competitive edge in the industry and is |
| 04:24 | 12 | carried fully on various DJI drones"? |
| 04:24 | 13 | A.    That's correct. |
| 04:24 | 14 | MR. SPEEGLE:  No further questions. |
| 04:24 | 15 | RECROSS-EXAMINATION |
| 04:24 | 16 | BY MR. SCHROEDER: |
| 04:24 | 17 | Q.    Mr. Andrien, if the Chinese government told |
| 04:24 | 18 | one of Textron's Chinese businesses that it could not |
| 04:24 | 19 | export its own source code from China, would Textron |
| 04:24 | 20 | violate that? |
| 04:24 | 21 | A.    I have no way of answering that question. |
| 04:25 | 22 | Q.    You indicated that the Chinese government |
| 04:25 | 23 | agreed or disagreed -- strike that.  I'll start over. |
| 04:25 | 24 | You indicated that the Chinese government |
| 04:25 | 25 | disagreed with DJI's application to export its source |

602

1    code.

04:25    2         Do you recall that testimony just a moment

04:25    3    ago?

04:25    4         A.    I do.  Yes.

04:25    5         Q.    Do you know if DJI -- you don't -- let me

04:25    6    start over.

04:25    7         You don't know, one way or another, whether

04:25    8    DJI ever submitted its source code to the Chinese

04:25    9    government with that application, correct?

04:25   10         A.    I just -- I don't know one way or another.

04:25   11    Just know what the document said.

04:25   12         Q.    So you don't know if the Chinese government

04:25   13    ever reviewed DJI's own source code; isn't that

04:25   14    correct?

04:25   15         A.    Yes.  That's correct.  I don't know one way or

04:25   16    the other.  Just what the documents tell me.

04:25   17         Q.    And the Chinese government didn't indicate any

04:25   18    disagreement with the dates stated in the export

04:25   19    application that DJI has been innovating drone

04:25   20    technology since 2006, correct?

04:25   21         A.    I don't recall that.  Yes.

04:25   22         Q.    You testified when I spoke to you a moment ago

04:25   23    that DJI had been selling the Phantom since 2012.

04:25   24         Do you recall that?

04:26   25         A.    Yes.

603

| | | |
|---|---|---|
| 04:26 | 1 | Q. Okay. And you agree with me that the '752 |
| 04:26 | 2 | patent application didn't even become public until |
| 04:26 | 3 | 2013? |
| 04:26 | 4 | A. I don't know when it became public. It was |
| 04:26 | 5 | filed in 2011, and it was issued in 2015. I don't know |
| 04:26 | 6 | what happened in between, other than the Patent Office |
| 04:26 | 7 | was considering it. |
| 04:26 | 8 | Q. Did you read the patent, Mr. Andrien? |
| 04:26 | 9 | A. I have. Yes. |
| 04:26 | 10 | MR. SCHROEDER: Can we put up the patent, |
| 04:26 | 11 | the front page, please? |
| 04:26 | 12 | And, Mr. Fisher, could I have you focus |
| 04:26 | 13 | on the publication date? |
| 04:26 | 14 | BY MR. SCHROEDER: |
| 04:26 | 15 | Q. And for the record, what's up on the screen |
| 04:26 | 16 | now is Joint Exhibit 8. And you can see under 87: PCT |
| 04:26 | 17 | publication date January 24th, 2013. |
| 04:27 | 18 | Do you see that? |
| 04:27 | 19 | A. I do. Yes. |
| 04:27 | 20 | Q. Doesn't that indicate that that's when the PCT |
| 04:27 | 21 | patent publication published and was, therefore, |
| 04:27 | 22 | available for the public to read? |
| 04:27 | 23 | A. Yes. That's my understanding. |
| 04:27 | 24 | Q. Thank you. |
| 04:27 | 25 | Finally, I have a question responsive to the |

604

04:27  1    questions about how you valued the camera -- or a

04:27  2    series of questions.

04:27  3            You have taken about 20-some percent out as

04:27  4    you -- because you attributed that amount of value to

04:27  5    the camera and the gimbal; is that correct?

04:27  6    A.    Yes.

04:27  7    Q.    Okay.  And I'll direct your attention to

04:27  8    Plaintiff's Exhibit 63 on Page 4.  This is a figure we

04:27  9    went over earlier.

04:27  10            Isn't it correct that more than 80 percent of

04:27  11   global users of DJI products considered the camera when

04:28  12   they decided to buy the drone?

04:28  13   A.    That's correct.

04:28  14   Q.    Thank you, Mr. Andrien.

04:28  15            MR. SPEEGLE:  No further questions.

04:28  16            THE COURT:  You may step down, sir.

04:28  17            THE WITNESS:  Thank you.

04:28  18            THE COURT:  Could I have counsel up here

04:28  19   for just one second?

04:28  20            (Bench conference.)

04:28  21            THE COURT:  Are you done -- your case is

04:28  22   done?

04:28  23            MR. RICH:  Yes.

04:28  24            THE COURT:  Okay.  Are you going to say

04:28  25   you rest or what are we going to do?  Because I know

| | | |
|---|---|---|
| 04:28 | 1 | y'all have this agreement, and I just want to make sure |
| 04:28 | 2 | when I ask you for your next witness, what you are |
| 04:28 | 3 | going to say. |
| 04:28 | 4 | MR. RICH:  The defendants are going to |
| 04:28 | 5 | call the next witness. |
| 04:28 | 6 | MR. SCHROEDER:  Okay.  So you guys are |
| 04:28 | 7 | going to say -- will you save the rest until the end or |
| 04:29 | 8 | I guess we could say rest subject to -- |
| 04:29 | 9 | THE COURT:  I think you can say, we're |
| 04:29 | 10 | going to rest subject to -- well -- |
| 04:29 | 11 | MR. SCHROEDER:  I think if Your Honor |
| 04:29 | 12 | would be up for it, you could just mention the Rule 50 |
| 04:29 | 13 | agreement outside the presence of them because they're |
| 04:29 | 14 | not going to get -- |
| 04:29 | 15 | THE COURT:  It's already on the record. |
| 04:29 | 16 | That's already been on the record.  It wasn't that.  I |
| 04:29 | 17 | just didn't want to surprise you by -- I'll just -- |
| 04:29 | 18 | I'll say this:  Plaintiff doesn't have any other |
| 04:29 | 19 | witnesses, you know, and then you can call your first |
| 04:29 | 20 | witness. |
| 04:29 | 21 | And you -- for the record, you, the |
| 04:29 | 22 | defendant, can call your next witness. |
| 04:29 | 23 | MR. SCHROEDER:  Yeah. |
| 04:29 | 24 | THE COURT:  Okay. |
| 04:29 | 25 | (Bench conference concludes.) |

606

| | | |
|---|---|---|
| 04:29 | 1 | THE COURT: Are we ready? |
| 04:31 | 2 | MR. MEEK: Yeah. |
| 04:31 | 3 | THE COURT: Okay. Does the plaintiff |
| 04:31 | 4 | have another witness? |
| 04:31 | 5 | MR. MEEK: No, Your Honor. |
| 04:31 | 6 | THE COURT: The defendant can call their |
| 04:31 | 7 | first witness. |
| 04:31 | 8 | MR. JAKES: Good afternoon, Your Honor. |
| 04:31 | 9 | Mike Jakes for the defendants. |
| 04:31 | 10 | We call Romsin Oushana. |
| 04:31 | 11 | (The witness was sworn.) |
| 04:31 | 12 | DIRECT EXAMINATION |
| 04:31 | 13 | BY MR. JAKES: |
| 04:31 | 14 | Q.   Good afternoon, Mr. Oushana. |
| 04:31 | 15 | Would you please introduce yourself to the |
| 04:31 | 16 | jury? |
| 04:31 | 17 | A.   Good afternoon. Yeah. My name is Romsin |
| 04:32 | 18 | Oushana. |
| 04:32 | 19 | Q.   Where do you live? |
| 04:32 | 20 | A.   I live in San Jose, California. |
| 04:32 | 21 | Q.   How long have you lived in San Jose? |
| 04:32 | 22 | A.   All my life. |
| 04:32 | 23 | Q.   Who do you currently work for? |
| 04:32 | 24 | A.   I work for DJI Creative Studios. |
| 04:32 | 25 | Q.   How long have you worked for DJI Creative |

607

04:32  1    Studios?

04:32  2        A.    It's been a little over seven years now.

04:32  3        Q.    You joined in when?  December 2015, does that

04:32  4    sound right?

04:32  5        A.    Yeah.  December 1, 2015.

04:32  6        Q.    What's your title at DJI Creative Studios?

04:32  7        A.    I'm a key accounts manager.

04:32  8        Q.    Tell us a little bit about your background.

04:32  9              Do you have a family?

04:32  10       A.    Yeah.  Actually I live with my parents at home

04:32  11   back in San Jose.  Come from a traditional background

04:32  12   so I'm still living with them.  I have a couple of twin

04:32  13   sisters.  They live close by within arm's reach of my

04:32  14   parents and, yeah, a lot of family and cousins and

04:32  15   uncles in that area as well.

04:32  16       Q.    So growing up, were you interested in

04:32  17   technology?

04:32  18       A.    Yeah.  Very.  My dad worked at Intel, a U.S.

04:33  19   chip manufacturer.  So he brought a lot of computer

04:33  20   parts and chips at home.  I used to tinker a lot as a

04:33  21   kid, built PCs.  Introduced me to my first video games.

04:33  22   And then, yeah, I was a tinkerer a lot.  Did a lot of

04:33  23   Radio Shack build-a-kits, and so I was fascinated by

04:33  24   technology.  Growing up in the Bay Area, it was easily

04:33  25   accessible to us.

608

| 04:33 | 1 | Q. All right. So let's talk about your job |
| 04:33 | 2 | history. Where did you work before DJI Creative |
| 04:33 | 3 | Studios? And maybe you can start at the beginning. |
| 04:33 | 4 | A. Yeah. Straight out of high school, I worked |
| 04:33 | 5 | for Home Depot. I got a job as a lot associate, |
| 04:33 | 6 | pulling carts. Eventually got promoted to be a cashier |
| 04:33 | 7 | and worked as a cashier for a few months. Eventually |
| 04:33 | 8 | was promoted to be a head cashier, and so I kind of was |
| 04:33 | 9 | a supervisor at some point. |
| 04:33 | 10 | Then eventually became a front-end supervisor |
| 04:33 | 11 | of that store and ran basically the front end of the -- |
| 04:33 | 12 | the operations of that store and then some of the |
| 04:33 | 13 | accounting services that were held in the back. |
| 04:33 | 14 | Q. How long did you work at Home Depot? |
| 04:34 | 15 | A. Over six years. |
| 04:34 | 16 | Q. So then where did you work after Home Depot? |
| 04:34 | 17 | A. I started working for Apple retail. |
| 04:34 | 18 | Q. What did you do for Apple retail? |
| 04:34 | 19 | A. Yeah. I started out as a sales specialist, |
| 04:34 | 20 | and I was pretty fascinated with technology so I wanted |
| 04:34 | 21 | to work for an innovative company. I started working |
| 04:34 | 22 | for Apple selling, you know, the newest iPhones and |
| 04:34 | 23 | iPads and Mac computers. And that was a pretty great |
| 04:34 | 24 | job at the time. |
| 04:34 | 25 | Eventually became an expert in that category, |

609

04:34  1    and then throughout that career experience I was

04:34  2    offered a job at their headquarters team to work on

04:34  3    operations and bringing cool new features to the store.

04:34  4    And at that time I worked on a project called the Easy

04:34  5    Pay App where customers can go into an Apple Store,

04:34  6    pull out their phone and purchase a product right on

04:34  7    the floor -- the sales floor, without having to have a

04:34  8    sales associate help them out.

04:34  9        Q.   So after Apple, where did you work?

04:34  10       A.    So after that I got introduced to a bunch of

04:34  11   people at Apple, including a gentleman named

04:34  12   Ron Johnson.  He was the SVP of Apple retail at that

04:35  13   time.  He went to go start a new venture called ENJOY

04:35  14   Tech, and that company ended up recruiting me outside

04:35  15   of Apple.

04:35  16       Q.   What did you do for ENJOY?

04:35  17       A.    I worked as a business development manager

04:35  18   bringing in new technology so that we can vet out.  So

04:35  19   ENJOY's premise was they wanted to bring technology to

04:35  20   people and deliver it to your door and then show people

04:35  21   how to use this technology.  So, like, cell phones and

04:35  22   laptops, Sonos speakers and even DJI drones at that

04:35  23   time.  We would bring them to people and show them how

04:35  24   to use them.

04:35  25            So I was tasked with the opportunity to find

610

04:35  1    different brands that were cool products, innovative

04:35  2    products, but still needed some help, and still had to

04:35  3    help kind of get up to speed with setting them up.

       4         Q.    Okay.  So when you worked for ENJOY, did you

04:35  5    have an opportunity to learn about DJI's drones?

04:35  6         A.    Yes.  I did.

04:35  7         Q.    And how did you learn about DJI's drones when

04:35  8    you were there at ENJOY?

04:35  9         A.    Yeah.  A gentleman named Patrick brought in a

04:35  10   couple new products.  One of them happened to be a

04:36  11   Phantom 2, which was my first introduction to a DJI

04:36  12   product.  I got a few guys from the office, we went

04:36  13   outside into the parking lot and started to tinker with

04:36  14   this thing, this drone.  Plugged a battery into it,

04:36  15   hooked up my phone to the remote controller and off --

04:36  16   we were away, you know.

04:36  17         And so it -- we got it up to about four or

04:36  18   five feet, and it amazed me because it just stood

04:36  19   there.  And I let go of the remote controller and it

04:36  20   just kind of stabilized in place.  And it was pretty

04:36  21   neat.  I don't think anybody else kind of thought it

04:36  22   was that cool, but I thought it was very amazing,

04:36  23   obviously, for what it was doing.

04:36  24         And only later I realized that it had a camera

04:36  25   so that became even more interesting to me.

611

04:36  1      Q.    All right.  So just to complete your job

04:36  2  history, was there a time when you left ENJOY and

04:36  3  started work for DJI?

04:36  4      A.    Yes.  So about a year into my career at ENJOY,

04:36  5  I was asked to go do a marketing event with DJI because

04:37  6  we became partners.  And so I met a bunch of their

04:37  7  team, their local team.  They took a liking to me.

04:37  8  When we got done with the marketing event, they invited

04:37  9  me to a luncheon.  Turned out to be an interview, an

04:37  10  informal interview, and then eventually I was recruited

04:37  11  to go work for DJI at that time.

04:37  12      Q.    So why did you decide to go to work at DJI?

04:37  13      A.    Again, from the very beginning, I was very

04:37  14  fascinated with innovative companies.  I wanted to work

04:37  15  for an innovative company.  The stuff at ENJOY that we

04:37  16  were doing was pretty fascinating but, again, when I

04:37  17  saw this drone, I got hooked.  So I jumped ship.

04:37  18      Q.    Well, all right.  So your actual employer is

04:37  19  DJI Creative Studios; is that right?

04:37  20      A.    That's correct.

04:37  21      Q.    Is DJI Creative Studios a U.S. or a foreign

04:37  22  company?

04:37  23      A.    They're a U.S. company.

04:37  24      Q.    And where is DJI Creative Studios based?

04:37  25      A.    In Burbank, California.

612

04:37  1      Q.    So to your understanding, DJI Creative Studios
04:37  2   is not a party to this lawsuit; is that right?
04:38  3      A.    That's my understanding, yes.
04:38  4      Q.    And to your understanding, the plaintiff,
04:38  5   Textron, has not accused DJI Creative Studios of
04:38  6   infringing their patents, right?
04:38  7      A.    That's correct.
04:38  8      Q.    Okay.  So how does DJI Creative Studios relate
04:38  9   to what we call DJI globally?
04:38  10     A.    It's one of the companies within the brand of
04:38  11  DJI.
04:38  12     Q.    Are there other companies within that brand?
04:38  13     A.    Yes.  There is.
04:38  14     Q.    So in general, what does the company, DJI
04:38  15  Creative Studios, what does it do?
04:38  16     A.    Yes.  We're in charge of the sales and
04:38  17  marketing for products in North America.
04:38  18     Q.    Okay.  So where are the employees of DJI
04:38  19  Creative Studios?  Where are they located?
04:38  20     A.    Mostly in Burbank, California.  Some of us are
04:38  21  remote, including myself.
04:38  22     Q.    Now, Mr. Baker, Wayne Baker, has been sitting
04:38  23  at counsel table.
04:38  24           Do you know Mr. Baker?
04:38  25     A.    Yes.  I do.

613

| | | |
|---|---|---|
| 04:38 | 1 | Q.    Does Mr. Baker also work for DJI Creative |
| 04:39 | 2 | Studios? |
| 04:39 | 3 | A.    Yes.  He does. |
| 04:39 | 4 | Q.    He's located here in Texas, though.  I think |
| 04:39 | 5 | it's in Cleburne; is that right? |
| 04:39 | 6 | A.    That's right. |
| 04:39 | 7 | Q.    Was Mr. Baker a fire chief at one time, to |
| 04:39 | 8 | your knowledge? |
| 04:39 | 9 | A.    Yes.  In Joshua, Texas, I believe. |
| 04:39 | 10 | Q.    Okay.  What does Mr. Baker do now for DJI |
| 04:39 | 11 | Creative Studios? |
| 04:39 | 12 | A.    He handles a lot of sales and marketing for |
| 04:39 | 13 | public safety, fire departments and police departments |
| 04:39 | 14 | in the United States.  He shows them the technology and |
| 04:39 | 15 | how they use it, trains them and gets them up to speed |
| 04:39 | 16 | on it. |
| 04:39 | 17 | Q.    While we're on that -- we'll come back to it, |
| 04:39 | 18 | but -- so how do fire departments use DJI's drones? |
| 04:39 | 19 | A.    Yeah.  They put them up in the sky right when |
| 04:39 | 20 | they get on scene as an extra eye in the sky to help |
| 04:39 | 21 | assess what's going on.  Take any safety measures that |
| 04:39 | 22 | need to be done.  Work with the ground teams down below |
| 04:39 | 23 | if they -- because they obviously have that bird's-eye |
| 04:39 | 24 | view. |
| 04:39 | 25 | And to -- we even have thermal cameras in some |

04:39   1   of our drones that can see heat.  So they can see

04:39   2   people inside of a building or maybe where the fire is

04:40   3   and where it's going.  So it's just...

04:40   4       Q.    All right.  So let's talk about what you do

04:40   5   for DJI Creative Studios.  Your title is key accounts

04:40   6   manager, right?

04:40   7       A.    That's correct.

04:40   8       Q.    What do you do as key accounts manager?

04:40   9       A.    I oversee one of our sales channels.  It's

04:40   10  actually Apple.

04:40   11      Q.    Are you responsible for any other sales

04:40   12  channels other than Apple?

04:40   13      A.    I was just introduced to Best Buy recently,

04:40   14  but I haven't fully got up to speed on everything

04:40   15  there.

04:40   16      Q.    Okay.  So what are some of the things you do

04:40   17  as the person responsible for the Apple account?

04:40   18      A.    Yeah.  So we do sell our products at the Apple

04:40   19  stores and Apple.com.  I work with Apple to introduce

04:40   20  new products into their channel, train them on those

04:40   21  products, make them understand the -- you know, the

04:40   22  benefits for their customers, why we should sell them

04:40   23  at the Apple stores.

04:40   24          If they agree, then we negotiate a price.  And

04:40   25  eventually we work on a forecast of how many they want

615

04:40  1   to sell in that first initial launch.  We'll ship out

04:40  2   those products.  We'll send them an invoice.  They'll

04:41  3   pay that invoice.  And I do everything in between.

04:41  4        Q.    So as part of your job as a key accounts

04:41  5   manager, do you educate customers about the history of

04:41  6   DJI?

04:41  7        A.    Yeah.  I do.

04:41  8        Q.    All right.  So let me just ask a few of those

04:41  9   questions.  When did DJI start?

04:41  10       A.    2006.

04:41  11       Q.    And how did DJI start?

04:41  12       A.    It started in a dorm room in a university in

04:41  13  Hong Kong.  Our founder went to a technical institute

04:41  14  there and, yeah, that's how it started.

04:41  15       Q.    All right.  And so -- and telling people the

04:41  16  history of DJI, what do you tell them about the

04:41  17  founding of the company?

04:41  18       A.    Yeah.  Our founder, Frank Wang, was very

04:41  19  fascinated by flight and model aircraft at a young age,

04:41  20  even when he was a child.  Begged his parents to get

04:41  21  him an RC helicopter, which they eventually did.

04:42  22             He learned really early that that RC

04:42  23  helicopter was very difficult to fly and immediately

04:42  24  crashed it after he received it from his parents.

04:42  25             That, I guess, stayed with him throughout his

04:42   1   life until he went to university, where he worked on a

04:42   2   college project to build something called the flight

04:42   3   controller, which would have -- actually give that RC

04:42   4   helicopter stability in flight so that you couldn't

04:42   5   crash it.

04:42   6           Because if you've ever flown an RC helicopter,

04:42   7   you have to give it throttle to keep it afloat.  And if

04:42   8   you give it too much throttle, you can actually flip it

04:42   9   and it'll run right into the ground.

04:42   10          So he built the first flight controllers that

04:42   11   were then attached to these RC helicopters that were

04:42   12   able to stabilize them in flight.

04:42   13      Q.   Okay.

04:42   14          MR. JAKES:  Mr. Fisher, could we put up

04:42   15   the demonstratives for Mr. Oushana?

04:42   16          And if we turn to the next page, this is

04:42   17   Demonstrative Exhibit 1.2.

        18   BY MR. JAKES:

04:42   19      Q.   What does this demonstrative show?

04:42   20      A.   The product roadmap and some of the history of

04:42   21   the products since 2006, the inception of the company,

04:43   22   to now.

04:43   23      Q.   Is this timeline something that you've used in

04:43   24   educating customers about DJI?

04:43   25      A.   Yes.

617

04:43  1    Q.    Okay.  Starting on the left where it says
04:43  2  "start-up," what's shown in this timeline?
04:43  3    A.    So those early flight controllers that I just
04:43  4  mentioned are the ones at the top left.  Those are some
04:43  5  boxes that were then, again, attached to these larger
04:43  6  RC helicopters.
04:43  7         These boxes look small in this picture, but
04:43  8  they're rather large in real life.
04:43  9         And then next to that -- yeah.  Next to that,
04:43 10  we went from building, you know, flight controllers for
04:43 11  large RC helicopters to then smaller flight controllers
04:43 12  for other model aircraft at that time, multi-rotor
04:43 13  aircraft.
04:43 14    Q.    And that was in the time frame of 2006 to 2012
04:43 15  or thereabouts?
04:43 16    A.    Yeah.  That's right.
04:43 17    Q.    Okay.  Continuing on this timeline, starting
04:43 18  in 2012 through 2016, that period is called "growing."
04:43 19  Tell us about this period.
04:44 20    A.    Yeah.  So actually right before this period --
04:44 21  a lot of model aircraft is for hardcore enthusiasts
04:44 22  that like to build this stuff, solder, put these kits
04:44 23  together, bolt on these flight controllers.  And it was
04:44 24  purely for flight.
04:44 25         The company is, again -- its innovation over

618

04:44   1    the years, they always wanted to bring this technology

04:44   2    to the masses so that more people can experience it.

04:44   3           So if you look at the top left, that aircraft

04:44   4    that the -- sorry -- the Phantom 1, the white one with

04:44   5    the red stripes, that was our first ready-to-fly kit.

04:44   6    So you actually didn't have to build it like you did

04:44   7    previously.

04:44   8           This was just -- you pulled it out of the box,

04:44   9    put the propellers on, plugged in the battery and off

04:44   10   you went.  You were able to fly within just a few

04:44   11   minutes, and it was called ready-to-fly.

04:44   12   Q.    So Phantom, that was the first ready-to-fly

04:44   13   DJI drone?

04:44   14   A.    That's correct.

04:44   15   Q.    Did it have a camera?

04:44   16   A.    At that time, it didn't.  Even though it has a

04:44   17   camera here, it didn't.  Again, a lot of these

04:44   18   hobbyists and enthusiasts, the early adopters of this

04:44   19   technology, actually double-sided taped a GoPro camera

04:45   20   to the bottom of that Phantom 1 and took some amazing

04:45   21   shots.

04:45   22          At that time, they didn't know what they were

04:45   23   shooting.  They kind of just hoped that they were going

04:45   24   to get a good shot.  So what they did was they taped it

04:45   25   and put it on a setting where it just took a picture

619

04:45  1    every few seconds.

04:45  2            One of the most famous pictures that was ever

04:45  3    taken was taken by actually an old boss of mine, Randy

04:45  4    Jay Braun.  He took a photo while he was in the ocean

04:45  5    in Maui on a kayak and below him was a whale and --

04:45  6        Q.   Well, if you pause there.

04:45  7        A.   Yeah.

04:45  8            MR. JAKES:  Let's advance the

04:45  9    demonstrative just to the next one.

04:45  10       A.   Sure.

04:45  11           MR. JAKES:  1-3.

       12    BY MR. JAKES:

04:45  13       Q.   Is this the photo that you're referring to?

04:45  14       A.   Yes.  This is it.

04:45  15           So that's Randy on his kayak in -- off the

04:45  16    coast of Maui flying a -- one of the first Phantoms

04:45  17    using a GoPro.  Again, he didn't know this whale was

04:45  18    under him or what picture he was actually taking.  Only

04:45  19    when he got home and transferred the footage over to

04:45  20    his laptop or computer, he then saw what he had taken.

04:46  21           MR. JAKES:  So going back to the

04:46  22    timeline, Mr. Fisher.  Thanks.

04:46  23    BY MR. JAKES:

04:46  24       Q.   When did DJI put a camera on one of its

04:46  25    drones?

620

04:46  1        A.    It was around the Phantom 2.  We put a camera

04:46  2   on there.  We wanted a little bit more control of the

04:46  3   system itself.  Again, we were kind of flying blind

04:46  4   before that.

04:46  5             And so Phantom 2 was the first camera.

04:46  6   Phantom 2 Vision+ was actually one of the first drones

04:46  7   that I was involved in.  Those cameras were interesting

04:46  8   because they would stream the live image down to the

04:46  9   remote controller.

04:46  10       Q.    All right.  So we're looking at the period of

04:46  11  2012 to 2016.

04:46  12            And is this the period when you joined DJI?

04:46  13       A.    Yes.  Yes.

04:46  14       Q.    Okay.  And that was the period entitled

04:46  15  "growing."

04:46  16            So you've been with the company since then

04:46  17  until now; is that right?

04:46  18       A.    That's right.

04:46  19       Q.    Okay.  So what are some of the products that

04:46  20  DJI has continued to introduce during this time frame?

04:46  21       A.    Yeah.  After those early Phantoms, although

04:47  22  small, they were still rather large.  You'd have to

04:47  23  commit a whole backpack or even carry-on luggage for

04:47  24  one of those.

04:47  25            So we decided to make the Mavic series, which

04:47  1    is the one on the bottom, the dark gray one.  And that

04:47  2    was a foldable drone, the first of its kind, very

04:47  3    innovative.

04:47  4         And it would fold up, and it would be quite

04:47  5    small.  And you can store it in a backpack with other

04:47  6    stuff if you were going on a trip.

04:47  7         And then more of a professional audience or

04:47  8    customer base started using them for film and

04:47  9    television.  So we made one kind of designed for them

04:47  10   called the Inspire 1, and that's what you see, the

04:47  11   white one with the articulated legs.  And that was more

04:47  12   geared towards professional use.

04:47  13        Q.   All right.

04:47  14             MR. JAKES:  Your Honor, may I approach

04:47  15   the witness?

04:47  16        A.   Thank you, sir.

04:47  17   BY MR. JAKES:

04:48  18        Q.   All right.  I've handed you a box.  You're

04:48  19   opening it.

04:48  20        Is this one of DJI's drones?

04:48  21        A.   Yes.  It is.

04:48  22        Q.   Which one is it?

04:48  23        A.   This is called the Mini 3 Pro.  This is one of

04:48  24   our latest and greatest drones we've come out with.

04:48  25        Q.   What are the best-selling drones for DJI right

622

04:48  1    now?

04:48  2        A.    So this Mini series.  This is the Mini 3, and

04:48  3    so this -- the Mini 1, Mini 2 and Mini 3 have been the

04:48  4    best-selling series that DJI has sold.

04:48  5        Q.    So one of the things you do as key accounts

04:48  6    manager, do you educate customers about the drones and

04:48  7    their features?

04:48  8        A.    I do.  Yes.

04:48  9        Q.    All right.  So if you could take the Mini

04:48  10   there and --

04:48  11       A.    Sure.

04:48  12       Q.    -- give the jury a tour?

04:48  13       A.    Yeah.  Absolutely.

04:48  14             So this is actually the full drone here.  And

04:48  15   you have a camera that's stabilized up front.  It's

04:48  16   called the gimbaled camera.  So as you can see, if I

04:48  17   rock my hand back and forth, the camera tries to stay

04:48  18   as straight as possible.  That's another innovation

04:49  19   that we had.

04:49  20             Again, we used to stick these on with tape,

04:49  21   and then we eventually came out with the gimbaled

04:49  22   cameras for video.

04:49  23             This one's interesting because it does fold

04:49  24   out, and then you'll see it actually becomes a drone,

04:49  25   kind of like a little Transformer.

623

| | | |
|---|---|---|
| 04:49 | 1 | It's got a battery back here.  There are |
| 04:49 | 2 | sensors down below to see the ground, sensors up front |
| 04:49 | 3 | and sensors behind it. |
| 04:49 | 4 | So if you're flying and there's a tree or a |
| 04:49 | 5 | fence near you, it'll actually avoid that obstacle, try |
| 04:49 | 6 | to move around it or just stop in its place. |
| 04:49 | 7 | This guy has about 35 minutes of flight time. |
| 04:49 | 8 | And what you can see on the remote controller here is |
| 04:49 | 9 | the actual live view of the camera -- whoops -- which |
| 04:49 | 10 | again is stabilized using that gimbal. |
| 04:49 | 11 | Q.    How important is the camera to DJI's drone |
| 04:49 | 12 | sales today? |
| 04:49 | 13 | A.    I'd say very, very important. |
| 04:49 | 14 | Q.    Why is that? |
| 04:49 | 15 | A.    Again, because prior to the camera, it was |
| 04:49 | 16 | more for recreational flying, which is, you know, fun |
| 04:50 | 17 | in itself, but once you put a camera in the sky, you |
| 04:50 | 18 | can do a lot with it. |
| 04:50 | 19 | Q.    Has that changed the way that DJI sells and |
| 04:50 | 20 | markets its drones? |
| 04:50 | 21 | A.    Definitely.  Yeah. |
| 04:50 | 22 | Q.    And in what way? |
| 04:50 | 23 | A.    I mean, now we can gear them towards certain |
| 04:50 | 24 | use cases.  In commercial-uses cases, obviously film |
| 04:50 | 25 | and television have taken advantage of this.  Prior to |

624

| | | |
|---|---|---|
| 04:50 | 1 | that, you know, again, it was more for recreational, |
| 04:50 | 2 | just flying. |
| 04:50 | 3 | Q.    All right.  So what are some of the things |
| 04:50 | 4 | that DJI's drones are used for today?  You can just |
| 04:50 | 5 | name a number of them. |
| 04:50 | 6 | A.    Yeah.  So film and television is one.  The oil |
| 04:50 | 7 | and gas industry use them for inspection.  Fire |
| 04:50 | 8 | departments have used them on scene.  Also police |
| 04:50 | 9 | departments and public safety departments for search |
| 04:50 | 10 | and rescue.  We also do use them in agriculture in some |
| 04:50 | 11 | use cases. |
| 04:50 | 12 | Q.    Okay.  Let's start with that one, agriculture. |
| 04:50 | 13 | Can you tell the jury how DJI's drones are |
| 04:50 | 14 | used in agricultural? |
| 04:50 | 15 | A.    Yeah.  So we have a -- kind of a different |
| 04:50 | 16 | version of this guy.  It's a little bit bigger, and it |
| 04:50 | 17 | has a specialized camera.  And when you fly it over a |
| 04:51 | 18 | crop, it can tell you things like if there's too much |
| 04:51 | 19 | nitrogen in the soil or over-watering or pesticide or |
| 04:51 | 20 | things like that. |
| 04:51 | 21 | It will then plug into another drone that'll |
| 04:51 | 22 | go out, and we actually have something that will do a |
| 04:51 | 23 | fertilizer sprayer or seed spreading.  It's called the |
| 04:51 | 24 | Agras.  It's quite large.  And that two-part system |
| 04:51 | 25 | actually does quite well with precision agriculture, |

04:51    1    and so it's being used a lot all around the world now.

04:51    2        Q.    Let's see.  You also mentioned the oil and gas

04:51    3    industry.

04:51    4            How are DJI's drones used in the oil and gas

04:51    5    industry?

04:51    6        A.    Yeah.  It's used mostly for inspection

04:51    7    purposes.  Whereas they were using maybe different

04:51    8    tools at the time and maybe weren't the safest way to

04:51    9    kind of inspect oil and gas, now they use a drone.

04:51    10            Some of our drones in the commercial space

04:51    11    actually have zoom cameras so you don't need to fly too

04:51    12    close.  You can actually just zoom in, record video,

04:51    13    and then actually share that out with the team.  If

04:51    14    there's any kind of leaks or issues, they can then

04:51    15    bubble that up and have a repair team go out and fix

04:52    16    whatever they need to.

04:52    17        Q.    You also mentioned that the drones are used in

04:52    18    public safety, police and fire departments; is that

04:52    19    right?

04:52    20        A.    That's right.

04:52    21        Q.    Are DJI's drones used by any police or fire

04:52    22    departments here in Texas?

04:52    23        A.    Yes.  They are.

04:52    24            MR. JAKES:  If we could return to the

04:52    25    demonstratives and look at -- I think it's 1-4.

626

BY MR. JAKES:

04:52    Q.    What are some of the public safety, police and
04:52    fire departments in Texas that use DJI's drones?
04:52    A.    Yeah.  Looks like Belton Fire Department,
04:52    Temple Police, Waco Police, the Sheriff's Office,
04:52    Austin-Travis County EMS and Dallas Police, just to
04:52    name a few on this list.
04:52    Q.    So let's talk about the fire departments.
04:52          How do the fire departments use DJI's drones?
04:52    A.    I think when they arrive on site, if there's,
04:52    let's say, a fire at a home, they put it up.  It's,
04:52    like, one of the first things that they do; they put it
04:52    up.  And it's, again, an eye in the sky.
04:52          They can then coordinate with the teams down
04:53    below on how to approach the fire itself, see if
04:53    there's anybody inside.  Again, we have different
04:53    cameras for different use cases.  That particular use
04:53    case, they'll use a thermal camera.  Maybe they'll see
04:53    hotspots within the house itself and areas where they
04:53    can attack the fire or tackle the fire before going in.
04:53    Q.    How about search and rescue?
04:53          How are DJI's drones used for search and
04:53    rescue?
04:53    A.    Missing persons, mostly.  They can deploy, you
04:53    know, two-man teams on the ground and have multiple

627

04:53  1    drones out at once doing large area searches.  Again,

04:53  2    they can use thermal cameras.  So if it was a night

04:53  3    search, they could look for heat signatures and try to

04:53  4    find somebody.  And they actually have been used in

04:53  5    those use cases.

04:53  6        Q.    Have DJI's drones improved search and rescue

04:53  7    operations in any way?

04:53  8        A.    Yes.  And one of the key facts that I know is

04:53  9    they've cut down the time in half to find somebody,

04:53  10   which in the search and rescue industry I think that's

04:54  11   huge.

04:54  12       Q.    And what about in terms of cost?

04:54  13       A.    It'd probably be a tenth of the cost to deploy

04:54  14   a UAV or drone in that situation.

04:54  15       Q.    Do you have any idea how many times DJI's

04:54  16   drones have been used as part of a successful rescue?

04:54  17       A.    I don't know the exact number.  I know it's

04:54  18   hundreds and that's all around the world.

04:54  19       Q.    All right.  Have DJI's drones also been used

04:54  20   for television and film?

04:54  21       A.    Yes.  They have.

04:54  22       Q.    Okay.

04:54  23             MR. JAKES:  Let's look at the next

04:54  24   demonstrative, 1-5.

      25   BY MR. JAKES:

628

04:54    1    Q.    What's shown on this demonstrative exhibit?

04:54    2    A.    These are just some of the film and television

04:54    3    shows that have used our products.  So Yellowstone,

04:54    4    Star Wars Mandalorian, MythBusters, Dancing with the

04:54    5    Stars, Game of Thrones.  They've all used them at one

04:54    6    point or another.

04:54    7    Q.    Has DJI won any awards for its innovative

04:54    8    drone technology?

04:54    9    A.    Yes.  We have.

04:54    10            MR. JAKES:  Let's look at the next

04:54    11    demonstrative.

         12    BY MR. JAKES:

04:55    13    Q.    What does this demonstrative exhibit show,

04:55    14    1-6?

04:55    15    A.    Yeah.  These are just some of our awards that

04:55    16    we've won over the years.  The more notable ones, it

04:55    17    looks like.

04:55    18    Q.    What are some of these awards?

04:55    19    A.    We've won a couple awards from Time Magazine

04:55    20    on being one of the most influential companies.  I

04:55    21    think we won that two years in a row.  CNET gave us the

04:55    22    Best of Drones.  And if you look at the top right

04:55    23    corner, we actually won an Emmy for Technology and

04:55    24    Engineering.

04:55    25    Q.    As someone who works in marketing and sales,

629

04:55  1    are you familiar with DJI's competitors and its

04:55  2    position in the market?

04:55  3         A.    Yes.

04:55  4         Q.    Who are some of DJI's competitors in the drone

04:55  5    market?

04:55  6         A.    I think the more notable ones are Autel

04:55  7    Robotics and Skydio.

04:55  8         Q.    Is Textron or Bell Helicopter, are they one of

04:55  9    DJI's competitors?

04:55  10        A.    No.

04:55  11        Q.    As someone who had worked -- who works in

04:55  12   marketing and sales, had you heard of Textron or Bell

04:55  13   Helicopter before this suit?

04:55  14        A.    Not before this suit, no.

04:56  15        Q.    Does DJI design and sell drones for military

04:56  16   use?

04:56  17        A.    We do not.

04:56  18        Q.    Does DJI have a company policy on its drones

04:56  19   and whether they're designed for military use?

04:56  20        A.    Yes.  We do.  I think it's also publicly

04:56  21   available.

04:56  22        Q.    Yeah.  Is that a written policy?

04:56  23        A.    It is, yes.

04:56  24             MR. JAKES:  Mr. Fisher, could we see

04:56  25   Defendants' Exhibit 796?

630

| | | |
|---|---|---|
| 04:56 | 1 | And this is just for demonstrative |
| 04:56 | 2 | purposes. |
| 04:56 | 3 | BY MR. JAKES: |
| 04:56 | 4 | Q.   So what is shown on this demonstrative exhibit |
| 04:56 | 5 | that we've put on the screen here? |
| 04:56 | 6 | A.   It's our statement on military use of drones. |
| 04:56 | 7 | Q.   And this statement has been posted on DJI's |
| 04:56 | 8 | website? |
| 04:56 | 9 | A.   That's correct. |
| 04:56 | 10 | Q.   What's the date of this statement? |
| 04:56 | 11 | A.   April 21, 2022. |
| 04:57 | 12 | Q.   Now, if we could look at the statement at the |
| 04:57 | 13 | end of the second paragraph, it says:  DJI has only |
| 04:57 | 14 | ever made products for civilian use.  They are not |
| 04:57 | 15 | designed for military applications. |
| 04:57 | 16 | Do you see that? |
| 04:57 | 17 | A.   Yes.  I do. |
| 04:57 | 18 | Q.   Is that your understanding of the company's |
| 04:57 | 19 | position on military use of its drones? |
| 04:57 | 20 | A.   Yes.  It is. |
| 04:57 | 21 | Q.   Then there are four bullet points that follow |
| 04:57 | 22 | that. |
| 04:57 | 23 | Could you read those to us, please? |
| 04:57 | 24 | A.   Sure. |
| 04:57 | 25 | DJI does not market or sell our products for |

631

04:57   1   military use.

04:57   2          DJI does not provide after-sales services for

04:57   3   products that have been identified as being used for

04:57   4   military purposes.

04:57   5          DJI has unequivocally opposed attempts to

04:57   6   attach weapons to our products.

04:57   7          DJI has refused to customize or enable

04:57   8   modifications that would enable our products for

04:57   9   military use.

04:57   10      Q.    Is that your understanding of the company's

04:57   11  policy on military use of its drones?

04:57   12      A.    Yes.  That's my understanding.

04:57   13      Q.    Does DJI have any control over these of its

04:58   14  drones after they're sold?

04:58   15      A.    Unfortunately, we don't.

04:58   16      Q.    So according to the company's policy, what

04:58   17  happens if one of its resellers or partners plans to

04:58   18  use the drones for military use or modify them for

04:58   19  military use?  What happens?

04:58   20      A.    We would terminate that contract with them.

04:58   21      Q.    All right.  So let's continue talking about

04:58   22  DJI's position in the drone market.  What is DJI's

04:58   23  position in the industry?

04:58   24      A.    We're the market leader.  We own about

04:58   25  70 percent of the market share.

632

04:58    1        Q.    How does that compare to the competitors that

04:58    2    you mentioned?

04:58    3        A.    Again, no one competitor owns more than 5

04:58    4    percent of the market share.  So we're very dominant in

04:58    5    that space.  I think it's mostly because of, again, all

04:58    6    the innovation that we've had over the years.

04:58    7        Q.    How would you say DJI's drones compare to the

04:58    8    competitors' drones?

04:58    9        A.    We have better, you know, battery specs,

04:59   10    better camera specs, more form-fitting products,

04:59   11    obviously, like this one here.  It's very, very small.

04:59   12    We've integrated screens now within our remote

04:59   13    controllers making it a little bit easier to use.

04:59   14              Our software is very simplified, and that's a

04:59   15    big winner for most people.  There's a lot of safety

04:59   16    aspects built around the drone like our obstacle

04:59   17    avoidance sensors that I mentioned earlier.  Those are

04:59   18    just a few different ways that we do it.

04:59   19        Q.    Now, we've talked about the cameras.

04:59   20              And how important to DJI's drones are the

04:59   21    cameras?

04:59   22        A.    I think they're one of the more important

04:59   23    features.

04:59   24        Q.    Does your employer, DJI Creative Studios, sell

04:59   25    drones in the U.S.?

633

04:59  1       A.    No.

04:59  2       Q.    Who actually makes the sales in the U.S.?

04:59  3       A.    So for my account, Apple, we work with DJI

04:59  4  Service, which is another company within the DJI brand.

04:59  5       Q.    Okay.  Is DJI Service a U.S. or a foreign

04:59  6  company?

04:59  7       A.    They're a U.S. company.

04:59  8       Q.    And to your understanding, DJI Service is not

05:00  9  a party to this lawsuit, is it?

05:00  10      A.    That's my understanding, yes.

05:00  11      Q.    So using Apple as an example, how are the

05:00  12  actual sales made by DJI Service?

05:00  13      A.    Yeah.  So when Apple places a purchase order

05:00  14  agreement with us, that's sent over to me.  I then

05:00  15  upload it into a dock or a system internally.  And then

05:00  16  a warehouse down in Southern California, DJI Service,

05:00  17  then will allocate the product, put it on a pallet,

05:00  18  wrap it up and ship it to the different Apple hubs in

05:00  19  the United States.

05:00  20      Q.    Okay.  So we talked about the company you

05:00  21  worked for, DJI Creative Studios.  We talked about DJI

05:00  22  Service.  What are some of the other companies that are

05:00  23  affiliated with the DJI global brand?

05:00  24            And let's start with DJI Industrial.

05:00  25      A.    Yeah.  So DJI Industrial, it's like Service.

634

05:00  1   It sells products in the United States.  They handle

05:00  2   the commercial drones sales of our products.

05:00  3       Q.   Is DJI Industrial a U.S. company?

05:01  4       A.   It is.

05:01  5       Q.   And so could you name some of the products

05:01  6   that DJI Industrial sells in the U.S.?

05:01  7       A.   The Matrice or M30s, some of the Mavic

05:01  8   enterprise drones.

05:01  9       Q.   And those are used for some of the examples we

05:01  10  talked about earlier?

05:01  11      A.   That's correct.

05:01  12      Q.   Does DJI Industrial sell drones for military

05:01  13  use?

05:01  14      A.   We do not.

05:01  15      Q.   Let's see.  Another DJI affiliated company is

05:01  16  Saikoron.  Are you familiar with Saikoron?

05:01  17      A.   Yes.

05:01  18      Q.   So what does the company Saikoron do?

05:01  19      A.   They fulfill for the store, dji.com website.

05:01  20  So when you go on to our website and want to purchase a

05:01  21  drone in the United States, that's the website that

05:01  22  then fulfills those orders.

05:01  23      Q.   So could you just explain to us, if a customer

05:01  24  in the U.S. orders a drone directly from the dji.com

05:01  25  website, that drone is actually sold by Saikoron; is

635

05:02    1    that right?

05:02    2        A.    That's correct.

05:02    3        Q.    How does that work?

05:02    4        A.    Well, it's -- whatever country you're in

05:02    5    whenever you make the buy/purchase button, it will kind

05:02    6    of redirect you to the store page, where you then put

05:02    7    it in the cart.  And for the U.S., it's actually

05:02    8    Saikoron that fulfills those orders.

05:02    9        Q.    In your position in marketing and sales, are

05:02    10   you generally aware of U.S. drone sales through

05:02    11   dji.com?

05:02    12       A.    Can you repeat that?

05:02    13       Q.    Sure.  Just in your position in sales and

05:02    14   marketing, are you generally aware of the sales through

05:02    15   the website dji.com?

05:02    16       A.    Yeah.  Generally aware.

05:02    17       Q.    Yeah.  And how much of DJI's drone sales in

05:02    18   the U.S. comes in directly through the dji.com website?

05:02    19       A.    It ranges between 16 and 24 percent.

05:02    20       Q.    Okay.  Another DJI affiliated company is SZ

05:02    21   DJI Technology.  Are you familiar with this company?

05:03    22       A.    Yes.

05:03    23       Q.    And what does SZ DJI Technology do?

05:03    24       A.    They're the research and development team that

05:03    25   design and -- design the drones.

636

05:03  1        Q.    Do you know how many engineers, for example,

05:03  2  work at SZ DJI?

05:03  3        A.    I don't know the exact number.  I know it's in

05:03  4  the thousands.

05:03  5        Q.    Does SZ DJI also maintain the dji.com website

05:03  6  where the customers can order DJI drones?

05:03  7        A.    The regular website, yes, with all the photos

05:03  8  and marketing materials, specs on the products.  Yes.

05:03  9        Q.    But does SZ DJI Technology, do they actually

05:03  10  sell the drones that are ordered through the website?

05:03  11        A.    No.

05:03  12        Q.    That depends on where the customer's located;

05:03  13  is that right?

05:03  14        A.    That's right.

05:03  15        Q.    And so in the U.S., that order's fulfilled

05:03  16  through Saikoron?

05:03  17        A.    That's correct.

05:03  18        Q.    Another DJI-affiliated company is Baiwang.

05:03  19              Are you familiar with Baiwang?

05:04  20        A.    Yes.

05:04  21        Q.    And what is Baiwang?

05:04  22        A.    They're one of the other DJI companies under

05:04  23  the DJI brand.

05:04  24        Q.    What does -- what role does Baiwang play in

05:04  25  the global structure?

637

| 05:04 | 1 | A. They're the manufacturer of all the products. |
| 05:04 | 2 | Q. Does Baiwang make or sell drones in the U.S.? |
| 05:04 | 3 | A. No. |
| 05:04 | 4 | Q. How do the drones made by Baiwang make it to |
| 05:04 | 5 | the U.S.? |
| 05:04 | 6 | A. There is an agreement there where Baiwang will |
| 05:04 | 7 | sell the drones to our -- another company called |
| 05:04 | 8 | iFlight, and then iFlight sells them to the U.S. |
| 05:04 | 9 | companies. There's a transaction made in China, and |
| 05:04 | 10 | then the U.S. companies will then import them to the |
| 05:04 | 11 | United States. |
| 05:04 | 12 | Q. So you mentioned iFlight. What is iFlight? |
| 05:04 | 13 | A. iFlight is the parent company of the DJI |
| 05:04 | 14 | brand. |
| 05:04 | 15 | Q. Does iFlight import or sell drones in the |
| 05:04 | 16 | U.S.? |
| 05:04 | 17 | A. No. |
| 05:04 | 18 | Q. Could iFlight import drones for sale in the |
| 05:04 | 19 | U.S.? |
| 05:04 | 20 | A. No. |
| 05:04 | 21 | Q. So I think you said drones are imported and |
| 05:04 | 22 | sold in the U.S. through three companies: DJI Service, |
| 05:05 | 23 | DJI Industrial and Saikoron; is that right? |
| 05:05 | 24 | A. That's right. |
| 05:05 | 25 | Q. Thank you. |

638

| | | |
|---|---|---|
| 05:05 | 1 | MR. JAKES:  I have no further questions. |
| 05:05 | 2 | THE COURT:  Cross? |
| 05:05 | 3 | MR. MEEK:  Permission to approach the |
| 05:05 | 4 | witness, Your Honor? |
| 05:05 | 5 | CROSS-EXAMINATION |
| 05:05 | 6 | BY MR. MEEK: |
| 05:05 | 7 | Q.    Mr. Oushana, my name's Kevin Meek.  Am I |
| 05:06 | 8 | saying your name right? |
| 05:06 | 9 | A.    Yes.  You are. |
| 05:06 | 10 | Q.    Thank you.  Appreciate it. |
| 05:06 | 11 | Other than the two hired experts for DJI, |
| 05:06 | 12 | you're the only person that's going to testify live for |
| 05:06 | 13 | DJI in this trial; is that correct? |
| 05:06 | 14 | A.    I think so.  Yes. |
| 05:06 | 15 | Q.    And you're not an officer at DJI, correct? |
| 05:06 | 16 | A.    That's correct. |
| 05:06 | 17 | Q.    And you don't work for any of the named |
| 05:06 | 18 | defendants in this lawsuit, do you? |
| 05:06 | 19 | A.    I think so.  Yeah. |
| 05:06 | 20 | Q.    And Mr. Baker doesn't work for any of the |
| 05:06 | 21 | named defendants over here either? |
| 05:06 | 22 | A.    That's correct. |
| 05:06 | 23 | Q.    And for whatever reasons, we're not going to |
| 05:06 | 24 | hear Mr. Baker tell his story about being a fire chief |
| 05:06 | 25 | or anything like that, right? |

639

| | | |
|---|---|---|
| 05:06 | 1 | A.    I think I'm just -- yeah.  I'm the only one |
| 05:06 | 2 | that's testifying. |
| 05:06 | 3 | Q.    Are you the highest ranked member of DJI |
| 05:06 | 4 | that's in the United States? |
| 05:06 | 5 | A.    No. |
| 05:06 | 6 | Q.    Who's that? |
| 05:06 | 7 | A.    I don't think we actually have a highest |
| 05:06 | 8 | member.  We're pretty -- we run pretty flat as an |
| 05:06 | 9 | organization. |
| 05:06 | 10 | Q.    So you tie with everybody else or is there |
| 05:06 | 11 | somebody else that's -- |
| 05:06 | 12 | A.    There are people that have been here longer so |
| 05:07 | 13 | we treat them with a little bit more seniority, but I |
| 05:07 | 14 | don't think there's an actual, you know, officer or |
| 05:07 | 15 | leader. |
| 05:07 | 16 | Q.    You don't make any decisions for DJI about the |
| 05:07 | 17 | technology that's implemented on the drones, correct? |
| 05:07 | 18 | A.    That's correct. |
| 05:07 | 19 | Q.    And you don't make any decisions for DJI about |
| 05:07 | 20 | licensing intellectual property or anything like that, |
| 05:07 | 21 | right? |
| 05:07 | 22 | A.    We -- I have done a licensing deal years ago |
| 05:07 | 23 | with a company, a backpack company, and I was in charge |
| 05:07 | 24 | of that. |
| 05:07 | 25 | Q.    And you made the decision on that licensing? |

640

05:07    1        A.    Yes.

05:07    2        Q.    Okay.  Do you -- you don't make any decisions

05:07    3    for DJI about pricing anything, do you?

05:07    4        A.    No.

05:07    5        Q.    And you don't have any experience with how the

05:07    6    drones work at a technical level, right?

05:07    7        A.    Not super technical.  Yes.

05:07    8        Q.    Okay.  And I think I heard your job is a key

05:07    9    accounts manager?

05:07   10        A.    That's correct.

05:07   11        Q.    And that's -- there's about a dozen key

05:07   12    account managers at DJI, right?

05:07   13        A.    About that.  Yeah.

05:07   14        Q.    And you have one account which is Apple.  I

05:08   15    think you said you might start doing business with Best

05:08   16    Buy, but right now it's just Apple; is that correct?

05:08   17        A.    That's correct.

05:08   18        Q.    When you talk to Apple, you represent yourself

05:08   19    as DJI, not any particular piece of DJI, right?

05:08   20        A.    Yes.

05:08   21        Q.    And your job is essentially to receive new

05:08   22    drones and try to convince Apple to buy those drones,

05:08   23    right?

05:08   24        A.    Drones and gimbals.  We also make handheld

05:08   25    gimbals for phones.

641

| | | |
|---|---|---|
| 05:08 | 1 | Q.    Okay.  And if Apple tells you about a feature |
| 05:08 | 2 | that they want, you don't even pass that on to the |
| 05:08 | 3 | technical people, do you? |
| 05:08 | 4 | A.    I do not. |
| 05:08 | 5 | Q.    Okay.  I think we heard that Mr. Frank Wang is |
| 05:08 | 6 | the founder of DJI; is that right? |
| 05:08 | 7 | A.    That's right. |
| 05:08 | 8 | Q.    And do you know how old Mr. Wang is? |
| 05:08 | 9 | A.    He must be in his 40s now. |
| 05:08 | 10 | Q.    He was born in 1980, correct? |
| 05:08 | 11 | A.    I don't know that exact date, but yeah.  I |
| 05:08 | 12 | think he's in his 40s. |
| 05:08 | 13 | Q.    Okay.  DJI made Mr. Wang a billionaire; is |
| 05:09 | 14 | that correct? |
| 05:09 | 15 | A.    I believe that's correct. |
| 05:09 | 16 | Q.    You've heard Mr. Wang referred to as the first |
| 05:09 | 17 | drone billionaire? |
| 05:09 | 18 | A.    I've seen that in one of the headlines of an |
| 05:09 | 19 | article.  Yes. |
| 05:09 | 20 | Q.    Mr. Wang is a resident of China; is that |
| 05:09 | 21 | right? |
| 05:09 | 22 | A.    That's right. |
| 05:09 | 23 | Q.    Do you know where in China he is? |
| 05:09 | 24 | A.    Shenzhen. |
| 05:09 | 25 | Q.    He's in Shenzhen? |

642

05:09  1              But you live in California, right?

05:09  2      A.    Yes.

05:09  3      Q.    Have you ever met Mr. Wang?

05:09  4      A.    No.

05:09  5      Q.    Does he travel to the United States ever?

05:09  6      A.    Not to my knowledge.

05:09  7      Q.    Why not?

05:09  8      A.    That, I don't know.

05:09  9      Q.    Is there any reason why he couldn't be here

05:09  10  with us today?

05:09  11     A.    I don't know.

05:09  12     Q.    Okay.  DJI's business is selling just

05:09  13  DJI-branded drones, right?  They don't sell anybody

05:09  14  else's, right?

05:09  15     A.    That's correct.

05:09  16     Q.    And DJI started selling drones in the United

05:09  17  States about 2012 with the Phantom; is that right?

05:09  18     A.    Yes.

05:09  19     Q.    And DJI expects some of its products that are

05:09  20  purchased in the U.S. to be used in the U.S., correct?

05:09  21     A.    I'm not sure if that's an expectation.  I

05:10  22  mean, myself, for instance, I've used them all around

05:10  23  the world.

05:10  24     Q.    You've never used your drones that you've

05:10  25  purchased or that you have, you've never used them in

643

05:10    1    the United States?

05:10    2        A.    I have.

05:10    3        Q.    Okay.  So at least some of the use would be in

05:10    4    the country of the purchaser, right?

05:10    5        A.    Sure.

05:10    6        Q.    Okay.  Every single accused DJI drone that DJI

05:10    7    sells into the United States comes through iFlight's

05:10    8    hands; is that right?

05:10    9        A.    I'm not sure if it's from iFlight's hands.  I

05:10    10   don't know how that would work.  We import them in

05:10    11   through the three companies that I mentioned earlier.

05:10    12       Q.    Didn't you testify that Baiwang is the

05:10    13   manufacturer --

         14        A.    Yep.

05:10    15       Q.    -- then goes to iFlight, who then sends them

05:10    16   to the three companies you mentioned; isn't that

05:10    17   correct?

05:10    18       A.    Yes.  Yes.

05:10    19       Q.    So in that context, everything would at least

05:10    20   go through iFlight, correct?

05:10    21       A.    Yes.

05:10    22       Q.    Okay.  And those companies are -- and I'm --

05:10    23   can't -- no way I'm going to say this right --

05:10    24   Saikoron?

05:10    25       A.    Yeah.  I don't even know the --

644

| | | |
|---|---|---|
| 05:10 | 1 | Q.    Let's just agree -- |
| 05:10 | 2 | A.    -- exact pronunciation.  Saikoron. |
| 05:10 | 3 | Q.    Saikoron? |
| 05:10 | 4 | A.    Saikoron. |
| 05:10 | 5 | Q.    Saikoron. |
| 05:11 | 6 | A.    Yeah. |
| 05:11 | 7 | Q.    And then Services, I do know how to say that. |
| 05:11 | 8 | A.    Sure. |
| 05:11 | 9 | Q.    And then Industrial, right? |
| 05:11 | 10 | A.    Yes. |
| 05:11 | 11 | Q.    And those that -- those sales that go from |
| 05:11 | 12 | Baiwang manufacturer to iFlight and then to these three |
| 05:11 | 13 | companies, those continue today; is that right? |
| 05:11 | 14 | A.    That's right. |
| 05:11 | 15 | Q.    Okay.  And historically, until recently, DJI |
| 05:11 | 16 | Europe, another company, they sold DJI-branded drones |
| 05:11 | 17 | into the United States, right? |
| 05:11 | 18 | A.    There was a short stint, yeah, where they did. |
| 05:11 | 19 | Q.    And those DJI drones also came from iFlight, |
| 05:11 | 20 | correct? |
| 05:11 | 21 | A.    I don't recall at this time. |
| 05:11 | 22 | Q.    Okay.  Hold on a second. |
| 05:11 | 23 | Sorry.  I get lost easily. |
| 05:11 | 24 | Okay.  Does all the products that Europe -- |
| 05:12 | 25 | that DJI Europe BV sell come from iFlight? |

645

| | | |
|---|---|---|
| 05:12 | 1 | A.    I don't know. |
| 05:12 | 2 | Q.    Okay.  Do you remember having your deposition |
| 05:12 | 3 | taken? |
| 05:12 | 4 | A.    I do. |
| 05:12 | 5 | MR. MEEK:  Could we get 82, 4 through 14, |
| 05:12 | 6 | please?  Okay.  Sorry.  That's, what, 68, 6 through 8. |
| 05:12 | 7 | The cite's on the top.  Line 6 through Line 8. |
| 05:12 | 8 | Thank you, Mr. Patterson. |
| 05:12 | 9 | BY MR. MEEK: |
| 05:12 | 10 | Q.    I took -- we took your deposition and we asked |
| 05:12 | 11 | you:  Does all the products that Europe -- that DJI |
| 05:12 | 12 | Europe BV sell come from iFlight? |
| 05:12 | 13 | And your answer was, sir? |
| 05:12 | 14 | A.    I believe so. |
| 05:12 | 15 | Q.    Thank you. |
| 05:13 | 16 | And you, yourself, in your business with Apple |
| 05:13 | 17 | as key accounts manager, you've ordered drones for |
| 05:13 | 18 | Apple while you were in the United States, right? |
| 05:13 | 19 | A.    I don't do the ordering.  No. |
| 05:13 | 20 | Q.    Okay.  Do the drones that Apple gets come |
| 05:13 | 21 | through the United States from iFlight? |
| 05:13 | 22 | A.    They do. |
| 05:13 | 23 | Q.    Okay. |
| 05:13 | 24 | A.    Not from iFlight, though.  Through one of the |
| 05:13 | 25 | service providers, sir.  Yeah.  Service. |

646

| | | |
|---|---|---|
| 05:13 | 1 | Q.    You're right.  It goes iFlight, Services, then |
| 05:13 | 2 | goes to -- |
| 05:13 | 3 | A.    That's right. |
| 05:13 | 4 | Q.    -- Apple, right? |
| 05:13 | 5 | A.    Yeah. |
| 05:13 | 6 | Q.    Thank you. |
| 05:13 | 7 | The products that iFlight sells through these |
| 05:13 | 8 | entities are all from DJI Baiwang, right? |
| 05:13 | 9 | They're made at DJI Baiwang, right? |
| 05:13 | 10 | A.    All the products are manufactured by DJI |
| 05:13 | 11 | Baiwang. |
| 05:13 | 12 | Q.    And at DJI Baiwang, the products are made and |
| 05:13 | 13 | they're actually packaged and the manuals are put in |
| 05:13 | 14 | and the cardboard box is shut? |
| 05:14 | 15 | A.    I don't know to that level of detail. |
| 05:14 | 16 | Q.    Okay.  So the manuals that are received -- or |
| 05:14 | 17 | the boxes that are received by the DJI Services/DJI |
| 05:14 | 18 | Industrial, those things already have the manuals in |
| 05:14 | 19 | them, right? |
| 05:14 | 20 | A.    They do.  Yeah. |
| 05:14 | 21 | MR. MEEK:  Let's put up PX -- Plaintiff's |
| 05:14 | 22 | 95. |
| | 23 | BY MR. MEEK: |
| 05:14 | 24 | Q.    Mr. Oushana, do you recognize this document? |
| 05:14 | 25 | A.    Let me just take a look. |

647

05:14  1         It looks vaguely familiar.  Again, I've

05:14  2  reviewed a lot of documents over the course of this

05:14  3  whole thing.

05:14  4      Q.    I think this is an agreement between iFlight

05:14  5  and Saikoron governing sales between iFlight and

05:14  6  Saikoron; is that correct?

05:14  7      A.    That looks to be correct.

05:15  8      Q.    And Saikoron, of course, is a DJI entity,

05:15  9  correct?

05:15  10     A.    Yes.

05:15  11     Q.    Okay.  Are sales agreements like this typical

05:15  12 between the iFlight entity and the distribution entity

05:15  13 in the United States?

05:15  14     A.    I don't know it to that level of detail.  I

05:15  15 don't sign these contracts myself so I don't have much

05:15  16 experience with these.

05:15  17     Q.    Do you have any reason to doubt that this is a

05:15  18 correct copy of a distribution agreement between

05:15  19 Saikoron and iFlight?

05:15  20     A.    No.

05:15  21             MR. MEEK:  Your Honor, we move to admit

05:15  22 PTX-095.

05:15  23             MR. JAKES:  No objection.

05:15  24             THE COURT:  Admitted.

05:15  25 BY MR. MEEK:

05:15    1          Q.    And iFlight has similar agreements with DJI

05:15    2    Services and DJI Industrial; is that correct?

05:15    3          A.    I don't know for sure.  So if you'd show me

05:15    4    them, then I can see.

05:15    5          Q.    Let's get through this one first.

05:15    6          A.    Okay.

05:15    7          Q.    iFlight has, in fact, sold DJI drones to

05:15    8    Saikoron, correct?

05:15    9          A.    I don't know if they've -- is that what it

05:16    10    says here?

05:16    11          Q.    Oh, I thought you testified earlier with

05:16    12    Mr. Jakes that iFlight sells drones to Saikoron, DJI

05:16    13    Services and DJI Industrial?

05:16    14          A.    Yes.  That's correct.

05:16    15          Q.    Okay.  So, in fact, iFlight has sold DJI

05:16    16    drones under this agreement to Saikoron?

05:16    17          A.    Okay.

05:16    18          Q.    Okay.  And according to this face of this

05:16    19    agreement, Saikoron is based in Delaware; is that

05:16    20    right?

05:16    21                    MR. MEEK:  Can you highlight that?

05:16    22          A.    That's correct.

         23    BY MR. MEEK:

05:16    24          Q.    New Castle County?

05:16    25          A.    Yes.

649

| | | |
|---|---|---|
| 05:16 | 1 | Q.    You see that? |
| 05:16 | 2 | A.    Yes. |
| 05:16 | 3 | Q.    And Delaware is in the United States, correct? |
| 05:16 | 4 | A.    Yes. |
| 05:16 | 5 | MR. MEEK:  Let's pull up PX-473. |
| 05:16 | 6 | And we can go to the next page.  Thank |
| | 7 | you very much. |
| 05:16 | 8 | BY MR. MEEK: |
| 05:16 | 9 | Q.    Who is -- this is an agreement between DJI |
| 05:16 | 10 | Industrial and 4Rivers Equipment. |
| 05:16 | 11 | Do you see that? |
| 05:16 | 12 | A.    I do. |
| 05:16 | 13 | Q.    Who is 4Rivers Equipment? |
| 05:17 | 14 | A.    I don't know. |
| 05:17 | 15 | Q.    And DJI Industrial is one of the three |
| 05:17 | 16 | companies that you mentioned receives things from |
| 05:17 | 17 | iFlight, correct? |
| 05:17 | 18 | A.    Correct. |
| 05:17 | 19 | Q.    According to this agreement, is 4Rivers |
| 05:17 | 20 | located in the United States? |
| 05:17 | 21 | A.    It says Colorado. |
| 05:17 | 22 | Q.    Which is in the United States, right? |
| 05:17 | 23 | A.    Yeah. |
| 05:17 | 24 | Q.    Does DJI have any other U.S. suppliers, like |
| 05:17 | 25 | 4Rivers, that are underneath the Industrial, Services |

650

05:17  1    and Saikoron?

05:17  2        A.    Not to my knowledge.  But yeah, again, I've

05:17  3    never seen this contract.  So yeah.

05:17  4        Q.    Okay.

05:17  5              MR. MEEK:  Let's go to Page 22 of the

05:17  6    contract.

05:17  7    BY MR. MEEK:

05:17  8        Q.    Do you recognize this list, Mr. Oushana?

05:17  9        A.    These look like some of our products.  Yes.

05:17  10       Q.    These are DJI products?

05:17  11       A.    Yes.

05:17  12       Q.    These are, in fact, DJI drones that are to be

05:17  13   sold by 4Rivers?

05:17  14       A.    It looks to be a product list.  I'm not sure

05:18  15   who 4Rivers is, so I wouldn't be able to answer that.

05:18  16       Q.    Okay.

05:18  17             MR. MEEK:  If we could go back to the

05:18  18   first page.  I think it's the second page, actually.

05:18  19   And could you highlight the "affiliates" definition,

05:18  20   please?

      21   BY MR. MEEK:

05:18  22       Q.    Do you see that:  Affiliate means any person,

05:18  23   corporation or other entity controlled by, controlling,

05:18  24   or under common control with the company?

05:18  25             Do you see that?

651

05:18  1          A.    I do see that.

05:18  2          Q.    And it's true, is it not, that iFlight is an

05:18  3   affiliate of DJI Industrial?  Isn't that correct?

05:18  4          A.    It's another brand -- a company within the

05:18  5   brand of DJI.

05:18  6          Q.    In fact, it is either controlled by,

05:18  7   controlling or in common control with each other,

05:18  8   correct?

05:18  9          A.    That, I don't know.

05:18  10         Q.    If they are sister companies within or if

05:18  11  iFlight is above, that would make them affiliates under

05:18  12  this definition, correct?

05:18  13         A.    That would be a little bit more advanced than

05:19  14  what I'm comfortable agreeing to.  That's more of a

05:19  15  legal question.

05:19  16         Q.    Okay.

05:19  17              MR. MEEK:  Let's go to the top again.

05:19  18  The "parties to the agreements," the first line there.

05:19  19              Thank you very much, Mr. Patterson.

05:19  20  BY MR. MEEK:

05:19  21         Q.    The party is DJI Industrial together with all

05:19  22  its affiliates.

05:19  23              Do you see that?

05:19  24         A.    Yes.

05:19  25         Q.    So, in fact, if iFlight is an affiliate of DJI

652

05:19  1    Industrial, iFlight is a party to this agreement,

05:19  2    correct?

05:19  3        A.    This question is maybe posed to more of a

05:19  4    legal person representative of the company.  Within my

05:19  5    scope of work, I don't really work on these dealer

05:19  6    agreements like this, so it's hard for me to give you

05:19  7    an answer.

05:19  8        Q.    Okay.  You don't know whether 4Rivers has

05:19  9    ordered drones or sold drones under this agreement?

05:19 10        A.    I don't know.

05:19 11        Q.    Okay.  Shifting -- you said earlier that DJI

05:19 12    drones, at least currently, are used to inspect power

05:19 13    lines.

05:19 14              Do you remember saying that?

05:20 15        A.    Oil and gas.

05:20 16        Q.    Oil and gas.

05:20 17        A.    Yeah.

05:20 18        Q.    Do you know whether DJI drones are used to

05:20 19    inspect power lines?

05:20 20        A.    I've heard that.

05:20 21        Q.    You have?

05:20 22        A.    Yeah.

05:20 23        Q.    In both of those cases, how was that work done

05:20 24    before DJI drones were used?

05:20 25        A.    That, I don't know.

653

05:20  1       Q.    Would it surprise you to know that that work

05:20  2   was done by helicopters?

05:20  3       A.    Yeah.  I would think maybe a cherry-picker or

05:20  4   something like that.

05:20  5       Q.    A cherry-picker can --

05:20  6       A.    Yeah.  Just my guess.

05:20  7       Q.    -- inspect an oil and gas platform?

05:20  8       A.    Oh, we're going back and forth now.  I thought

05:20  9   you said power line.

05:20  10      Q.    Okay.  You're right.  You're right.  Let's

05:20  11  get -- so a power line.

05:20  12      A.    Yeah.

05:20  13      Q.    A DJI drone can inspect a power line, and you

05:20  14  don't think that a helicopter could do that job?

05:20  15      A.    I would think it might be a little unsafe to

05:20  16  fly next to a power line with a helicopter.  That's

05:20  17  just my opinion.

05:20  18      Q.    Is it safe to fly a DJI drone near a power

05:20  19  line and not safe to fly a helicopter near a power

05:20  20  line?

05:20  21      A.    DJI drone's unmanned.  So if there was

05:21  22  something, no person would be hurt hopefully.

05:21  23      Q.    Were you here when Mr. Runstadler testified?

05:21  24      A.    I was not.

05:21  25      Q.    Okay.  Okay.  If the DJI drone is being used

05:21   1   for a job that a helicopter is being used for and that

05:21   2   helicopter's not used anymore, that makes the

05:21   3   helicopter seller and DJI competitors.

05:21   4          Maybe not direct competitors, but indirect

05:21   5   competitors, right?

05:21   6   A.   I didn't have any prior knowledge that

05:21   7   helicopters are used for those types of things, so I --

05:21   8   yeah.  I don't know.

05:21   9   Q.   Okay.  Shifting gears a little bit.

05:21   10          The hover function makes DJI's drones easier

05:21   11   to fly, doesn't it?

05:21   12   A.   Yeah.  It makes them easier to fly.

05:21   13   Q.   Do you think that DJI drones would be able to

05:21   14   film all those neat movies and win all those awards if

05:22   15   they were not able to hover?

05:22   16   A.   Yes and no.

05:22   17   Q.   Please explain.

05:22   18   A.   Yeah.  Yes.  Because obviously you can take

05:22   19   really nice still imagery.

05:22   20          No.  Because you're moving and you're -- you

05:22   21   know, on some of our new drones, like our first-person

05:22   22   drones, you're kind of diving and rolling and doing all

05:22   23   sorts of things that don't involve hover, flying more

05:22   24   manually.

05:22   25          MR. MEEK:  Let's go back to the Saikoron

655

| | | |
|---|---|---|
| 05:22 | 1 | agreement.  I am going to find out -- PX-95. |
| 05:22 | 2 | And if you could go to Section 9.4, I'm |
| 05:22 | 3 | not sure what page. |
| 05:22 | 4 | And could you expand that? |
| 05:23 | 5 | BY MR. MEEK: |
| 05:23 | 6 | Q.    Mr. Oushana, can you see Section 9.4? |
| 05:23 | 7 | A.    Yes. |
| 05:23 | 8 | Q.    And it says:  If supplier -- and supplier in |
| 05:23 | 9 | this case is iFlight, correct? |
| 05:23 | 10 | A.    I would -- yeah.  I think so. |
| 05:23 | 11 | Q.    And then purchaser in this case would be |
| 05:23 | 12 | Saikoron, correct? |
| 05:23 | 13 | A.    This is the same document we just reviewed, |
| 05:23 | 14 | right? |
| 05:23 | 15 | Q.    Yes. |
| 05:23 | 16 | A.    Then yes. |
| 05:23 | 17 | Q.    Then yes.  Okay.  Thank you. |
| 05:23 | 18 | And if iFlight anticipates or is aware of any |
| 05:23 | 19 | situation which may possibly constitute an infringement |
| 05:23 | 20 | to any third party's intellectual property rights -- |
| 05:23 | 21 | the potential infringement -- it will immediately |
| 05:23 | 22 | notify Saikoron and make its best efforts to assist |
| 05:23 | 23 | Saikoron in taking measures to avoid any such potential |
| 05:23 | 24 | infringement. |
| 05:23 | 25 | Did I read that right? |

656

05:23  1         A.    Yeah.  I read it the same as you.

05:23  2         Q.    And DJI has done nothing to help Saikoron

05:24  3    avoid the infringement allegations in this case, have

05:24  4    they?

05:24  5         A.    That, I'm not aware of.

05:24  6         Q.    DJI has not taken any steps to avoid

05:24  7    infringement, correct?

05:24  8         A.    I'm not sure.

05:24  9         Q.    Let's go -- are there steps taken by DJI to

05:24  10   avoid infringement that are not listed in DJI's

05:24  11   response to Interrogatory No. 13?

05:24  12        A.    I don't know the answer to that.

05:24  13        Q.    Okay.

05:24  14              MR. MEEK:  Could we go to Page 280, Lines

05:24  15   7 through 12, of his deposition?  280:7-12.

05:24  16   BY MR. MEEK:

05:25  17        Q.    And we asked you:  Are there steps taken by

05:25  18   DJI to avoid infringement that are not listed in DJI's

05:25  19   response to Interrogatory No. 13?

05:25  20              And your answer was?

05:25  21        A.    I'm unaware of any steps taken.

05:25  22        Q.    Thank you.

05:27  23              Do you have any non-privileged facts to

05:27  24   disclose to the jury to support the idea that DJI does

05:27  25   not infringe the asserted patent?

657

05:27    1          A.    I don't.

05:27    2                    MR. MEEK:  Could we put up PTX-067?

05:27    3    BY MR. MEEK:

05:27    4          Q.    Have you seen this document before,

05:27    5    Mr. Oushana?

05:27    6          A.    I believe something like this was shown to me

05:27    7    during my deposition.

05:27    8          Q.    Okay.  It's a letter to Mr. John Wang of DJI

05:27    9    Technology from Mr. Noah Tevis of Bell Textron.

05:27    10                   Do you see that?

05:27    11         A.    I do.

05:27    12         Q.    Do you know Mr. Wang?

05:27    13         A.    I don't.

05:27    14         Q.    Apparently he's in New York.  The address is

05:27    15    in -- on Broadway in New York.

05:27    16                   Do you see that?

05:27    17         A.    I do see the address.  I don't know who that

05:27    18    individual is.  Again, I'm on the sales and marketing

05:27    19    team.  And yeah.  We have a small group of DJI Creative

05:27    20    Studios that we work with.

05:27    21         Q.    I understand.  But as we established earlier,

05:27    22    you're the only person from DJI we get to talk to.  So,

         23    if we could talk to somebody else, that'd be great.

         24                   But you remember I asked you whether there was

05:27    25    anybody else coming, and what'd you say?

658

05:27  1        A.    I don't think so.

05:27  2        Q.    As of 2019, because of this letter, DJI had

05:27  3   knowledge of the '909 patent, correct?

05:27  4        A.    That, I don't know.  Again, this is outside of

05:27  5   my scope being on the sales and marketing team.  I

05:27  6   don't deal with documents like this.

05:27  7        Q.    When did you personally learn about the

05:27  8   patents in the suit?

05:27  9        A.    The day of the deposition.

05:27  10       Q.    So you learned about the deposition on

05:27  11  October 28th, 2022, right?

05:27  12       A.    Yes.  Yes.

05:27  13       Q.    Nobody told you about the patents until the

05:27  14  day of your deposition?

05:27  15       A.    That's correct.

05:27  16       Q.    You testified on -- excuse me.

05:27  17             You testified for Mr. Jakes that you don't

05:27  18  think that DJI's a Chinese military company; is that

05:28  19  right?

05:28  20       A.    That's right.

05:28  21       Q.    Just a second.  I want to make sure.

05:28  22       A.    Sure.

05:28  23             MR. MEEK:  Mr. Patterson, could you

05:28  24  please bring up the Department statement on DJI?

05:28  25  BY MR. MEEK:

659

05:28    1          Q.    Have you seen this document before?

05:28    2          A.    If it was shown to me during the deposition,

05:28    3    then yes.

05:28    4          Q.    Okay.   The first sentence of -- this is dated

05:28    5    July 23rd, 2021, correct?

05:29    6          A.    Yes.   That's correct.

05:29    7          Q.    And the first sentence says:   The Department

05:29    8    of Defense position is that systems produced by DJI

05:29    9    pose potential threats to national security.

05:29   10          Do you see that?

05:29   11          A.    Yes.

05:29   12          Q.    And then going on down in the second

05:29   13    paragraph, there's a line that begins "in 2018."

05:29   14                   MR. MEEK:   Thank you, Mr. Patterson.

05:29   15    BY MR. MEEK:

05:29   16          Q.    In 2018, DoD issued a ban on the purchase and

05:29   17    use of all commercial off-the-shelf drones, regardless

05:29   18    of manufacturer, due to the cybersecurity concerns.

05:29   19          Do you see that?

05:29   20          A.    I do.   Yes.

05:29   21          Q.    And then finally at the end of the document,

05:29   22    there's a paragraph that says "mitigating."

05:29   23          Mitigating the threats posed by small UAS --

05:29   24    that's unmanned aerial systems -- including DJI systems

05:29   25    remains a priority across the department and DoD

660

05:29  1    continues to ensure existing policy remains current and

05:30  2    appropriately implemented.

05:30  3            Is that correct?

05:30  4    A.    That's what it says.

05:30  5    Q.    Does this mention the Chinese military?

05:30  6    A.    I didn't see any mention to the Chinese

05:30  7    military.

05:30  8    Q.    And it details a cybersecurity threat,

05:30  9    correct?

05:30  10   A.    Yes.

05:30  11   Q.    Do you know what cybersecurity is?

05:30  12   A.    Vaguely.

05:30  13   Q.    What is it?

05:30  14   A.    Yeah.  I wouldn't have an exact definition.

05:30  15   Something that's trying to, I don't know, penetrate a

05:30  16   firewall or -- yeah.  Get access to something.

05:30  17   Q.    Data going the wrong way, right?

05:30  18   A.    I'm not sure which way.  Yeah.

05:30  19           MR. MEEK:  Okay.  Could you bring up

05:30  20   Defense Exhibit 796?

05:30  21   BY MR. MEEK:

05:30  22   Q.    And this is DJI's statement that you spoke of

05:30  23   earlier, correct?

05:30  24   A.    That's correct.

05:30  25   Q.    And does this discuss DJI being -- DJI taking

661

05:31  1    measures to prevent cybersecurity risks?

05:31  2        A.    No.    This is a statement on the use of drones

05:31  3    for military use.

05:31  4        Q.    Okay.    So this doesn't have any mention of the

05:31  5    problems that the DoD actually has with DJI in the 2021

05:31  6    time frame, correct?

05:31  7        A.    That's correct.

05:31  8        Q.    Has DJI addressed the problem of potential

05:31  9    cybersecurity risks with the U.S. military?

05:31  10       A.    That, I'm unaware of.

05:31  11       Q.    Okay.

05:31  12             MR. MEEK:    In the second bullet there,

05:31  13   Mr. Patterson, could you highlight that?

05:31  14   BY MR. MEEK:

05:31  15       Q.    You talked about this earlier:    DJI does not

05:31  16   provide after-sales services for products that have

05:31  17   been identified as being used for military purposes.

05:31  18       A.    Yeah.

05:31  19       Q.    Do you see that?

05:31  20       A.    Yeah.    That's a warranty repair.

05:31  21       Q.    Okay.    How do you know something has been used

05:31  22   for military purposes?

05:32  23       A.    That, I don't know.

05:32  24       Q.    Is there any effort by DJI to track down the

05:32  25   uses of their drones?

662

05:32  1        A.    Not to my knowledge.

05:32  2        Q.    You were here when Mr. Runstadler and I bought

05:32  3   a drone, right?  Were you in the audience when we did?

05:32  4        A.    No.  This is the first time I've been in the

05:32  5   courtroom.

05:32  6        Q.    Okay.  Well, welcome.

05:32  7        A.    Thanks.

05:32  8        Q.    We bought a drone.  It's on its way to Texas.

05:32  9              In that process, I was not asked if I was in

05:32  10  the military; is that true?

05:32  11             When you go to dji.com and buy a drone, are

05:32  12  you asked if you're in the military?

05:32  13       A.    No.  You're asked for your personal

05:32  14  information, shipping, billing, standard.

05:32  15       Q.    And are you asked about your intended use for

05:32  16  the drone?

05:32  17       A.    No.

05:32  18       Q.    Okay.  So is there -- if there's no way to

05:32  19  identify it and there's no way to track it, what does

05:32  20  it mean that you won't provide after-sales service?

05:32  21       A.    I don't know.

05:32  22       Q.    Do you think that you personally have better

05:33  23  knowledge of the military operations of the People's

05:33  24  Liberation Army in China than the U.S. government?

05:33  25       A.    No.  No.

663

05:33  1    Q.    Do you think that DJI has better information

05:33  2    on the interface with Chinese military than the

05:33  3    U.S. government?

05:33  4    A.    Say that again.

05:33  5    Q.    Do you think that DJI has more information on

05:33  6    the Chinese use of DJI drones than the U.S. government?

05:33  7    A.    That, I don't know either.

05:33  8    Q.    If DJI doesn't have any way of tracking uses,

05:33  9    they have no information about what China's doing with

05:33  10   their drones, correct?

05:33  11   A.    I think that would be correct.

05:33  12   Q.    Okay.  Now, you worked at Apple before you

05:33  13   worked at DJI?

05:33  14   A.    Yes.

05:33  15   Q.    And then after you came to DJI, eventually

05:34  16   Apple becomes your biggest -- you're their huckleberry,

05:34  17   right?

05:34  18   A.    Full circle.

05:34  19   Q.    So who would you say Apple's biggest

05:34  20   competitor is?

05:34  21   A.    In the cell phone space, you mean?

05:34  22   Q.    Yeah.  Sure.  Let's pick that.  Samsung --

05:34  23   A.    Samsung.

05:34  24   Q.    -- probably?

05:34  25         If Apple came to you tomorrow and said, we do

05:34    1    not want you doing business with Samsung, would that be

05:34    2    an issue for you?

05:34    3        A.    I would obviously have to take that up to who

05:34    4    makes the decisions.

05:34    5        Q.    Do you think you and DJI would think twice

05:34    6    about doing business with Samsung?

05:34    7        A.    Yeah.  I'm lost on that.  Can you ask that

05:34    8    again?

05:34    9        Q.    If Apple --

05:34   10        A.    Yeah.

05:34   11        Q.    -- your biggest customer --

05:34   12        A.    Okay.

05:34   13        Q.    -- tells you, I do not want you doing business

05:34   14    with Samsung, would that be something that your

05:34   15    superiors would need to know?

05:34   16        A.    Yeah.  I guess I would tell them about it, but

05:34   17    it's a hypothetical.

05:34   18        Q.    And you understood that it's been the

05:35   19    testimony in here that Bell Helicopters' biggest

05:35   20    customer by far is the U.S. government?

05:35   21        A.    I don't know that.

05:35   22        Q.    Well, okay.  Would you agree that if it is,

05:35   23    just like you would think twice about doing business

05:35   24    with Samsung, the -- Bell would think twice about doing

05:35   25    business with DJI if the U.S. government told them to?

05:35  1        A.    Those are larger decisions than what I'm kind

05:35  2   of tasked for on a day-to-day, so it would be hard for

05:35  3   me to give you an answer there.

05:35  4                    MR. MEEK:  Let's go to Plaintiff's

05:35  5   Exhibit 106.

05:35  6   BY MR. MEEK:

05:35  7        Q.    And this is the export application for that

05:35  8   source code.

05:35  9              Do you remember discussing this?

05:35  10       A.    I don't think so.

05:35  11       Q.    Okay.

05:35  12       A.    Yeah.

05:35  13       Q.    This was discussed with Dr. Michalson, and

05:35  14   it's the application for export of the source code

05:36  15   that -- where DJI is requesting that from Chinese

05:36  16   authorities.

05:36  17       A.    I believe this is the first time I'm seeing

05:36  18   this document.

05:36  19       Q.    Okay.  Okay.

05:36  20                    MR. MEEK:  Let's go then -- let's go

05:36  21   directly to Plaintiff's Exhibit 389.

05:36  22   BY MR. MEEK:

05:36  23       Q.    Let me make sure I'm in the right place.

05:36  24       A.    Okay.

05:36  25       Q.    And the application that begins -- the

666

05:36   1   paragraph that begins "the application."

05:36   2           Do you see that?

05:36   3       A.    Yep.  Regarding the -- oh, that one.  Yep.  I

05:36   4   do see it.

05:36   5       Q.    And, in fact, this is the Chinese government

05:36   6   reviewing that application, and it states at the end:

05:36   7   This administration -- which is China -- renders the

05:37   8   decision to not grant the administrative license for

05:37   9   the protection of the security of the State.

05:37   10          Do you see that?

05:37   11      A.    Yes.  I do see that.

05:37   12      Q.    And the "State" here is China, right?

05:37   13      A.    Again, this is the first time I'm seeing

05:37   14   these, so I have no idea.

05:37   15      Q.    I understand, but I don't have anybody else to

05:37   16   talk to.

05:37   17      A.    Yeah.  I just -- I've never seen this before,

05:37   18   so I couldn't tell you.

05:37   19      Q.    So DJI's information, its source code, was not

05:37   20   exported for the protection of the security of China;

05:37   21   is that correct?

05:37   22      A.    That's what it says.

05:37   23      Q.    Okay.  I understand that you testified earlier

05:37   24   that DJI drones are used by public safety outfits for

05:37   25   various reasons, fire departments, police departments,

```
05:37   1    I think you said?
05:37   2        A.   That's correct.
05:37   3        Q.   Are you familiar -- are you aware that any
05:37   4    public -- any states have prohibited DJI drones to be
05:38   5    used by public safety facilities for any reason?
05:38   6        A.   I'm not aware.
05:38   7        Q.   Okay.  You do not know that Florida's done so?
05:38   8        A.   I don't.  No.
05:38   9        Q.   Okay.  I believe you testified on that
05:38   10   timeline that -- and the Phantom was there, right?
05:38   11   With -- the white with the red stripes?
05:38   12       A.   Yes.
05:38   13       Q.   Remember that?
05:38   14       A.   Yes.
05:38   15       Q.   And that is the -- that is the drone that was
05:38   16   testified earlier where it said that:  We started the
05:38   17   drone industry in 2012.
05:38   18            Remember?
05:38   19       A.   What do you mean by -- who said that?
05:38   20            MR. MEEK:  Can we get PX-106 back up,
05:38   21   Page 10?  Sorry.
05:38   22            Got to keep remembering what you've got.
05:38   23   So in here, the second-to-last paragraph, the last
05:39   24   sentence, Mr. Patterson.
05:39   25   BY MR. MEEK:
```

668

05:39    1    Q.    This is the application to the Chinese

05:39    2    government.  DJI swore this was true.

05:39    3          With the flight control technology, the

05:39    4    exporter started the civil drone industry in 2012; is

05:39    5    that correct?

05:39    6    A.    That's what it says.

05:39    7    Q.    And the two patents that are in this case were

05:39    8    filed long before that, right?

05:39    9          The first patent was filed in 2004; is that

05:39   10    correct?

05:39   11    A.    I don't know when they were filed.  If that's

05:39   12    correct, then yeah.  I'll agree.

05:39   13    Q.    And the '752 was filed in 2011, correct?

05:39   14    A.    Okay.

05:39   15    Q.    Okay.  Can you see this from there, or do I

05:40   16    need to approach?

05:40   17    A.    I can see it.

05:40   18    Q.    You've got great eyes.

05:40   19          This is a model that has been used by several

05:40   20    witnesses in testimony of the Eagle Eye drone, a

05:40   21    vertical takeoff drone, of Bell Helicopter.

05:40   22          Have you ever seen this?

05:40   23    A.    I think so.  Yes.

05:40   24    Q.    Okay.  And in what context did you see it?

05:40   25    A.    I saw a picture of it.

05:40  1          Q.    Okay.  And the Eagle Eye was flown

05:40  2    successfully in 2000, the year 2000, when Frank Wang

05:40  3    was 20 years old?

05:40  4          A.    Okay.

05:40  5          Q.    Okay.  Do you know what that is?

05:40  6          A.    I don't.  I see it, but I don't know what that

05:40  7    is.

05:40  8          Q.    Is that a camera?

05:40  9          A.    Is it?  I'm not sure.  Bring it closer now.

05:40  10   Because from here I can see the outline, but I can't

05:40  11   see what that is.

05:40  12         Q.    It's a mount.

05:40  13         A.    If that's the camera, then yeah.  You're

05:41  14   telling me that's a camera, then I'll agree.

05:41  15         Q.    You see the bracket on the camera?

05:41  16         A.    I do.

05:41  17         Q.    Is that a gimbal?

05:41  18         A.    I don't know.  I don't know.

05:41  19         Q.    Would you -- would it surprise you to know

05:41  20   that the Eagle Eye in 2000 had a high-resolution camera

05:41  21   with a full 360-degree gimbal?

05:41  22         A.    I would be surprised.

05:41  23         Q.    You don't think it did?

05:41  24         A.    No.  I mean, I would be surprised if you told

05:41  25   me that.  I don't know that.  So yeah.

670

| | | |
|---|---|---|
| 05:41 | 1 | MR. MEEK:  No further questions at this |
| 05:41 | 2 | time. |
| 05:41 | 3 | MR. JAKES:  No redirect, Your Honor. |
| 05:41 | 4 | THE COURT:  May this witness be excused? |
| 05:41 | 5 | MR. MEEK:  Yes, Your Honor. |
| 05:41 | 6 | THE COURT:  Thanks for being here, sir. |
| 05:41 | 7 | THE WITNESS:  Thank you. |
| 05:41 | 8 | THE COURT:  Could I have counsel up here |
| 05:41 | 9 | for a second? |
| 05:41 | 10 | (Off-the-record bench conference.) |
| 05:42 | 11 | THE COURT:  Let's go back on the record. |
| 05:42 | 12 | Ladies and gentlemen of the jury, we're |
| 05:42 | 13 | done for the evening.  As I mentioned to you in the |
| 05:42 | 14 | hall, I will be doing sentencings tomorrow, and so we |
| 05:42 | 15 | won't be starting tomorrow until 1 o'clock in the |
| 05:42 | 16 | afternoon. |
| 05:42 | 17 | If you'll be here by 1:00, we'll get |
| 05:42 | 18 | started as shortly -- I never know how long sentencings |
| 05:42 | 19 | take.  They take as long as they take, so.... |
| 05:42 | 20 | But hopefully we'll be ready to go by |
| 05:42 | 21 | 1:00, and I'll see you all tomorrow.  Have a good |
| 05:42 | 22 | evening. |
| 05:42 | 23 | THE BAILIFF:  All rise. |
| 05:42 | 24 | (Jury exited the courtroom.) |
| 05:42 | 25 | (Off-the-record discussion.) |

```
05:42   1                    THE COURT:  Is there anything we need --
05:42   2    you may be seated.
05:42   3                    Is there anything we need to take up?
05:43   4                    Mr. Siegmund?
05:43   5                    MR. SIEGMUND:  Yes, Your Honor.  Just a
05:43   6    little bit of confusion in terms of, I guess, how the
05:43   7    case would go.
05:43   8                    Our understanding is that the only thing
05:43   9    that goes on rebuttal is invalidity.  We're obviously
05:43   10   not going to do an infringement rebuttal or anything.
05:43   11                   THE COURT:  Correct.
05:43   12                   MR. SIEGMUND:  Okay.  I think that was
05:43   13   the only --
05:43   14                   THE COURT:  The only evidence you're
05:43   15   going to put on -- the only expert you're going to put
05:43   16   on is a rebuttal to the defendants' invalidity case.
05:43   17                   MR. SIEGMUND:  Okay.  That was our
05:43   18   understanding.  I think that's everything.
05:43   19                   THE COURT:  Anything else from defense?
05:43   20                   MR. MEEK:  No, Your Honor.
05:43   21                   MR. SCHROEDER:  Nothing, Your Honor.
05:43   22                   THE COURT:  Okay.  We can go off the
05:43   23   record.
05:43   24                   (Off-the-record discussion.)
05:47   25                   THE COURT:  With regard to the
```

672

05:47  1    inequitable conduct, what additional evidence do you

05:47  2    anticipate putting on?  Is it just going to be

05:47  3    cross-examining the inventor?

05:47  4                MR. SCHROEDER:  It'll be an examination

05:47  5    of the inventor and our technical expert as well.

05:47  6                THE COURT:  Okay.  Technical -- just

05:47  7    high-level technical expert will be saying what?

05:47  8                MR. SCHLESINGER:  On materiality, Your

05:47  9    Honor.

05:47  10                THE COURT:  Okay.  Okay.

05:47  11                MR. MEEK:  We'll have a redirect of our

05:47  12    inventor.  We will not have a technical expert.  We'll

05:47  13    have a few minutes of redirect.

05:47  14                THE COURT:  Okay.  Very good.

05:47  15                MR. SCHROEDER:  And for that, Your Honor,

05:47  16    there's, I think, two issues the parties are discussing

05:47  17    and hopefully by this time tomorrow we'll have an

05:47  18    agreement as far as the procedure.

05:47  19                But one question we had both discussed

05:47  20    is -- just to raise the issues with you and tell you,

05:47  21    we'll probably present an agreement with you -- for you

05:48  22    tomorrow, unless you have a different preference.

05:48  23                But we'd like to have a different

05:48  24    attorney take the direct --

     25                (Simultaneous speakers.)

673

05:48    1                    MR. MEEK:  Jake, I can agree to that.

05:48    2    Yeah.  So he wants to have a different --

05:48    3                    THE COURT:  I don't care.  If you don't

05:48    4    care, I don't care.

05:48    5                    MR. SCHROEDER:  The other thing is

05:48    6    argument.  Either before or after, we would like to

05:48    7    have just at least a brief argument to Your Honor, if

05:48    8    Your Honor's interested in it --

05:48    9                    THE COURT:  About a --

05:48    10                    MR. SCHROEDER:  -- about the issue of

05:48    11    inequitable conduct following the testimony.

05:48    12                    THE COURT:  That's fine.

05:48    13                    MR. SCHROEDER:  Okay.

05:48    14                    MR. MEEK:  Okay.

05:48    15                    MR. SCHROEDER:  Just so we know for our

05:48    16    own planning purposes what Your Honor anticipates and

05:48    17    get ready for it.

05:48    18                    MR. SIEGMUND:  I have at least a

05:48    19    30-minute opening prepared, Your Honor.

05:48    20                    (Laughter.)

05:48    21                    THE COURT:  I'm -- so no one has ever

05:48    22    actually followed through and done this.  I'm not sure

05:48    23    why -- what the expert will have to add to me about

05:48    24    what materiality is.  That's what I'm questioning.

05:48    25                    I don't know why I need an expert to tell

674

| | | |
|---|---|---|
| 05:48 | 1 | me whether something's material or not.  I'm -- let me |
| 05:49 | 2 | just put it this way.  I'm skeptical. |
| 05:49 | 3 | And so I don't -- so yeah.  And I don't |
| 05:49 | 4 | think we're on the scale anymore that we were when I |
| 05:49 | 5 | started doing this, where the more material it was, you |
| 05:49 | 6 | know, the less culpable the person had to be. |
| 05:49 | 7 | I think things have shifted, and I think |
| 05:49 | 8 | it's more important what I think of what the inventor |
| 05:49 | 9 | did than an expert that you hire to come in and tell me |
| 05:49 | 10 | that something was really substantive. |
| 05:49 | 11 | So -- but that's just my general thoughts |
| 05:49 | 12 | about it, so... |
| 05:49 | 13 | MR. SCHROEDER:  Thank you, Your Honor. |
| 05:49 | 14 | THE COURT:  So very good. |
| 05:49 | 15 | Well, we'll do -- I think -- oh, I also |
| 05:49 | 16 | have a hearing tomorrow after the sentencing, don't I? |
| 05:49 | 17 | So I apologize for the sentencings.  I |
| 05:49 | 18 | just can't not do sentencings.  So one-trick pony here. |
| 05:50 | 19 | Y'all have a good evening.  I'll see you |
| 05:50 | 20 | tomorrow at 8:30.  If you need anything -- I'm sorry. |
| 05:50 | 21 | I'll see you tomorrow at 1:00. |
| 05:50 | 22 | THE BAILIFF:  All rise. |
| 05:50 | 23 | (Hearing adjourned.) |
| | 24 | |
| | 25 | |

675

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 30th day of April

14   2023.

15

16                        /s/ Kristie M. Davis
                          KRISTIE M. DAVIS
17                        Official Court Reporter
                          800 Franklin Avenue
18                        Waco, Texas 76701
                          (254) 340-6114
19                        kmdaviscsr@yahoo.com

20

21

22

23

24

25

05:50