—835—

07:51

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
2                          WACO DIVISION

3   TEXTRON INNOVATIONS INC.*
                            *      April 20, 2023
4   VS.                     *
                            * CIVIL ACTION NO. 6:21-CV-740
5   SZ DJI TECHNOLOGY CO.,  *
      LTD. ET AL            *
6
                   BEFORE THE HONORABLE ALAN D ALBRIGHT
7                       JURY TRIAL PROCEEDINGS
                           Volume 4 of 5
8
    APPEARANCES:
9
    For the Plaintiff:   Kurt Pankratz, Esq.
10                        Morgan G. Mayne, Esq.
                          Harrison Rich, Esq.
11                        Emily M. Deer, Esq.
                          Baker Botts
12                        2001 Ross Ave., Suite 900
                          Dallas, TX 75206
13
                          Kevin J. Meek, Esq.
14                        Mark A. Speegle, Esq.
                          Lance Joseph Goodman, Esq.
15                        Boyang Zhang, Esq.
                          Baker Botts, LLP
16                        98 San Jacinto Blvd., Suite 1500
                          Austin, TX 78701
17
                          Mark Siegmund, Esq.
18                        Cherry Johnson Siegmund James, PLLC
                          The Roosevelt Tower
19                        400 Austin Avenue, 9th Floor
                          Waco, Texas 76701
20
    For the Defendant:   J. Michael Jakes, Esq.
21                        Qingyu Yin, Esq.
                          Sydney Kestle, Esq.
22                        Finnegan Henderson Farabow Garrett
                            & Dunner LLP
23                        901 New York Ave. Nw
                          Washington, DC 20001
24

25

—836—

```
 1                          Benjamin R. Schlesinger, Esq.
                            Robert High, Esq.
 2                          Finnegan Henderson Farabow Garrett
                               & Dunner LLP
 3                          271 17th St Nw, Suite 1400
                            Atlanta, GA 30363
 4
                            Jacob Schroeder, Esq.
 5                          Finnegan Henderson Farabow Garrett
                               & Dunner LLP
 6                          Stanford Research Park
                            3300 Hillview Avenue, 2nd Floor
 7                          Palo Alto, CA 94304

 8                          John P. Palmer, Esq.
                            Jacqueline Altman, Esq.
 9                          Naman Howell Smith & Lee
                            P.O. Box 1470
10                          Waco, TX 76703-1470

11      Court Reporter:     Kristie M. Davis, CRR, RMR
                            PO Box 20994
12                          Waco, Texas 76702-0994
                            (254) 340-6114
13

14         Proceedings recorded by mechanical stenography,

15      transcript produced by computer-aided transcription.
```

| | | |
|---|---|---|
| 08:39 | 1 | (Hearing begins.) |
| 08:39 | 2 | THE BAILIFF:  All rise. |
| 08:39 | 3 | THE COURT:  Thank you.  You may be |
| 08:39 | 4 | seated. |
| 08:39 | 5 | Good morning, everyone. |
| 08:40 | 6 | Mr. Siegmund? |
| 08:40 | 7 | MR. SIEGMUND:  Good morning, Your Honor. |
| 08:40 | 8 | Mark Siegmund on behalf of the plaintiff. |
| 08:40 | 9 | I think just a couple of housekeeping |
| 08:40 | 10 | things, Your Honor.  Both sides filed objections to |
| 08:40 | 11 | Judge Gilliland's report and recommendations on various |
| 08:40 | 12 | issues, and I'm -- |
| 08:40 | 13 | THE COURT:  I'll overrule those for the |
| 08:40 | 14 | record. |
| 08:40 | 15 | MR. SIEGMUND:  Okay.  Great.  That was my |
| 08:40 | 16 | question.  We have not filed a response to those.  I'm |
| 08:40 | 17 | assuming you don't need one since -- |
| 08:40 | 18 | THE COURT:  I don't need one. |
| 08:40 | 19 | MR. SIEGMUND:  Okay.  Great. |
| 08:40 | 20 | And then the other issue is, I guess, |
| 08:40 | 21 | timing and how you want Rule 50 motions. |
| 08:40 | 22 | Are those going to be oral?  Do you want |
| 08:40 | 23 | a written response?  What is kind of the Court's |
| 08:40 | 24 | preference? |
| 08:40 | 25 | THE COURT:  You know, I always try to |

```
08:40   1    defer to you all about what you think protects you the
08:40   2    most since I knew so little about how to do that
08:40   3    myself.
08:40   4               But what typically we have done is -- by
08:40   5    agreement of parties, is have them done orally.  In
08:40   6    this case, y'all have agreed to do them at the end of
08:40   7    the evidence, and we'll do them then.
08:40   8               And then, generally speaking, the parties
08:40   9    have submitted written briefs as well, but I rule on
08:41   10   the oral motions.  And if you all are okay with that,
08:41   11   that's typically what I've done.  And so that's -- that
08:41   12   would be what I would propose.
08:41   13               MR. SIEGMUND:  Okay.
08:41   14               THE COURT:  If the parties are okay with
08:41   15   that.
08:41   16               MR. SCHROEDER:  Yeah, Your Honor.  And
08:41   17   just for -- good morning, Your Honor.  Jacob Schroeder
08:41   18   from Finnegan on behalf of defendants.
08:41   19               Is Your Honor's preference that we would
08:41   20   do the oral at the close of evidence before the charge?
08:41   21               THE COURT:  Oh, yes.
08:41   22               MR. SCHROEDER:  Okay.  Yeah.  And then
08:41   23   could we --
08:41   24               THE COURT:  But let me say here not to be
08:41   25   too lawyerly, but again, I had thought you were going
```

08:41  1    to do it at the end of your evidence as opposed to

08:41  2    the -- because they're going to have a rebuttal case.

08:41  3                Again, I'm agnostic.  I'll do it --

08:41  4    whatever you all want to do is fine with me, but the

08:41  5    way I had understood it, the motions were going to be

08:41  6    made at the end of your case.

08:41  7                If you want to do it, then we can.  And

08:41  8    then we can do them again after we hear their rebuttal

08:42  9    expert.  We can wait until we hear the rebuttal expert.

08:42  10   I don't care.

08:42  11               MR. SCHROEDER:  Propose we wait until all

08:42  12   the evidence is in and then just get it out before the

08:42  13   charge.  And then we would like to file a written

08:42  14   Rule 50 --

08:42  15               THE COURT:  You're more than welcome to.

08:42  16               MR. SCHROEDER:  -- get that on file

08:42  17   tomorrow morning before closing.

08:42  18               THE COURT:  Sure.

08:42  19               MR. SIEGMUND:  And then on that,

08:42  20   Your Honor, that's totally -- we don't care, but do

08:42  21   you -- when is our deadline to respond to the written

08:42  22   Rule 50 motion?

08:42  23               THE COURT:  Given that they're going to

08:42  24   be overruled before the -- well, let me say, the only

08:42  25   one I will take up -- I will take up -- let me say it

08:42  1    to protect my record.  But the one I will most

08:42  2    seriously consider will be, I anticipate, a motion on

08:42  3    willfulness from the defendant.

08:42  4                And I will -- I will want to hear -- and

08:42  5    maybe at the end of today, after we're done with the

08:42  6    evidence, we can take that one up.  Because I really

08:42  7    would like -- I think that in this case deserves --

08:42  8    it's been hard fought.  And also I've been listening to

08:43  9    evidence about what the defendant did, your client did

08:43  10   and all that.

08:43  11               And so we ought -- I think we ought to

08:43  12   spend whatever time that you, the defendant, think you

08:43  13   want to have me hear arguments, and we can do that

08:43  14   today --

08:43  15               MR. SCHROEDER:  Okay.

08:43  16               THE COURT:  -- when we finish up with

08:43  17   their expert on invalidity.

08:43  18               The others I think -- I can't think of a

08:43  19   motion either one of you all would have that I would

08:43  20   consider granting as a directed verdict other than that

08:43  21   one.

08:43  22               And I'm not forecasting I am going to

08:43  23   grant it.  I'm just saying it's the one that we take

08:43  24   up -- I routinely take up and decide whether or not to

08:43  25   submit to the jury.

08:43  1               And then I'm also -- once I've heard

08:43  2    everything, I may or may not prognosticate -- sometimes

08:43  3    I have, sometimes I haven't -- the likelihood, if even

08:43  4    there were a willfulness finding, whether or not I

08:43  5    would, you know, find it an exceptional case.  And I

08:43  6    might let you all know that at the end of the arguments

08:43  7    today too.

08:44  8               But with regard to the others, that's the

08:44  9    only one I think that there is a serious chance of me

08:44  10   granting --

08:44  11               MR. SCHROEDER:  Okay.

08:44  12               THE COURT:  -- if that helps you all.

08:44  13               MR. SCHROEDER:  Thank you, Your Honor.

08:44  14               MR. SIEGMUND:  It does.  Thank you.

08:44  15               MR. SCHROEDER:  There was one other item.

08:44  16   The parties have agreed as far as the physical

08:44  17   exhibits, the drones that we have entered into

08:44  18   evidence, that that can go back to the jury room so

08:44  19   long as the battery --

08:44  20               THE COURT:  They can't go.

08:44  21               MR. SCHROEDER:  -- is removed, is what

08:44  22   we -- would that be okay?

08:44  23               THE COURT:  We can't do that.

08:44  24               MR. SCHROEDER:  Okay.

08:44  25               THE COURT:  Yeah.  I mean, that's -- and

08:44   1   so you can take photos of them and send the photos

08:44   2   back, but we can't have the physical ones going back.

08:44   3                   MR. SCHROEDER:  Even with the batteries

08:44   4   removed?

        5                   THE COURT:  It has nothing to do with the

08:44   6   batteries -- I'm not an airport, and so it wouldn't

08:44   7   matter what they were.  They can't go back.

08:44   8                   MR. SCHROEDER:  Thank you, Your Honor.

08:44   9                   THE COURT:  Mr. Palmer?

08:44   10                  MR. PALMER:  I was just going to ask a

08:44   11  question.

08:44   12                  Could we publish that to the jury so they

08:44   13  could at least hold it during the -- outside, out here

08:44   14  and --

08:44   15                  THE COURT:  I'm not sure what you mean --

08:44   16  I'm not sure the timing of the publishing.

08:45   17                  I'm sure I'll let you do it, but I'm

08:45   18  not sure what you're asking for.

08:45   19                  MR. PALMER:  Yes, Your Honor.  Just

08:45   20  because we're talking about that exhibit not being able

08:45   21  to physically go back there where they could actually

08:45   22  hold it, and they've never held it, we would like to

08:45   23  publish that at some time today.

08:45   24                  THE COURT:  You'd like to let

08:45   25  them physically --

08:45  1                    MR. PALMER:  Yeah.  Pass it to each other

08:45  2    and see what it feels like and look at it.

08:45  3                    THE COURT:  I don't --

08:45  4                    MR. SIEGMUND:  I guess our question would

08:45  5    be why and the timing, Your Honor.  I mean, if we

08:45  6    instruct them and they go back to deliberate, I mean,

08:45  7    are they going to sit out here and pass it around?

08:45  8                    THE COURT:  No.  I think they're talking

08:45  9    about during their case.  They're not talking about --

08:45  10   I think they are talking about while they have a

08:45  11   witness on the stand, most likely, I would assume,

08:45  12   this -- the doctor who's testifying, they'd like to

08:45  13   publish -- they'd like to hand it out to the jury.

08:45  14                   MR. SIEGMUND:  I think we probably just

08:45  15   object on relevance and it's -- and stand on that,

08:45  16   Your Honor.  I don't know why that would matter, but...

08:45  17                   THE COURT:  I don't have a -- you can

08:45  18   have them.  You can distribute it.

08:45  19                   Anything else?

08:46  20                   Yes, sir.

08:46  21                   MR. HIGH:  Thank you, Your Honor.  This

08:46  22   is Bob High for the defendants.

08:46  23                   We just have one objection on one slide.

08:46  24                   THE COURT:  Okay.  Okay.  The slide is

08:46  25   Slide 6 of their rebuttal --

08:46  1                MR. HIGH:  Dr. Michalson's rebuttal

08:46  2    expert, and we think this is a misstatement of the law

08:46  3    and not really the place of the technical expert to be

08:46  4    telling the jury what the legal standard is for

08:46  5    obviousness.

08:46  6                And specifically, we don't think there's

08:46  7    any requirement that an element be missing from a

08:46  8    reference.  We think you can have obviousness if all of

08:46  9    the elements are --

08:46  10               THE COURT:  You're right.  I mean, you

08:46  11   can have a -- I mean, this is -- this is -- the first

08:46  12   sentence is not right.  The first sentence is not the

08:46  13   law, and it's frightening to me that I know that, but

08:46  14   only because I've had single-reference obviousness

08:46  15   arguments that have been made.

08:46  16               So if -- if -- on the other hand, I think

08:47  17   all that the plaintiff is trying to say is, you know,

08:47  18   that in this situation -- I'm guessing there's a

08:47  19   combination here.  I'm guessing y'all are using a

08:47  20   combination and they're attacking that.

08:47  21               MR. HIGH:  So we're relying on

08:47  22   single-reference obviousness.

08:47  23               THE COURT:  You are?

       24               MR. HIGH:  Yes.

08:47  25               THE COURT:  Well, then this can't come

845

| | | |
|---|---|---|
| 08:47 | 1 | in. |
| 08:47 | 2 | MR. HIGH:  Okay.  Thank you. |
| 08:47 | 3 | THE COURT:  Okay.  Anything else? |
| 08:47 | 4 | MR. SIEGMUND:  No, Your Honor. |
| 08:47 | 5 | THE COURT:  Okay.  We'll -- as soon as -- |
| 08:47 | 6 | is the jury all here? |
| 08:47 | 7 | If you all will wait five minutes, we'll |
| 08:47 | 8 | bring the jury in. |
| 08:47 | 9 | THE BAILIFF:  All rise. |
| 08:47 | 10 | (Recess taken.) |
| 08:55 | 11 | THE BAILIFF:  All rise. |
| 08:55 | 12 | THE COURT:  Please remain standing for |
| 08:55 | 13 | the jury. |
| 08:55 | 14 | (Jury entered the courtroom.) |
| 08:55 | 15 | THE COURT:  Thank you.  You may be |
| 08:55 | 16 | seated. |
| 08:55 | 17 | Counsel? |
| | 18 | MR. SCHLESINGER:  Thank you. |
| 08:55 | 19 | Ben Schlesinger again from Finnegan on behalf of DJI. |
| 08:55 | 20 | DIRECT EXAMINATION CONTINUED |
| 08:55 | 21 | BY MR. SCHLESINGER: |
| 08:55 | 22 | Q.   Good morning. |
| 08:55 | 23 | A.   Good morning. |
| 08:55 | 24 | Q.   Yesterday we talked about noninfringement. |
| 08:55 | 25 | I'd like to switch gears a little bit and move over to |

08:55  1    whether the patents are valid.

08:55  2            First off, let's start with the '909 patent.

08:56  3            Are you familiar with the concept of a person

08:56  4    of ordinary skill in the art?

08:56  5        A.    Yes.  I am.

08:56  6        Q.    Do you have an opinion on who would be a

08:56  7    person of ordinary skill in the art with respect to the

08:56  8    '909 patent?

08:56  9        A.    I do.  I've prepared a slide on that that you

08:56  10   can all see now.

08:56  11       Q.    And what is that opinion?

08:56  12       A.    That opinion as described here is:  It's

08:56  13   somebody who has a degree in a field related to what

08:56  14   this patent is talking about, such as mechanical

08:56  15   engineering, robotics, electrical engineering, and, of

08:56  16   course, somebody knowledgeable about flying, and as

08:56  17   well somebody who has some experience developing or

08:56  18   evaluating or designing these systems.

08:56  19           And of course, if you have lots of experience

08:56  20   on the field, that's just as important as education.

08:56  21       Q.    Thank you.

08:56  22           Now, let's turn to the asserted claims.

08:56  23           Can you remind us which claims are asserted in

08:56  24   this case?

08:56  25       A.    Sure.  The '909 patent has four claims

08:57  1    specifically that were asserted.  The two big ones you

08:57  2    see on the left, the independent claims, and then the

08:57  3    two smaller dependent claims.  So 1, 7, 10 and 11.

08:57  4        Q.    Are these all of the claims in the '909

08:57  5    patent?

08:57  6        A.    No.  The '909 patent has many, many claims.

08:57  7    These are the only four that are asserted in this case

08:57  8    against DJI.

08:57  9        Q.    So if the jury agrees with you that the

08:57  10   asserted claims are invalid, does that mean all of the

08:57  11   claims of the '909 patent are invalid?

08:57  12       A.    No.

08:57  13       Q.    What does it mean?

08:57  14       A.    Just that these four are invalid.

08:57  15       Q.    Would you please turn to Tab DX-345, which is

08:57  16   Defendants' Exhibit 345?

08:57  17       A.    I'm going there.  I'm there.

08:57  18       Q.    What is this?

08:57  19       A.    This is a patent issued by the United States

08:57  20   Patent Office.  It's -- we call it the Frink patent.

08:58  21       Q.    And how does the Frink patent relate to the --

08:58  22   your opinions with respect to the validity of the '909

08:58  23   claims?

08:58  24       A.    When I looked at what's been done before the

08:58  25   '909 patent, what had other peoples invented

—848—

08:58  1    previously, I looked at this patent because it's done

08:58  2    previously, and so it informs my understanding of

08:58  3    invalidity.

08:58  4        Q.    What is the basis of your opinion on -- with

08:58  5    respect to whether the Claims 1, 7, 10 and 11 of the

08:58  6    '909 patent are valid or invalid?

08:58  7        A.    I believe that Frink anticipates and renders

08:58  8    obvious those claims.

08:58  9            MR. SCHLESINGER:  Your Honor, DJI moves

08:58 10    to admit DX-345.

08:58 11            MR. RICH:  No objection.

08:58 12            THE COURT:  It'll be admitted.

08:58 13            MR. SCHLESINGER:  Could we please pull up

08:58 14    DX-345, and let's put it on the left side, and pull up

08:58 15    the '909 patent and put it on the right side.

08:59 16            And could you blow up the filing dates of

08:59 17    each?

08:59 18    BY MR. SCHLESINGER:

08:59 19        Q.    When was the Frink patent -- Mr. Frink's

08:59 20    patent filed?

08:59 21        A.    On June of 2002.

08:59 22        Q.    When was the '909 patent filed?

08:59 23        A.    In March of 2004, almost two years later.

08:59 24        Q.    Does the Frink patent qualify as prior art to

08:59 25    the '909 patent?

849

08:59  1        A.    Yes.

08:59  2        Q.    Why is that?

08:59  3        A.    Because it was filed earlier and was available

09:00  4    before.

09:00  5        Q.    And you mentioned that the Frink patent was

09:00  6    obviously a patent.

09:00  7              What's the patent number for Mr. Frink's

09:00  8    patent?

09:00  9        A.    It's listed up here.  It's 6,868,314.

09:00  10       Q.    And what's the patent number for what we've

09:00  11   been calling the '909 patent?

09:00  12       A.    That's right here.  8,014,909.

09:00  13             MR. SCHLESINGER:  Can we go back to the

09:00  14   slides, please?

09:00  15   BY MR. SCHLESINGER:

09:00  16       Q.    Can you remind us what the '909 patent is

09:00  17   about?

09:00  18       A.    Sure.  We talked about it kind of two patents

09:00  19   ago, but it was all about this idea that you have a

09:00  20   ship bucking in the ocean, for example, and you're

09:00  21   trying to approach it.  So what are all the information

09:00  22   you need to get, like position and movement, so you can

09:00  23   approach it to, for instance, land on that ship.

09:01  24       Q.    When the Patent Office evaluated the '909

09:01  25   patent, it did not have knowledge of the Frink patent;

850

09:01   1    is that right?

09:01   2        A.    That's correct.

09:01   3        Q.    How do you know that?

09:01   4        A.    Well, the Patent Office, on the front of the

09:01   5    patent here, they list all the references that they

09:01   6    knew about.

09:01   7              MR. SCHLESINGER:  And why don't we bring

09:01   8    up the '909 patent directly so it's a little bigger.

09:01   9        A.    Yeah.  It's small.

09:01  10    BY MR. SCHLESINGER:

09:01  11        Q.    And what are you circling?

09:01  12        A.    I'm circling the references cited.  And you

09:01  13    can go ahead.  Go ahead.

09:01  14              MR. SCHLESINGER:  Yeah.  If we can just

09:01  15    zoom in right above the figure so we can see that.

09:01  16              There we go.

09:01  17    BY MR. SCHLESINGER:

09:01  18        Q.    And do you see Mr. Frink's patents listed in

09:02  19    those references cited?

09:02  20        A.    No.

09:02  21        Q.    What does that mean?

09:02  22        A.    That means the examiner wasn't aware of this

09:02  23    patent when they were considering whether or not the

09:02  24    '909 patent should get a patent.

09:02  25        Q.    What about the fact that the -- Mr. Frink's

851

09:02    1    patent was at the Patent Office at the time?

09:02    2          Was the examiner aware of it?

09:02    3    A.    No.

09:02    4    Q.    And again, how do you know that?

09:02    5    A.    Because if the examiner had considered Frink,

09:02    6    he or she would have listed it here.

09:02    7          MR. SCHLESINGER:  And let's switch back

09:02    8    to the slides and let's...

        9    BY MR. SCHLESINGER:

09:02   10    Q.    Can you describe what Frink discloses?

09:02   11    A.    Sure.  Frink is all about the idea that you

09:02   12    have an unmanned aircraft, in other words, some kind of

09:02   13    device that's flying in the air.  You can see it here

09:02   14    kind of pictured in this figure.

09:03   15          And the idea is you have, for instance, in the

09:03   16    water, perhaps, a boat and you're trying to be able to

09:03   17    approach its position to do things like circle it or

09:03   18    fly alongside it.  And same thing for a ground

09:03   19    transmitter to be able to fly to it.

09:03   20          The idea was, for instance, you might be

09:03   21    measuring watershed, like stream levels, and you want

09:03   22    to be able to send an autonomous aircraft out to circle

09:03   23    it and get the data or you might even be doing

09:03   24    fish-spotting, and you want to be able to go out and

09:03   25    find the fish for the fishermen.

```
09:03   1        Q.    You mentioned flying patterns.  What kind of
09:03   2   patterns does Frink disclose?
09:03   3        A.    There's two examples he gives that I've
09:03   4   prepared slides on.  If you go to the next slide, I
09:03   5   think I have the first example.
09:03   6             This, he's kind of -- you can see in the
09:03   7   description here I've highlighted in yellow, the idea
09:03   8   is -- one thing that he talks about is matching the
09:03   9   marine vessel's speed.  So that's velocity matching,
09:03  10   same relative velocity, so you can follow the boat as
09:04  11   it's going through the waves.
09:04  12        Q.    What do you mean by "follow the boat"?
09:04  13        A.    I mean being able to match its velocity so you
09:04  14   can go right alongside it.
09:04  15        Q.    Does Frink disclose any other patents?
09:04  16        A.    He does.  If you go to the next slide, please.
09:04  17             And there's a little quote here for you.  It
09:04  18   can be programmed to fly a pattern, it says here.  And
09:04  19   in particular, it says an oval pattern.
09:04  20             So now you have a boat moving through the
09:04  21   water, and Frink describes and discloses that you could
09:04  22   have this aircraft circling the boat in an oval shape
09:04  23   as it's going through the water, which means you have
09:04  24   to both match its speed but also have this interesting
09:04  25   relative velocity to go faster and slower than it so
```

853

09:04  1    you can move along with it and go in an oval pattern

09:04  2    around it at the same time.

09:04  3        Q.    So Frink discloses both following another

09:04  4    object, so an aircraft following a boat, for example,

09:04  5    or an aircraft circling the boat?

09:04  6                MR. RICH:  Objection, leading.

09:04  7                THE COURT:  Overruled.

09:05  8        A.    That's correct.

09:05  9    BY MR. SCHLESINGER:

09:05  10       Q.    Let's turn to Claim 1.

09:05  11            What is your opinion with respect to whether

09:05  12   Frink anticipates or renders obvious Claim 1 of the

09:05  13   '909 patent?

09:05  14       A.    My opinion is that Frink anticipates and

09:05  15   renders obvious Claim 1.

09:05  16       Q.    Why is that?

09:05  17       A.    Well, for understanding invalidity, I go

09:05  18   through every line of Claim 1 and consider does Frink,

09:05  19   does this invention that was a couple years earlier,

09:05  20   disclose every line, every word?

09:05  21            And as I did this in Claim 1, I went through

09:05  22   it one step at a time.  I found that every part of

09:05  23   Claim 1 is indeed disclosed by Frink.

09:05  24       Q.    Why don't we start with the first element?

09:05  25       A.    Sure.

854

09:05  1    Q.    Where does Frink disclose the first
09:05  2  limitation?
09:05  3    A.    So the very beginning of Claim 1 is a system
09:05  4  for controlling the flight of an aircraft.  That line
09:05  5  that we call the preamble.
09:05  6         And even in the very beginning of the Frink
09:06  7  patent, it already says this invention is about this
09:06  8  aerial vehicle, that's an aircraft, flying, and it's
09:06  9  about controlling it.
09:06  10        Actually, I'm underlining the wrong thing.
09:06  11        It's about flying this aircraft and being able
09:06  12  to fly it in a specific pattern.  So you got to control
09:06  13  it to be able to fly it in a pattern like that.
09:06  14    Q.    And where in Frink is that disclosed?
09:06  15    A.    That's disclosed in Frink here in the summary
09:06  16  of the invention right in the description.
09:06  17    Q.    And is that Column 2, Lines 15 to 17?
09:06  18    A.    Yes.  That's shown right here.
09:06  19    Q.    And what does -- what about the next element,
09:06  20  the sensor element?
09:06  21    A.    You'll remember this element from yesterday.
09:06  22  This was the idea that the aircraft needs to be able to
09:06  23  have a sense of its own position.
09:06  24        And in the claim language, they said two
09:06  25  things about that.  The aircraft has to have the

09:06  1    ability to sense its position, has to have a sensor

09:07  2    system for that, and inertial motion.

09:07  3         Remember, we talked about the idea that it's

09:07  4    not just position but also how it's moving.

09:07  5         And on the left side, I'm showing Frink at

09:07  6    Column 4 talking about the idea that the vehicle --

09:07  7    that's the aerial vehicle, that's the aircraft -- can

09:07  8    have the following.

09:07  9         It says right here a "global positioning

09:07  10   receiver," and it even names a specific one, and of

09:07  11   course, that's going to give you position.

09:07  12        And then in that same paragraph, at the bottom

09:07  13   here, it has this phrase:  It can be backed up with an

09:07  14   inertial guidance system.

09:07  15        And it actually lists out accelerometers and

09:07  16   gyroscopes, which are part of the systems I was telling

09:07  17   you about yesterday.  So that is actually the inertial

09:07  18   movement of the aircraft.

09:07  19   Q.   And when you say systems telling you about

09:07  20   yesterday, you're talking about the inertial movement

09:07  21   sensors?

09:07  22   A.   Yes.

09:07  23   Q.   What about the rest of the sensor limitation

09:07  24   in the '909 patent?

09:07  25   A.   The second half of this paragraph is saying

09:07  1    "the sensor system adapted to communicate."  So it's

09:08  2    not good enough for the aircraft to collect the data

09:08  3    with the sensor system.  It needs to be in a position

09:08  4    of being able to use that information.  So it has to

09:08  5    communicate it to the control system somehow.

09:08  6            And in Frink here, in Column 7, Line 44, Frink

09:08  7    says:  The flight computer is in communication with the

09:08  8    flight dynamic sensors.  The flight dynamic sensors are

09:08  9    the sensors that measure its position in motion.

09:08  10           So now we know that Frink is disclosing this

09:08  11   second half here as well.

09:08  12       Q.    So does Frink disclose the entire sensor

09:08  13   system limitation in Claim 1 of the '909 patent?

09:08  14       A.    Yes.  Frink does so.

09:08  15       Q.    What about the next limitation?

09:08  16       A.    The next one, you'll remember yesterday too,

09:08  17   it was about the idea that the aircraft has to receive

09:08  18   the position of the boat or the reference vehicle and

09:09  19   the movement of the boat or the reference vehicle.

09:09  20           So we can look in Frink to see, does Frink

09:09  21   disclose this idea that the boat's information, the

09:09  22   boat's position, the boat's motion, is being received

09:09  23   by the aircraft?

09:09  24           And here, on the left, I'm showing Column 4 of

09:09  25   Frink, again, Line 63, all the way through to Column 5,

857

09:09   1    a few things about that.

09:09   2              First of all, we're going to just start with

09:09   3    the receiver.  Does the aircraft even have the ability

09:09   4    to receive things?

09:09   5              And here, we're seeing wireless communication

09:09   6    system for communicating with surface-based data

09:09   7    collectors.  Surface-based data collectors is, for

09:09   8    example, the boat or the antenna on the ground.

09:09   9              And then it says this is useful for retrieving

09:09   10   data.  So we know that we've fulfilled this first part

09:09   11   here.

09:09   12   Q.    What about the rest of the receiver limitation

09:09   13   in the '909, Claim 1?

09:09   14   A.    Let's go to the next slide, please.

09:09   15             So the rest of it, now that we know we have a

09:09   16   receiver, that receiver has to receive that position

09:10   17   information and movement information that we talked

09:10   18   about.

09:10   19             And in Column 8 here in Frink, there's this

09:10   20   paragraph.  And what this is saying is that the flight

09:10   21   navigation computer on the aircraft uses the surface

09:10   22   object's navigation data.  And it actually spells it

09:10   23   out:  Position, heading and speed.

09:10   24             Position, of course, that is right away

09:10   25   connected to position here.  And heading and speed,

858

09:10  1    that's movement information.  So that's connected right

09:10  2    over here to movement.

09:10  3           So both of those are being called out and

09:10  4    disclosed by Frink.

09:10  5       Q.   And you mentioned "this paragraph" of

09:10  6    Column 8.  Is that Lines 31 to 44?

09:10  7       A.   Yes.

09:10  8       Q.   What about the next limitation, "the commanded

09:10  9    data"?  Does Frink disclose that?

09:10  10      A.   Yes.

09:10  11          So this limitation, you'll remember, was about

09:10  12   the idea that there has to be something representing

09:10  13   selected velocity of the aircraft relative to the

09:11  14   reference vehicle.

09:11  15          So if it's a boat, some commanded data is

09:11  16   saying what's the relative velocity we want to have

09:11  17   between these two?

09:11  18          And in Frink, here in Column 9, Lines 1 to 8,

09:11  19   Frink says that the aircraft can be programmed to fly

09:11  20   in the pattern.  And he even uses the word "commanded"

09:11  21   here.  It can be commanded, for example, to fly

09:11  22   directly over or it can be programmed to fly in an oval

09:11  23   pattern.

09:11  24          Both of those cases, if you're going to tell

09:11  25   the aircraft, for example, to fly in an oval pattern,

09:11  1    you need to command its relative velocity, you know,

09:11  2    saying it should go a little bit faster on this side, a

09:11  3    little bit slower on this side and keep going round and

09:11  4    round the boat.

09:11  5        Q.    And yesterday, you mentioned there were

09:11  6    multiple ways for -- I believe it was referred to as

09:11  7    station-keeping.

09:11  8        A.    Yes.

09:11  9        Q.    Which of those ways does Frink disclose?

09:11  10       A.    He actually says very specifically matching

09:11  11   the marine vessel's speed here when he talks about

09:11  12   commanding it to fly directly over.  So that's relative

09:12  13   velocity too, because you're saying, I want you to

09:12  14   match your velocities.

09:12  15       Q.    And just for the -- remind us what the other

09:12  16   way of doing?

09:12  17       A.    The other way of doing it was the wooden

09:12  18   yardstick, right?  You can just take your position and

09:12  19   lock your position together.

09:12  20       Q.    And Frink discloses the relative velocity?

09:12  21       A.    Correct.

09:12  22       Q.    What about the control system limitation?

09:12  23   Does Frink disclose that?

09:12  24       A.    Yes.

09:12  25       Q.    How do you know that?

09:12  1        A.    Well, we can kind of go through it a step at a

09:12  2   time also.  And this is a longer one, but that's it --

09:12  3   it is what it is, I guess.

09:12  4             Here we have -- first of all, we have to have

09:12  5   a control system on the aircraft, and Frink says that

09:12  6   the aircraft can have a flight control computer.  So we

09:12  7   know we have a control system.

09:12  8        Q.    And where does Frink say that?

09:12  9        A.    In Column 5, Lines 15 to 24.

09:12  10       Q.    And what about the next part of the control

09:13  11  system limitation?

09:13  12             MR. RICH:  Your Honor, may we approach?

09:13  13             THE COURT:  Sure.

09:13  14             (Bench conference.)

09:13  15             MR. RICH:  Your Honor, we don't believe

09:13  16  this is in his report.  He's about to tie -- he's going

09:13  17  to try to tie matching into calculating the velocity.

09:13  18  But in his report all he ties is the pattern, that it's

09:13  19  programmed to fly in a pattern.

09:13  20             MR. SCHLESINGER:  DJI's objections to

09:13  21  this were due three days ago.  And actually, counsel

09:13  22  surprised me with an objection yesterday asking if

09:13  23  there was anything else --

      24             (Simultaneous speakers.)

      25             THE REPORTER:  I can't hear you when your

861

1    papers are over the microphone.

09:13    2                THE COURT:  I'm not worried about this

09:13    3    slide.  What I need to know is whether or not something

09:13    4    is in -- just show me where -- hold on a second.

09:13    5                Show me where what you're about to have

09:14    6    the witness say is in his report.

09:14    7                MR. RICH:  So you're addressing

09:14    8    calculating limitation, and all he does is say it flies

09:14    9    in a pattern to calculate.

09:14    10               It never says matching to calculate.

09:14    11               MR. SCHLESINGER:  We're not going to --

09:14    12   that's not the intent.

09:14    13               MR. RICH:  As long as he doesn't say --

09:14    14               (Simultaneous speakers.)

09:14    15               MR. RICH:  I mean, if he says it, I have

09:14    16   to object to that.

09:14    17               THE COURT:  If he says it, object, and

18    I'll strike it.

19               MR. RICH:  Thanks, Your Honor.

09:14    20               THE COURT:  And again, let me make clear.

09:14    21   My -- I'm not -- my concern is not with what's in this

09:14    22   slide.  It's with -- if you have something that's

09:14    23   supported in the report, I'll let him talk about it.

09:14    24               MR. RICH:  Thank you, Your Honor.

09:14    25               (Bench conference concludes.)

862

BY MR. SCHLESINGER:

09:15  Q.    Now, for the calculating limitation, is this

09:15  done by the oval pattern disclosed in Frink?

09:15  A.    Yes.

09:15  Q.    Can you explain that, please?

09:15  A.    Yes.  The control system on the aircraft has

09:15  to figure out how to fly in the real world kind of with

09:15  all the wind and all the vagaries, what's actually

09:15  happening, to be able to maintain that oval racetrack

09:15  pattern as it's going around the boat as it's moving.

09:15  So it's going to be calculating how to do that.

09:15  Q.    And what about the next part of the control

09:15  system limitation?

09:15  A.    The next part -- can we go back one?  I'm

09:15  sorry.  Thank you.

09:15       The next part is the idea that you need to be

09:15  using the sensed data and the reference data.  Frink

09:15  says that we're using the surface object's navigation

09:15  data and heading information.  And we know the

09:16  navigation computer also has its own position

09:16  information.

09:16  Q.    And is that at Column 8, Lines 36 to 42?

09:16  A.    Yes.

09:16  Q.    What about the rest of the control systems

09:16  limitation?

863

09:16    1     A.    The rest is kind of saying:  How are you doing

09:16    2   it?

09:16    3          And so it says that, in the claim, you need to

09:16    4   control the flight-control devices.  That means the

09:16    5   flaps on the airplane, the ailerons, the elevator, the

09:16    6   rudder, whatever makes the airplane be able to change

09:16    7   direction and speed.

09:16    8          And in Frink, he says right here in Column 5,

09:16    9   15 to 24, that the system is going to actuate the

09:16   10   flight control surfaces which is matching that and

09:16   11   disclosing that.

09:16   12     Q.    And what about the rest of -- the next part of

09:16   13   the control systems limitation?

09:16   14     A.    Finally, the limitation's saying, what are you

09:16   15   doing?  And it's saying you're maintaining and

09:16   16   achieving a selected velocity relative to the reference

09:17   17   vehicle.

09:17   18          And of course, if you have an aircraft that's

09:17   19   going around a boat, it's maintaining that relative

09:17   20   velocity around that reference vehicle.

09:17   21     Q.    And where is that shown in Frink?

09:17   22     A.    It's shown both in the text that I'm showing

09:17   23   here from Column 9:1-8 and in the figure that we're

09:17   24   animating.

09:17   25     Q.    And what about the last limitation?

864

09:17   1       A.    Let's go ahead and go to the next slide.

09:17   2   Thank you.

09:17   3           The last limitation you'll remember is saying

09:17   4   that the commanded data is programmed into the control

09:17   5   system prior to flight.

09:17   6           And I'm showing here some writing from Frink

09:17   7   in Column 3:18-30, and he actually says it both ways.

09:17   8   He can say that it can be preprogrammed, which means

09:17   9   prior to flight in this case, and he can say,

09:18   10  alternatively here, it can be provided while the

09:18   11  unmanned aerial vehicle is in flight.  So he gives both

09:18   12  indications.

09:18   13          And then below, I've just pointed out that he

09:18   14  talks about the idea that you can program these

09:18   15  commands.  So you're talking about the things that

09:18   16  we're programming or preprogramming.

09:18   17      Q.    So what is your opinion with respect to

09:18   18  whether Frink anticipates or renders obvious Claim 1 of

09:18   19  the '909 patent?

09:18   20      A.    I believe Frink anticipates and renders

09:18   21  obvious Claim 1.

09:18   22      Q.    So Frink shows that the '909 patent did not

09:18   23  invent what's claimed in Claim 1 of the '909 patent?

09:18   24          MR. RICH:  Objection, leading.

09:18   25          THE COURT:  Overruled.

09:18    1        A.    That is my opinion.  I believe Frink shows

09:18    2    that the Claim 1 -- everything in Claim 1 was already

09:19    3    invented.

09:19    4    BY MR. SCHLESINGER:

09:19    5        Q.    Let's turn to the next asserted claim,

09:19    6    Claim 7.  I believe yesterday we heard that this is

09:19    7    very similar to Claim 1; is that right?

09:19    8        A.    Yes.

09:19    9        Q.    What is your opinion with respect to whether

09:19    10   Frink anticipates or renders obvious Claim 7?

09:19    11       A.    I believe Frink also anticipates and renders

09:19    12   obvious Claim 7.

09:19    13       Q.    And maybe we can move a little faster through

09:19    14   this one since it's similar.  But what's the basis of

09:19    15   your opinion?

09:19    16       A.    It'll be absolutely faster, yes.

09:19    17             Again, I went through the whole claim line by

09:19    18   line because every word matters, and I'll point out to

09:19    19   you where it differs.

09:19    20             So this one, there's no difference.  It's a

09:19    21   system for controlling an aircraft just like in

09:19    22   Claim 1.  And the same evidence applies Column 2,

09:19    23   Lines 15 to 17.

09:19    24       Q.    What about the sensor limitation?

09:19    25       A.    The difference in sensor limitation I've

09:19   1   underlined here in red.  This claim is just like the

09:19   2   other claim except it says position of the aircraft

09:19   3   relative to the earth.

09:20   4          And so if we look at Frink here on the left,

09:20   5   he actually disclosed a global positioning system.  And

09:20   6   the way GPS like on your phone works is actually gives

09:20   7   you your position relative to the earth.  And yes, if

09:20   8   you were on the moon or Mars, it would not work at all.

09:20   9   It's just relative to the earth.

09:20   10      Q.    And is that at Column 4, Lines 63 through

09:20   11   Column 5, Line 8 in Frink?

09:20   12      A.    Yes.

09:20   13      Q.    So what's your opinion with respect to whether

09:20   14   Frink discloses the sensor limitation?

09:20   15      A.    I believe Frink does disclose this limitation.

09:20   16      Q.    And what about the next element?  The receiver

09:20   17   limitation?

09:20   18      A.    This one, you'll recall, is about the aircraft

09:20   19   receiving position and movement data from the ship,

09:20   20   from the reference vehicle.  And the difference is,

09:20   21   again, just the phrase "relative to earth."  So this

09:20   22   claim's just saying it has to be compared to the earth.

09:20   23          But, again, Frink discloses not only aircraft

09:21   24   can be using GPS, but the marine vessel can be using

09:21   25   GPS.  So that means that the boat has GPS.  And we know

09:21   1   that the boat is sending its heading and speed to the

09:21   2   aircraft, and that's relative to earth because you're

09:21   3   measuring your speed, for instance, on the water.

09:21   4       Q.    And so where in Frink does it disclose the

09:21   5   receiver limitation of Claim 7 of the '909 patent?

09:21   6       A.    In Column 8, Line 31 to 44 and Column 8,

09:21   7   Line 53 to 61 and Column 9, Line 25 to 28.

09:21   8       Q.    And what about the control system limitation?

09:21   9   Does Frink disclose that?

09:21   10      A.    If we go through it step by step again, the

09:21   11  beginning of it, control system connected to the

09:21   12  sensors and receivers is just the same as Claim 1.  So

09:21   13  I'm showing the same evidence on the left.  It's

09:21   14  Column 5, Lines 15 to 24.  It's the same.

09:21   15      Q.    And what about the calculating?  Does Frink

09:22   16  similarly disclose calculating based on an oval

09:22   17  pattern?

09:22   18      A.    Yes.  It's -- again, I'm showing the same

09:22   19  evidence because it's word for word the same for the

09:22   20  section that I have highlighted.  So it's Lines --

09:22   21  Column 9, Lines 1 to 8 and Column 8, Lines 36 to 42.

09:22   22      Q.    And what about the last limitation with the

09:22   23  "or"?  Does Frink also disclose this based on the oval

09:22   24  pattern?

09:22   25      A.    Yes.  He does.  If we look at the words here,

868

09:22  1    you'll see there's one difference twice over, which is

09:22  2    it says:  Maintains a selected position relative to the

09:22  3    reference vehicle "or" a selected velocity relative to

09:22  4    the reference vehicle.

09:22  5           So Claim 7's a little bit different here, but

09:22  6    of course, we already heard that Frink, in Column 9,

09:22  7    Lines 1 to 8, is saying you can be commanded to fly an

09:22  8    oval pattern.

09:22  9           And to fly that oval pattern, you're going to

09:22  10   have to be able to both have a velocity of increasing

09:23  11   and decreasing relative to the boat, and you are to be

09:23  12   orbiting the position of the boat.  So you need both.

09:23  13   Q.    And what about the last limitation in Claim 7?

09:23  14   Does Frink disclose that?

09:23  15   A.    This is, again, similar to the language you

09:23  16   saw before because at the end it says "prior to

09:23  17   flight."  And it says:  The selected position and

09:23  18   velocity of the aircraft is selected and input prior to

09:23  19   flight.

09:23  20          And just like before up here in this, what I'm

09:23  21   circling right now in Column 3, Line 18 to 30, Frink

09:23  22   says it both ways.  He says it up at the top half it

09:23  23   can be preprogrammed, and then he says in the bottom

09:23  24   half it can even be done while the aircraft is in

09:23  25   flight.

09:23    1        Q.    And what is your opinion with respect to

09:23    2    whether Frink anticipates or renders obvious Claim 7 of

09:23    3    the '909 patent?

09:23    4        A.    I believe Frink anticipates and renders

09:23    5    obvious Claim 7 of the '909 patent.

09:23    6        Q.    Now, let's move on to the last two claims that

09:24    7    are asserted in this case, Claims 10 and Claim 11.

09:24    8              Are these dependent claims?

09:24    9        A.    Yes.  They are.

09:24   10        Q.    What does that mean?

09:24   11        A.    That means they add an additional element to

09:24   12    an existing claim that we've already talked about.

09:24   13    They just make it even longer.

09:24   14        Q.    Let's look at that additional element, though.

09:24   15              Well, first off, since it's referring to

09:24   16    Claim 7 here, do you see that?

09:24   17        A.    I do.

09:24   18        Q.    And does your same analysis for Claim 7 apply

09:24   19    to Claim 10?

09:24   20        A.    Yes.  So all the -- Claim 10 builds on

09:24   21    Claim 7.  So everything that I decided for Claim 7 is

09:24   22    already what I believe for Claim 10, except we have a

09:24   23    new additional element that we have to also consider.

09:24   24        Q.    And Claim 11 also refers to the system

09:24   25    according to Claim 7.

| | | |
|---|---|---|
| 09:24 | 1 | Does your analysis for Claim 7 also apply to |
| 09:24 | 2 | Claim 11? |
| 09:24 | 3 | A.   Yes. |
| 09:24 | 4 | Q.   Let's start with Claim 10 and let's look at |
| 09:24 | 5 | that additional limitation. |
| 09:24 | 6 | Does Frink disclose the additional limitation |
| 09:25 | 7 | in Claim 10? |
| 09:25 | 8 | A.   Yes. |
| 09:25 | 9 | Q.   Where? |
| 09:25 | 10 | A.   So additional bit in Claim 10 -- and you saw |
| 09:25 | 11 | this before yesterday -- is it's saying that |
| 09:25 | 12 | information about the position movement of the boat, |
| 09:25 | 13 | for example, it's coming from the boat.  The reference |
| 09:25 | 14 | vehicle is sending it itself. |
| 09:25 | 15 | And in Frink, I've highlighted the section. |
| 09:25 | 16 | It says that the flight navigation uses the unmanned |
| 09:25 | 17 | aerial vehicle's onboard receiver to receive the |
| 09:25 | 18 | navigation data from...  And that's important, from the |
| 09:25 | 19 | moveable surface object. |
| 09:25 | 20 | So that's disclosing that it's actually coming |
| 09:25 | 21 | from the boat. |
| 09:25 | 22 | Q.   And where is that in Frink? |
| 09:25 | 23 | A.   It's in Column 8, Lines 31 to 44. |
| 09:25 | 24 | Q.   So what is your opinion on whether Frink |
| 09:25 | 25 | anticipates or renders obvious Claim 10 of the '909 |

09:25  1    patent?

09:25  2        A.    I believe that Frink anticipates and renders

09:25  3    obvious Claim 10 of the '909 patent.

09:25  4        Q.    Let's move on to Claim 11.

09:26  5        A.    Sure.

09:26  6        Q.    Does Frink disclose the additional

09:26  7    requirements in Claim 11?

09:26  8        A.    So when you look at Claim 11, the additional

09:26  9    requirement is how we're determining the position of

09:26  10   the aircraft.  We're using GPS just like your phone.

09:26  11             And if we look back at Frink, the same way I

09:26  12   talked about it before, Frink very precisely says using

09:26  13   GPS such as the Axiom navigation's Swift A1, which is

09:26  14   GPS.  And that's Column 4, Line 63 to Column 5, Line 8.

09:26  15       Q.    What is your opinion with respect to whether

09:26  16   Frink anticipates or renders obvious Claim 11 of the

09:26  17   '909 patent?

09:26  18       A.    I believe he does anticipate and render

09:26  19   obvious Claim 11 also.

09:26  20       Q.    So did Textron invent having an aircraft

09:26  21   follow a reference vehicle?

09:26  22       A.    No.

09:26  23       Q.    And to clarify, did the United States Patent

09:26  24   Office have the benefit of evaluating Mr. Frink's

09:26  25   patent when it was considering whether to issue or

872

09:26   1    grant the '909 patent?

09:27   2         A.    No.

09:27   3         Q.    Let's move on to the '752 patent.

09:27   4         A.    Sure.

09:27   5         Q.    Do you have an opinion on who would a person

09:27   6    of ordinary skill in the art be with respect to the

09:27   7    '752 patent?

09:27   8         A.    I do.  And that's up on the slide on

09:27   9    everybody's screen.

09:27   10        Q.    And what is that opinion?

09:27   11        A.    It's that you have a bachelor's degree or

09:27   12   better in engineering, for example, or robotics so you

09:27   13   understand flight controls, and that you have some

09:27   14   experience with those systems.  And, of course, just

09:27   15   like I said before, nothing beats real-world education

09:27   16   in the real world -- I'm sorry -- nothing beats

09:27   17   real-world experience.

09:27   18              And so if you have significant experience in

09:27   19   the real world, that always substitutes for schooling.

09:27   20        Q.    And in the '909 -- I'm sorry -- in the '752

09:27   21   patent, which claim is asserted?

09:27   22        A.    Only one claim, Claim 13.

09:27   23        Q.    Does the '752 patent have other claims?

09:27   24        A.    Yes.  It's got 20 claims altogether, but the

09:27   25   only claim being asserted in this case is Claim 13.

873

09:28  1      Q.    So are you offering opinion on whether any of

09:28  2   those other asserted claims are invalid?

09:28  3      A.    No.

09:28  4      Q.    So what does it mean if the jury agrees with

09:28  5   you that Claim 13 of the '752 patent is invalid?

09:28  6            Is the entire patent invalid?

09:28  7      A.    No.

09:28  8      Q.    If you could, please turn to DX-396 in your

09:28  9   binder.

09:28  10     A.    I'm there.

09:28  11     Q.    What is this?

09:28  12     A.    This is an article, "Design and Pilot

09:28  13  Evaluation of the RAH-66 Comanche Selectable Control

09:28  14  Modes."

09:28  15     Q.    And who's the first author of that article?

09:28  16     A.    Mr. Gold.

09:28  17     Q.    And how does this article relate to your

09:28  18  analysis of whether the '752 -- Claim 13 of the '752

09:28  19  patent is valid?

09:28  20     A.    I studied this article to understand whether

09:29  21  somebody invented the things in Claim 13 before

09:29  22  Claim 13 was written.

09:29  23     Q.    And when was -- can we refer to this article

09:29  24  as the Gold article?

09:29  25     A.    Sure.

874

| | | |
|---|---|---|
| 09:29 | 1 | Q.   Mr. Gold's article? |
| 09:29 | 2 | When was Mr. Gold's article published? |
| 09:29 | 3 | A.   It was published in, I believe, 1993. |
| 09:29 | 4 | MR. SCHLESINGER:  Your Honor, DJI moves |
| 09:29 | 5 | to admit Defendants' Exhibit 396. |
| 09:29 | 6 | MR. RICH:  No objection. |
| 09:29 | 7 | THE COURT:  It'll be admitted. |
| 09:29 | 8 | MR. SCHLESINGER:  Actually, we can go |
| 09:29 | 9 | back to the slides.  Thank you. |
| 09:29 | 10 | BY MR. SCHLESINGER: |
| 09:29 | 11 | Q.   You mentioned this was Mr. Gold's article. |
| 09:29 | 12 | Who else authored this article? |
| 09:29 | 13 | A.   James Dryfoos. |
| 09:29 | 14 | Q.   And who did Mr. Dryfoos work for? |
| 09:29 | 15 | A.   Boeing Helicopter Division. |
| 09:29 | 16 | Q.   What kind of aircraft -- you've mentioned |
| 09:29 | 17 | helicopters.  What type of helicopters does Boeing |
| 09:29 | 18 | make? |
| 09:29 | 19 | A.   I hope I don't get this wrong, but I think |
| 09:29 | 20 | they make the Apache helicopter.  Pretty sure about |
| 09:30 | 21 | that. |
| 09:30 | 22 | Q.   And what type of helicopters is this article |
| 09:30 | 23 | about? |
| 09:30 | 24 | A.   It's about military attack helicopters, and |
| 09:30 | 25 | it's about the controls in those military helicopters. |

```
09:30   1    They're two-seaters, where the pilot's sitting one
09:30   2    behind the other.  And they have all kinds of weaponry
09:30   3    and defensive material onboard, and they have to be
09:30   4    able to do battle no matter what the conditions are.
09:30   5        Q.    Did the Patent Office have Mr. Gold's article
09:30   6    before them when they considered whether to grant the
09:30   7    '752 patent?
09:30   8        A.    No.
09:30   9        Q.    And you mentioned Gold was published in 1993?
09:30  10        A.    Yes.
09:30  11              MR. SCHLESINGER:  Could we please pull up
09:30  12    the '752 patent?
09:30  13              And let's look in and get when it was
09:30  14    filed.
09:30  15    BY MR. SCHLESINGER:
09:30  16        Q.    When was the '752 patent filed?
09:30  17        A.    It's right here, July 15, 2011.
09:31  18        Q.    It's quite a bit of time after 1993, right?
09:31  19        A.    Nearly 18 years after the Gold article was
09:31  20    published.
09:31  21        Q.    And how do you know that the Patent Office
09:31  22    didn't consider Gold when it decided whether to issue
09:31  23    the '752 patent?
09:31  24        A.    Similar to what we explained on the last
09:31  25    patent, there's this whole section called "references
```

876

09:31  1    cited" that I'm circling, and that lists out everything

09:31  2    that the Patent Office had considered, and it says

09:31  3    continued.  So this is partial.

09:31  4        Q.    Okay.  And is that the continued part now

09:31  5    shown on the screen on the second page of the '752

09:31  6    patent?

09:31  7        A.    Yes.

09:31  8        Q.    And is Gold listed on either page?

09:31  9        A.    Ask that again?

09:31  10       Q.    Is Gold listed in either of those pages?

09:31  11       A.    No.

09:31  12       Q.    And so that means the Patent Office didn't

09:31  13   look at Gold and see what it disclosed with the '752

09:31  14   patent claims?

09:31  15       A.    Correct.  They didn't look at Gold.

09:31  16             MR. SCHLESINGER:  We can go back to the

09:32  17   slides, please.

09:32  18   BY MR. SCHLESINGER:

09:32  19       Q.    What is Gold about?

09:32  20       A.    Well, Boeing was building a new

09:32  21   next-generation military helicopter a lot like the

09:32  22   Apache.  It was called the Comanche.  It's hardened.

09:32  23   So if you shoot at it from below, it's armored down

09:32  24   here so that the bullets can't get through and hurt the

09:32  25   helicopter or the pilots in the helicopter.  And they

877

09:32   1    really wanted this to be stable and safe in really

09:32   2    dangerous situations.

09:32   3           So the whole patent is about the question of:

09:32   4    If we have some autopilot modes on this helicopter and

09:32   5    we're flying in dangerous situations, what should

09:32   6    happen?  How should the pilot be able to let go of the

09:32   7    controls and have the helicopter turn on automatically?

09:32   8           And so just like we talked about yesterday,

09:32   9    it's all about this question of:  How is it that you

09:32   10   get your autopilot to take over and make the helicopter

09:32   11   safe when you let go of the controls?  And then, of

09:32   12   course, when you take back over the controls and use

09:33   13   them, how does the helicopter behave?

09:33   14   Q.    And I see part of the section highlighted

09:33   15   refers to "velocity stabilization," and then there's a

09:33   16   slash, "hover hold and altitude hold."

09:33   17          Can you explain how we should read when

09:33   18   something's on the left side of the slash versus the

09:33   19   right side of the slash?

09:33   20   A.    Yeah.  This is a little new.  We didn't have

09:33   21   to talk it through yesterday.  But in helicopters, when

09:33   22   we're talking about all the autopilots and the way they

09:33   23   work, we're always wondering:  How does the helicopter

09:33   24   behave when you use the controls, and then what does

09:33   25   the autopilot do when you let go of the controls?

878

09:33  1         You always have to think about those two

09:33  2  cases, because you're frequently going between you

09:33  3  controlling the helicopter and letting the helicopter

09:33  4  control itself, and then you control some more, then

09:33  5  you let go and let it control itself.  You're going

09:33  6  back and forth all the time.

09:33  7         This is not how I drive my car.

09:33  8         And so the slash, whatever's to the left of

09:33  9  the slash is how the helicopter behaves when you're

09:33  10  controlling it.  So, for instance, velocity

09:34  11  stabilization here is a specific thing.  It means that

09:34  12  as I move the stick forward, the more I move the stick

09:34  13  forward, the faster the helicopter goes but stably.  It

09:34  14  won't upset itself if there's bad wind currents.

09:34  15         And then whatever's after the slash is what

09:34  16  happens when you let go of the controls.  So hover hold

09:34  17  is saying if I let go of the controls, I want the

09:34  18  helicopter to hover.

09:34  19      Q.   You mentioned "autopilot."  Is autopilot

09:34  20  always on?

09:34  21      A.   No.  When you are flying a helicopter, you

09:34  22  know, you turn on the rotors, you lift off.  You decide

09:34  23  if you're going to need autopilot today for your

09:34  24  flight.

09:34  25         If you're going to need these modes, you have

879

| | | |
|---|---|---|
| 09:34 | 1 | to hit a switch to enable autopilot.  And that's a |
| 09:34 | 2 | safety feature, because if something malfunctions |
| 09:34 | 3 | later, you want to be able to turn off autopilot if |
| 09:34 | 4 | somebody shoots you and damages something. |
| 09:34 | 5 |          So you turn on the mode when you lift off and |
| 09:34 | 6 | you start to fly, then later, half an hour later, |
| 09:35 | 7 | whenever you want, you can actually use it.  So now you |
| 09:35 | 8 | can actually, for instance, push forward on the stick, |
| 09:35 | 9 | do the right thing, let go of the stick and the |
| 09:35 | 10 | autopilot will take over automatically. |
| 09:35 | 11 |    Q.    Does Gold refer to -- actually, let me strike |
| 09:35 | 12 | that. |
| 09:35 | 13 |          I see on the slide you have -- it's Degraded |
| 09:35 | 14 | Visual Environment, DVE. |
| 09:35 | 15 |    A.    Yes. |
| 09:35 | 16 |    Q.    What is that? |
| 09:35 | 17 |    A.    I believe that exact same language was |
| 09:35 | 18 | actually in the '752 patent yesterday too.  That means |
| 09:35 | 19 | when the pilot can't necessarily see everything.  It |
| 09:35 | 20 | could be brownout.  It could be you're flying in fog or |
| 09:35 | 21 | really bad weather. |
| 09:35 | 22 |    Q.    And we'll move on to the next slide. |
| 09:35 | 23 |          Does Gold disclose a control system? |
| 09:35 | 24 |          Oops.  There we go. |
| 09:35 | 25 |    A.    Yes.  This is a slide where Gold is talking |

09:35  1   about the idea that the Comanche helicopter or -- this
09:35  2   is just a long way of saying Comanche.  The Comanche
09:35  3   helicopter has a control system, and it talks about the
09:36  4   fact that it has manual control and all these autopilot
09:36  5   modes that can take over and work with you.
09:36  6       Q.   And are those the button you were referring to
09:36  7   so that you could fly in the autopilot modes?
09:36  8       A.   Yes.  You turn on all those modes so that
09:36  9   later during flight, you can automatically go between
09:36  10  them and manual control as you wish.
09:36  11      Q.   And this is -- these cites are a little
09:36  12  different on this one.  I believe what we could just
09:36  13  refer to -- we're looking at Defendants' Exhibit 396,
09:36  14  and you see that long list of numbers.  Let's just
09:36  15  refer to the last four as, for example here, 4333.
09:36  16           Is that where these quotes come from, Gold?
09:36  17      A.   Yes.
09:36  18      Q.   And on the one on the left, it refers to
09:36  19  "produce superior flight performance and low pilot
09:36  20  workload."
09:36  21           What is that referring to?
09:36  22      A.   If you're able to collaborate with your
09:36  23  autopilot and decide what it's doing, what you're
09:36  24  doing, and let go of the controls when you need to, one
09:36  25  thing that buys you is -- we talked about how flying a

09:37    1    helicopter is a dance.  You're using your hands and

         2    feet all the time.

09:37    3            If you can let go sometimes, that lets your

09:37    4    brain relax.  It lets you recover from high-stress

09:37    5    situations, and so that makes your workload go down,

09:37    6    where workload is kind of how anxious you are.

09:37    7            Superior flight performance, well, if you want

09:37    8    to go forward at 25 knots in a very tricky situation

09:37    9    with low visibility, if you can just tell the

09:37   10    helicopter, just do that for me, and you just hold the

09:37   11    stick there, that's a lot easier than trying to fight

09:37   12    all of the wind currents and turbulence and keep the

09:37   13    helicopter upright manually.  So you're going to fly

09:37   14    better and with less stress.

09:37   15    Q.    And I see a reference to "control law design."

09:37   16            How does that relate to control loops?

09:37   17    A.    You're going to be turning on and off

09:37   18    different control loops so that you're deciding what

09:37   19    you're controlling when you actually fly the

09:37   20    helicopter.

09:37   21            MR. SCHLESINGER:  And let's turn back to

09:37   22    Claim 13 of the '752 patent.

        23    BY MR. SCHLESINGER:

09:37   24    Q.    What is your opinion on whether Gold qualifies

09:37   25    as prior art to the '752 patent?

882

09:38  1        A.    I believe Gold is prior art.

09:38  2        Q.    And what is your opinion on whether Gold

09:38  3   renders Claim 13 of the '752 patent obvious?

09:38  4        A.    I believe Gold does render Claim 13 obvious.

09:38  5        Q.    There's a lot of limitations here, but let's

09:38  6   walk through them one by one.

09:38  7        A.    Sorry.

09:38  8        Q.    Let's start with the first one.

09:38  9              What is your opinion with respect to whether

09:38 10   Gold discloses a flight control system for a rotary

09:38 11   aircraft?

09:38 12        A.    So that's just the preamble.  And as we

09:38 13   already pointed out, Gold says this has a control

09:38 14   system on the Comanche.  So I believe that we've

09:38 15   disclosed that already here.

09:38 16        Q.    And is that on Page 4333 of Gold?

09:38 17        A.    Yes.  4333.

09:38 18        Q.    What about the rest of the preamble, the

09:38 19   rotary aircraft having to list -- the listed

09:38 20   controllers?  Does Gold disclose that?

09:38 21        A.    Yes.

09:38 22        Q.    Where?

09:38 23        A.    So that limitation, remember, is saying it's a

09:38 24   particular kind of rotary aircraft.  It's one that has

09:39 25   these controllers right here.

09:39  1            And Gold actually explains that the Comanche

09:39  2    cockpit has controllers, and specifically it says it

09:39  3    has a 4-axis controller.  That's a very fancy way of

09:39  4    saying it has a special device that they were doing

09:39  5    their experiments with.  When you twist that device, it

09:39  6    goes left and right.  When you lift up, it goes up.

09:39  7    When you push down, it goes down.  When you go forward,

09:39  8    it goes forward; backward, backward; and right, right;

09:39  9    left, left.  So it gives you longitudinal, lateral,

09:39  10   directional and vertical control.

09:39  11       Q.   And is that on Page 4339 of Gold?

09:39  12       A.   Yes.

09:39  13       Q.   And you mentioned forward, backward and all

09:39  14   these things.

09:39  15            How does that relate to what's listed in the

09:40  16   preamble of Claim 1?

09:40  17       A.   Did you say Claim 1?

09:40  18       Q.   I'm sorry.  Claim 13.  I misspoke.

09:40  19       A.   Those are all the controllers that we need the

09:40  20   rotary aircraft to have, and so I believe that Gold's

09:40  21   disclosure meets that.

09:40  22       Q.   For example, which one's the longitudinal

09:40  23   controller?

09:40  24       A.   The 4-axis controller when you move it forward

09:40  25   and backward.

884

09:40  1      Q.    How about the lateral controller?

09:40  2      A.    The 4-axis controller when you move it

09:40  3  sideways.

09:40  4      Q.    The directional controller?

09:40  5      A.    You twist it, and that gives you the

09:40  6  directional control.

09:40  7      Q.    And the vertical controller?

09:40  8      A.    It comes up and down.  It pulls up and down

09:40  9  like a knob, and that gives you up and down control

09:40  10  which is vertical control.

09:40  11      Q.    What is your opinion with respect to whether

09:40  12  Gold discloses the preamble of Claim 13?

09:40  13      A.    I believe Gold does disclose the preamble.

09:40  14      Q.    Let's move on to the next limitation, "a

09:40  15  longitudinal loop design having..."

09:40  16          Does Gold disclose this limitation?

09:40  17      A.    Yes.  I need to explain the new figure we're

09:40  18  looking at on the left now.

09:41  19          So this longitudinal loop design limitation is

09:41  20  all about having different modes of control, like we

09:41  21  talked about yesterday, to control the helicopter's

09:41  22  attitude, like this, or rate or speed.

09:41  23      Q.    And can you explain how that's shown in

09:41  24  Figure 1 in Gold?

09:41  25      A.    Sure.  We can step through it one at a time.

09:41   1          So let's just start with the bottom one, pitch

09:41   2   rate loop.  You'll recall pitch rate loop means how

09:41   3   fast the helicopter does this.  And any helicopter with

09:41   4   an autopilot has to have that pitch rate loop so it can

09:41   5   control its rate so it doesn't crash.

09:41   6          And if you look at the very top of this

09:41   7   complicated figure, this figure breaks up into three

09:41   8   parts, but the top one actually is about what's called

09:41   9   angular rate which is pitch rate.  And it's a model,

09:41   10  it's a loop, that's figuring out how to control the

09:42   11  angular rate of change of the helicopter.

09:42   12     Q.    Does Gold disclose a pitch rate loop?

09:42   13     A.    Yes.

09:42   14     Q.    Let's move on to a pitch attitude loop.

09:42   15     A.    Sure.  So a pitch attitude loop is the

09:42   16  electronics that's going to figure out how to be able

09:42   17  to maintain a specific angle as you fly, for example,

09:42   18  just holding 10 degrees or just holding 20 degrees.

09:42   19          And I've colored that in green here in this

09:42   20  same schematic.  Here you can see attitude right there,

09:42   21  and it's actually measuring attitude and then using a

09:42   22  model of attitude to decide how to control for

09:42   23  attitude.

09:42   24          Of course, it controls attitude by changing

09:42   25  rates, by using a rate to make sure it can hold that

886

09:42  1    angle as it flies through the air.

09:42  2        Q.    And the green box you colored here in

09:42  3    Figure 1, that's just below the purple box on the top?

09:42  4        A.    Yes.

09:42  5        Q.    What about a forward speed hold loop?  Does

09:42  6    Gold disclose that?

09:42  7        A.    Yes.

09:42  8        Q.    Where?

09:42  9        A.    If you go forward one more slide, forward

09:43  10   speed hold loop, the idea that the autopilot needs to

09:43  11   be able to -- if you want it to go at 20 miles an hour

09:43  12   constantly, it needs to be able to hold 20 miles an

09:43  13   hour.

09:43  14        So you need, again, electronics to do that.

09:43  15   And, of course, the way you do that is the autopilot

09:43  16   needs to -- if you're controlling the speed, it needs

09:43  17   to figure out how to maneuver the helicopter to keep

09:43  18   you at 20 miles an hour constantly.

09:43  19        And so if you look at the bottom here, this is

09:43  20   called velocity stabilization.  And there's a

09:43  21   groundspeed coming in here because it's measuring the

09:43  22   speed, groundspeed and airspeed as a matter of fact,

09:43  23   and it's using a velocity model.  And it's actually

09:43  24   using those to control the forward speed, and that is

09:43  25   the forward speed hold loop.

09:43   1        Q.    And for the record, the blue box you have

09:43   2   shown here is at the bottom of Figure 1?

09:43   3        A.    Correct.

09:43   4        Q.    Let's look at the first wherein clause.

09:44   5              Does Gold disclose the forward speed hold loop

09:44   6   and the wherein clause about engaging the forward speed

09:44   7   hold loop automatically when the controller's returned

09:44   8   to a detent position and the aircraft groundspeed is

09:44   9   outside of the groundspeed threshold?

09:44   10       A.    Yes.

09:44   11       Q.    How do you know that?

09:44   12       A.    Well, I'm going to teach you how to read

09:44   13   another table now.

09:44   14             So on the left side, we have some text:  The

09:44   15   pitch axis response type is attitude command/velocity

09:44   16   hold.

09:44   17             We were just talking about these slashes.  So

09:44   18   to remind you, that mode that Gold's disclosing,

09:44   19   attitude command/velocity hold, that means when I move

09:44   20   the stick forward, when I move the little controller

09:44   21   forward, the more I move it forward, the more I'm

09:44   22   commanding a certain angle.  That's attitude command

09:44   23   because angle is attitude.

09:44   24             When I let go of it, it goes to velocity hold,

09:45   25   which means it takes the speed I'm moving at when I let

888

09:45  1    go and it just continues at that speed.  So I'm

09:45  2    commanding changes to the angle.  And when I let go,

09:45  3    the autopilot's automatically controlling the speed so

09:45  4    I keep going at the same speed.

09:45  5          That's attitude command/velocity hold.

09:45  6    Sometimes you write it AC/VH.  That's what it says up

09:45  7    here in the text.

09:45  8          Now, I want you to see how to read it in the

09:45  9    figure down below because that gives us even more

09:45  10   detail.

09:45  11         So first of all, there's a number line here.

09:45  12   That number line is just showing us how to read the

09:45  13   rest of the figure in terms of how fast the

09:45  14   helicopter's going.  So if the helicopter was going

09:45  15   40 knots, which is like 43 miles an hour, we'd be kind

09:45  16   of here on the number line.  If the helicopter was

09:45  17   going almost nothing, it was like moving at 1 mile an

09:45  18   hour, it would be here in the figure.

09:45  19         So it's just a number line.  The further you

09:46  20   are to the right, the faster you're going.  So let me

09:46  21   clear those.

09:46  22         So now longitudinal loops are all about what's

09:46  23   happening this way, and that's the same as pitch.  So I

09:46  24   just made this black so we can just pay attention to

09:46  25   this direction.  That's what matters in this table.

09:46   1          And if we look at the limitation it says:  The

09:46   2   forward speed hold loop, which you know is the same as

09:46   3   velocity hold here, it needs to automatically engage

09:46   4   when the longitudinal controller is returned to detent.

09:46   5   That part means if I let go of the controls, it has to

09:46   6   automatically start holding forward speed which is

09:46   7   velocity.

09:46   8          And then it says this has to happen when the

09:46   9   aircraft's groundspeed is outside a threshold.  So when

09:46   10  you're going faster than something, and that something

09:46   11  in this picture is this -- really this area here.

09:46   12  Q.   And which area are you pointing to?

09:46   13  A.   It's a darkened area that's from about

09:46   14  negative 5 knots to 5 knots, and it's labeled "hover

09:47   15  hold."

09:47   16         So what this is saying is for that claim

09:47   17  limitation is, if I'm going faster than something, in

09:47   18  this case 5 knots, when I let go of the stick, what

09:47   19  happens?  It needs to hold the speed, and that's

09:47   20  exactly what this figure is saying happens in this

09:47   21  entire region.  It's attitude command/velocity hold.

09:47   22  Q.   And so does Gold disclose a forward speed hold

09:47   23  loop that engages as required by the wherein clause?

09:47   24  A.   Yes.

09:47   25  Q.   And just to be clear, you're looking at

| | | |
|---|---|---|
| 09:47 | 1 | Figure 2 in the text on Page 4335 of Gold? |
| 09:47 | 2 | A.    Yes. |
| 09:47 | 3 | Q.    Let's move on to the next wherein clause that |
| 09:47 | 4 | also refers to a pitch attitude loop. |
| 09:47 | 5 | Does Gold disclose:  Wherein longitudinal |
| 09:47 | 6 | maneuverability of the rotary aircraft is controlled by |
| 09:47 | 7 | either the pitch attitude loop or the pitch rate loop |
| 09:47 | 8 | when the longitudinal controller is out of the detent |
| 09:48 | 9 | position? |
| 09:48 | 10 | A.    Yes. |
| 09:48 | 11 | Q.    How do you know that? |
| 09:48 | 12 | A.    So we talked about how, you know, you lifted |
| 09:48 | 13 | off the airplane, you turned on the autopilot modes, |
| 09:48 | 14 | you're flying, you've pushed forward, right?  And |
| 09:48 | 15 | you're moving and you let go, and it just holds that |
| 09:48 | 16 | speed.  That was the last limitation. |
| 09:48 | 17 | Now it's -- let's say it's holding its speed. |
| 09:48 | 18 | What happens when you take the controller and you |
| 09:48 | 19 | actually move it forward or backward?  How does it |
| 09:48 | 20 | behave?  That's what this is all about.  So when you |
| 09:48 | 21 | start exerting control, what happens? |
| 09:48 | 22 | And when you take it and you move it, the |
| 09:48 | 23 | limitation is saying you need to be controlled by |
| 09:48 | 24 | either pitch attitude or pitch rate.  Pitch attitude |
| 09:48 | 25 | means when I move that stick, it's controlling the |

09:48  1    angle.  Pitch rate, when I move that stick forward,

09:48  2    it's controlling how fast it changes the angle.

09:48  3            And we actually have in the picture on the

09:48  4    left, the left side of that slash is attitude command

09:49  5    which is exactly the same as pitch attitude loop.  So

09:49  6    we are controlled by pitch attitude when you move that

09:49  7    controller.

09:49  8        Q.    Is that enough to meet Claim -- the

09:49  9    requirement of Claim 13?

09:49  10       A.    Yes.

09:49  11       Q.    What is your opinion with respect to whether

09:49  12   Gold discloses the entire longitudinal loop design

09:49  13   claimed in Claim 13?

09:49  14       A.    I believe Gold discloses it.

09:49  15       Q.    Let's move on to the lateral loop design.

09:49  16   Does Gold disclose a lateral loop design?

09:49  17       A.    Yes.

09:49  18       Q.    Where?

09:49  19       A.    On the same figure I've made brighter, the

09:49  20   roll part of the figure so that we can talk through it.

09:49  21       Q.    And you're referring to Figure 2?

09:49  22       A.    I am.  It's the middle part of Figure 2.  And

09:49  23   it's also the text in our excerpt at the top from 4335

09:49  24   that talks about a roll response type.

09:49  25       Q.    Does Gold disclose:  Wherein the lateral speed

892

09:50  1    hold loop automatically engages when the lateral

09:50  2    controller is returned to a detent position and the

09:50  3    aircraft groundspeed is outside the first groundspeed

09:50  4    threshold?

09:50  5        A.    Yes.

09:50  6        Q.    And actually, just to be clear, on the last

09:50  7    loop, the longitudinal loop design, what's the

09:50  8    groundspeed threshold?

09:50  9        A.    5 knots.

09:50  10       Q.    And what's the groundspeed threshold here?

09:50  11       A.    5 knots.

09:50  12       Q.    Where in Gold does it disclose this limit --

09:50  13   wherein clause?

09:50  14       A.    Here in the roll section Gold says that in

09:50  15   this whole region, when you're outside of 5 knots,

09:50  16   you're running the sideways control of the helicopter

09:50  17   and attitude command groundspeed hold.

09:50  18           That means if you are pushing the control to

09:50  19   the right, make the helicopter go sideways like this

09:50  20   perhaps, because you're looking at the treeline or

09:51  21   something like that.  When you let go of the controls,

09:51  22   that's the hold part, right?  Groundspeed hold.  So

09:51  23   it's going to hold the same speed.

09:51  24           It's not a forward speed, right?  It's a

09:51  25   sideways speed or a lateral speed.  But it's going to

09:51  1    hold that speed.  That's what this here is saying.

09:51  2        Q.    What about the next limitation, a roll rate

09:51  3    loop?  And then a wherein clause that:  The lateral

09:51  4    maneuverability of the rotary aircraft is controlled by

09:51  5    either the lateral speed hold loop or the roll rate

09:51  6    loop when the lateral controller's out of the detent

09:51  7    position.

09:51  8        A.    For this one, again, out of the detent, this

09:51  9    is when you actually take the controller and move it.

09:51  10   So now it's prescribing something that has to happen

09:51  11   when you move the controller.

09:51  12           And it's saying one of two things has to

09:51  13   happen, either you control the speed or you control the

09:51  14   roll rate.  And actually in Gold, we even have this

09:51  15   rate command right here.  When you're going faster than

09:51  16   about 70 knots, if you move that control to the right,

09:52  17   you're actually controlling the rate.  And it does that

09:52  18   because it makes it fly a little bit like an airplane.

09:52  19       Q.    What is your opinion on whether Gold discloses

09:52  20   Claim 13's lateral loop design?

09:52  21       A.    I believe Gold does disclose this whole loop

09:52  22   design.

09:52  23       Q.    All right.  That covers the lateral loop

09:52  24   design.  Let's move on to the next loop.

09:52  25           A directional loop design.  Does Gold disclose

894

09:52  1    the claim directional loop design?

09:52  2        A.    Yes.

09:52  3        Q.    Where?

09:52  4        A.    Same figure we were looking at before,

09:52  5    Figure 2.  Now we're just -- I've boldfaced the very

09:52  6    bottom which is yaw.  Yaw, you'll recall, is just the

09:52  7    angle that you're facing:  North, south, east, west.

09:52  8    So it's the same as directional control.

09:52  9        Q.    Let's start with the -- actually, I'm sorry.

09:52  10            Where does it disclose a heading hold loop in

09:52  11   Gold?

09:52  12       A.    It talks about heading hold both up here in

09:53  13   4334, "heading hold control laws," and it talks about

09:53  14   it in the figure, Figure 2.

09:53  15       Q.    Where in Figure 2?

09:53  16       A.    So the very bottom of Figure 2 where it says

09:53  17   "yaw," you can see that here it's saying "heading hold"

09:53  18   to the right of the slash and "rate command" to the

09:53  19   left.

09:53  20            So that means -- and if you look in the -- on

09:53  21   the right side in the claim, it says you need a heading

09:53  22   hold loop to happen whenever you go back to detent.  It

09:53  23   says re-engage.

09:53  24            So every time you twist the knob, it's going

09:53  25   to move.  Every time you let go of the knob, it's going

09:53   1   to engage heading control, which means you're going to

09:53   2   hold the heading as that.  You twist it again, it's

09:53   3   going to move again.  You let go again, it's going to

09:53   4   re-engage that heading hold in the new direction.

09:53   5           And so since the command type here for yaw is

09:53   6   rate command/heading hold, that means when you spin

09:53   7   this, you're changing the angle, the rate of the angle

09:53   8   change, and you let go of the spinner, it's going to

09:54   9   hold that heading.

09:54   10      Q.    And you mentioned a groundspeed threshold of

09:54   11   5 knots.  What happens if you let go of that controller

09:54   12   above 5 knots in Gold?

09:54   13      A.    The heading hold loops gets re-engaged.

09:54   14      Q.    And you mentioned the rate command.

09:54   15           Is that a yaw rate command?

09:54   16      A.    Yes.

09:54   17      Q.    Does that meet the -- a yaw rate command loop

09:54   18   claimed in Claim 13?

09:54   19      A.    Yes.

09:54   20      Q.    So what is your opinion on whether Gold

09:54   21   discloses the entire directional loop design claimed in

09:54   22   Claim 13?

09:54   23      A.    I believe Gold does disclose this whole loop

09:54   24   design.

09:54   25      Q.    Let's move on to the vertical control loop.

09:54  1          Does Gold disclose the vertical control loop

09:54  2   claimed in Claim 13?

09:54  3       A.   I believe so.  Yes.

09:54  4       Q.   Let's start with the altitude hold loop in the

09:54  5   wherein clause:  The altitude hold loop automatically

09:54  6   engages when the vertical controller is returned to a

09:54  7   detent position and the aircraft groundspeed is inside

09:54  8   the first groundspeed threshold.

09:54  9          Does Gold disclose this?

09:54  10      A.   Yes.

09:54  11      Q.   Where?

09:55  12      A.   So we can see up in the top box, which is

09:55  13  4338, that Gold says:  This is going to be a vertical

09:55  14  rate command altitude height hold.

09:55  15         And when the vertical controllers return to a

09:55  16  detent, that means you're pulling up and you let go.

09:55  17  So you're -- maybe your helicopter's at 500 feet.  You

09:55  18  pull up, and you start going up 10 feet a minute.  And

09:55  19  after half a minute or so, you let go, and you've

09:55  20  gotten to 550 feet.  You want -- when you let go, you

09:55  21  want the helicopter to stay at 550 feet of altitude.

09:55  22         And in the writing on the left, it says

09:55  23  "vertical rate command."  So when I pull up and down on

09:55  24  that knob, I'm commanding the speed at which I go up

09:55  25  and down.

| 09:55 | 1 | When I let go of it, it's height hold. |
| 09:55 | 2 | Attitude hold and height hold are the same thing. |
| 09:55 | 3 | Q.   You mentioned the vertical speed.  Is that the |
| 09:55 | 4 | vertical speed loop claimed in Claim 13? |
| 09:55 | 5 | A.   Yes. |
| 09:55 | 6 | Q.   And is that shown on Page 4338 of Gold? |
| 09:56 | 7 | A.   Yes. |
| 09:56 | 8 | Q.   In the earlier description, you were talking |
| 09:56 | 9 | about the attitude hold and how it engages and meets |
| 09:56 | 10 | the wherein clause. |
| 09:56 | 11 | Is that on Pages 4337 through 4338 of Gold? |
| 09:56 | 12 | A.   Yes. |
| 09:56 | 13 | Q.   And does that occur when the groundspeed is |
| 09:56 | 14 | less than the 5 knots first groundspeed threshold? |
| 09:56 | 15 | A.   Yes. |
| 09:56 | 16 | Q.   And I also just want to confirm, on the |
| 09:56 | 17 | directional loop, you mentioned the heading hold would |
| 09:56 | 18 | be re-engaged. |
| 09:56 | 19 | Just to confirm, the heading hold would be |
| 09:56 | 20 | re-engaged if the groundspeed is less than 5 knots, |
| 09:56 | 21 | which is the first groundspeed threshold; is that |
| 09:56 | 22 | correct? |
| 09:56 | 23 | A.   Yes. |
| 09:56 | 24 | Q.   I believe we actually went through all those |
| 09:56 | 25 | loops. |

898

09:56    1        A.      We did.

09:56    2        Q.      But I think you have a little bit additional

09:56    3    evidence -- or I'm curious if you have a little

09:57    4    additional evidence on the vertical speed hold loop.

09:57    5             Is there any diagrams that disclose that?

09:57    6        A.      There is an even more complicated-looking

09:57    7    diagram.  Yes.

09:57    8        Q.      Where is that?

09:57    9        A.      It is on Gold 4337.  It's called Figure 5.

09:57   10        Q.      It's a little complex, but can you break it

09:57   11    down for us?

09:57   12        A.      Sure.

09:57   13             I'm going to start by showing you the speed

09:57   14    part of it.  How do you maintain the same speed when

09:57   15    you command it to keep going up, for example, at 5 feet

09:57   16    per minute?

09:57   17             And that speed part of it, this is the 4-axis

09:57   18    controller that we're pulling up on.  So we're pulling

09:57   19    up on that in this direction inside the cockpit.

09:57   20             And when we do that, these are actually speed

09:57   21    commands.  That ALT with a dot on top means how fast

09:57   22    you're going up and down.

09:57   23             And so you're actually measuring how fast

09:57   24    you're actually going up and down.  You're comparing it

09:57   25    here to how fast you're commanding it to go up and

09:57  1   down, and then you're making adjustments to the actual

09:58  2   rotors of the helicopter so that if you're asking for 5

09:58  3   feet a minute, you're going to get 5 feet per minute.

09:58  4        Q.   And is this showing a loop, a vertical speed

09:58  5   hold loop?

09:58  6        A.   Yes.

09:58  7        Q.   And that's Figure 5?

09:58  8        A.   Yes.

09:58  9        Q.   Does Figure 5 also show an altitude hold loop?

09:58  10       A.   Absolutely.

09:58  11       Q.   Can you describe that?

09:58  12       A.   Sure.

09:58  13            When you let go of this controller, you don't

09:58  14   want to go up at 5 feet a minute anymore.  You want it

09:58  15   to just lock in on the altitude it's at and stay there

09:58  16   so that, for instance, you can survey the ground, look

09:58  17   for whatever you're looking for.

09:58  18            And so when that happens, you're measuring the

09:58  19   altitude you're at and the altitude that you've

09:58  20   commanded, which is basically the altitude when you let

09:58  21   go of the controller.

09:58  22            You're comparing those two, figuring out the

09:58  23   error that's in the altitude you're supposed to be at

09:58  24   and the altitude you're actually at.  And then, again,

09:58  25   you're commanding the helicopter so you can fix it.

09:58  1          So if you're at 800 feet and you're supposed

09:59  2  to be at 795 feet, it'll bring itself right down to 795

09:59  3  and stay there.  And if there's a thermal blowing it

09:59  4  out of position, it's going to constantly compensate

09:59  5  for that and stay at 795.

09:59  6      Q.    And that's when you let go of the controls?

09:59  7      A.    Yes.

09:59  8      Q.    What is your opinion with respect to whether

09:59  9  Gold renders obvious Claim 13?

09:59  10      A.    I believe Gold does render obvious all of

09:59  11  Claim 13.

09:59  12      Q.    Did Mr. Gold invent the control loops claimed

09:59  13  in Claim 13 prior to the '752 patent?

09:59  14      A.    No.  These control loops -- helicopter

09:59  15  autopilots have been around for decades.  Control loops

09:59  16  are not new.  Gold and the '752 patent are just talking

09:59  17  about how to turn them on and off when you let go of

09:59  18  the controls and push on the controls.

09:59  19      Q.    I see.  So the controllers predate even Gold?

09:59  20      A.    Oh, yes.

09:59  21      Q.    Did Gold disclose the specific control loops

10:00  22  claimed in Claim 13 of the '752 patent before the '752

10:00  23  patent was filed?

10:00  24      A.    Yes.

10:00  25      Q.    And is that why Gold renders obvious Claim 13

10:00  1   of the '752 patent?

10:00  2        A.    Yes.

10:00  3        Q.    And again, you're only opining whether one

10:00  4   claim in the '752 patent is invalid; is that correct?

10:00  5        A.    That's right.

10:00  6        Q.    And so if the jury agrees with your opinions

10:00  7   both on the '752 patent and the '909 patent, that

10:00  8   doesn't mean the entire patent's invalid?

10:00  9        A.    Correct.

10:00  10       Q.    And just as a reminder, the United States

10:00  11  government Patent Office, when they evaluated Claim 13

10:00  12  of the '752 patent, they never looked at Gold.  They

10:00  13  didn't have Gold before it, did they?

10:00  14       A.    Correct.

10:00  15       Q.    So let's shift gears.  We're on the last

10:00  16  questions finally.

10:00  17             Let's talk a little bit about the technical

10:00  18  value and potential alternative designs.  Let's start

10:00  19  with the '909 patent.

10:00  20             Do you have an opinion on whether the -- what

10:00  21  the '909 patent's technical value is related to DJI

10:00  22  drones?

10:00  23       A.    Yes.  I do.

10:01  24       Q.    What is that?

10:01  25       A.    I believe the '909 patent does not have any

902

10:01  1    value for these drones.

10:01  2        Q.    Why not?

10:01  3        A.    Because what the '909 patent teaches isn't

10:01  4    necessary or useful to the way we fly these drones in

10:01  5    the real world.

10:01  6        Q.    And you're talking about the RIV that was

10:01  7    described?

10:01  8        A.    Yes.  The relative inertial velocity mode.

10:01  9        Q.    Was following an object new in the '909

10:01  10   patent?

10:01  11       A.    No.

10:01  12       Q.    Do you have an opinion with respect to the

10:01  13   '752 patent, whether that has any technical value to

10:01  14   the DJI drones?

10:01  15       A.    For these drones that DJI builds and people

10:01  16   buy and use, I don't believe the '752 patent has any

10:01  17   technical value.

10:01  18       Q.    Why not?

10:01  19       A.    Because the things that the '752 patent is

10:01  20   about, while they're very applicable to this kind of

10:01  21   machine, I just don't think they apply.  They have no

10:02  22   value for this kind of machine where I'm standing

10:02  23   outside here and controlling it.

10:02  24       Q.    And you're differentiating between the

10:02  25   helicopter that's piloted by a pilot and a drone that's

| | | |
|---|---|---|
| 10:02 | 1 | not? |
| 10:02 | 2 | A.    That's my example.  Yes. |
| 10:02 | 3 | Q.    And kind of like how the DJI drones with |
| 10:02 | 4 | Follow Me aren't about landing on a ship? |
| 10:02 | 5 | A.    That's right. |
| 10:02 | 6 | Q.    Were you asked to consider if there were any |
| 10:02 | 7 | alternative designs that were available for the '909 |
| 10:02 | 8 | and '752 patents? |
| 10:02 | 9 | A.    I was. |
| 10:02 | 10 | Q.    Did you identify any? |
| 10:02 | 11 | A.    I did. |
| 10:02 | 12 | Q.    Let's start with the '909 patent. |
| 10:02 | 13 | What alternative design did you identify? |
| 10:02 | 14 | A.    Well, I thought about this last element, |
| 10:02 | 15 | "wherein the commanded data is preprogrammed into the |
| 10:02 | 16 | control system prior to flight of the aircraft," |
| 10:02 | 17 | because Textron has the contention that we're doing |
| 10:02 | 18 | this with the DJI drones -- not we, that DJI is doing |
| 10:03 | 19 | this with their drones. |
| 10:03 | 20 | And so there's a nice alternative design. |
| 10:03 | 21 | Because when I use Follow Me or ActiveTrack with these |
| 10:03 | 22 | drones, I take off first, right?  I take off, angle it |
| 10:03 | 23 | toward me so that I can make sure I get a good picture |
| 10:03 | 24 | of me when I'm walking around in Follow Me mode or when |
| 10:03 | 25 | it's following my son on his mountain bike in |

10:03  1    ActiveTrack mode.

10:03  2              So the change I could make to the interface

10:03  3    would be at that moment when I say, yeah.  I want to

10:03  4    start Follow Me or I want to start ActiveTrack.  It can

10:03  5    show this box -- I've drawn a really crude-looking box,

10:03  6    but graphic designers can make it pretty -- inside

10:03  7    here.  Right here.  Like a little box here.

10:03  8              And what that box would have on it is, it

10:03  9    would let me choose if I want to even have commanded

10:03  10   relative velocity.  I could push on that velocity

10:03  11   button and decide how fast I want the drone to get

10:03  12   closer or further away from me as I walk.

10:04  13             So if I just added that box, then I'd actually

10:04  14   have commanded relative velocity and I'd have it on my

10:04  15   interface, and it wouldn't be prior to flight because

10:04  16   I'm clearly using it while I'm flying.

10:04  17   Q.    And was this alternative something DJI could

10:04  18   have done at the time it released Follow Me or

10:04  19   ActiveTrack?

10:04  20   A.    Certainly.

10:04  21   Q.    How do you know that?

10:04  22   A.    Because they had programers and graphic

10:04  23   designers that created this interface.  And with my

10:04  24   software understanding and skills, I know they could

10:04  25   have easily added this additional complexity to the

905

10:04   1    screen.

10:04   2        Q.    So you believe DJI was capable of implementing

10:04   3    this at that time?

10:04   4        A.    Yes.

10:04   5        Q.    Would this alternative design have infringed

10:04   6    the asserted claims of the '909 patent?

10:04   7        A.    No.  It can't.

10:04   8        Q.    Why not?

10:04   9        A.    Because it doesn't practice this element.

10:04  10    It's kind of designed to not practice this element.

10:04  11        Q.    Do you believe this alternative design would

10:04  12    have been acceptable to consumers?

10:04  13        A.    Sure.

10:04  14        Q.    Why?

10:04  15        A.    Because it gives them all the functionality

10:04  16    they have now, in addition to the ability to close in

10:04  17    on them or get further away from them.

10:05  18        Q.    Did you identify any other alternative designs

10:05  19    for the '909 patent?

10:05  20        A.    Yes.

10:05  21        Q.    What is that?

10:05  22        A.    Well, the other idea that I came up with was

10:05  23    when you're flying that drone and you got your phone up

10:05  24    here and you're going to do ActiveTrack, let's say, as

10:05  25    an example, when you position it and it's got a good

10:05  1    view of you, you could just tell it to start tracking

10:05  2    you and following you around by just touching your

10:05  3    picture on the screen of the phone.

10:05  4          And if you just touch your picture with your

10:05  5    finger, it could just use that to then do computer

10:05  6    vision, figure out, oh, I'm following Illah, and then

10:05  7    it could follow Illah around.

10:05  8    Q.    So you mean touching it without any bounding

10:05  9    box?

10:05  10   A.    That's right.  You just put your finger on the

10:05  11   object you want to follow like the dog or the human

10:05  12   being.

10:05  13   Q.    And is this something that would have been

10:05  14   available to DJI at the time that it released Follow Me

10:05  15   or ActiveTrack?

10:06  16   A.    Sure.

10:06  17   Q.    Do you think DJI was capable of implementing

10:06  18   that?

10:06  19   A.    Yes.

10:06  20   Q.    Do you believe this alternative is acceptable

10:06  21   to consumers?

10:06  22   A.    Sure.  It's convenient.

10:06  23   Q.    And would this alternative infringe the

10:06  24   asserted claims of the '909 patent?

10:06  25   A.    No.

—907—

10:06   1        Q.    Why is that?

10:06   2        A.    Because you're not sending any position data

10:06   3   or any movement data, ever.

10:06   4        Q.    And for both of these alternatives, for the

10:06   5   '909 patent, about how much engineering time would it

10:06   6   take to implement either one?

10:06   7        A.    It's a rough guess, but about one month of an

10:06   8   engineer's time.

10:06   9        Q.    Is that one month per alternative design?

10:06  10        A.    Yes.

10:06  11        Q.    Did you come up with any alternatives for the

10:06  12   '752 patent?

10:06  13        A.    I did.

10:06  14        Q.    What is that?

10:06  15        A.    The brake pedal and the parking brake

10:06  16   metaphor.  So I'll explain them to y'all.

10:06  17              In these drones we have right now, you're

10:06  18   flying along by pushing on this, and when you let go,

10:07  19   it slows down and stops, and then it does a position

10:07  20   hold.  It stays in position.  And if for some reason

10:07  21   DJI were to say that all infringes by some argument

10:07  22   they're making --

10:07  23        Q.    Do you mean Textron?

10:07  24        A.    I'm sorry.  Yes.  Textron says that that all

10:07  25   infringes by some argument they make, there's two real

908

10:07  1    simple changes that are both alternatives that would

10:07  2    work, I think, great.

10:07  3            One of them is, like, having a brake pedal.

10:07  4    So you could have it so when you push on this

10:07  5    controller, the DJI drone starts going.  And when you

10:07  6    let go, instead of slowing down rapidly and stopping,

10:07  7    it coasts just like your car coasts when you stop

10:07  8    pushing on the accelerator pedal.

10:07  9            And if you want to stop coasting, you just

10:07  10   push this button.  It's a brake pedal.  You push on the

10:07  11   button, it slows down.  That's the brake pedal idea.

10:07  12           Another idea for noninfringing that also

10:07  13   avoids this whole thing is, like, a parking brake.  So

10:07  14   you push on this, and the drone starts going real fast.

10:08  15   You let go, it could slow down and start hovering, but

10:08  16   it doesn't position hold.  It just hovers around.  And

10:08  17   if you push on it, it won't come back.  It'll just stay

10:08  18   wherever it is.

10:08  19           You push a button to turn on the parking

10:08  20   brake, and then it just stays put so that -- you could

10:08  21   have a brake pedal or you could have a parking brake,

10:08  22   and either way you've avoided this issue.

10:08  23       Q.    And why have you avoided this issue -- why

10:08  24   would they not infringe?

10:08  25       A.    Because it's never actually doing speed hold

909

10:08    1    when you let go of this stick.  It's just coasting.

10:08    2        Q.    And what about the parking brake example?

10:08    3        A.    It's not ever going to a different mode that

10:08    4    it has to re-engage out of because it's just speed

10:08    5    holding the whole time until you hit the parking brake

10:08    6    and it comes out of that.

10:08    7        Q.    And you've been clicking buttons on an

10:08    8    existing DJI remote; is that right?

10:08    9        A.    I have.  These have so many buttons on them

10:08   10    that I rarely use.  I think it'd be easy to re-use one

10:09   11    of these buttons for a brake pedal or a parking brake.

10:09   12        Q.    And these examples that you've given as

10:09   13    alternative designs for the '752 patent, would those

10:09   14    have been available at the time that Textron claims DJI

10:09   15    first infringed?

10:09   16        A.    Yes.

10:09   17        Q.    How do you know that?

10:09   18        A.    Because I've looked at the code, and I know

10:09   19    the complexity of implementing something like this.

10:09   20    It's very simple to do in the code -- in the software

10:09   21    as is.

10:09   22        Q.    And do you believe DJI had that capability at

10:09   23    the time?

10:09   24        A.    Certainly.

10:09   25        Q.    Do you believe these alternative designs would

910

10:09    1    be acceptable to consumers?

10:09    2        A.    Yes.  It's how I drive my car.

10:09    3        Q.    And I think you already answered that these

10:09    4    designs wouldn't infringe the claims?

10:09    5        A.    No.

10:09    6        Q.    The asserted Claim 13?

10:09    7        A.    No.  They would not infringe Claim 13.

10:09    8        Q.    And about how much engineering time would it

10:09    9    take to implement these designs?

10:09    10        A.    I'm sorry they're the same rough guesses, but

10:09    11    about a month for each one.

10:09    12        Q.    Have you ever seen a brake button on a DJI

10:09    13    remote?

10:09    14        A.    Yes.  I have.

10:09    15        Q.    And that's a remote that's currently sold?

10:10    16        A.    Yes.  It's one of their newest machines,

10:10    17    actually has a brake button.

10:10    18        Q.    Have you flown that?

10:10    19        A.    I have flown it.

10:10    20        Q.    Did it work?

10:10    21        A.    It's fast.  And the brake works real well too.

10:10    22        Q.    Could you please summarize your opinions -- or

10:10    23    let's start with the first one.

10:10    24            What's your opinion on whether DJI infringes

10:10    25    any of the asserted claims of the '909 and '752

10:10  1   patents?

10:10  2        A.    This was from yesterday.  But my opinion is

10:10  3   that DJI does not infringe the four claims that are

10:10  4   asserted in '909 patent, and it also doesn't infringe

10:10  5   the one claim from the '752 patent.

10:10  6        Q.    And what -- can you summarize your opinion on

10:10  7   whether the asserted claims of the '909 patent and

10:10  8   '752 -- and that the Claim 13 of the '752 patent are

10:10  9   valid?

10:10  10       A.    My opinion is that those four claims in the

10:10  11  '909 patent and the one claim in '752 are not valid.

10:10  12  They're invalid.

10:10  13       Q.    We just went over your opinions on the

10:10  14  technical value and alternatives.  So I don't think we

10:11  15  need to summarize those.

10:11  16            But just to summarize in general, the '909

10:11  17  patent, that was about using velocity to follow another

10:11  18  object, the arrows in a boat; is that right?

10:11  19       A.    Yes.  Relative velocity is what it's all

10:11  20  about.

10:11  21       Q.    And DJI, they use position, not velocity; is

10:11  22  that right?

10:11  23       A.    Correct.

10:11  24       Q.    Now, the Claim 13, that's also about velocity;

10:11  25  is that right?

10:11   1        A.    Yeah.  It's all about velocity in a way.

10:11   2        Q.    But we -- does DJI use velocity when it's

10:11   3   holding a position?

10:11   4        A.    No.  When it's staying put like I showed in

10:11   5   the courtroom, you can pull it away and it'll go right

10:11   6   back down to the same position.  So the idea that it's

10:11   7   holding zero velocity is just not true.

10:11   8        Q.    So in your opinion, is DJI using what's

10:11   9   claimed by Textron in the '909 and '752 patents for the

10:11   10  asserted claims?

10:11   11       A.    No.

10:11   12       Q.    Have you looked at whether DJI itself has any

10:12   13  patents?

10:12   14       A.    I have.

10:12   15       Q.    How many patents did you -- or patent or

10:12   16  patent applications worldwide did you discover DJI has?

10:12   17       A.    I know this number sounds crazy.  I went on

10:12   18  Google patent search and used it to search for patents

10:12   19  that DJI owns, and I was so surprised at the number, I

10:12   20  went back to the United States patent trademark search

10:12   21  site and did the same thing again and went back and

10:12   22  forth.  But I got nearly 40,000 patents -- patent

10:12   23  applications that DJI has around the world.

10:12   24       Q.    What about patents with respect to

10:12   25  tracking-type features like Follow Me?

913

10:12  1    A.    Well, one of the nice things you can do when
10:12  2  you do a patent search on the Internet is you can say I
10:12  3  want to find only patents that have these words in
10:12  4  them.  So I looked up words like "tracking" and I still
10:12  5  got 2,000 patents that DJI has applied for or has
10:12  6  around the world just on tracking.
10:12  7    Q.    And what about hovering?  Does DJI have any
10:12  8  patents on hovering?
10:12  9    A.    I searched on the word "hovering" in the
10:13 10  patent database, and DJI has 1,600 patents that are
10:13 11  about hovering.
10:13 12            MR. SCHLESINGER:  I pass the witness,
10:13 13  Your Honor.
10:13 14                CROSS-EXAMINATION
10:13 15  BY MR. RICH:
10:13 16    Q.    Good morning, Dr. Nourbakhsh.
10:13 17    A.    Good morning, sir.
10:13 18    Q.    You and I met in Pittsburgh a few months back
10:13 19  when I flew up to take your deposition, didn't we?
10:13 20    A.    That's exactly right.
10:13 21    Q.    Good to see you again, Doctor.
10:13 22    A.    Good to see you too.
10:13 23    Q.    Now, you just talked about how DJI has nearly
10:13 24  40,000 patents, applications and publications, didn't
10:13 25  you?

914

10:13  1       A.     I did.

10:13  2       Q.     Out of those 40,000 patents and applications,

10:13  3  you didn't identify a single one as invalidating the

10:13  4  '909 patent, did you?

10:13  5       A.     I didn't use them for that purpose, no.

10:14  6       Q.     Sir, you didn't identify a single one that

10:14  7  invalidates the '909 patent?

10:14  8       A.     That's correct.

10:14  9       Q.     And out of those 40,000 patents and

10:14  10  applications, you didn't identify a single one as

10:14  11  invalidating the '752 patent, right?

10:14  12       A.     That's correct.

10:14  13       Q.     Exactly zero of DJI's 40,000 patents and

10:14  14  applications are ones that you say invalidate Textron's

10:14  15  patents?

10:14  16       A.     That's right.  I didn't look at them that way.

10:14  17       Q.     And you're not relying on any DJI products or

10:14  18  development to say that the jury should invalidate

10:14  19  Textron's patents?

10:14  20       A.     That's right.

10:14  21       Q.     Instead you're using the Frink reference and

10:14  22  the Gold reference, but those guys have nothing to do

10:14  23  with DJI, right?

10:14  24       A.     Exactly.

10:14  25       Q.     And so you're not saying to the jury that they

915

| | | |
|---|---|---|
| 10:14 | 1 | should take away Mr. Harris' and Mr. Christensen's |
| 10:14 | 2 | patents because DJI came up with the ideas first, |
| 10:14 | 3 | correct? |
| 10:14 | 4 | A.    Correct. |
| 10:14 | 5 | Q.    You're also not saying to the jury that DJI |
| 10:14 | 6 | doesn't infringe Textron's patents just because they |
| 10:14 | 7 | have their own patents, right? |
| 10:15 | 8 | A.    That's not the reason they don't infringe, no. |
| 10:15 | 9 | Q.    And you're not saying that just because DJI |
| 10:15 | 10 | has patents, they don't infringe Textron's patents. |
| 10:15 | 11 | That wouldn't be the right analysis, right? |
| 10:15 | 12 | A.    Correct. |
| 10:15 | 13 | Q.    Let's say you moved on down from Pittsburgh |
| 10:15 | 14 | and bought a house next door to me in Dallas, okay? |
| 10:15 | 15 | A.    Sure. |
| 10:15 | 16 | Q.    You and I each own our own properties, right? |
| 10:15 | 17 | A.    Absolutely. |
| 10:15 | 18 | Q.    Just because you own your own house does not |
| 10:15 | 19 | mean you can come and trespass on my property, right? |
| 10:15 | 20 | A.    I definitely wouldn't. |
| 10:15 | 21 | MR. RICH:  May I have Dr. Nourbakhsh's |
| 10:15 | 22 | Slide 3? |
| 10:15 | 23 | BY MR. RICH: |
| 10:16 | 24 | Q.    Dr. Nourbakhsh, you remember putting up this |
| 10:16 | 25 | slide in the start of your examination, right? |

916

10:16    1          A.    Yes.

10:16    2          Q.    You're not here working for NASA, are you?

10:16    3          A.    No.  I'm retired.  I'm a retired civil

10:16    4    servant.

10:16    5          Q.    You're not here working for the Jet Propulsion

10:16    6    Laboratory?

10:16    7          A.    No.

10:16    8          Q.    And you're not here working for Carnegie

10:16    9    Mellon, are you?

10:16   10          A.    No.  I was hired to do this job even though

10:16   11    I'm a professor at Carnegie Mellon.

10:16   12          Q.    But you're not here on behalf of Carnegie

10:16   13    Mellon, right?

10:16   14          A.    No.  I speak just for myself.

10:16   15          Q.    You're actually here as part of your own

10:16   16    separate business as an expert, correct?

10:16   17          A.    Yes.

10:16   18          Q.    And you've worked on -- as an expert witness

10:16   19    in about four patent cases, right?

10:16   20          A.    That's about right, plus or minus.

10:16   21          Q.    When you were talking about your work history,

10:16   22    you didn't tell the jury that a significant part of

10:17   23    your work as an expert witness has been working for DJI

10:17   24    when DJI gets sued for patent infringement?

10:17   25          A.    I don't know if the word "significant" is

| | | |
|---|---|---|
| 10:17 | 1 | right.  I've worked with DJI and many other people. |
| 10:17 | 2 | I've worked with Finnegan on other cases too. |
| 10:17 | 3 | Finnegan is the name of the law firm that's |
| 10:17 | 4 | representing DJI here. |
| 10:17 | 5 | Q.   Finnegan is one of your clients, right? |
| 10:17 | 6 | A.   That's right. |
| 10:17 | 7 | Q.   The law firm that's representing DJI? |
| 10:17 | 8 | A.   Yes. |
| 10:17 | 9 | Q.   And you've served as an expert on three |
| 10:17 | 10 | separate cases for DJI, correct? |
| 10:17 | 11 | A.   I think that's the right number.  Three. |
| 10:17 | 12 | Q.   You have not served as an expert for anyone |
| 10:17 | 13 | other than DJI in the past year? |
| 10:17 | 14 | A.   In the past year, this is the only case I've |
| 10:17 | 15 | been working on, I think. |
| 10:17 | 16 | Q.   And so it's correct, the only person that |
| 10:17 | 17 | you've worked -- the only company that you've worked |
| 10:17 | 18 | for as an expert in the past year has been DJI? |
| 10:17 | 19 | A.   That definitely is true. |
| 10:17 | 20 | Q.   In each of those three cases where you were |
| 10:17 | 21 | DJI's expert, DJI had been sued for patent |
| 10:17 | 22 | infringement, correct? |
| 10:17 | 23 | A.   They get sued a lot. |
| 10:18 | 24 | Q.   They get sued a lot? |
| 10:18 | 25 | A.   Yes. |

918

10:18  1       Q.    In each of these three cases where you were

10:18  2  DJI's expert, you opined that either DJI did not

10:18  3  infringe the patents or that the patents asserted

10:18  4  against DJI were invalid, right?

10:18  5       A.    That's right.

10:18  6       Q.    Just like you're doing again here in this

10:18  7  case?

10:18  8       A.    Yes.

10:18  9       Q.    For DJI?

10:18 10       A.    Yes.

10:18 11       Q.    You've actually never rendered an opinion

10:18 12  against DJI?

10:18 13       A.    That's right.  I've never been hired by

10:18 14  somebody to show how DJI is being a bad party to them.

10:18 15       Q.    You've never opined that DJI infringes a

10:18 16  patent, have you?

10:18 17       A.    No.

10:18 18       Q.    You've never opined that a patent asserted

10:18 19  against DJI is valid?

10:18 20       A.    I don't remember that.

10:18 21       Q.    You told the jury that you have some of your

10:18 22  own patents, right?

10:18 23       A.    I do.

10:18 24       Q.    You've never taken the position that one of

10:18 25  your own patents is invalid, right?

919

10:19  1        A.    Can you ask that again?

10:19  2        Q.    You haven't taken the position that one of

10:19  3   your own patents is invalid, correct?

10:19  4        A.    My own patent is invalid?

10:19  5        Q.    Correct.

10:19  6        A.    No.  I've never sued myself or anything like

10:19  7   that.

10:19  8        Q.    And so you spend a significant part of your

10:19  9   expert time trying to invalidate other people's patents

10:19  10  but not your own?

10:19  11       A.    No.  I spend a significant part of my expert

10:19  12  time trying to defend people to make sure that justice

10:19  13  has truth.

10:19  14       Q.    Sir, I noticed you kept saying in your

10:19  15  examination that "we don't infringe."

10:19  16       A.    I did try and correct myself when I did that.

10:19  17       Q.    In fact, I did a word search on your

10:19  18  transcript from last night, you said "we" 34 times.

10:19  19       A.    Okay.

10:19  20       Q.    You wouldn't be surprised by that, right?

10:19  21       A.    I had -- didn't count.

10:19  22       Q.    You're supposed to be an independent expert in

10:19  23  this case, right?

10:19  24       A.    I'm an independent expert hired by a

10:19  25  particular law firm, just like Dr. Michalson.

920

10:19  1        Q.    Now, you said -- just said that DJI does not

10:19  2    infringe -- sorry.  Let me strike that.

10:20  3              Do you view yourself as part of DJI?

10:20  4        A.    No.

10:20  5        Q.    But DJI has paid you pretty handsomely,

10:20  6    haven't they?

10:20  7        A.    Well, I charge Finnegan, the law firm.  My

10:20  8    relationship is with them.

10:20  9        Q.    And is Finnegan paying you?

10:20  10       A.    Yes.

10:20  11       Q.    Is DJI paying you?

10:20  12       A.    I get paid by Finnegan.  I give them invoices,

10:20  13   and then they pay me.  I'm sure that they're collecting

10:20  14   the money from DJI to pay me.  That must be how it's

10:20  15   happening.

10:20  16       Q.    Right.  DJI is paying you $850 every hour you

10:20  17   work on this case, right?

10:20  18       A.    Yes.

10:20  19       Q.    At least as of January of this year, you

10:20  20   already had billed between 200 and 500 hours in this

10:20  21   case, right?

10:20  22       A.    Approximately.  Yes.

10:20  23       Q.    And since January, you've probably billed

10:20  24   another 200 hours to DJI for this case, right?

10:20  25       A.    I think that's a fine estimate.

10:20  1      Q.    And so taking the high end, you've billed DJI

10:20  2  about 700 hours on this case alone, right?

10:20  3      A.    That sounds high.  I think it's probably

10:21  4  closer to 4 or 500.

10:21  5      Q.    Well, you gave me an estimate of 2 to

10:21  6  500 hours, right?

10:21  7      A.    Just sounds like a lot of hours.  I have to

10:21  8  fit this in with all my teaching and all the

10:21  9  responsibilities at the university.

10:21  10     Q.    Sir, you said 200 to 500 hours as of January,

10:21  11 didn't you?

10:21  12     A.    Okay.

10:21  13     Q.    And if I take the 500 hours and I add another

10:21  14 200 hours, that's 700 hours?

10:21  15     A.    I'm just saying, you're taking the high end.

10:21  16 It's a real high number, 500 compared to 200.

10:21  17     Q.    Okay.  Well, those are your words, right?

10:21  18     A.    Yeah.

10:21  19     Q.    And so if you take 700 hours times 850 every

10:21  20 hour, that comes out to $595,000, correct?

10:21  21     A.    It does come out to that number.

10:21  22     Q.    And you billed about 200 to 500 hours in the

10:21  23 last case where you were DJI's noninfringement and

10:21  24 invalidity expert, correct?

10:21  25     A.    I don't remember, but I'm sure you've looked

922

10:21  1    it up and done your homework, sir.

10:21  2        Q.    You're right.  I did.

10:21  3            And that's another $425,000 on the upper end

10:22  4    of your own words for your hours worked.

10:22  5            That wouldn't surprise you, right?

10:22  6        A.    The numbers are huge so they kind of surprise

10:22  7    me.  Because I'm pretty sure I have not gotten paid

10:22  8    half a million dollars in this case, but you're doing

10:22  9    the math at these high ends.

10:22  10       Q.    Well, you gave me the estimate, sir.

10:22  11       A.    Okay.

10:22  12       Q.    And just factoring in this case and the last

10:22  13   case where DJI got sued for infringement, taking your

10:22  14   own hours' estimates, DJI's paid you about a million

10:22  15   bucks to be its expert?

10:22  16       A.    You're taking high estimates.  I've never

10:22  17   gotten that much money from consulting altogether.  So

10:22  18   I just disagree with you, but I get what you're doing.

10:22  19   You're taking the high end and multiplying.  I get it.

10:22  20       Q.    And this doesn't even factor the third case

10:22  21   that we didn't even talk about, right?

10:22  22       A.    Sure.

10:22  23       Q.    And you make about $200,000 in your normal day

10:22  24   job as a professor?

10:22  25       A.    That's right.

923

10:22  1        Q.    And so DJI's paid you roughly five times your

10:23  2   normal salary as a professor?

10:23  3        A.    I get paid as a professor every year.  These

10:23  4   cases are just once in a while when I have time to do a

10:23  5   case.  That's why I only have one this year because I

10:23  6   can't imagine doing two of these at one time.

10:23  7        Q.    Sir, if you add up the numbers, DJI's paid you

10:23  8   about five times what you make in a year as a

10:23  9   professor, right?

10:23  10       A.    What I make -- okay.  DJI, over the course of

10:23  11  many years, has paid me more than I make in one year as

10:23  12  a professor.  Yes.

10:23  13       Q.    Right.

10:23  14             Over the course of your many-year relationship

10:23  15  saying that DJI doesn't infringe patents, correct?

10:23  16       A.    Correct.  Of course I've done other cases that

10:23  17  aren't with DJI too.

10:23  18       Q.    Now, you told the jury yesterday that you

10:23  19  teach an ethics class, right?

10:23  20       A.    Yes.  I do.

10:23  21       Q.    As part of your teaching, you won't accept

10:23  22  funding from the United States Department of Defense,

10:23  23  correct?

10:23  24       A.    No.  As part of my teaching, I teach my

10:23  25  students to think about the social consequences of what

10:23   1    careers they choose.

10:23   2           And I have many students who've become

10:24   3    outstanding members of the military, and I've had many

10:24   4    students become outstanding members outside the

10:24   5    military.  I teach both sides.

10:24   6                    MR. RICH:  Objection, nonresponsive.

10:24   7                    THE COURT:  Sustained.

10:24   8    BY MR. RICH:

10:24   9       Q.    Sir, you won't accept funding from the United

10:24   10   States Department of Defense, right?

10:24   11      A.    To the CREATE Lab, correct.

10:24   12      Q.    But you've been paid about a million bucks by

10:24   13   a company that the Department of Defense has identified

10:24   14   as a Chinese military company?

10:24   15      A.    They have.

10:24   16      Q.    You submitted some reports in this case,

10:24   17   correct, sir?

10:24   18      A.    Yes.

10:24   19      Q.    They were fairly voluminous, right?

10:24   20      A.    They were long.

10:24   21      Q.    You tried to focus on things that you thought

10:24   22   were relevant to answering questions the jury has to

10:24   23   answer, right?

10:24   24      A.    Sure.

10:24   25      Q.    You reviewed depositions from folks at DJI

925

10:24    1    that you thought would be important enough to reference

10:24    2    in your report?

10:24    3        A.    Yes.

10:24    4        Q.    Loki Zhang's deposition, right?

10:24    5        A.    Yes.

10:24    6        Q.    Gavin Chen's?

10:25    7        A.    Yes.

10:25    8        Q.    Zhimeng Shang's?

10:25    9        A.    That's right.

10:25    10        Q.    Litian Zhang's?

10:25    11        A.    Yes.

10:25    12        Q.    Chuyue Ai's?

10:25    13        A.    Yes.

10:25    14        Q.    Those are all DJI employees who you reviewed

10:25    15    their depositions, right?

10:25    16        A.    I believe so.

10:25    17        Q.    But not a single one of those people is going

10:25    18    to come into this courtroom and take the stand and let

10:25    19    us ask them questions, correct?

10:25    20        A.    I'm not aware of the machinations of that.    I

10:25    21    know they played their witness testimony on the

10:25    22    computer.

10:25    23        Q.    You've been in the courtroom all week.    I've

10:25    24    seen you back there, right?

10:25    25        A.    I have been here the whole time.

10:25  1       Q.    And you haven't seen a single one of those

10:25  2   guys come into the courtroom and take the stand, right?

10:25  3       A.    Not live.

10:25  4       Q.    Now, you talked about the video depositions.

10:25  5   A video deposition is much different than sitting

10:25  6   across from the jury on that witness stand, isn't it?

10:25  7       A.    Yeah.  This is, I think, more interesting.

10:25  8       Q.    When you're on the stand, the jury gets to

10:26  9   watch mannerisms.  They get to watch witnesses raise

10:26  10  their voice.  They get to look at the witnesses in the

10:26  11  eyes, right?

10:26  12      A.    Yes.

10:26  13      Q.    There's something about watching someone

10:26  14  testify live versus reading their deposition on paper

10:26  15  or watching it on video, isn't there?

10:26  16      A.    Yes.

10:26  17      Q.    Now, you also mentioned DJI's founder,

10:26  18  Frank Wang, in your direct examination.

10:26  19            Do you remember that?

10:26  20      A.    No.

10:26  21      Q.    You don't remember talking about Frank Wang

10:26  22  and DJI's founding?

10:26  23      A.    I don't remember that part of the direct.  I'm

10:26  24  sorry.

10:26  25      Q.    You were in here for Mr. Oushana's

10:26  1    examination, weren't you?

10:26  2        A.    Yes.

10:26  3        Q.    And you heard him talk about Mr. Wang, right?

10:26  4        A.    Yes.

10:26  5        Q.    He's the guy that cuts your checks, right?

10:26  6        A.    I've explained, sir, that Finnegan cuts my

10:26  7    checks.

10:26  8        Q.    From Mr. Wang, right?

10:26  9        A.    I don't know how -- I don't know how they get

10:26  10   paid, in lump sums or monthly or whatnot.  I have no

10:27  11   idea how that works.

10:27  12       Q.    Now, you've heard his name multiple times from

10:27  13   DJI in this courtroom, right?

10:27  14       A.    Yes.

10:27  15       Q.    But when we talked, you couldn't even remember

10:27  16   his name, right?

10:27  17       A.    I'm sorry.  When?

10:27  18       Q.    When we talked in January, you couldn't

10:27  19   remember his name.

10:27  20       A.    No.  I didn't know the name of the founder of

10:27  21   that company.

10:27  22       Q.    And you've never talked to Mr. Wang, right?

10:27  23       A.    No.

10:27  24       Q.    You didn't get to review his deposition

10:27  25   transcript in this case, did you?

928

10:27  1      A.    No.

10:27  2      Q.    That's because DJI did not make him a witness

10:27  3  in this case, correct?

10:27  4      A.    I don't know the -- I don't know the legal

10:27  5  decisions.

10:27  6      Q.    I wasn't asking about legal decisions.

10:27  7            You didn't review any deposition testimony

10:27  8  from Mr. Wang?

10:27  9      A.    Correct.

10:27  10     Q.    And he didn't bother to show up in this

10:27  11 courtroom this week to let us ask him questions, did

10:27  12 he?

10:27  13     A.    I don't think he's here.

10:27  14     Q.    Even when his company is facing $367 million

10:28  15 in infringement damages for his products, he didn't

10:28  16 show up, right?

10:28  17     A.    Right.  I haven't seen him here.

10:28  18     Q.    Now, just before we came in here today, I

10:28  19 checked how much flights cost from Shenzhen to Dallas,

10:28  20 okay?

10:28  21     A.    Sure.

10:28  22     Q.    2,500 bucks.  Right?  I'll tell you, it was

10:28  23 2,500 bucks.  Not much for a drone billionaire to get

10:28  24 here, right?

10:28  25     A.    You know, whenever I think of these chief

929

10:28  1   executives and people, I think their time is the thing

10:28  2   that's super valuable, not the flight costs.

10:28  3       Q.   But you wouldn't know because you didn't talk

10:28  4   to Mr. Wang, right?

10:28  5       A.   I haven't talked to him in my life.

10:28  6       Q.   Neither have I.

10:28  7            And the fact that Mr. Wang did not bother to

10:28  8   show up for cross-examination, did not stop DJI from

10:28  9   cross-examining all the folks from Textron that took

10:28  10  that stand, did it?

10:28  11      A.   No.  DJI -- I'm sorry.  Finnegan

10:29  12  cross-examined people here, yes.

10:29  13      Q.   Right.  And the fact that Mr. Wang didn't show

10:29  14  up, didn't stop them from crossing the folks from

10:29  15  Textron that showed up?

10:29  16      A.   I think that's why they showed up.

10:29  17      Q.   Sir, you have kids, right?

10:29  18      A.   I do.

10:29  19      Q.   They grow up fast, don't they?

10:29  20      A.   At first, real slow, then gradually faster the

10:29  21  older they get, I think.

10:29  22      Q.   Right.  I've got three kids; two girls and a

10:29  23  boy, all right?

10:29  24      A.   Sure.

10:29  25      Q.   My boy is eight, and he loves to play

10:29   1   baseball, all right?  Sometimes he's out in the yard

10:29   2   throwing a bit wild.  Hasn't happened yet, but you can

10:29   3   imagine that if he threw the ball and it broke the

10:29   4   neighbor's window, I'd hope he'd come tell me, right?

10:29   5       A.   Yes.

10:29   6       Q.   You teach your kids stuff like that, right?

10:29   7       A.   I've had that specific issue with the soccer

10:29   8   ball, actually.

10:29   9       Q.   Right.  It happens sometimes, right?

10:29   10           One of the books that you flashed up on your

10:29   11  slides was a book about parenting, right?

10:29   12      A.   Yes.

10:29   13      Q.   If something like that happened, would you go

10:30   14  over to the neighbor's house and apologize for your kid

10:30   15  or would you say, son, you did it.  You're going to

10:30   16  have to go over to the neighbor's house and apologize?

10:30   17      A.   Actually, I had my son mend the fence that he

10:30   18  broke with the soccer ball.  So I taught him how to

10:30   19  mend it with carpentry because I woodwork, and then I

10:30   20  had him go and do it.

10:30   21      Q.   Right.  You'd make him face the music, right?

10:30   22      A.   Yes.  But I also -- he was shy so I also

10:30   23  helped him go and apologize in person, but I wanted him

10:30   24  to fix the fence first.

10:30   25      Q.   But the simple lesson that we teach our kids,

10:30  1   to show up and take responsibility, is apparently not

10:30  2   something that DJI's founder knows, correct?

10:30  3       A.   That's such a loaded question, I can't agree

10:30  4   with it.

10:30  5       Q.   Now, you understand that there are transcripts

10:30  6   generated every single day we're in here showing what's

10:30  7   happening, right?

10:30  8       A.   Yes.

10:30  9       Q.   Ms. Davis is up there working hard, taking

10:30  10  down every word that's said, right?

10:31  11      A.   I can see it happening.

10:31  12      Q.   And we all get the transcripts.  I don't know

10:31  13  if you know this.  We get them every day after work,

10:31  14  okay?

10:31  15      A.   Okay.

10:31  16      Q.   And the transcripts are available if you want

10:31  17  to review them, okay?

10:31  18      A.   I didn't know that.

10:31  19      Q.   And so all those transcripts get e-mailed

10:31  20  around.  We all look at them, and we might ask a

10:31  21  witness a question about some of the testimony that

10:31  22  happened the last day.  You've seen that happen,

10:31  23  actually, in this courtroom, right?

10:31  24      A.   Yes.

10:31  25      Q.   You think these daily transcripts are getting

10:31 1    sent over to Mr. Wang back in China?

10:31 2        A.   I have no idea what's private or public in a

10:31 3    courtroom like this.

10:31 4        Q.   You think he's going to read your direct

10:31 5    examination and say, look at this.  Our guy,

10:31 6    Dr. Nourbakhsh, got us out of another one?

10:31 7        A.   I don't appreciate that tone, sir.  I mean,

10:31 8    I'm doing my best to find truth.  I've been hired to be

10:32 9    an expert just like Dr. Michalson.

10:32 10       Q.   He's probably not going to be laughing when he

10:32 11   gets to this part of the transcript, is he?

10:32 12       A.   Same answer.

10:32 13       Q.   Now, Textron's patents in this case relate to

10:32 14   flight control technology, right?

10:32 15       A.   That's a very general term, but I think it's

10:32 16   fine.

10:32 17       Q.   Now, let's talk about the patents that you

10:32 18   flashed up on the screen that are your own patents,

10:32 19   okay?

10:32 20       A.   Sure.

10:32 21       Q.   Now, your patents relate to a wide range of

10:32 22   technologies, right?

10:32 23       A.   Yes.

10:32 24       Q.   Scheduling systems, correct?

10:32 25       A.   Sure.

933

10:32  1      Q.    A leg design for hopping, running and walking,
10:32  2   right?
10:32  3      A.    Yeah.  It's for a very special kind of pogo
10:32  4   stick.
10:32  5      Q.    Air quality sensors?
10:32  6      A.    Yes.
10:32  7      Q.    Exactly zero of your own patents mentions
10:32  8   flight control, right?
10:32  9      A.    That's right.
10:32  10     Q.    Have you ever seen the patent video that the
10:33  11  jurors saw?
10:33  12     A.    No.
10:33  13     Q.    Well, it talks about how claims are sort of
10:33  14  like the deed to your property, right?
10:33  15     A.    Okay.
10:33  16     Q.    Okay?
10:33  17           Your deed defines the metes and bounds of your
10:33  18  property lines, okay?
10:33  19     A.    Okay.
10:33  20     Q.    And the deed says what it says, right?
10:33  21     A.    Yes.
10:33  22     Q.    You can't go over to your neighbor's house and
10:33  23  take a red pen to their deed to make their property
10:33  24  boundaries smaller, can you?
10:33  25     A.    Correct.

934

10:33  1      Q.    Just like the words of your deed matter, the

10:33  2  words of a claim matter, right?

10:33  3      A.    Yes.

10:33  4      Q.    I think you said it multiple times yesterday

10:33  5  that words matter, right?

10:33  6      A.    I did.

10:33  7      Q.    One of the reasons that you say DJI doesn't

10:33  8  infringe Claim 13 of the '752 patent is that you say

10:33  9  the claim requires the aircraft to have an onboard

10:33  10 controller, right?

10:33  11     A.    That's -- the language is not that, but the

10:34  12 language is that the aircraft has, and then those four

10:34  13 controllers we talked about, yeah.

10:34  14     Q.    Right.  And you depicted an aircraft -- a

10:34  15 helicopter and said that the controllers were onboard

10:34  16 the helicopter, right?

10:34  17     A.    You're adding the word "onboard."  I said the

10:34  18 "having" word in the claim says that the aircraft has

10:34  19 these.  So I showed a picture of a helicopter because

10:34  20 it has those controllers.  It's the verb "have to

10:34  21 have."

10:34  22     Q.    Can we have Slide 25 from Dr. Michalson's

10:34  23 (sic) demonstratives?

10:34  24           Your opinion is that the claim in this case is

10:34  25 limited to a manned rotary aircraft; is that not right?

10:34   1       A.    No.   You're adding words to the claim.   We

10:34   2   just said the words matter.   You're adding words that I

10:34   3   never added to the claim.

10:34   4       Q.    So the claim is broad enough to cover an

10:34   5   unmanned rotary aircraft?

10:34   6       A.    It doesn't say whether it's manned or unmanned

10:34   7   at all.   It just says the aircraft has a longitudinal

10:35   8   controller, et cetera.

10:35   9       Q.    Sir, is the claim limited to a manned rotary

10:35   10  aircraft?

10:35   11      A.    No.   There's no word "manned" in the claim.

10:35   12      Q.    Right.   It's broad enough to cover manned or

10:35   13  unmanned, isn't it?

10:35   14      A.    It's not about being manned or unmanned.   Its

10:35   15  narrowness is defined by how it says the "rotary

10:35   16  aircraft having" and then the stuff after having.

10:35   17                  MR. RICH:   Objection, nonresponsive.

        18                  THE COURT:   Sustained.

10:35   19  BY MR. RICH:

10:35   20      Q.    Sir, the claim is not -- strike that.

10:35   21             Rotary aircraft encompasses both UAVs and

10:35   22  manned aircraft, correct?

10:35   23      A.    Yes.

10:35   24      Q.    The claim is not limited to a manned rotary

10:35   25  aircraft?

936

10:35  1        A.    Correct.

10:35  2        Q.    The words of Claim 13 do not say that the

10:35  3    controllers are on board the rotary aircraft, correct?

10:35  4        A.    The word "on board" is not used, correct.

10:36  5        Q.    The claim does not say that the controllers

10:36  6    are physically part of the rotary aircraft, correct?

10:36  7        A.    The words "physically" and the words "part"

10:36  8    aren't used.  Correct.

10:36  9        Q.    And just so we're clear, the claim does not

10:36  10    say manned rotary aircraft, right?

10:36  11        A.    That's right.  The word "manned" isn't in the

10:36  12    claim.  It doesn't say manned rotary aircraft.

10:36  13        Q.    And the words "onboard controllers" are not in

10:36  14    the claim?

10:36  15        A.    That's right.  The word "onboard" has been

10:37  16    written on here with red ink.  It's not in the claim.

10:37  17        Q.    Right.  Those are the concepts you're adding

10:37  18    into the claim?

10:37  19        A.    I disagree completely.

10:37  20        Q.    The claim doesn't say that there is a pilot on

10:37  21    board the aircraft, does it?

10:37  22        A.    No.  The word "pilot" is not in the claim

10:37  23    either.

10:37  24              MR. RICH:  May I have Dr. Nourbakhsh's

10:37  25    Slide 47, please?

937

10:37   1    BY MR. RICH:

10:37   2        Q.    Do you remember showing the jury this slide

10:37   3    yesterday?

10:37   4        A.    Yes.

10:37   5        Q.    And you see the words "pedals" and "cyclic

10:37   6    stick" and "collective stick"?

10:37   7        A.    I do.

10:37   8        Q.    And then you went to Slide 55, and you used

10:37   9    this same figure from that helicopter you were showing

10:37   10   and those sticks to try to map them to the language of

10:37   11   the claim, correct?

10:38   12       A.    Yes.

10:38   13       Q.    The claim does not use the word "pedals," does

10:38   14   it?

10:38   15       A.    No.  It doesn't have the word "pedals" in it.

10:38   16       Q.    Claim doesn't use the word "cyclic stick,"

10:38   17   does it?

10:38   18       A.    It doesn't have that word in it.

10:38   19       Q.    Claim also doesn't say collective stick,

10:38   20   right?

10:38   21       A.    That's right.  It doesn't have that word in

10:38   22   it.

10:38   23       Q.    The claim instead uses the term "rotary

10:38   24   aircraft having the four controllers," right?

10:38   25       A.    Correct.

938

10:38  1      Q.    And a drone is a type of rotary aircraft,

10:38  2  right?

10:38  3      A.    Correct.

10:38  4      Q.    You sat in the courtroom when Mr. Christensen

10:38  5  testified two days ago, right?

10:38  6      A.    I did.

10:38  7              MR. RICH:  May I have the Day 1 trial

10:38  8  transcript at 229, Lines 16 through 17?

10:38  9  BY MR. RICH:

10:38 10      Q.    This is one of those transcripts I was talking

10:38 11  about just a minute ago.

10:38 12          All right.  This is a question Mr. Christensen

10:39 13  was asked, and he answered that he does think his

10:39 14  invention is applicable and useful for drones.

10:39 15          Do you see that?

10:39 16      A.    I do.

10:39 17      Q.    Now, you told the jury you fly your own

10:39 18  personal plane, right?

10:39 19      A.    I do.

10:39 20      Q.    Yet you're here disagreeing with

10:39 21  Mr. Christensen about the words of his -- what the

10:39 22  words of his invention mean even though he retired from

10:39 23  the Air Force after flying F-16s and F-22s, right?

10:39 24      A.    Well, I don't disagree with his words.  If you

10:39 25  would like me to explain, I can explain.

939

| 10:39 | 1 | Q.    One thing we can agree on is that the claim |
| 10:39 | 2 | just says:  The rotary aircraft has the controllers, |
| 10:39 | 3 | right? |
| 10:39 | 4 | A.    Yes. |
| 10:39 | 5 | Q.    Now, my wife bought a new TV last year.  I was |
| 10:39 | 6 | pretty excited, okay? |
| 10:39 | 7 | A.    Okay. |
| 10:39 | 8 | Q.    You probably won't be surprised to learn that |
| 10:39 | 9 | the TV had a remote controller with it in the box. |
| 10:39 | 10 | A.    I think you just used the word to "have." |
| 10:39 | 11 | Q.    Right.  The TV has a remote with it, right? |
| 10:40 | 12 | A.    With it.  Yes.  I understand your use. |
| 10:40 | 13 | Q.    You're not aware of any DJI drones that are |
| 10:40 | 14 | sold in the United States that don't have a remote |
| 10:40 | 15 | controller in the box with it? |
| 10:40 | 16 | A.    No.  I'm not. |
| 10:40 | 17 | Q.    In fact, this box right here is an example of |
| 10:40 | 18 | the boxes that DJI drones come in? |
| 10:40 | 19 | A.    Yes. |
| 10:40 | 20 | Q.    Right.  And it has a drone that has a remote |
| 10:40 | 21 | controller with it? |
| 10:40 | 22 | A.    Yes.  It has a drone in the box, and it has a |
| 10:40 | 23 | remote control in the box. |
| 10:40 | 24 | Q.    Did you see the padding on that box? |
| 10:40 | 25 | A.    The foam? |

940

| | | |
|---|---|---|
| 10:40 | 1 | Q.    Yeah. |
| 10:40 | 2 | A.    I do see it. |
| 10:40 | 3 | Q.    Pretty thick padding, right? |
| 10:40 | 4 | A.    I think -- hopefully, it's just thick enough. |
| 10:40 | 5 | Q.    You need a lot of padding to protect one of |
| 10:40 | 6 | those drones that costs 2 or 3,000 bucks, don't you? |
| 10:40 | 7 | A.    I think they cost anywhere from 200 bucks up. |
| 10:40 | 8 | Q.    Now, you used the term "fly-by-wire" |
| 10:40 | 9 | yesterday, right? |
| 10:40 | 10 | A.    I did. |
| 10:41 | 11 | Q.    You said yesterday that the drones don't meet |
| 10:41 | 12 | the rotary aircraft element because the drones are |
| 10:41 | 13 | not -- this is your quote -- "not fly-by-wire." |
| 10:41 | 14 |      Do you remember that? |
| 10:41 | 15 | A.    I remember that.  It's a little out of |
| 10:41 | 16 | context, but I remember that.  Yes, sir. |
| 10:41 | 17 | Q.    That was your testimony that DJI drones are |
| 10:41 | 18 | not fly-by-wire, right? |
| 10:41 | 19 | A.    They aren't.  That's true. |
| 10:41 | 20 | Q.    But, sir, a drone is a type of fly-by-wire |
| 10:41 | 21 | aircraft, right? |
| 10:41 | 22 | A.    I disagree with your use of the words. |
| 10:41 | 23 | Q.    You disagree that a drone is a type of |
| 10:41 | 24 | fly-by-wire system? |
| 10:41 | 25 | A.    Usually when we talk about drones, we're |

10:41  1    talking about a remote control system.

10:41  2                    MR. RICH:  Objection, nonresponsive.

10:41  3                    THE COURT:  Sustained.

       4        A.    Sorry.

10:41  5    BY MR. RICH:

10:41  6        Q.    Dr. Nourbakhsh, you agree that a drone is a

10:41  7    type of fly-by-wire system?

10:41  8        A.    I disagree.

10:41  9        Q.    Sir, I took your deposition in this case,

10:41  10   didn't I?

10:42  11       A.    Yes.

10:42  12       Q.    And you were under oath in your deposition,

10:42  13   weren't you?

10:42  14       A.    Yes.

10:42  15       Q.    And there was a court reporter there, right?

10:42  16       A.    Yes.

10:42  17       Q.    And they were taking down the testimony?

10:42  18       A.    That's right.

10:42  19       Q.    And at that deposition I asked you:  A drone

10:42  20   is a type of fly-by-wire system, right?

10:42  21       A.    Yes.

10:42  22       Q.    And you answered:  The whole system of a

10:42  23   remote control system is a fly-by-wire.  Yes?

10:42  24             Did I ask that question and did you give that

10:42  25   answer?

10:42  1       A.   I don't remember the details, but I bet I did

10:42  2   give that answer because you're asking me this way.  So

10:42  3   yes.

10:42  4              THE COURT:  Counsel, if you're at a point

10:42  5   we can break, why don't we take our morning recess?

10:42  6              MR. RICH:  Certainly, Your Honor.

10:42  7              THE COURT:  Ladies and gentlemen of the

10:42  8   jury, we'll stand in recess for about ten minutes.

10:42  9              THE BAILIFF:  All rise.

10:42  10             (Jury exited the courtroom.)

10:42  11             THE COURT:  Doctor, you may step down.

10:43  12             You may be seated.

10:43  13             Is there anything we need to take up?

10:43  14             MR. MEEK:  Nothing from plaintiff.

10:43  15             MR. SCHLESINGER:  No, Your Honor.

10:43  16             (Recess taken.)

10:56  17             THE BAILIFF:  All rise.

10:56  18             THE COURT:  Please remain standing for

10:56  19   the jury.

10:56  20             (Jury entered the courtroom.)

10:56  21             THE COURT:  Thank you.  You may be

10:57  22   seated.

10:57  23             MR. RICH:  Your Honor, may I approach the

10:57  24   witness with binders?

10:57  25             THE COURT:  Sure.

943

| | |
|---|---|
| 10:58 | 1 |  BY MR. RICH: |
| 10:58 | 2 |       Q.    All right.  Dr. Nourbakhsh, are you ready to |
| 10:58 | 3 |  continue, sir? |
| 10:58 | 4 |       A.    Yes. |
| 10:58 | 5 |       Q.    All right.  Yesterday when you were talking |
| 10:58 | 6 |  about the controllers on board the aircraft, you talked |
| 10:58 | 7 |  about something called "degraded visual environments," |
| 10:58 | 8 |  right? |
| 10:58 | 9 |       A.    Correct. |
| 10:58 | 10 |       Q.    Fog is a type of degraded visual environment, |
| 10:58 | 11 |  correct? |
| 10:58 | 12 |       A.    Yes. |
| 10:58 | 13 |       Q.    You talked about how DJI's user manuals say do |
| 10:58 | 14 |  not use in fog, right? |
| 10:58 | 15 |       A.    Yes. |
| 10:58 | 16 |       Q.    And you told the jury that you're not allowed |
| 10:58 | 17 |  to fly this if there's fog, correct? |
| 10:58 | 18 |       A.    Correct. |
| 10:58 | 19 |       Q.    You said that's illegal, right? |
| 10:58 | 20 |       A.    No.  I said the FAA says it's illegal to fly |
| 10:58 | 21 |  it if you can't see it. |
| 10:58 | 22 |       Q.    You also said that you can't even touch your |
| 10:59 | 23 |  drone in those situations, right? |
| 10:59 | 24 |       A.    Yes. |
| 10:59 | 25 |       Q.    But you, yourself, have flown drones in fog? |

10:59  1     A.    Yes.  That's true.  I have.

10:59  2     Q.    So you didn't follow DJI's own rules?

10:59  3     A.    Correct.

10:59  4     Q.    And so when people break the rules and fly

10:59  5  their drones in fog, rain, smog, DJI has to make sure

10:59  6  that there are features, like Mr. Christensen's

10:59  7  automatic hovering technology, to make sure the drones

10:59  8  don't crash, right?

10:59  9     A.    I think there should be features to keep it

10:59  10  from crashing.  I don't think they need to be like

10:59  11  Mr. Christensen's claim.

10:59  12     Q.    Automatic hovering is one of those features

10:59  13  that prevent the drone from crashing, right?

10:59  14     A.    That feature is a good feature, yes.

10:59  15     Q.    You submitted an opinion in your expert report

10:59  16  that you gave to us in this case that DJI doesn't

10:59  17  infringe the patent '752, right?

11:00  18     A.    Claim 13, yes.

11:00  19     Q.    And you tried to be as careful as possible

11:00  20  when you wrote that report, right?

11:00  21     A.    I tried.

11:00  22     Q.    You're a pretty detail-oriented guy, right?

11:00  23     A.    I try.

11:00  24     Q.    As part of that report, you included a section

11:00  25  that provided your understanding of the law that you

945

| | | |
|---|---|---|
| 11:00 | 1 | were supposed to apply to the case, right? |
| 11:00 | 2 | A.    Yes. |
| 11:00 | 3 | Q.    And DJI's attorneys provided you with that |
| 11:00 | 4 | law, right? |
| 11:00 | 5 | A.    Yes.  They helped make sure we're getting it |
| 11:00 | 6 | right. |
| 11:00 | 7 | Q.    Now, all of the instructions from DJI's |
| 11:00 | 8 | attorneys on the law to apply to this case were in your |
| 11:00 | 9 | report on noninfringement, right? |
| 11:00 | 10 | A.    Yes. |
| 11:00 | 11 | Q.    You didn't omit any instructions from DJI's |
| 11:00 | 12 | attorneys in that report, right? |
| 11:00 | 13 | A.    Not that I'm aware. |
| 11:00 | 14 | Q.    You've heard the saying "the rules of the |
| 11:00 | 15 | road," right? |
| 11:00 | 16 | A.    Sure. |
| 11:00 | 17 | Q.    It's a metaphor for the rules that we're |
| 11:00 | 18 | supposed to follow, right? |
| 11:00 | 19 | A.    Yes. |
| 11:00 | 20 | Q.    The Court has given us a rule of the road for |
| 11:01 | 21 | the infringement analysis for the '752 patent, correct? |
| 11:01 | 22 | A.    Okay. |
| 11:01 | 23 | Q.    And that's because DJI did not produce certain |
| 11:01 | 24 | source code, you were supposed to presume that the |
| 11:01 | 25 | source code would have been favorable to Textron and |

946

11:01  1    its infringement allegations on the '752 patent,

11:01  2    correct?

11:01  3        A.    Correct.

11:01  4        Q.    But you did not include anything about that

11:01  5    presumption in your report on noninfringement, did you?

11:01  6        A.    I didn't write about it, no.

11:01  7        Q.    And you didn't mention the presumption in your

11:01  8    direct examination just this morning?

11:01  9        A.    No.

11:01  10       Q.    Or yesterday?

11:01  11       A.    Correct.

11:01  12       Q.    Now, even though the rule of the road is to

11:01  13   presume the missing code is favorable to Textron's

11:01  14   infringement case for the '752 patent, you testified

11:01  15   yesterday that that code's not relevant, didn't you?

11:01  16       A.    I did so.

11:01  17             MR. RICH:  May I please have Plaintiff's

11:02  18   Exhibit 106?

11:02  19   BY MR. RICH:

11:02  20       Q.    Okay.  You recognize this as DJI's application

11:02  21   to the Chinese government to export some of its source

11:02  22   code for this case, right?

11:02  23       A.    I do.

11:02  24       Q.    DJI wouldn't lie to the Chinese government,

11:02  25   would it?

11:02  1    A.    I certainly hope nobody lies to nobody.

11:02  2    Q.    Did you hear your counsel ask one of our

11:02  3  witnesses if they knew what would happen if someone

11:02  4  lied to the Chinese government?

11:02  5    A.    I remember that.

11:02  6    Q.    You know what would happen if they did?

11:02  7    A.    Probably bad things, fines and imprisonment.

11:02  8    Q.    Probably bad things.

11:02  9              MR. RICH:  Let's go to Page 7 of

11:02  10  Plaintiff's Exhibit 106.

11:02  11              Can we please zoom in on the top?

11:02  12  BY MR. RICH:

11:02  13    Q.    Okay.  Doctor, do you see "Purpose of

11:02  14  Technology Export" at the top?

11:02  15    A.    I do.

11:02  16    Q.    Okay.  The purpose of the application that DJI

11:03  17  put right here was to provide relevant source codes in

11:03  18  a litigation to fulfill discovery obligations under

11:03  19  civil litigation law of the United States.

11:03  20              Do you see that?

11:03  21    A.    Sure.

11:03  22    Q.    DJI told the Chinese government that the

11:03  23  missing code is relevant source code?

11:03  24    A.    Relevant to the discovery obligations, yeah.

11:03  25    Q.    Sir, DJI told the Chinese government that

948

11:03  1    there was relevant source code, correct?

11:03  2        A.    Yes.

11:03  3        Q.    And you're here saying it's irrelevant,

11:03  4    correct?

11:03  5        A.    To Claim 13, yeah.

11:03  6        Q.    But DJI didn't say it was irrelevant to the

11:03  7    Chinese government, right?

11:03  8        A.    DJI did not tell the Chinese government this

11:03  9    source code is irrelevant to Claim 13, no.  They didn't

11:03  10   say that.

11:04  11       Q.    And to be clear, sir, you have not seen the

11:04  12   missing source code, have you?

11:04  13       A.    No.  I haven't.

11:04  14       Q.    Yet you're telling the jury that code you've

11:04  15   never seen in your life is totally irrelevant, aren't

11:04  16   you?

11:04  17       A.    No.  I'm telling the jury it's irrelevant to

11:04  18   understanding infringement or noninfringement of

11:04  19   Claim 13.

11:04  20              MR. RICH:  Objection, nonresponsive.

11:04  21              THE COURT:  Sustained.

11:04  22   BY MR. RICH:

11:04  23       Q.    Sir, you're telling the jury that code you've

11:04  24   never seen in your life is irrelevant, aren't you?

11:04  25       A.    No.

949

11:04   1          Q.    You have seen the missing code?

11:04   2          A.    No.

11:04   3          Q.    But you testified it was irrelevant yesterday?

11:04   4                    THE WITNESS:  Your Honor, I don't know

11:04   5     how to respond.

11:04   6                    THE COURT:  I understood the question.

11:04   7     I'm not sure why you can't.

11:04   8          A.    Okay.  Ask it one more time.

11:04   9     BY MR. RICH:

11:04   10         Q.    You testified it was irrelevant yesterday,

11:04   11    correct?

11:04   12         A.    Yes.

11:04   13         Q.    And you've never seen it in your life,

11:04   14    correct?

11:04   15         A.    That's right.

11:04   16         Q.    Thank you.

11:04   17                Now, you did a demonstration in this courtroom

11:05   18    yesterday, right?

11:05   19         A.    I did.

11:05   20         Q.    You had the drone in the air flying and went

11:05   21    up to push it with your finger like this, right?

11:05   22         A.    I pulled on it with my finger like this.

11:05   23         Q.    Now, you gave us this video the other day,

11:05   24    didn't you?  This is a still shot, right?

11:05   25         A.    Yes.

950

11:05  1      Q.    And that's you?

11:05  2      A.    Yes.

11:05  3      Q.    So you did the same demonstration a couple

11:05  4  days ago?

11:05  5      A.    Yes.

11:05  6      Q.    Have you ever seen that symbol in your

11:06  7  lifetime?

11:06  8      A.    Yes.

11:06  9      Q.    Tells you not to do something, doesn't it?

11:06 10      A.    Yes.

11:06 11              MR. RICH:  Can we have the Phantom 4

11:06 12  series disclaimer and safety guidelines?

11:06 13  BY MR. RICH:

11:06 14      Q.    Have you ever seen this document before,

11:06 15  Doctor?

11:06 16      A.    I believe so, yes.

11:06 17      Q.    It's a DJI document, right?

11:06 18      A.    Yes.

11:06 19      Q.    Called "Disclaimer and Safety Guidelines,"

11:06 20  right?

11:06 21      A.    Yes.

11:06 22      Q.    This document lays out some of DJI's rules for

11:06 23  safety, right?

11:06 24      A.    Yes.

11:06 25              MR. RICH:  Let's go to Page 3 of this

11:06  1    document.

11:06  2             Zoom in on the bottom left-hand corner,

11:06  3    please.

11:06  4    BY MR. RICH:

11:06  5         Q.    You see the "don't do it" symbol over the

11:07  6    person's finger approaching the drone?

11:07  7         A.    The propellers, yeah.

11:07  8         Q.    And so DJI's telling the world, stay away from

11:07  9    the rotating propellers and motors, right?

11:07  10         A.    Yes.

11:07  11         Q.    In all of the cases where you've said that DJI

11:07  12    doesn't infringe a patent, is this the first one where

11:07  13    you've broken DJI's own rules to make your

11:07  14    noninfringement argument?

11:07  15         A.    I don't remember.

11:07  16         Q.    Now, you heard that Mr. Baker over there does

11:07  17    public safety marketing at Creative Studios?

11:07  18         A.    Yes.

11:07  19         Q.    Did he give you a talking-to after that

11:07  20    yesterday when he saw you break this rule?

11:07  21         A.    I don't believe so.

11:07  22         Q.    Now, you said in your demonstration that it

11:07  23    shows that DJI holds position, right?

11:07  24         A.    Yes.

11:07  25         Q.    When you're holding position, you're holding,

952

| | | |
|---|---|---|
| 11:07 | 1 | generally speaking, at zero, aren't you? |
| 11:07 | 2 | A.    At times, yes. |
| 11:08 | 3 | MR. RICH:  May I have the '752 patent, |
| 11:08 | 4 | please? |
| 11:08 | 5 | May I have Column 9 of the '752, please? |
| 11:08 | 6 | And if you could please zoom in on |
| 11:08 | 7 | Lines 23 through 27. |
| 11:08 | 8 | BY MR. RICH: |
| 11:08 | 9 | Q.    Okay.  You see the "PH" there? |
| 11:08 | 10 | A.    I do. |
| 11:08 | 11 | Q.    That's position hold? |
| 11:08 | 12 | A.    Yes. |
| 11:08 | 13 | Q.    And that's where Mr. Christensen's patent is |
| 11:08 | 14 | talking about position hold? |
| 11:08 | 15 | A.    In this section, sure. |
| 11:08 | 16 | Q.    And what Mr. Christensen's patent says at |
| 11:08 | 17 | Line 24:  With position hold engaged, the captured |
| 11:08 | 18 | position will be tightly held even in the presence of |
| 11:09 | 19 | disturbances due to gusty winds or control inputs in |
| 11:09 | 20 | the directional or vertical axes. |
| 11:09 | 21 | You see that, right? |
| 11:09 | 22 | A.    Yes. |
| 11:09 | 23 | Q.    And the patent says in the next sentence that: |
| 11:09 | 24 | If the aircraft drifts off from the captured position, |
| 11:09 | 25 | the position hold mode will make corrections to bring |

| | | |
|---|---|---|
| 11:09 | 1 | it back. |
| 11:09 | 2 | You see that, right? |
| 11:09 | 3 | A.   I do. |
| 11:09 | 4 | Q.   And so just because there are small |
| 11:09 | 5 | corrections in the speed, that doesn't mean there's not |
| 11:09 | 6 | a forward speed hold loop in Claim 13, right? |
| 11:09 | 7 | A.   I don't understand.  This is talking about |
| 11:09 | 8 | position hold.  I agree with Dr. Christensen. |
| 11:09 | 9 | Can you ask the question in a way that I can |
| 11:09 | 10 | give a yes/no answer? |
| 11:09 | 11 | Q.   Yes, sir. |
| 11:09 | 12 | Just because there are corrections in the |
| 11:09 | 13 | speed, that doesn't mean that there's not a forward |
| 11:09 | 14 | speed hold loop in Claim 13, right? |
| 11:09 | 15 | A.   Just because there are corrections in the |
| 11:09 | 16 | speed doesn't mean there isn't?  So it does mean there |
| 11:09 | 17 | is? |
| 11:10 | 18 | Yes.  Just because there are corrections in |
| 11:10 | 19 | the speed means you're doing -- you could be -- you |
| 11:10 | 20 | could be doing position hold, yes. |
| 11:10 | 21 | Q.   Sir, just because there are tiny corrections |
| 11:10 | 22 | in the speed that you're trying to hold, that doesn't |
| 11:10 | 23 | mean that it's not a forward speed hold loop, correct? |
| 11:10 | 24 | A.   Correct. |
| 11:10 | 25 | Q.   And when Claim 13 requires the forward speed |

| | | |
|---|---|---|
| 11:10 | 1 | hold loop to engage when the controller is returned to |
| 11:10 | 2 | a detent position, the drone just needs to consistently |
| 11:10 | 3 | hold its forward speed, right? |
| 11:10 | 4 | A.    That's fine. |
| 11:10 | 5 | Q.    It sure looked yesterday to my eyes that the |
| 11:10 | 6 | drone you flew was holding speed at zero until you went |
| 11:10 | 7 | up and knocked it off its normal operation, okay? |
| 11:10 | 8 | A.    I disagree a little bit. |
| 11:10 | 9 | Q.    When you went up and knocked that drone off |
| 11:10 | 10 | its normal hovering operation, you broke DJI's safety |
| 11:10 | 11 | guidelines telling you not to do exactly what you did, |
| 11:11 | 12 | correct? |
| 11:11 | 13 | A.    I disagree with that too. |
| 11:11 | 14 | Q.    But we don't have to trust our eyes on this |
| 11:11 | 15 | one because we have Mr. Shang, right? |
| 11:11 | 16 | A.    I like trusting everything.  I want to talk to |
| 11:11 | 17 | people, see it and look at code. |
| 11:11 | 18 | Q.    Mr. Shang, who's one of the folks in charge of |
| 11:11 | 19 | DJI's flight control technology, correct? |
| 11:11 | 20 | A.    Yes. |
| 11:11 | 21 | Q.    Now, unlike you and me, Mr. Shang had full |
| 11:11 | 22 | access to the flight control code, right? |
| 11:11 | 23 | A.    Sure. |
| 11:11 | 24 | Q.    You didn't mention Mr. Shang one time during |
| 11:11 | 25 | your examination yesterday. |

955

| | | |
|---|---|---|
| 11:11 | 1 | Did you know that? |
| 11:11 | 2 | A.   I do know that. |
| 11:11 | 3 | Q.   You did mention that you had some closed-door |
| 11:11 | 4 | talks with DJI engineers, though, didn't you? |
| 11:11 | 5 | A.   I did. |
| 11:11 | 6 | Q.   I wasn't invited to those closed-door talks, |
| 11:11 | 7 | was I? |
| 11:11 | 8 | A.   Not if they're closed-door. |
| 11:11 | 9 | Q.   You didn't put Mr. Shang under oath when you |
| 11:12 | 10 | had those closed-door talks with him, did you? |
| 11:12 | 11 | A.   No. |
| 11:12 | 12 | Q.   Well, sir, I personally got to depose |
| 11:12 | 13 | Mr. Shang, and he was under oath, okay? |
| 11:12 | 14 | A.   I understand. |
| 11:12 | 15 | MR. RICH:  May I please have |
| 11:12 | 16 | Dr. Michalson's Slide 30? |
| 11:12 | 17 | BY MR. RICH: |
| 11:12 | 18 | Q.   You saw this the other day in the courtroom, |
| 11:12 | 19 | correct? |
| 11:12 | 20 | A.   I did. |
| 11:12 | 21 | Q.   And this is Mr. Shang on the left? |
| 11:12 | 22 | A.   Yes. |
| 11:12 | 23 | Q.   And this was where Dr. Michalson talked about |
| 11:12 | 24 | the forward speed hold loop, right? |
| 11:12 | 25 | A.   I do. |

956

11:12   1      Q.    And you see that Mr. Shang said if the right

11:12   2   stick is centered, a DJI drone will hold its forward

11:12   3   speed at zero, correct?

11:12   4      A.    I see that.

11:12   5      Q.    And he said if the right stick is centered, a

11:12   6   DJI drone will hold its backward speed at zero,

11:12   7   correct?

11:12   8      A.    He said that.

11:12   9      Q.    And if the right stick is centered, a DJI

11:12   10   drone will hold its left speed at zero, correct?

11:13   11      A.    He said that too.

11:13   12      Q.    And he also said that if the right stick is

11:13   13   centered, a DJI drone will hold right speed at zero,

11:13   14   correct?

11:13   15      A.    He said that too.

11:13   16      Q.    Now, in DJI's drones when the user centers the

11:13   17   control stick to the detent position, the horizontal

11:13   18   velocity command is set to zero, correct?

11:13   19      A.    Yes.

11:13   20      Q.    The drone can issue a horizontal speed command

11:13   21   of zero and then issue the same command again, can't

11:13   22   it?

11:13   23      A.    Yes.

11:13   24      Q.    When you were asked yesterday how you know

11:13   25   drones are holding a position, you pulled up a source

```
11:13   1    code file, didn't you?

11:13   2        A.    I did.

11:13   3        Q.    And you showed a function name "horizontal

11:14   4    position control."

11:14   5              Do you remember that?

11:14   6        A.    I do.

11:14   7        Q.    But you left out something important.  You're

11:14   8    aware that one of the files that DJI withheld in this

11:14   9    case is called the "horizontal velocity control,"

11:14  10    right?

11:14  11        A.    Okay.

11:14  12        Q.    Now, they only gave us the position control

11:14  13    code but not the velocity control code.

11:14  14              You understand that?

11:14  15        A.    So they gave us a file that has one name, and

11:14  16    they didn't give us a file that has a different name.

11:14  17    Okay.

11:14  18        Q.    Right.  The file that you showed yesterday was

11:14  19    horizontal position control, but DJI withheld the file

11:14  20    horizontal velocity control run?

11:14  21        A.    Okay.

11:14  22        Q.    So you think it's fair to be saying that DJI

11:14  23    only holds position when DJI didn't give the file

11:14  24    titled the function name "horizontal velocity control

11:14  25    run"?
```

958

11:14  1    A.    You know, the file names don't have anything

11:14  2  to do with my opinion based on the code that I read.

11:14  3    Q.    One thing that we can be sure of here, though,

11:15  4  is that Mr. Shang testified under oath that DJI holds

11:15  5  forwards, backwards, left and right speed at zero,

11:15  6  correct?

11:15  7    A.    He said that.

11:15  8    Q.    Now, you also talked yesterday about DJI not

11:15  9  infringing because it doesn't control pitch rate.

11:15  10         Do you remember that?

11:15  11    A.    I do.

11:15  12                MR. RICH:  Can I have Claim 13, please?

11:15  13                Can we please zoom in on:  Wherein

11:15  14  longitudinal maneuverability of the rotary aircraft is

11:15  15  controlled by either the pitch attitude or pitch rate

11:15  16  loop?

11:15  17                Claim 13, right around Line 40.

11:16  18  BY MR. RICH:

11:16  19    Q.    All right.  Doctor, you can see that --

11:16  20    A.    I can.

11:16  21    Q.    -- okay?  Okay.

11:16  22         Now, the claim refers to longitudinal

11:16  23  maneuverability, right?

11:16  24    A.    Yes.

11:16  25    Q.    And it says longitudinal maneuverability is

11:16  1    controlled by one of two types of loops, right?

11:16  2        A.    Correct.

11:16  3        Q.    The thing being controlled here is

11:16  4    longitudinal maneuverability?

11:16  5        A.    Correct.

11:16  6        Q.    The claim does not say it the other way around

11:16  7    that there is -- let me strike that.

11:16  8             The claim doesn't say it the other way around.

11:16  9    The words "control pitch attitude" don't appear in the

11:16  10   claim, correct?

11:16  11       A.    I think if you're saying it's using the

11:16  12   passive voice rather than the active voice, yeah.  It's

11:16  13   saying controlled by rather than controls.

11:16  14       Q.    Correct.  The claim does not say control pitch

11:16  15   attitude, right?

11:16  16       A.    No.  It says controlled by pitch attitude.

11:17  17       Q.    The thing being controlled is longitudinal

11:17  18   maneuverability, right?

11:17  19       A.    The -- it's -- yes.  An inverted passive

11:17  20   voice.  So the object is longitudinal maneuverability,

11:17  21   the subject is the attitude loop.

11:17  22       Q.    Now, you said yesterday, I quote:  DJI doesn't

11:17  23   care about its attitude one bit.

11:17  24             Do you remember that?

11:17  25       A.    Sure.  I can believe that quote.

| | | |
|---|---|---|
| 11:17 | 1 | Q.    Even though you testified under oath yesterday |
| 11:17 | 2 | that DJI doesn't care about attitude, DJI drones have |
| 11:17 | 3 | an attitude loop, don't they? |
| 11:17 | 4 | A.    Of course.  All the loops have to be there. |
| 11:17 | 5 | Q.    But they don't care about attitude? |
| 11:17 | 6 | A.    I think you're taking that quote way out of |
| 11:17 | 7 | context, sir. |
| 11:17 | 8 | Q.    Well, it was your words, wasn't it, Doctor? |
| 11:17 | 9 | A.    It was my words. |
| 11:17 | 10 | Q.    The attitude loop commands attitude, doesn't |
| 11:17 | 11 | it? |
| 11:17 | 12 | A.    The attitude loop makes sure you're stable in |
| 11:17 | 13 | the attitude direction.  Yes. |
| 11:17 | 14 | Q.    Sir, the attitude loop commands attitude, |
| 11:18 | 15 | doesn't it? |
| 11:18 | 16 | A.    Yeah. |
| 11:18 | 17 | Q.    In DJI's product? |
| 11:18 | 18 | A.    In any attitude loop, including DJI's |
| 11:18 | 19 | products.  The attitude loop helps you keep track of |
| 11:18 | 20 | attitude. |
| 11:18 | 21 | Q.    The attitude loop in DJI's product adjusts |
| 11:18 | 22 | pitch attitude, doesn't it? |
| 11:18 | 23 | A.    Yes. |
| 11:18 | 24 | Q.    Now, even though you're arguing that DJI |
| 11:18 | 25 | doesn't infringe this pitch attitude element, one of |

11:18  1  the source code modules that DJI did not give us is

11:18  2  called the "attitude sensing determination module,"

11:18  3  right?

11:18  4      A.    Okay.

11:18  5      Q.    Right?

11:18  6      A.    Yes.   That's the name of a piece of code.

11:18  7      Q.    You talked some about Claim 1 of the '752

11:18  8  patent.

11:18  9            Do you remember that?

11:18  10      A.    Not very clearly, but you can refresh me.

11:18  11      Q.    You understand that Textron is asserting

11:18  12  Claim 13 of the '752 patent, right?

11:18  13      A.    Correct.

11:18  14      Q.    Not Claim 1 of the '752 patent that you

11:19  15  pointed to?

11:19  16      A.    Correct.

11:19  17      Q.    You understand that the title of the '752

11:19  18  patent is "Flight Control Laws for Automatic Hover

11:19  19  Hold," right?

11:19  20      A.    Yes.

11:19  21      Q.    You understand that a patent claim can cover a

11:19  22  feature without actually reciting the tokenized name of

11:19  23  the feature, right?

11:19  24      A.    Sure.

11:19  25      Q.    For example, let's say I had a claim that

11:19  1    covered the boundaries of Apple's FaceTime feature, but

11:19  2    my claim didn't say the words "FaceTime," okay?

11:19  3        A.    Correct.

11:19  4        Q.    My claim instead said do a voice call with

11:19  5    volume, okay?

11:19  6        A.    Okay.

11:19  7        Q.    My claim does not actually have to use the

11:19  8    words "FaceTime" to cover the boundaries of FaceTime,

11:19  9    right?

11:19  10       A.    That's right.

11:19  11       Q.    So to clear up any confusion here, the jury,

11:19  12   when it does its deliberations, will have to compare

11:19  13   the boundaries of Claim 13 of the '752 patent to DJI's

11:19  14   drones to determine infringement?

11:19  15       A.    Exactly.

11:20  16              MR. RICH:  Can I have Dr. Nourbakhsh's

11:20  17   slide at -- 70?

11:20  18   BY MR. RICH:

11:20  19       Q.    Moving on to the '909 patent, Doctor.

11:21  20   Yesterday you testified and today, I think, again I

11:21  21   heard you testify over and over again about closing and

11:21  22   landing on a boat, right?

11:21  23       A.    Yes.

11:21  24       Q.    Claim 1 of the '909 patent is not limited to a

11:21  25   boat, is it?

11:21  1      A.     Not limited to a boat.  No.

11:21  2      Q.     Claim 1 of the '909 patent is not limited to

11:21  3  closure, is it?

11:21  4      A.     It's not limited to that.  No.

11:21  5      Q.     And, in fact, there's no boat recited in

11:21  6  Claim 1, is there?

11:21  7      A.     There is no word "boat" in Claim 1.

11:21  8      Q.     Right.  Mr. Harris broadly used the word

11:21  9  "reference vehicle," correct?

11:21 10      A.     In Claim 1, it says reference vehicle.  Yeah.

11:21 11      Q.     And you heard Mr. Harris testify that he did

11:21 12  not limit his invention to landing on a boat, correct?

11:21 13      A.     That's right.

11:21 14      Q.     All right.

11:21 15             MR. RICH:  Let's look at Claim 1 of the

11:22 16  '909 patent.

11:22 17             If we could highlight "calculating a

11:22 18  calculated velocity of the aircraft relative to the

11:22 19  reference vehicle," please?

11:22 20  BY MR. RICH:

11:22 21      Q.     Okay.  Do you see that element, Doctor?

11:22 22      A.     I do.

11:22 23      Q.     When you were interpreting that element, you

11:22 24  read that to mean the act of calculating a relative

11:22 25  velocity where, in mathematics, you do that by

11:22  1    subtracting two velocities to get a differential; is

11:22  2    that right?

11:22  3        A.    Yes.

11:22  4        Q.    You based your noninfringement opinion on that

11:22  5    interpretation, didn't you?

11:22  6        A.    There's many bases for the noninfringement

11:23  7    opinion, but that's certainly an interpretation I used

11:23  8    for that part.  Yes.

11:23  9        Q.    Sir, that's the interpretation you used when

11:23  10   you were looking at whether DJI's drones calculate a

11:23  11   calculated velocity, correct?

11:23  12       A.    Yes.

11:23  13       Q.    But the words of the claim don't say subtract

11:23  14   one velocity from another to get a differential,

11:23  15   correct?

11:23  16       A.    You want me to answer the question, is the

11:23  17   word "subtract" in that phrase?

11:23  18       Q.    Sir, I asked:  The words of the claim don't

11:23  19   say, subtract one velocity from another to get a

11:23  20   differential, correct?

11:23  21       A.    No.  They don't say "subtract one velocity

11:23  22   from another to get a differential."

11:23  23       Q.    In Follow Me, DJI's drones will calculate the

11:23  24   velocity of the object that's being followed, correct?

11:23  25       A.    Yes.

965

| | | |
|---|---|---|
| 11:23 | 1 | Q.    The velocity of the reference vehicle is set |
| 11:23 | 2 | to the value of a variable in DJI's code, right? |
| 11:24 | 3 | A.    Sure. |
| 11:24 | 4 | Q.    In ActiveTrack mode, DJI's drone will also |
| 11:24 | 5 | calculate the velocity of the reference vehicle, won't |
| 11:24 | 6 | it? |
| 11:24 | 7 | A.    Yes. |
| 11:24 | 8 | Q.    And DJI's code will also set the value of the |
| 11:24 | 9 | velocity of the reference vehicle, correct? |
| 11:24 | 10 | A.    Yes. |
| 11:24 | 11 | Q.    DJI's drone will then calculate a velocity for |
| 11:24 | 12 | the drone to fly at in ActiveTrack mode, right? |
| 11:24 | 13 | A.    Sure. |
| 11:24 | 14 | Q.    DJI's drones will compute the velocity of the |
| 11:24 | 15 | drone needed to move it to maintain a stable distance |
| 11:24 | 16 | from the target at all times, correct? |
| 11:24 | 17 | A.    Yes. |
| 11:24 | 18 | Q.    Can you see this okay, Doctor?  Can you see |
| 11:25 | 19 | the -- |
| 11:25 | 20 | MR. RICH:  Oh, I need to publish that. |
| 11:25 | 21 | There we go. |
| 11:25 | 22 | MR. SCHLESINGER:  Your Honor, may we seal |
| 11:25 | 23 | the courtroom? |
| 11:25 | 24 | THE COURT:  Sure. |
| 11:25 | 25 | If you're not under the protective order, |

11:25   1    please exit.

11:25   2                    MR. RICH:   Thank you.

11:25   3                    (Sealed proceedings.)

11:25   4    BY MR. RICH:

11:26   5        Q.    All right, Doctor.  Can you see this okay?

11:26   6        A.    I can.

11:26   7        Q.    And this is the slide where Dr. Michalson

11:26   8    showed some ActiveTrack code, right?

11:26   9        A.    Yes.

11:26   10       Q.    And you put this up yesterday, right?

11:26   11       A.    I did.

11:26   12       Q.    And you talked about how this isn't about

11:26   13   velocity, right?

11:26   14       A.    Right.

11:26   15   ██    ████████████████████████████████████████

11:26   16   ██    ████

11:26   17       Q.    That's at Line 5532?

11:26   18       A.    Yes.

11:26   19   ██    ████████████████████████████████████████

11:26   20   ████████

11:26   21   ██    ████

11:26   22   ██    █████████████████████████  ██████

11:26   23   ██    ███

11:26   24   ██    ██████████████

11:26   25   ██    ████

967

11:26   1

11:26   2

11:26   3

11:26   4

11:26   5       Q.    Now, you were in the courtroom for

11:27   6   Dr. Michalson's examination, right?

11:27   7       A.    Yes.  I was.

11:27   8       Q.    And you saw him put up a slide showing

11:27   9   differences between Claim 1 and Claim 7 of the '909

11:27   10  patent?

11:27   11      A.    I remember that.

11:27   12      Q.    Now, you agree that Claim 1 recites a

11:27   13  calculation of calculated velocity, correct?

11:27   14      A.    Yes.

11:27   15      Q.    And Claim 1 isn't the claim that requires a

11:27   16  calculation of position relative to the reference

11:27   17  vehicle, correct?

11:27   18      A.    Correct.

11:27   19      Q.    One of the main differences between Claims 1

11:27   20  and 7 is that Claim 7 requires a calculation of

11:27   21  position relative to the reference vehicle, correct?

11:27   22      A.    Yes.  It adds that.

11:27   23      Q.    And do you agree that Follow Me meets the

11:27   24  element of calculation of a position of the aircraft

11:28   25  relative to the reference vehicle as recited in

11:28  1    Claim 7?

11:28  2        A.    The specific part, yes.

11:28  3        Q.    And do you agree that ActiveTrack meets the

11:28  4    element in Claim 7 of a calculation of a position of

11:28  5    the aircraft relative to the reference vehicle, right?

11:28  6        A.    Again, that specific part.  Sure.

11:28  7        Q.    You talked some about the '909 patent claim

11:28  8    element reference data communicating position and

11:28  9    movement.

11:28  10           Do you remember that?

11:28  11       A.    I do.

11:28  12       Q.    And in Follow Me mode, a drone receives GPS

11:28  13   data that tells it the position of the reference

11:28  14   vehicle, right?

11:28  15       A.    Yes, sir.

11:28  16       Q.    And the drone will continue to receive the GPS

11:28  17   of the reference vehicle very rapidly, right?

11:28  18       A.    It does.

11:28  19       Q.    ████████████████████████████████████████

11:28  20   ████████████████████████████

11:29  21   ██ ████████████████ ████████████████████

11:29  22   ████████████████████ ██████████████

11:29  23   ██ ██████████████████████████

11:29  24   ██ ████████████████ ██████████████

11:29  25   ██████

969

| 11:29 | 1 | Q. In ActiveTrack, the drone is configured to |

11:29    1        Q.    In ActiveTrack, the drone is configured to

11:29    2    receive bounding box coordinate data, right?

11:29    3        A.    Correct.

11:29    4        Q.    The drone uses that data to determine the

11:29    5    position of the target, right?

11:29    6        A.    That's right.

11:29    7        Q.    The drone uses that data to estimate the

11:29    8    movement of the target?

11:29    9        A.    What data?

11:29   10        Q.    The received data.

11:29   11        A.    Oh, the position. Yeah. The drone looks at

11:29   12    me as I move and figures out from its camera how I'm

11:29   13    moving. That's right.

11:29   14        Q.    Sir, the drone uses the bounding box

11:29   15    coordinate data to estimate the movement of the target?

11:29   16        A.    The first thing you said, sir. It's to

11:29   17    estimate the position of the target.

11:29   18        Q.    Sir, I took your deposition in this case,

11:29   19    didn't I?

11:30   20        A.    Yes.

11:30   21        Q.    And on January 25th of 2023 at Page 129,

11:30   22    Lines 4 through 8 of your transcript, I asked you: The

11:30   23    drone uses the bounding box coordinate data to estimate

11:30   24    the movement of the target, correct?

11:30   25        A.    Yes.

970

11:30  1       Q.    And you said:  Yes, over time.

11:30  2             Did I ask that question and did you give that

11:30  3   answer?

11:30  4       A.    That's accurate.

11:30  5             MR. RICH:  Let's pull up the words of

11:30  6   Claim 1 again.

11:30  7             (Clarification by Reporter.)

11:30  8             MR. RICH:  I believe we can go off the

11:30  9   sealed record.

11:30  10            THE COURT:  Okay.

09:42  11            (Sealed proceedings end.)

11:30  12            MR. RICH:  Now, can we -- let me get that

11:30  13  started.

11:30  14            Can we zoom in on "reference data

11:31  15  communicating a position and movement of a reference

11:31  16  vehicle," please, and the receiver element?

11:31  17            Thank you.

11:31  18  BY MR. RICH:

11:31  19       Q.    Can you see that okay, Doctor?

11:31  20       A.    Oh, I sure can.

11:31  21       Q.    The claim says:  Reference data communicating

11:31  22  a position and movement of a reference vehicle.

11:31  23            You see that, right?

11:31  24       A.    I do.

11:31  25       Q.    The claim doesn't say position data and

11:32    1    movement data separately communicated, correct?

11:32    2        A.    The words "separately communicated" is, I

11:32    3    think, what you just added, and it's not in the

11:32    4    dependent claim, no.

11:32    5        Q.    Right.  The claim says:  Reference data that

11:32    6    communicates position and movement, right?

11:32    7        A.    Communicating.  Yeah.

11:32    8        Q.    There's not a limitation that says communicate

11:32    9    both things at once, right?

11:32   10        A.    It doesn't say at once --

11:32   11        Q.    Sorry.

        12        A.    -- no.

        13        Q.    Strike that.

11:32   14            There's not a limitation in there that says

11:32   15    don't use position information to also give you

11:32   16    movement, correct?

11:32   17        A.    Doesn't have that language.

11:32   18        Q.    You heard Mr. Harris testify earlier, right?

11:32   19        A.    I did.

11:32   20        Q.    You heard him testify that his invention could

11:32   21    communicate data indicating position and movement with

11:32   22    just GPS, right?

11:32   23        A.    Yes.  His invention can.

11:32   24        Q.    Now, you talked about something called

11:32   25    noninfringing alternatives for the '752 patent, didn't

11:32    1    you?

11:32    2        A.    I remember that.

11:32    3        Q.    Those are hypothetical designs you say DJI

11:33    4    could come up with, right?

11:33    5        A.    Yes.    Could have come up with, yeah.

11:33    6        Q.    Could have, as in could have at the date of

11:33    7    first infringement in 2015?

11:33    8        A.    That's right.

11:33    9        Q.    And, in fact, you came up with those

11:33    10   alternatives just for the purposes of this litigation,

11:33    11   didn't you?

11:33    12       A.    I was considering what they could have done

11:33    13   that would have avoided this whole situation.

11:33    14       Q.    One of the requirements for a noninfringing

11:33    15   alternative is that the alternative has to be

11:33    16   acceptable to consumers, right?

11:33    17       A.    Yes.

11:33    18       Q.    One of the ways that you say DJI could

11:33    19   hypothetically change its product is you add a brake

11:33    20   button to DJI's remote controllers, and the user hits

11:33    21   that brake button to trigger a hover, right?

11:33    22       A.    Yes.    That's right.    Well, yeah.    You can call

11:34    23   it --

11:34    24       Q.    Until the user --

11:34    25       A.    -- to trigger braking, but yes.

973

11:34   1          Q.    Until the user hits the added brake button in
11:34   2    your hypothetical design, the drone just continues to
11:34   3    either drift or fly, right?
11:34   4          A.    It coasts.
11:34   5          Q.    Coasts.
11:34   6          A.    Yeah.
11:34   7          Q.    In other words, the drone won't come to a
11:34   8    hover when the user releases the stick like it does
11:34   9    now?
11:34   10         A.    Right.  It'll coast until you hit the brake
11:34   11   like a car would coast.
11:34   12         Q.    It'll keep moving, right?
11:34   13         A.    That's right.
11:34   14         Q.    And the way you have to trigger it to brake in
11:34   15   your hypothetical is add the button, right?
11:34   16         A.    Yeah.  You have to have a brake pedal.
11:34   17         Q.    And you say triggering a hover by hitting a
11:34   18   new button instead of releasing the stick would be
11:34   19   perfectly acceptable to consumers, right?
11:34   20         A.    I think so.
11:34   21         Q.    When you were tasked with determining if your
11:34   22   alternative would be acceptable to consumers, you
11:34   23   didn't go out and check with a single consumer to see
11:34   24   if that alternative would work for them, did you?
11:35   25         A.    Did I survey consumers?  No.

974

11:35    1        Q.    Sir, I asked did you talk to a single consumer
11:35    2    to see if your alternative would be acceptable?
11:35    3        A.    No.
11:35    4        Q.    You didn't ask a single consumer if they'd be
11:35    5    happy if you took away triggering a hover using a
11:35    6    centered stick position, right?
11:35    7        A.    Correct.
11:35    8        Q.    And you know that they've used that
11:35    9    functionality for 11 years, correct?
11:35   10        A.    They have.
11:35   11        Q.    They've been used to centering a stick to
11:35   12    create a hover for 11 years?
11:35   13        A.    Like people who used it for 11 years, sure.
11:35   14        Q.    And then you're suddenly just going to take
11:35   15    that operation away from them, right?
11:35   16        A.    From people who've used it for 11 years?
11:35   17        Q.    Yes.
11:35   18        A.    I'm giving an alternative, what you could have
11:35   19    done instead.  Yeah.
11:35   20        Q.    But you're saying that taking it away, the
11:35   21    behavior that they are used to and have used for
11:36   22    11 years, would be perfectly acceptable to them?
11:36   23        A.    Well, I'm guessing a lot of them drive cars,
11:36   24    and so I believe they'll find it acceptable.  Yeah.
11:36   25                MR. RICH:  Objection, nonresponsive.

975

11:36  1                  THE COURT:  Sustained.

11:36  2    BY MR. RICH:

11:36  3        Q.    Sir --

11:36  4        A.    Yes.

11:36  5        Q.    -- you're telling the jury that consumers who

11:36  6    have used a feature for 11 years and they're used to

11:36  7    that use would be perfectly fine if you totally change

11:36  8    the product and remove the thing they're used to?

11:36  9        A.    Yes.  And I can explain, if you'd like me to.

11:36  10       Q.    And you didn't do any consumer surveys, right?

11:36  11       A.    That's correct.

11:36  12       Q.    You didn't ask anyone to do a consumer survey,

11:36  13   correct?

11:36  14       A.    I didn't ask anybody to do consumer surveys.

11:36  15       Q.    And you didn't even do any market research,

11:36  16   right?

11:36  17       A.    No.  I didn't do market research on brake

11:36  18   pedals or anything like that.

11:36  19       Q.    Now, I've been going to the same Tex-Mex place

11:36  20   in Dallas for about ten years, okay?

11:37  21       A.    I believe it.

11:37  22       Q.    And I go there because I love their queso,

11:37  23   okay?

11:37  24       A.    All right.

11:37  25       Q.    Let's say that one day they totally change

976

11:37  1    their menu and take my queso, my favorite queso, off

11:37  2    the menu, okay?

11:37  3        A.    I'm sorry.

11:37  4        Q.    Me too.  But you wouldn't be surprised to know

11:37  5    that I probably am not going back there because my

11:37  6    queso is no longer there.

11:37  7        A.    Depends on how their new stuff tastes.

11:37  8        Q.    That kind of sounds like what you're saying

11:37  9    DJI would do.  They would take the normal operation and

11:37  10   totally change it, you agree?

11:37  11       A.    I agree that it's an alternative design.  Yes.

11:37  12   Different queso.

11:37  13       Q.    You also talked about how easy it would be for

11:37  14   DJI to add the new brake button you're proposing,

11:37  15   right?

11:37  16       A.    Yes.

11:37  17       Q.    Well, let me step back a little bit.

11:37  18             We talked about how under your hypothetical

11:37  19   the drone would continue to drift, right?

11:37  20       A.    It would coast.  Yeah.

11:37  21       Q.    And when you're saying coasting, it's still

11:38  22   coasting -- it's moving, right?  Unless you hit that

11:38  23   button?

11:38  24       A.    Yeah.  It's what you think of as zero-pitch

11:38  25   motion.  So what happens is it stops trying to push

977

| 11:38 | 1 | itself forward.  It just coasts, and that'll cause it |

11:38    1    itself forward.  It just coasts, and that'll cause it

11:38    2    to gradually slow down.

11:38    3         I'm sorry.  That's the wrong answer.  Yes.

11:38    4    Q.    Well, let's say I accidentally -- under your

11:38    5    hypothetical, let's say I accidentally drop the

11:38    6    controller on the ground, okay?

11:38    7    A.    Okay.

11:38    8    Q.    Now, with the normal operation where the

11:38    9    sticks create the hover, the drone will come to a hover

11:38   10    and stop, right?

11:38   11    A.    I hope so.  I mean, if you break the

11:38   12    controller, I have no idea what'll happen if it hits

11:38   13    the ground and breaks.  Let's say you just let go of it

11:38   14    gently.

11:38   15    Q.    Sir, if you drop the controller under the

11:38   16    normal operation and the sticks are centered, it's

11:38   17    going to come to a hover?

11:38   18    A.    Yes.

11:38   19    Q.    Now, if I drop it under your hypothetical and

11:38   20    I haven't hit your new button, the drone just continues

11:39   21    to go, doesn't it?

11:39   22    A.    It coasts.  Yeah.

11:39   23    Q.    And my $3,000 DJI drone is coasting right at

11:39   24    my house, isn't it?

11:39   25    A.    It's running obstacle avoidance so it's not

978

11:39    1    going to hit the house.  Right.

11:39    2        Q.    Sir, the drone will continue to drift towards

11:39    3    my house, won't it?

11:39    4        A.    Sure.

11:39    5        Q.    That isn't going to end too well for the drone

11:39    6    with your new brake button, is it?

11:39    7        A.    I disagree.

11:39    8        Q.    But the fact is, sir, you talked about how DJI

11:39    9    could have avoided this whole thing just a minute ago.

11:39    10        But they never changed their product, did

11:39    11    they?

11:39    12        A.    Can you ask that in a different way?

11:39    13        Q.    Sir, DJI never implemented your proposed

11:39    14    alternative of adding a brake button, right?

11:39    15        A.    Well, I've flown a really recent FPV drone

11:40    16    from DJI that has a brake button.  So there is such a

11:40    17    thing as a brake button today.

11:40    18        Q.    Sir, DJI hasn't actually implemented your

11:40    19    alternative, has it?

11:40    20        A.    Not at the time of my deposition with you.

11:40    21        Q.    Exactly.  You told me that DJI hasn't

11:40    22    implemented a brake button?

11:40    23        A.    Right.

11:40    24        Q.    And you're supposed to be analyzing the

11:40    25    alternatives as of 2015, correct?

979

| | | |
|---|---|---|
| 11:40 | 1 | A.    Okay. |
| 11:40 | 2 | Q.    Correct? |
| 11:40 | 3 | A.    Yes. |
| 11:40 | 4 | Q.    And so this brand new, one product with the |
| 11:40 | 5 | brake button wasn't available back then? |
| 11:40 | 6 | A.    Correct. |
| 11:40 | 7 | Q.    You understand the standard of proof for |
| 11:40 | 8 | infringement, right? |
| 11:40 | 9 | A.    Yes. |
| 11:40 | 10 | Q.    It's a preponderance of the evidence, right? |
| 11:40 | 11 | A.    Correct. |
| 11:40 | 12 | Q.    That's more likely than not, right? |
| 11:40 | 13 | A.    Yes. |
| 11:40 | 14 | Q.    Now, DJI has to prove invalidity under a |
| 11:40 | 15 | different standard, right? |
| 11:40 | 16 | A.    Yes. |
| 11:40 | 17 | Q.    Mr. Harris and Mr. Christensen's patents are |
| 11:41 | 18 | presumed valid, aren't they? |
| 11:41 | 19 | A.    Yes. |
| 11:41 | 20 | Q.    You agree that DJI has the burden to overcome |
| 11:41 | 21 | that presumption of validity, right? |
| 11:41 | 22 | A.    That's right. |
| 11:41 | 23 | Q.    Now, because patents are presumed valid, |
| 11:41 | 24 | there's a higher standard for taking away a patent than |
| 11:41 | 25 | for establishing infringement. |

980

11:41  1            You understand that?

11:41  2       A.    That's correct.

11:41  3       Q.    And do you understand that the standard for

11:41  4  taking away a patent is called clear and convincing

11:41  5  evidence?

11:41  6       A.    Yes.

11:41  7       Q.    I didn't hear you mention to the jury that

11:41  8  patents are presumed valid, did you?

11:41  9       A.    If I forgot to say that -- I don't remember

11:41 10  mentioning it one way or the other.

11:41 11       Q.    You also didn't mention that you have -- DJI

11:41 12  has to prove invalidity by clear and convincing

11:41 13  evidence.

11:41 14            You didn't tell them that, did you?

11:41 15       A.    I didn't say that phrase to them.

11:41 16       Q.    That's kind of important information to have,

11:41 17  isn't it?

11:41 18       A.    Well, I thought they were going to get that in

11:41 19  the Judge's orders.

11:41 20       Q.    And that's the standard that you had to apply

11:41 21  when you were doing your invalidity analysis?

11:41 22       A.    Yes.

11:41 23       Q.    You're saying that the Frink reference

11:42 24  anticipates Mr. Harris' '909 patent, right?

11:42 25       A.    That's right.

11:42  1      Q.    You understand that anticipation is a

11:42  2   stringent standard, right?

11:42  3      A.    I do.

11:42  4      Q.    If even a single limitation is not disclosed

11:42  5   in Frink, then Frink can't anticipate, right?

11:42  6      A.    That's right.

11:42  7      Q.    Obviousness is different than anticipation,

11:42  8   right?

11:42  9      A.    It is.

11:42  10      Q.    You use obviousness when the reference that

11:42  11   you're relying on doesn't actually teach all the

11:42  12   elements of the claim?

11:42  13      A.    Well, my understanding may be not perfect

11:42  14   about legal matters.  I don't know if you want me to

11:42  15   say this if -- or if I'm going to get in trouble.

11:42  16          Can I talk about the relationship between

11:42  17   obviousness and anticipation or do you want me to avoid

11:42  18   that?

11:42  19      Q.    Well, you told the jury that the Gold

11:42  20   reference makes Mr. Christensen's '752 patent obvious,

11:42  21   right?

11:42  22      A.    Yes.

11:42  23      Q.    Now, as part of obviousness, DJI has to show

11:43  24   that one of ordinary skill would have been motivated to

11:43  25   combine things together, right?

982

| | | |
|---|---|---|
| 11:43 | 1 | A.    And able.  Yeah. |
| 11:43 | 2 | Q.    You can't just take two pieces of prior art |
| 11:43 | 3 | and smash them together, can you? |
| 11:43 | 4 | A.    Again, I don't know how to answer.  We're not |
| 11:43 | 5 | talking about two pieces of prior art.  We're talking |
| 11:43 | 6 | about one piece of prior art, the Gold reference. |
| 11:43 | 7 | Q.    And you're using obviousness, right? |
| 11:43 | 8 | A.    That's right. |
| 11:43 | 9 | Q.    And so you're acknowledging that something |
| 11:43 | 10 | isn't in Gold, aren't you? |
| 11:43 | 11 | A.    I'm acknowledging that somebody skilled in the |
| 11:43 | 12 | arts would be able to take Gold -- I apologize if I'm |
| 11:43 | 13 | giving a long answer -- and come up with the invention |
| 11:43 | 14 | that '752 is. |
| 11:43 | 15 | Q.    Is it your opinion that Gold anticipates or |
| 11:43 | 16 | renders obvious Claim 13? |
| 11:43 | 17 | A.    Renders obvious. |
| 11:43 | 18 | Q.    So something is missing from Gold.  It's not |
| 11:44 | 19 | anticipated, right? |
| 11:44 | 20 | A.    As you pointed out, anticipate is a more |
| 11:44 | 21 | stringent standard. |
| 11:44 | 22 | Q.    And so you're acknowledging that something is |
| 11:44 | 23 | not in Gold because you agree that it's not |
| 11:44 | 24 | anticipating? |
| 11:44 | 25 | A.    Would you like me to explain? |

11:44  1      Q.    I would like an answer, sir.

11:44  2      A.    Okay.

11:44  3      Q.    Let me ask my question again, sir.

11:44  4      A.    Sure.

11:44  5      Q.    You -- I believe you just said that Gold

11:44  6  doesn't anticipate Claim 13, right?

11:44  7      A.    Right.

11:44  8      Q.    And so since it's not anticipation, that means

11:44  9  that an element is missing in Gold?

11:44  10     A.    It means I use obviousness to overcome that.

11:44  11  Yes.

11:44  12            So yes.  It means there's something where I

11:44  13  want obviousness instead of anticipation.  And I can

11:44  14  explain if you want.

11:44  15                 MR. RICH:  I'll object as nonresponsive.

11:44  16                 THE COURT:  Sustained.

11:44  17  BY MR. RICH:

11:44  18     Q.    Sir --

11:44  19                 MR. RICH:  Let's move on to Slide 117 at

11:45  20  Dr. Nourbakhsh's presentation, please.

11:45  21  BY MR. RICH:

11:45  22     Q.    All right.  You see on the right side of the

11:45  23  slide you have Claim 13 here?

11:45  24     A.    I do.

11:45  25     Q.    And do you see the claim element that the

11:45  1    lateral speed hold loop automatically -- well, the

11:45  2    speed hold loop automatically engages, right?

11:45  3        A.    The forward -- yeah.  Forward.

11:45  4        Q.    Correct.  Correct.

11:45  5              Claim says the loop automatically engages,

11:45  6    right?

11:45  7        A.    That's right.

11:45  8        Q.    All right.  Now it should be displayed.

11:45  9              Claim says automatically engages, right?

11:45  10       A.    That's right.

11:45  11       Q.    Manually pressing a button to engage the

11:46  12   longitudinal or lateral speed hold loops would not be

11:46  13   automatically engaging those loops as recited in

11:46  14   Claim 13?

11:46  15       A.    That's right.

11:46  16       Q.    Now, you told the jury that Gold discloses

11:46  17   that the lateral speed hold loop is automatically

11:46  18   engaged, right?

11:46  19       A.    That's right.

11:46  20       Q.    And what you pointed to was this box on the

11:46  21   left that references a pitch --

11:46  22              MR. RICH:  Well, can we have the next

11:46  23   slide, please?

11:46  24              There we go.

11:46  25   BY MR. RICH:

| | | |
|---|---|---|
| 11:46 | 1 | Q.    You pointed to this on the left that has the |
| 11:46 | 2 | roll axis, right? |
| 11:46 | 3 | A.    That's right. |
| 11:46 | 4 | Q.    Now, that velocity hold that you're pointing |
| 11:46 | 5 | to on the left happens after the velocity stabilization |
| 11:46 | 6 | mode is engaged, correct? |
| 11:46 | 7 | A.    It happens when you let go of the stick, |
| 11:47 | 8 | correct? |
| 11:47 | 9 | Q.    Well, the velocity stabilization has to be |
| 11:47 | 10 | engaged first before you can get into the velocity |
| 11:47 | 11 | hold, right? |
| 11:47 | 12 | A.    Yeah.  All -- the autopilot has to be on when |
| 11:47 | 13 | you're flying the helicopter for any of this to |
| 11:47 | 14 | function.  That's right. |
| 11:47 | 15 | Q.    Right.  For any of the things that you're |
| 11:47 | 16 | pointing to, to function, autopilot has to be on first? |
| 11:47 | 17 | A.    Yeah.  When you take off with the helicopter, |
| 11:47 | 18 | you've got to turn that on. |
| 11:47 | 19 | Q.    Now, you didn't actually show the jury the |
| 11:47 | 20 | full context of this Gold reference, did you? |
| 11:47 | 21 | A.    I'm not sure what you mean.  I didn't show |
| 11:47 | 22 | them the entire article, no. |
| 11:47 | 23 | MR. RICH:  Can we have Defendants' |
| 11:47 | 24 | Exhibit 396, please? |
| 11:47 | 25 | Go to Page 421, please.  And just under |

| | | |
|---|---|---|
| 11:47 | 1 | "Velocity Stabilization/Hover Hold" on the left-hand |
| 11:47 | 2 | side. |
| 11:47 | 3 | BY MR. RICH: |
| 11:47 | 4 | Q.    Okay.  The velocity stabilization mode and |
| 11:48 | 5 | hover hold mode. |
| 11:48 | 6 | Do you see that? |
| 11:48 | 7 | A.    I do. |
| 11:48 | 8 | Q.    This is the part that you didn't show the |
| 11:48 | 9 | jury, right? |
| 11:48 | 10 | A.    I talked about it.  I didn't show them this |
| 11:48 | 11 | text.  Right. |
| 11:48 | 12 | Q.    All right.  What's the -- |
| 11:48 | 13 | MR. RICH:  Can I have highlighting on the |
| 11:48 | 14 | first sentence, please? |
| 11:48 | 15 | BY MR. RICH: |
| 11:48 | 16 | Q.    Sir, the velocity stabilization mode is |
| 11:48 | 17 | engaged manually by pressing the velocity hover hold |
| 11:48 | 18 | switch. |
| 11:48 | 19 | Do you see that? |
| 11:48 | 20 | A.    I do. |
| 11:48 | 21 | Q.    And so you have to hit a button to engage |
| 11:48 | 22 | velocity stabilization mode, right? |
| 11:48 | 23 | A.    Yeah.  That's the button that turns on the |
| 11:48 | 24 | whole autopilot system. |
| 11:48 | 25 | Q.    Right.  And without hitting that button, you |

987

| | | |
|---|---|---|
| 11:48 | 1 | can't engage any of the stuff that you pointed to? |
| 11:48 | 2 | A.    Yeah.  If you don't turn on autopilot, none of |
| 11:48 | 3 | these cool functions function.  It's just a manual |
| 11:48 | 4 | helicopter. |
| 11:48 | 5 | MR. RICH:  Objection, nonresponsive. |
| 11:48 | 6 | THE COURT:  Sustained. |
| 11:48 | 7 | BY MR. RICH: |
| 11:48 | 8 | Q.    Doctor, you have to first hit a button before |
| 11:48 | 9 | any of the things that you pointed to are engaged, |
| 11:48 | 10 | correct? |
| 11:48 | 11 | A.    That's right. |
| 11:49 | 12 | MR. RICH:  May I have Figure 1 of Gold, |
| 11:49 | 13 | please? |
| 11:49 | 14 | BY MR. RICH: |
| 11:49 | 15 | Q.    This is Figure 1 that you showed the jury, |
| 11:49 | 16 | right? |
| 11:49 | 17 | A.    Yes.  It is. |
| 11:49 | 18 | Q.    At the bottom it says "longitudinal control |
| 11:49 | 19 | laws," right? |
| 11:49 | 20 | A.    Yes.  It does. |
| 11:49 | 21 | Q.    And this is what you said teaches the |
| 11:49 | 22 | longitudinal loop design in Claim 13, right? |
| 11:49 | 23 | A.    Yes. |
| 11:49 | 24 | Q.    You didn't show the jury any similar figure |
| 11:49 | 25 | that talks about loops for the lateral loop design, did |

988

| | | |
|---|---|---|
| 11:49 | 1 | you? |
| 11:49 | 2 | A.    No.    It would work the same way, of course. |
| 11:49 | 3 | But you're right.  Okay.  Yes to your question.  No, I |
| 11:49 | 4 | didn't show them another figure. |
| 11:49 | 5 | MR. RICH:  Objection, nonresponsive. |
| 11:49 | 6 | THE COURT:  Overruled. |
| 11:49 | 7 | BY MR. RICH: |
| 11:49 | 8 | Q.    Sir, you didn't -- you did not show the jury |
| 11:49 | 9 | any loops like this one in Figure 1 for the lateral |
| 11:50 | 10 | loop design? |
| 11:50 | 11 | A.    That's correct. |
| 11:50 | 12 | Q.    And you didn't show the jury any loops like |
| 11:50 | 13 | this one in Figure 1 for the directional loop design, |
| 11:50 | 14 | correct? |
| 11:50 | 15 | A.    That's correct. |
| 11:50 | 16 | Q.    The bottom line, sir, is manual engagement is |
| 11:50 | 17 | the opposite of automatic engagement, isn't it? |
| 11:50 | 18 | A.    I disagree with your use of the word |
| 11:50 | 19 | "engagement" twice because there are different things |
| 11:50 | 20 | we're engaging.  So I disagree. |
| 11:50 | 21 | Q.    You disagree that manually pressing a button |
| 11:50 | 22 | is the opposite of automatic engagement? |
| 11:50 | 23 | A.    You're using the word "engagement" -- well, |
| 11:50 | 24 | you said "pressing a button" this time.  Manually |
| 11:50 | 25 | pressing a button is completely different from letting |

989

11:50   1    go of the stick.

11:50   2                    MR. RICH:  May I have the title of Gold,

11:50   3    please, first page?

11:50   4                    Can you blow up the title, please?

11:50   5    BY MR. RICH:

11:50   6       Q.    You see the title, sir?

11:50   7       A.    I do.

11:51   8       Q.    It says "Selectable Control Modes"?

11:51   9       A.    It does.

11:51  10       Q.    Now, you talked some about how this came from

11:51  11    Mr. Gold and a guy from Boeing.

11:51  12             Do you remember that?

11:51  13       A.    I do.

11:51  14       Q.    You didn't go talk to Mr. Gold about his

11:51  15    selectable control modes, did you?

11:51  16       A.    I didn't talk to Mr. Gold.  I've never met the

11:51  17    gentleman.

11:51  18       Q.    And you didn't go talk to the other gentleman,

11:51  19    Mr. Dryfoos, either, did you?

11:51  20       A.    I've never met Mr. Dryfoos either.

11:51  21       Q.    Did you know that this paper says it's the --

11:51  22    gives the history of what happened?

11:51  23       A.    You mean the Comanche project?

11:51  24       Q.    The paper talks about how this is the

11:51  25    preliminary design of the selectable modes, and it was

990

11:51   1    done at Sikorsky, right?

11:51   2        A.    Yes.

11:51   3        Q.    Pretty good aerospace company, right?

11:51   4        A.    Sure.

11:51   5        Q.    A lot of engineers there?

11:51   6        A.    Yes.

11:51   7        Q.    And then it talks about how there was some

11:51   8    pilot evaluations at Sikorsky and the control laws got

11:51   9    transferred to Boeing.

11:51   10            Do you see that?

11:51   11       A.    Yes.

11:51   12       Q.    Another pretty good aerospace company with a

11:52   13   lot of engineers, right?

11:52   14       A.    Absolutely.

11:52   15       Q.    And then the final design went back to

11:52   16   Sikorsky.

11:52   17            Did you see that?

11:52   18       A.    Okay.

11:52   19       Q.    And so after all this back and forth between

11:52   20   Sikorsky and Boeing, all those good engineers only

11:52   21   described in the Gold paper that you have to first hit

11:52   22   a button before you can do all the things that you

11:52   23   pointed to?

11:52   24       A.    That's required in all aircraft, yeah.

11:52   25       Q.    Now, let's quickly turn to the Frink

991

11:52    1    reference.  This is the one that you're saying to the

11:52    2    jury that they should use to take Mr. Harris' patent

11:52    3    away, right?

11:52    4        A.    No.  I didn't say they should take his patent

11:52    5    away.  That's not fair.

11:52    6        Q.    To be clear, sir, Mr. Frink is not Mr. Frank

11:52    7    Wang at DJI, right?  Two separate people?

11:52    8        A.    I'm sorry?

11:52    9        Q.    Mr. Frink is not Mr. Frank Wang at DJI, right?

11:52    10        A.    I think the inventor's name is Bentley Frink.

11:52    11    His last name is Frink, F-r-i-n-k.

11:52    12        Q.    You understand that Claim 1 says you have to

11:53    13    have a calculation of velocity of the aircraft relative

11:53    14    to the reference vehicle, right?

11:53    15        A.    I do.

11:53    16        Q.    There has to be a calculation, right?

11:53    17        A.    Yes.

11:53    18            MR. RICH:  Can I have Dr. Nourbakhsh's

11:53    19    Slide 88, please?

11:53    20    BY MR. RICH:

11:53    21        Q.    All right, Doctor.

11:53    22            You told the jury that Frink -- the first line

11:53    23    of Frink at -- in the center of this page.

11:53    24            Do you see that?

11:53    25            The unmanned aerial vehicle can be programmed

992

11:53  1    to fly in a pattern relative to the marine vessel.

11:53  2              You see that, right?

11:53  3        A.    I do see that.

11:53  4        Q.    That's two lines out of Frink, right?

11:53  5        A.    Two lines of text, yes.

11:53  6        Q.    Two lines of text.

11:53  7              And you told the jury that Frink teaches

11:53  8    calculating a calculated velocity of the aircraft

11:53  9    relative to the reference vehicle based on those two

11:54  10   lines because it's programmed to fly in a pattern,

11:54  11   right?

11:54  12       A.    I think there's a whole lot of places where

11:54  13   Frink talks about the oval pattern.  It's not just

11:54  14   those two lines.  That's not fair.

11:54  15       Q.    But what you're pointing to is a pattern,

11:54  16   correct?

11:54  17       A.    I'm using a pattern, yes.

11:54  18       Q.    And the two lines that you pointed to on this

11:54  19   slide for the calculation, the word "calculate" does

11:54  20   not appear, does it?

11:54  21       A.    No.  The word "calculate" is not in that

11:54  22   sentence.

11:54  23       Q.    In those two lines that you're relying on, the

11:54  24   word "calculation" does not appear, correct?

11:54  25       A.    Neither of those two words is in that

11:54  1    sentence.

11:54  2        Q.    In those two sentences that you're pointing

11:54  3    to -- or that one sentence that you're pointing to, the

11:54  4    word "velocity" does not appear, right?

11:54  5        A.    That sentence doesn't have the word

11:54  6    "velocity," correct.

11:54  7        Q.    And now, you remember Claim 7 of the '909

11:54  8    patent.  It talks about calculating position, right?

11:54  9        A.    That's right.

11:54  10       Q.    And so in the lines that you're relying on

11:54  11   here on this slide, those lines don't say calculate a

11:55  12   position, do they?

11:55  13       A.    The word "calculated position" isn't in this

11:55  14   sentence.

11:55  15       Q.    Frink mentions in that line programming,

11:55  16   right?

11:55  17       A.    That sentence doesn't have the word -- oh,

11:55  18   programmed, yes.  It has the word "programmed."

11:55  19       Q.    Doesn't say the word "calculation," right?

11:55  20       A.    That's right.  The word "calculation" is still

11:55  21   not in that sentence.

11:55  22       Q.    Sir, patents are important property rights,

11:55  23   aren't they?

11:55  24       A.    Absolutely.

11:55  25       Q.    Protecting your patents in court is sometimes

994

11:55  1    necessary, right?

11:55  2        A.    I think so.

11:55  3        Q.    Patents are so important that the whole basis

11:55  4    for them is in the Constitution, right?

11:55  5        A.    That's right.

11:55  6        Q.    Now, I want to end close to where we started,

11:55  7    sir.  You remember where we began this

11:55  8    cross-examination with the DJI patents?

11:55  9        A.    Yes.

11:55  10       Q.    We started with all those DJI patents that

11:55  11   you're not saying invalidate Mr. Harris' and

11:55  12   Mr. Christensen's patents?

11:55  13       A.    That's right.

11:55  14       Q.    And you've said you found those doing a Google

11:56  15   search, didn't you?

11:56  16       A.    I did.

11:56  17       Q.    Probably took you about a minute to look up

11:56  18   those patents, right?

11:56  19       A.    I think it took a lot longer than a minute,

11:56  20   but yes.

11:56  21       Q.    You did a --

11:56  22       A.    Took some time, let's say.

11:56  23       Q.    You did an assignee search for DJI, right?

11:56  24       A.    I did an assignee search for DJI, then I

11:56  25   questioned the number.  So I tried it various ways

11:56  1    trying to figure out why am I getting such a huge

11:56  2    number of hits.

11:56  3                    MR. RICH:  Objection, nonresponsive.

11:56  4                    THE COURT:  Overruled.

11:56  5    BY MR. RICH:

11:56  6    Q.    Sir, you were in the courtroom when we played

11:56  7    the depositions of all those DJI engineers that aren't

11:56  8    here, correct?

11:56  9    A.    I was.

11:56  10   Q.    And you heard that not a single one of them

11:56  11   Googled Textron's patents, correct?

11:56  12   A.    That's right.  They say that -- they said they

11:56  13   hadn't read the patent.

11:56  14   Q.    Doctor, I think I'm missing somebody here.

11:56  15         There's no Mr. Wang in this courtroom, is

11:56  16   there?

11:56  17   A.    I don't know what he looks like, but I'm

11:56  18   pretty sure you're right.  He's not in here.

11:56  19   Q.    Thank you.

11:57  20                    THE COURT:  Why don't we take our lunch

11:57  21   break, unless it's very short?

11:57  22                    MR. SCHLESINGER:  It'll be a couple of

11:57  23   minutes.

11:57  24                    THE COURT:  No.  Let's go ahead then.

11:57  25                    Let me ask you all:  Do y'all want to

996

11:57  1    wrap this gentleman up or do you want to go to lunch?

11:57  2                    I'm happy to do either.

11:57  3                    JURY:  Wrap it up.

11:57  4                    THE COURT:  Okay.  Very good.

       5                    Please.

11:57  6                    THE WITNESS:  Wrap it up.

11:57  7                    REDIRECT EXAMINATION

11:57  8    BY MR. SCHLESINGER:

11:57  9        Q.    Dr. Nourbakhsh, I want to start with some of

11:57  10   the questions you were initially asked about.

11:57  11            And I want to be very clear:  What you get

11:57  12   paid, does that depend on whether DJI wins or loses?

11:57  13       A.    No.

11:57  14       Q.    Do you offer any opinions you don't agree

11:57  15   with?

11:57  16       A.    Never.

11:57  17       Q.    Whose opinions are you offering?

11:57  18       A.    My own.

11:57  19       Q.    And you understand Textron's who filed this

11:57  20   lawsuit and that's why we're here?

11:57  21       A.    Of course.  Yes.

11:57  22       Q.    Would you be surprised to know or learn that

11:58  23   Textron choose who they deposed?

11:58  24       A.    No.  That's not surprising to me.

11:58  25       Q.    Would you be surprised to know that Textron

—997—

| | | |
|--|--|--|
| 11:58 | 1 | never asked to talk to Mr. Frink? |
| 11:58 | 2 | A.    I'm a little surprised. |
| 11:58 | 3 | Q.    You have a drone right there with you, and you |
| 11:58 | 4 | have the remote control. |
| 11:58 | 5 |       Can you please hold both of those? |
| 11:58 | 6 | A.    Sure. |
| 11:58 | 7 | Q.    Which one's the aircraft? |
| 11:58 | 8 | A.    That's the aircraft. |
| 11:58 | 9 | Q.    Does it have any controllers? |
| 11:58 | 10 | A.    No. |
| 11:58 | 11 | Q.    You were also asked about missing code that |
| 11:58 | 12 | you explained yesterday -- or earlier where it's |
| 11:58 | 13 | irrelevant. |
| 11:58 | 14 |       Do you recall that? |
| 11:58 | 15 | A.    Yes. |
| 11:58 | 16 | Q.    Now, there are a lot of claims counsel was |
| 11:58 | 17 | saying what the code was about. |
| 11:58 | 18 |       Has the other counsel seen the code? |
| 11:58 | 19 | A.    No. |
| 11:58 | 20 | Q.    Have you? |
| 11:58 | 21 | A.    No. |
| 11:58 | 22 | Q.    How much code did you review? |
| 11:58 | 23 | A.    I counted the lines and it sounds insane. |
| 11:59 | 24 | It's a little bit more than 2 million lines of code. |
| 11:59 | 25 | That's not the missing code.  That's the code that we |

11:59  1    all saw and read and used.

11:59  2        Q.    Is that the same code that Textron and

11:59  3    Dr. Michalson had access to?

11:59  4        A.    Yes.

11:59  5        Q.    Or Textron's counsel?

11:59  6              Now, did counsel show you what the application

11:59  7    that he's referring to actually stated?

11:59  8        A.    No.

11:59  9        Q.    Let's look at that.

11:59  10             MR. SCHLESINGER:    Could we pull up

11:59  11   Plaintiff's Exhibit 106?

11:59  12             And if we could go to page -- I believe

11:59  13   it's Page 8, and let's look at No. 6.

       14   BY MR. SCHLESINGER:

11:59  15       Q.    Do you remember being asked about

11:59  16   attitude-related code?

11:59  17       A.    Yes.

11:59  18             MR. SCHLESINGER:    If we could highlight

11:59  19   that?

11:59  20   BY MR. SCHLESINGER:

12:00  21       Q.    Do you have an understanding of what this is

12:00  22   describing?

12:00  23       A.    I do.

12:00  24       Q.    What is that?

12:00  25       A.    This is describing the ability to have stable

999

12:00  1   flight so it'll be able to deal with rapid changes that

12:00  2   you need to so that you cannot crash.

12:00  3       Q.   When it says "attitude sensing and

12:00  4   determination," what is that referring to?

12:00  5       A.   That's the accelerometers and inertial

12:00  6   guidance systems we talked about before.  It means

12:00  7   those little chips that let it know rapidly how fast

12:00  8   it's going left/right and getting twisted by the wind,

12:00  9   for example.

12:00  10      Q.   How is that related to Claim 13?

12:00  11      A.   It's completely not related to Claim 13.

12:00  12  Claim 13's not about this stuff.

12:00  13      Q.   Are you aware that the relevancy determination

12:00  14  during discovery is much broader than whether

12:00  15  something's infringed?

12:00  16      A.   Yes.

12:00  17      Q.   Now, you were also asked about whether the

12:00  18  drone that they were testing was holding a velocity of

12:00  19  zero or holding a position.

12:00  20           Do you recall that?

12:00  21      A.   Yes.

12:00  22      Q.   What is it doing?

12:01  23      A.   It's holding a position.

12:01  24      Q.   How can you be so certain?

12:01  25      A.   Because when I pull it away, it uses velocity

-1000-

12:01  1    to get back to that position.

12:01  2        Q.   But what about velocity errors?  How do you

12:01  3    know that's not just what's happening?

12:01  4        A.   It's actually trying on purpose to get back to

12:01  5    where it was.  You saw how angry it gets when I pull on

12:01  6    it.  And I'm careful with my finger not to get near the

12:01  7    propeller blades because I want to keep my fingers.

12:01  8            That's why I use the one that has this big

12:01  9    long stem on it, because I can pull on that and stay

12:01  10   away from the propeller.

12:01  11       Q.   Now, how do you -- if you want to go

12:01  12   somewhere, from Position A to Position B, how do you

12:01  13   accomplish that with a drone?

12:01  14       A.   You use control software that drives it

12:01  15   forward and then stops.

12:01  16       Q.   Now -- and if you're in position mode, what's

12:01  17   controlling?  Is it position?  Is it velocity?  Is it

12:01  18   attitude?

12:01  19       A.   It's just the position.

12:01  20       Q.   And how can you be so confident?

12:01  21       A.   Because I've seen the code and because I can

12:01  22   use the machine, and they agree.

12:01  23       Q.   And did Dr. Michalson have access to that same

12:01  24   code?

12:01  25       A.   Yes.

-1001-

12:01   1        Q.    Now, you heard a lot of talk about hovering

12:02   2   having to be enabled in the Gold reference.

12:02   3              Do you recall that?

12:02   4        A.    I do.

12:02   5        Q.    And I believe you had something to explain.

12:02   6              Could you please explain what you're referring

12:02   7   to?

12:02   8        A.    Sure.  Counsel was asking me about pushing

12:02   9   this button and manual enabling versus automatically

12:02  10   enabling.

12:02  11              The button is an autopilot button that every

12:02  12   aircraft has to have.  Because if something goes wrong

12:02  13   with the autopilot, you have to be able to turn it off.

12:02  14   So it has to have an on/off switch.

12:02  15              Once you've turned it on, then half an hour

12:02  16   later, an hour later, whenever you want, you're flying.

12:02  17   And when you let go of that control stick, it

12:02  18   automatically enables the mode.

12:02  19              The whole point of the claim is what happens

12:02  20   when you let go of the stick.  So when we're saying

12:02  21   automatically engaging, we're talking about what

12:02  22   happens when you let go of the stick.  We're not

12:02  23   talking about the button you use to turn on and off the

12:02  24   autopilot mode when you take off in the helicopter and

12:03  25   go for a ride.

1002

12:03    1        Q.    Are you aware that the claims must be read the

12:03    2    same way for both the infringement and the validity

12:03    3    analysis?

12:03    4        A.    Yes.

12:03    5        Q.    Let's take a Phantom 4.  That's accused in

12:03    6    this case, right?

12:03    7        A.    Yeah.

12:03    8        Q.    Will the Phantom 4 hover if it's not in the

12:03    9    normal mode?

12:03   10        A.    No.  It has modes in which it doesn't hover.

12:03   11        Q.    And so for the Phantom 4 to hover, you have to

12:03   12    actually be in a mode that enables the hovering; is

12:03   13    that right?

12:03   14        A.    Yes.

12:03   15                MR. SCHLESINGER:  May I approach the

12:03   16    witness, Your Honor?

12:03   17                THE COURT:  Sure.

12:03   18    BY MR. SCHLESINGER:

12:03   19        Q.    What are you holding?

12:03   20        A.    The Phantom 4 remote controller.

12:03   21        Q.    Are there selections available on that?

12:03   22        A.    Yes.

12:03   23        Q.    What does that selection do?

12:03   24        A.    It moves between modes that hover and modes

12:03   25    that don't.

1003

12:03  1        Q.    And so if it's not in the correct mode, will

12:04  2    the Phantom 4 hover?

12:04  3        A.    No.

12:04  4        Q.    Did you hear Dr. Michalson talk about this at

12:04  5    all?

12:04  6        A.    No.

12:04  7        Q.    Now, let's move on to the '909 patent.

12:04  8              To follow a fixed position behind a moving

12:04  9    object, the drone needs to change its speed or

12:04  10   velocity; is that right?

12:04  11       A.    Yes.

12:04  12       Q.    Now, the '909 patent, that was about velocity

12:04  13   control?

12:04  14       A.    Yes.

12:04  15       Q.    And there is a reference to Claim 7 about

12:04  16   velocity or position control, but do you remember the

12:04  17   wherein clause?

12:04  18       A.    Vaguely.

12:04  19              MR. SCHLESINGER:  Let's pull up Claim 7,

12:04  20   and if we could, go to the last limitation.

12:04  21   BY MR. SCHLESINGER:

12:05  22       Q.    When did DJI drones with either Follow Me or

12:05  23   ActiveTrack ever determine what relative position to

12:05  24   follow the object?

12:05  25       A.    After you're up in the sky, taken off already

-1004-

12:05  1    and you're choosing the target.

12:05  2        Q.    Is that prior to flight?

12:05  3        A.    No.

12:05  4        Q.    What does the claim require?

12:05  5        A.    Prior to flight.

12:05  6        Q.    Now, did anything that you heard today change

12:05  7    your -- or got crossed on today change your opinions?

12:05  8        A.    No.

12:05  9        Q.    How confident are you?

12:05  10       A.    I'm completely confident.

12:05  11       Q.    Thank you.

12:05  12              MR. RICH:  One question, Your Honor.

12:05  13                  RECROSS-EXAMINATION

12:05  14   BY MR. RICH:

12:05  15       Q.    On that last point about the wherein clause in

12:05  16   the '909 patent, DJI's code includes the algorithm

12:05  17   that's programmed in to select the position and

12:05  18   velocity, doesn't it?

12:05  19       A.    Yes.  It has programming.

12:06  20       Q.    Thank you.

12:06  21              MR. SCHLESINGER:  Nothing further,

12:06  22   Your Honor.

12:06  23              THE COURT:  Thanks for being here,

12:06  24   Doctor.

12:06  25              Ladies and gentlemen, we will take our

| | | |
|---|---|---|
| 12:06 | 1 | recess, lunch recess.  If you would be back by 1:15 or |
| 12:06 | 2 | 1:20, we'll start at 1:30. |
| 12:06 | 3 | THE BAILIFF:  All rise. |
| 12:06 | 4 | (Jury exited the courtroom.) |
| 12:06 | 5 | THE COURT:  You may be seated. |
| | 6 | You may step down, sir, and you're |
| 12:06 | 7 | excused.  Thank you for being here. |
| 12:06 | 8 | Anything we need to take up? |
| 12:06 | 9 | MR. SCHLESINGER:  Yes.  There's one |
| 12:06 | 10 | thing, Your Honor. |
| 12:06 | 11 | I didn't want to interrupt counsel during |
| 12:06 | 12 | his questioning, but he read off the wrong standard of |
| 12:06 | 13 | obviousness that we -- Your Honor ruled on this morning |
| 12:06 | 14 | to the jury, and so we think it would be appropriate to |
| 12:06 | 15 | update the jury instructions. |
| 12:06 | 16 | He told the jury that obviousness |
| 12:07 | 17 | can't -- means that something's missing from the claim, |
| 12:07 | 18 | and that's exactly what Your Honor ruled against this |
| 12:07 | 19 | morning. |
| 12:07 | 20 | THE COURT:  Well, the way he said it I |
| 12:07 | 21 | didn't think was incorrect, and maybe I just misheard |
| 12:07 | 22 | the way he said it. |
| 12:07 | 23 | MR. SCHLESINGER:  Can I read it to you? |
| 12:07 | 24 | THE COURT:  Sure. |
| 12:07 | 25 | MR. SCHLESINGER:  You use obviousness |

-1006-

| | | |
|---|---|---|
| 12:07 | 1 | when the reference that you're relying on doesn't |
| 12:07 | 2 | actually teach all of the elements of the claim. |
| 12:07 | 3 | That's the same issue that we had this |
| 12:07 | 4 | morning. |
| 12:07 | 5 | MR. RICH:  And I moved on right after |
| 12:07 | 6 | that. |
| 12:07 | 7 | MR. SCHLESINGER:  I don't think he gave |
| 12:07 | 8 | me an answer, if I remember, but... |
| 12:07 | 9 | THE COURT:  Yeah.  I can't imagine out of |
| 12:07 | 10 | all the jury heard, that that had any impact on them. |
| 12:07 | 11 | MR. SCHLESINGER:  Okay. |
| 12:07 | 12 | THE COURT:  I know it matters to you and |
| 12:07 | 13 | everyone on your side, but I would be willing to bet |
| 12:07 | 14 | none of the jury remembers that particular question out |
| 12:07 | 15 | of the give and take over the course of the last three |
| 12:08 | 16 | hours. |
| 12:08 | 17 | So I will respectfully overrule your |
| 12:08 | 18 | request. |
| 12:08 | 19 | So the defendant has their -- you have |
| 12:08 | 20 | your damages expert? |
| 12:08 | 21 | MR. SCHLESINGER:  Yes, Your Honor. |
| 12:08 | 22 | THE COURT:  And then you're done? |
| 12:08 | 23 | MR. SCHLESINGER:  Yes, Your Honor. |
| 12:08 | 24 | THE COURT:  Then we have your rebuttal |
| 12:08 | 25 | expert? |

—1007—

```
12:08    1              MR. RICH:  Yes, Your Honor.

12:08    2              THE COURT:  And we're done?

12:08    3              Now, I think what my plan -- what I would

12:08    4    prefer to do to get the jury out of here, but I'll need

12:08    5    your agreement, is we've talked about when you'll do

12:08    6    the directed verdict.  I would prefer when you all are

12:08    7    done with the evidence to go ahead and move right

12:08    8    into -- well, no.  I guess we need to take up whether

12:08    9    or not I'm going to submit willfulness to the jury.  So

12:08   10    I guess I need to take that up.

12:08   11              We'll take that up, and then we'll --

12:08   12    I'll read the jury charge.  So that will be the plan

12:08   13    for the afternoon.  Okay.

12:08   14              MR. SCHLESINGER:  Thank you, Your Honor.

12:08   15              THE COURT:  Thank you all.

12:08   16              THE BAILIFF:  All rise.

12:08   17              (Recess taken.)

01:29   18              THE BAILIFF:  All rise.

01:29   19              THE COURT:  Please remain standing for

01:29   20    the jury.

01:29   21              (Jury entered the courtroom.)

01:29   22              THE COURT:  Thank you.  You may be

01:29   23    seated.

01:29   24              Counsel, you may call your next witness.

01:29   25              MS. KESTLE:  DJI calls as its next
```

1008

01:29  1    witness Mr. Todd Schoettelkotte.

01:29  2                    (The witness was sworn.)

01:29  3                    DIRECT EXAMINATION

01:29  4    BY MS. KESTLE:

01:30  5        Q.    Good afternoon.  Will you please introduce

01:30  6    yourself to the jury?

01:30  7        A.    Good afternoon.  My name is William Todd

01:30  8    Schoettelkotte.  I go by Todd.

01:30  9        Q.    And can you tell the jury a little bit more

01:30  10   about yourself?

01:30  11       A.    I'm from Houston, Texas.  I'm married to my

01:30  12   wonderful wife.  We've been together for, at this

01:30  13   point, 27 years.  I've got two -- I'll call them grown

01:30  14   children, but are they ever really grown?  I don't

01:30  15   know.  But they're wonderful in their own right.

01:30  16            I've got a daughter who's 25, and my son is

01:30  17   23.  Both are proud graduates of Texas A&M.

01:30  18       Q.    I think we heard a little bit earlier that you

01:30  19   played college basketball.  Can you tell us a little

01:30  20   bit about that?

01:30  21       A.    Yeah.  I did.  It's maybe not as exciting as

01:31  22   maybe other stories, but I did really enjoy it.  I

01:31  23   played at Purdue and Rice in Houston.  I played in the

01:31  24   early '90s.  It would have been back in the time of the

01:31  25   old Southwest Conference.  So we came up here to Waco

01:31   1    on a couple of occasions.

01:31   2           I think we maybe split, but it was always

01:31   3    tough when we came up.  It was -- yeah.  It was a good

01:31   4    time to play basketball.  I actually ran into Shaquille

01:31   5    O'Neal, and he and I played against each other.  As you

01:31   6    might appreciate, it didn't end all that well for me,

01:31   7    but it was certainly an experience.  I think overall

01:31   8    I'm just grateful to have done it.

01:31   9        Q.   Did you prepare any slides to help share your

01:31   10   analysis today?

01:31   11       A.   I did, yes.

01:31   12              MS. KESTLE:  Could we -- thank you very

01:31   13   much.

        14   BY MS. KESTLE:

01:31   15       Q.   Let's start at the very beginning.  Where do

01:31   16   you work?

01:31   17       A.   I work at a company called J.S. Held,

01:31   18   Incorporated.

01:31   19       Q.   And what is J.S. Held, Incorporated?

01:31   20       A.   It's a multi-dimensional consulting firm which

01:31   21   essentially means that they have many practice areas.

01:31   22   The practice area that I'm in is the area that values

01:32   23   intellectual property such as patents, trademarks,

01:32   24   trade secrets, copyrights, things of that nature.

01:32   25       Q.   And what position do you hold at J.S. Held?

1010

01:32  1    A.    I'm a senior managing director, and I'm

01:32  2    responsible for running the Houston office.

01:32  3    Q.    Okay.  Will you tell the jury a little bit

01:32  4    about your work as a senior managing director?

01:32  5    A.    So I do a number of things.  As I mentioned,

01:32  6    I'm responsible for the office which basically means

01:32  7    responsible for the people.

01:32  8         One of the things I guess I take pride in is,

01:32  9    having done this work for a long time, I enjoy

01:32  10   mentoring those who are kind of coming in.  So maybe

01:32  11   teaching them the skills and the crafts to do what we

01:32  12   do, as well as assisting them in their personal growth.

01:32  13        I also work heavily with clients in the

01:32  14   valuation of their intellectual property.  Oftentimes

01:32  15   that valuation is done either for a commercial sale

01:32  16   when one company wants to sell something to another

01:32  17   company or perhaps in a litigation like we are here,

01:33  18   where we'll value that technology for purposes of

01:33  19   identifying what a potential harm might be.

01:33  20   Q.    And how long have you been working on the

01:33  21   valuation of intellectual property and analyzing

01:33  22   damages and business disputes?

01:33  23   A.    Well, it bookends my kids.  So I said I've got

01:33  24   two kids, and I started before they came to the house,

01:33  25   and I'm still working, and they're gone from the house.

—1011—

01:33  1    So at this point, just about 30 years.

01:33  2        Q.    Okay.  And have you ever assisted companies in

01:33  3    licensing negotiations as a financial consultant?

01:33  4        A.    I have.  It's something that I do quite often.

01:33  5    And generally how that works is we will be contacted by

01:33  6    companies who have intellectual property assets and

01:33  7    they're looking to, what we would say, monetize them.

01:33  8        And what I mean by that is they're looking to

01:33  9    either value them for a potential sale or they're

01:33  10   looking to license them to someone else, and so they

01:33  11   will come to us and ask us how we might help them with

01:33  12   that.

01:33  13       It generally involves studying the technology,

01:33  14   studying the various financial considerations that

01:34  15   might go with a license.  Everything from the

01:34  16   competitive status in the market to the importance of

01:34  17   the technology, any licensing that has been done in the

01:34  18   market that we might be able to use as a proxy for what

01:34  19   the technology is worth.

01:34  20       Kind of like you would think if you were going

01:34  21   to buy a house and you looked at other houses that were

01:34  22   similar that might have a similar price, same number of

01:34  23   bedrooms, a garage, three bathrooms, those kind of

01:34  24   things.  Again, that's called the market approach.

01:34  25       Q.    And will you tell the jury a little bit about

01:34  1   your education and how it allows you to do the work

01:34  2   that you do?

01:34  3        A.    Yes.  I feel very fortunate I had the

01:34  4   opportunity to study at both Purdue and Rice.  I

01:34  5   studied in the business schools at both universities.

01:34  6   Ultimately I earned my bachelor's in Business

01:34  7   Management.  The focus there was on courses in

01:34  8   accounting, economics, finance, statistics.

01:34  9             I then stayed at Rice and earned my master's

01:34  10  in Accounting.

01:35  11             Ultimately what those skills allowed me to do

01:35  12  is it's really something called forensic accounting,

01:35  13  where you are really understanding the ebbs and flows

01:35  14  of financial information and how revenues and costs

01:35  15  interact together, how pricing matters, competition in

01:35  16  the marketplace.  All of those things kind of wound up

01:35  17  in one as part of my education.

01:35  18        Q.    Do you have any professional certifications or

01:35  19  memberships?

01:35  20        A.    I do.  I'm a certified public accountant in

01:35  21  the State of Texas.  It's something that most people

01:35  22  think about in terms of doing taxes.  And I guess I

01:35  23  would say that there's many CPAs out there like myself

01:35  24  who are focused on, as I mentioned, the forensic

01:35  25  accounting aspect of assisting companies in either

—1013—

01:35  1   valuing things or helping them understand what the

01:35  2   value of an asset is or even intellectual property.

01:35  3          So part of my role is to serve as a CPA and

01:35  4   follow the guidelines of all things that CPAs are

01:36  5   required to do as part of their normal ordinary course.

01:36  6   Q.   I think you mentioned mentorship a little bit

01:36  7   earlier as your role as a senior managing director.

01:36  8   Have you ever taught any classes related to your work?

01:36  9   A.   I have.  So one of the things that's

01:36  10  oftentimes very fun to do, I really certainly enjoy it,

01:36  11  is working with young people.  Certainly not only in my

01:36  12  office, but outside of my office.  I've had the

01:36  13  opportunity to teach at Georgetown in D.C., the

01:36  14  Chicago-Kent in Chicago, of course, John Marshall in

01:36  15  Chicago, as well as the University of Oregon on topics

01:36  16  that would include accounting, finance topics such as

01:36  17  valuation as well as how to calculate patent damages.

01:36  18  Q.   And during your almost 30-year career, have

01:36  19  you ever received any recognition for your work valuing

01:36  20  patents, trademarks and other forms of intellectual

01:36  21  property?

01:36  22  A.   You know, I have.  It's one of those things,

01:36  23  maybe it reminds me of being an athlete.  You work

01:37  24  really hard and you hope that you do well and somebody

01:37  25  recognizes you.  In your career, you do the same thing.

01:37  1    I'm fortunate, again, to be recognized by Intellectual

01:37  2    Asset Magazine as a global leader and a leading patent

01:37  3    damages expert for my work with patents and patent

01:37  4    valuation.

01:37  5        Q.    And have you testified before at a trial just

01:37  6    like this one for cases involving damages for

01:37  7    intellectual property and business disputes?

01:37  8        A.    I have.  I've had the opportunity to testify

01:37  9    in district courts, like this one, as well as state

01:37  10   courts, and also at the ITC, which is the International

01:37  11   Trade Commission, which regulates what products come in

01:37  12   and out of the U.S.  And they also look at patent

01:37  13   coverage and things like that.  I've also been here in

01:37  14   Waco before.

01:37  15       Q.    And just as part of your work experience, have

01:37  16   you ever worked on a case that involved drones before?

01:37  17       A.    I have.  So one of the cases that I have

01:37  18   worked on was a case for the Drone Racing League.

01:37  19   Sometimes it's called DRL.  And if I was to simplify

01:38  20   it, DRL, or Drone Racing League, it's a little bit like

01:38  21   NASCAR for drones.  It's a closed course inside where

01:38  22   professional drone racers race an obstacle course.

01:38  23            There was a shareholder dispute for the owners

01:38  24   of the Drone Racing League, and my job in the case was

01:38  25   to value the enterprise and all the assets and then

1015

01:38  1   determine what portion of the value would have been

01:38  2   attributable to that shareholder in the dispute.

01:38  3                    MS. KESTLE:  Your Honor, at this time DJI

01:38  4   would offer Mr. Todd Schoettelkotte as an expert in the

01:38  5   valuation of intellectual property and patent damage

01:38  6   awards.

01:38  7                    MR. PANKRATZ:  No objections.

01:38  8                    THE COURT:  He'll be admitted as such.

01:38  9   BY MS. KESTLE:

01:38  10      Q.    Let's talk a little bit more about why you're

01:38  11   here today.

01:38  12                    Mr. Schoettelkotte, what were you asked to do

01:38  13   for this case?

01:38  14      A.    I was asked to assist the jury, based upon my

01:38  15   review and assessment of the work of Mr. Andrien and

01:38  16   his report, and also to prepare my own analysis of

01:38  17   damages in this case to the extent that the jury were

01:38  18   to find the two patents valid and infringed.

01:39  19      Q.    And were you here for the testimony of

01:39  20   Dr. Nourbakhsh?

01:39  21      A.    I was, yes.

01:39  22      Q.    Okay.  And would you please remind the jury of

01:39  23   his conclusions regarding infringement in this case?

01:39  24      A.    My understanding is Dr. Nourbakhsh arrived at

01:39  25   the conclusions that the DJI drones do not infringe the

1016

01:39  1    '909 and '752 patents, and also that the '909 and '752
01:39  2    patents are invalid.
01:39  3         Q.   You answered my next question.  So what does
01:39  4    all of that mean from a damages perspective?
01:39  5         A.   To the extent that the patents are either not
01:39  6    valid or they are not infringed, there would be no
01:39  7    damages in this case.  And so my role as a damages
01:39  8    expert, and frankly Mr. Andrien's role as a damages
01:39  9    expert, would not be necessary.  Because without
01:39  10   validity and without infringement, there can be no
01:39  11   damages.
01:39  12        Q.   So if no damages are owed, why are you sitting
01:39  13   here today?
01:39  14        A.   Well, because I understand that the way the
01:40  15   process works for ourselves in providing evidence for
01:40  16   the jury to consider is it all comes out at once, both
01:40  17   information regarding validity and infringement or
01:40  18   invalidity and noninfringement as well as damages.  It
01:40  19   all comes out at once, and there's no break in the
01:40  20   middle.
01:40  21             So the jury has to make a determination at
01:40  22   once, once all the facts are in, as to both validity
01:40  23   and infringement and damages.  And so I'm here to
01:40  24   provide my opinion, as Mr. Andrien was, to make sure
01:40  25   that the jury has everything they need to make an

1017

01:40  1    informed decision.

01:40  2        Q.    And can you remind the jury how much Textron

01:40  3    and Mr. Andrien are asking for?

01:40  4        A.    $367 million.

01:40  5        Q.    Okay.  And have you been able to evaluate that

01:40  6    number?

01:40  7        A.    I have, yes.

01:40  8        Q.    Okay.  And what did you conclude?

01:40  9        A.    It's my opinion that that is a significantly

01:41  10   overstated ask for damages in this case.

01:41  11       Q.    Okay.  And can you quickly walk us through

01:41  12   some of the information you've reviewed as part of your

01:41  13   analysis?

01:41  14       A.    So one of the first things I do is I review

01:41  15   the '909 and '752 patents.  I'm not a technical expert,

01:41  16   but I try to gain as much information as I can.  You'll

01:41  17   see in a moment that I discussed the technology with

01:41  18   Dr. Nourbakhsh.  So it gives me the opportunity to ask

01:41  19   questions and get his perspective as an expert on what

01:41  20   those patents mean.

01:41  21            I also review the legal filings in the case,

01:41  22   not as a lawyer would, but just to inform me of what

01:41  23   the parties are alleging in the case.

01:41  24            I also reviewed Textron and DJI documents that

01:41  25   were produced in this case.  They're provided to me by

―1018―

01:41  1    counsel.  I don't work directly with the companies.

01:41  2    Counsel gives me information and I ask for information,

01:41  3    and that information then comes to me for me to review.

01:41  4         In this case, what I really tried to do is

01:41  5    look at documents from both Textron as well as DJI.

01:41  6    And so you'll see throughout my presentation, I'm going

01:42  7    to show you both and how they both impacted my opinion.

01:42  8    Q.    And have you been present for this trial to

01:42  9    hear previous testimony?

01:42  10   A.    I have.  So I've been here in Waco since this

01:42  11   past weekend.  I've been in the courtroom for a very

01:42  12   significant portion of the case and working back at the

01:42  13   hotel and then reading -- I think we heard about trial

01:42  14   transcripts.  I understand that the kind court

01:42  15   reporters here will type up what is said at trial, and

01:42  16   I've asked for those in the evening when I haven't seen

01:42  17   things.  Most of it's been deposition testimony that

01:42  18   was played, and I had the opportunity to review that.

01:42  19   Q.    And what has that testimony indicated to you

01:42  20   about the value of Textron's patents in this case?

01:42  21   A.    Several things.  I start from an understanding

01:42  22   that this technology is -- it's incremental and, if

01:42  23   anything, would only provide minor -- very small

01:42  24   improvements over what came before.

01:43  25        Now, I learned that from my discussions with

—1019—

| | | |
|---|---|---|
| 01:43 | 1 | Dr. Nourbakhsh as well as the presentation that he gave |
| 01:43 | 2 | both yesterday and today.  But what I wanted to do is |
| 01:43 | 3 | understand from an economic standpoint, whether there |
| 01:43 | 4 | were things that I reviewed that were consistent with |
| 01:43 | 5 | what he arrived at.  And a few of those things that I |
| 01:43 | 6 | identified were, I understand that Textron does not use |
| 01:43 | 7 | the two patents at issue. |
| 01:43 | 8 | And in the economic world, we call those idle |
| 01:43 | 9 | patents.  They're just sitting.  So they're not being |
| 01:43 | 10 | used by -- for any real purpose.  It's a bit like if |
| 01:43 | 11 | you were, again, looking around your house and you have |
| 01:43 | 12 | a lot of things in your house and say, well, I don't |
| 01:43 | 13 | necessarily use those things.  And if I don't use them, |
| 01:43 | 14 | how really valuable are -- they are to me. |
| 01:43 | 15 | So the fact that they don't use them was |
| 01:43 | 16 | relevant, and then I understand that at least for the |
| 01:43 | 17 | '909 patent, they offered to sell it to DJI.  And |
| 01:43 | 18 | that's another piece of evidence that would suggest |
| 01:43 | 19 | that when you're looking to sell something that perhaps |
| 01:44 | 20 | you don't use, you're looking to sell it such that you |
| 01:44 | 21 | can get a return on it, but it really isn't all that |
| 01:44 | 22 | important to you. |
| 01:44 | 23 | And then lastly, and I'll talk about this |
| 01:44 | 24 | later in my presentation, an economic theory to value |
| 01:44 | 25 | intellectual property, certainly patents, is whether |

—1020—

01:44  1  there are available alternatives to those patents.  And

01:44  2  to the extent that there are available alternatives,

01:44  3  the cost of that alternative, it's a bit like if you

01:44  4  said I could drive today and I could pay $5 to park or

01:44  5  I could take the bus and pay $4.75.

01:44  6          And those are alternatives.  And maybe they

01:44  7  have a very, very small distinct cost from an economic

01:44  8  standpoint.  So doing one or the other really doesn't

01:44  9  impact you all that much.  If there's an alternative to

01:44  10 a patent, an alternative design, and you can use that

01:44  11 at relatively low cost, companies will move to those

01:44  12 things, certainly if they're facing an extraordinarily

01:45  13 overstated royalty ask in a patent case.

01:45  14     Q.   And so before we dive into your specific

01:45  15 opinions, I'd just like to walk through a couple basic

01:45  16 principles.  And so let's start first with what is a

01:45  17 royalty?

01:45  18     A.   So royalty, it's an interesting concept.  And

01:45  19 I'm going to use an analogy.  And I'm -- I guess I'm a

01:45  20 little bit embarrassed to do that, but I want to make

01:45  21 sure that if I provide an analogy, it will make sense.

01:45  22          It's always reminded me of renting something

01:45  23 like an apartment.  It's really about usage.

01:45  24          It's one of those situations where if you were

01:45  25 going to rent an apartment for a period of time, you

01:45  1   might go to a landlord and you might say, I'd like to

01:45  2   rent the apartment for a couple months, and the

01:45  3   landlord would give you the keys and you would give the

01:45  4   landlord the rent money, and then you could stay in the

01:45  5   apartment.  So it's a payment for usage.

01:45  6           With a patent, you'll see on this diagram I

01:45  7   have, instead of renting an apartment, you're really

01:45  8   renting or licensing the patents.  You're saying, I'd

01:46  9   like to use those patents.

01:46  10          And so just like you're using that apartment,

01:46  11  you enter into a license agreement as opposed to a

01:46  12  rental agreement, where the patent owner and the

01:46  13  licensee agree on an amount, they sign a license

01:46  14  agreement like a lease agreement for an apartment, and

01:46  15  then they exchange a royalty just like you would a

01:46  16  rental.

01:46  17          So it's really like you're renting those

01:46  18  patents for a period of time.

01:46  19     Q.    And what form can a royalty come in?

01:46  20     A.    There's really two forms.  One is called an

01:46  21  upfront lump-sum payment.  It's where you pay one

01:46  22  single amount all up front for the usage of that

01:46  23  technology.

01:46  24          And the other is called a running royalty,

01:46  25  where you pay periodically for your continued use of

01:46   1    the technology.  Both are -- both are appropriate and

01:46   2    informative in certain circumstances.

01:46   3        Q.    And what form do you consider informative or

01:46   4    appropriate in this circumstance?

01:46   5        A.    In this case, I think --

01:46   6                MR. PANKRATZ:  Objection, Your Honor.

01:46   7    This is outside the scope of his report and what he's

01:47   8    permitted to testify to.

01:47   9                THE COURT:  Overruled.

01:47   10               MR. PANKRATZ:  All right.

01:47   11       A.    So it's my opinion that in this case in

01:47   12   particular, an upfront lump sum would be an appropriate

01:47   13   measure of damages, and there's a number of reasons for

01:47   14   that.

01:47   15               THE COURT:  Hold on one second.

01:47   16               I must have misheard the -- I thought the

01:47   17   question was just an explanation of lump sum.

01:47   18               Do you have somewhere in his report where

01:47   19   he points out --

        20               MS. KESTLE:  Yes, Your Honor.

01:47   21               THE COURT:  -- that he's selected a lump

01:47   22   sum and then why?

01:47   23               MR. PANKRATZ:  May we approach,

01:47   24   Your Honor?

01:47   25               THE COURT:  Sure.

1023

01:47  1                    (Bench conference.)

01:47  2                    MR. PANKRATZ:  Your Honor, we filed a

01:47  3    Daubert that was granted on his lump-sum analysis.  He

01:47  4    had an opinion that the lump sum was appropriate, and

01:47  5    it was excluded.  All the bases for that analysis were

01:47  6    excluded.

01:47  7                    I suppose he can say that he thinks a

01:48  8    lump sum is appropriate, but he cannot say what he

01:48  9    thinks the number is.

01:48  10                   THE COURT:  Was his lump sum excluded?

01:48  11                   MS. KESTLE:  No.  It was just the

01:48  12   reliance on settlement agreements.  His lump-sum

01:48  13   discussion applied to both his response to

01:48  14   Mr. Andrien's opinion and his discussion of settlement

01:48  15   agreements.

01:48  16                   THE COURT:  Well, his opinion was either

01:48  17   excluded or it wasn't.

01:48  18                   Do you have the order where it was

01:48  19   excluded?

01:48  20                   MR. PANKRATZ:  I can get you that.

01:48  21                   MS. KESTLE:  And --

01:48  22                   THE COURT:  I mean, it's kind of black

01:48  23   and white.

01:48  24                   MR. PANKRATZ:  He may not rely -- his

01:48  25   entire lump-sum analysis was based on two agreements.

1024

01:48  1    He is not permitted to rely on those two agreements.

01:48  2                MS. KESTLE:  In addition to discussing

01:48  3    some of those agreements, which was a separate issue,

01:48  4    he also critiqued Mr. Andrien's discussion and reliance

01:48  5    on a running royalty and said that it would be --

01:48  6                THE COURT:  Well, he can do that --

01:48  7                MS. KESTLE:  -- appropriate to be a lump

01:48  8    sum, and that's exactly what he's doing now.

01:48  9                THE COURT:  -- but he doesn't get to talk

01:48  10   about the lump sum if it was excluded.  And I don't

01:48  11   know if it was or not.

01:48  12               MS. KESTLE:  It wasn't excluded.

01:48  13               (Bench conference ends.)

01:48  14               THE COURT:  Ladies and gentlemen, we're

01:48  15   going to take a short recess.  If you would remember my

01:49  16   instructions.

01:49  17               THE BAILIFF:  All rise.

01:49  18               (Jury exited the courtroom.)

01:49  19               THE COURT:  You may be seated.

01:49  20               You can step down.

01:49  21               Okay.  The objection, as I understand it,

01:49  22   has to do with the fact that plaintiff's counsel

01:49  23   informs me that a Daubert was granted with respect to

01:49  24   this witness being able to proffer an opinion with

01:49  25   regard to a lump sum.

01:49  1          And as I understood it, but I may not

01:49  2  understand it fully, it was because he based it on two

01:49  3  license agreements or he based it on something and it

01:49  4  was excluded.

01:49  5          So let me hear first from plaintiff as to

01:49  6  your position on what the ruling was on the Daubert

01:50  7  motion.

01:50  8          MR. PANKRATZ:  And, Your Honor, may I

01:50  9  approach and hand you the order?

01:50  10          THE COURT:  Sure.  Please.

01:50  11          Okay.  Thank you.

01:50  12          MR. PANKRATZ:  Your Honor,

01:50  13  Mr. Schoettelkotte's lump-sum analysis was premised on

01:50  14  his starting point of two agreements.  We filed a

01:50  15  Daubert, Docket No. 141, which was granted excluding

01:50  16  his reliance on those two agreements.

       17          I've handed you the order and the

       18  transcript.

01:50  19          Without those two agreements, he does not

01:50  20  have any lump-sum number to provide.

01:50  21          THE COURT:  Let me hear a response to

01:50  22  that.

01:50  23          MS. KESTLE:  Your Honor, in at least

01:50  24  Paragraphs 62 through 66 of his report, he opines on

01:50  25  Mr. Andrien's failure to properly consider evidence of

−1026−

01:51  1    a lump-sum royalty structure.  That's the only opinion

01:51  2    he is trying to provide today.  He is not getting into

01:51  3    these settlement agreements --

01:51  4                    THE COURT:  Slow down.

01:51  5                    I heard you ask him about whether or not

01:51  6    he had offered a lump-sum opinion, did I not?

01:51  7                    I mean, that was why I stopped it.

01:51  8    Wasn't he about to say that he thought a lump sum would

01:51  9    be appropriate here?

01:51  10                   MS. KESTLE:  Yes.  He was about to say

01:51  11   that, and that is entirely consistent with parts of his

01:51  12   opinion that were not excluded.

01:51  13                   THE COURT:  And he is going to say -- but

01:51  14   the plaintiff is worried he was going to offer a

01:51  15   lump-sum opinion which has been stricken.

01:51  16                   And what you're telling me is that he is

01:51  17   going to say he thinks a lump sum would have been

01:51  18   appropriate in this case and not the running royalty

01:51  19   that plaintiff's expert did, and then he's going to

01:51  20   explain why -- consistent with what he had in his

01:51  21   report, why he's going to criticize the plaintiff's

01:51  22   report for not being a lump sum.

01:51  23                   And that's as far as you're going to go?

01:51  24                   MS. KESTLE:  Yes, Your Honor.  That's

01:51  25   correct.  He will provide --

—1027—

01:51  1                    THE COURT:  I got it.

01:51  2                    Do you have an objection to that?

01:52  3                    MR. PANKRATZ:  No, Your Honor.  Thank

01:52  4      you.

01:52  5                    THE COURT:  Okay.  Very good.

01:52  6                    William, will you bring the jury back in,

01:52  7      please?

01:53  8                    (Jury entered the courtroom.)

01:53  9                    THE COURT:  Thank you.  You may be

01:53  10     seated.

01:53  11                    Counsel, you may continue.

01:53  12     BY MS. KESTLE:

01:53  13     Q.    As I asked you before the break, what form do

01:53  14     you consider to be -- what form of a royalty do you

01:53  15     consider to be appropriate in this case?

01:53  16     A.    An upfront lump-sum royalty.

01:53  17     Q.    And how do you go about calculating royalty in

01:53  18     a patent case?

01:53  19     A.    There's a -- there's a construct called the

01:53  20     hypothetical negotiation, and the first thing we do is

01:53  21     we want to understand what is the timing of that

01:53  22     hypothetical negotiation?  When does it happen?  When

01:54  23     did the two parties meet?

01:54  24                    The second thing that we do is we look at what

01:54  25     is -- or who are, rather, the parties.  In this case it

—1028—

01:54  1    would be Textron and DJI.

01:54  2              And then, lastly, we determine what is the

01:54  3    amount that the parties would agree upon.

01:54  4        Q.    And you mentioned a hypothetical negotiation.

01:54  5              When would that hypothetical negotiation occur

01:54  6    in this case?

01:54  7        A.    There's actually two of them.  It's April of

01:54  8    2015 for the '909 patent, and October of 2015 for the

01:54  9    '752 patent.

01:54  10       Q.    And how do you go about determining the

01:54  11   royalty that the parties would have agreed to at that

01:54  12   hypothetical negotiation?

01:54  13       A.    So as a patent valuator, for purposes of

01:54  14   determining a royalty in a patent case, we look at a

01:54  15   case that happened in the state of New York in 1970.

01:54  16   And it's somewhat of a precedent on something that

01:55  17   damages experts and valuators should look at.  It's

01:55  18   called the Georgia-Pacific case.

01:55  19              And the Georgia-Pacific case identified 15

01:55  20   factors.  And of those 15 factors, some of them relate

01:55  21   to licensing, some of them relate to financial factors

01:55  22   and some of them relate to the actual technology

01:55  23   itself.

01:55  24              And you look at all of those factors, as well

01:55  25   as other considerations, and in a hypothetical

01:55  1   negotiation you evaluate those factors to determine

01:55  2   what a reasonable royalty would be.

01:55  3       Q.   And did you consider all 15 of these factors

01:55  4   as part of your analysis for this case?

01:55  5       A.   I did, but we only really need to talk about

01:55  6   the ones that were most relevant.

01:55  7            And in this case, it's my opinion that

01:55  8   Factors 5, 9, 10 and 13, as well as Factor 15, which is

01:55  9   the hypothetical, would be most relevant.

01:55  10      Q.   Okay.  And looking at your last bullet point

01:55  11  here, Textron and DJI are not competitors.

01:56  12           Why is that your opinion?

01:56  13      A.   It is because -- and you want me to move to

01:56  14  the last bullet point?

01:56  15      Q.   Yes.  Yes.  Thank you.

01:56  16      A.   Thank you.

01:56  17           So the reason that would be is because DJI

01:56  18  sells drones -- we've heard a lot about that -- and

01:56  19  Textron does not.

01:56  20           And what that tells us is, is that they're not

01:56  21  competing head to head.  We've heard evidence in the

01:56  22  case that there's no evidence of competition in the

01:56  23  marketplace where there was a lost sale.

01:56  24           When we look at the economics of competition,

01:56  25  we often try to see is there a situation where the

1030

01:56  1    parties are going head to head to try to sell an asset

01:56  2    to a particular customer, and we have not seen that

01:56  3    here.  So that's certainly something that we've looked

01:56  4    at.

01:56  5          And in addition, and very importantly, DJI's

01:56  6    customers are oftentimes very different than customers

01:56  7    of Textron.  DJI customers are those focused on using

01:57  8    drones for consumer purposes; whereas, Textron's

01:57  9    customers are much more commercial- or

01:57  10   government-oriented.

01:57  11         I wanted to look into this a little bit more,

01:57  12   and so I did two things.  And I also heard some

01:57  13   testimony.  There's a gentleman named Mr. Pascal.  He

01:57  14   testified, I think, yesterday via deposition.  He's a

01:57  15   Textron witness.  And he, himself, identified at least

01:57  16   twice during the deposition that I heard that he did

01:57  17   not see a situation where Textron and DJI were

01:57  18   competing.

01:57  19         And then as a valuation person, I have various

01:57  20   resources that I go to to check to see if there's

01:57  21   competition.  One is the SEC filings that are available

01:57  22   to me.  The SEC is where Textron files its

01:57  23   publicly-available financial statements for people who

01:57  24   own their stock to read and see.

01:57  25         And I looked at that SEC filing 10-K, if you

01:57  1    will, and I did not see any reference to drones as

01:57  2    competition, and certainly not any reference to DJI.

01:57  3         I also looked at Capital IQ, which is an

01:58  4    organization that's owned by Standard & Poor's that

01:58  5    identifies competitors in each market.  And they did

01:58  6    not identify either drones or any drone manufacturer to

01:58  7    be a competitor of Textron.

01:58  8    Q.   And I think you mentioned the -- Textron's

01:58  9    offer to sell the '909 patent a little bit earlier.

01:58  10        Do you remember that?

01:58  11   A.   Yes.

01:58  12   Q.   Okay.  And have you, yourself, reviewed that

01:58  13   offer to sell, which I believe is Exhibit PX-67 which

01:58  14   has already been introduced into evidence?

01:58  15   A.   Yes.  I have.

01:58  16   Q.   Okay.  And how does Textron's offer to sell

01:58  17   the '909 patent inform your understanding of the

01:58  18   competitive relationship or lack thereof between

01:58  19   Textron and DJI?

01:58  20   A.   I mentioned as an accountant and evaluator,

01:58  21   we're oftentimes looking at many, many documents from

01:58  22   both sides.  So I've seen competition, competitive

01:58  23   documents in all types of situations with all types of

01:58  24   products.  And as I read this, there were a few things

01:58  25   that stuck out to me as to why this suggests that there

—1032—

01:58  1   is not competition between these two parties.

01:59  2          The first is a -- if you were just to look up

01:59  3   at the top here it says "opportunity for DJI."  And in

01:59  4   the documents that I'm normally seeing where there's

01:59  5   head-to-head competition or competition in the

01:59  6   marketplace, you're not looking for opportunities to

01:59  7   give to a competitor.  You're looking to compete with

01:59  8   them.

01:59  9          Here what you read is, in the top paragraph --

01:59  10  and maybe if we could highlight it.  It says:  We

01:59  11  identified a patent family that may be of interest to

01:59  12  DJI.  The family includes the below United States --

01:59  13  you're going to start at the "we" and "identified" --

01:59  14  we identified a patent family that may be of interest.

01:59  15  The family includes the below United States patents as

01:59  16  well as counterparts in China, Canada, Germany, France

01:59  17  and Great Britain.

01:59  18         And then you'll see the '909 patent listed.

01:59  19  And what that's saying is that this opportunity that

01:59  20  they want to give DJI is not only a U.S. patent, but

01:59  21  they want to give them rights to this patent -- and I

02:00  22  said "give."  I take that back.  I'm sorry.  Sell them

02:00  23  rights, not only in the U.S. but also in China, Canada,

02:00  24  Germany, France and Great Britain, as well as Italy.

02:00  25  So almost a worldwide rights to this patent.

02:00  1    If you have important technology, you don't

02:00  2    share that with your competitors.  You hold that close

02:00  3    to the vest.

02:00  4    Lastly, at the bottom, it says, Bell has

02:00  5    decided to sell.  This wasn't a situation, at least as

02:00  6    I read it, where they're looking for anything else but

02:00  7    to get into a transaction with another company.  This

02:00  8    patent family is reaching out to a number of companies

02:00  9    in the UAV market if your company is interested in

02:00  10   purchasing these patents.

02:00  11   So again, I'm involved in transactions where

02:00  12   there's commercial sales of intellectual property as

02:00  13   well as licensing.  This is very standard, fair type

02:00  14   stuff you would see between companies.  Certainly there

02:00  15   doesn't appear to me, as an economic person, to

02:01  16   identify any competitive threat in this document.

02:01  17   Q.   And earlier I believe you also mentioned you

02:01  18   do not agree with Mr. Andrien's opinions in this case.

02:01  19   Can you just explain for us at a high level

02:01  20   why you disagree with Mr. Andrien and his opinions?

02:01  21   A.   Sure.  And I'm going to see if I can clear

02:01  22   that, if I can.

02:01  23   There we go.

02:01  24   So I pulled together this slide, and there's a

02:01  25   lot on it so I'm going to go through it rather quickly,

—1034—

02:01 1  and then I'll get into the details.  It's my opinion

02:01 2  that Mr. Andrien failed to properly account for the

02:01 3  full value of the camera and gimbal.

02:01 4          You may recall he said that was a subtraction

02:01 5  that he made in order to reduce the price associated

02:01 6  with a drone.  It's also my opinion that he failed to

02:01 7  deduct DJI's costs to manufacture and sell drones.

02:01 8  That he failed to apply Textron's own profit split

02:01 9  approach.  That he failed to consider DJI's innovations

02:02 10  to drones, and lastly that he failed to consider the

02:02 11  cost of alternative designs.

02:02 12  Q.    And I'd like to walk through each of these one

02:02 13  by one with you, if everyone will indulge.

02:02 14          Let's start with the first one.  Would you

02:02 15  please explain what you mean by fail to properly

02:02 16  account for the full value of the camera/gimbal?

02:02 17  A.    As part of my work on this case, I understand

02:02 18  that Mr. Andrien deducted what he called the

02:02 19  replacement costs of a camera and a gimbal, which is,

02:02 20  to my understanding, what attaches the camera to the

02:02 21  drone.

02:02 22          But as you saw these drones, they're very much

02:02 23  integrated devices.  And so the camera and the gimbal,

02:02 24  they don't work separate and apart from the drone.  In

02:02 25  fact, inside the drone, I understand that there are

—1035—

02:02  1   image processors and also what I would term as a motor

02:02  2   that actually helps move the camera.  It moves the

02:03  3   camera for things such as taking, say, a panoramic

02:03  4   picture.  And so those types of features inside of the

02:03  5   drone are things that Mr. Andrien didn't take out when

02:03  6   he made his deduction.  And all of those are integrated

02:03  7   into the drone and work hand in hand, if you will, with

02:03  8   the camera and its functionality.

02:03  9            MS. KESTLE:  And before we turn to the

02:03  10  second point here, Your Honor, I believe at this point

02:03  11  we'll have to seal the courtroom.  We're about to get

02:03  12  into some confidential materials.

02:03  13            THE COURT:  If you're not under the

02:03  14  protective order, would you please excuse yourself?

02:03  15            (Sealed proceedings.)

02:03  16  A.    May I just add one thing that I had forgotten

02:03  17  to mention?

02:03  18  BY MS. KESTLE:

02:03  19  Q.    Yes.  Absolutely.

02:03  20  A.    I'm sorry.  As part of the camera, because

02:03  21  those other elements that were integral in the actual

02:03  22  drone that work with the camera were not deducted, it's

02:03  23  my opinion that his deduction for the camera was not

02:03  24  enough.  Thank you.

02:04  25  Q.    Okay.  So then let's turn to your second

—1036—

02:04  1    bullet point here.  And would you please explain what
02:04  2    you mean by Mr. Andrien failed to deduct DJI's costs to
02:04  3    manufacture and sell drones?
02:04  4        A.    So we get into a very interesting part of
02:04  5    measuring the value of patents, and this is about
02:04  6    something called apportionment.  What we're really
02:04  7    required to do in a patent case is be very careful to
02:04  8    apportion down to just the footprint of the patented
02:04  9    technology in the marketplace, which means we have to
02:04  10   be very careful that we're not valuing other features
02:04  11   and attributes of the drone unnecessarily and putting
02:04  12   that in the royalty or the damages.
02:04  13       We have to get just to that patented feature,
02:04  14   and this is one of the first areas where I notice that
02:04  15   I don't believe Mr. Andrien did that correctly.
02:04  16       Q.    Okay.  And what cost did Mr. Andrien deduct?
02:04  17       A.    If we would go to the next slide.  Thank you.
02:04  18       We heard from Mr. Andrien that DJI had
02:05  19   ███████████  in revenue.  And he deducted, I believe he
02:05  20   testified, roughly $90,000.  On this particular
02:05  21   document, it says 134, but I believe his testimony was
02:05  22   that he deducted $90,000.
02:05  23       And so that caught my attention as, one, an
02:05  24   accountant who looks at revenue and costs, but it
02:05  25   struck me if you're only deducting $90,000 in costs

—1037—

02:05  1  from ████████ in revenue, how -- how could it be

02:05  2  that they could bring a drone to market for that little

02:05  3  money?  How is it possible that DJI could bring a drone

02:05  4  to market for only $90,000 but sell ████████ in

02:06  5  drones?

02:06  6        There's an enormous disconnect there, and so I

02:06  7  did some investigation.

02:06  8    Q.    Okay.  And can you walk us through a little

02:06  9  bit about why that disconnect may be a problem or an

02:06  10  issue here?

02:06  11    A.    Sure.

02:06  12        Could we go to the next slide?  Thank you.

02:06  13        And if you would advance one more, please.

02:06  14        So when you study DJI, they do not sell

02:06  15  standalone software.  They don't sell ActiveTrack,

02:06  16  Follow Me and Hover as standalone software.  You

02:06  17  couldn't go to -- back in the day when you could go to

02:06  18  a store and buy, you know, a tax software off the shelf

02:06  19  or some other software off the shelf.  They're not

02:06  20  selling it like that.

02:06  21        DJI sells drones, and those drones have this

02:06  22  software on it.  But in order for this software to ever

02:06  23  go to the market, they have to create a drone and sell

02:06  24  that drone.

02:06  25        In accounting we call this the matching

—1038—

02:06   1   principle.  Whenever you have a revenue, you have to

02:07   2   match the cost that's associated with that revenue.  So

02:07   3   if you have $100 in revenue and you have $80 in costs,

02:07   4   you have to match those so that the result is a $20

02:07   5   profit.  100 minus 80, a $20 profit.

02:07   6        So you have to have your revenue and match all

02:07   7   the costs.  That's not what Mr. Andrien did here.

02:07   8        Q.   So in your opinion, what costs should have

02:07   9   been deducted?

02:07   10       A.   Mr. Andrien should have deducted all the costs

02:07   11  associated with manufacturing the drone because that's

02:07   12  what DJI does.

02:07   13       Q.   And how did you determine what those costs

02:07   14  were in this case?

02:07   15       A.   Sure.  So as part of my work in this case, I

02:07   16  looked at various financial documents that were

02:07   17  provided by DJI in this case.  And after having

02:07   18  reviewed those, I spoke with Ms. Huang who is one of

02:07   19  their accounting professionals with DJI, and I also

02:08   20  reviewed her deposition.

02:08   21       And what she identified for me is that to

02:08   22  manufacture a drone, they perform research and

02:08   23  development, that's on the far left, which means

02:08   24  they're studying various ways to put technologies

02:08   25  together to assemble things properly, to make sure that

—1039—

02:08  1   they meet all the standards that they need to, to test

02:08  2   them, all types of research that they do.  And there's

02:08  3   a cost to that.  So that could be a cost that would

02:08  4   need to be deducted.

02:08  5         After R&D happens, so they know how to build

02:08  6   it, then they have to manufacture it, which means you

02:08  7   have the componentry but also the labor and also the

02:08  8   direct overhead.  Because you have to have a building,

02:08  9   a place to build it.  We call that cost of goods sold.

02:08  10  And in cost of goods sold you have the materials, the

02:08  11  labor and the manufacturing overhead.

02:08  12        Once they build it, they have to ship it to

02:08  13  their customers, which means they have to package it.

02:08  14  I saw Dr. Nourbakhsh up here earlier, and he was

02:09  15  holding a drone.  They can't ship a drone without a

02:09  16  box, without putting it on a truck, without putting it

02:09  17  on a plane, and there's a cost to that.  And he didn't

02:09  18  subtract that cost either.

02:09  19        There's also operating costs, and those are

02:09  20  costs of the leadership.  It's the cost of assisting

02:09  21  and managing all of these processes that we're seeing,

02:09  22  including R&D, cost to manufacture, shipping costs.

02:09  23        And then finally we heard from Mr. Oshauna a

02:09  24  day or so ago, and he talked about his efforts to sell

02:09  25  these products to Apple.  Well, he would be part of the

02:09   1   marketing and selling expenses.  So they have to go to

02:09   2   market.  You might find this product in a Best Buy.  So

02:09   3   somebody has to market it to Best Buy, market it to

02:09   4   Apple, put it on the website.

02:09   5          All of those costs are the costs that have to

02:09   6   follow the revenue.  So if you're going to identify

02:09   7   ███████████████ in sales, you can't just subtract the

02:09   8   costs of three softwares that they don't sell alone.

02:10   9   They sell them on a drone.  So you have to get all

02:10   10  these costs.

02:10   11         And when I evaluated the costs, I identified

02:10   12  ███████████████ as the cost to manufacture and sell UAVs

02:10   13  or drones.

02:10   14      Q.   And I think you mentioned a couple of DJI

02:10   15  financial documents.  If you can quickly turn in your

02:10   16  binder, I'd just like you to confirm a couple of things

02:10   17  quickly.

02:10   18         The first is, if you could please turn to

02:10   19  Tab PTX-74, which has already been admitted into

02:10   20  evidence.

02:10   21      A.   Yes.

02:10   22      Q.   Is this one of the DJI financial documents

02:10   23  that you reviewed?

02:10   24      A.   Yes.  This is some of the documents I spoke

02:10   25  with Ms. Huang about.

—1041—

02:10    1    Q.    Okay.  Great.  And then -- thank you.

02:10    2         If you would please also turn to Tab PTX-77,

02:10    3    which has also been admitted into evidence already.

02:10    4    A.    Yes.

02:10    5    Q.    Okay.  And is this also one of the DJI

02:10    6    financial documents that you reviewed in forming your

02:10    7    opinions?

02:11    8    A.    Yes, ma'am.  It is.

02:11    9    Q.    Okay.  In your opinion, if Mr. Andrien had

02:11   10    accounted for these manufacturing and sales costs that

02:11   11    you just identified, what impact would this have had on

02:11   12    his overall damages analysis or number?

02:11   13    A.    So if we can pull up my next slide, what I did

02:11   14    is I took Mr. Andrien's calculations of 367.6 million

02:11   15    and I adjusted for the costs that he did not remove

02:11   16    related to the manufacturing of the drone.

02:11   17         And when I did that, it corrected

02:11   18    Mr. Andrien's damages number to be ██████████

02:11   19    Q.    So then let's turn to your next disagreement

02:11   20    and just keep walking through them.

02:11   21         Could you please explain for the jury what you

02:11   22    mean by failed to apply Textron's own profit split

02:11   23    approach?

02:11   24    A.    Sure.

02:11   25         So I mentioned earlier that I'm really looking

1042

02:12   1   for the proper way to apportion.  One way to apportion

02:12   2   is to subtract out the proper costs, which we just

02:12   3   talked about.  And now I'm looking at something called

02:12   4   what's the appropriate profit split.

02:12   5           And what we're really saying there is, once

02:12   6   you get to a profit number, how much should go to the

02:12   7   patent owner and how much should go to the licensee in

02:12   8   this case.

02:12   9   Q.   Okay.  And what did you review to understand

02:12  10   what Textron's own profit split approach would be?

02:12  11   A.   Earlier in my testimony I mentioned that I

02:12  12   reviewed both Textron and DJI documents.  These are

02:12  13   some of the Textron documents that I looked at and

02:12  14   wanted to make sure that I took into account Textron's

02:12  15   position in this case.

02:12  16           If we would go to the next slide, please.

02:12  17           So as part of Textron's normal course of

02:12  18   business, they perform analyses whenever they are

02:12  19   entering into a licensing negotiation with a third

02:13  20   party, and they produced that information so that I

02:13  21   could evaluate each and every one of those documents.

02:13  22           And it would take a very long time to show you

02:13  23   all of them.  So what I've tried to do is show you some

02:13  24   from before the hypothetical negotiation -- remember,

02:13  25   that was in 2015 -- before the hypothetical

1043

02:13    1    negotiation, at or around the time of the hypothetical

02:13    2    negotiation and then after the hypothetical negotiation

02:13    3    so you could make your own determination.

02:13    4    So this is one of those files.  And if you've

02:13    5    ever used Excel, it's an Excel workbook with various

02:13    6    worksheets in it.  And across the bottom, you'll see

02:13    7    this particular spreadsheet.

02:13    8    And the thing I would point you to first is,

02:13    9    up at the top, you'll see it's 2010.  So this is before

02:13    10   the hypothetical negotiation.  And you'll see here they

02:13    11   identify what they believe is a fair share.  They say:

02:14    12   IP value estimated as a "fair share" of potential

02:14    13   buyer/licensee's profit.

02:14    14   Now, remember, the buyer/licensee is the one

02:14    15   who's licensing the technology from Textron.  So it's

02:14    16   very similar to what we have in this case.  It would be

02:14    17   DJI licensing from Textron.

02:14    18   And under analysis methodology, they say --

02:14    19   under the profit split approach, they want to identify

02:14    20   what the fair share is.

02:14    21   Over here on the right, this is where they

02:14    22   start.  They begin with a baseline profit split of

02:14    23   25 percent.  Again, this is their normal course of

02:14    24   business.

02:14    25   And then they make some adjustments to this.

1044

02:14    1    And those adjustments are related to technology risks,

02:14    2    development cost risks, manufacturing cost risks,

02:14    3    market/sales risk and political risks.  And then at the

02:14    4    end, they identify what the royalty rate would be.

02:14    5         In this particular situation, they started

02:14    6    with 25 percent and they adjusted downward.  And you'll

02:15    7    see that happens down here.  They identify what the

02:15    8    adjustments are going to be.

02:15    9         They start here at medium, and then they

02:15   10    adjust either down to low or very low or up to high or

02:15   11    very high.  And based upon those adjustments here, they

02:15   12    made an adjustment down for development cost risks and

02:15   13    an adjustment down for market and sales risk.

02:15   14         Ultimately, 25 minus the 10 is 15, and that's

02:15   15    what they determined would be a risk-adjusted profit

02:15   16    split rate.

02:15   17         So according to Textron, they would use that

02:15   18    15 percent and multiply that times the profit to give a

02:15   19    profit split.  It would be 15 percent to Textron and

02:15   20    85 percent to the licensee.

02:15   21    Q.    And this is from Defendants' Exhibit 253; is

02:15   22    that correct?

02:15   23    A.    That is correct.

02:15   24    Q.    Okay.

02:15   25    A.    And if we go to the next slide.  I told you

02:16  1    that I was going to show you one at the time of the

02:16  2    hypothetical negotiation.  This is 2015.

02:16  3         You'll recall -- this is a different workbook

02:16  4    with a different set of worksheets.  They're doing the

02:16  5    fair-share discussion here.  Under the methodology,

02:16  6    they want to do a fair share.

02:16  7         Over here, their normal course of business,

02:16  8    start with 25 percent, and then they're going to adjust

02:16  9    it for the same five factors.  Here they adjusted down

02:16  10   3, 3, 3 and 3 respectively.  And you'll see that down

02:16  11   here.

02:16  12        And then, ultimately, they came up with this

02:16  13   13 percent.  And similarly to the 2010 example, that

02:16  14   would be 13 percent to Textron and the balance to the

02:16  15   licensee.

02:16  16   Q.    And this is from Defendants' Exhibit 816,

02:16  17   which has also been admitted into evidence, correct?

02:16  18   A.    That's correct.

02:16  19   Q.    Okay.  And for good measure, let's do one

02:17  20   more.  I think you mentioned one from recent times as

02:17  21   well.

02:17  22   A.    Sure.

02:17  23        So I know that I'm showing you three of these,

02:17  24   but I thought it would make sense to give you a

02:17  25   perspective of the normal-course-of-business nature of

1046

02:17   1   these documents, the fact that they were done in 2010,

02:17   2   in 2015 and 2022.

02:17   3        You'll see it's the same consideration.  We

02:17   4   have a fair share.  Textron starts with 25 percent in

02:17   5   the ordinary course of business.  Here they make

02:17   6   adjustments:  -5, -5, -5 and -5.  So four out of the

02:17   7   five things that they have evaluated, and you'll note

02:17   8   that those are over here.

02:17   9        And here, they're at 45 percent.  So they

02:17   10  adjust down and they adjust up, but they're always

02:17   11  starting at this 25 percent baseline, and then they're

02:17   12  adjusting for various factors after that.

02:18   13        And as I mentioned earlier, these documents,

02:18   14  which are Textron's own documents in the normal course

02:18   15  of business, Mr. Andrien didn't evaluate these.  He

02:18   16  didn't incorporate these into his report.

02:18   17        And from the perspective of a hypothetical

02:18   18  negotiation between a willing buyer and a willing

02:18   19  seller, what we're called to do as independent experts

02:18   20  is look at what each party would evaluate happening at

02:18   21  that hypothetical.

02:18   22        And it's my position that the baseline profit

02:18   23  split of 25 percent would be what Textron would

02:18   24  consider because that's the policy, that's the

02:18   25  procedure they followed throughout time.

02:18  1       Q.    And this slide is from Defendants'
02:18  2   Exhibit 199; is that correct?
02:18  3       A.    Yes.
02:18  4       Q.    Okay.  And you said you reviewed a number of
02:18  5   Textron documents.
02:18  6             So approximately how many Textron documents
02:18  7   did you see this 25 percent baseline profit split rate?
02:18  8       A.    So I saw -- there were 61 total documents, and
02:19  9   by "documents," I mean 61 different workbooks with
02:19 10   these types of worksheets in them.  They had 25 percent
02:19 11   as the baseline profit split in those 61 documents.
02:19 12             What this tells me is it's a normal course of
02:19 13   business.  It's something that they evaluate internally
02:19 14   as they're determining what an appropriate profit split
02:19 15   would be for a negotiation with a licensee.
02:19 16       Q.    And in any of those 61 documents, those
02:19 17   exemplary documents that you reviewed, did you ever see
02:19 18   a profit split up to ████████ as Mr. Andrien has
02:19 19   proposed in this case?
02:19 20       A.    I didn't.  And interestingly enough, if you
02:19 21   look at the way the model was built, it wouldn't even
02:19 22   allow you to go as high as ████████.
02:19 23             The highest it would ever go is 55 percent.
02:19 24   And again, I think had Mr. Andrien looked at this, he
02:19 25   might have been guided at least by the principles that

02:19  1    they follow internally in the ordinary course of

02:19  2    business.

02:20  3          What I'm showing here is 13 percent was the

02:20  4    lowest one I showed you, 45 percent is the highest one

02:20  5    I showed you, but to be fair, in full disclosure, I saw

02:20  6    some as low as 11 percent at the end of the day and as

02:20  7    high as 55 percent at the end of the day.

02:20  8    Q.    And how long has Textron, based on the

02:20  9    documents that you've reviewed, been using this 25

02:20  10   baseline profit split approach?

02:20  11   A.    If you'd advance the slide.

02:20  12         The first document that I saw using this

02:20  13   approach was 2009, and it has continued every year

02:20  14   through 2022.  So as early as -- or late as last year,

02:20  15   in 2022, they were following this normal course of

02:20  16   business practice, and so I thought it was at least

02:20  17   relevant to incorporate into my analysis.

02:20  18   Q.    And I believe you mentioned this earlier, but

02:20  19   did Mr. Andrien consider any of these documents or this

02:20  20   25 percent baseline profit split in his approach?

02:21  21   A.    He didn't.  And again, it's -- there's always

02:21  22   valuator judgment involved in what we do, but I have to

02:21  23   ask myself if I'm really putting together what parties

02:21  24   are thinking at the time of a hypothetical negotiation.

02:21  25   I can't ignore their standard normal course of business

1049

02:21  1    documents.

02:21  2        Q.    And if Mr. Andrien had considered the --

02:21  3    Textron's basic baseline profit split practice, what

02:21  4    impact would this have had on his damages number?

02:21  5        A.    You'd have to advance the slide, please.

02:21  6             So what I ended up doing here is I took

02:21  7    Mr. Andrien's 367 million and I adjusted it for

02:21  8    costs -- we talked about that just a few minutes ago --

02:21  9    to ████████████.  And then I adjusted that based upon

02:21  10   the profit split of 25 percent, and I got ████████████.

02:21  11            And so that would be -- I beg your pardon.

02:22  12   That would be correcting both for the costs that

02:22  13   weren't deducted as well as the ordinary course of

02:22  14   business 25 percent profit split that Textron uses

02:22  15   internally.

02:22  16       Q.    And is that the end of your disagreements with

02:22  17   Mr. Andrien's opinion?

02:22  18       A.    No.  It's not.

02:22  19       Q.    Would you please explain to the jury what you

02:22  20   mean by Mr. Andrien failed to consider DJI's

02:22  21   innovations to drones?

02:22  22       A.    So at the risk of being a clanging cymbal,

02:22  23   again, apportionment is not something that we're asked

02:22  24   to do.  It's not something that someone says it would

02:22  25   be a good idea.  It's something that we are required to

1050

02:22  1    do, because we can't value more than just the patent at

02:22  2    issue.  We're valuing what that specific asset is.

02:22  3          And the approach that Mr. Andrien used is

02:22  4    improper because it incorporates other technologies

02:23  5    outside of the patent at issue based upon his use of a

02:23  6    percentage royalty rate.

02:23  7          And I'm going to take my time and try to

02:23  8    explain this as best I can because I think it's

02:23  9    extremely important.

02:23  10   Q.    So do you have an example then you'd like to

02:23  11   walk us through?

02:23  12   A.    I do.  If you were considering drones and you

02:23  13   had one drone that had a very baseline level of

02:23  14   feature, very few features on it, and it was, say, a

02:23  15   hundred dollar drone.  And then you had -- excuse me --

02:23  16   but one feature it did have was hover.

02:23  17         And over here in this hand you had a high-end

02:23  18   drone.  This is a $1,000 drone over here, and it is

02:23  19   chock full of additional features.  It's made with

02:23  20   better -- it's made with better equipment.  It's got a

02:23  21   bigger engine in it.  It's got bigger propellers in it.

02:24  22   It's got better lights on it.  It makes a cooler sound.

02:24  23   But it also has hover in it.

02:24  24         What Mr. Andrien has done is he's used a

02:24  25   percentage royalty rate.  Let's just assume I say it's

| 02:24 | 1 | 10 percent.  He takes 10 percent, multiplies it times |
|---|---|---|
| 02:24 | 2 | the $100 drone and says, okay, I've got $10. |
| 02:24 | 3 | He takes that same 10 percent and multiplies |
| 02:24 | 4 | it times a $1,000 drone, but what we know when that |
| 02:24 | 5 | happens is 10 percent times $1,000 is $100, but that 10 |
| 02:24 | 6 | percent is taking some of every other feature and |
| 02:24 | 7 | benefit in that drone. |
| 02:24 | 8 | Because that drone has a bunch of additional |
| 02:24 | 9 | features in it.  It's got better propellers.  It's got |
| 02:24 | 10 | a bigger motor.  It's faster.  It does all kinds of |
| 02:24 | 11 | cool stuff that bigger, better drones do.  And when you |
| 02:24 | 12 | apply that 10 percent to that drone and get $100, it's |
| 02:24 | 13 | not only taking a portion of hover, it's taking a |
| 02:25 | 14 | portion of every other dollar associated with that |
| 02:25 | 15 | additional $90 of other features. |
| 02:25 | 16 | MS. KESTLE:  Ryan, if you'll please |
| 02:25 | 17 | display Defendants' Exhibit 521.  This will just be a |
| 02:25 | 18 | demonstrative. |
| 02:25 | 19 | And then if we could turn, please -- |
| 02:25 | 20 | thank you -- to Page 3. |
| 02:25 | 21 | BY MS. KESTLE: |
| 02:25 | 22 | Q.    And, Mr. Schoettelkotte, do you recognize this |
| 02:25 | 23 | document? |
| 02:25 | 24 | A.    Yes.  This is Schedule 4.2 of my report. |
| 02:25 | 25 | Q.    Okay.  And what is this document showing? |

02:25  1     A.   This shows the weighted average price of

02:25  2  different drone series that are offered by DJI.

02:25  3     Q.   And how is this relevant to the analysis or

02:25  4  the example that you were just walking us through?

02:25  5     A.   If it would be possible to take the product

02:25  6  series labels and blow them up, as well as the total

02:25  7  weighted average prices and blow them up and bring them

02:26  8  together?  Thank you.

02:26  9          So I gave you an example a few minutes ago

02:26  10  where if you have different priced drones and you apply

02:26  11  the same percentage royalty rate, you get vastly

02:26  12  different numbers.  And that's because the higher

02:26  13  priced drones have more features than the lower priced

02:26  14  drones do.

02:26  15          And so what Mr. Andrien did is he looked at

02:26  16  the various products with each -- within each one of

02:26  17  these series that was alleged to have infringed.  And

02:26  18  so if you just take the first two, if you look at the

02:26  19  AGRAS, which is $5,079 versus the FPV, which is 885,

02:26  20  you might ask yourself, well, I wonder why there's such

02:26  21  a big price difference between those?

02:26  22          And the reason is because those drones offer

02:27  23  such a significantly different stable of features and

02:27  24  benefits.  The FPV drone is much more modest.  The

02:27  25  AGRAS is used to go ahead and seed farms and drop seeds

02:27  1    and drop fertilizer.  It's enormous.

02:27  2         But when Mr. Andrien uses his royalty rate, he

02:27  3    applies the same royalty rate to 885 that he does to

02:27  4    5079.  So he's taking a portion of all the other

02:27  5    features and benefits with that percentage, because

02:27  6    that's how percentages work.

02:27  7         There's a way to fix this, though that's an

02:27  8    acceptable methodology that I have used here and peers

02:27  9    of mine have used as well, and it's called looking at

02:27  10   the lowest cost accused product.

02:27  11        MS. KESTLE:  Ryan, if you'll please turn

02:27  12   back to the demonstrative.

02:27  13   BY MS. KESTLE:

02:28  14   Q.   And have you prepared a slide to share with

02:28  15   the jury about the lowest average selling price that

02:28  16   you were just describing?

02:28  17   A.   Yes.  I have.

02:28  18   Q.   Okay.

02:28  19   A.   So what I've sought to do -- and, Ryan, if you

02:28  20   have the ability to highlight with me, I'd really

02:28  21   appreciate that.  If we look at the feature and we

02:28  22   highlight "Follow Me."

02:28  23        So I said to myself, I need to find the lowest

02:28  24   priced drone that uses Follow Me, and so I identified

02:28  25   Phantom 3 Standard/3C.

02:28  1           If you highlight that, please.

02:28  2           And that drone sells for $364.  What I know

02:28  3  about this is that that drone has the '909 features in

02:28  4  it.  So it's going to have Follow Me in it.  It's got

02:28  5  this feature Follow Me in it.

02:28  6           And as a result of that, when we calculate the

02:28  7  royalty, after making all the other adjustments to

02:29  8  costs, we subtract the appropriate costs, we make the

02:29  9  right profit adjustment, and then we use the lowest

02:29  10  priced drone, the royalty rate is ███ per unit.

02:29  11           Now, it doesn't matter if you add additional

02:29  12  features to the next drone.  We've already valued what

02:29  13  Follow Me is worth.  When you add another feature, the

02:29  14  royalty rate shouldn't get a part of that other feature

02:29  15  because it's not accused.  We're just apportioning down

02:29  16  to the feature at issue.

02:29  17           We did the same thing for ActiveTrack.  We

02:29  18  identified Spark.  Spark is the -- it's the drone

02:29  19  offered by DJI that uses ActiveTrack and is at the

02:29  20  lowest price.  So we know when we make the same

02:29  21  adjustments, when we get to ███, the value of

02:30  22  ActiveTrack to that product is never going to be higher

02:30  23  than that.  Because any price increases that happened

02:30  24  on another drone are not going to be related to that

02:30  25  feature.

1055

02:30  1    And then finally, we did the same thing with

02:30  2  Hover.  Here we identified the Tello product.  It had

02:30  3  an average selling price of $86.  And we identified a

02:30  4  royalty rate, after making all the same adjustments, of

02:30  5  ███.

02:30  6    Q.    Okay.  So then what happens when you apply

02:30  7  that adjusted royalty rate in this case?

02:30  8    A.    If we could go to the next slide.

02:30  9    So on the left you see the feature:  Follow

02:30  10  Me, ActiveTrack and Hover, and you see the accused

02:30  11  units.

02:30  12    So for Follow Me, there were ██████ accused

02:30  13  units, and I've applied a royalty of ████ to that

02:30  14  based upon our calculations a moment ago.  Total

02:30  15  damages would result in █████.

02:31  16    For ActiveTrack, we identified

02:31  17  ██████ units.  We apply a royalty of ████ based

02:31  18  upon the way that we calculated it a moment ago, and

02:31  19  that results in █████, which would yield a total

02:31  20  corrected royalty damages of ██████ for the '909

02:31  21  patent.

02:31  22    And then for Hover, we identified the accused

02:31  23  units of ██████.  Based upon the discussion we had a

02:31  24  moment ago, we identified a royalty rate of ████.  We

02:31  25  multiply those together, and we get total damages of

—1056—

02:31  1  ▮▮▮▮▮▮

02:32  2            And so collectively for the '909 and the '752,

02:32  3  when you use the lowest priced drone which factors out

02:32  4  all the other features that are not at issue in this

02:32  5  case, these are figures that I've identified.

02:32  6       Q.   And so then what impact, Mr. Schoettelkotte,

02:32  7  does this have adjusting Mr. Andrien's opinion?

02:32  8       A.   Taking the next step after making corrections

02:32  9  for the costs that Mr. Andrien didn't deduct, using the

02:32  10  profit split that Textron uses in the ordinary course

02:32  11  of business and correcting for the lowest priced drone

02:32  12  that uses the accused technology, it yields a corrected

02:32  13  damages amount of ▮▮▮▮▮▮

02:32  14       Q.   And I believe there's still one more

02:32  15  disagreement to walk through; is that correct?

02:32  16       A.   That is correct.

02:32  17       Q.   Okay.  And will you explain to the jury what

02:32  18  you mean by Mr. Andrien failed to consider cost of

02:32  19  alternative designs?

02:32  20       A.   So we spoke about this earlier.  I think I

02:33  21  gave the example of you have a choice if you were going

02:33  22  to take the bus or drive to work, park in a parking lot

02:33  23  or pay for a bus ride.

02:33  24            We all face alternatives.  And companies,

02:33  25  certainly high-tech companies like DJI, they have

1057

02:33  1    ability to modify software such that they have an

02:33  2    alternative design.  And we heard Dr. Nourbakhsh talk

02:33  3    about various of those alternative designs that were

02:33  4    available for both the '909 and '752 patents.

02:33  5         And so as part of my work in this case, I

02:33  6    spoke with Dr. Nourbakhsh about what those alternatives

02:33  7    would look like.  I also spoke with personnel at DJI, a

02:33  8    gentleman by the name of Mr. Ai, who explained to me

02:33  9    what the costs would be in order to make these

02:33  10   modifications.  I also read his deposition which

02:33  11   identified for me the same.

02:33  12        And I've taken all that information, not only

02:34  13   the understanding that there are alternative designs,

02:34  14   but also how much time it would take and what the costs

02:34  15   to implement that alternative design would be.

02:34  16        And I prepared a slide to share that with the

02:34  17   jury.

02:34  18   Q.    Is the cost of alternative designs, in your

02:34  19   understanding, something that Textron also considers

02:34  20   when valuing IP?

02:34  21   A.    It is.

02:34  22   Q.    Okay.  And how do you know that?

02:34  23   A.    If we go to the next slide.

02:34  24        So in those workbooks with the worksheets,

02:34  25   we've been talking about -- earlier we'd been talking

1058

02:34  1    about this profit split approach, but they also look at

02:34  2    something called the development cost approach, which

02:34  3    is exactly the same as an alternative design.

02:34  4          And what they say here is intellectual

02:34  5    property value estimated as cost a potential -- or

02:34  6    buyer -- a potential buyer/licensee would incur -- and

02:35  7    this is important -- to independently develop a legal

02:35  8    alternative to existing IP.

02:35  9          And that's what high-technology companies like

02:35  10   DJI do, and Textron recognizes that as well.

02:35  11   Q.    And is this something that financial experts

02:35  12   regularly consider when valuing patents?

02:35  13   A.    It is.  One of the things that I noted in

02:35  14   Mr. Andrien's report, and I would be paraphrasing, he

02:35  15   identified the fact that to the extent that there is an

02:35  16   alternative design that is available, it would be a

02:35  17   significant data point for the parties to consider.

02:35  18   And even moreover, it can be a limiter to what parties

02:35  19   would be willing to pay.

02:35  20         Because if a damages ask was so high,

02:35  21   companies would redesign away from the accused

02:36  22   technology to an alternative design at a reasonable

02:36  23   price at a reasonable time period.  And that's, I

02:36  24   think, what Textron is identifying here.  And

02:36  25   Mr. Andrien has identified it as well.

1059

02:36   1        Q.    Is the cost approach something relevant to

02:36   2   consider in this case?

02:36   3        A.    It is, yes.

02:36   4        Q.    Okay.  And why is that?

02:36   5        A.    If we look at what I've learned in this case,

02:36   6   really there's two things.  One is we understand that

02:36   7   it would be available at the time of the hypothetical

        8   negotiation.

02:36   9             And what that means is that according to

02:36  10   Dr. Nourbakhsh, all of the information necessary, the

02:36  11   technical understanding, would be available for DJI to

02:36  12   make the proper adjustments to their software in order

02:36  13   to implement an alternative design.

02:36  14             And then secondarily, the costs associated

02:36  15   with implementing that redesign would be consistent

02:37  16   with the costs that programmers would identify as

02:37  17   reasonable.  In this case, it was approximately one

02:37  18   month of time for both patents.

02:37  19             And then lastly, I understand from

02:37  20   Dr. Nourbakhsh that these alternatives would be

02:37  21   acceptable in the marketplace for the reasons that he

02:37  22   stated.

02:37  23        Q.    And how do you determine the specific costs

02:37  24   for the alternative designs available in this case?

02:37  25        A.    So as part of my work, I spoke with Mr. Ai

—1060—

02:37  1    from DJI, and he explained to me the various costs that

02:37  2    would be relevant in order to make or implement a

02:37  3    redesign.  I spoke with Dr. Nourbakhsh, and he

02:37  4    explained to me that it would take a month for each

02:37  5    patent to redesign.

02:37  6           And I used both the salaries of a programmer

02:38  7    and the salaries of a tester, meaning to QC the

02:38  8    process, and their benefits for a fully-loaded cost to

02:38  9    identify what the cost of those alternatives would be.

02:38  10          And in 2015 in April, at the time of the first

02:38  11   hypothetical negotiation, the cost to redesign was

02:38  12   ███████  and the cost of testing was ███████.  The total

02:38  13   cost per the series was ███████.

02:38  14          Similarly in October of 2015, at the second

02:38  15   hypothetical negotiation, the cost to design was

02:38  16   ███████.  The cost of testing was ███████.  And the cost

02:38  17   per series was ███████.

02:38  18          And when I say "the cost of the series," what

02:38  19   I'm getting at is that they would have to make that

02:39  20   same adjustment to more than one series of drone.

02:39  21   Because they have more than one series, they would need

02:39  22   to adjust more than one of those.

02:39  23          But the range of alternatives, ███████ in

02:39  24   April 2015, and ███████ in October 2015.

02:39  25       Q.   And so what do you do next after you've

02:39  1    determined that cost per series?

02:39  2         A.    If we go to the next slide, please.

02:39  3              So here, as I mentioned, there are various

02:39  4    series.  We understand for the '909 patent there would

02:39  5    be one drone series that would need to be modified.  So

02:39  6    one drone series times ████, the cost of this

02:39  7    alternative would be the same, ████.  That would be

02:39  8    for the '909 patent.

02:39  9              For the '752 patent, there are three series.

02:39  10   For those three series, the cost per series would be

02:39  11   ████.  When I do that multiplication, I get to ████

02:40  12   for a total of ████.

02:40  13             Now, importantly, as part of my work in this

02:40  14   case, I think I mentioned I had an opportunity to

02:40  15   review Dr. -- or excuse me -- Mr. Andrien's report.

02:40  16             As part of his report, you may recall he

02:40  17   talked about the cost to program in a design-around --

02:40  18   I beg your pardon.

02:40  19             He talked about the cost to program in a

02:40  20   software.  So very similar to what I'm calculating up

02:40  21   top, he talked about how costly it would be to make a

02:40  22   software change in a drone series.

02:40  23             And you'll see here in Mr. Andrien's report,

02:40  24   he was somewhat higher than the estimate that was

02:40  25   provided to me.  He identified it as ████ for the

—1062—

02:40  1    '909 patent, and for the '752, ███████████ for a total

02:41  2    of ██████ .

02:41  3           And a moment ago I mentioned that he

02:41  4    identified a higher value.  You may recall in his

02:41  5    testimony, I believe he was told that it would be

02:41  6    approximately 200 hours of time.  And he said, well,

02:41  7    I'll just be conservative, and I'll bump it up to

02:41  8    500 hours.

02:41  9           I think that's the reason it's so much higher

02:41  10   because he doubled a number that, you know, he had

02:41  11   identified originally.  Had he not doubled the number,

02:41  12   I think we would've been almost lockstep in what we

02:41  13   were trying to anticipate there, even though I just

02:41  14   used that as a way to check, if you will, the

02:41  15   reasonableness of the alternative amounts that I got

02:41  16   from both DJI and Dr. Nourbakhsh.

02:41  17   Q.    And what impact would considering the costs of

02:41  18   these alternative designs have on Mr. Andrien's

02:41  19   analysis?

02:41  20   A.    So again, this isn't necessarily a correction

02:41  21   to the 367, but what it shows is, is that if DJI were

02:42  22   to implement a noninfringing alternative, the total

02:42  23   cost of that noninfringing alternative for the series

02:42  24   that we've just discussed would be ██████ .

02:42  25          And both myself, Mr. Andrien, as well as

02:42  1    Textron, have identified that the cost of alternatives

02:42  2    is a valid and appropriate way to value technology.

02:42  3        Q.    And how does the cost of alternative designs

02:42  4    limit a damage award?

02:42  5        A.    Doesn't necessarily limit it.  What it does

02:42  6    is, is it provides a data point that parties would look

02:42  7    at to determine what would be reasonable to pay.  It's

02:42  8    not a limiter.  It just identifies what parties would

02:42  9    be reasonable to pay.

02:42 10        Q.    So we've walked through a number of

02:42 11    adjustments that you've made to Mr. Andrien's analysis.

02:42 12              And before we wrap up this afternoon, would

02:42 13    you just briefly summarize those opinions for the jury?

02:42 14        A.    So as part of my work here, I've identified

02:43 15    alternative design costs for the '909 and '752 patent

02:43 16    as ███████ for the '909 patent, and ███████ for the '752

02:43 17    patent.

02:43 18              And after making corrections to Mr. Andrien's

02:43 19    calculations, I've identified ███████████ for the '909

02:43 20    patent and ███████████ for the '752 patent.

02:43 21        Q.    And given the adjustments that you've made to

02:43 22    Mr. Andrien's numbers and the failures we've talked

02:43 23    about today, do you think his analysis results in a

02:43 24    reasonable royalty award?

02:43 25        A.    I don't.  I -- reasonable royalties are

—1064—

02:43  1   supposed to be -- they're supposed to be reasonable to

02:43  2   both parties, where you're taking into account the

02:43  3   considerations of both the licensee and the licensor.

02:43  4        And as we've talked about today, I believe

02:43  5   that Mr. Andrien either left out certain information,

02:43  6   certainly Textron's own documents, but in addition, he

02:44  7   also failed to properly apportion out many of the

02:44  8   features that are on these higher-priced drones that

02:44  9   otherwise should have been apportioned out to avoid

02:44  10  taking more than just the footprint of the technology

02:44  11  in the marketplace.

02:44  12  Q.   And to briefly circle back what we discussed

02:44  13  at the very beginning, if the jury finds that the

02:44  14  patents are invalid or not infringed, what damages are

02:44  15  owed?

02:44  16  A.   So again, my opinions and Mr. Andrien's

02:44  17  opinions, they're only relevant if the jury finds

02:44  18  validity and infringement.

02:44  19       I understand that Dr. Nourbakhsh has concluded

02:44  20  that the DJI drones do not infringe either the '909 or

02:44  21  the '752 patents and both the '909 and '752 patents are

02:44  22  invalid.

02:44  23       If that was the case, again, my analysis would

02:44  24  not be necessary.  The jury could dismiss my analysis

02:45  25  and Mr. Andrien's analysis because there would be no

02:45  1    damages.

02:45  2         Q.    Thank you, Mr. Schoettelkotte.

02:45  3         A.    You're welcome.

02:45  4                MS. KESTLE:  Your Honor, we pass the

02:45  5    witness.

02:45  6                         CROSS-EXAMINATION

02:45  7    BY MR. PANKRATZ:

02:45  8         Q.    Good afternoon, Mr. Schoettelkotte.

02:45  9         A.    Good afternoon.

       10         Q.    My name is Kirk Pankratz.  I'm counsel for

02:45  11   plaintiff Bell Textron.

02:45  12                (Clarification by Reporter.)

09:42  13                (Sealed proceedings end.)

02:45  14   BY MR. PANKRATZ:

02:45  15        Q.    You and I have something in common, which is

02:45  16   tough last names to say and spell.

02:45  17        A.    Yeah.  I can feel that a little bit.

02:45  18        Q.    Now, you are here to address damages issues in

02:45  19   this case, right, sir?

02:45  20        A.    Yes.  I am.

02:45  21        Q.    And as you let the jury know, you're basically

02:45  22   the counterpart to the expert, Mr. Andrien, who

02:45  23   testified in Bell's case, right, sir?

02:46  24        A.    I guess I don't consider myself a counterpart.

02:46  25   I consider myself an independent expert who was asked

02:46  1    to come in and value technology, as well as review his

02:46  2    report.

02:46  3        Q.    Right.  You and Mr. Andrien agree on some

02:46  4    things, fair?

02:46  5        A.    Yeah.  I'd have to think about it, but yeah.

02:46  6    I think there's probably a few things we do agree on.

02:46  7        Q.    Well, you and Mr. Andrien both agree that to

02:46  8    calculate damages in this case, you must look to a

02:46  9    hypothetical negotiation, right?

02:46  10       A.    I agree with that.

02:46  11       Q.    And both of you agree that in this case there

02:46  12   would be two separate hypothetical negotiations to look

02:46  13   at, right?

02:46  14       A.    Yes.  That would be in April and October of

02:46  15   2015.

02:46  16       Q.    And the April hypothetical negotiation would

02:46  17   be for the '909 patent, right, sir?

02:46  18       A.    That's my understanding.

02:46  19       Q.    That's the patent that we've heard called the

02:46  20   Follow Me patent?

02:47  21       A.    Follow Me or ActiveTrack, I think, is what

02:47  22   it's been called.

02:47  23       Q.    And then the other hypothetical negotiation

02:47  24   would take place in what day?

02:47  25       A.    October 2015.

—1067—

02:47  1          Q.    And that's for the '752 patent?

02:47  2          A.    Yes.  That's correct.

02:47  3          Q.    The one that we've heard referred to as the

02:47  4    hover hold, right?

02:47  5          A.    Yes.

02:47  6          Q.    Now, you and Mr. Andrien are all in agreement

02:47  7    on that, right?

02:47  8          A.    I believe that's correct.

02:47  9          Q.    And you and Mr. Andrien also both agree that,

02:47  10   for damages purposes, you must assume that the patents

02:47  11   are valid and infringed, right?

02:47  12         A.    Yes.  That's correct.

02:47  13         Q.    And at that hypothetical negotiation, DJI

02:47  14   would come to the table assuming valid and infringed

02:47  15   patents, right?

02:47  16         A.    Yes.

02:47  17         Q.    And then the other assumption from the Bell

02:47  18   perspective is:  No matter how distasteful they may

02:47  19   think a deal is in real life, you have to assume that

02:47  20   Bell comes to the table as a willing licensor?

02:48  21         A.    That's correct.  A willing licensee, a willing

02:48  22   licensor, looking at all documents as we talked about.

02:48  23         Q.    Now, damages, I think you and Mr. Andrien have

02:48  24   both explained to the jury, those are effectively if

02:48  25   there is infringement, if the patents are valid, that's

1068

02:48  1    the number that the jury will need to award to

02:48  2    compensate Bell for DJI's use of its patented

02:48  3    technology, right?

02:48  4        A.    I missed just the first part of that question.

02:48  5    And if I could ask you to just give it to me again, I

02:48  6    would appreciate it.  Thank you.

02:48  7        Q.    I think it was kind of long so I'll break it

02:48  8    down.

02:48  9        A.    That's -- that's what I meant, and I

02:48  10   apologize.  Thank you.

02:48  11       Q.    No worries.

02:48  12             At the conclusion of our evidence and after

02:48  13   the Judge charges the jury and they hear closing,

02:48  14   they'll go back to deliberate and they'll receive a

02:48  15   verdict form, right?

02:48  16       A.    That is my understanding of the Court's

02:48  17   process, if you will, in general.  I wouldn't pretend

02:48  18   to know exactly, but I believe that may be true.

02:49  19       Q.    They'll be asked to determine whether they

02:49  20   conclude and agree that DJI is infringing on the '752

02:49  21   and '909, right?

02:49  22       A.    That is correct.

02:49  23       Q.    And they'll have boxes to check for that?

02:49  24       A.    They will have a jury verdict form.

02:49  25       Q.    And on that verdict form, they'll also have to

1069

02:49    1    decide whether the patents are valid, right?

02:49    2        A.    That's my understanding.  Yes.

02:49    3        Q.    And if they agree that there is infringement

02:49    4    of valid patents, they'll have a line for each patent

02:49    5    where they need to write in the amount of damages that

02:49    6    are owed to Bell?

02:49    7        A.    If that's what the parties to this case agree

02:49    8    to in terms of the form of the verdict form, I haven't

02:49    9    seen it.  But in general, that's my understanding, if

02:49   10    the parties agree to some form of a verdict form and

02:49   11    the Judge approves of it.

02:49   12        Q.    I actually think the Judge has told us we're

02:49   13    going to have two lines on there.

02:49   14        A.    Then I would take your word for it.

02:49   15        Q.    So Mr. Andrien has proposed numbers to assist

02:49   16    the jury and said, these are the numbers I have

02:50   17    calculated, and it is my affirmative opinion that these

02:50   18    are the numbers that should go on each of those lines,

02:50   19    right?

02:50   20        A.    That's my understanding.  Yes.

02:50   21        Q.    And what you have just walked us through is

02:50   22    effectively just a critique of Mr. Andrien's numbers,

02:50   23    right?

02:50   24        A.    I disagree.

02:50   25        Q.    Well, you have not, for any number that we saw

1070

02:50  1    on the screen, offered an affirmative opinion that you

02:50  2    say, based on all of your analysis, this is the correct

02:50  3    number that the jury should write down; isn't that

02:50  4    fair?

02:50  5        A.    I would say I have identified two numbers, a

02:50  6    corrected Andrien number, as well as an alternative

02:50  7    design calculation.

02:50  8        Q.    You've identified numbers, right?

02:50  9        A.    I've identified numbers, calculated and

02:50 10    adjusted for corrections to Mr. Andrien's calculation.

02:50 11    The jury can certainly look at that and the jury can

02:50 12    either agree or disagree with it.

02:51 13             And then, secondarily, I've also identified

02:51 14    the costs of alternative designs, which is an economic

02:51 15    form of measuring the value of a patent.  That would be

02:51 16    another figure that the jury can look at and determine,

02:51 17    just like they can look at and determine what

02:51 18    Mr. Andrien has set forth.

02:51 19        Q.    All right.  We'll get back to that in just a

02:51 20    second to see what it is you are saying is your opinion

02:51 21    versus whether it's just a critique.

02:51 22             But before we do, I noted at the beginning you

02:51 23    talked about reviewing Bell's 10-Ks and other

02:51 24    documents.

02:51 25             Do you recall that?

1071

02:51  1        A.    Yes.

02:51  2        Q.    And I think you said something along the lines

02:51  3   of I did not see any references to drones as

02:51  4   competition?

02:51  5        A.    That's right.

02:51  6        Q.    Did you just go into the 10-Ks and do a word

02:51  7   search for "drones"?

02:51  8        A.    No.  I think it was a bit more thorough than

02:51  9   that.  I think I was looking at Textron's 10-K.

02:51  10       Q.    Do you know what unmanned -- well, I guess

02:52  11  we'll have to see what the word -- have you ever heard

02:52  12  of unmanned aerial systems?

02:52  13       A.    That's -- it's not a phrase that I've heard.

02:52  14  I would say I've heard other phrases.  I haven't heard

02:52  15  that one.

02:52  16       Q.    You've probably heard "unmanned aerial

02:52  17  vehicles"?

02:52  18       A.    That's correct, yes.

02:52  19       Q.    And that's a drone?

02:52  20       A.    Yes.

02:52  21       Q.    Just by a different name?

02:52  22       A.    I believe that's true in most senses.

02:52  23       Q.    Okay.  But you didn't see any reference when

02:52  24  you looked at the 10-Ks to drones?

02:52  25       A.    Not in Textron's 10-K.

—1072—

02:52  1                    MR. PANKRATZ:  Can we bring up, please,

02:52  2      Plaintiff's Exhibit 377, Mr. Patterson?  And Page 4.

02:52  3                    And if you could zoom in on the bottom

02:52  4      part of Page 4, the Textron's -- well, that's fine.

02:52  5      This is under -- actually go back out for a second.

02:52  6                    We'll see this is under the Textron

02:52  7      systems segment, and now we can blow up that paragraph.

02:52  8      BY MR. PANKRATZ:

02:53  9         Q.    And that second paragraph starts:  Our

02:53  10     unmanned systems product line includes unmanned

02:53  11     aircraft systems, unmanned surface systems, and goes on

02:53  12     to mention a couple others.

02:53  13                    Next sentence:  Unmanned aircraft systems

02:53  14     include the Shadow, the U.S. Army's premier tactical

02:53  15     unmanned aircraft system, which has surpassed 1 million

02:53  16     flight hours since its introduction.

02:53  17                    And then it goes on to mention another such as

02:53  18     the Aerosonde small unmanned aircraft system.

02:53  19                    Do you see that?

02:53  20        A.    I see that.  I guess I'm not quite following

02:53  21     what you're -- what you're getting at.

02:53  22        Q.    The 10-K's talking about drones, isn't it?

02:53  23        A.    But that wasn't my testimony.  My testimony

02:53  24     was that I did not see any reference as it related to

02:53  25     competition with commercial drones.  And I did not see

—1073—

02:53  1    that in terms of either naming a commercial drone

02:54  2    company like DJI or Autel.  And I also didn't see any

02:54  3    naming of drones in terms of, again, commercial drones.

02:54  4        Q.    Okay.  So you didn't see the word "drones" and

02:54  5    you didn't see the word "DJI" or "Autel," fair?

02:54  6        A.    No.  I think my testimony was I didn't see any

02:54  7    name of any drone company in either their 10-K, which

02:54  8    is their filing, or a Standard & Poor's filing that's

02:54  9    available to everyone.  Every financial person.  It's

02:54  10   available to you, all your colleagues.  It's available

02:54  11   to your expert.

02:54  12            And we look at those things on a normal course

02:54  13   of business basis to understand who competes with who.

02:54  14   And what I'm really trying to understand is when I do

02:54  15   those analyses, especially with an SEC filing, is the

02:54  16   SEC filings are done for one purpose.  They're done to

02:55  17   tell you -- they're done to tell you and anyone else

02:55  18   who has an interest in the financial performance and

02:55  19   the background of a company, what that company is

02:55  20   doing.  And leadership signs off on them to their

02:55  21   accuracy.

02:55  22            And the point being, if we want to invest in

02:55  23   Textron, we want to know who their competitors are.  We

02:55  24   want to know what their challenges are.  And when they

02:55  25   send that to the SEC, the Securities and Exchange

02:55    1    Commission, I was looking to see who they -- who

02:55    2    Textron identified as their competitors.

02:55    3          So I beg your pardon.  I see what you've

02:55    4    showed me here, but this is inconsistent with what I

02:55    5    testified to.

02:55    6                MR. PANKRATZ:  Objection, nonresponsive.

02:55    7                THE COURT:  Sustained.

02:55    8    BY MR. PANKRATZ:

02:55    9        Q.    Sir, maybe you didn't hear my question.  I

02:55   10    wasn't asking about SEC documents beyond this or your

02:55   11    analysis or a long description of that.  I just wanted

02:55   12    to know if you saw the words "DJI" or "Autel" or

02:56   13    "drones" in any of Textron's 10-Ks?

02:56   14        A.    Neither there nor in the other documents I

02:56   15    looked at.

02:56   16        Q.    Okay.  But we do see that drones are discussed

02:56   17    in Textron's 10-Ks, but not using the word "drone,"

02:56   18    right?

02:56   19        A.    I think that I see what's here and I'd be

02:56   20    happy to elaborate.  I can't really comment any further

02:56   21    other than I disagree with what you're suggesting here

02:56   22    about my analysis.

02:56   23                MR. PANKRATZ:  You can take that down,

02:56   24    Mr. Patterson.

02:56   25    BY MR. PANKRATZ:

02:56    1          Q.    Now, you and Mr. Andrien also agree on at

02:56    2    least one more thing, I think, which is there are three

02:56    3    main approaches to calculating or determining the

02:56    4    appropriate damages in a patent case, right?

02:56    5          A.    I think that's reasonable, yes.

02:56    6          Q.    And those are market, cost and income, right?

02:56    7          A.    I believe that's correct, yes.

02:56    8          Q.    All right.  Mr. Andrien did not present a

02:57    9    market approach damages number to the jury, fair?

02:57   10          A.    That's correct.

02:57   11          Q.    You also did not present a market approach

02:57   12    damages number to the jury, correct?

02:57   13          A.    That's correct.

02:57   14          Q.    Mr. Andrien did not present a cost approach

02:57   15    damages number to the jury, correct?

02:57   16          A.    That's correct.

02:57   17          Q.    You also did not present a cost approach

02:57   18    damages number to the jury, right?

02:57   19          A.    That's incorrect.  I did.

02:57   20          Q.    Well, let's dig into that just a little bit

02:57   21    deeper.  I know we'll go a lot deeper in noninfringing

02:57   22    alternatives in a minute, but that's what you're

02:57   23    talking about, noninfringing alternatives, right?

02:57   24          A.    Yes.  Noninfringing alternatives is identified

02:57   25    as the cost approach.  You're looking at what would the

—1076—

02:57  1    cost be to design around a particular patent.

02:57  2        Q.    Right.  But you were clear to the jury that

02:57  3    the noninfringing alternative costs you were looking

02:57  4    at, those are not a limit, right?

02:57  5        A.    They're not a limit.  I understand that from a

02:58  6    legal perspective, but I also understand that it is

02:58  7    certainly a very significant data point that I

02:58  8    understand that a jury can determine whether they

02:58  9    believe that is the number in terms of damages that

02:58  10   should be awarded.  It doesn't suggest it can't be

02:58  11   higher than that, but that's certainly a data point

02:58  12   that the jury can consider.

02:58  13       Q.    You did not tell the jury, unless I missed it,

02:58  14   that you think the cost of noninfringing alternatives

02:58  15   is the number they should write down on the verdict

02:58  16   form, right?

02:58  17       A.    I absolutely believe that's a number that is

02:58  18   open to the jury to write down on a jury verdict form.

02:58  19   It is the cost approach.  I'm aware of it.

02:58  20   Mr. Andrien's aware of it, and Textron is aware of it.

02:58  21            It is certainly a number that they use.  I

02:58  22   understand that it is not a limiter on damages from a

02:58  23   legal standpoint, but from an economic standpoint, as a

02:58  24   valuator, I've used it.  Mr. Andrien's used it, and

02:58  25   Textron uses it over 60 times in its documents.  So we

—1077—

02:59  1    know it's prevalent.  It's taught in all treatises in

02:59  2    terms of accounting and finance.  So it's absolutely

02:59  3    very significant and certainly the jury can take that

02:59  4    into account.

02:59  5                    MR. PANKRATZ:  Objection, nonresponsive.

02:59  6                    THE COURT:  Sustained.

02:59  7    BY MR. PANKRATZ:

02:59  8        Q.    Sir, I'm going to ask it and I'll try and be

02:59  9    careful in my wording.

02:59  10                   Yes or no, did you present to the jury an

02:59  11   opinion to tell them that when they fill in those

02:59  12   blanks, the appropriate correct royalty number is the

02:59  13   amount of the noninfringing alternatives?

02:59  14       A.    Absolutely.  It was the last slide that I

02:59  15   showed.  The jury can consider that number, and they

02:59  16   can select that number.  It's not a limiter.  They can

02:59  17   choose or select something higher --

02:59  18                   THE COURT:  Maybe you don't understand

02:59  19   how this works, and I know you do because you've done

02:59  20   this a lot.  He's doing his best to ask you a direct

02:59  21   question that gets a yes or no.

02:59  22                   I let you go as long as you wanted when

02:59  23   your witness (sic) was putting you on, but now this is

03:00  24   cross, and you need to answer his question.

03:00  25                   THE WITNESS:  Yes, sir.

1078

03:00    1                    THE COURT:  Thank you.

03:00    2                    THE WITNESS:  Thank you.

03:00    3    BY MR. PANKRATZ:

03:00    4        Q.    Okay, sir.  We'll circle back to noninfringing

03:00    5    alternatives and that -- the cost approach a little

03:00    6    bit, okay?

03:00    7        A.    Yes.

03:00    8        Q.    The third one -- the third approach that we

03:00    9    talked about is an income approach, fair?

03:00   10        A.    Yes.

03:00   11        Q.    And you understand that Mr. Andrien did

03:00   12    calculate damages in this case using that third

03:00   13    approach, the income approach, right?

03:00   14        A.    Yes.

03:00   15        Q.    And the majority of your slides where we saw

03:00   16    those numbers coming down, those were based on income

03:00   17    approach, right?

03:00   18        A.    Yes.

03:00   19        Q.    Sir, you did not perform an income approach,

03:00   20    did you?

03:00   21        A.    No.  I've corrected Mr. Andrien's.

03:00   22        Q.    You do not believe that an income approach is

03:00   23    an appropriate methodology to use based on the evidence

03:01   24    in this case; isn't that fair?

03:01   25        A.    That's correct.

1079

03:01  1      Q.   So it's fair to say that all of those income

03:01  2  approach numbers that you put up, you don't think

03:01  3  they're appropriate, right?

03:01  4      A.   I think the numbers are appropriate.  I don't

03:01  5  think the income approach is appropriate.  So, no, I

03:01  6  don't agree with that.

03:01  7      Q.   All of those numbers you were putting up are

03:01  8  income-approach calculations, right?

03:01  9      A.   Yes.

03:01  10     Q.   And again, you do not believe that an income

03:01  11 approach is appropriate to use in this case?

03:01  12     A.   That's correct.

03:01  13     Q.   Wouldn't you agree, sir, that what you've

03:01  14 presented here is effectively just a critique of

03:01  15 Mr. Andrien's income approach?

03:01  16     A.   I think I would use the word "critique" or

03:01  17 "correct."  That's correct.

03:01  18     Q.   So let's turn to that critique.  You chopped

03:01  19 it down several different ways, right?

03:01  20     A.   Yes.

03:01  21     Q.   Because you think his conclusions are

03:02  22 unreasonable, right?

03:02  23     A.   Yes.  Among other things.

03:02  24     Q.   But, again, you're not suggesting that your

03:02  25 numbers are alternatives to Mr. Andrien's, are you?

1080

03:02   1      A.    No.   They would certainly be alternatives

03:02   2   because I have corrected them.   I disagree.

03:02   3      Q.    You're providing alternative calculations of a

03:02   4   royalty using Mr. Andrien's methodology but with

03:02   5   different assumptions?

03:02   6      A.    I am -- I would say I disagree with that.

03:02   7      Q.    Mr. -- you do recall you had your deposition

03:02   8   taken in this case, right?

03:02   9      A.    Yes.

03:02   10     Q.    All right.   And you were under oath?

03:02   11     A.    Yes.

03:02   12     Q.    You've been through how many depositions in

03:02   13   your career?

03:02   14     A.    Many.

03:02   15     Q.    Okay.   Dozens?

03:02   16     A.    Yeah.   Certainly.

03:02   17     Q.    More than a hundred?

03:02   18     A.    I would say it's somewhere around there.

03:02   19     Q.    Okay.   So you know how depositions work?

03:03   20     A.    Yes.   I do.

03:03   21     Q.    And you're under oath and swear to tell the

03:03   22   truth?

03:03   23     A.    Yes.

03:03   24     Q.    And you did, right?

03:03   25     A.    Absolutely.

```
03:03   1        Q.    Okay.

03:03   2              MR. PANKRATZ:  Mr. Patterson, could we

03:03   3   play the clip of Mr. Schoettelkotte's answer to this

03:03   4   exact question?

03:03   5              It starts at Line 88 -- I'm sorry --

03:03   6   Page 88, Line 14, runs through Page 89, Line 3, about

03:03   7   alternative calculations.

03:03   8              (Video played.)

03:03   9        Q.    You provided alternative calculations of a

03:03  10   royalty using Mr. Andrien's methodology but with

03:03  11   different assumptions, right?

03:03  12        A.    I wouldn't suggest that it's an alternative.

03:03  13   I would suggest what I'm showing here is the nature of

03:03  14   the unreasonable conclusions that Mr. Andrien has

03:03  15   reached.  And simply by adjusting certain inputs into

03:03  16   Mr. Andrien's analysis, it vastly modifies

03:03  17   Mr. Andrien's approach.

03:04  18              I certainly wouldn't set that forth as an

03:04  19   opinion that I'm offering but much more part and parcel

03:04  20   to my rebuttal of Mr. Andrien's approach to his

03:04  21   analysis and the uses of data in -- based upon what

03:04  22   I've seen and what I've reviewed in -- in ways that are

03:04  23   inconsistent with the evidence in the case.

03:04  24              (End video.)

03:04  25   BY MR. PANKRATZ:
```

03:04  1        Q.    That was your testimony, right, sir?

03:04  2        A.    Yes.

03:04  3        Q.    You certainly wouldn't set that forth as an

03:04  4    opinion that you're offering, right?

03:04  5        A.    I heard that.  Yes.

03:04  6        Q.    One of the ways in this analysis where you

03:04  7    rebutted but were clear this is not your opinion you're

03:04  8    setting forth but you knocked down Andrien's number,

03:04  9    was with respect to costs, right?

03:04  10       A.    Yes.

03:04  11       Q.    You said you had to match revenue to costs?

03:04  12       A.    Yes.

03:04  13       Q.    And just as one example, and I think you

03:04  14   mentioned it was leadership or executive, something

03:05  15   along those lines?

03:05  16       A.    Yes.

03:05  17       Q.    So one of those costs that you think should be

03:05  18   off the table is bonuses to DJI's executives?

03:05  19       A.    I'm not sure what you mean by "off the table."

03:05  20       Q.    That means that it's money that DJI gets to

03:05  21   keep out from the split, right?

03:05  22       A.    To the extent that there is salaries and

03:05  23   bonuses that are paid to management who is running the

03:05  24   company, certainly running the manufacturing of the

03:05  25   drones, I think that's a reasonable cost.

03:05  1      Q.    Okay.  So if Frank Wang gave himself a

03:05  2   $100 million bonus, that's off the table, right?

03:05  3      A.    I'm not aware of that.  That seems like a

03:05  4   hypothetical.  I don't know that there's accuracy to

03:05  5   that.

03:05  6      Q.    What, because you didn't look deep enough to

03:05  7   know whether he did that?

03:05  8      A.    No.  I just haven't seen that in the financial

03:05  9   records that I've identified.

03:05  10     Q.    Okay.  But if he had given himself a

03:05  11  $100 million bonus, according to you, he gets to keep

03:06  12  that and doesn't have to split any of it with Bell,

03:06  13  right?

03:06  14     A.    To the extent that there were bonuses that

03:06  15  were paid and they were included in the financial

03:06  16  information, that would be part of their compensation,

03:06  17  and it would be part of managing the company.

03:06  18     Q.    Any arbitrary bonus he gives himself, that's

03:06  19  off the table?

03:06  20     A.    I would disagree.

03:06  21     Q.    Okay.  So, in fact, there is some level of

03:06  22  unreasonableness on executive bonuses and other costs

03:06  23  where you would say, hold on.  Those do need to be put

03:06  24  back in?

03:06  25     A.    Again, I wouldn't agree with that either.  I

1084

03:06  1    would say that I'm not aware what you mean by

03:06  2    "arbitrary bonus."

03:06  3         Q.   Okay.  But --

03:06  4         A.   Most of -- I'm sorry.  May I speak?

03:06  5         Q.   I was about to ask a question.

03:06  6         A.   Oh, beg your pardon.  Go ahead, please.

03:06  7         Q.   Just so the jury's clear, though, executive

03:06  8    bonuses, those are off the table for the hypothetical

03:06  9    negotiation to be shared between the parties, right?

03:06  10        A.   I believe that bonuses that are based on

03:07  11   performance would be incorporated into the analysis.

03:07  12   I'm not aware of arbitrary bonuses.  I'm sorry.

03:07  13        Q.   The second way you started to cut down or

03:07  14   suggested that Mr. Andrien's numbers were unreasonable

03:07  15   is based on the 25 percent baseline royalty rate that

03:07  16   Bell Textron uses in some instances, right?

03:07  17        A.   Yes.

03:07  18        Q.   And you reran his numbers and dropped them

03:07  19   down lower by using this different profit split?

03:07  20        A.   Yes.

03:07  21        Q.   And you call that Textron's baseline profit

03:07  22   split rate, right?

03:07  23        A.   Yes.

03:07  24        Q.   Okay.  Now, that 25 percent baseline number

03:07  25   that you used, I think you said it's something Bell

03:07  1    uses in the standard normal course of business?

03:07  2        A.    Yes.  It was used in the standard normal

03:08  3    course of business.

03:08  4        Q.    But never for a patent license, right, sir?

03:08  5        A.    I don't know that in particular.

03:08  6        Q.    You don't?

03:08  7        A.    No.

03:08  8        Q.    Does it surprise you to learn here right now

03:08  9    that Bell has never used the 25 percent baseline profit

03:08  10   split for a patent license?

03:08  11       A.    No.

03:08  12       Q.    And, in fact, you're not aware of a single

03:08  13   executed Bell Textron patent license that has had a

03:08  14   25 percent value, right?

03:08  15       A.    I'm not aware that I've seen that.

03:08  16       Q.    You would also agree, sir, that you aren't

03:08  17   using -- even setting aside that Bell doesn't use it

03:08  18   for patents, the way you're using it here is not the

03:08  19   way Bell even uses it for the other situations, right?

03:08  20       A.    I'm not sure I understand the question.

03:08  21       Q.    Well, you just applied it 25 percent, right?

03:08  22       A.    I'm not sure I understand that question

03:08  23   either.  Can you tell me what you're asking me?

03:08  24       Q.    Did you make any adjustments to that

03:09  25   25 percent?

                                                                      1086

03:09   1        A.    I looked at the Georgia-Pacific factors.

03:09   2        Q.    Yes or no, sir?

03:09   3        A.    The answer's no.  I beg your pardon.

03:09   4        Q.    You didn't adjust it up or down, right?

03:09   5        A.    It wasn't necessary.

03:09   6        Q.    Well, every time Bell uses it in all the

03:09   7   documents you showed, they did a lot of analysis

03:09   8   adjusting it up or down, right?

03:09   9        A.    That's not correct.

03:09   10        Q.    You showed the jury three different examples,

03:09   11   maybe four, I can't remember.  How many?

03:09   12        A.    I showed them three, and I identified I

03:09   13   reviewed 61.

03:09   14        Q.    Okay.  But the three that you showed to the

03:09   15   jury, there were adjustments being made to that

03:09   16   25 percent, right?

03:09   17        A.    Yes.  I'd be happy to explain, if you'd like.

03:09   18        Q.    Well, let's look at one and we'll talk about

03:09   19   it.

03:09   20        A.    Sure.

03:09   21        Q.    All right.

03:09   22              MR. PANKRATZ:  Mr. Patterson, if you

03:09   23   could bring up DTX-199, please.

03:09   24              And go to -- there we go.  I think this

03:10   25   is the right -- no.  Maybe this is the right page here.

| | | |
|---|---|---|
| 03:10 | 1 | Baseline profit.  There we go.  That's -- |
| 03:10 | 2 | see.  You read my mind.  Thank you, sir. |
| 03:10 | 3 | BY MR. PANKRATZ: |
| 03:10 | 4 | Q.    So we're looking at DTX-199.  We've zoomed in |
| 03:10 | 5 | on the analysis here where at the top there is a |
| 03:10 | 6 | baseline profit split rate of 25 percent. |
| 03:10 | 7 | Do you see that, sir? |
| 03:10 | 8 | A.    Yes. |
| 03:10 | 9 | Q.    And then below it, in this Excel spreadsheet, |
| 03:10 | 10 | there is a series of adjustment factors, right? |
| 03:10 | 11 | A.    Yes. |
| 03:10 | 12 | Q.    And after those five different adjustment |
| 03:10 | 13 | factors are put in place, there is a risk-adjusted |
| 03:10 | 14 | profit split rate of 45 percent. |
| 03:10 | 15 | Do you see that? |
| 03:10 | 16 | A.    Yes. |
| 03:10 | 17 | Q.    You did not analyze any adjustment factors for |
| 03:10 | 18 | this particular analysis that you performed, right, |
| 03:11 | 19 | sir? |
| 03:11 | 20 | A.    That's incorrect. |
| 03:11 | 21 | Q.    They weren't in your report. |
| 03:11 | 22 | A.    I think that's incorrect. |
| 03:11 | 23 | Q.    Okay.  Well, I certainly didn't tell you -- |
| 03:11 | 24 | hear you tell the jury that they needed to adjust that |
| 03:11 | 25 | 25 percent, did you? |

1088

03:11  1           You didn't tell them that?

03:11  2      A.   I believe that's also incorrect.

03:11  3      Q.   One of the adjustment factors in Textron's own

03:11  4  documents, again, this is not for patent licenses but

03:11  5  for some licensing, one of the adjustment factors is

03:11  6  political risks, right?

03:11  7      A.   Yes.

03:11  8      Q.   And down there it talks about:  Political risk

03:11  9  is risk of program modification, cancellation...

03:11  10          Do you see that?

03:11  11     A.   Yes.

03:11  12     Q.   You would agree that there are risks to Bell

03:11  13  if it were to make a deal with DJI, right?

03:11  14     A.   You'd have to be more explicit.  I'm not sure

03:11  15  what you're asking me.

03:11  16     Q.   Bell's biggest customer is the United States

03:12  17  government.

03:12  18          Did you hear that?

03:12  19     A.   Yes.  I did.

03:12  20     Q.   And the U.S. government has identified DJI as

03:12  21  a Chinese military company operating in the United

03:12  22  States, correct?

03:12  23     A.   I believe I've heard evidence of that.  Yes.

03:12  24     Q.   It would be risky for Bell to do a deal with a

03:12  25  company that the U.S. government has specifically said

03:12   1   not to do business with, wouldn't it?

03:12   2       A.   I can't tell you from a specific standpoint

03:12   3   what that relationship is, but I -- I mean, it could.

03:12   4   Might not be.  It could be.

03:12   5           But again, I think there's a lot of -- I mean,

03:12   6   at the same time, DJI disputes it.  So I'm trying to

03:12   7   value the technology.

03:12   8       Q.   Well, you're the one who suggested that we

03:12   9   should look to this baseline profit split methodology,

03:12  10   right?

03:12  11       A.   Yes.  Absolutely.

03:12  12       Q.   Which is adjusted based on risk according to

03:13  13   Bell's analysis, right?

03:13  14       A.   Yes.

03:13  15       Q.   And you did not -- well, let me back up and

03:13  16   ask a different question.

03:13  17           You agree, sir, that the fact that it would be

03:13  18   risky for Bell to do business with a company that its

03:13  19   biggest customer has identified as a risk, that alone

03:13  20   would be a reason for Bell to demand a higher royalty

03:13  21   rate, wouldn't it?

03:13  22       A.   It could.  Again, it all depends on a lot of

03:13  23   different factors.  And I think it's unclear to me as

03:13  24   to what actually would happen there.

03:13  25       Q.   Okay.  But you just used 25 percent, right?

1090

03:13  1    The baseline?

03:13  2        A.    That's incorrect.

03:13  3        Q.    You're saying that your numbers were not

03:13  4    calculated using the 25 percent number?

03:13  5        A.    I used the 25 percent number, and then I

03:13  6    looked at the Georgia-Pacific factors and I outlined

03:13  7    those at the beginning of my presentation.  And I said,

03:13  8    collectively, they would have a downward impact.

03:13  9            And so I looked at those Georgia-Pacific

03:14  10   factors and identified, based upon that 25 percent

03:14  11   starting point, the Georgia-Pacific factors would have

03:14  12   a downward impact.

03:14  13       Q.    Okay.  I'll try and ask it again.

03:14  14            You started at 25 percent, fair?

03:14  15       A.    Yes.

03:14  16       Q.    You ended at 25 percent, fair?

03:14  17       A.    That is correct.

03:14  18       Q.    The third way you suggested that Mr. Andrien's

03:14  19   numbers get chopped down is based on the average sales

03:14  20   price of drones, right?

03:14  21       A.    Yes.

03:14  22       Q.    And you said you intentionally looked for the

03:14  23   cheapest drone you could find with the feature, right?

03:14  24       A.    I looked for the lowest cost drone with the

03:14  25   feature.

```
03:14   1        Q.    Lowest cost is another way of saying the
03:14   2   cheapest one?
03:14   3        A.    You can call it whatever you like, sir.
03:14   4        Q.    Would you agree that the lowest cost drone is
03:14   5   the cheapest one?
03:14   6        A.    I don't think any of them are cheap, and I
03:14   7   think cheap has a different connotation.  I beg your
03:14   8   pardon.
03:14   9        Q.    All right.  Is a --
03:14  10        A.    I think most people, when they buy these
03:15  11   drones, they're spending quite a bit of money to have
03:15  12   one.  So I don't think any of them are cheap.
03:15  13        Q.    Is $86 a cheap drone, in your view?
03:15  14        A.    I would say it's the lowest cost drone.
03:15  15        Q.    Okay.  That is the price of the drone that you
03:15  16   picked as the one to use your -- do your calculations
03:15  17   for the '752 patent though, right?
03:15  18        A.    That is correct.  That is -- that is correct.
03:15  19              MR. PANKRATZ:  Mr. Patterson, could you
03:15  20   bring up -- I believe it's Slide 50 from Mr. Andrien's
03:15  21   slide deck.  See if we get the right -- there.  Thank
03:15  22   you.  Perfect.
       23   BY MR. PANKRATZ:
03:15  24        Q.    Now, you understand that Mr. Andrien looked at
03:15  25   a set of drones based on surveys, right?
```

1092

03:15  1      A.    Yes.

03:15  2      Q.    And this slide was where he was explaining to

03:15  3  the jury that these are the surveyed drones and their

03:16  4  costs, right?

03:16  5      A.    Well, I would say it's a price.

03:16  6      Q.    All right.  We'll call it price.

03:16  7      A.    Well, that would be accurate so let's do that.

03:16  8      Q.    Okay.  None of the drones that were surveyed

03:16  9  cost $86, right?

03:16  10     A.    Not on this page, no.

03:16  11     Q.    So when Mr. Andrien was trying to figure out

03:16  12 the value based on surveys of features on drones, he

03:16  13 actually used the drones that were being surveyed,

03:16  14 right?

03:16  15     A.    I believe those are the ones that he

03:16  16 handpicked.

03:16  17     Q.    Well, you -- I didn't hear you say he

03:16  18 handpicked the wrong ones.

03:16  19     A.    Those are the ones that he handpicked for his

03:16  20 analysis.  I can't tell you they're the wrong ones.

03:16  21 Those are just the ones that he picked, but there could

03:16  22 have been others.

03:16  23     Q.    Do you think maybe he picked those because

03:16  24 those are the drones that DJI picked to survey?

03:17  25     A.    It's possible.  You'd have to ask Mr. Andrien.

03:17  1      Q.    Well, I think I recall him saying that that's

03:17  2  why he chose those because DJI chose to survey them.

03:17  3      A.    Okay.

03:17  4      Q.    Wouldn't that be a fair reason to choose those

03:17  5  drones to look at?

03:17  6      A.    Not necessarily.  Not in my opinion.

03:17  7      Q.    And I said -- I heard you talking about how

03:17  8  there were more features on higher-priced drones,

03:17  9  right?

03:17  10     A.    Yes.

03:17  11     Q.    Is that an every time, all the time, there's

03:17  12 always more features if you pay more money?

03:17  13     A.    It depends.  I would say if you're paying more

03:17  14 money, you might get a larger drone.  There could be

03:17  15 more material that's involved.  So it doesn't have to

03:17  16 hold every time.  But in general, if you buy a

03:17  17 higher-priced drone, it's got more quality to it, I

03:17  18 would think.  It's got more features.  It's got more

03:17  19 size.

03:17  20     Q.    Okay.

03:17  21           MR. PANKRATZ:  You can take that one

03:17  22 down.

03:17  23 BY MR. PANKRATZ:

03:18  24     Q.    You do agree, though, sir, that the surveys

03:18  25 Mr. Andrien used were for specific drones with a

03:18   1    specific set of features, right?

03:18   2        A.    That's what he said.

03:18   3        Q.    Did you look at those surveys?

03:18   4        A.    Yes.

03:18   5        Q.    You would agree that those surveys were for

03:18   6    specific drones and the features on those drones,

03:18   7    right?

03:18   8        A.    Yes.

03:18   9        Q.    But you would not agree -- let me rephrase it.

03:18   10           You think it's wrong to look at the price of

03:18   11   the drones that were actually surveyed, right?

03:18   12       A.    No.  I think that -- well, I disagree with

03:18   13   you.  I want to make sure that I stick to the Q&A that

03:18   14   you have.

03:18   15       Q.    Thanks.

03:18   16           You think that a better data point is to look

03:18   17   at a drone that wasn't surveyed, right?

03:18   18       A.    Well, that wasn't my rationale for selecting

03:19   19   that.  So I would disagree with that.

03:19   20       Q.    Okay.  But you did select a drone that wasn't

03:19   21   surveyed, right?

03:19   22       A.    But not for that purpose.  But yes.

03:19   23       Q.    Well, you chose it because it got a real low

03:19   24   number.  Isn't that why you chose it?

03:19   25       A.    No.

03:19  1      Q.    You would agree, though, sir, if you had

03:19  2   calculated a rate using the surveyed drones, you would

03:19  3   have gotten a higher number?

03:19  4      A.    I think the answer is yes.  And I'd be happy

03:19  5   to explain why.

03:19  6      Q.    Well, I think we know why.  They're more

03:19  7   expensive, right?

03:19  8      A.    If you'd allow me to elaborate, I'd be happy

03:19  9   to explain why.

03:19  10      Q.    Well, I may ask you some more questions about

03:19  11   that, but before I do, I'd like to talk to you about

03:19  12   insurance.

03:19  13            We all know what insurance is, right?

03:19  14      A.    Yes.

03:19  15      Q.    And it's an important thing.  It's kind of a

03:19  16   safety net for us, right?

03:20  17      A.    It's good to have insurance when you need

03:20  18   insurance.

03:20  19      Q.    Yeah.  If you wreck your car, you better have

03:20  20   insurance because it's -- the law says so, right?

03:20  21      A.    That's one reason, yes.

03:20  22      Q.    You would agree that hover hold is a safety

03:20  23   feature, right?

03:20  24      A.    Could be.

03:20  25      Q.    In fact, multiple folks have sat in that chair

—1096—

03:20  1    and said exactly that, right?

03:20  2        A.    Could be.  Yes.  I'm not a drone expert, but

03:20  3    yes, it could be.

03:20  4        Q.    Helps protect against crashing your drone?

03:20  5        A.    I believe I've heard testimony one way or the

03:20  6    other on that.  I don't recall specifically.

03:20  7        Q.    You would agree, sir, that customers would be

03:20  8    willing to pay more to protect a $12,000 drone compared

03:20  9    to an $86 one, right?

03:20  10       A.    In general, I would say that's accurate.

03:20  11       Q.    Let's talk about those noninfringing

03:20  12   alternatives again.

03:20  13       A.    Okay.

03:20  14       Q.    All right.  We're done with the income

03:21  15   approach and now we're to what you call the cost

03:21  16   approach, right?

03:21  17       A.    I think that's correct.

03:21  18       Q.    And you testified about what you say it would

03:21  19   have cost for DJI to implement noninfringing

03:21  20   alternatives, right?

03:21  21       A.    I've -- well, I would disagree with that.

03:21  22       Q.    Okay.

03:21  23       A.    And I'd be happy to explain why.

03:21  24       Q.    Well, let's see if we can get there.  I think

03:21  25   you explained that a noninfringing alternative is

—1097—

03:21  1    effectively just an alternative that DJI could switch

03:21  2    to or design into that would avoid infringing the

03:21  3    patent; is that fair?

03:21  4         A.    No.  I believe that's unfair.

03:21  5         Q.    That's unfair?  Okay.  It's not just -- a

03:21  6    noninfringing alternative is not just a design-around?

03:21  7         A.    I would disagree with that.

03:21  8         Q.    It's something that has to be available and

03:21  9    acceptable to the customers, right?

03:21  10        A.    Available and acceptable to customers, which

03:21  11   is something I evaluated.

03:21  12        Q.    But you don't know whether it would be

03:22  13   available and acceptable, any of these noninfringing

03:22  14   alternatives, do you?

03:22  15        A.    I disagree with that.  I'd be happy to

03:22  16   explain.

03:22  17        Q.    Well, you relied on DJI to tell you that,

03:22  18   right?

03:22  19        A.    I would disagree with that.  I'd be happy to

03:22  20   explain.

03:22  21             THE COURT:  You don't need to keep saying

03:22  22   you'd be happy to explain.  Just answer his questions,

03:22  23   okay?

03:22  24             THE WITNESS:  Okay.  Certainly.

03:22  25   BY MR. PANKRATZ:

—1098—

03:22  1      Q.    Well, you would agree with me that DJI claims

03:22  2  it had available noninfringing alternatives, right?

03:22  3      A.    Yes.

03:22  4      Q.    DJI is claiming it could avoid infringement by

03:22  5  switching out the infringing features, right?

03:22  6      A.    Well, I guess that's not my -- that's not my

03:22  7  understanding of what they're saying.

03:22  8      Q.    Were you here for Dr. Nourbakhsh's testimony?

03:22  9      A.    I was, yes.

03:22  10     Q.    Where he said that DJI could have just avoided

03:23  11 this whole mess by switching to one of those

03:23  12 alternatives?

03:23  13     A.    Yes.

03:23  14               MR. PANKRATZ:  For the '909 patent, if we

03:23  15 could bring up -- let's look at this.  If we could

03:23  16 bring up DDX -- this is Mr. Schoettelkotte's slides at

03:23  17 Slide 33.  You can see it in black and white.

       18 BY MR. PANKRATZ:

03:23  19     Q.    All right.  This is your Slide 33, correct,

03:23  20 sir?

03:23  21     A.    Yes.

03:23  22     Q.    You said, if we look at that top row, that the

03:23  23 cost for a noninfringing alternative for the '909

03:23  24 patent would have been $9,297, right?

03:23  25     A.    Yes.

03:23  1     Q.    Less -- just a little bit shy of 10,000?

03:23  2     A.    Yes.

03:23  3     Q.    So for just a little bit less than $10,000, as

03:24  4  Dr. Nourbakhsh said, DJI could have avoided this whole

03:24  5  mess, right?

03:24  6     A.    I don't recall what he specifically said, but

03:24  7  I understand that for that number, 9,297, that would

03:24  8  have provided them with a design-around.

03:24  9     Q.    And for the '752 patent, because there's three

03:24  10  UAV series, it's three times 9,000-ish, which comes in

03:24  11  at just shy of $30,000, right?

03:24  12    A.    Yes.

03:24  13    Q.    And, again, DJI could have avoided the whole

03:24  14  mess on the '752 by just spending $30,000 to put in

03:24  15  these supposed alternatives, right?

03:24  16    A.    It's my under -- well, I don't know if I would

03:24  17  agree with that based on the way you phrased it.

03:24  18    Q.    Well, for a total of less than $40,000,

03:24  19  according to your and Dr. Nourbakhsh's logic, DJI could

03:24  20  have avoided this whole trial, right?

03:24  21    A.    I think that they could have designed around,

03:25  22  as we talked about.  I haven't really thought about the

03:25  23  trial, but if you're throwing that in, I would say,

03:25  24  yeah.  If there was no infringement and there was no

03:25  25  accusation of that, there wouldn't be a trial.

1100

03:25  1       Q.    And I think that's probably "the whole mess"

03:25  2   that Dr. Nourbakhsh was referring to?

03:25  3       A.    I don't know.

03:25  4       Q.    By avoiding this trial, DJI could have avoided

03:25  5   the risk of having to pay $367 million in damages,

03:25  6   right?

03:25  7       A.    I would say if you're -- if you're referring

03:25  8   to the damages position of Mr. Andrien?

03:25  9       Q.    Yes.

03:25  10      A.    I would say that that's one thing one would

03:25  11  consider if you had -- if you believe that to be an

03:25  12  accurate presentation.

03:25  13      Q.    Okay.  DJI did not implement any of the

03:26  14  noninfringing alternatives that Dr. Nourbakhsh

03:26  15  discussed into any of these accused products, right?

03:26  16      A.    I'm not aware they did.

03:26  17      Q.    DJI chose not to do that, right?

03:26  18      A.    I can't speak on what they chose to do.

03:26  19      Q.    Well, they chose to keep using the accused

03:26  20  technology, right?

03:26  21      A.    I can't speak to that.

03:26  22      Q.    Isn't that why we're here?

03:26  23      A.    Like I said, I can't speak to what they chose

03:26  24  to do.

03:26  25      Q.    Sir, your billing rate is -- that your company

-1101-

03:26  1    bills you out at is $650 per hour, right?

03:26  2        A.    That's correct.

03:26  3        Q.    And how many folks have you had helping you on

03:26  4    this case?

03:26  5        A.    Two.

03:26  6        Q.    Two?

03:26  7              Collectively, over the past few weeks,

03:26  8    roughly, how much is your invoice going to look like?

03:26  9        A.    I'm not sure I could tell you.  I've worked

03:26  10   quite a bit on this case over the last few weeks, but I

03:26  11   don't have a sense of that.

03:26  12       Q.    Probably more than $40,000, right?

03:26  13       A.    I would say it's probably more than that.

03:26  14   Again, I don't know the sense of it.

03:26  15       Q.    And over the course of this entire case, do

03:27  16   you have a rough estimate of what the total invoices

03:27  17   from your company that are going to be paid by DJI look

03:27  18   like?

03:27  19       A.    I don't.  I don't.  We've worked very hard on

03:27  20   the project, but I don't have a sense of that.

03:27  21       Q.    You heard Dr. Nourbakhsh alone has been paid

03:27  22   somewhere around half a million dollars just for this

03:27  23   case, right?

03:27  24       A.    I think I heard something along those lines.

03:27  25   Yes.

1102

03:27  1      Q.   At the high end, it was more; maybe it was a

03:27  2   little less?

03:27  3      A.   Again, I heard some numbers thrown around.  I

03:27  4   don't recall what they were specifically.

03:27  5      Q.   Do you think DJI has paid your company more or

03:27  6   less than half a million dollars for all the time y'all

03:27  7   have spent on this?

03:27  8      A.   I think it would be less.

03:27  9      Q.   It would be less?

03:27  10      So somewhere shy of a million dollars just to

03:27  11   the experts is what DJI has already paid in this case?

03:27  12      A.   I don't know what the numbers would be.  I

03:27  13   would say that my firm bills for my time.  I can't tell

03:27  14   you what it is.  It's not something that I track.

03:27  15      Q.   And the million dollars in experts doesn't

03:28  16   count how much DJI has paid the lawyers, right?

03:28  17      A.   Yeah.  I wouldn't have any way of knowing

03:28  18   that.  I'm not billed with the lawyers.

03:28  19      Q.   All right.  Or the risks of a potential

03:28  20   damages verdict, right?  That -- if you add that in,

03:28  21   there's even more potential money at stake, right?

03:28  22      A.   Well, I think there's risks on both sides

03:28  23   because there's accusations on both sides.  And I don't

03:28  24   know what the lawyers think when they evaluate those

03:28  25   things.

                                                           —1103—

03:28   1        Q.   But rather than just spending $40,000 to avoid

03:28   2    this whole mess, DJI decided to spend all that money

03:28   3    instead, right?

03:28   4        A.   Well, I would disagree with what I think

03:28   5    you're suggesting.

03:28   6                  MR. PANKRATZ:  I pass the witness.

03:28   7                  MS. KESTLE:  No further questions,

03:28   8    Your Honor.

03:28   9                  THE COURT:  Very good.  You may step

03:28   10   down.

03:28   11                 THE WITNESS:  Thank you, sir.

03:28   12                 THE COURT:  And if I could have one

03:29   13   counsel up here from each side, please.

03:29   14                 (Bench conference.)

03:29   15                 THE COURT:  About how long is your --

03:29   16                 MR. PANKRATZ:  I'm going to make you a

03:29   17   happy man and tell you that, based on the state of the

03:29   18   evidence and the record, we don't need a rebuttal case.

03:29   19                 THE COURT:  Oh, okay.  Then we'll take

03:29   20   our afternoon break.  We'll take up willfulness.  I'll

03:29   21   decide that.

03:29   22                 When we finish and decide that, we may or

03:29   23   may not need to fix the charge.  Either way, I'm going

03:29   24   to get that resolved.  I'll bring them in, I'll charge

03:29   25   them, and we'll be done for the afternoon.

—1104—

03:29  1             MR. SCHROEDER:  Two questions.  We can do

03:29  2  the whole 50(a) at that time --

03:29  3             THE COURT:  Yes.  I'm sorry.  I meant to

03:29  4  complete that too.

03:29  5             MR. SCHROEDER:  The second issue,

03:29  6  Your Honor, is we had some exhibits that were admitted

03:29  7  during, I think, the public record, and we wanted to

03:29  8  move them onto the sealed record.

03:29  9             Do we do that in front of the presence of

03:30  10  the jury or can --

03:30  11             THE COURT:  No.  I don't think you

03:30  12  need -- I don't think you need to do that in front of

03:30  13  the jury.

03:30  14             MR. SCHROEDER:  Okay.  So we can just

03:30  15  sort that out.

03:30  16             THE COURT:  Yeah.  Just sort that out.

03:30  17             MR. SCHROEDER:  Okay.  All right.

03:30  18             THE COURT:  Anything else?

03:30  19             MR. PANKRATZ:  No.

03:30  20             THE COURT:  Can I tell them that both

03:30  21  sides have rested?

03:30  22             MR. SCHROEDER:  Yes.

       23             MR. PANKRATZ:  Yes.

03:30  24             THE COURT:  Okay.  Thank you.

03:30  25             (Bench conference concludes.)

03:30    1            THE COURT:  Ladies and gentlemen of the

03:30    2    jury, I know you are anxious to take a break, but I'm

03:30    3    going to hold you one second longer to give you the

03:30    4    good news that we're done with the trial, and so both

03:30    5    sides have rested.

03:30    6            In a few minutes I'm going to have to do

03:30    7    the thing I hate the most, which is read to you for

03:30    8    about an hour the jury charge, and we have a -- we're

03:30    9    going to need just a few minutes to make sure we've got

03:30    10    it right.

03:30    11            You all take your break.  As soon as --

03:30    12    it won't take that long, but as soon as we're done with

03:30    13    that, we'll come back in.  I will read this to you.  It

03:30    14    takes about an hour.  When we finish, you'll be going

03:31    15    home.  Tomorrow morning at 9:00, you'll come back, the

03:31    16    lawyers will do their closing arguments, and you'll

03:31    17    begin your deliberations.  And you'll do those as long

03:31    18    as you need.

03:31    19            So that's the plan for the rest of the

03:31    20    afternoon.

03:31    21            THE BAILIFF:  All rise.

03:31    22            (Jury exited the courtroom.)

03:31    23            THE COURT:  You may be seated.

03:31    24            Why don't we split up -- why don't we go

03:31    25    first with the plaintiff and any motions you want to

—1106—

03:31   1   make.  And then when I get to defendant, I'd like to

03:31   2   split up all the motions -- the motions you want to

03:31   3   make with everything, other than with respect to

03:31   4   willfulness, and then I'll take up willfulness

03:31   5   separately.

03:31   6              And also, if -- setting aside for a

03:32   7   second the willfulness issue, which is a substantive

03:32   8   issue, does the plaintiff have any objections they'd

03:32   9   like to put on the record with respect to the charge?

03:32  10              MR. HAWES:  No, Your Honor.  The

03:32  11   plaintiff does not.

03:32  12              THE COURT:  And does the defendant have

03:32  13   any objections they'd like to make, setting aside

03:32  14   anything that deals with willfulness?

03:32  15              MR. PALMER:  One minute, Your Honor.

03:32  16              THE COURT:  Of course.

03:32  17              While y'all are searching, why doesn't

03:32  18   the plaintiff make their motions for directed verdict?

03:32  19              MR. HAWES:  Yes, Your Honor.  This is

03:32  20   Michael Hawes.

03:32  21              So, Your Honor, we're going to be making

03:32  22   motions with regard to validity and infringement.  I'd

03:32  23   like to start with the '752 obviousness case that you

03:32  24   heard this morning.

03:32  25              As we heard the expert admit, this was

—1107—

03:32  1    not an anticipation argument.  The only argument for

03:33  2    invalidity of the '752 asserted claim is under

03:33  3    obviousness.

03:33  4              And with regard to the automatic

03:33  5    engagement requirement, we have no testimony going to

03:33  6    any analysis or evidentiary support for modifying the

03:33  7    reference, the Gold reference, to have that requirement

03:33  8    or testimony and evidence as required to have that

03:33  9    requirement and to analyze whether that had a

03:33  10   reasonable expectation of success at the time.

03:33  11             Once you move from anticipation to

03:33  12   obviousness, those are blackletter law requirements for

03:33  13   an obviousness case, and we just -- we just didn't hear

03:33  14   them this morning.

03:33  15             And so, you know, plaintiff requests that

03:33  16   the Court enter judgment that there's no invalidity

03:33  17   with regard to the '752 patent, Claim 13.

03:33  18             And that's our first one.  You want me to

03:33  19   just keep going?

03:33  20             All right.

03:33  21             With regard to invalidity under the '909,

03:34  22   we believe that the -- we should also have a judgment

03:34  23   as a matter of law under Rule 50(a), specifically a

03:34  24   reasonable jury could not adopt DJI's sole invalidity

03:34  25   argument under Frink, which is the only reference that

—1108—

03:34  1    we had, because the calculating a calculated velocity

03:34  2    requirement was not adequately identified with respect

03:34  3    to a person of ordinary skill in the art, clear and

03:34  4    convincing evidence that a person of ordinary skill in

03:34  5    the art would have understood that requirement was

03:34  6    disclosed in Frink or that Frink could be modified to

03:34  7    include that requirement.

03:34  8               And because of that, we believe judgment

03:34  9    as a matter of law should be granted.

03:34  10              Moving to infringement.

03:34  11              With regard to the '909 patent, the

03:34  12   testimony of the defendants' expert was based on

03:34  13   language that's not in the asserted claims.

03:34  14              So, for example, the expert continued to

03:34  15   refer to how movement data was missing.  Movement data

03:35  16   is not found -- it's not a term in the actual asserted

03:35  17   claims.  And the law is clear that testimony based on

03:35  18   language missing from the claims is not substantial

03:35  19   evidence.

03:35  20              He also relied on additional features in

03:35  21   the sense of saying that because the accused products

03:35  22   controlled position, that that negated infringement.

03:35  23   But that's contrary to the law that having an

03:35  24   additional feature does not negate infringement.

03:35  25              You -- that doesn't establish an absence.

03:35  1   You could have both controlling the position as well as

03:35  2   the claimed velocity requirements.

03:35  3            And to the extent that the expert merely

03:35  4   crossed out portions of the claim language with regard

03:35  5   to that testimony, that's merely conclusory, which the

03:35  6   Court has found is not substantial evidence.

03:35  7            Finally, Your Honor, on the '752 patent,

03:35  8   Dr. Nourbakhsh first argued that Claim 13's preamble

03:36  9   requires controllers that must be on board; however,

03:36  10  the claim language does not say whether the aircraft

03:36  11  has remote controllers or onboard controllers.

03:36  12           The infringement allegation here is one

03:36  13  of sale.  There is no evidence that those controllers

03:36  14  are not provided as part of the sale.  And the claim

03:36  15  itself does not require them to be on board or remote.

03:36  16  It allows any controller.  And so because on board is

03:36  17  not a term of the claim, that is not substantial

03:36  18  evidence.

03:36  19           Again, Dr. Nourbakhsh showed an

03:36  20  additional feature, that if you push the -- in the

03:36  21  courtroom he had it come up.  And if you push away the

03:36  22  drone, he said, well, in that situation, you know, the

03:36  23  drone's trying to come back.

03:36  24           And, you know, the law is clear that, you

03:36  25  know, one method of operation, especially an operation

| | | |
|---|---|---|
| 03:36 | 1 | in a limited scenario that's contrary to the user |
| 03:36 | 2 | instructions, is not substantial evidence of |
| 03:36 | 3 | noninfringement because the fact that the drone might |
| 03:37 | 4 | sometimes operate in a different matter, doesn't show |
| 03:37 | 5 | noninfringement with regard to the common operation. |
| 03:37 | 6 | That's indicated in their documents and |
| 03:37 | 7 | was indicated in the testimony of plaintiff's expert. |
| 03:37 | 8 | So to the extent the, you know, their |
| 03:37 | 9 | expert crossed out -- again, just crossed out language |
| 03:37 | 10 | on the slide, that's conclusory without actual evidence |
| 03:37 | 11 | to back it up. |
| 03:37 | 12 | So for all those reasons, DJI moves for |
| 03:37 | 13 | judgment of infringement with regard to the asserted |
| 03:37 | 14 | claims of the '909 patent and the '752 patent. |
| 03:37 | 15 | THE COURT:  Thank you.  Those are |
| 03:37 | 16 | overruled. |
| 03:37 | 17 | Now, back to defendant.  Are there any |
| 03:37 | 18 | objections you want to make to the jury charge? |
| 03:37 | 19 | MR. SCHROEDER:  Yes, Your Honor. |
| 03:37 | 20 | With respect to jury instruction in B.22 |
| 03:37 | 21 | regarding the missing source code, the defendants |
| 03:37 | 22 | object to the inclusion of this instruction in its |
| 03:37 | 23 | entirety.  The Chinese government precluded defendants |
| 03:37 | 24 | from exporting certain source code, and the entry of |
| 03:37 | 25 | such an instruction is a harsh penalty for defendants |

—1111—

03:37 1  being so precluded.

03:37 2          More importantly, however, as the

03:38 3  evidence adduced at trial illustrates, this source code

03:38 4  was not necessary for either party to offer their

03:38 5  opinions regarding infringement, and the entry of such

03:38 6  an instruction is unfairly prejudicial.

03:38 7          With respect to the instruction in B.37,

03:38 8  doubts resolved against the infringer, defendants

03:38 9  object to the inclusion of this instruction in its

03:38 10 entirety.

03:38 11         Textron contends that this instruction is

03:38 12 warranted because defendants failed to produce sales

03:38 13 information on an entity-by-entity or sales channel

03:38 14 basis.  Textron never sought this information on an

03:38 15 entity-by-entity or sales channel basis during

03:38 16 discovery.  And any theories for which any such

03:38 17 financial information may have been relevant were not

03:38 18 introduced by Textron until its opposition to

03:38 19 defendants' motion for partial summary judgment.

03:38 20         Defendants have not failed to produce

03:38 21 necessary financial information to justify the

03:38 22 inclusion of such an instruction.

03:38 23         And as to the verdict form, defendants

03:38 24 object to Question No. 1.  Magistrate Judge Gilliland

03:39 25 rejected Textron's attempts to introduce a

03:39  1    piercing-the-corporate-veil theory and treat defendants

03:39  2    as a single entity, yet that is precisely what

03:39  3    Question 1 of the verdict form does.

03:39  4              Textron presented different theories for

03:39  5    direct infringement based on the DJI entity.  Question

03:39  6    No. 1 fails to give the jury the opportunity to

03:39  7    appropriately address each of those distinct theories.

03:39  8              Question No. 1 should ask instead whether

03:39  9    the jury believes Textron has proven, one, that DJI

03:39  10   Europe BV directly infringes; two, that the other named

03:39  11   DJI entities directly infringe or, three, that other

03:39  12   unnamed DJI entities directly infringe.

03:39  13             I believe that's it as to the jury charge

03:39  14   and the verdict form.

03:39  15             THE COURT:  Okay.

03:39  16             Now, if you would like to make your

03:39  17   objections to the non-willfulness issues in the case.

03:39  18             Yes, sir.

03:39  19             MR. JAKES:  Good afternoon, Your Honor.

03:40  20   Mike Jakes for the defendants.

03:40  21             We move for a judgment under Rule 50(a)

03:40  22   on direct infringement, induced infringement,

03:40  23   invalidity and damages, and I will say willfulness.  We

03:40  24   are planning to file a Rule 50(a) motion before the

03:40  25   case is submitted to the jury tomorrow.

1113

| | |
|---|---|
| 03:40 | 1 |

Starting with infringement, the Court should enter judgment that DJI's drones with the Follow Me or ActiveTrack do not infringe Claims 1, 7, 10 and 11 of the '909 patent either literally or under the doctrine of equivalents.

A reasonable jury would not have a legally sufficient basis to find that DJI's drones receive transmitted reference data communicating a position and movement of a reference vehicle, either literally or by equivalency. In the Follow Me mode, DJI's drones only receive position data, not velocity data. And in ActiveTrack, the drones do not receive either position or movement data.

Second, a reasonable jury would not have a legally sufficient basis to find that DJI's drones have a selected velocity relative to the reference vehicle, either literally or by equivalency. DJI's drones with the Follow Me mode or ActiveTrack do not allow for selection of any relative velocity, either literally or equivalently. DJI's drones with Follow Me mode or ActiveTrack follow an object at a fixed distance to the object.

In addition, a reasonable jury would not have a legally sufficient basis to find that DJI's drones have a control system that calculates relative

1114

03:41  1    velocity.  They also do not control the aircraft such

03:41  2    that it attains and maintains the selected relative

03:41  3    velocity.  DJI's drones also do not have a selected

03:41  4    relative position or selected relative velocity which

03:41  5    is selected and input prior to flight.

03:42  6           And a reasonable jury would not have a

03:42  7    legally sufficient basis to find that DJI's drones have

03:42  8    a selected relative velocity preprogrammed into the

03:42  9    control system prior to flight.

03:42  10          So for these reasons, the Court should

03:42  11   enter a judgment that DJI's drones do not infringe the

03:42  12   '909 patent, either literally or under the doctrine of

03:42  13   equivalents.

03:42  14          On the '752 patent, the Court should

03:42  15   enter judgment that DJI's drones do not infringe

03:42  16   Claim 13 of this patent, either literally or under the

03:42  17   doctrine of equivalents.

03:42  18          A reasonable jury would not have a

03:42  19   legally sufficient basis to find that DJI's drones have

03:42  20   the claimed longitudinal, lateral, directional and

03:42  21   vertical controllers, either literally or under the

03:42  22   doctrine of equivalents.  Under the plain meaning of

03:42  23   the claim, the aircraft does not have the claim

03:42  24   controllers.  To the extent they are found anywhere,

03:42  25   they're on the remote.

03:42  1              A reasonable jury would not have a

03:42  2   legally sufficient basis to find that DJI's drones have

03:42  3   the forward speed hold loop or lateral speed hold loop,

03:43  4   either literally or under the doctrine of equivalents.

03:43  5              No reasonable jury could find that

03:43  6   holding a position is the same as holding speed, which

03:43  7   is what is required by the claims.

03:43  8              Also DJI's drones do not automatically

03:43  9   engage either a forward speed hold loop or a lateral

03:43  10  speed hold loop when the corresponding controller is

03:43  11  returned to detent positions and the aircraft

03:43  12  groundspeed is outside a first groundspeed threshold.

03:43  13             In addition, any forward or lateral speed

03:43  14  hold loop does not automatically engage when the

03:43  15  respective controller is released.

03:43  16             A reasonable jury would not have a

03:43  17  legally sufficient basis to find that DJI's drones have

03:43  18  the claimed longitudinal maneuverability or lateral

03:43  19  maneuverability, either literally or under the doctrine

03:43  20  of equivalents.  DJI's drones behave the same way for

03:43  21  longitudinal and lateral flight.  So no reasonable jury

03:43  22  could find that longitudinal and lateral

03:43  23  maneuverability are controlled by different loops.

03:44  24             So for those reasons, the Court should

03:44  25  enter judgment that DJI's drones don't infringe

1116

03:44  1    Claim 13 of the '752 patent.

03:44  2              On direct infringement, aside from sales

03:44  3    in the U.S. made by DJI Europe, a reasonable jury would

03:44  4    not have a legally sufficient basis to find that the

03:44  5    other DJI defendants, that's iFlight, Baiwang and SZ

03:44  6    DJI, have committed an act of direct infringement in

03:44  7    the U.S.  These three DJI defendants do not make, use,

03:44  8    sell or offer to sell drones in the U.S.

03:44  9              Sales in the U.S. are made through other

03:44  10   DJI entities that are not parties to this suit.  That's

03:44  11   DJI Service, DJI Industrial and Saikoron, which are

03:44  12   U.S. entities that Textron did not name in this

03:44  13   lawsuit.

03:44  14             The only evidence shows that defendant,

03:44  15   iFlight, sells the drones to the U.S. entities in

03:44  16   China, not in the U.S.

03:44  17             To the extent that Textron contends that

03:44  18   SZ DJI or the other defendants offer to sell drones in

03:45  19   the U.S. through the dji.com website, a reasonable jury

03:45  20   would not have a legally sufficient basis to find that

03:45  21   any of these entities actually made sales in the U.S.

03:45  22   for the purpose of calculating and awarding damages.

03:45  23             On invalidity, the Court should grant

03:45  24   judgment of invalidity that Claims 1, 7, 10 and 11 of

03:45  25   the '909 patent would have been anticipated or rendered

−1117−

| | | |
|---|---|---|
| 03:45 | 1 | obvious by Frink. |
| 03:45 | 2 | A reasonable jury would not have a |
| 03:45 | 3 | legally sufficient basis to find that the claims were |
| 03:45 | 4 | not anticipated or obvious over the Frink reference. |
| 03:45 | 5 | There's no dispute that Frink is prior art to the '909 |
| 03:45 | 6 | patent and there was clear and convincing evidence that |
| 03:45 | 7 | was unrebutted that Frink discloses each of the |
| 03:45 | 8 | limitations of the claims and that the claims would |
| 03:45 | 9 | have been obvious. |
| 03:45 | 10 | The Court should also grant judgment of |
| 03:45 | 11 | invalidity of the Claim 13 of the '752 patent would |
| 03:45 | 12 | have been obvious over Gold. |
| 03:45 | 13 | A reasonable jury would not have a |
| 03:45 | 14 | legally sufficient basis to find that the claims were |
| 03:46 | 15 | not obvious over the Gold reference. There's no |
| 03:46 | 16 | dispute that Gold is prior art, and there's clear and |
| 03:46 | 17 | convincing evidence that Claim 13 would have been |
| 03:46 | 18 | obvious from the Gold reference. |
| 03:46 | 19 | And finally, DJI moves for judgment as a |
| 03:46 | 20 | matter of law that Textron is not entitled to any |
| 03:46 | 21 | damages because the patents are not infringed or |
| 03:46 | 22 | invalid. |
| 03:46 | 23 | A reasonable jury would not have a |
| 03:46 | 24 | legally sufficient basis to award a lump sum more than |
| 03:46 | 25 | $3.6 million. That's 1.5 million for the '909 patent |

—1118—

03:46  1   and 2.1 million for the '752 patent, considering the

03:46  2   cost of the design-arounds and the available

03:46  3   alternatives.

03:46  4        Textron's damages theories are based on

03:46  5   an improper use of the Book of Wisdom and labeling DJI

03:46  6   as a Chinese military company, which was also improper.

03:46  7        In addition, as I mentioned before in

03:46  8   connection with direct infringement, to the extent

03:46  9   Textron contends that SZ DJI or the other defendants

03:47  10  directly infringe by offering to sell drones in the

03:47  11  U.S. through the dji.com website, Textron has not shown

03:47  12  any actual sales by those entities for computing

03:47  13  damages or the amount of those allegedly infringing

03:47  14  sales.

03:47  15        Your Honor, that leaves willfulness and

03:47  16  indirect infringement, which is -- raises a similar

03:47  17  issue, and I'm happy to address willful infringement.

03:47  18        THE COURT:  I'm going to ask the

03:47  19  plaintiffs to argue first on willful and put on

03:47  20  whatever evidence they think they have.

03:47  21        MR. JAKES:  I don't want to leave out

03:47  22  indirect infringement, because I think that goes with

03:47  23  it.

03:47  24        THE COURT:  I understand.  And I won't

03:47  25  forget.  I just -- I want to hear from plaintiff as to

—1119—

03:47    1    what evidence they think should go to the jury.

03:47    2             MR. SIEGMUND:  May I approach,

       3    Your Honor?

       4             THE COURT:  Uh-huh.

03:48    5             MR. SIEGMUND:  Mark Siegmund on behalf of

03:48    6    the plaintiff.

03:48    7             To kind of set the stage, Judge, in order

03:48    8    to prevail on our claim of willfulness, we just have to

03:48    9    show by a preponderance of the evidence that DJI knew

03:48   10    of the patents, which is undisputed in this case, and

03:48   11    engaged in deliberate or intentional infringement.

03:48   12    Like I said, knowledge here is unrebutted.  It's not in

03:48   13    dispute.  So we're only talking about deliberate

03:48   14    infringement evidence here.

03:48   15            And what I have in all those slides,

03:48   16    Your Honor, is all of DJI's engineers were not provided

03:48   17    with the patent.  They didn't take the time to read it,

03:48   18    and all of them confirmed that they would do nothing

03:48   19    differently, despite knowing of Textron's infringement

03:48   20    contentions and what we alleged infringed their

03:48   21    products.  And that's pretty much quintessential

03:48   22    evidence of infringement that should be decided by the

03:48   23    jury.

03:48   24            So what I'd like to do, Your Honor, is in

03:48   25    the jury instructions that you are about to give the

—1120—

```
03:48   1    jury here, there's four factors underneath the
03:48   2    willfulness instruction that was agreed by the parties.
03:48   3    So I'd like to walk the Court through evidence under
03:48   4    each of those factors.
03:48   5                    So starting with Factor 1, which is
03:49   6    whether or not DJI acted consistently with standards of
03:49   7    behavior for its industry.
03:49   8                    So if we could go to Slide 1, please,
03:49   9    Mr. Patterson.
03:49   10                   And DJI --
03:49   11                   THE COURT:  I can -- you can just read
03:49   12   the four standards into the record.
03:49   13                   MR. SIEGMUND:  Okay.  Great, Your Honor.
03:49   14   So I read the first factor.
03:49   15                   The second and third factors are whether
03:49   16   or not DJI reasonably believed it did not infringe or
03:49   17   that the patent was invalid and whether or not DJI made
03:49   18   a good-faith effort to avoid infringing the '909 and
03:49   19   '752 patents, in other words, design around it.
03:49   20                   And so starting with the first factor, we
03:49   21   have evidence of the letter that I --
03:49   22                   THE COURT:  I'm good.  What's the next
03:49   23   factor?
03:49   24                   MR. SIEGMUND:  Okay.  So Factors 2 and 3,
03:49   25   if we go to Slide 5.
```

03:49  1              And this is where we'll get into the

03:49  2    various engineers and employees of DJI discussing their

03:49  3    knowledge of the patents and how they would not change

03:49  4    anything whatsoever despite knowing of the allegations.

03:49  5              So on Slide 5, you can see what

03:49  6    Mr. Zhang, DJI's engineer, said.

03:50  7              Did you review any of Textron's patents

        8    asserted in this case?

03:50  9              He said no.  The patents were never

03:50 10    provided to him.

03:50 11              If we could go to Slide 7.  This one

03:50 12    provides, I think, a pretty clear example of what I'm

03:50 13    talking about.

03:50 14              This is Mr. --

03:50 15              THE COURT:  I'm good.  What's the final

03:50 16    one?

03:50 17              MR. SIEGMUND:  And the fourth factor,

03:50 18    Your Honor, is whether DJI attempted to cover up any of

03:50 19    their evidence of infringement, which we would argue a

03:50 20    reasonable jury could believe that based on the

03:50 21    evidence that we adduced concerning the source code

03:50 22    dispute that Your Honor said was relevant, Judge

03:50 23    Gilliland said was relevant and our experts said were

03:50 24    relevant.

03:50 25              THE COURT:  Well, I don't think that I --

—1122—

03:50  1    at least from my perspective, that I hold the defendant

03:50  2    liable for that.  So -- but I don't know that I need

03:50  3    to.

03:50  4                    Okay.  Let me hear a response from

03:50  5    defendant.

03:50  6                    MR. JAKES:  Thank you, Your Honor.

03:50  7                    We do move for a judgment as a matter of

03:51  8    law under Rule 50, that there's no willful infringement

03:51  9    or induced infringement.

03:51  10                    Judge Gilliland in his report and

03:51  11   recommendation, he granted our motion for a partial

03:51  12   summary judgment, that DJI did not willfully infringe

03:51  13   before the complaint was filed or induce infringement.

03:51  14                    And in granting that motion, he said:

03:51  15   There's adequate evidence that the defendants knew of

03:51  16   the patents, but there's insufficient evidence that

03:51  17   defendants knew they infringe.

03:51  18                    And that's exactly why willful

03:51  19   infringement after the complaint should also be

03:51  20   granted.

03:51  21                    THE COURT:  Let me ask you this:  Here's

03:51  22   the problem I have, and I had at the last trial.

03:51  23   Mr. Siegmund was on the other side at the other table

03:51  24   in the last one.

03:51  25                    At this stage, where it's not a summary

—1123—

03:51  1   judgment stage, it's a -- in my opinion, it's a, was

03:51  2   there evidence that was put on -- any evidence that was

03:51  3   put on --

03:51  4                   MR. JAKES:  Yes.

03:51  5                   THE COURT:  -- disputed or not.

03:51  6                   And if there is evidence, then it goes to

03:52  7   the jury, and I can deal with it afterwards.

03:52  8                   And so what do -- if that's the standard,

03:52  9   what do I do here?

03:52  10                  MR. JAKES:  You should grant the judgment

03:52  11  under Rule 50(a) because there is no evidence.  A

03:52  12  reasonable jury here couldn't find willful infringement

03:52  13  because the evidence showed there were multiple -- now,

03:52  14  we're talking just after the complaint was filed.

03:52  15  There are multiple reasons why DJI believed its drones

03:52  16  didn't infringe or the claims were invalid, and they

03:52  17  were abundantly presented to the jury.

03:52  18                  We have -- Textron introduced PTX-106.

03:52  19  That was the application to export code.  And in that

03:52  20  document, DJI warranted its technology did not infringe

03:52  21  any other intellectual property rights.

03:52  22                  And so there's no evidence of any

03:52  23  behavior by DJI of copying, no evidence that they knew

03:53  24  their positions were unreasonable.

03:53  25                  The only thing that Textron has really

—1124—

03:53  1   pointed to is statements by the engineers that they

03:53  2   didn't review the patents.  But without something that

03:53  3   says that they had an obligation to, after the

03:53  4   complaint was filed, and form a belief as to

03:53  5   infringement or invalidity, then that shouldn't be

03:53  6   enough either.

03:53  7          So we're left really with no evidence on

03:53  8   willful infringement.  And I'd say it's the same for

03:53  9   induced infringement, and that's why we move under

03:53  10  Rule 50(a) on induced infringement as well.

03:53  11         Because even though there was knowledge

03:53  12  of the patents, there's insufficient evidence that the

03:53  13  defendants knew that they infringed.  They didn't

03:53  14  induce infringement because you have to intend to

03:53  15  encourage another's infringement.  And that is a very

03:53  16  similar standard to willful infringement, and there's

03:53  17  no evidence of that intent either.

03:53  18         What we have, instead, is after the

03:53  19  complaint was filed, evidence that shows the claims

03:54  20  were not infringed or are invalid.  And there's nothing

03:54  21  to negate that or that there was a reasonable belief by

03:54  22  DJI that those positions were not reasonable.

03:54  23         THE COURT:  Let me hear a response from

03:54  24  plaintiff just with regard to the induced infringement.

03:54  25         MR. SIEGMUND:  Yes, Your Honor.  I

03:54  1    actually have a case right on point, if I could pass it

03:54  2    up to you.

03:54  3                    THE COURT:  Sure.

03:54  4                    MR. SIEGMUND:  It'll be under Subpart 3,

03:54  5    Your Honor.

03:54  6                    THE COURT:  And this is --

03:54  7                    MR. SIEGMUND:  And it actually goes to

03:54  8    our question on the last trial of whether or not if

03:54  9    you -- even if you aren't inclined to find enhancement,

03:54  10   should the question be submitted to the jury, and the

03:54  11   Federal Circuit said yes.  Absolutely.  The willfulness

03:54  12   question should be submitted to the jury.

03:54  13                    But the facts of this case and the case

03:54  14   that I handed you are strikingly similar.  We have in

03:54  15   that case, which for the record is the Ironburg

03:55  16   Inventions Limited versus Valve Corporation case.  They

03:55  17   had notice of the patent, a failure to communicate the

03:55  18   patent to designers and the failure to attempt to

03:55  19   design around.

03:55  20                    And that's exactly the same evidence that

03:55  21   we have in this case, Your Honor.  We have --

03:55  22   undisputed, they had knowledge of the patent.  You saw

03:55  23   testimony in the 13 or 14 slides that I gave you that

03:55  24   the design was not -- there's a failure to communicate

03:55  25   the patents to the designers, and they didn't do

03:55  1    anything about it.

03:55  2                    And that's the exact same case in -- in

03:55  3    the -- and the Valve case match up almost identically

03:55  4    to here.

03:55  5                    And the Federal Circuit said that a

03:55  6    denial of a JMOL in that case was exactly the

03:55  7    appropriate situation, and it should have went to the

03:55  8    jury.

03:55  9                    And so our argument would be:  It's the

03:55  10   same case.  It applies here.  This issue should be

03:55  11   decided by the jury.

03:55  12                   And then I think Your Honor already knows

03:55  13   this, but a finding of induced infringement does not

03:55  14   compel a finding of willfulness.  That's from the SRI

03:55  15   case.  Induced infringement is a lower standard than

03:56  16   willfulness.

03:56  17                   And we have unrebutted testimony from

03:56  18   Dr. Michalson where he displayed the slide on induced

03:56  19   infringement.  I do not even think there was any cross

03:56  20   that was elicited from that whatsoever.  So there is

03:56  21   actual evidence in the record.

03:56  22                   Unless Your Honor has any questions, I

03:56  23   can -- happy to circle back.  Okay.

03:56  24                   THE COURT:  I'm good.

03:56  25                   Any response to the -- this Ironburg

03:56  1    Inventions versus Valve case?

03:56  2                 MR. JAKES:  Your Honor, we're talking

03:56  3    about post-complaint activity.  And certainly in this

03:56  4    case everything the jury has heard, they would be --

03:56  5    they should conclude that DJI's positions were

03:56  6    reasonable.

03:56  7                 It's Textron's burden here.  And focusing

03:56  8    on the Chinese engineers, there are language issues

03:56  9    here.  And the idea that they -- the burden was on them

03:56  10   to somehow come up with noninfringement or

03:56  11   design-arounds after the suit was filed, that's not

03:57  12   what the law requires.

03:57  13                 THE COURT:  Yeah.  Mr. Siegmund, does it

03:57  14   matter -- with regard to the holding in Ironburg

03:57  15   Inventions, does it -- and let me say this also:  Was

03:57  16   this case presented to Judge Gilliland?

03:57  17                 MR. SIEGMUND:  No, Your Honor.  That case

03:57  18   is extremely recent.  I think it was, my gosh, maybe

03:57  19   two, three weeks --

03:57  20                 THE COURT:  Two weeks ago.

03:57  21                 MR. SIEGMUND:  Two weeks ago.  So it was

03:57  22   very recently.  I don't believe he had that case,

03:57  23   Your Honor.

03:57  24                 THE COURT:  Yeah.

03:57  25                 MR. SIEGMUND:  And then also DJI put on

-1128-

03:57  1   no evidence --

03:57  2              THE COURT:  Okay.  I'm going to deny the

03:57  3   motion for directed verdict.

03:57  4              So I think that means that the jury

03:57  5   charge is --

03:57  6              MR. MEEK:  Your Honor, did we get a

7   ruling on --

8              THE COURT:  Directed verdict, and

9   indirect as well.

10              MR. MEEK:  (Inaudible.)

11              THE REPORTER:  Counsel, I can't hear you.

03:58  12              THE COURT:  I thought I said I denied the

03:58  13   ones earlier.  If I didn't, all the motions -- let me

03:58  14   do it this way.

03:58  15              Every motion I just heard, I'm denying.

03:58  16              MR. SIEGMUND:  Got it.

03:58  17              THE COURT:  So the record's clear.

03:58  18              Now, does that mean that the version

03:58  19   subject -- I understand the objections that were made.

03:58  20              Does that mean that the charge is ready

03:58  21   to go?

03:58  22              MR. SIEGMUND:  It does, Your Honor.  We

03:58  23   were -- agreed on the willfulness instruction.

03:58  24              THE COURT:  Okay.  Do we have a copy of

03:58  25   the charge?

| | | |
|---|---|---|
| 03:58 | 1 | And we're making copies -- can we go make |
| 03:58 | 2 | copies? |
| 03:58 | 3 | Okay.  We will go make copies.  As soon |
| 03:58 | 4 | as they're ready, I'll let you know.  We'll bring the |
| 03:58 | 5 | jury out, I'll read it to the jury, and we'll be done |
| 03:58 | 6 | for the day. |
| 04:20 | 7 | (Recess taken.) |
| 04:24 | 8 | THE BAILIFF:  All rise. |
| 04:24 | 9 | THE COURT:  Please remain standing for |
| 04:24 | 10 | the jury. |
| 04:25 | 11 | (Jury entered the courtroom.) |
| 04:25 | 12 | THE COURT:  Thank you.  You may be |
| 04:25 | 13 | seated. |
| 04:25 | 14 | Ladies and gentlemen, I'm about to read |
| 04:25 | 15 | to you the instructions of the law.  You are free to |
| 04:25 | 16 | listen.  You're free -- you have to listen, but you are |
| 04:25 | 17 | free to listen and read along, just listen.  You're |
| 04:25 | 18 | free to do whatever you want, but whatever's the most |
| 04:25 | 19 | effective way for you to -- it's relatively long.  So |
| 04:25 | 20 | whatever's the most efficient and effective way for you |
| 04:25 | 21 | to pay attention to what I'm saying.  So... |
| 04:25 | 22 | Members of the jury, it is my duty and |
| 04:25 | 23 | responsibility to instruct you on the law that you must |
| 04:26 | 24 | apply in this case.  The law contained in these |
| 04:26 | 25 | instructions is the only law that you may follow. |

1130

04:26  1          It is your duty to follow what I instruct

04:26  2   you the law is regardless of any opinion that you might

04:26  3   have as to what the law ought to be.

04:26  4          Each of you is going to have your own

04:26  5   printed copy -- you do have your own printed copy of

04:26  6   these final jury instructions.  So there's no need for

04:26  7   you to take notes unless you want to.

04:26  8          If I have given you the impression during

04:26  9   the trial that I favor either party, you must disregard

04:26  10  that impression.  If I have given you an impression in

04:26  11  the trial that I have any opinion about anything in

04:26  12  this case, the facts or whatever, you must disregard

04:26  13  that impression.

04:26  14          You are the sole judges of the facts in

04:26  15  this case.  Other than these instructions to you on the

04:26  16  law, you must disregard anything I may have said or

04:26  17  done during the trial when you are arriving at your

04:26  18  verdict.

04:26  19          You should consider all the instructions

04:26  20  about the law as a whole and regard each instruction in

04:27  21  light of the others, without isolating a particular

04:27  22  statement or paragraph.

04:27  23          The testimony of the witnesses and other

04:27  24  exhibits introduced by the parties constitute the

04:27  25  evidence.  The statements of counsel are not evidence.

04:27    1    They are only argument.

04:27    2              It is important for you to distinguish

04:27    3    between the arguments of counsel and the evidence on

04:27    4    which those arguments rest.  What the lawyers say or do

04:27    5    is not evidence.

04:27    6              You may, however, consider their

04:27    7    arguments in light of the evidence that's been admitted

04:27    8    and determine whether the evidence admitted in this

04:27    9    trial supports those arguments.

04:27   10              You must determine the facts from all the

04:27   11    testimony that you have heard and the evidence

04:27   12    submitted.  You are the judges of the facts, but in

04:27   13    finding those facts, you must apply the law as I

04:27   14    instruct you.

04:27   15              You are required by law to decide the

04:27   16    case in a fair, impartial and unbiased manner based

04:27   17    entirely on the law and the evidence presented to you

04:27   18    within the courtroom.  You may not be influenced by

04:27   19    passion or prejudice or sympathy that you might have

04:28   20    for either party in arriving at your verdict.

04:28   21              As you -- after the remainder of these

04:28   22    instructions, tomorrow morning at 9:00 we will resume

04:28   23    and you will hear closing arguments from the attorneys.

04:28   24              The statements and arguments of the

04:28   25    attorneys, I remind you again, are not evidence.  They

04:28  1  are not instructions on the law.  They're intended only

04:28  2  to assist you, the jury, in understanding the evidence

04:28  3  and the parties' contentions.

04:28  4            A verdict form has been prepared for you.

04:28  5  You will receive the verdict form in the jury room.

04:28  6  And once you have reached a unanimous decision or

04:28  7  agreement with respect to the verdict, you will have

04:28  8  your foreperson fill in the blanks on the verdict form.

04:28  9  He or she will date it and sign it.

04:28  10            Answer each question in the verdict form

04:28  11  from the facts as you find them to be.  Do not decide

04:28  12  who you think should win and then answer the questions

04:28  13  to reach that result.  Your answers and your verdict

04:29  14  must be unanimous.

04:29  15            The evidence you are to consider consists

04:29  16  of the testimony of the witnesses here at trial or in

04:29  17  the form of deposition that were presented to you, the

04:29  18  documents and the exhibits that I admitted into

04:29  19  evidence and any facts the lawyers agree to or

04:29  20  stipulated to.  You are to apply any fair inference and

04:29  21  reasonable conclusions you draw from the facts and

04:29  22  circumstances that you believe have been proven.

04:29  23  Nothing else is evidence.

04:29  24            As a reminder, here are some examples of

04:29  25  what is not evidence.  The fact that Textron

—1133—

04:29  1   Innovations filed the lawsuit is not evidence that it

04:29  2   is entitled to a judgment in this case.  The fact of

04:29  3   making a claim in a lawsuit by itself does not in any

04:29  4   way tend to establish the claim and is not evidence.

04:29  5           Likewise, the fact that DJI has raised

04:29  6   arguments against the claims asserted is not evidence

04:29  7   that it is entitled to a judgment in its favor.  The

04:29  8   act of making defensive arguments by themselves do not

04:30  9   in any way tend to establish such arguments have merit.

04:30  10  They are not evidence.

04:30  11          Statements, arguments and questions by

04:30  12  the attorneys are not evidence.  Objections to

04:30  13  questions are not evidence.  The attorneys that are

04:30  14  seated in front of you objected if they believed that

04:30  15  the documents and evidence that was be -- attempted to

04:30  16  being offered into evidence was improper under the

04:30  17  rules of evidence.

04:30  18          During the trial I may not have let you

04:30  19  hear the answers to some of the questions the lawyers

04:30  20  asked.  I may have ruled that you could not see some of

04:30  21  the exhibits the lawyers wanted you to see.  Further,

04:30  22  sometimes I may have ordered you to disregard things

04:30  23  that you saw or heard or struck things from the record.

04:30  24  You must follow these rulings and completely ignore all

04:30  25  those things.

04:30  1            Do not speculate about what a witness
04:30  2  might have said or what an exhibit might have shown.
04:30  3  These things are not evidence.  You are bound by your
04:30  4  oath to not let them influence your decision in any
04:30  5  way.
04:30  6            Generally speaking, there are two types
04:31  7  of evidence.  One is direct such as the testimony of a
04:31  8  witness.  The other is indirect or circumstantial.
04:31  9  Circumstantial evidence is evidence that proves from a
04:31  10  fact which you can logically conclude another fact
04:31  11  exists.
04:31  12            As a general rule, the law makes no
04:31  13  distinction between direct and circumstantial evidence.
04:31  14  It simply requires that you determine the facts from
04:31  15  all of the evidence that you have heard in the case,
04:31  16  whether direct or circumstantial or some combination.
04:31  17            As I instructed you before the trial
04:31  18  began, in judging the facts you must consider all the
04:31  19  evidence, whether direct or circumstantial.  But that
04:31  20  does not mean that you have to accept or believe all
04:31  21  the evidence.  It is entirely up to you to give the
04:31  22  evidence you received in the case whatever you
04:31  23  believe -- whatever weight you individually believe it
04:31  24  deserves.  And I emphasize individually believe it
04:31  25  deserves.  It'll be up to each of you to decide which

04:31   1   witness to believe or not believe, the weight to give

04:31   2   any testimony you've heard and how much of any witness'

04:32   3   testimony you choose to accept or reject.

04:32   4              You should never be influenced by any

04:32   5   ruling on any -- or any objection that I made.  If I

04:32   6   sustained an objection, pretend the question wasn't

04:32   7   asked.  If there was an answer given, ignore it.  If I

04:32   8   overruled the objection, act like the objection was

04:32   9   never made.

04:32   10             If I gave any limiting instruction at

04:32   11  trial, follow it.  Any testimony I told you to exclude

04:32   12  or disregard is not evidence.  It may not be

04:32   13  considered.

04:32   14             You must not conduct any independent

04:32   15  research or investigation.  You must make your decision

04:32   16  based only on the evidence as I define it here and

04:32   17  nothing more.

04:32   18             Some evidence was admitted for a limited

04:32   19  purpose only.  When I instruct you that an item of

04:32   20  evidence has been admitted for a limited purpose, you

04:32   21  must consider it only for that limited purpose and no

04:32   22  other.

04:32   23             Witnesses.  You alone determine the

04:32   24  credibility or truthfulness of the witnesses.  No

04:32   25  matter what language people speak, they have the right

04:33  1    to have their testimony heard and understood.

04:33  2              You heard a trial in which interpreter --

04:33  3    in which an interpreter translated for one or more of

04:33  4    the participants.  The interpreter was required to

04:33  5    remain neutral.  The interpreter was required to

04:33  6    translate between English and Chinese accurately and

04:33  7    impartially to the best of his or her skill and

04:33  8    judgment.

04:33  9              It is now up to you to evaluate the

04:33  10   interpreted testimony as you would weigh any other

04:33  11   testimony.  You must not give it -- interpreted

04:33  12   testimony any greater weight or lesser weight than you

04:33  13   would if the witness had spoken in English.

04:33  14             Keep in mind a person might speak some

04:33  15   English without speaking it fluently.  The person has

04:33  16   the right to the services of an interpreter, therefore,

04:33  17   you should not give greater or lesser weight to a

04:33  18   person's translated testimony based on any conclusion

04:33  19   regarding the extent to which that person speaks

04:33  20   English.

04:33  21             In weighing the testimony of a witness,

04:33  22   you may consider their manner and demeanor on the

04:33  23   witness stand, any feeling or interest they have in the

04:34  24   case, any prejudice or bias about the case and the

04:34  25   consistency or inconsistency of the witness' testimony

04:34  1    considered in the light of all circumstances.

04:34  2                    Has the witness been contradicted by

04:34  3    other credible evidence?  Has the witness made

04:34  4    statements at other times that are contrary to those

04:34  5    made here on the witness stand?  You must give the

04:34  6    testimony of each witness the credibility you believe

04:34  7    it deserves.

04:34  8                    Even though a witness may be a party to

04:34  9    the action and, therefore, interested in the outcome,

04:34  10   you may accept the testimony if it is not contradicted

04:34  11   by direct evidence or by any inference that may be

04:34  12   drawn from the evidence if you believe the testimony.

04:34  13                   You are not to decide the case by

04:34  14   counting the number of witnesses who have testified for

04:34  15   each of the opposing sides.  Witness testimony is

04:34  16   weighed.  Witnesses are not counted.

04:34  17                   The test is not the relative number of

04:34  18   witnesses but the relative convincing force of the

04:34  19   evidence.  The testimony of a single witness is

04:34  20   sufficient to prove any fact even if a greater number

04:34  21   of witnesses testified to the contrary, if after you

04:35  22   have considered all the evidence, you choose to believe

04:35  23   that one single witness.

04:35  24                   Certain testimony was presented to you

04:35  25   through a deposition.  A deposition is a sworn recorded

1138

04:35  1    answer to questions a witness was asked in advance of

04:35  2    this trial.

04:35  3                Under some circumstances, a witness

04:35  4    cannot be present to testify from the witness stand.

04:35  5    That witness' testimony may be presented under oath in

04:35  6    the form of a deposition.  Sometime before this trial,

04:35  7    attorneys representing the parties in the case

04:35  8    questioned those witnesses under oath.  There was a

04:35  9    court reporter present who recorded the testimony.  The

04:35  10   questions and answers have been show to you.

04:35  11               The deposition testimony is entitled to

04:35  12   the same consideration and must be weighed and

04:35  13   otherwise considered by you in the same way as if the

04:35  14   witness had been present and had testified from the

04:35  15   witness stand in court.

04:35  16               In addition, some of the video recordings

04:35  17   of witnesses you see may be of lower quality because

04:35  18   the witnesses had their depositions taken remotely.

04:35  19   You should not hold the quality of the video or the

04:36  20   location of the witness or any other circumstances

04:36  21   arriving -- arising from travel restrictions against

04:36  22   either party.

04:36  23               You heard from experts in this case.

04:36  24   Expert testimony is testimony from a person who has a

04:36  25   special skill or knowledge in some science or

—1139—

04:36  1    profession or business.  This skill or knowledge is not

04:36  2    common to the average person but was acquired by the

04:36  3    expert through extra special study or experience.

04:36  4              In weighing expert testimony, you may

04:36  5    consider the expert's qualifications, the reasons for

04:36  6    his opinions, the reliability of the information

04:36  7    supporting those opinions, as well as all the factors

04:36  8    I've already previously mentioned for weighing the

04:36  9    testimony of any fact witness.  Expert testimony should

04:36  10   receive whatever weight and credit you think is

04:36  11   appropriate given all the other evidence in the case.

04:36  12             You're not required to accept the opinion

04:36  13   of the expert.  Rather, you are free to accept it or

04:36  14   reject it just as with all other witnesses.

04:36  15             The fact a person has brought a lawsuit

04:36  16   and is in court seeking damages creates no inference

04:37  17   that that person is entitled to a judgment.  Anyone can

04:37  18   make a claim and anyone can file a lawsuit.  The act of

04:37  19   making a claim in a lawsuit by itself does not tend to

04:37  20   establish the claim -- that claim and is not evidence.

04:37  21             A stipulation is an agreement.  When

04:37  22   there is no dispute about certain facts, the attorneys

04:37  23   may agree or stipulate to those facts.  You must accept

04:37  24   or stipulate -- you must accept a stipulated fact as

04:37  25   evidence and treat that fact as having been proven here

1140

04:37    1    in court.

04:37    2                    When testimony or an exhibit is admitted

04:37    3    for a limited purpose, you may consider that testimony

04:37    4    or exhibit only for the specific limited purpose for

04:37    5    which it was admitted.

04:37    6                    Charts and summaries.  Certain charts and

04:37    7    summaries were shown to you solely to help explain or

04:37    8    summarize facts disclosed by other books, records or

04:37    9    other documents in evidence.  These charts and

04:37    10   summaries are not evidence or proof of any facts unless

04:37    11   I specifically admitted the chart or summary into

04:37    12   evidence.  You must determine the facts exclusively

04:37    13   from the evidence.

04:37    14                   Certain exhibits were shown to you such

04:38    15   as PowerPoint presentations, posters, models or

04:38    16   illustrations.  They are not themselves evidence.  It

04:38    17   is a party's description, picture or model used to

04:38    18   describe something involved in the trial.  If your

04:38    19   recollection of the evidence differs from any exhibit

04:38    20   you saw, rely on your recollection.

04:38    21                   Do not let bias, prejudice or sympathy

04:38    22   play any part in your deliberations.  Whether you're

04:38    23   familiar with one party or the other should not play

04:38    24   any part in your deliberations.  A corporation and all

04:38    25   persons are equal before the law.  They must be treated

1141

04:38   1   equally in a court of justice.

04:38   2              In any legal action facts must be proven

04:38   3   by a required amount of evidence known as a burden of

04:38   4   proof.  This is a civil case.  Textron Innovations has

04:38   5   the burden of proving patent infringement, willfulness

04:38   6   and damages by the standard of proof of a preponderance

04:38   7   of the evidence.

04:38   8              A preponderance of the evidence means

04:38   9   evidence that persuades you that a claim is more

04:38  10   probably true than not.  Sometimes this is talked about

04:39  11   as being greater -- the greater weight and degree of

04:39  12   credible testimony.

04:39  13              DJI does not have any burden of proof on

04:39  14   the issues of patent infringement, willfulness and

04:39  15   damages.

04:39  16              We'll do a different standard which is

04:39  17   clear and convincing.  The defendant, DJI, has the

04:39  18   burden of proving their patent invalidity case by clear

04:39  19   and convincing evidence.

04:39  20              Clear and convincing evidence is evidence

04:39  21   that produces, in your mind, a firm belief or

04:39  22   conviction as to the truth of the matter sought to be

04:39  23   established.  It is so clear, direct, weighty and

04:39  24   convincing as to enable you to come to a clear

04:39  25   conviction without hesitancy.

1142

04:39  1        This standard is different from a

04:39  2   preponderance of the evidence standard which applies to

04:39  3   the plaintiff's burden of proving infringement.

04:39  4        These standards of -- are different from

04:39  5   what you've heard about in criminal proceedings where

04:39  6   facts must be proven beyond a reasonable doubt, the

04:39  7   highest level we have.

04:39  8        On a scale of the various standards of

04:40  9   proof, as you move first from the preponderance of the

04:40  10  evidence, where proof need only be sufficient to tip

04:40  11  the scales in favor of a party proving the fact, to the

04:40  12  other end which is beyond a reasonable doubt, where the

04:40  13  fact must be proven to a very high degree of certainty,

04:40  14  you can think of clear and convincing evidence, that

04:40  15  standard, as being between the two ends of the spectrum

04:40  16  or the two different standards.

04:40  17        Textron Innovations does not have any

04:40  18  burden of proof on the issue of patent validity or

04:40  19  prior art.

04:40  20        As I did at the start of the case, I will

04:40  21  now give you a summary of each side's contentions in

04:40  22  the case.  I'll provide you with detailed instructions

04:40  23  on what each side must prove to win on each of its

04:40  24  contentions.

04:40  25        Textron Innovations seeks money damages

04:40   1    from DJI for allegedly infringing the '909 and '752

04:40   2    patents by making, importing, using, selling and

04:40   3    offering for sale products that Textron Innovations

04:40   4    argues are covered by Claims 1, 7, 10 and 11 of the

04:41   5    '909 patent and Claim 13 of the '752 patent.

04:41   6              The parties and I have sometimes referred

04:41   7    to these claims collectively as the "asserted claims."

04:41   8    Textron Innovations also argues that DJI has actively

04:41   9    induced infringement of the asserted claims by others.

04:41   10            The features that are alleged to infringe

04:41   11    are as follows: 1, Follow Me; 2, ActiveTrack 1.0, 2.0,

04:41   12    3.0, 4.0 and 5.0; and, 3, hovering.

04:41   13            The defendant denies that it infringed

04:41   14    the asserted claims and argues that, in addition, the

04:41   15    asserted claims against it are invalid.

04:41   16            Your job is to decide whether DJI has

04:41   17    infringed the asserted claims and whether any of those

04:41   18    claims are invalid.

04:41   19            If you decide that any of the asserted

04:41   20    claims has been infringed and also is not invalid, then

04:41   21    you'll need to decide any money damages to be awarded

04:41   22    to Textron Innovations to compensate it for that

04:42   23    infringement.

04:42   24            You will also need to make a finding as

04:42   25    to whether the infringement was willful. If you decide

04:42   1   any infringement was willful, the decision should not

04:42   2   affect any damages award you make.  I will do the job

04:42   3   of taking willfulness into account later.

04:42   4           Before you can decide many of the issues

04:42   5   in this case, you'll need to understand the role of

04:42   6   patent claims.

04:42   7           The patent claims are the numbered

04:42   8   sentences at the end of each patent.  The claims are

04:42   9   important because it is the words of the claim that

04:42   10  define what a patent covers.

04:42   11          The figures and texts in the rest of the

04:42   12  patent provide a description and are examples of the

04:42   13  invention and provide a context for the claims, but it

04:42   14  is the claims that define the breadth of the patent's

04:42   15  coverage; therefore, what a patent covers depends, in

04:42   16  turn, on what each of its claims covers.

04:42   17          To know what a claim covers, a claim sets

04:42   18  forth in words a set of requirements.  Each claim sets

04:42   19  forth its requirements in a single sentence.  The

04:42   20  coverage of a patent is assessed claim by claim.

04:43   21          When a product or a method meets all the

04:43   22  requirements of a claim, the claim is said to cover

04:43   23  that product or method and that product or method is

04:43   24  said to fall within the scope of that claim; in other

04:43   25  words, a claim covers a product or method where each of

04:43    1    the claim elements or limitations is present in the

04:43    2    product or method.

04:43    3              You will need to understand what each

04:43    4    claim covers in order to decide whether or not there's

04:43    5    infringement of the claim and decide whether or not the

04:43    6    claim is invalid.  The first step is to understand the

04:43    7    meaning of the words used in the patent claim.

04:43    8              The law says that it is my role to define

04:43    9    the terms of the claim; it is your role to apply my

04:43    10   definitions of the terms I've construed to the issues

04:43    11   that you are asked to decide in the case.

04:43    12              Therefore, as I explained to you at the

04:43    13   start of the case, I've determined the meaning of

04:43    14   certain claim terms.  I've provided you my definitions

04:43    15   of certain claim terms.

04:43    16              "Selected velocity and/or position,"

04:43    17   plain and ordinary meaning;

04:43    18              "A flight control system for a rotary

04:43    19   aircraft, the rotary aircraft having a longitudinal

04:44    20   controller, a lateral controller, a directional

04:44    21   controller and a vertical controller, the control

04:44    22   system comprising," preamble is limiting with plain and

04:44    23   ordinary meaning;

04:44    24              "Detent position," plain and ordinary

04:44    25   meaning;

04:44 1        "Forward speed holding" -- "forward speed

04:44 2   hold loop... wherein the forward speed hold loop

04:44 3   automatically engages when the longitudinal controller

04:44 4   is returned to a detent position and the aircraft

04:44 5   groundspeed is outside a first groundspeed threshold,"

04:44 6   plain and ordinary meaning;

04:44 7        "Wherein the lateral speed hold loop

04:44 8   automatically engages when the lateral controller is

04:44 9   returned to a detent position and the aircraft's

04:44 10  groundspeed is outside the first groundspeed threshold;

04:44 11  and wherein lateral maneuverability of the rotary

04:44 12  aircraft is controlled by the lateral speed hold loop

04:44 13  when the lateral controller is out of the detent

04:44 14  position," plain and ordinary meaning;

04:44 15       "Flight in the first groundspeed

04:44 16  threshold," plain and ordinary meaning.

04:44 17       You must accept my definitions to these

04:44 18  words in the claim as being as -- in the claims as

04:45 19  being correct.

04:45 20       It is your job to take the definitions

04:45 21  and apply them to the issues you're deciding, including

04:45 22  the issues of infringement and validity.

04:45 23       The beginning portion, which is known as

04:45 24  the preamble of a claim, often uses the word

04:45 25  "comprising." The word "comprising," when used in the

04:45  1   preamble, means "including but not limited to" or

04:45  2   "containing but not limited to."

04:45  3            When "comprising" is used in the

04:45  4   preamble, if you decide that an accused product

04:45  5   includes all the requirements of that claim, the claim

04:45  6   is infringed.  This is true even if the accused product

04:45  7   contains additional elements.

04:45  8            For any words in the claim for which I

04:45  9   have not provided you with the definition, you should

04:45 10   apply the ordinary meaning of those terms in the field

11   of rotorcraft flight.

04:45 12            You should not take my definition of the

04:45 13   language of the claims as an indication that I have any

04:45 14   view regarding how you decide the issues that you as

04:45 15   the judges are asked to decide, such as infringement or

04:46 16   invalidity.  Those are up to you.

04:46 17            This case includes two types of patent

04:46 18   claims; independent and dependent.

04:46 19            An independent claim sets forth all the

04:46 20   requirements that must be met in order to be covered by

04:46 21   the claim.  It is not necessary to look at any other

04:46 22   claim to determine what an independent claim covers.

04:46 23            The following asserted claims are

04:46 24   independent:  Claims 1 and 7 of the '909 patent;

04:46 25   Claim 13 of the '752 patent.

04:46 1                The remainder of the asserted claims are

04:46 2     dependent claims.  A dependent claim does not itself

04:46 3     recite all the requirements of the claim but refers to

04:46 4     another claim for at least some of its requirements.

04:46 5     In this way, the claim depends from another claim.

04:46 6                A dependent claim incorporates all the

04:46 7     requirements of the claim to which it refers.  The

04:46 8     dependent claim then adds its own additional

04:46 9     requirements.

04:46 10               To determine what a dependent claim

04:46 11    covers, it is necessary to look at both the dependent

04:46 12    claim and any other claims to which it refers.

04:46 13               A product that meets all the requirements

04:47 14    of both the dependent claim and the claims to which it

04:47 15    refers is covered by the dependent claim.

04:47 16               Allow me to instruct you on how to decide

04:47 17    whether or not the plaintiff has proven that defendant

04:47 18    DJI has infringed either or both of the '909 and '752

04:47 19    patents.

04:47 20               Infringement is assessed on a

04:47 21    claim-by-claim basis, therefore, there may be

04:47 22    infringement as to one claim but not as to another.

04:47 23               In this case, there are two possible ways

04:47 24    a claim could be infringed.  The first is called direct

04:47 25    infringement, and the second is active inducement.

1149

04:47  1    Active inducement is referred to as indirect
04:47  2    infringement.
04:47  3         There cannot be indirect infringement
04:47  4    without someone else engaging in direct infringement.
04:47  5    In this case, plaintiff has alleged that defendant has
04:47  6    directly infringed the '909 and '752 patents.
04:47  7         In addition, plaintiff has alleged that
04:47  8    others directly infringed the '909 and '752 patent and
04:48  9    that the defendant is liable for actively inducing that
04:48  10   direct infringement by the others.
04:48  11        To prove infringement, plaintiff must
04:48  12   prove that the requirements for one or more of these
04:48  13   types of infringement are met by a preponderance of the
04:48  14   evidence, that is, that it's more likely than not that
04:48  15   all the requirements of one or more of each of these
04:48  16   types of infringement have been proven.
04:48  17        Allow me to explain now the types of
04:48  18   infringement in detail.
04:48  19        First is literal infringement.
04:48  20        There are two types of literal
04:48  21   infringement:  First, literal infringement and, two,
04:48  22   infringement under the doctrine of -- let me start
04:48  23   over.  I think I said -- there are two types of direct
04:48  24   infringement.  One is literal, and one is infringement
04:48  25   under the doctrine of equivalents.

1150

04:48  1        Unlike indirect infringement, which you
04:48  2   must hear about in a minute, a party can directly
04:48  3   infringe a patent without knowing of the patent or
04:48  4   without knowing that what the party was doing
04:49  5   constitutes patent infringement.
04:49  6        To prove direct infringement by literal
04:49  7   infringement, plaintiff must prove by a preponderance
04:49  8   of the evidence, more likely than not, that the
04:49  9   defendant made, used, sold, offered for sale within or
04:49  10   imported in the United States a product or method that
04:49  11   meets all the requirements of a claim and did so
04:49  12   without the permission of the plaintiff during the time
04:49  13   the '909 patent and '752 patents were in force.
04:49  14        You must compare the product or method
04:49  15   with each and every one of the requirements of a claim
04:49  16   to determine whether all the requirements of that claim
04:49  17   are met.
04:49  18        Direct infringement of a method claim
04:49  19   occurs when all steps of a claimed method are performed
04:49  20   by a single party.
04:49  21        You must determine separately for each
04:49  22   asserted claim whether or not there is infringement.
04:49  23   For dependent claims, if you find that a claim to which
04:49  24   the dependent claim refers is not infringed, there
04:49  25   cannot be infringement of that dependent claim.

04:49  1              On the other hand, if you find that an

04:50  2    independent claim has been infringed, you must still

04:50  3    decide separately whether the product meets the

04:50  4    additional requirements of any claim that depend from

04:50  5    the independent claim to determine whether those

04:50  6    dependent claims have also been infringed.

04:50  7              A dependent claim includes all the

04:50  8    requirements of any of the claims to which it refers

04:50  9    plus additional requirements of its own.

04:50  10             If a company makes, uses, sells, offers

04:50  11   to sell within or imports in the United States a

04:50  12   product that does not literally meet all the elements

04:50  13   of a claim and thus does not literally infringe that

04:50  14   claim, there can still be direct infringement if that

04:50  15   product satisfies that claim element under the doctrine

04:50  16   of equivalents.

04:50  17             Under the doctrine of equivalents -- or

04:50  18   you may hear it as DOE -- a product infringes a claim

04:50  19   if the accused product contains elements that literally

04:50  20   meet or are equivalent to each and every element of the

04:50  21   claim.  You may find that an element or step is

04:50  22   equivalent to an element of a claim that is not met

04:50  23   literally if a person having ordinary skill in the

04:51  24   field of rotorcraft flight would have considered the

04:51  25   differences between them to be insubstantial, or would

04:51  1   have found that the structure:  (1) performs

04:51  2   substantially the same function and (2) works in

04:51  3   substantially the same way (3) to achieve substantially

04:51  4   the same result as the elements of the claim.

04:51  5           In order to prove infringement by

04:51  6   equivalents plaintiff must prove the equivalency of the

04:51  7   structure to the claim element by a preponderance of

04:51  8   the evidence.  Thus, each element of a claim must be

04:51  9   met by the accused product either literally or under

04:51  10  the doctrine of equivalents for you to find

04:51  11  infringement.

04:51  12          Known interchangeability of the claim

04:51  13  elements and the proposed equivalent is a factor that

04:51  14  can support a finding of infringement under the

04:51  15  doctrine of equivalents.  In order for the structure to

04:51  16  be considered interchangeable, the claim element must

04:51  17  have been known at the time of the alleged infringement

04:51  18  to a person having ordinary skill in the field of

04:51  19  technology of the patent.  Interchangeability at the

04:52  20  present time is not sufficient.

04:52  21          Plaintiff alleges that defendant is

04:52  22  liable for the infringement by actively inducing other

04:52  23  entities to directly infringe the '909 and '752

04:52  24  patents.  As with direct infringement, you must

04:52  25  determine whether there's been active inducement on a

04:52  1    claim-by-claim basis.

04:52  2                Defendant is liable for active inducement

04:52  3    of a claim only if Textron Innovations proves by a

04:52  4    preponderance of the evidence:

04:52  5                (1) the acts that are actually carried

04:52  6    out by the other entity directly infringe that claim;

04:52  7                (2) that DJI took action during the time

04:52  8    the '909 and '752 patents were enforced that was

04:52  9    intended to cause and led to the infringing acts by the

04:52  10   other entity; and,

04:52  11               (3) that DJI was aware of the '909 and

04:52  12   '752 patents and knew that the acts, if taken, would

04:52  13   constitute infringement of the corresponding patent, or

04:52  14   that DJI believed there was a high probability that the

04:52  15   acts by the other entity would infringe the '909 and

04:52  16   '752 patents and DJI took deliberate steps to avoid

04:52  17   learning of that infringement.

04:52  18               If you find that DJI was aware of the

04:53  19   patent but believed that it's -- the acts encouraged

04:53  20   did not infringe the patent, they're not liable for

04:53  21   inducement.

04:53  22               In order to establish active inducement

04:53  23   or infringement, it is not sufficient that another

04:53  24   entity or person itself directly infringes the claim.

04:53  25   Nor is it sufficient that defendant was aware of the

04:53  1    acts by the other entity or person that allegedly

04:53  2    constitute that direct infringement.

04:53  3              Rather, in order to find active

04:53  4    inducement or infringement, you must find either that

04:53  5    defendants specifically intended the other entity or

04:53  6    person to infringe the '909 and '752 patents, or the

04:53  7    defendant believed that there was a high probability

04:53  8    that the other entity or person would infringe the '909

04:53  9    and '752 patents but deliberately avoided learning the

04:53  10   infringing nature of the other entity or person's acts.

04:53  11             The mere fact, if true, that defendant

04:53  12   knew or should have known that there's a substantial

04:53  13   risk that the other entity or person's acts would

04:54  14   infringe the '909 or '752 patents would not be

04:54  15   sufficient to support a finding of active inducement

04:54  16   infringement.

04:54  17             Willful infringement.  In this case

04:54  18   plaintiff argues that defendant willfully infringed the

04:54  19   '909 and '752 patents.  If you have decided that DJI

04:54  20   has infringed, you must go on and address the

04:54  21   additional issue of whether or not it was willful.

04:54  22             Willfulness requires you to determine

04:54  23   whether Textron Innovations proved it is more likely

04:54  24   than not that DJI knew of Textron Innovations' patents

04:54  25   and that the infringement by defendant was intentional.

—1155—

04:54  1    You may not determine that the infringement was willful

04:54  2    just because the defendant was aware of the '909 and

04:54  3    '752 patents and infringed them.  Instead, you must

04:54  4    also find that defendant deliberately infringed the

04:54  5    '909 and '752 patents.

04:54  6              To determine whether the defendant acted

04:55  7    willfully, consider all facts and assess their

04:55  8    knowledge at the time of the challenged conduct.  These

04:55  9    are facts that you should consider -- these are some

04:55  10   facts.  You can consider whatever you care to.

04:55  11             (1) Whether or not DJI acted consistently

04:55  12   with the standard of behavior for its industry;

04:55  13             (2) Whether or not DJI reasonably

04:55  14   believed it did not infringe or that the patent was

04:55  15   invalid;

04:55  16             (3) Whether or not DJI made a good-faith

04:55  17   effort to avoid infringing the '909 and '752 patents.

04:55  18   For example, whether DJI attempted to design around the

04:55  19   '909 and '752 patents; and,

04:55  20             (4) Whether or not DJI tried to cover up

04:55  21   its infringement.

04:55  22             You may not assume that merely because

04:55  23   the defendant did not obtain a legal opinion about

04:55  24   whether it infringed the '909 and '752 patents, that

04:55  25   the opinion would have been unfavorable.  The absence

04:55  1   of legal opinion may not be used by you to find that

04:55  2   defendant acted willfully.  Rather, the issue is

04:55  3   whether, considering all the facts, plaintiff has

04:55  4   established the defendants' conduct was willful.

04:56  5          Because DJI could not produce certain

04:56  6   source code related to certain functions and some

04:56  7   function during discovery, you should presume that the

04:56  8   source code would have been favorable to Textron

04:56  9   Innovations and Textron Innovations' infringement

04:56  10  allegations regarding the '752 patent.

04:56  11         I will now instruct you on the rules you

04:56  12  must follow in deciding whether or not DJI has proven

04:56  13  that the asserted claims of the '909 and '752 patents

04:56  14  are invalid.  To prove that any claim of a patent is

04:56  15  invalid, DJI must persuade you by clear and convincing

04:56  16  evidence.  That is, you must be left with a clear

04:56  17  conviction the claim is invalid.

04:56  18         In order for someone to be entitled to a

04:56  19  patent, the invention must actually be new and not

04:56  20  obvious over what had come before, which is referred to

04:56  21  as the prior art.  Prior art is considered in

04:56  22  determining whether the asserted claims are anticipated

04:56  23  or obvious.

04:56  24         Prior art may include items that are

04:56  25  publicly known or that have been used or offered for

—1157—

04:57   1    sale or references such as publication or patents that

04:57   2    disclose the claimed invention or elements of the

04:57   3    claimed invention.

04:57   4              Defendant contends the following is prior

04:57   5    art to the '909 patent:

04:57   6              United States Patent No. 6,868,314,

04:57   7    referred to as Frink.

04:57   8              Defendant contends the following's prior

04:57   9    art to the '752 patent:

04:57   10             Gold, Phillip J, et al., "The Design and

04:57   11   Pilot Evaluation of the RAH-66 Comanche Selectable

04:57   12   Control Modes."

04:57   13             There is no dispute Gold qualifies as

04:57   14   prior art to the '752 patent.

04:57   15             For purposes of evaluating whether any

04:57   16   dispute or reference or system qualifies as prior art,

04:57   17   the filing dates for the asserted patent are March 25,

04:57   18   2004, and for the '909 -- for the '909 patent, and

04:57   19   July 15, 2011 for the '752 patent.

04:58   20             What is anticipation?  In order for

04:58   21   someone to be entitled to a patent, the invention must

04:58   22   actually be new.  Defendant contends that the asserted

04:58   23   claims of the '909 and '752 patents are invalid because

04:58   24   the claimed inventions are anticipated.  DJI must

04:58   25   convince you of this by clear and convincing evidence

04:58  1   that the evidence highly probably demonstrates that the

04:58  2   claim is -- is or are invalid.

04:58  3          Specifically, defendant contends the

04:58  4   following piece of prior art anticipates the asserted

04:58  5   claims of the '909 patent:  Frink.  Defendant also

04:58  6   contends that the following piece of prior art

04:58  7   anticipates the asserted claim of the '752 patent:

04:58  8   Gold.

04:58  9          Anticipation must be determined on a

04:58  10  claim-by-claim basis.  Defendant must prove by clear

04:58  11  and convincing evidence that all the requirements of a

04:58  12  claim are present in a single piece of prior art.  A

04:58  13  prior art system is considered a single piece of art,

04:58  14  even if multiple documents are used to describe that

04:58  15  system, as it is the system itself that is the prior

04:58  16  art.

04:58  17         However, anticipation does not permit an

04:59  18  additional piece of prior art to supply a missing

04:59  19  limitation.  To anticipate the invention, the prior art

04:59  20  does not have to use the same words as used in the

04:59  21  claims.  But all the requirements of the claim must

04:59  22  have been disclosed and arranged as in the claim.

04:59  23         The claim requirements may either be

04:59  24  disclosed expressly or inherently.  That is necessarily

04:59  25  implied such that the person having ordinary skill in

04:59 1    the art in the technology of the invention, looking at

04:59 2    that one reference, could make and use the claimed

04:59 3    invention.

04:59 4              Where defendant is relying on prior art

04:59 5    that was not considered by the PTO during its

04:59 6    examination, you may consider whether the prior art is

04:59 7    significantly different and more relevant than the

04:59 8    prior art that the plaintiff -- that the PTO did

04:59 9    consider.  If you decide it is different and more

04:59 10   relevant, you may weigh that prior art more heavily

04:59 11   when considering whether the challenger has carried its

04:59 12   clear and convincing burden of proving invalidity.

04:59 13             If a dependent claim is anticipated by

04:59 14   the prior art, then the claims from which it depends

05:00 15   are necessarily anticipated as well.

05:00 16             Obviousness.  Even though an invention

05:00 17   may not have been identically disclosed or described

05:00 18   before it was made by an inventor, in order to be

05:00 19   patentable, the invention must also not have been

05:00 20   obvious to a person of ordinary skill in the field of

05:00 21   rotorcraft flight at the time the invention was made.

05:00 22             Defendant may establish by -- the patent

05:00 23   claim is invalid by proving by clear and convincing

05:00 24   evidence that the claimed invention would have been

05:00 25   obvious to persons having ordinary skill in the art at

1160

05:00  1    the time the invention was made in the field of

05:00  2    rotorcraft flight.

05:00  3                In determining whether a claimed

05:00  4    invention is obvious, you must consider the level of

05:00  5    ordinary skill in the field of rotorcraft flight that

05:00  6    someone would have had at the time the invention was

05:00  7    made, the scope and content of prior art, any

05:00  8    differences between the prior art and the claimed

05:00  9    invention.

05:00  10               Do not use hindsight.  Consider only what

05:01  11   was known at the time of the invention.

05:01  12               Keep in mind that the existence of each

05:01  13   and every element of the claimed invention in the prior

05:01  14   art does not necessarily prove obviousness.  Most, if

05:01  15   not all, inventions rely on building blocks of prior

05:01  16   art.  When considering the different prior art

05:01  17   references, keep in mind that a prior art system is

05:01  18   considered a single piece of art even if multiple

05:01  19   documents are used to describe that system, as it is

05:01  20   the system itself that is the prior art.

05:01  21               In considering whether a claimed

05:01  22   invention is obvious, you should consider whether at

05:01  23   the time of the claimed invention there is a reason

05:01  24   that would have prompted a person having ordinary skill

05:01  25   in the field of the invention to combine the known

1161

05:01  1   elements in the prior art in a way as the claimed

05:01  2   invention does, taking into account such factors as:

05:01  3              (1) Whether the claimed invention was

05:01  4   merely the predictable result of using prior art

05:01  5   elements according to their known functions;

05:01  6              (2) Whether the claimed invention

05:01  7   provides an obvious solution to a known problem in the

05:01  8   relevant field;

05:01  9              (3) Whether the prior art teaches or

05:02  10  suggests the desirability of combining elements claimed

05:02  11  in the invention;

05:02  12             (4) Whether the prior art teaches away

05:02  13  from combining elements of the claimed invention;

05:02  14             (5) Whether it would have been obvious to

05:02  15  try the combinations of elements, such as when there is

05:02  16  a design incentive or market pressure to solve a

05:02  17  problem and there are a finite number of identified,

05:02  18  predictable solutions.

05:02  19             To find it rendered the claimed invention

05:02  20  obvious, you must find that the prior art provided a

05:02  21  reasonable expectation of success.  Obvious to try is

05:02  22  not sufficient in unpredictable technologies.

05:02  23             In determining whether the claimed

05:02  24  invention is obvious, you should take into account any

05:02  25  objective evidence, sometimes called secondary

05:02  1  considerations, that may shed light on whether or not

05:02  2  the claimed invention is obvious, such as:

05:02  3              Whether the claimed invention was

05:02  4  commercially successful as a result of the merits of

05:02  5  the claimed invention (rather than the result of the

05:02  6  design needs or market-pressure advertising or similar

05:02  7  activities);

05:02  8              Whether the claimed invention satisfied a

05:02  9  long-felt need;

05:03  10             Whether others had tried and failed to

05:03  11  make the claimed invention;

05:03  12             Whether others invented the claimed

05:03  13  invention at roughly the same time;

05:03  14             Whether others copied the claimed

05:03  15  invention;

05:03  16             Whether there were damages -- I'm

05:03  17  sorry -- whether there were changes or related

05:03  18  technologies or market needs contemporaneous with the

05:03  19  claimed invention;

05:03  20             Whether the claimed invention achieved

05:03  21  unexpected results;

05:03  22             Whether others in the field praised the

05:03  23  claimed invention;

05:03  24             Whether persons having ordinary skill in

05:03  25  the art of the invention expressed surprise or

05:03  1    disbelief regarding the claimed invention;

05:03  2                    Whether others sought or obtained rights

05:03  3    to the patent from the patentholder; and,

05:03  4                    Whether the inventor proceeded contrary

05:03  5    to accepted wisdom in the field.

05:03  6                    In determining whether the claimed

05:03  7    invention was obvious, consider each claim separately,

05:03  8    but understand that if a dependent claim is obvious,

05:03  9    then the claims from which it depends are necessarily

05:03  10   obvious as well.

05:03  11                   What is it meant by level of ordinary

05:03  12   skill?

05:03  13                   In deciding what the level of ordinary

05:03  14   skill in the field of rotorcraft flight, you should

05:03  15   consider all the evidence introduced at trial,

05:03  16   including but not limited to:

05:03  17                   (1) The levels of education and

05:04  18   experience of the inventor and other persons actively

05:04  19   working in the field;

05:04  20                   (2) The types of problems encountered in

05:04  21   the field;

05:04  22                   (3) Prior art solution to the problems;

05:04  23   and,

05:04  24                   (4) The rapidity with which innovations

05:04  25   are made; and,

1164

05:04   1               (5) The sophistication of the technology.

05:04   2               In considering whether the claimed

05:04   3   invention was obvious, you must first determine the

05:04   4   scope and content of the prior art.

05:04   5               Scope and content of the prior art for

05:04   6   deciding whether the invention was obvious includes at

05:04   7   least prior art in the same field as the claimed

05:04   8   invention.

05:04   9               It also includes prior art from different

05:04   10  fields that a person of ordinary skill in the art would

05:04   11  have considered when trying to solve the problem

05:04   12  addressed by the invention.

05:04   13              Where a defendant is relying on prior art

05:04   14  that was not considered by the PTO during examination,

05:04   15  you may consider whether the prior art is significantly

05:04   16  different and more relevant than the prior art the PTO

05:04   17  did consider.

05:04   18              If you decide it is different and more

05:04   19  relevant, you may weigh that prior art more heavily

05:04   20  when considering whether the challenger has carried its

05:04   21  clear-and-convincing burden of proving invalidity.

05:05   22              If you find that DJI infringed any

05:05   23  claim -- any valid claim of the '909 patent and the

05:05   24  '752 patent, you must then consider what amount of

05:05   25  damages to award to the plaintiff.

05:05  1          I'm going to instruct you now about the

05:05  2   measure of damages.  Let me say this:  By instructing

05:05  3   on damages, I'm not suggesting which party should win

05:05  4   the case on any issue.

05:05  5          If you find that the defendant has not

05:05  6   infringed any valid claim of the patent, then plaintiff

05:05  7   is not entitled to any damages.

05:05  8          The damages you award must be adequate to

05:05  9   compensate Textron Innovations for the infringement if

05:05  10  they prove it.  They are not meant to punish the

05:05  11  defendant.

05:05  12         Your damages award, if you reach that

05:05  13  issue, should not -- should put the plaintiff in

05:05  14  approximately the same financial position you believe

05:05  15  it would have been in had the infringement not

05:05  16  occurred.

05:05  17         Plaintiff has the burden to establish the

05:05  18  amount of damages by a preponderance of the evidence.

05:05  19  You should award only those damages that plaintiff

05:06  20  establishes are more likely than not that it has

05:06  21  suffered.

05:06  22         While plaintiff is not required to prove

05:06  23  the amount of damages with mathematical precision, it

05:06  24  must prove them with reasonable certainty.  You may not

05:06  25  award damages that are speculative, only possible or

05:06    1    that are based on guesswork.

05:06    2                In this case, plaintiff seeks a

05:06    3    reasonable royalty.  Reasonable royalty is defined as

05:06    4    the amount of money that a plaintiff and defendant

05:06    5    would have agreed upon as a fee for use of the

05:06    6    invention at the time just prior to when infringement

05:06    7    began.

05:06    8                You must be careful to ensure that the

05:06    9    award is no more and no less than the value of the

05:06   10    patented invention.  I will give you more detailed

05:06   11    instructions with respect to damages shortly.  Know,

05:06   12    however, that plaintiff is entitled to recover no less

05:06   13    than a reasonable royalty.

05:06   14                A royalty is a payment made to a

05:06   15    patentholder in exchange for the right to make, use,

05:06   16    sell or import the claimed invention.

05:06   17                A reasonable royalty is the amount of

05:07   18    royalty payment that a patentholder and the alleged

05:07   19    infringer would have agreed to in a hypothetical

05:07   20    negotiation taking place at a time prior to when the

05:07   21    infringement first began.

05:07   22                In considering this hypothetical

05:07   23    negotiation, you should focus on what the expectation

05:07   24    of the patentholder and the alleged infringer would

05:07   25    have been had they entered into an agreement at that

05:07  1    time and had they acted reasonably in the negotiations.

05:07  2              In determining this, you must assume that

05:07  3    both parties believed the patent was valid and

05:07  4    infringed and that both parties were willing to enter

05:07  5    into the agreement.

05:07  6              The reasonable royalty you determine must

05:07  7    be a royalty that would have resulted from the

05:07  8    hypothetical negotiation and not simply a royalty that

05:07  9    one or the other party would have preferred.

05:07  10             Evidence of the things that happened

05:07  11   after the infringement first began can be considered in

05:07  12   evaluating the reasonable royalty only to the extent

05:07  13   that the evidence aids in assessing what royalty would

05:07  14   have resulted from the hypothetical negotiation just

05:07  15   prior to the first infringement.

05:07  16             In determining the reasonable royalty,

05:07  17   you should consider all the facts known and available

05:07  18   to the parties.  Some of the factors that you can

05:08  19   consider in your determination are:

05:08  20             The value that the claimed invention

05:08  21   contributes to the accused product;

05:08  22             The value that factors other than the

05:08  23   claimed invention contribute to the accused product.

05:08  24             The so-called Georgia-Pacific factors,

05:08  25   which can be considered in appropriate cases to inform

—1168—

05:08  1   the hypothetical negotiation, including the following:

05:08  2            Royalties received by the patentee for

05:08  3   the licensing of the patents-in-suit, proving or

05:08  4   tending to prove an established royalty;

05:08  5            The rates paid by the licensee for the

05:08  6   use of other patents comparable to the patent in this

      7   case;

05:08  8            The nature and scope of the license, as

05:08  9   exclusive or nonexclusive, or as restricted or

05:08  10  non-restricted in terms of territory or with respect to

05:08  11  whom the manufactured product may be sold;

05:08  12           The licensor's established policy and

05:08  13  marketing program to maintain his or her patent

05:08  14  monopoly by not licensing others to use the invention

05:08  15  or by granting licenses under special conditions

05:08  16  designed to preserve that monopoly;

05:08  17           The commercial relationship between the

05:09  18  licensor and licensee, such as whether they are

05:09  19  competitors in the same territory in the same line of

05:09  20  business, or whether they are inventor and promoter;

05:09  21           The effect of selling the patented

05:09  22  specialty in promoting sales of other products of the

05:09  23  licensee, the existing value of the invention to the

05:09  24  licensor as a generator of sales of the non-patented

05:09  25  items, and the extent of such derivative or convoyed

1169

05:09  1    sales;

05:09  2              The duration of the patent and the term

05:09  3    of the license;

05:09  4              The established profitability of the

05:09  5    product made under the patents and its commercial

05:09  6    success and its current popularity;

05:09  7              The utility and advantages of the

05:09  8    patented property over the old modes or devices, if

05:09  9    any, that have been used for working out similar

05:09  10   results;

05:09  11             The nature of the patented invention, the

05:09  12   character of the commercial embodiment of it as owned

05:09  13   and produced by the licensor, and the benefits to those

05:09  14   who have used the invention;

05:09  15             The extent to which the inventor has made

05:09  16   use of the invention and any evidence probative of the

05:09  17   value of that use;

05:09  18             The portion of the profit or of the

05:10  19   selling price that may be customary in the particular

05:10  20   business or in comparable businesses to allow for the

05:10  21   use of the invention or analogous inventions;

05:10  22             The portion of the realizable profit that

05:10  23   should be credited to the invention as distinguishable

05:10  24   from non-patented elements, the manufacturing process,

05:10  25   business risks or significant features or improvements

—1170—

05:10  1    added by the infringer;

05:10  2                    The opinion and testimony of qualified

05:10  3    experts;

05:10  4                    The amount that a licensor, such as the

05:10  5    patentee, and the licensee, such as the infringer,

05:10  6    would have agreed upon at the time the infringement

05:10  7    began if both had been reasonably and voluntarily

05:10  8    trying to reach an agreement; that is, the amount which

05:10  9    a prudent licensee -- who desired, as a business

05:10  10   proposition, to obtain a license to manufacture and

05:10  11   sell a particular article embodying the patented

05:10  12   invention -- would have been willing to pay as a

05:10  13   royalty and yet be able to make a reasonable profit and

05:10  14   which amount would have been acceptable by the prudent

05:10  15   patentee who was willing to grant a license.

05:10  16                    No one factor is dispositive, and you can

05:11  17   and should consider the evidence that has been

05:11  18   presented to you in this case on each of these factors.

05:11  19                    You may also consider any other factors

05:11  20   which in your mind would have increased or decreased

05:11  21   the royalty the alleged infringer would have been

05:11  22   willing to pay and the patentholder would have been

05:11  23   willing to accept, acting as normally prudent business

05:11  24   people.

05:11  25                    In determining the amount of damages, you

—1171—

05:11  1    must determine when the damages began.  If damages are

05:11  2    awarded for direct infringement, the party -- the

05:11  3    parties agree damages will begin on July 19th, 2015,

05:11  4    for defendants' alleged direct infringement of the '909

05:11  5    patent and October 20th, 2015, for defendants' alleged

05:11  6    direct infringement of the '752 patent.

05:11  7              If damages are awarded for induced

05:11  8    infringement, the date damages began would depend on

05:11  9    defendants' knowledge, which the parties dispute.

05:11  10             Damages for induced infringement would

05:11  11   begin no sooner than July 19th, 2021, when plaintiff

05:12  12   filed its complaint in this case.

05:12  13             In determining a reasonable royalty, you

05:12  14   may also can consider evidence concerning the

05:12  15   availability and cost of acceptable noninfringing

05:12  16   substitutes to the patented invention.  An acceptable

05:12  17   substitute must be a product that does not infringe the

05:12  18   patent.

05:12  19             Damages are not based on hindsight

05:12  20   evaluation of what happened, but on what the parties to

05:12  21   the hypothetical license negotiations would have agreed

05:12  22   upon.  Nonetheless, evidence relevant to the

05:12  23   negotiation is not necessarily limited to facts that

05:12  24   occurred on or before the date of the hypothetical

05:12  25   negotiation.

05:12    1              You may also consider information the

05:12    2    parties would have foreseen or estimated during the

05:12    3    hypothetical negotiation, which may under certain

05:12    4    circumstances include evidence of usage after

05:12    5    infringement started, license agreements entered into

05:12    6    by the parties shortly after the day of the

05:12    7    hypothetical negotiation and profits earned by the

05:12    8    infringer and noninfringing alternatives.

05:12    9              A reasonable royalty can be paid either

05:13   10    in the form of a one-time, lump-sum payment or as a

05:13   11    running royalty.  Either method is designed to

05:13   12    compensate the patentholder based on the infringer's

05:13   13    use of the patented technology.  It is up to you, based

05:13   14    on the evidence, to decide what type of royalty, if

05:13   15    any, is appropriate in this case.

05:13   16              Reasonable royalty awards may take the

05:13   17    form of a lump-sum payment.  A lump-sum payment is

05:13   18    equal to the amount that defendant would have paid at

05:13   19    the time of the hypothetical negotiation for a license

05:13   20    covering all allegedly infringing defendant sales, both

05:13   21    past and future.  When a lump sum is paid, the

05:13   22    infringer pays a single price for a license covering

05:13   23    both past and future infringing sales.

05:13   24              Reasonable royalty awards may also take

05:13   25    the form of a running royalty based on the revenue from

1173

05:13  1    or the volume of sales of the licensed product.  A

05:13  2    running royalty can be calculated, for example, by

05:13  3    multiplying a royalty base by a royalty rate or by

05:13  4    multiplying the number of infringing products or

05:13  5    product units sold by a royalty amount per unit.

05:14  6              The amount that you find as damages must

05:14  7    be based on the value attributable to the patented

05:14  8    invention, as distinct from the unpatented features of

05:14  9    the accused products or other factors such as marketing

05:14  10   or advertising or defendants' size or market position.

05:14  11             A royalty compensating the patentholder

05:14  12   for damages must reflect the value attributable to the

05:14  13   infringing features of the product, no more.

05:14  14             The process of severing the value of the

05:14  15   allegedly infringing features from the value of all

05:14  16   other features is called apportionment.  When the

05:14  17   accused infringing product have both patented and

05:14  18   unpatented features, your award must be apportioned so

05:14  19   that it is based only on the value of the patented

05:14  20   features and no more.

05:14  21             Any confusion or difficulties caused by a

05:14  22   defendants' record should be held against defendant,

05:14  23   not plaintiff.  The burden of proving damages is always

05:14  24   still on plaintiff, however.

05:14  25             Okay.  So we will do closing arguments

1174

| 05:15 | 1 | tomorrow morning at 9:00.  After we finish the closing |
| 05:15 | 2 | arguments, it will then be your duty to deliberate and |
| 05:15 | 3 | consult with each other in an effort to reach a |
| 05:15 | 4 | verdict. |
| 05:15 | 5 | Let me make clear to you.  Each of you |
| 05:15 | 6 | must decide the case for yourselves after an impartial |
| 05:15 | 7 | consideration of the evidence with each other.  During |
| 05:15 | 8 | your deliberations do not hesitate to re-examine your |
| 05:15 | 9 | own opinions and change your mind if you are convinced |
| 05:15 | 10 | that your own opinion is wrong.  But never give up your |
| 05:15 | 11 | own honest beliefs because others think differently or |
| 05:15 | 12 | just to finish the case.  Remember you are the judges |
| 05:15 | 13 | of the facts. |
| 05:15 | 14 | You've been allowed to take notes during |
| 05:15 | 15 | the trial.  If you took notes during the trial, they |
| 05:15 | 16 | are only aids to memory.  If your memory differs from |
| 05:15 | 17 | your notes, rely on your memory, not your notes.  The |
| 05:15 | 18 | notes are not evidence. |
| 05:15 | 19 | If you did not take notes, rely on your |
| 05:15 | 20 | independent recollection of the evidence and don't be |
| 05:15 | 21 | unduly influenced by others' notes.  Notes are never |
| 05:16 | 22 | entitled to greater weight than the recollection or |
| 05:16 | 23 | impression of each of you about the testimony. |
| 05:16 | 24 | Okay.  Let me tell you -- I'll tell |
| 05:16 | 25 | briefly and then I'll remind you tomorrow afterwards. |

05:16  1    What will happen after the lawyers do their closing

05:16  2    arguments is you will go retire back to the jury room.

05:16  3    We will get to you virtually immediately the exhibits

05:16  4    because they're electronic.  And you'll have a way of

05:16  5    looking at them back there.  So you'll have them

05:16  6    virtually instantaneously.

05:16  7            Remember also, during the course of the

05:16  8    trial there were demonstrative exhibits.  They were not

05:16  9    admitted.  You won't have them tomorrow.  So

05:16  10   occasionally I have jurors asking we saw something, we

05:16  11   can't find it.  It's probably because it was a

05:16  12   demonstrative exhibit.

05:16  13           You will have all of the exhibits that

05:16  14   were admitted into evidence.  And as you heard me read,

05:16  15   that is what you base your decision on.

05:17  16           The first thing that you'll do tomorrow

05:17  17   is take -- we have note paper back there.  You will

05:17  18   select a foreperson.  That foreperson will fill out a

05:17  19   note.  And what I learned in the last trial I need to

05:17  20   make clear, we won't know that you've done that unless

05:17  21   you give us the note.

05:17  22           So it's not enough for you all just to

05:17  23   select a jury foreperson and not tell us.  You have to

05:17  24   select a jury foreperson and hand the note to the

05:17  25   person outside the door which allows us to know that we

05:17  1    have a foreperson.

05:17  2                And so once you have a foreperson

05:17  3    selected, and you have -- and the exhibits are already

05:17  4    back there, at that point you begin to deliberate.  And

05:17  5    from then on you will -- it's whatever amount of time

05:17  6    you need to deliberate.

05:17  7                If during the course of your

05:17  8    deliberations you -- one of you says, I have a question

05:17  9    that we need to ask the Court, the foreperson will

05:17  10   take, again, a piece of note paper.  They'll write the

05:17  11   question out, hand it to hopefully this handsome

05:18  12   gentleman or one of our other CSOs.  And they'll bring

05:18  13   it to me.

05:18  14                I will let the lawyers know what the

05:18  15   question is.  I will write out a response.  And I will

05:18  16   give it back to you -- him, and he will give it back to

05:18  17   the foreperson.  And y'all will have the response.

05:18  18                And that's usually very quickly done.

05:18  19   And so you, generally speaking, won't have to wait very

05:18  20   long to get an answer to your questions.

05:18  21                The bottom line is, for tonight I'm not

05:18  22   sure how you get out of here.  But it looks like we

05:18  23   might need an ark.  But hopefully you all will be safe

05:18  24   tonight as you leave.

05:18  25                We'll start tomorrow morning -- if you'll

| | | |
|---|---|---|
| 05:18 | 1 | be here by about 8:45, we'll do the closing arguments |
| 05:18 | 2 | at 9:00.  Each side will have about a half hour.  So |
| 05:18 | 3 | you will begin deliberating shortly after 10 o'clock. |
| 05:18 | 4 | I think that's all that we have for you. |
| 05:18 | 5 | Again, please be careful out there.  And we will -- |
| 05:19 | 6 | remember, I know it's tempting, we're near the end. |
| 05:19 | 7 | You can't talk about the case yet because you haven't |
| 05:19 | 8 | heard the closing arguments. |
| 05:19 | 9 | Please don't do any independent |
| 05:19 | 10 | investigation.  And please don't post anything about |
| 05:19 | 11 | the case. |
| 05:19 | 12 | But tomorrow you'll begin your |
| 05:19 | 13 | deliberations.  And then you'll get to talk to each |
| 05:19 | 14 | other as much as you want to about what you heard this |
| 05:19 | 15 | week. |
| 05:19 | 16 | Have a good evening. |
| 05:19 | 17 | THE BAILIFF:  All rise. |
| 05:19 | 18 | (Jury exited the courtroom.) |
| 05:19 | 19 | THE COURT:  Gentlemen and ladies, |
| 05:19 | 20 | anything we need to take up? |
| 05:19 | 21 | MR. MEEK:  Nothing from plaintiff, Your |
| 05:19 | 22 | Honor. |
| 05:19 | 23 | THE COURT:  All right.  I'm pretty sure I |
| 05:19 | 24 | told you this, but -- you may be seated -- you don't |
| 05:19 | 25 | need to exchange slides tonight.  Just come and give |

05:20  1    your closing argument.

05:20  2                    And I'll be here as usual, although there

05:20  3    shouldn't be anything to take up because, you know, you

05:20  4    aren't going to have anything from the other side to

05:20  5    complain about.  So if you're here by 9:00, we should

05:20  6    get started then.

05:20  7                    And is there anything that we do need to

05:20  8    take up?  I don't think so.

05:20  9                    MR. SCHROEDER:  The only thing, Your

05:20  10   Honor, is once we send the jury back there was going to

05:20  11   be a snippet where we were going to do an additional

05:20  12   testimony on that inequitable conduct issue.  That's

05:20  13   it.

05:20  14                    THE COURT:  Sure.  That's right.  I don't

05:20  15   need to hear from your expert on inequitable conduct.

05:20  16   And so --

05:20  17                    MR. SCHROEDER:  We took the Court's

05:20  18   guidance and decided not to bring him.

05:20  19                    THE COURT:  Okay.  And so that -- this

05:20  20   will go -- it will go pretty quickly.  I can assure

05:20  21   you.

05:20  22                    So unlike the jury, who I know that each

05:20  23   of you feels like if something's worth being asked

05:20  24   once, it's worth being asked nine times, the problem I

05:20  25   had as a lawyer, I don't really need to hear it nine

—1179—

05:21  1   times.  We'll move through it pretty quickly, I promise

05:21  2   you.

05:21  3              So we'll see you tomorrow.

05:21  4              THE BAILIFF:  All rise.

05:21  5              (Hearing adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-1180-

1    UNITED STATES DISTRICT COURT )

2    WESTERN DISTRICT OF TEXAS      )

3

4

5              I, Kristie M. Davis, Official Court

6    Reporter for the United States District Court, Western

7    District of Texas, do certify that the foregoing is a

8    correct transcript from the record of proceedings in

9    the above-entitled matter.

10             I certify that the transcript fees and

11   format comply with those prescribed by the Court and

12   Judicial Conference of the United States.

13             Certified to by me this 30th day of April

14   2023.

15

16                    */s/ Kristie M. Davis*
                      KRISTIE M. DAVIS
17                    Official Court Reporter
                      800 Franklin Avenue
18                    Waco, Texas 76701
                      (254) 340-6114
19                    kmdaviscsr@yahoo.com

20

21

22

23

24

25

05:21