07:52

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                        WACO DIVISION

3   TEXTRON INNOVATIONS INC.*
                            *     April 21, 2023
4   VS.                     *
                            * CIVIL ACTION NO. 6:21-CV-740
5   SZ DJI TECHNOLOGY CO.,  *
      LTD. ET AL            *
6
7            BEFORE THE HONORABLE ALAN D ALBRIGHT
                  JURY TRIAL PROCEEDINGS
                     Volume 5 of 5
8
    APPEARANCES:
9
    For the Plaintiff:   Kurt Pankratz, Esq.
10                        Morgan G. Mayne, Esq.
                          Harrison Rich, Esq.
11                        Emily M. Deer, Esq.
                          Baker Botts
12                        2001 Ross Ave., Suite 900
                          Dallas, TX 75206
13
                          Kevin J. Meek, Esq.
14                        Mark A. Speegle, Esq.
                          Lance Joseph Goodman, Esq.
15                        Boyang Zhang, Esq.
                          Baker Botts, LLP
16                        98 San Jacinto Blvd., Suite 1500
                          Austin, TX 78701
17
                          Mark Siegmund, Esq.
18                        Cherry Johnson Siegmund James, PLLC
                          The Roosevelt Tower
19                        400 Austin Avenue, 9th Floor
                          Waco, Texas 76701
20
    For the Defendant:   J. Michael Jakes, Esq.
21                        Qingyu Yin, Esq.
                          Sydney Kestle, Esq.
22                        Finnegan Henderson Farabow Garrett
                            & Dunner LLP
23                        901 New York Ave. Nw
                          Washington, DC 20001
24
25

```
 1                          Benjamin R. Schlesinger, Esq.
                            Robert High, Esq.
 2                          Finnegan Henderson Farabow Garrett
                              & Dunner LLP
 3                          271 17th St Nw, Suite 1400
                            Atlanta, GA 30363
 4
                            Jacob Schroeder, Esq.
 5                          Finnegan Henderson Farabow Garrett
                              & Dunner LLP
 6                          Stanford Research Park
                            3300 Hillview Avenue, 2nd Floor
 7                          Palo Alto, CA 94304

 8                          John P. Palmer, Esq.
                            Jacqueline Altman, Esq.
 9                          Naman Howell Smith & Lee
                            P.O. Box 1470
10                          Waco, TX 76703-1470

11   Court Reporter:        Kristie M. Davis, CRR, RMR
                            PO Box 20994
12                          Waco, Texas 76702-0994
                            (254) 340-6114
13

14      Proceedings recorded by mechanical stenography,

15   transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

|       |    |                                                     |
|-------|----|-----------------------------------------------------|
| 08:54 | 1  | (Hearing begins.)                                   |
| 08:54 | 2  | THE BAILIFF:  All rise.                              |
| 08:54 | 3  | THE COURT:  Please remain standing for              |
| 08:54 | 4  | the jury.                                            |
| 08:54 | 5  | (Jury entered the courtroom.)                        |
| 08:54 | 6  | THE COURT:  Thank you.  You may be                   |
| 08:55 | 7  | seated.                                              |
| 08:55 | 8  | Counsel?                                             |
| 08:55 | 9  | OPENING ARGUMENT ON BEHALF OF THE PLAINTIFF          |
| 08:55 | 10 | MR. MEEK:  Thank you, Your Honor.                    |
| 08:55 | 11 | THE COURT:  Would you like any kind of               |
| 08:55 | 12 | warning?                                             |
| 08:55 | 13 | MR. MEEK:  I've got people all over the              |
| 08:55 | 14 | place doing it.  I'm going to try 20/10, but we'll see |
| 08:55 | 15 | how it works out.                                    |
| 08:55 | 16 | Yeah.  I'm reserving -- I'm going to                 |
| 08:55 | 17 | reserve about ten minutes.                           |
| 08:55 | 18 | THE COURT:  Okay.                                    |
| 08:55 | 19 | MR. MEEK:  How are y'all doing?                      |
| 08:55 | 20 | Congratulations.  You made it.  It's been            |
| 08:55 | 21 | a long week.  We've had some fun moments; we've had  |
| 08:55 | 22 | some tense moments.  I hope not too many, but I think |
| 08:55 | 23 | we may have had some boring times for y'all, maybe a |
| 08:55 | 24 | few confusing times.                                 |
| 08:55 | 25 | Both Judge Gilliland and Judge Albright              |

08:55  1   told you multiple times how important and serious your

08:55  2   job is, and you took that to heart.

08:55  3        We have all noticed how you've stayed

08:55  4   attentive and engaged, and I know that was no small

08:56  5   feat.  The Judge told you and both sides reminded you

08:56  6   that juries are the foundation of this country, and the

08:56  7   job you have done is so important.

08:56  8        Our teams are done.  We finished.  We've

08:56  9   done our best.  Now it's for you -- your turn to start

08:56  10  work.  Let me assure you, when you go home today,

08:56  11  you're going to be proud of yourself.  You're going to

08:56  12  be proud of yourself because you did a good job and you

08:56  13  did it right.

08:56  14       And how do you do a good job now?  Well,

08:56  15  Judge Albright told you, you review and you weigh the

       16  evidence.

08:56  17       At the beginning of this week, I made you

08:56  18  some promises.  I told you that we would show you the

08:56  19  evidence that shows that DJI's drones infringe these

08:56  20  patents.  That these patents are valid and that there's

08:56  21  a fair amount of money that needs to be paid by DJI to

08:56  22  Bell Textron.

08:56  23       I'm sure this -- sometime this week you

08:56  24  felt stressed, maybe even scared.  One reason you might

08:57  25  have felt that way is because you got all these

08:57  1   questions popping in your head, and you need answers to

08:57  2   do your job right.

08:57  3            I want you to think about this week.  Who

08:57  4   gave you answers?  Which party to this lawsuit showed

08:57  5   up with the folks, put them in the box and gave you

08:57  6   answers and -- the answers you need?  Which party

08:57  7   showed up and which party didn't?

08:57  8            Why are we here?  We're protecting the

08:57  9   patents of these two inventors and their teams that

08:57  10  created these amazing inventions.

08:57  11           You heard from Mr. James Harris, on the

08:57  12  left, the inventor of the following technology and the

08:57  13  '909 patent.  You heard how he led a team working on

08:57  14  Bell Textron's Eagle Eye project, the vertical takeoff

08:57  15  drone.

08:57  16           You heard from Colonel Kevin Christensen,

08:57  17  on the right, the inventor of the automatic hover

08:57  18  technology and the '752 patent.  You heard about his

08:57  19  impressive background flying the coolest planes that

08:57  20  have ever existed and his amazing knowledge of

08:58  21  astronautical engineering.

08:58  22           You heard about his invention and how he

08:58  23  made it -- flying a helicopter is so easy -- I loved

08:58  24  this joke -- that even a fighter pilot could do it.  I

08:58  25  especially liked the part where he put the CEO in the

08:58  1    helicopter and let him drive.

08:58  2                    These are two men that worked incredibly

08:58  3    hard to patent valuable new technology, and me and my

08:58  4    team have been working incredibly hard to protect it.

08:58  5    Now it's your turn to help us out.

08:58  6                    I don't want to overlook this or go back

08:58  7    into detail on this, but you also heard from Mr. James

08:58  8    Runstadler, the president of Textron Innovations and

08:58  9    the company-wide director of IP.

08:58  10                    You also heard from Mr. John Wittmaak,

08:58  11    who gave you the history of Bell's drone development,

08:58  12    which goes back into the '90s.

08:58  13                    This is nothing new for Bell.  Bell has

08:58  14    been pioneering innovations since they started.  They

08:58  15    changed the world, and then their stuff shows up in

08:59  16    museums.

08:59  17                    How do we protect these inventors and

08:59  18    their patents?  Well, when they won't call you back and

08:59  19    talk about a deal, unfortunately you come into a

08:59  20    lawsuit and trust you folks.

08:59  21                    We have to hold companies responsible

08:59  22    that use Textron's innovative technology without

08:59  23    permission.

08:59  24                    Like I told you Monday, the case breaks

08:59  25    down into three groups of issues.  We're going to talk

08:59  1    about them one at a time.

08:59  2              First, does DJI drones infringe the

08:59  3    patents?  Second, are Textron's patents valid?

08:59  4    Finally, what is a reasonable number that needs to be

08:59  5    paid by DJI to Textron?

08:59  6              You've heard patent cases a lot here.

08:59  7    Patent cases are about the claims.  The claims are the

08:59  8    edges of the property.

08:59  9              We've talked about the claims all week,

08:59  10   and you've heard us go through this piece by piece.

09:00  11   Every single element is there.  Dr. Michalson stood up

09:00  12   there and we got green checkbox on every single

09:00  13   element.

09:00  14              What does that mean?  That means if all

09:00  15   the checkboxes are there, DJI drones infringes these

09:00  16   claims.

09:00  17              I appreciate the effort it took for you

09:00  18   to wade through that with Dr. Michalson, but at the end

09:00  19   of the day, this one, '909 patent, Claim 1, the DJI

09:00  20   Follow Me and ActiveTrack features check every box.

09:00  21              Moving on.  Claim 7 of the '909 patent,

09:00  22   the Follow Me and ActiveTrack features check every box.

09:00  23              Claims 10 and 11, the same patent, the

09:00  24   Follow Me and ActiveTrack features check every box.

09:00  25              And finally, the automatic hover feature

09:00    1    of DJI drones checks every box of Claim 13 of the '752

09:00    2    patent.

09:00    3                    What does that mean?  That means these

09:00    4    patents are infringed.  All green checkbox means they

09:01    5    infringe.

09:01    6                    DJI agrees on almost all of these

09:01    7    checkmarks, almost all of them.  They -- just a couple

09:01    8    of things that they don't agree with.  I'm not going to

09:01    9    talk about the stuff we agree on.  I'm going to go over

09:01   10    the things we disagree on.

09:01   11                    For example, I'll focus on when

09:01   12    Dr. Nourbakhsh tried to rewrite Claim 1 of the '909

09:01   13    patent for DJI's benefit.

09:01   14                    Do you remember when Dr. Nourbakhsh said

09:01   15    he was paraphrasing the claims?

09:01   16                    He couldn't remember exactly what they

09:01   17    said, but he said:  DJI drones don't infringe because

09:01   18    they get position data and movement data from the

09:01   19    remote controller.

09:01   20                    His editing the claims is rewriting them.

09:01   21    You can't do that.  The claims don't require that.  The

09:01   22    claims say you communicate one thing, reference data.

09:01   23    You use the -- and that is used to communicate both

09:01   24    position and movement.

09:01   25                    And that is exactly what James Harris

09:02  1    told you.  Remember his story about leaving his home in
09:02  2    Fort Worth?  If you get position data periodically and
09:02  3    keep track of the time, you can infer movement.
09:02  4              I left my home in Fort Worth at noon and
09:02  5    I text you.  I get to Waco an hour later and I text you
09:02  6    again.  You can pretty much tell I moved, and you
09:02  7    pretty much tell I got a speeding ticket.
09:02  8              We don't have to trust Mr. Harris.  DJI's
09:02  9    own engineer, Mr. Litian Zhang, said it:  On the drone
09:02 10    we can estimate the speed through the position
09:02 11    difference.
09:02 12              That's exactly what the claim says.
09:02 13              Another attempt, same song, second verse.
09:02 14              DJI's going to tell you that they don't
09:02 15    infringe Claim 1 -- this is a couple of paragraphs
09:02 16    down -- because they don't do this required
09:02 17    calculation, okay?
09:02 18              But Dr. Nourbakhsh admitted this happens.
09:03 19    That's a quote from him:  So I'll take the fact that I
09:03 20    just broke into a run, multiply by half and give the
09:03 21    drone a little push so he can stay up with me.
09:03 22              Multiplication is a calculation.
09:03 23              Same -- now we're moving to the '752
09:03 24    patent.  DJI told you that it doesn't infringe the '752
09:03 25    patent because they think the '752 patent is limited to

09:03  1   a helicopter with a pilot in it.

09:03  2              That is completely wrong.  The claim says

09:03  3   it is about rotary aircraft.  Rotary aircraft includes

09:03  4   drones.  I can see the rotors on it right there.

09:03  5              Colonel Christensen agrees with us:  Do

    6   you think your invention is applicable and useful for

    7   drones?

09:03  8              I do.  I think it's a perfect use for the

09:03  9   invention since the pilot is not in the aircraft and

09:03  10  the visibility of what the aircraft is doing is

09:03  11  restricted.

09:03  12             Also in the '752 patent -- you heard this

09:03  13  from Dr. Nourbakhsh -- in Claim 13, Dr. Nourbakhsh is

09:04  14  trying to tell you that what the claim says, the

09:04  15  rotorcraft has controllers, it means that they have to

09:04  16  be on board the device.

09:04  17             Even my three-year-old grandson, Aaron,

09:04  18  knows this is wrong.  We have a game we play.  I point

09:04  19  at him and I say, do you have fingers?  He holds up his

09:04  20  fingers.  Do you have an ear?  He holds up -- points to

09:04  21  his ear.  And I say, do you have a grandpa?  And he

09:04  22  points at me.  Do you have a dog?  And he points at

09:04  23  Copper, his dog.

09:04  24             His fingers are attached.  His ear's

09:04  25  attached, but I'm not attached.  Copper's not attached.

-1191-

09:04    1          "Has" does not mean attached.  It never

09:04    2    has meant that.  "Has" means it's related to it.  That

09:04    3    dog is related to you.  Your ear is related to you.  It

09:04    4    always has meant that.  It always will.  Even Aaron

09:04    5    knows that.

09:04    6          You can't rewrite the claim to say that

09:04    7    an English word means something that it doesn't.

09:04    8          And we talked about this.  If you buy a

09:04    9    TV, it has a remote control.  The remote control's not

09:05   10    hooked to the TV.  That would be really dumb.

09:05   11          One more verse here.  DJI's also trying

09:05   12    to distract you by arguing that if the drone gets moved

09:05   13    off its position somehow, that means it doesn't

09:05   14    infringe.  This is about whether it's holding speed,

09:05   15    remember?

09:05   16          Dr. Nourbakhsh hovered the drone right

09:05   17    over there.  It started holding zero speed.  It's

09:05   18    sitting there holding zero speed.  By the way, that

09:05   19    means it's infringing.  He came up and pushed it, got

09:05   20    it mad, and then it came back.  He said that means that

09:05   21    it was not holding position -- or he said that means it

09:05   22    was holding position, not speed.

09:05   23          The problem is when it's sitting there

09:05   24    before he bothers it, it's infringing because it's

09:05   25    holding zero speed.  He pushes it, it comes back and

09:05  1   starts infringing again.

09:05  2            Let's be clear.  If a drone ever

09:05  3   infringes, that is enough for Textron to win.  DJI

09:05  4   cannot get out of this by saying we only infringe

09:05  5   sometimes.  Infringement is infringement, and DJI has

09:06  6   to pay for that.

09:06  7            We don't have to worry about

09:06  8   Dr. Nourbakhsh on this one either.  Zhimeng Shang, he's

09:06  9   the senior DJI engineer.  His team is the one that

09:06  10  writes the code for these drones.  Let that sink in.

09:06  11  That means that he is the only person in this case that

09:06  12  has full access to all the source code.

09:06  13            We're going to talk about that next

09:06  14  because of -- but because of DJI's failure to produce

09:06  15  some code, nobody involved in this case, none of the

09:06  16  lawyers, none of the witnesses, not you good folks,

09:06  17  none of them had access to the source code except this

09:06  18  guy.

09:06  19            And what did he say under oath?  The

09:06  20  question:  If the stick is centered and a DJI drone

09:06  21  will hold its forward speed, backwards, left and right

09:06  22  speed at zero, it will hold speed at zero?

09:06  23            Yes.

09:06  24            They hold speed.  That testimony is the

09:06  25  beginning, the ending and the middle of infringement.

| | | |
|---|---|---|
| 09:06 | 1 | You needed answers.  We provided you |
| 09:07 | 2 | answers.  The answers add up to DJI infringes. |
| 09:07 | 3 | Let's talk really quickly about the |
| 09:07 | 4 | source code issue.  What happened here is unusual.  In |
| 09:07 | 5 | ordinary cases, both sides get information that |
| 09:07 | 6 | disclose everything to each other, but that didn't |
| 09:07 | 7 | happen in this case.  DJI did not produce the relevant |
| 09:07 | 8 | source code that will tell us how the drones behave. |
| 09:07 | 9 | As a result, unlike the normal case, we |
| 09:07 | 10 | didn't have the full story.  The Judge had to step in |
| 09:07 | 11 | and address this problem.  The Judge instructed |
| 09:07 | 12 | everyone involved in the case, including y'all, that |
| 09:07 | 13 | you should presume that the source code we didn't see |
| 09:07 | 14 | would have been favorable to Textron's infringement |
| 09:07 | 15 | allegations. |
| 09:07 | 16 | If you want to just jot this down so you |
| 09:07 | 17 | can take a note, this is at B.22 in the instructions |
| 09:07 | 18 | you got yesterday.  It's on Page 27. |
| 09:07 | 19 | We'll talk about -- later about whether |
| 09:07 | 20 | Dr. Nourbakhsh followed this rule.  But for now, since |
| 09:07 | 21 | we know that the DJI drones infringe the '909 and the |
| 09:08 | 22 | '752 patent, let's move on. |
| 09:08 | 23 | What's next?  We're going to do this in |
| 09:08 | 24 | detail really -- with really pretty pictures later. |
| 09:08 | 25 | But the infringement questions are on Page 2, Page 3 |

1194

09:08  1  and Page 4.  And I will -- going to tell you exactly

09:08  2  how to fill out that form a bit later.

09:08  3           Now we need to talk about DJI's excuse

09:08  4  that all this work and the innovation of Mr. Harris and

09:08  5  Colonel Christensen weren't real.

09:08  6           The law requires that Textron's patents

09:08  7  are presumed valid.  That's very important.  DJI, in

09:08  8  order to overcome that presumption, has to prove to you

09:08  9  by clear and convincing evidence that the patents are

09:08  10  invalid.  That's important.  That's the standard we use

09:08  11  if somebody's trying to take property away.  Something

09:08  12  is yours and suddenly it's not.  That's a big deal.

09:09  13  Every claim in a patent is property, and it's property

09:09  14  of these inventors that they deserve.  Taking away even

09:09  15  just one claim is a big deal.

09:09  16           The law also says that if you want to

09:09  17  take that property away -- the Judge gave us some help

09:09  18  here -- the evidence has to be so clear, so direct, so

09:09  19  weighty that it convinces you to a clear conviction

09:09  20  without hesitancy.  Let's talk about that.  No

09:09  21  hesitation.

09:09  22           Let's say your best friend, best friend

09:09  23  in your life, sneezes, asks for a tissue.  And you're a

09:09  24  good person.  You always have one in your pocket.  You

09:09  25  give that, no hesitation.  No doubt.  No pause.

| | | |
|---|---|---|
| 09:09 | 1 | Think about a different situation.  What |
| 09:09 | 2 | if my seven-year-old nephew happened to be named |
| 09:09 | 3 | Justin.  Cute kid, but the world's biggest klutz.  What |
| 09:09 | 4 | if he comes up and says, Uncle Kevin, can I look at |
| 09:09 | 5 | your pocket knife?  And I go, whoa, maybe not.  Maybe |
| 09:10 | 6 | you look at it from over here.  That's a hesitation. |
| 09:10 | 7 | If there's any hesitation, any at all, |
| 09:10 | 8 | it's not clear and convincing evidence. |
| 09:10 | 9 | Dr. Nourbakhsh wants to take both patents |
| 09:10 | 10 | away.  We'll talk about this more later, but if anyone |
| 09:10 | 11 | ever asserts a patent against DJI, he's the guy that's |
| 09:10 | 12 | going to take it away. |
| 09:10 | 13 | He wants to take the '909 patent away |
| 09:10 | 14 | because of two lines in the Frink patent.  Just two |
| 09:10 | 15 | lines.  He was asked, and he says that these two lines |
| 09:10 | 16 | disclose the patent's term for calculation, calculating |
| 09:10 | 17 | the velocity. |
| 09:10 | 18 | You can read those two lines for yourself |
| 09:10 | 19 | right at the top.  There's -- nowhere do they say |
| 09:10 | 20 | calculate.  And he agrees, the word "calculate" is not |
| 09:10 | 21 | in that sentence. |
| 09:10 | 22 | What is in that sentence is "programmed |
| 09:10 | 23 | to fly."  Once again, programmed to fly is the opposite |
| 09:11 | 24 | of calculate.  Program means it's doing a predetermined |
| 09:11 | 25 | thing, right?  Calculate means it's making decisions on |

09:11   1    the fly.

09:11   2                    Are you, without hesitation, going to

09:11   3    conclude that two opposite things are the same thing?

09:11   4    There's no way that's clearly right.  In fact, that's

09:11   5    clearly wrong, and there's no way that that is

09:11   6    convincing.  The '909 patent is valid.

09:11   7                    Dr. Nourbakhsh also wants to take away

09:11   8    the '752 patent.  This time it's based on an article by

09:11   9    Mr. Gold.  The '752 patent deals with automatic

09:11   10   hovering.  Claim 13 of the '752 patent says

09:11   11   "automatically engage."

09:11   12                   The Gold reference says the opposite.  It

09:11   13   says engage manually.  It has a button.  There's

09:11   14   nothing more opposite to automatic than a button.  If

09:11   15   that doesn't cause you to hesitate to take away Colonel

09:12   16   Christensen's property, I don't know what to tell you.

09:12   17   There's no way that a button is the same thing as

09:12   18   automatic.  The '752 patent is valid.

09:12   19                   These patents are valid.  They should not

09:12   20   be taken away.  They should remain with the owners.

09:12   21   Mr. Harris and his team invented important things.

09:12   22   Colonel Christensen and his team were pioneers.

09:12   23                   Does anything -- anyone really think that

09:12   24   these inventions didn't happen?  That the hard-working

09:12   25   teams of Bell Helicopter don't deserve these patents?

09:12  1    When you get to Questions 4 and 5 -- excuse me --
09:12  2    Question 4 on Page 5, the answer's going to be no.
09:12  3    They did not prove that these things were invalid.
09:12  4              So now let's talk about how much money.
09:12  5    Now that we know that we have a trespass on Bell's
09:12  6    property, DJI infringes, now that we know that you good
09:12  7    folks got to meet actual inventors, actual innovators,
09:12  8    not frauds, now we have to talk about what happens to
09:13  9    fix that problem.  We need to talk about a fair price
09:13  10   to pay.
09:13  11             Jeff Andrien walked us through this.  He
09:13  12   explained how he carefully measured the value of the
09:13  13   patented technology.  He started at the full sales
09:13  14   amount, $3 billion, and excluded the camera to get it
09:13  15   down to $2.4 billion.
09:13  16             These are huge numbers, by the way.  Huge
09:13  17   numbers.  These are incredibly valuable products and
09:13  18   inventions.
09:13  19             From there he had to figure out what the
09:13  20   actual features are worth, and he said there's
09:13  21   $430 million profit added because of the '752 patent
09:13  22   and $53 million profit added because of the '909.
09:13  23             That's $483 million in the middle of that
09:13  24   table.  Remember we talked about that at the
09:13  25   negotiation?  He had to decide how to split it up.  So

09:13   1   he studied the factors that affect the leverage at that

09:13   2   table.

09:13   3           He noted, though, there was a potential

09:13   4   competition.  That increases Bell's leverage.  He

09:13   5   also -- remember, he noted that Bell would have to

09:14   6   think twice about doing a deal with DJI because DJI had

09:14   7   been labeled a Chinese military company by the

09:14   8   U.S. government, who happens to be Bell's biggest

09:14   9   customer by far.

09:14   10          Even so, Mr. Andrien conservatively

09:14   11  concluded that DJI should get its standard profit

09:14   12  margin.  Get the money that it usually makes.  If you

09:14   13  take those percentages, that's how you get to the

09:14   14  $367 million royalty we've been talking about all week.

09:14   15  That's a fair price.

09:14   16          If you've learned anything, you know I

09:14   17  love green checkboxes.  So we got them all now.

09:14   18          DJI infringes.  The Textron patents are

09:14   19  valid.  And the reasonable compensation for DJI's

09:14   20  trespass is 367 million.

09:14   21          What do we do with that information?

09:14   22  This is a picture of the verdict form that you'll have,

09:14   23  and I'm going to go through the other ones when I get

09:14   24  back up here.  It's very important you keep this

09:14   25  straight.  You got to put the right number on the right

-1199-

09:15  1    line.

09:15  2              If you agree with me, the right number is

09:15  3    40,902,504 on the '909 patent and 326,679,293 on the

09:15  4    '752 patent.  Please be careful.  The right number on

09:15  5    the right blank makes a big difference.

09:15  6              Thank you for your time right now.  I'm

09:15  7    going to go sit down, take a break, and I'll be back

09:15  8    later to give you some more information.

09:15  9              Thank you.

09:15  10   CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

09:15  11             MR. SCHROEDER:  Good morning.

09:15  12             Thank you for being here and for serving

09:16  13   this very important function in our justice system.  I

09:16  14   agree with Mr. Meek that you guys have been very

09:16  15   attentive this week paying attention to all the

09:16  16   witnesses even when it got really technical.  And we've

09:16  17   seen you taking notes and paying great attention.

09:16  18             It is a tremendous honor for me to be

09:16  19   able to be here today and to address you on this case

09:16  20   of great importance, a case that was hard fought.  And

09:16  21   you have important work to do now.

09:16  22             In the early 2000s, what nobody ever

09:16  23   dreamed could be done is now a multi-billion dollar

09:16  24   drone industry, and that's because of DJI.  They made

09:16  25   drones accessible and easy to use for millions of

09:16  1    people around the world.  And the world is a better

09:16  2    place because of their innovations.

09:16  3                And let me be perfectly clear.  DJI did

09:16  4    not get to where they are today by taking other

09:16  5    people's technology.  They got here by generating novel

09:16  6    ideas of their own, by creating new technology from

09:16  7    those ideas, and by -- and that technology was

09:16  8    immensely popular and in high demand.

09:17  9                And clearly DJI values and respects

09:17  10   intellectual property.  It has a lot of its own.  They

09:17  11   own thousands of patents.  You heard that they own over

09:17  12   39,000 patents, patent applications and patent

09:17  13   publications around the world.  And to put that big

09:17  14   number in context, if you read one of those a day, it

09:17  15   would take you more than 100 years -- or yeah, more

09:17  16   than 100 years to read all of them.  That's a huge

09:17  17   number.

09:17  18                You do not win awards on innovation from

09:17  19   entities like MIT by cheating, stealing and

09:17  20   disrespecting other people's property.  And you don't

09:17  21   get to be a market leader with almost 80 percent of the

09:17  22   market worldwide by cheating, stealing and

09:17  23   disrespecting other people's property.

09:17  24                And as I told you in the opening,

09:17  25   Textron, too, they are an innovator.  You've seen the

09:17  1    products they've made over the years, and they are a

09:17  2    major player in the aerospace and defense industry.

09:17  3    They do make amazing helicopters, and they do have

09:17  4    brilliant engineers.  I acknowledge that.  I admire

09:18  5    that.  And I thank them for keeping our country safe.

09:18  6            But this case is not about DJI's patents;

09:18  7    this is a case about their patents.  Textron is the one

09:18  8    who brought this suit; DJI did not.  Textron chose to

09:18  9    bring this case.  This case is about specific claims in

09:18  10   the patents that Textron owns.

09:18  11           You heard Mr. Meek in opening refer to

09:18  12   patent claims being like a fence, a fence line around

09:18  13   your property.  And that's absolutely right.

09:18  14           And the words, the words of the claim,

09:18  15   which tell you where that fence line is, they matter.

09:18  16   And Dr. Nourbakhsh said that repeatedly.

09:18  17           Now, you've heard from two technical

09:18  18   experts in this case.  Both experts received the same

09:18  19   source code, around 2 million lines.  They received the

09:18  20   same documents and had access to drones for testing.

09:18  21           Dr. Nourbakhsh was the only expert who

09:18  22   was a helicopter pilot.  And I never knew how difficult

09:18  23   it was to fly one of those until I heard him explain it

09:18  24   to us, and it sounds like it's really complicated.

09:19  25           He's the only expert who took the claims

09:19   1    for what they are.  The words of the patent matter.

09:19   2    That's what he said, and that's what he did.

09:19   3            He was also the only expert to fly the

09:19   4    drone in here to show you.  The expertise and reality

09:19   5    of Dr. Nourbakhsh's expert testimony, it allowed you to

09:19   6    see with your own eyes how the product worked and also

09:19   7    to see with your own eyes the full guns from Textron as

09:19   8    they came out on cross-examination of him.

09:19   9            And what did they focus primarily on?

09:19   10   What is he getting paid?  Does he know DJI's CEO?  Does

09:19   11   he know how much a flight costs from China?  Why isn't

09:19   12   DJI's CEO here?  Has he ever flown a drone in the fog?

09:19   13   And did he break a rule by trying to touch the drone to

09:19   14   explain to you and to defend his own opinions as to why

09:19   15   DJI's products don't infringe?

09:19   16           They even grilled him about how he raised

09:19   17   his kids.

09:19   18           They tried to suggest he was inserting

09:19   19   words into his testimony.  They showed you slides like

09:19   20   this.  But Dr. Nourbakhsh's testimony was clear.  He

09:20   21   did not say that the claims had to be manned.  He said

09:20   22   the word "manned" isn't in the claim.  Doesn't say

09:20   23   manned aircraft -- manned rotary aircraft.  And

09:20   24   then if -- Mr. Fisher, go to the next one.

09:20   25           He also agreed that the claims do not say

09:20  1    on board.  And then Textron's expert also said to --

09:20  2                The next slide, Mr. Fisher.  Thank you.

09:20  3                -- that Dr. Nourbakhsh wanted to read

09:20  4    this language into the claims that the forward speed

09:20  5    hold maintains a nonzero forward speed, and then that

09:20  6    somehow is written into the claims.

09:20  7                But Dr. Nourbakhsh never said that the

09:20  8    forward speed hold loop requires holding a current

09:20  9    non-zero speed.

09:20  10               And if we go to the next slide,

09:20  11   Mr. Fisher.

09:20  12               Here's the other example where they said

09:20  13   Dr. Nourbakhsh would write in chosen by the operator.

09:20  14   Other than describing how DJI's products were working,

09:20  15   I never heard him say that was a requirement of the

09:20  16   claims.

09:20  17               So what did Dr. Nourbakhsh tell you?  He

09:21  18   told you DJI's drones operate different from what's

09:21  19   claimed in Textron's patents.  For DJI, it's all about

09:21  20   position control.  And for Textron, it's all about

09:21  21   velocity or movement control.

09:21  22               It's a difference for the consumer

09:21  23   application, where you just want to follow position

09:21  24   versus a military application, where you need precise

09:21  25   control of velocity.

09:21  1                    For the '909 patent, DJI's drones don't

09:21  2    send movement data to the drone.  They follow based on

09:21  3    position only, and position is not movement.

09:21  4                    If we could go to Claim 1, and I'll have

09:21  5    you pull up, Mr. Fisher, Column 8, Lines 42 to 44.

09:21  6                    This requirement and similar requirements

09:21  7    are in every claim of the '909 patent:  A receiver

09:21  8    disposed on the aircraft and adapted to receive.

09:21  9                    And what does it have to receive?

09:21  10    Transmitted reference data communicating a position and

09:21  11    movement of a reference vehicle.

09:21  12                    It doesn't say communicating a position

09:21  13    of the reference vehicle.  It doesn't say position or

09:22  14    movement.  It says "position and movement."  Words of a

09:22  15    claim matter.

09:22  16                    And if we go to Defendants' Demonstrative

09:22  17    2-30, Mr. Fisher.

09:22  18                    As Dr. Nourbakhsh explained, in DJI's

09:22  19    Follow Me mode, the controller, which is mapped to the

09:22  20    reference vehicle, it's sending position data from the

09:22  21    global positioning system.  It sends the position, not

09:22  22    the movement.

09:22  23                    And, Mr. Fisher, if we can go to the next

09:22  24    slide.

09:22  25                    And for ActiveTrack, it's even easier.

09:22  1    You heard how this works.  There's a screen and you

09:22  2    touch on an image, and then the drone will then receive

09:22  3    where on that image the object is that you want to

09:22  4    track.

09:22  5            You can see on this slide, there's a

09:22  6    plane.  It's the second image.  It's one of Textron's

09:22  7    planes.  And you can tell it's moving because planes

09:22  8    don't hover in the air.  They're flying.

09:22  9            If I point at that moving vehicle, am I

09:22  10   telling you how fast that plane is going?  No.  I'm

09:23  11   telling you it's the plane in the middle.  And yes,

09:23  12   that's the position of the plane on an image, but I'm

09:23  13   not telling you where that plane is nor am I telling

09:23  14   you how fast it's moving.

09:23  15           Thank you, Mr. Fisher.

09:23  16           For the '752 patent, DJI's hovering is

09:23  17   position-based, not speed-based.  DJI's drones are

09:23  18   controlled when they're hovering by their position when

09:23  19   the sticks are released.  DJI's drones hold their

09:23  20   position.  You saw that in here.

09:23  21           They do not use the control logic recited

09:23  22   in the patent.  The forward speed hold can hold any

09:23  23   speed like a cruise control, sure.  But the specific

09:23  24   cruise control recited in the patent is engaged at

09:23  25   certain times.  Dr. Nourbakhsh explained this to us,

09:23   1   and it's also in the claims.  And so let's take a look

09:23   2   at the claims.

09:23   3                And I'll have you, let's see, focus on

09:23   4   Column 12, Lines 36 to 39, Mr. Fisher.

09:23   5                Wherein the forward speed hold loop

09:23   6   automatically engages when the longitudinal controller

09:23   7   is returned to a detent.

09:24   8                The forward speed hold loop claimed in

09:24   9   the patent has to be engaged when the stick is in

09:24  10   detent, meaning its center.

09:24  11                And Dr. Nourbakhsh provided a detailed

09:24  12   technical analysis using the code that was provided and

09:24  13   the documents, but he said you don't even need to read

09:24  14   that stuff to tell the behavior that the drone is

09:24  15   performing.

09:24  16                And at least what I think was the most

09:24  17   fun part of the trial, he flew the drone right over

09:24  18   there, and he showed the test that he used to confirm

09:24  19   that his analysis was correct.

09:24  20                He wasn't saying it's infringing when

09:24  21   it's staying still and then not when he moves it.

09:24  22   Obviously a rock on the ground has a fixed position and

09:24  23   no velocity.

09:24  24                What his test was intended to show you

09:24  25   is, is that drone, when it's hovering, when the sticks

09:24  1   are released, when he set the controller over there, is

09:24  2   that drone being controlled to maintain its position or

09:24  3   is it being controlled to maintain its speed?

09:24  4        And he said there's a very simple test

09:24  5   you can do to confirm this.  If you drag this to the

09:24  6   side and if the drone -- while the controller's on the

09:24  7   desk -- if the drone is maintaining its current speed,

09:25  8   then when you let go of it, it'll stay put.

09:25  9        You could drag it over here, and it'll

09:25  10  stay right here, but if it's being controlled by its

09:25  11  position, then if you drag it away, when you let go,

09:25  12  it's going to move back to the position because it's

09:25  13  trying to hold its position.

09:25  14        This test definitively established that

09:25  15  when a DJI drone is in a hover, the control system

09:25  16  engages in position hold, not a forward speed hold.

09:25  17        Now, I want to be very clear on one

09:25  18  point.  Dr. Nourbakhsh did not say that DJI drones do

09:25  19  not infringe only when he's pushing that, rather, that

09:25  20  test was simply used to explain what the behavior is

09:25  21  going on when it's hovering.

09:25  22        I cannot possibly address all the other

09:25  23  reasons why Dr. Nourbakhsh explained how DJI's products

09:25  24  don't infringe the asserted claims, otherwise we'd be

09:25  25  here all week again.

09:25   1              But there's one more point I'd like to
09:25   2   highlight to show how Textron is rewriting its claims
09:26   3   to stretch them to cover DJI's products.
09:26   4              For the '752 patent, the very first part
09:26   5   of the claim says the rotorcraft -- or the rotary
09:26   6   aircraft has these four controllers.
09:26   7              I think that's clear enough.  Words of a
09:26   8   patent matter.  This does not say the rotary aircraft
09:26   9   is controlled by the controller.  It says it has that.
09:26  10              And here's what Textron does.
09:26  11              This is the rotary aircraft.  This is the
09:26  12   controller.  So for the '752 patent, they want to say
09:26  13   these two are the same, okay?
09:26  14              And look at what they do with the '909
09:26  15   patent.  The '909 patent, they say that this is the
09:26  16   aircraft and that this for Follow Me is the reference
09:26  17   vehicle.
09:26  18              The inconsistency just shows how they're
09:26  19   stretching the claims to cover DJI's products in a way
09:26  20   that was not intended and is not covered by the words
09:26  21   of the patent.
09:26  22              Thank you, Mr. Fisher.
09:26  23              DJI doesn't need and doesn't want the
09:27  24   technical features in Textron's patents.  The
09:27  25   technology in both patents is about very precise

—1209—

09:27  1    maneuvers to ensure the safety of the aircraft.  And

09:27  2    that degree of precision just isn't needed for how

09:27  3    DJI's drones operate.

09:27  4                DJI's drones use position to track an

09:27  5    object, not its movement.  And DJI's drones use

09:27  6    position hold, not speed hold, when they're hovering.

09:27  7                DJI's behavior is entirely consistent

09:27  8    with what it did.  It's why DJI had no interest in

09:27  9    buying the '909 patent.  It didn't need what Textron

09:27  10   was selling.

09:27  11               And if you get a flier in the mail from a

09:27  12   car dealership offering to sell you a car, you know

09:27  13   you're not obligated to buy it nor are you obligated to

09:27  14   call them back and say thanks but no thanks.  And if

09:27  15   you're on your own property, you can stand your ground.

09:27  16               In Textron's view, that car advertisement

09:27  17   is a notice.  That obligates you to enter into

09:27  18   negotiation with the dealer for a car that you don't

09:27  19   want and that you don't even need.  And that's simply

09:27  20   unreasonable, and that's why DJI did not respond.

09:28  21               For a decade before Textron filed this

09:28  22   lawsuit, DJI's engineers have been minding their own

09:28  23   business, working hard, innovating as they always have,

09:28  24   making and improving drones.

09:28  25               Textron wants you to believe that's an

09:28   1    engineer's job to investigate legal allegations,

09:28   2    20-year-old engineers in China who don't even know

09:28   3    English well enough to testify in it.  But that's not

09:28   4    the engineer's job nor is it the software engineer's

09:28   5    job.

09:28   6                Textron's engineers don't look at patents

09:28   7    either, and you heard that from Mr. Wittmaak:  Do you

09:28   8    ever review any of DJI's patents in the course of your

09:28   9    work developing the APT, which is their drone?

09:28   10               Not that I recall.

09:28   11               Why not?

09:28   12               So typically when we design a new

09:28   13   product, we design them from requirements that we

09:28   14   identified, the use cases we identified.  In general,

09:28   15   patents typically don't provide us much of what we need

09:28   16   to do that.  That'd be infringement if we had.

09:28   17               Thank you, Mr. Fisher.

09:28   18               It's the job of DJI's attorneys to

09:28   19   investigate allegations of infringement.  That's what

09:28   20   DJI did.  That's why DJI is here.

09:29   21               We all know that just because someone

09:29   22   accused you of something that doesn't make it so, and

09:29   23   that is why I am here and that is why my team is here.

09:29   24               In Textron's view, once it accused DJI of

09:29   25   something, everyone should assume it's automatically a

09:29  1   fact.  And as you heard repeatedly, because DJI has its

09:29  2   headquarters in China, everyone should presume it's

09:29  3   guilty, and then let's pile on a few extra helpings of

09:29  4   damages for good measure.

09:29  5             So DJI was never treading on property

09:29  6   that Textron claims it owns.  DJI was always on its own

09:29  7   property and it stood up for itself.

09:29  8             A lot is on the line.  You heard the ask.

09:29  9   And it's not cheap for DJI to stand here.  Our legal

09:29  10  system is expensive, but it's the right thing to do.

09:29  11            Let's talk about property, because

09:29  12  another question you have to answer is whether that

09:29  13  property truly belongs to Textron.  And remember,

09:29  14  Textron is the one who brought this suit.  They know

09:29  15  that it comes with risks.  It means their claims are

09:29  16  scrutinized, and they get a second look.

09:30  17            You, the jury, are the ultimate judges on

09:30  18  that issue.  You, specifically, are built into the

09:30  19  patent system as the ultimate determiner of the patent

09:30  20  validity.  You get the last word.

09:30  21            And so for the '909 patent, we heard the

09:30  22  patent is all about following a vehicle.  It's written

09:30  23  into the claim.  The problem of landing on a moving

09:30  24  boat was described.

09:30  25            And when the Patent Office granted this

—1212—

09:30    1    patent -- this is Figure 1 from the '909 patent -- it

09:30    2    did not have the next slide which was the Frink patent.

09:30    3    The patent to Mr. Frink.

09:30    4            As you see on this slide, Frink discloses

09:30    5    matching the speed of a reference vehicle.  It stays

09:30    6    right there.

09:30    7            Dr. Nourbakhsh walked through every

09:30    8    single element of every asserted '909 patent claim, and

09:30    9    he explained how Claims 1, 7, 10 and 11 of the '909

09:30    10   patent were already invented by Mr. Frink.  Here's him

09:30    11   walking through the elements for Claim 1, as you

09:30    12   probably recall.

09:30    13           Now, Textron, they had the opportunity to

09:30    14   call up Dr. Michalson to explain that Dr. Nourbakhsh

09:31    15   missed something or was wrong.  And, in fact,

09:31    16   Dr. Michalson was in the room.  I saw him back there.

09:31    17   Textron did not even call him to the stand to defend

09:31    18   their own property that they contend is so valuable.

09:31    19           And for the '752 patent, Dr. Nourbakhsh

09:31    20   explained that a Boeing engineer had already described

09:31    21   a similar system for the Comanche helicopter.  This is

09:31    22   the article by Mr. Gold and Mr. Dryfoos.

09:31    23           Textron does not dispute that the

09:31    24   Comanche and Mr. Gold's article was prior art.  It was

09:31    25   prior to the '752 patent.  In fact, you were instructed

09:31  1   yesterday that there is no dispute.

09:31  2                   Thank you, Mr. Fisher.

09:31  3                   Like with the '909 patent, Textron had

09:31  4   the opportunity to call Dr. Michalson up to the stand

09:31  5   to explain that Dr. Nourbakhsh missed an element or

09:31  6   that he was wrong, and yet Textron did not even get up

09:31  7   and defend its patent, the one it wants you to use to

09:31  8   award over 300 million in damages in this case.

09:32  9                   And they said with respect to the

09:32  10  validity, you have to press a button to start the --

09:32  11  you have to press a button to engage their autopilot,

09:32  12  but you also have to press a button to start a

09:32  13  helicopter.  And that does not mean that the Comanche

09:32  14  doesn't have a hover when the autopilot is on and when

09:32  15  that button is pressed.  Dr. Nourbakhsh explained that.

09:32  16                   With both of these, your job is critical

09:32  17  because the Patent Office did not have either of them.

09:32  18  And if you take a careful look at Instruction B.25,

09:32  19  which is titled "Anticipation" -- and I've got the

09:32  20  highlight up here from when it was read to you

09:32  21  yesterday afternoon -- when a defendant is relying on

09:32  22  prior art that was not considered by the PTO during its

09:32  23  examination, you may consider whether the prior art is

09:32  24  significantly different and more relevant than the

09:32  25  prior art that the PTO did consider.  If you decide it

09:32  1    is different and more relevant, you may weigh that

09:32  2    prior art more heavily when considering whether the

09:32  3    challenger has carried its clear and convincing burden

09:32  4    of proving invalidity.

09:32  5                 Thank you, Mr. Fisher.

09:32  6                 The clear and convincing, and I submit

09:33  7    the only evidence about -- that you heard during this

09:33  8    trial about whether Mr. Frink's patent and Mr. Gold's

09:33  9    article would have made a difference were from

09:33  10   Dr. Nourbakhsh.  The evidence you heard in this case is

09:33  11   that the patent claims at issue describe technology

09:33  12   that now belongs to the public, not to Textron alone.

09:33  13                 And if the Patent Office had those

09:33  14   references, Textron would have never been granted these

09:33  15   claims.  Letting Textron keep patent claims it does not

09:33  16   deserve, claims that cover property that's now -- the

09:33  17   public has had, has negative consequences for

09:33  18   everybody.  It robs the public of the right to use that

09:33  19   property and it hinders innovation.

09:33  20                 The patent system did not intend for

09:33  21   people to put a fence around a public park and declare

09:33  22   it as their own.  The patent to Mr. Frink and

09:33  23   Mr. Gold's hard work described in that article, they

09:33  24   came before Textron's '909 patent and before their '752

09:33  25   patent.  The work described in Mr. Frink's patent and

09:33  1    Mr. Gold's article, they belong to the public.  These

09:34  2    are not Textron Innovations.

09:34  3              So why are we really here?

09:34  4    Mr. Runstadler, the one in charge of the plaintiff,

09:34  5    said that Textron is here to protect its intellectual

09:34  6    property.  You heard from Textron's witnesses that

09:34  7    intellectual property is critical to its R&D and that

09:34  8    Textron must protect it.

09:34  9              And we wholeheartedly agree.  DJI is an

09:34  10   innovator as well.  They have thousands of patents.

09:34  11   And if someone was infringing our patents, our

09:34  12   property, we would take every measure to protect what

09:34  13   we own as well.

09:34  14             But what Mr. Runstadler told you doesn't

09:34  15   match the evidence you heard, the real-world evidence.

09:34  16             First, this was never Textron's property

09:34  17   to begin with.  We just discussed why.  And Textron did

09:34  18   not even bother to tell you, the jury, why and how its

09:34  19   '909 and '752 patents differ from Mr. Frink's patent,

09:34  20   the invention described in Mr. Frink's patent or the

09:34  21   system described in Mr. Gold's article.  They didn't

09:34  22   even defend it when they had the chance.

09:34  23             Second, Textron brought you their

09:35  24   polished damages expert and told you a nice story about

09:35  25   the value of the intellectual property in this

—1216—

09:35  1    courtroom, but where's the evidence of that value in

09:35  2    the real world?  Textron doesn't use it.  Textron

09:35  3    doesn't need it.  Textron tried to sell it more than

09:35  4    once.  Nobody wanted to buy it, not DJI, not anybody

09:35  5    else.  No one ever asked to license it, and they never

09:35  6    got anyone to license.

09:35  7            Now, Textron says it's protecting its

09:35  8    valuable property and that it's critical.  It's --

09:35  9    Mr. Runstadler's primary job is to protect it.  They're

09:35  10   a sophisticated corporation.  Textron was created for

09:35  11   the -- Textron Innovations, the plaintiff in this case,

09:35  12   was created for the sole purpose of managing and

09:35  13   protecting its IP.  It has one job.  That's what it

09:35  14   does.

09:35  15           Textron had these patents in 2015 when it

09:35  16   alleges the first infringing drones came on the market.

09:35  17   To be clear, DJI was not doing that in secret.  By that

09:35  18   time, DJI was winning awards and making headlines.  The

09:36  19   drone market was booming.  I mean, you even heard

09:36  20   Mr. Wittmaak testify that Textron used DJI's drones to

09:36  21   film and take pictures of their stuff from the air.

09:36  22           So while DJI had no idea about Textron,

09:36  23   Textron had DJI on their radar.  And if you own

09:36  24   something that you believe was important and had a lot

09:36  25   of value and you saw someone else using it, what would

—1217—

09:36   1   you do?  Well, let's see what Textron did when,

09:36   2   according to Textron, DJI released its infringing

09:36   3   drones on the market.  In 2015, this is what Textron

09:36   4   did.

09:36   5                   Mr. Fisher?

09:36   6                   And in 2016, Mr. Fisher, what did -- what

09:36   7   did Textron do?  And in 2017?  And 2018?

09:37   8                   And when 2019 rolls around, this is what

09:37   9   Textron did.  You've heard a lot about this letter,

09:37  10   Plaintiff's Exhibit 67.  Textron says in this letter

09:37  11   that they had decided to sell the patent.

09:37  12                   Mr. Fisher, if you could blow up that

09:37  13   first paragraph.  Yeah.

09:37  14                   Right beneath the bullet, it says Bell

09:37  15   has decided to sell this patent.  There's not a mention

09:37  16   of the word "infringement" in this letter.  They said

09:37  17   they're looking for someone to purchase the patents.

09:37  18   If there was ever a moment to say, we think you

09:37  19   infringe, get off of my lawn, this was -- this would

09:37  20   have been the perfect moment to do it.

09:37  21                   And when 2020 rolls around, here's what

09:37  22   Textron did.  Did nothing.

09:37  23                   And when does Textron finally take

09:37  24   action?  It's in 2021 when they filed this lawsuit.

09:37  25   And that's the first time DJI got a word from Textron.

09:37  1    It's the very first time Textron did anything.

09:38  2                    You, the jurors -- you, the jury, are the

09:38  3    weighers of the facts and the evidence viewed through

09:38  4    the lens of your everyday commonsense experiences.

09:38  5    That's the way this system is set up.  So when you

09:38  6    deliberate, you should ask yourself:  Is their behavior

09:38  7    consistent with someone who truly believes someone else

09:38  8    is using their property without permission?  And is

09:38  9    Textron's behavior consistent with someone who truly

09:38  10   believes they have valuable property?

09:38  11                   Truth is, we're not here because

09:38  12   Textron's trying to protect its valuable property.

09:38  13   Textron's own behavior tells you that.  In their

09:38  14   opening statement you heard Mr. Meek tell you that this

09:38  15   trial is Textron's last resort.

09:38  16                   But it's not because of Textron's

09:38  17   innovation, it's because of DJI's innovations.  For the

09:38  18   past 17 years, DJI has been good at what it does:

09:38  19   Developing drone technology, improving drone technology

09:38  20   and innovating.

09:38  21                   They revolutionized how people interact

09:38  22   with the world, improving how people work and how they

09:38  23   play.  And DJI's products also offer life-changing and

09:39  24   life-saving utility across multiple applications.

09:39  25                   Just a decade ago a helicopter pilot

09:39    1    would be risking his life if he was told to go inspect

09:39    2    power lines or scout a forest fire.  Today these

09:39    3    dangerous tasks can be accomplished with sophisticated

09:39    4    drones.  It's easier and less expensive with no loss of

09:39    5    life.  And what once had never been dreamt of is now a

09:39    6    reality because of DJI.  Textron sees that and they see

09:39    7    how quickly that technology's improving and how

09:39    8    profitable that technology is.

09:39    9                Now, to be clear, you heard the evidence.

09:39   10    DJI and Textron, they are not competitors.  This is a

09:39   11    quote from Runstadler:  They are not direct

09:39   12    competitors.

09:39   13                The next slide:  Bell has not

09:39   14    manufactured any drones for sale either.

09:39   15                Next:  And if they were a competitor, you

09:39   16    would have expected DJI to have heard of them as well.

09:39   17    And you heard from Mr. Oshauna up on the stand.  He had

09:39   18    never heard of Textron before.

09:40   19                And you heard evidence from Textron's own

09:40   20    witnesses and documents that DJI has not harmed

09:40   21    Textron.  And that's from Mr. Andrien you heard that.

09:40   22                Let's see.  Yeah.  Next quote.  Here we

09:40   23    go:  Mr. Andrien did not tell you that Textron has been

09:40   24    unable to sell drones because of DJI.

09:40   25                And the next one:  Nor did he tell you

09:40   1    that Textron has lost sales of helicopters because of

09:40   2    DJI.  And even if the five asserted claims -- not

09:40   3    patents -- even if those five claims are determined by

09:40   4    you, the jury, to be invalid, it would have no adverse

09:40   5    impact on Textron.

09:40   6                 I asked Mr. Runstadler if the jury

09:40   7    concludes the patents in this case are invalid, would

09:40   8    there be a material impact on Textron?  He said he

09:40   9    didn't know it was true initially.

09:40   10                And then I reminded him of what Textron

09:40   11   had told the federal government, our federal

09:40   12   government, the Securities and Exchange Commission, in

09:40   13   their annual report, the one he'd just finished talking

09:40   14   about.

09:40   15                In here it tells you at the final end, it

09:41   16   says:  While intellectual property rights in the

09:41   17   aggregate are important, we do not believe that any

09:41   18   existing patent is of such importance that its loss or

09:41   19   termination would have a material adverse impact on our

09:41   20   business taken as a whole.

09:41   21                And then he agreed with me on the next

09:41   22   quote.

09:41   23                THE COURT:  Counsel, you have five

09:41   24   minutes.

09:41   25                MR. SCHROEDER:  Thank you.

09:41 1              And that's because none of the patents in
09:41 2    this case are that important to Textron's business;
09:41 3    isn't that correct?
09:41 4              They're not material.  That's correct.
09:41 5              Thank you, Mr. Fisher.
09:41 6              So DJI is not an actual threat to
09:41 7    Textron, but Textron believes it can get money.
09:41 8              And I'm a simple man.  I'm usually quite
09:41 9    content sitting and listening to people talk.  I used
09:41 10   to hate public speaking.  It was one of my biggest
09:41 11   fears.  I get tongue tied every now and then,
09:41 12   especially when I say a word like DJI and try to put
09:41 13   that in a sentence.
09:41 14             What I've observed that most the time
09:41 15   people introduce themselves, they say what's important
09:41 16   to them.  I do.  I told you about my wife and my kids
09:41 17   and my cat, things I hope to return to this weekend.
09:42 18             That happened a lot here too.  I think I
09:42 19   know which of the witnesses are married, how many kids
09:42 20   they have, what their names are, all of that.
09:42 21             Well, let's think back to Textron's
09:42 22   opening.  Mr. Meek, in his opening, the first things he
09:42 23   said about DJI was not that they're innovators.  He
09:42 24   said:  Who is the defendant?  Defendant is DJI.
09:42 25   They're a company in Shenzhen, China.  They make a lot

09:42    1    of money, billions of dollars of revenue.

09:42    2                    That's the real reason we're here.  I've

09:42    3    been wondering since this case was filed, and it's

09:42    4    finally come into focus this morning for me.

09:42    5                    Textron seeks to profit off of DJI's

09:42    6    innovations.  DJI and Textron are not competitors.

09:42    7    There's no lost sales.  If Textron loses the patents it

09:42    8    asserted, has no material impact on it.  And like you

09:42    9    heard, DJI gets sued a lot.

09:42   10                    Unfortunately, that's what happens to

09:42   11    successful companies.  You saw we had to seal the

09:42   12    courtroom a few times during the proceedings.  That's

09:42   13    because DJI's true competitors are out there, and DJI

09:42   14    protects its own property.

09:43   15                    You also heard that Textron more than

09:43   16    tripled its damages demand after DJI was designated a

09:43   17    Chinese military company based on documents it

09:43   18    submitted to the Chinese government to try to get its

09:43   19    source code out.

09:43   20                    In fact, there are moments of this trial,

09:43   21    I reviewed the transcript, where it seems that Textron

09:43   22    spent more time talking about China than about the

09:43   23    technology at issue.  And why is that?

09:43   24                    So like I said at the beginning, we're

09:43   25    going to ask three things of you.  We're going to ask

09:43  1    you to conclude that what DJI does is different and,

09:43  2    therefore, we do not infringe.

09:43  3              We're going to ask you to award Textron

09:43  4    nothing in damages, not a penny.

09:43  5              We're going to ask you to invalidate just

09:43  6    the five patent claims in Textron's patents that do not

09:43  7    rightfully belong to them.

09:43  8              I'm going to briefly run through -- let's

09:43  9    see.  I'll do that in a moment.

09:43  10             There's one other thing I want to address

09:43  11   because it came out in trial, and it was -- this was

09:43  12   the comment about how come DJI's CEO is not here.

09:44  13             Mr. Wang is the head of a leading

09:44  14   drone-maker in the world.  15,000 people around the

09:44  15   world is how many they've got innovating for over a

09:44  16   decade at a rapid pace.  When it takes Textron three

09:44  17   months to make a drone, DJI's already releasing its new

09:44  18   model.

09:44  19             Of course, the president of Textron

09:44  20   Innovations is here.  He flew in from Rhode Island.

09:44  21   He's the head of a four-person company whose job is to

09:44  22   file lawsuits.

09:44  23             DJI did show up as well.  The Judge

09:44  24   instructed you in Instruction B-4, as you'll read and

09:44  25   as you were read yesterday:  The deposition testimony

-1224-

09:44    1    that was played is entitled to the same consideration

09:44    2    and is to be weighed and otherwise considered by you in

09:44    3    the same way as if the witness had been present and had

09:44    4    testified from the witness stand in court.

09:44    5              You should not hold the quality of the

09:44    6    video, the location of the witness or any other

09:44    7    circumstances arising from travel restrictions against

09:44    8    either party.

09:44    9              And when you listen to that translated

09:44   10    testimony, consider how difficult it is to speak when

09:44   11    you only know one language, like me, let alone when you

09:45   12    need to answer a question that's already been

09:45   13    translated once, give an answer back and then your

09:45   14    answer is translated by one, sometimes two translators.

09:45   15              And if those witnesses, at the time of

09:45   16    those depositions, had they come to the U.S., they

09:45   17    would've had to quarantine for weeks because that's the

09:45   18    state of the world at that time.

09:45   19              And as far as why Mr. Wang's not here,

09:45   20    Textron never asked him to come here.  They filed this

09:45   21    suit, and they never asked him to come here.  They

09:45   22    never asked to talk to him, which brings me back to

09:45   23    what I said at the beginning.

09:45   24              Our justice system is not perfect, but

09:45   25    it's the best in the world.  In many places, an

09:45  1   accused -- someone who's accused, they never get a

09:45  2   trial.  And for those other places where they do, you

09:45  3   can never hope to get a fair one.  But here in America,

09:45  4   you can count on getting a fair trial.

09:45  5              DJI is here to defend its reputation, its

09:45  6   innovations and its property.  I and, more importantly,

09:45  7   DJI, we trust that you'll decide this case on the

09:46  8   merits.  I'm confident no matter the outcome that you

09:46  9   will.

09:46  10             Thank you.

09:46  11             THE COURT:  You can wrap up.

09:46  12             MR. SCHROEDER:  I'll do one final

       13   illustration.

09:46  14             When you have -- when you're handed the

09:46  15   verdict form, I want to make one -- I want to show you

09:46  16   what you're going to see when you go back.

09:46  17             And if I could switch to the ELMO real

09:46  18   quick.  They call these things ELMO.  I don't know why

09:46  19   but...

09:46  20             So this is the verdict form you will see.

09:46  21   This is Question No. 1.

09:47  22             Question No. 1 is the verdict form, and

09:47  23   this asks you if Textron has proven that DJI directly

09:47  24   infringed the asserted claims.  And for each of these,

09:47  25   I'm asking you to check no.

09:47   1            Question 2 will ask you about, did DJI --

09:47   2    or did Textron Innovations prove by a preponderance of

09:47   3    the evidence that DJI actively induced infringement of

09:47   4    the following asserted claims?

09:47   5            Read the instruction for active

09:47   6    inducement and ask yourself whether you saw any

09:47   7    evidence of intent to infringe on behalf of DJI.  For

09:47   8    these, you should check no.

09:47   9            And Question 3:  Did Textron Innovations

09:47   10   prove by a preponderance of the evidence that DJI's

09:47   11   infringement of the '909 patent was willful?

09:47   12           Again, ask yourself what evidence have

09:47   13   you heard that DJI was intending to infringe?

09:48   14           Read the instruction as you deliberate

09:48   15   over this, and I think you will agree the evidence

09:48   16   shows no.

09:48   17           And it'll be the same answer with respect

09:48   18   to willful infringement of the '752 patent.

09:48   19           And Question No. 4 will be the last

09:48   20   question.  This will be the one about validity.  Did

09:48   21   DJI prove by clear and convincing evidence that the

09:48   22   following asserted claims are invalid?

09:48   23           I submit to you the only evidence you

09:48   24   heard in this trial is that they are.  For these, yes.

09:48   25           And then, finally, for Question 5, the

09:48   1   instructions say to answer Question 5 only if there is

09:48   2   at least one asserted claim for which you answered

09:48   3   "yes" in 1 or 2, which we did not, and if you answered

09:48   4   "no" for the same claim in Question No. 4.

09:48   5          So if this one -- if you've already

09:48   6   reached this point, you can go on.  If you've done as

09:48   7   we've already marked no, no, no, yes -- and actually,

09:48   8   on this one you don't even need to answer Question

09:49   9   No. 3 if 1 or 2 were marked "no."

09:49   10          And then damages, you can skip over that

09:49   11   one.  And then once you've reached -- followed those

09:49   12   instructions and then here's where you will unanimously

09:49   13   concur in every element.

09:49   14          Once that's unanimous, as the Judge

09:49   15   instructed, you will date and the jury foreperson will

09:49   16   sign.

09:49   17          And with that, thank you for your

09:49   18   indulgence.  Thank you for your patience this whole

09:49   19   week.  It's been an honor to be here.

09:49   20          THE COURT:  Thank you, sir.

09:49   21          Mr. Meek?

09:49   22          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

09:49   23          MR. MEEK:  I'd like to take a few moments

09:50   24   to talk about some of the things that Mr. Schroeder

09:50   25   said.  Some of them were quite troubling to me.

09:50    1          He acknowledged openly how amazing Bell

09:50    2    is.  He acknowledged how great their technical

09:50    3    achievements have been and how hard the engineers work,

09:50    4    but then a mere ten minutes later, he wants to take

09:50    5    away the patents from them.

09:50    6          That means that they're not inventors

09:50    7    according to him.  I just don't see how that's

09:50    8    consistent.

09:50    9          On the noninfringement thing, I don't --

09:50    10   do I need to talk about it again?  If you're in a

09:50    11   stationary position, what is your velocity?  It's zero,

09:50    12   and it's holding that speed at zero.

09:50    13          Mr. Schroeder said that -- something that

09:50    14   I agree with.  When Bell sent that letter in 2019, DJI

09:50    15   had no obligation.  They had no -- there's no law that

09:50    16   says that they have to call back.

09:50    17          They have the right to be disrespectful.

09:51    18   They have the right to be silent.

09:51    19          I didn't -- we didn't call

09:51    20   Dr. Michalson -- this is sort of incredible.  We didn't

09:51    21   have to call Dr. Michalson.  Everybody sat here and saw

09:51    22   Dr. Nourbakhsh admit that the Frink reference is

09:51    23   missing something and that the Gold reference is

09:51    24   missing something.

09:51    25          I didn't have to call a witness and take

09:51  1    y'all's valuable time because we had all the things

09:51  2    from Dr. Nourbakhsh himself.  I thought that was a

09:51  3    courtesy.

09:51  4            I'm not sure what the blank screens are

09:51  5    in the -- all these years.  It sounds kind of like

09:51  6    Mr. Schroeder wanted us to sue him sooner.  I don't

09:51  7    understand that.  That's a very strange way of doing

09:51  8    business.

09:51  9            What we heard -- on Monday morning, I

09:51  10   told you this case was about respect but now I'm

09:51  11   wondering.  I think this case is more about disrespect.

09:52  12            This is about property and respecting

09:52  13   other people's property, and that's not what's going on

09:52  14   here.

09:52  15            These people have patents that have been

09:52  16   issued by the United States government.  That means

09:52  17   something, at least it means something to us.

09:52  18            What did you just hear from

09:52  19   Mr. Schroeder?  A litany of excuses, excuses how -- why

09:52  20   they don't infringe that don't make any sense, excuses

09:52  21   trying to invalidate patents from people that worked

09:52  22   hard to get them and excuses about why they should pay

09:52  23   nothing.  Relying on smoke screens and excuses is not

09:52  24   respectful.

09:52  25            If you respect this process, if you

| | | |
|---|---|---|
| 09:52 | 1 | respect this courtroom, the Judge and you, what do you |
| 09:52 | 2 | do?  You bring answers into the courtroom. |
| 09:52 | 3 | Let me be very clear.  The depositions of |
| 09:52 | 4 | the people from DJI, that was us asking them questions. |
| 09:53 | 5 | Mr. Schroeder never asked those people any questions. |
| 09:53 | 6 | The deposition testimony that you heard was things that |
| 09:53 | 7 | we put in the record.  We brought that to you. |
| 09:53 | 8 | Mr. Schroeder and DJI did not bring -- |
| 09:53 | 9 | they only brought one live witness that was not an |
| 09:53 | 10 | expert into the courtroom. |
| 09:53 | 11 | What -- and what did these people say? |
| 09:53 | 12 | Mr. Fox Li, he's the IP manager.  What did he say?  He |
| 09:53 | 13 | doesn't know whether DJI infringes. |
| 09:53 | 14 | Mr. Gavin Chen, he's the guy in charge of |
| 09:53 | 15 | changing the products, but he said he won't do it. |
| 09:53 | 16 | Mr. Zhimeng Shang, he knows the source |
| 09:53 | 17 | code.  He's the one that knows the source code, and he |
| 09:53 | 18 | admitted all of the elements of the '752 patent were in |
| 09:53 | 19 | that code. |
| 09:53 | 20 | Mr. Chu Ai, he manages 150 software |
| 09:53 | 21 | engineers, but he doesn't want any of them to look at |
| 09:53 | 22 | the patents even after the lawsuit. |
| 09:53 | 23 | Litian Zhang admitted that the DJI drones |
| 09:53 | 24 | have the elements of the '909 patent. |
| 09:54 | 25 | And finally, Sugar Huang, she admitted |

—1231—

09:54    1    the drones are sold in the United States.

09:54    2              Remember, Textron brought these witnesses

09:54    3    to you, not DJI.  Textron brought information to you,

09:54    4    gave you answers you need.

09:54    5              There is one guy that might have been

09:54    6    helpful.  Mr. Wang.  He's a billionaire.  He made

09:54    7    $3.1 billion on selling infringing articles alone, but

09:54    8    he couldn't come up with $2,500 for a plane ride to

09:54    9    come see you folks.

09:54    10             Who did DJI bring?  Mr. Baker has been

09:54    11   sitting over there the whole time.  He's never said a

09:54    12   word.

09:54    13             There was one guy that testified.  I got

09:54    14   to talk to him.  Mr. Romsin Oushana.  As you saw,

09:54    15   that's the only person we got to talk to.

09:54    16             Was he able to provide the answers you

09:54    17   need?  I asked a lot of questions.  I didn't get a lot

09:54    18   of answers.  I heard a lot of, I'm sorry.  That's not

09:55    19   my area.  You need to speak to somebody else.

09:55    20             And by the way, that's not his fault.  He

09:55    21   was put in an absolutely impossible situation.  He

09:55    22   doesn't even work for the defendants.  Mr. Oushana told

09:55    23   you himself he is not technical.  He has nothing to do

09:55    24   with the features of the drones.  He has nothing to do

09:55    25   with how they're sold or pricing.

−1232−

09:55  1           Amazingly he literally told you that if

09:55  2    Apple, his one customer, calls him and says they would

09:55  3    like a feature, he doesn't even pass that request on.

09:55  4    This is not somebody that's in the loop at DJI.

09:55  5           He's a good guy.  He is a very smart guy.

09:55  6    But how useful is he to you for answers when he didn't

09:55  7    even learn of the patents or the lawsuit until the day

09:55  8    of his deposition?  He couldn't give you answers

09:55  9    because he's not the person at DJI that has the

09:55  10   answers.

09:55  11          Whoever that person is, he wasn't here

09:56  12   this week.  Is that respect?  Is that a respectful way

09:56  13   to help you find the answers that you need?

09:56  14          So who did speak for DJI?

09:56  15          Dr. Nourbakhsh.  Dr. Nourbakhsh is a

09:56  16   professor and a lab director.  But what's his most

09:56  17   lucrative job by far?  His best paid job is to tell the

09:56  18   world that DJI didn't do it.  He's made millions

09:56  19   digging DJI out of the dirt.

09:56  20          In Nourbakhsh's world, the only -- the

09:56  21   one thing that causes a patent to go invalid is that

09:56  22   it's used against DJI.  He has never opined that a

09:56  23   patent asserted against DJI is valid or infringed.

09:56  24   That just doesn't happen in the DJI-didn't-do-it world.

09:56  25          He told you they get sued a lot.

09:56  1   Business is good in that world.  How does he get the

09:56  2   same answer every time?  DJI didn't do it.  How does he

09:56  3   get that?  Well, sometimes, I'm telling you, he ignores

09:57  4   the rules.

09:57  5           Here the Judge told both sides that

09:57  6   because DJI didn't turn over the source code when they

09:57  7   were supposed to, the Judge had to step in.  He ordered

09:57  8   everyone, me, you, the witnesses, that the code should

09:57  9   be presumed to be favorable to a finding of

09:57  10  infringement on the '752 patent.

09:57  11          What did Dr. Nourbakhsh do with that

09:57  12  order?  He concludes that the code -- by the way, that

09:57  13  he's never seen -- he concludes that it's not relevant,

09:57  14  even though his bosses at DJI swore to the Chinese

09:57  15  government under penalty of God only knows what, that

09:57  16  it was relevant code to this lawsuit.  Everyone agrees

09:57  17  that this code is relevant, and it is.

09:57  18          Don't you think it's kind of odd that

09:57  19  DJI's argument with the drone is saying, well, it's

09:57  20  about position, and we have the position code?  We're

09:57  21  saying that it's about velocity.  Guess what code

09:58  22  didn't come into the courtroom?  The file titled

09:58  23  "velocity."  Seems a little convenient.

09:58  24          Nourbakhsh singing in tune with DJI also

09:58  25  extends to imaginary technology, hypothetical systems.

1234

09:58  1  With no input from DJI engineers, and most importantly,

09:58  2  no -- never talking to a DJI customer, Dr. Nourbakhsh

09:58  3  came up with a number of new hypothetical systems that

09:58  4  don't infringe, but according to him, the customers

09:58  5  would just suck it up.  They would just take it without

09:58  6  hesitating.

09:58  7          One example, instead of a fully automatic

09:58  8  hover where I drop the controller, like the doofus that

09:58  9  I am, and my drone just sits there patiently waiting

09:58  10  for me to get my act together, instead of that, he

09:58  11  wants to put a brake button on there.  A brake button.

09:58  12  The brake button is on the controller on the floor as

09:58  13  my $2,000 drone disappears over the horizon.  That's

09:59  14  not suitable.  That's not the same thing.

09:59  15          He says customers would think that a

09:59  16  drone over the horizon is just as good as my hover one

09:59  17  calmly waiting for me to get my act together.  That

09:59  18  doesn't make any sense.  It only makes sense in one

09:59  19  place.  The DJI-didn't-do-it world.

09:59  20          The other guy that we had talk was Todd

09:59  21  Schoettelkotte.  Mr. Schoettelkotte didn't give us any

09:59  22  answers either.  He spent a lot of time criticizing

09:59  23  Mr. Andrien, but when asked about his own number, his

09:59  24  own analysis, there wasn't anything to say.  "I

09:59  25  wouldn't be offering that opinion."

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 09:59 | 1  | What Schoettelkotte did was tell you why                             |
| 09:59 | 2  | he thought Andrien was wrong.  Don't you love people                 |
| 09:59 | 3  | that tell you why you're wrong and -- but won't tell                 |
| 09:59 | 4  | you why they're right?                                               |
| 09:59 | 5  | He said Andrien did three things wrong,                              |
| 09:59 | 6  | and he's wrong about all of them.  He said Mr. Andrien               |
| 10:00 | 7  | didn't handle the costs right.  Andrien subtracted the               |
| 10:00 | 8  | costs that has to do with the features.  But                         |
| 10:00 | 9  | Schoettelkotte says he's got to subtract all the costs.              |
| 10:00 | 10 | Do you remember this one?  Even bonuses                              |
| 10:00 | 11 | to the executives.  Think about that.  Mr. Wang could               |
| 10:00 | 12 | inflate the costs through the roof, eradicate all the               |
| 10:00 | 13 | damages by just writing himself a check.  That doesn't              |
| 10:00 | 14 | make any sense anywhere except DJI-didn't-do-it world.              |
| 10:00 | 15 | The way Schoettelkotte handled the value                            |
| 10:00 | 16 | of the features doesn't make any sense either.                      |
| 10:00 | 17 | Remember this?  He took the cheapest drone, the least               |
| 10:00 | 18 | expensive one, $86.  Somehow he comes up with the auto              |
| 10:00 | 19 | hover feature, which is effectively the crash-proof                 |
| 10:00 | 20 | feature, right, is $0.44.  Then he tells you that that              |
| 10:00 | 21 | $0.44 should apply to the $12,000 drone too.  That                  |
| 10:00 | 22 | doesn't make any sense.                                             |
| 10:00 | 23 | Crash-proofing a Lamborghini costs a lot                            |
| 10:01 | 24 | more cash than crash-proofing my old 1992 Ford 150 with            |
| 10:01 | 25 | 200,000 miles on it.  Now, I love that truck, but I am             |

—1236—

10:01  1    not going to spend the same amount of money on

10:01  2    crash-proofing that Mr. Wang is spending on

10:01  3    crash-proofing his Lamborghini.

10:01  4                    Mr. Schoettelkotte also --

10:01  5                    THE COURT:  Counsel?

10:01  6                    MR. MEEK:  -- said that Andrien split the

       7    money.

       8                    THE COURT:  Counsel?

10:01  9                    MR. MEEK:  Sorry.

10:01  10                   THE COURT:  If you'd wrap up, please.

10:01  11                   MR. MEEK:  Okay.

10:01  12                   Let's go to the verdict form then.

10:01  13   You'll see this on Page 2 of your verdict form.  Are

10:01  14   the drones infringing?  You're going to answer yes on

10:01  15   every single question.

10:01  16                   On the next one we're asking about

10:02  17   whether or not DJI actively induced infringement.  This

10:02  18   is whether they are helping folks in the United States

10:02  19   infringe.  This is through their manuals.  The

10:02  20   questions are yes.

10:02  21                   Was this evidence -- was there evidence

10:02  22   that this infringement was willful?  You heard from

10:02  23   their own engineers.  They knew about the patents and

10:02  24   did it anyway.

10:02  25                   This is the easy one.  Are you clearly

—1237—

| | | |
|---|---|---|
| 10:02 | 1 | convinced, without hesitation, that these gentlemen are |
| 10:02 | 2 | not inventors, that their patents should be taken away? |
| 10:02 | 3 | No. |
| 10:02 | 4 | And finally, as I told you before, if you |
| 10:02 | 5 | agree with us, please be careful.  40 million on the |
| 10:02 | 6 | top, 326 million on the bottom. |
| 10:02 | 7 | Mr. Baker hasn't said anything, but after |
| 10:02 | 8 | this trial he's going to have to make a phone call. |
| 10:02 | 9 | Could go two ways.  One phone call is:  We got away |
| 10:03 | 10 | with it again.  DJI-didn't-do-it was a winning |
| 10:03 | 11 | strategy. |
| 10:03 | 12 | The second phone call might be:  We got |
| 10:03 | 13 | to change what we're doing.  We got caught.  We have to |
| 10:03 | 14 | start respecting the law. |
| 10:03 | 15 | Which phone call's up to you. |
| 10:03 | 16 | I really appreciate your time. |
| 10:03 | 17 | THE COURT:  Thank you, sir. |
| 10:03 | 18 | Okay.  Ladies and gentlemen of the |
| 10:03 | 19 | jury -- and thank you for those closing arguments.  I |
| 10:03 | 20 | thought they were quite good. |
| 10:03 | 21 | You're going to go back to your room. |
| 10:03 | 22 | You're going to select a foreperson.  You're going to |
| 10:03 | 23 | let us know who the foreperson is, and then you're |
| 10:03 | 24 | going to begin to deliberate. |
| 10:03 | 25 | Jen will make sure you have all of the |

—1238—

10:03  1  exhibits ready to go.  And as I said, the amount of

10:03  2  time you take to resolve these issues is entirely up to

10:03  3  you.

10:03  4              THE BAILIFF:  All rise.

10:03  5              (Jury exited the courtroom.)

10:03  6              THE COURT:  Thank you.  You may be

10:04  7  seated.

10:04  8              Are we ready to take up the issue of

10:04  9  inequitable conduct?

10:04  10             MR. PANKRATZ:  Your Honor, the one

10:04  11  witness, the van wasn't there for him.  He's on his

10:04  12  way.  I think he may be here now, but he should be here

10:04  13  very shortly.

10:04  14             THE COURT:  It's the inventor, right?

10:04  15             MR. PANKRATZ:  Yes, sir.

10:04  16  Mr. Christensen.

10:05  17             MR. HIGH:  Your Honor, may I put this on

10:05  18  the witness stand?

10:05  19             THE COURT:  Sure.

10:06  20             MR. PANKRATZ:  Your Honor, he's in the

10:07  21  courthouse on his way up.  Our apologies.

10:07  22             THE COURT:  No problem.

10:07  23             MR. PANKRATZ:  May I approach,

10:07  24  Your Honor?

10:07  25             THE REPORTER:  Do y'all want this on the

-1239-

```
10:07   1   record?
10:07   2            MR. PANKRATZ:  It doesn't need to be on
10:07   3   the record.
10:07   4            (Off-the-record bench conference.)
10:08   5            MR. HIGH:  Your Honor, defendants call to
10:08   6   the stand Mr. Kevin Christensen.
10:08   7            THE COURT:  Welcome back, sir.  You'll
10:08   8   remember you're under oath.
10:08   9            THE WITNESS:  Yes.  I do.
10:08  10            THE COURT:  Okay.
10:08  11                    DIRECT EXAMINATION
10:08  12   BY MR. HIGH:
10:09  13      Q.    Good morning.
10:09  14      A.    Good morning.
10:09  15      Q.    You're the first named inventor of U.S. Patent
10:09  16   No. 9,162,752, right?
10:09  17      A.    Yes.
10:09  18      Q.    And if you'd turn to your right, you'll see a
10:09  19   binder.
10:09  20      A.    Okay.
10:09  21      Q.    Could you please turn in your binder to the
10:09  22   tab labeled JX-8?
10:09  23      A.    Okay.
10:09  24      Q.    And this is the '752 patent, correct?
10:09  25      A.    Yes.
```

10:09    1                     MR. HIGH:  Your Honor, I don't know if

10:09    2    you want us to separately admit these exhibits or if

10:09    3    this is a --

10:09    4                     THE COURT:  They've already been -- no,

10:09    5    they're in the record.

10:09    6                     MR. HIGH:  Okay.

10:09    7                     THE COURT:  If -- but you should refer to

10:09    8    them by the exhibit number that they were given during

10:09    9    trial.

10:09    10                    MR. HIGH:  Yes.

10:09    11    BY MR. HIGH:

10:09    12        Q.    And if you could put Figure 1 -- and you can

10:10    13    turn to your -- in your binder to Figure 1.

10:10    14              Just wanted to quickly walk through what this

10:10    15    figure's about.  So this outer circle that you see,

10:10    16    that's a circle representing a 10-knot groundspeed,

10:10    17    right?

10:10    18        A.    Yes.

10:10    19        Q.    And as the aircraft decelerates to below that

10:10    20    10-knot speed, the response type will change, correct?

10:10    21        A.    According to this figure.  Yes.

10:10    22        Q.    And it will specifically engage a mode called

10:10    23    automatic hover hold?

10:10    24        A.    Yes.  According to this figure.

10:10    25        Q.    And in automatic hover hold, when the cyclic

| | | |
|---|---|---|
| 10:10 | 1 | stick is in the detent position, the helicopter will |
| 10:10 | 2 | decelerate towards zero groundspeed, right? |
| 10:10 | 3 | A.    Yes. |
| 10:10 | 4 | Q.    And when that groundspeed drops below 1 knot, |
| 10:10 | 5 | a mode called position hold will automatically engage, |
| 10:11 | 6 | right? |
| 10:11 | 7 | A.    That is depicted in the figure.  Yes. |
| 10:11 | 8 | Q.    And that's represented by the smaller circle |
| 10:11 | 9 | in the middle, right? |
| 10:11 | 10 | A.    Yes. |
| 10:11 | 11 | MR. HIGH:  You can take it down. |
| 10:11 | 12 | BY MR. HIGH: |
| 10:11 | 13 | Q.    You started at Bell Textron in 2005, right? |
| 10:11 | 14 | A.    Correct. |
| 10:11 | 15 | Q.    And when you first showed up to work, your |
| 10:11 | 16 | boss at Bell Textron at the time handed you a document |
| 10:11 | 17 | called ADS-33 and told you to learn this? |
| 10:11 | 18 | A.    Yes. |
| 10:11 | 19 | Q.    If you could turn in your binder to |
| 10:11 | 20 | Defendants' Exhibit 340.  This exhibit has been |
| 10:11 | 21 | previously admitted. |
| 10:11 | 22 | Do you remember being asked questions about |
| 10:11 | 23 | this document when you testified earlier this week? |
| 10:11 | 24 | A.    Yes. |
| 10:11 | 25 | Q.    And to recap, this document identifies the |

1242

10:11   1    handling qualities requirements for military

10:11   2    rotorcraft?

10:11   3        A.    Yes.

10:11   4        Q.    And the U.S. Army issued this document?

10:12   5        A.    Correct.

10:12   6        Q.    And at the bottom of this page it says:

10:12   7    Approved for public use.  Distribution is unlimited?

10:12   8        A.    I see that.

10:12   9              MR. HIGH:  If you could turn to Page 67

10:12   10   of this document.  Referring to the bottom of the page,

10:12   11   and zoom in on Table 4 at the top.

10:12   12   BY MR. HIGH:

10:12   13       Q.    Do you recall being asked questions about this

10:12   14   table a few days ago?

10:12   15       A.    I do.

10:12   16       Q.    And just to recap, this table lists the

10:12   17   required response types for hover and low speed near

10:12   18   earth, correct?

10:12   19       A.    Yes.

10:12   20       Q.    And at the top, you see UCE-1, UCE-2 and

10:12   21   UCE-3?

10:13   22       A.    I do.

10:13   23       Q.    And UCE stands for usable cue environment?

10:13   24       A.    Correct.

10:13   25       Q.    And UCE-3 is considered the most degraded

1243

10:13  1   visual environment, right?

10:13  2       A.    It is.

10:13  3       Q.    And brownout is one example of a UCE of 3,

10:13  4   correct?

10:13  5       A.    Yes.

10:13  6       Q.    So Table 4 lists the required response types

10:13  7   for brownout conditions when at low speed and hover,

10:13  8   right?

10:13  9       A.    Yes.

10:13  10      Q.    One of those response types is TRC, which

10:13  11  stands for translational rate command, correct?

10:13  12      A.    Correct.

10:13  13      Q.    And translational rate command is where a

10:13  14  velocity command is proportional to the amount of

10:13  15  cyclic stick displacement away from the detent

10:13  16  position?

10:13  17      A.    Yes.

10:13  18      Q.    And when the cyclic stick is in the detent

10:13  19  position, it will command a zero velocity, right?

10:13  20      A.    Yes.

10:13  21      Q.    And PH in this table stands for position hold,

10:14  22  right?

10:14  23      A.    Yes.

10:14  24      Q.    So after you learned this document for your

10:14  25  job, you knew that the Army required its military

-1244-

10:14  1    rotorcraft to make translational rate command and

10:14  2    position hold available to pilots when flying in

10:14  3    brownout conditions, right?

10:14  4        A.   Yes.  For Level 1 handling qualities.

10:14  5        Q.   And Level 1 handling qualities is considered

10:14  6    the best handling qualities, right?

10:14  7        A.   Yes.  Mental pilot compensation, no

10:14  8    deficiencies that would warrant improvement.

10:14  9        Q.   Now, if you could turn in your binder to

10:14  10   Defendants' Exhibit 339.

10:14  11       And this is a paper titled "Flight Control

10:15  12   Development for the ARH-70 Armed Reconnaissance

10:15  13   Helicopter Program," right?

10:15  14       A.   Yes.

10:15  15       Q.   And you are the first named author of this

10:15  16   paper, right?

10:15  17       A.   Yes.

10:15  18               MR. HIGH:  Defendants move to admit

10:15  19   Defendants' Exhibit 339.

10:15  20               MR. PANKRATZ:  No objection.

10:15  21               THE COURT:  It's admitted.

10:15  22   BY MR. HIGH:

10:15  23       Q.   This was presented at the American Helicopter

10:15  24   Society 63rd Annual Forum in May 2007, right?

10:15  25       A.   Yes.

10:15  1          Q.    The American Helicopter Society is a

10:15  2    professional society that is focused on helping

10:15  3    academia, the military and operators of rotary-wing

10:15  4    aircraft to develop the technology for it?

10:15  5          A.    At that time it was called American Helicopter

10:15  6    Society.  They've renamed themselves.

10:15  7          Q.    They've renamed to the Vertical Flight Society

10:15  8    now, right?

10:15  9          A.    Yes.  With the same goals that you just

10:15  10   stated.

10:15  11         Q.    You attended this forum, right?

10:16  12         A.    Yes.

10:16  13         Q.    This paper was presented at the handling

10:16  14   qualities session?

10:16  15         A.    It was.

10:16  16         Q.    Did you see other papers presented at the

10:16  17   handling qualities session as well?

10:16  18         A.    Yes.

10:16  19         Q.    If you could turn to the page of this document

10:16  20   that ends in 3400.

10:16  21               And you see in the bottom right corner a mode

10:16  22   called hover hold mode?

10:16  23         A.    Yes.

10:16  24         Q.    This hover hold mode provides a translational

10:16  25   rate command position hold response type, right?

—1246—

10:16    1        A.    Yes.

10:16    2        Q.    So if you let go of the stick in this mode,

10:16    3    the helicopter will decelerate towards the speed of

10:16    4    zero?

10:16    5        A.    Yes.

10:16    6        Q.    And it will engage position hold to hold

10:16    7    position and hover, right?

10:16    8        A.    Yes.

10:16    9        Q.    Now, let's turn back to the cover page.

10:17    10            Let's -- Jeffrey W. Harding was one of your

10:17    11    coauthors on this paper, right?

10:17    12        A.    Yes.

10:17    13        Q.    Mark B. Tischler was one of your coauthors for

10:17    14    this paper, right?

10:17    15        A.    Yes.

10:17    16        Q.    Mr. Harding and Mr. Tischler helped

10:17    17    considerably with your design of your control laws,

10:17    18    right?

10:17    19        A.    I wouldn't characterize it as considerably.  I

10:17    20    would say they helped.

10:17    21        Q.    Do you recall when I took your deposition back

10:17    22    in November?

10:17    23        A.    I do.

10:17    24        Q.    Do you remember using the words

10:17    25    "considerably"?

10:17  1      A.    I don't.  I'm not doubting that I did back

10:17  2   then, though.

10:17  3                MR. HIGH:  May I approach, Your Honor?

10:18  4                THE COURT:  Let me interrupt you just to

10:18  5   tell you that Ms. Petty is the foreperson.

10:18  6                MR. HIGH:  Thank you.

10:18  7   BY MR. HIGH:

10:18  8      Q.    And do you see at -- do you see on the -- on

10:18  9   Page 59, around Line 4, you stated:  They helped

10:19 10   considerably with our design of our control laws for

10:19 11   ARH-70?

10:19 12          Do you see that?

10:19 13      A.    I do.

10:19 14      Q.    And you're referring to Mr. Harding and

10:19 15   Mr. Tischler?

10:19 16      A.    Yes.  In the deposition, I was.

10:19 17      Q.    Okay.  That was your testimony at that time?

10:19 18      A.    Yes.

10:19 19                MR. HIGH:  You can take this down.

10:19 20   BY MR. HIGH:

10:19 21      Q.    So the ARH-70 program that you were working on

10:19 22   at Bell got canceled in October of 2008, right?

10:19 23      A.    Yes.

10:19 24      Q.    And at that point you transferred from the

10:19 25   ARH-70 program into Bell's advanced control law

10:19  1    program, right?

10:19  2        A.    Yes.

10:19  3        Q.    And in 2008, right after you joined the

10:19  4    advanced control law program, you personally conducted

10:19  5    an extensive search for papers, right?

10:20  6        A.    Yes.

10:20  7        Q.    And this search was for any papers that were

10:20  8    related to advancements in control laws, right?

10:20  9        A.    I think it was more specific than that, and I

10:20  10   probably testified to that in my deposition, but it was

10:20  11   more specifically focused than that.

10:20  12       Q.    If you recall being asked -- well, do you

10:20  13   remember telling me during your deposition that your

10:20  14   search was for -- that your search was for any papers

10:20  15   that were related to advancements in control laws?

10:20  16       A.    I don't doubt that I said that in my

10:20  17   deposition.  I can't remember specifically what I said.

10:20  18   But I've given it more thought now, and it was more

10:20  19   focused than just general advancements in control laws.

10:20  20       Q.    What was it more focused on?

10:21  21       A.    We really focused on any applications to

10:21  22   implement the response types from ADS-33 that were

10:21  23   listed in that previous paragraph that we showed, and

10:21  24   also any rotary-wing aircraft that had implemented a

10:21  25   fly-by-wire technology.  We were intending to take the

10:21  1    response types to the next level with fly-by-wire

10:21  2    technology.

10:21  3         Q.   You performed this search using Bell's

       4    database of papers from the American Helicopter

10:21  5    Society?

10:21  6         A.   I did.

10:21  7         Q.   The search uncovered more than 20 papers?

10:21  8         A.   I'm not sure of the exact amount, but that

10:21  9    sounds about right.

10:21  10        Q.   And after our deposition, those papers were

10:21  11   produced to DJI?

10:21  12        A.   Yes.  I provided them with Bell's counsel --

10:21  13   to Bell's counsel.

10:21  14        Q.   So this is the first time that I've gotten to

10:22  15   ask you about those papers, right?

10:22  16        A.   Yes.

10:22  17        Q.   You shared the results of your research with

10:22  18   your team that you were working on at that time, right?

10:22  19        A.   I did.

10:22  20        Q.   And you shared the results of your research

10:22  21   mostly through discussions and figuring out how to

10:22  22   implement your design, right?

10:22  23        A.   I shared it online.  And it was 15 years ago

10:22  24   so I can't remember any discussions I had with our team

10:22  25   about any content of those papers.

1250

10:22  1      Q.    Do you remember during your deposition when I

10:22  2  asked you:  How did you share the results of your

10:22  3  search?

10:22  4      A.    I don't remember the exact words that I used

10:22  5  there.

10:22  6      Q.    Do you want to turn to Page 143 of the

10:22  7  transcript?

10:22  8      A.    Okay.

10:22  9      Q.    And Line 7, I asked:  How did you share the

10:23  10  results of your search?

10:23  11      A.    Yes.

10:23  12      Q.    And your testimony was mostly through

10:23  13  discussions and figuring out how to implement our

10:23  14  design?

10:23  15      A.    I did.  But if you go down to Line 22, I

10:23  16  elaborated on that statement.

10:23  17      Q.    Well, that was your testimony, right?

10:23  18      A.    Yes.  But I added some additional words that

10:23  19  I'd like to read here.  It says:  I believe so.  I

10:23  20  can't specifically recall whether it would have been

10:23  21  putting it out on a share drive so they could reference

10:23  22  it.

10:23  23      Q.    Right.  And that was with reference to my

10:23  24  question, did you share those papers that your research

10:23  25  uncovered with other members of your team?

10:23    1    A.    Right.

10:23    2              MR. HIGH:  You can take this down.

         3    BY MR. HIGH:

10:23    4    Q.    And you saved the copies of the papers that

10:23    5    your research uncovered, right?

10:23    6    A.    Did I save copies?

10:23    7    Q.    Yes.

10:23    8    A.    Yes.

10:23    9    Q.    That's how you were able to produce them to

10:23    10   DJI in November?

10:23    11   A.    Yes.

10:23    12   Q.    The advance control laws that you were

10:24    13   developing in the advance control law program would

10:24    14   automatically change the response type, depending on

10:24    15   how fast the helicopter was traveling and whether the

10:24    16   pilot had released the force from the pilot's

10:24    17   controller, right?

10:24    18   A.    That's one of the applications of it.

10:24    19   Q.    If you could turn in your binder to

10:24    20   Defendants' Exhibit 391.

10:24    21              This is one of the papers that your search

10:24    22   identified as relating to advancements in control laws

10:24    23   in 2008, right?

10:24    24   A.    I believe so.  I don't know all the papers,

10:24    25   but it sounds like one of the papers I would have

10:25   1    included in my research.

10:25   2        Q.    Are you aware that counsel for Textron has

10:25   3    stipulated that this is one of the papers you

10:25   4    identified?

10:25   5        A.    I'm not.  But it doesn't surprise me.

10:25   6        Q.    And this paper is titled "Optimization and

10:25   7    Piloted Simulation Results of the AH-64D Modern Control

10:25   8    Laws," right?

10:25   9        A.    Yes.

10:25   10       Q.    Jeffrey W. Harding is the first named author,

10:25   11   right?

10:25   12       A.    Yes.

10:25   13       Q.    Mark B. Tischler is another author on this

10:25   14   paper, right?

10:25   15       A.    Yes.

10:25   16       Q.    If you could scroll down to the bottom of this

10:25   17   page.  This document says it was presented at the

10:25   18   American Helicopter Society's 63rd Annual Forum in May

10:25   19   of 2007, right?

10:25   20       A.    Yes.

10:25   21       Q.    That's the same conference that you attended

10:25   22   and presented your paper at?

10:25   23       A.    Yes.  It is.

10:25   24       Q.    If you could go back up to the abstract.

10:26   25             This paper refers to:  A program to develop

—1253—

10:26  1    modern control laws for the AH-64D Apache Longbow to

10:26  2    provide improved handling qualities for hover/low speed

10:26  3    flight in a degraded visual environment.

10:26  4          Right?

10:26  5    A.    Yes.  That's what it says.

10:26  6    Q.    This paper was also presented at the handling

10:26  7    qualities session that you attended, right?

10:26  8    A.    Yes.

10:26  9    Q.    So this paper refers to a program to develop

10:26  10   modern control laws?

10:26  11   A.    That's what the title says, yes.

10:26  12   Q.    And the program at Bell that you joined a year

10:26  13   later was called advanced control laws?

10:26  14   A.    It was.

10:26  15   Q.    And if you could look at the first paragraph

10:27  16   of that introduction.

10:27  17         And the last sentence states:  The goal is to

10:27  18   improve hover/low speed handling qualities in a

10:27  19   degraded visual environment based on the requirements

10:27  20   of ADS-33E to address safety issues associated with

10:27  21   operating in harsh desert conditions where blowing sand

10:27  22   and dust cause brownouts leading to increased accident

10:27  23   rates.

10:27  24         Do you see that?

10:27  25   A.    Uh-huh.

1254

10:27 | 1    Q.    If you could turn to the page that ends in

10:27 | 2    476.  Do you see the section called mode blending?

10:27 | 3    A.    Yes.

10:27 | 4    Q.    And the second paragraph of this section has a

10:28 | 5    sentence -- the second sentence says that:  ...the

10:28 | 6    system automatically transitions from [an] attitude

10:28 | 7    command -- attitude hold to translational rate command

10:28 | 8    as the aircraft's total groundspeed goes below

10:28 | 9    10 knots.

10:28 | 10            Do you see that?

10:28 | 11    A.    Yes.

10:28 | 12    Q.    And TRC, or translational rate command, is a

10:28 | 13    response type where putting the cyclic stick in detent

10:28 | 14    commands a groundspeed of zero?

10:28 | 15    A.    I don't see that.

10:28 | 16    Q.    That's what you testified earlier, right?

10:28 | 17    A.    Oh, you're not referring to what's in the

10:28 | 18    paper.

10:28 | 19    Q.    No.  I'm asking you.

10:29 | 20    A.    Oh, okay.  Yes.  TRC, release the stick, it

10:29 | 21    goes to zero.

10:29 | 22    Q.    If you could look at the last paragraph on

10:29 | 23    this page.

10:29 | 24            The last sentence that we can see is:  Below 1

10:29 | 25    knot, position hold automatically captures position

1255

| | | |
|---|---|---|
| 10:29 | 1 | over the ground. |
| 10:29 | 2 | Do you see that? |
| 10:29 | 3 | A. Yes. |
| 10:29 | 4 | Q. You understood at the time of filing the '752 |
| 10:29 | 5 | patent that you had a duty to provide information |
| 10:29 | 6 | material to patentability of the claimed invention that |
| 10:29 | 7 | you knew about to the Patent Office, right? |
| 10:29 | 8 | A. Yes. |
| 10:29 | 9 | Q. You signed an oath to that matter for the '752 |
| 10:29 | 10 | patent application? |
| 10:29 | 11 | A. I did. |
| 10:29 | 12 | Q. During your search you discovered information |
| 10:30 | 13 | material to the patentability of your claimed |
| 10:30 | 14 | invention, correct? |
| 10:30 | 15 | A. I know I said during my deposition yes to |
| 10:30 | 16 | that, but I didn't understand the legal -- that that |
| 10:30 | 17 | was legal terminology that you were using. |
| 10:30 | 18 | So I would say no now. |
| 10:30 | 19 | Q. But that was your testimony at the time, that |
| 10:30 | 20 | you said yes? |
| 10:30 | 21 | A. Yes. Not understanding that was a patent |
| 10:30 | 22 | legal term that you were using. |
| 10:30 | 23 | Q. But during your deposition also you confirmed |
| 10:30 | 24 | that you understood you had a duty to provide |
| 10:30 | 25 | information material to the patentability to the Patent |

10:30  1  Office, right?

10:30  2       A.    Yes.

10:30  3                 MR. HIGH:  If you could pull back up the

10:30  4  '752 patent, and if you could go to Column 1.

5  BY MR. HIGH:

10:31  6       Q.    And in the description of the prior art you

10:31  7  refer repeatedly to problems associated with brownout,

10:31  8  right?

10:31  9       A.    Yes.

10:31  10      Q.    And you discuss how brownout crashes have

10:31  11 claimed more helicopters in recent military operations

10:31  12 than all other threats combined?

10:31  13      A.    Yes.

10:31  14      Q.    And this patent application is directed to

10:31  15 existing aircraft sensors, actuators and control laws

10:31  16 to help the pilot overcome brownout, right?

10:31  17      A.    Yes.

10:31  18                MR. HIGH:  If you could go back to the

10:31  19 cover page.

10:31  20 BY MR. HIGH:

10:31  21      Q.    And if you look at the references cited

10:31  22 section, you don't see any papers listed under the

10:32  23 references cited section of the '752 patent, do you?

10:32  24      A.    Not on this page.  This does continue, though.

10:32  25      Q.    If you want to turn in your binder to Joint

10:32  1   Exhibit 8, you're welcome to.

10:32  2        A.    I'm sorry.  I lost track of where the patent

10:32  3   was in here.

10:32  4        Q.    It's the very first tab.

10:32  5        A.    Okay.

10:32  6        Q.    So in the references cited section you don't

10:32  7   see any papers listed, right?

10:32  8        A.    I see other publications.  And I'm not sure

10:32  9   what the numbers on there mean.  I'm not a lawyer.

10:32  10  So...

10:32  11       Q.    All the other -- all the things listed in

10:32  12  other publications refer to documents from patent

10:32  13  applications either in the U.S. or internationally.

10:33  14       A.    Okay.

10:33  15       Q.    So none of the papers you uncovered in your

10:33  16  search were disclosed to the Patent Office, right?

10:33  17       A.    No.  I wouldn't say that.

10:33  18       Q.    No, they weren't disclosed, or you disagree

10:33  19  with my -- my statement?

10:33  20       A.    I don't know what was disclosed to the Patent

10:33  21  Office.  That was the realm of my patent attorney.

10:33  22            THE COURT:  Could you say that again?

10:33  23  I'm not sure I followed what you meant.

10:33  24            THE WITNESS:  He asked if any of the

10:33  25  papers were disclosed to the Patent Office, and I guess

10:33   1    I don't know what my patent attorney disclosed to the

10:33   2    Patent Office.

10:33   3                    THE COURT:  Okay.  That's not what I

10:33   4    heard, but thank you.

10:33   5                    THE WITNESS:  Okay.  That's what I meant.

10:33   6                    THE COURT:  Okay.

10:33   7    BY MR. HIGH:

10:33   8        Q.    The papers aren't listed in the patent though?

10:33   9        A.    I don't see any papers listed in the patent.

10:33   10       Q.    ADS-33 isn't listed on the patent, right?

10:33   11       A.    I don't see that listed in the patent.

10:34   12       Q.    And your 2007 paper describing a hover hold

10:34   13   wasn't disclosed to the Patent Office, was it?

10:34   14       A.    By "disclosed to the Patent Office," it's not

10:34   15   listed in the patent.  So that...

10:34   16       Q.    Did you disclose these papers to your

10:34   17   attorney?

10:34   18       A.    So this was 12 years ago.  I don't remember

10:34   19   exactly what I provided the attorney.  I do know that

10:34   20   we talked about the research that we completed and made

10:34   21   him aware that that was out there.

10:34   22       Q.    And you decided not to disclose that to the

10:34   23   Patent Office?

10:34   24                    THE COURT:  He decided or the attorney

10:34   25   decided?

1    BY MR. HIGH:

2       Q.   Either you or your attorney decided not to

3    disclose that to the Patent Office?

4                MR. PANKRATZ:  Objection.  Calls for

5    speculation.

6                THE COURT:  You need to establish whether

7    he had any role in deciding what would be -- his

8    testimony is he disclosed it to his attorney.  If he

9    can remember whether or not he had anything to do with

10   whether or not it got disclosed to the Patent Office,

11   that might be important.

12               But I'll sustain the objection.

13   BY MR. HIGH:

14      Q.   Did you give copies of the papers to your

15   patent attorney?

16      A.   I don't recall what I gave to my patent

17   attorney that long ago, 12 years ago.  I don't recall

18   exactly what I provided to him.  He was aware of the

19   research, though, and I gave him everything he asked

20   for.

21               MR. HIGH:  No further questions.

22               MR. PANKRATZ:  Mr. Fisher, may I borrow

23   your services?  Can you bring up DX-391 which you were

24   displaying -- counsel was displaying?

25               And go to that portion that y'all had on

10:35    1    the screen, if you could.

10:35    2                        CROSS-EXAMINATION

10:35    3    BY MR. PANKRATZ:

10:36    4        Q.    Mr. Christensen, you see at the bottom, the

10:36    5    paragraph that counsel was asking you about?  It

10:36    6    begins:  PH is available.

10:36    7              Do you see that?

10:36    8        A.    The part that's highlighted?

10:36    9        Q.    No, no, no, no.  He did not highlight this

10:36   10    part.

10:36   11        A.    Oh, okay.  Yes.  I see that part, yes.

10:36   12        Q.    And it reads:  PH is available below 5 knots

10:36   13    by cycling the FTR button.

10:36   14              Do you see that?

10:36   15        A.    Yes.

10:36   16        Q.    Okay.  So pushing a button?

10:36   17        A.    Yes.

10:36   18        Q.    That's what cycling a button is?

10:36   19        A.    Yes.

10:36   20        Q.    Okay.

10:36   21                  MR. PANKRATZ:  You can -- thank you,

10:36   22    Mr. Fisher.

10:36   23    BY MR. PANKRATZ:

10:36   24        Q.    Sir, do you have an understanding, generally,

10:36   25    of the allegations being made against you by counsel?

10:36  1          A.    I do.

10:36  2          Q.    They're -- they've accused you in their

10:37  3    documents of intending to deceive the Patent Office?

10:37  4          A.    Yes.

10:37  5          Q.    Did you, sir, intend to deceive the Patent

10:37  6    Office?

10:37  7          A.    I did not.

10:37  8          Q.    Do you have any knowledge as to whether or not

10:37  9    the patent attorney who worked with you intended to

10:37  10   deceive the Patent Office?

10:37  11         A.    I have no knowledge of that.

10:37  12         Q.    How did it make you feel when you learned that

10:37  13   you were being accused of intending to deceive the

10:37  14   Patent Office?

10:37  15         A.    Honestly, very offended.  I try to have

10:37  16   complete integrity in my career, throughout my career,

10:37  17   and I kind of take it personal when someone questions

10:37  18   that.  And I've been honest here today, and I've been

10:37  19   honest throughout my career.

10:37  20         Q.    Thank you, sir.  I have no more questions.

10:37  21         A.    Thank you.

10:37  22               THE COURT:  Let me ask you a couple

10:37  23   questions.

10:37  24               Did you provide everything to your

10:37  25   attorney that you understood to be relevant material?

—1262—

| | | |
|---|---|---|
| 10:37 | 1 | THE WITNESS:  I did. |
| 10:37 | 2 | THE COURT:  Did you instruct your |
| 10:38 | 3 | attorney to withhold anything from the Patent Office? |
| 10:38 | 4 | THE WITNESS:  I did not. |
| 10:38 | 5 | THE COURT:  Did you make the decision of |
| 10:38 | 6 | what he presented to the Patent Office? |
| 10:38 | 7 | THE WITNESS:  No. |
| 10:38 | 8 | THE COURT:  Did you act in any way with |
| 10:38 | 9 | any intent to deceive the Patent Office? |
| 10:38 | 10 | THE WITNESS:  No.  I did not. |
| 10:38 | 11 | THE COURT:  We're done. |
| 10:38 | 12 | I'm going to deny the motion, or whatever |
| 10:38 | 13 | it is, with respect to the inequitable conduct |
| 10:38 | 14 | actually, and I'll put down I'm relatively offended by |
| 10:38 | 15 | the allegation as well.  So... |
| 10:38 | 16 | MR. PANKRATZ:  Thank you, Your Honor. |
| 10:38 | 17 | And procedurally, we have objections |
| 10:38 | 18 | pending to you on the denial of the summary judgment |
| 10:38 | 19 | motion we filed.  You could simply rule in favor of our |
| 10:38 | 20 | objection and -- |
| 10:38 | 21 | THE COURT:  I don't think I want to do it |
| 10:38 | 22 | in the form of a summary judgment. |
| | 23 | MR. PANKRATZ:  Okay. |
| 10:38 | 24 | THE COURT:  We've had evidence now and |
| 10:38 | 25 | so -- |

10:38   1                    MR. PANKRATZ:  Understood.

10:38   2                    THE COURT:  -- I'd rather the -- it be

10:38   3    clear on the record that we had a trial on the issue

10:38   4    and that I'm affirmatively finding that there was no

10:39   5    inequitable conduct.

10:39   6                    MR. PANKRATZ:  Thank you, Your Honor.

10:39   7                    THE COURT:  I think that's -- I don't

10:39   8    want the record to appear that there was a summary

10:39   9    judgment because they failed to put, you know --

10:39  10                    MR. PANKRATZ:  Understood.  And I

10:39  11    actually appreciate that even more.  Thank you.

10:39  12                    THE COURT:  Okay.  If you all would be so

10:39  13    kind as to have one lawyer remain in the courtroom or

10:39  14    right around the bend so when we get a jury note, I can

10:39  15    bring it out and read it to you and let you know what

10:39  16    the questions are.

10:39  17                    If we get close to the lunch hour, we'll

10:39  18    make a game-time decision what to do about leaving them

10:39  19    here and running out somewhere and getting lunch.  But

10:39  20    we'll -- let's wait for, you know, the next hour or so

10:39  21    and see what they do.

10:39  22                    MR. MEEK:  We need to have some of these

10:39  23    exhibits sealed, Your Honor.

10:39  24                    THE COURT:  Okay.  Y'all can -- I don't

10:39  25    think I need to be involved in that.

1264

| | | |
|---|---|---|
| 10:40 | 1 | MR. MEEK:  No. |
| 10:40 | 2 | THE COURT:  Sir, you may step down, and |
| 10:40 | 3 | thank you for your service. |
| 10:40 | 4 | THE WITNESS:  Thank you, sir. |
| 10:40 | 5 | THE BAILIFF:  All rise. |
| 10:40 | 6 | (Recess taken.) |
| 01:22 | 7 | THE COURT:  I have two notes, but they're |
| 01:22 | 8 | basically the same. |
| 01:22 | 9 | Jury Note No. 2 says:  Can we see the |
| 01:22 | 10 | drone that was used to fly in the courtroom? |
| 01:22 | 11 | Jury Note No. 3 is:  Can we see the white |
| 01:22 | 12 | drone? |
| 01:22 | 13 | The answer's going to be no.  I'll write |
| 01:22 | 14 | out the answer, and then I'll read it to you. |
| 01:22 | 15 | MR. SPEEGLE:  Okay. |
| 01:22 | 16 | THE COURT:  They were not admitted into |
| 01:22 | 17 | evidence, right?  They were demonstratives. |
| 01:22 | 18 | MR. PALMER:  Actually, this one was, |
| 01:22 | 19 | Your Honor.  You know, one of the questions was because |
| 01:22 | 20 | it has a camera.  But if you -- if the Court personnel |
| 01:22 | 21 | is in there, I think we could probably solve that |
| 01:22 | 22 | problem if they want to look at it. |
| 01:22 | 23 | MR. SCHLESINGER:  We can take the battery |
| 01:22 | 24 | out. |
| | 25 | THE COURT:  I'm not worried about the |

01:22   1   battery.

01:22   2                  (Off-the-record discussion.)

01:22   3                  THE COURT:  If this is in evidence, then

01:22   4   why don't they get it?

01:22   5                  DEPUTY CLERK:  988 was the photo of one

01:23   6   of them, Defendants' 988, and I don't know if there's a

01:23   7   photo of the other one.

01:23   8                  MR. SCHLESINGER:  That was the only one I

01:23   9   moved into evidence.

01:23   10                  THE COURT:  And you moved this into

01:23   11   evidence without objection?

01:23   12                  MR. SCHLESINGER:  Yes, Your Honor.

01:23   13                  MR. PALMER:  Correct.

01:23   14                  DEPUTY CLERK:  It's Exhibit

01:23   15   Defendant 988.

01:23   16                  THE COURT:  So why would they not get it?

01:23   17                  MR. SPEEGLE:  We had a discussion

        18   about --

01:23   19                  THE COURT:  I remember having a

01:23   20   discussion, but I didn't remember that it had been

01:23   21   moved into evidence, which means this has been moved

01:23   22   into evidence.

01:23   23                  DEPUTY CLERK:  The photo.

01:23   24                  MR. PALMER:  It was the actual drone.

01:23   25                  THE COURT:  Yeah.  I thought it was a

```
01:23   1    demonstrative.  And so what is plaintiff's argument --
01:23   2    what is plaintiff's argument as to why they shouldn't
01:23   3    get it if it's in evidence?  If the physical object is
01:23   4    in evidence?
01:23   5                MR. SPEEGLE:  Your Honor, we were a
01:23   6    little concerned about having the recording device in
01:23   7    the jury room, and that's why we suggested removing the
01:23   8    camera -- or should we remove the battery so it
01:23   9    couldn't be used to record anything in there.
01:23  10                THE COURT:  Oh.  So the battery is not a
01:23  11    safety feature.  The battery has to do with recording?
01:23  12                MR. SPEEGLE:  Yes, Your Honor.
01:23  13                THE COURT:  I don't want -- I can just
01:24  14    tell -- tell them that they can't use the recording
01:24  15    feature.  I'll put that in the note.
01:24  16                MR. SPEEGLE:  Your Honor, if you're
01:24  17    inclined to let it go back there, I don't think we have
01:24  18    any other objections.
01:24  19                MR. SCHLESINGER:  Your Honor, would you
01:24  20    like me to attach the sticks to the remote?  They're
01:24  21    currently detached but when he had it up on the witness
01:24  22    stand, they were attached.  Either way is fine with us.
01:24  23    I just wanted to offer that up.
01:24  24                THE COURT:  I'm going to send it back
01:24  25    like this.
```

```
          1              MR. SPEEGLE:  Okay.
01:24     2              THE COURT:  And I'll put in the note that
01:24     3    they may not use the recording feature while they're
01:24     4    deliberating.
01:24     5              MR. SCHLESINGER:  Okay.
01:24     6              (Off-the-record discussion.)
01:24     7              (Conference between counsel.)
01:24     8              THE COURT:  Okay.
01:24     9              MR. PALMER:  Judge, it was out of the box
01:24    10    and actually has a stamp on the actual device too.
01:24    11              THE COURT:  Okay.  Was this the one that
         12    was flown?
01:24    13              MR. PALMER:  Yes, sir.
01:24    14              MR. SCHLESINGER:  Oh, no.  That was not
         15    the one that was flown.
01:25    16              THE COURT:  Okay.  I didn't think this
01:25    17    was the one that was flown.
01:25    18              MR. SPEEGLE:  Was the one that was flown
         19    admitted into evidence?
01:25    20              THE COURT:  No.  They're not getting
01:25    21    that.
01:25    22              MR. SPEEGLE:  The ones that they've asked
01:25    23    for are not the ones that were admitted into evidence?
         24              THE COURT:  The one they asked -- the
01:25    25    white drone is this one.  I'm assuming it's the one --
```

```
01:25   1                    MR. SPEEGLE:  Well, we had a large
01:25   2     Phantom that was a demonstrative as well.
01:25   3                    MR. SCHLESINGER:  Yeah.  That's white
01:25   4     too.
01:25   5                    MR. PANKRATZ:  Was it admitted into
01:25   6     evidence?
01:25   7                    MR. SPEEGLE:  No.  That one in the box
01:25   8     was admitted into evidence.  It was not the one flown,
01:25   9     and it was not the large white one over here.
01:25  10                    THE COURT:  So there are two white
01:25  11     drones, and we don't know which one they want?
01:25  12                    MR. SPEEGLE:  That's possible,
01:25  13     Your Honor.
01:25  14                    DEPUTY CLERK:  But neither was admitted.
01:25  15                    MR. SPEEGLE:  Well, that one was
01:25  16     admitted.
01:25  17                    THE COURT:  998 is a white drone, and it
01:25  18     was admitted.
01:25  19                    Okay.  Let me do the -- I'm going to
01:25  20     start with the drone that was used to fly in the
01:25  21     courtroom.
01:26  22                    And then we have the question of which
01:26  23     white drone they want.  So I'm willing to in the note
01:26  24     ask them if they -- which white drone -- I'm willing to
01:26  25     ask them, if y'all agree to that, which white drone you
```

01:26  1    want.  One is in evidence and one isn't.

01:26  2                    And that would make -- that's how I would

01:27  3    make my decision on whether or not they can have it.

01:27  4                    MR. SPEEGLE:  That seems reasonable,

01:27  5    Your Honor.

01:27  6                    THE COURT:  So on Jury Note No. 2 I've

01:27  7    written:  The drone that was flown in the courtroom was

01:27  8    not admitted into evidence, therefore, the answer is

01:27  9    no.

01:27  10                   On this one I'm going to put something

01:27  11   along the lines of:  There were two white drones shown

01:27  12   to the jury during the trial.  Which white drone are

01:27  13   you speaking of?

01:27  14                   And this one is large -- can I put large

01:27  15   or small?

01:27  16                   MR. SCHLESINGER:  This one's the smaller

01:27  17   one.  If it helps, it's the one that was with

01:27  18   Dr. Nourbakhsh.  He only had this one.

01:27  19                   MR. PALMER:  It was the one that was

01:27  20   sitting up there forever.

01:27  21                   THE COURT:  I'm just going to say:

01:27  22   One -- do you want the large one or the small one?

       23                   MR. SPEEGLE:  That seems reasonable,

01:27  24   Your Honor.

01:27  25                   MR. SCHLESINGER:  Your Honor, since that

01:27    1    is already admitted into evidence, shouldn't it be back

01:27    2    there?

01:27    3                    THE COURT:  They have a photo of it.  But

01:28    4    I'm not sure that it should not be back there

01:28    5    regardless.

01:28    6                    MR. PALMER:  I think it should be,

01:28    7    Your Honor.  I think that's our position is it should

01:28    8    be back there.

01:29    9                    THE COURT:  Okay.  I'm going to wait to

01:29    10   resolve your issue, because it may -- depending on how

01:29    11   they answer it.

01:29    12                   I understand defendants' position is that

01:29    13   ought to go -- that the exhibit ought to go back.  I

01:29    14   got that.

01:29    15                   I'm going to ask them this question.  If

01:29    16   they say the small one, it will -- I'm going to send it

01:29    17   back.  If they say the large one, I'll take up

01:29    18   separately whether or not that one goes back or not.

01:29    19                   So let me just say -- and what I've

01:29    20   written is:  There were two white drones shown to the

01:29    21   jury during trial.  Are you asking about the large one

01:29    22   or the small one?

01:29    23                   (Pause in proceedings.)

01:29    24                   THE COURT:  And let me make sure I have

01:29    25   your permission.  I'm going to have William hand them

| | | |
|---|---|---|
| 01:29 | 1 | both and ask them if they would answer No. 2 |
| 01:29 | 2 | immediately -- No. 3 immediately so I can get their |
| 01:29 | 3 | answer, and we can keep going on this.  If you're okay |
| 01:30 | 4 | with him asking them to answer on No. 3? |
| 01:30 | 5 | MR. SCHLESINGER:  Yes, Your Honor. |
| 01:30 | 6 | MR. SPEEGLE:  Yes, Your Honor. |
| 01:30 | 7 | THE COURT:  But it needs to go on a |
| 01:30 | 8 | separate note. |
| 01:30 | 9 | (Pause in proceedings.) |
| 01:31 | 10 | THE COURT:  They responded by saying:  We |
| 01:32 | 11 | would like the large white drone, which also is not in |
| 01:32 | 12 | evidence, right? |
| 01:32 | 13 | MR. SPEEGLE:  Yes, Your Honor. |
| 01:32 | 14 | THE COURT:  So I'm going to answer this |
| 01:32 | 15 | one the same:  It's not in evidence, you don't get it. |
| 01:32 | 16 | Now, the question is what to do with the |
| 01:32 | 17 | smaller one which I am now of the opinion ought to go |
| 01:32 | 18 | back there. |
| 01:32 | 19 | Let me hear from the plaintiff as to why |
| 01:32 | 20 | it should. |
| 01:32 | 21 | MR. SPEEGLE:  Your Honor, we are |
| 01:32 | 22 | concerned about recording anything in the jury room. |
| 01:32 | 23 | We think these -- it's kind of hard to know how you |
| 01:32 | 24 | have it turned on, if the jury's especially going to |
| 01:32 | 25 | turn on the controllers to do anything with it. |

01:32  1                    THE COURT:  So are you all -- by "you

01:32  2      all," the defendant -- able to take the battery out?

       3                    MR. SPEEGLE:  Yeah.

01:32  4                    THE COURT:  And would that prevent that?

01:32  5                    MR. SCHLESINGER:  My understanding is it

01:32  6      would, Your Honor.

01:32  7                    No, no.  I can take it out, I believe.

01:32  8                    THE COURT:  Please.  Please do.

01:32  9                    MR. MEEK:  Both the controller and the

01:32  10     drone?

01:32  11                    MR. SCHLESINGER:  I don't think there's a

01:32  12     recorder on the controller.

01:33  13                    Should I put the sticks on there like it

01:33  14     was when it was up on the stand or leave it just like

01:33  15     this?

01:33  16                    THE COURT:  I would leave it like that.

01:33  17                    MR. SCHLESINGER:  Okay.

01:34  18                    THE COURT:  It's disabled from being able

01:34  19     to record, right?

01:34  20                    MR. SCHLESINGER:  That's my

01:34  21     understanding.  I think it doesn't have a camera.  The

01:34  22     camera is on the drone and the drone can't turn on

01:34  23     without the battery, is my understanding.

01:34  24                    THE COURT:  Okay.  I have written:  The

01:34  25     large white drone was not admitted into evidence,

—1273—

01:34  1   therefore, the answer is no.  I am sending you the

01:35  2   physical version of Exhibit 988 --

01:35  3                    Did I get the number right?

01:35  4                    DEPUTY CLERK:  Yes, sir.

01:35  5                    THE COURT:  -- of 988.  You already have

01:35  6   a photo of it.

01:35  7                    (Pause in proceedings.)

01:35  8                    MR. PALMER:  Quick question, Your Honor.

       9                    THE COURT:  Sure.

01:35  10                   MR. PALMER:  Do we need to tell them that

01:35  11  it's not the full exhibit since the battery's out?

01:35  12                   THE COURT:  No.

01:35  13                   MR. PALMER:  All right.

01:35  14                   THE COURT:  If they -- if they find that

01:35  15  the battery's out, then I may worry about them.

01:35  16                   (Laughter.)

02:49  17                   (Recess taken.)

02:50  18                   THE BAILIFF:  All rise.

02:50  19                   THE COURT:  Please remain standing for

02:50  20  the jury.

02:50  21                   (Jury entered the courtroom.)

02:50  22                   THE COURT:  Thank you.  You may be

02:50  23  seated.

02:50  24                   Ms. Petty, it's my understanding you are

02:50  25  the foreperson?

1274

02:50    1                    JUROR:  Yes, sir.

02:50    2                    THE COURT:  Okay.

02:50    3                    Thank you, ma'am.

02:50    4                    I would ask the jurors to listen

02:50    5    carefully as I read this verdict, because after I

02:50    6    finish reading it, I'm going to ask all of you who

02:50    7    agree with -- if I read it correctly, to stand to show

02:51    8    the unanimity of your decisions.

02:51    9                    So Questions No. 1:  Did Textron

02:51   10    Innovations prove by a preponderance of the evidence

02:51   11    that DJI directly infringed the following asserted

02:51   12    claims:

02:51   13                    With respect to the '909 patent, Claim 1,

02:51   14    yes.

02:51   15                    Claim 7, yes.

02:51   16                    Claim 10, yes.

02:51   17                    Claim 11, yes.

02:51   18                    The '752 patent:  Claim 13, yes.

02:51   19                    With regard to Question No. 2:  Did

02:51   20    Textron Innovations prove by a preponderance of the

02:51   21    evidence that DJI actively induced infringement of the

02:51   22    following asserted claims:

02:51   23                    With respect to the '909 patent, Claim 1,

02:51   24    yes.

02:51   25                    Claim 7, yes.

02:51  1              Claim 10, yes.

02:51  2              Claim 11, yes.

02:51  3              '752 patent:  Claim 13, yes.

02:51  4              Now, with respect to Question No. 3:  Did

02:52  5    Textron Innovations prove by a preponderance of the

02:52  6    evidence that the -- that DJI's infringement of the

02:52  7    '909 patent was willful?

02:52  8              Answer, yes.

02:52  9              3B:  Did Textron Innovations prove by a

02:52  10   preponderance of the evidence that the infringement of

02:52  11   the '752 patent was willful?

02:52  12             The answer is yes.

02:52  13             With regard to Question No. 4:  Did DJI

02:52  14   prove by clear and convincing evidence that the

02:52  15   following asserted claims are invalid:

02:52  16             With respect to the '909 patent, Claim 1,

02:52  17   no.

02:52  18             Claim 7, no.

02:52  19             Claim 10, no.

02:52  20             Claim 11, no.

02:52  21             With regard to the '752 patent, Claim 13,

02:52  22   no.

02:52  23             With regard to the damages question, what

02:52  24   sum of money has Textron Innovations proven by the

02:52  25   preponderance of the evidence would fairly and

02:52  1  reasonably compensate Textron Innovations for any

02:52  2  infringement of the asserted claims by DJI:

02:52  3           With respect to the '909 patent, the

02:53  4  answer is $30.7 million.

02:53  5           With respect to the '752 patent, the

02:53  6  answer is $248.2 million.

02:53  7           And then it is signed by Ms. Petty.

02:53  8           Would everyone who is on the jury who

02:53  9  agreed with the verdict as I read it please stand?

02:53  10           Let the record reflect all members are

02:53  11  standing.

02:53  12           You may be seated.

02:53  13           Let me start by thanking the jurors for

02:53  14  their time here.  I get to talk to you and thank you on

02:53  15  behalf of the plaintiff and their counsel, on behalf of

02:53  16  the defendant and their counsel.

02:53  17           I was watching you throughout the trial,

02:53  18  and I was -- I'm always amazed at how attentive jurors

02:53  19  are and how carefully you were paying attention.  I was

02:53  20  even more impressed by your good humor throughout the

02:53  21  week, and so I'm very grateful.

02:53  22           So I've told you in the past you may not

02:54  23  talk to anyone about the case.  That is no longer true.

02:54  24  It's America.  You can talk to whoever you want; you

02:54  25  can not talk to anyone you want with one exception --

02:54  1    two exceptions.

02:54  2              One is, I would ask that you not discuss

02:54  3    with anybody what you discussed while you were

02:54  4    deliberating in the privacy of the jury room.  I think

02:54  5    that ought to remain confidential and private.  And so

02:54  6    I would ask you not to reveal to anyone what you all

02:54  7    discussed while you were deliberating to the extent it

02:54  8    related to the case.

02:54  9              Number two, the lawyers and the -- their

02:54  10   clients may not talk to you about the case.  So you can

02:54  11   talk to whoever you want, but they are not in that

02:54  12   universe of people.

02:54  13             Now, after -- in a second, after I say a

02:54  14   couple of words to the lawyers, I'm going to make a

02:54  15   request that the seven of you favor me by, when you go

02:54  16   back to the jury room, staying for just a minute or two

02:55  17   to let me thank you in person for your service.

02:55  18             But it's been a long week.  If you've had

02:55  19   enough of me and us and you want to just get in there

02:55  20   and keep going, it's America, and you can do that too.

02:55  21   But I would like the chance to thank you in person for

02:55  22   your service this week.

02:55  23             Now, let me turn to the lawyers.  I

02:55  24   always get to this point.  I always get choked up a

02:55  25   little bit because I think it's so important, what we

02:55  1    do.

02:55  2                It's so amazing to me that we can have

02:55  3    disputes between two parties, and we find seven people

02:55  4    who are completely uninterested -- or disinterested in

02:55  5    what they're fighting over, and we ask those seven

02:55  6    people to take a week out of their lives, sit and

02:55  7    listen to evidence and come up with a verdict.

02:55  8                You all were blessed to have some of the

02:55  9    very best lawyers that I've seen in the courtroom

02:55  10   trying the case.  One side is happier than the other,

02:56  11   but that is always the way it is when you go to trial.

02:56  12               I don't think the fact that one side won

02:56  13   and the other side didn't is any reflection on the

02:56  14   quality of the lawyers who were involved.  I thought

02:56  15   everyone did a very, very good job during the case.

02:56  16   And on the things where you could make my life easier,

02:56  17   you did, and it was appreciated.  And on the things

02:56  18   where you had to make my life difficult to represent

02:56  19   your clients, you did that as well, and I respect you

02:56  20   for doing that.

02:56  21               So I want to thank the lawyers who were

02:56  22   in front of me.  I hope I get to have the -- I hope I

02:56  23   get to see you all again in court, and I want -- hope

02:56  24   you all have a good weekend.

02:56  25               And -- but, ladies and gentlemen of the

                                                                          1279

02:56  1   jury, you are excused.

02:56  2                  THE BAILIFF:  All rise.

02:56  3                  (Jury exited the courtroom.)

02:56  4                  THE COURT:  You may be seated.

02:57  5                  Ladies and gentlemen, let me, without the

02:57  6   jury in here, again, say thank you for -- I thought it

02:57  7   was a very well-tried case.  I appreciate the hard work

02:57  8   that you all obviously put into this.

02:57  9                  And the quality of the lawyering was the

02:57 10   reason I continue to feel like I'm so blessed to have

02:57 11   this job and I get to preside over patent trials.  I

02:57 12   just think the quality of lawyers is uniformly

02:57 13   exceptional, and it was so in this case.

02:57 14                  Is there anything we need to take up from

02:57 15   the plaintiff?

02:57 16                  MR. MEEK:  No, Your Honor.

02:57 17                  THE COURT:  Anything from the defendant?

02:57 18                  MR. SCHROEDER:  No, Your Honor.

02:57 19                  THE COURT:  Okay.  I hope to see all of

02:57 20   you again in the relatively near future.

02:57 21                  THE BAILIFF:  All rise.

02:57 22                  (Hearing adjourned.)

      23

      24

      25

-1280-

1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS    )

3

4

5                I, Kristie M. Davis, Official Court

6   Reporter for the United States District Court, Western

7   District of Texas, do certify that the foregoing is a

8   correct transcript from the record of proceedings in

9   the above-entitled matter.

10               I certify that the transcript fees and

11  format comply with those prescribed by the Court and

12  Judicial Conference of the United States.

13               Certified to by me this 30th day of April

14  2023.

15

16                         */s/ Kristie M. Davis*
                           KRISTIE M. DAVIS
17                         Official Court Reporter
                           800 Franklin Avenue
18                         Waco, Texas 76701
                           (254) 340-6114
19                         kmdaviscsr@yahoo.com

20

21

22

23

24

25